**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM, UNITED STATES HOUSE OF REPRESENTATIVES,<br><br>*Plaintiff*,<br><br>v.<br><br>ERIC H. HOLDER, JR.,<br>in his official capacity as Attorney General of the United States,<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:12-cv-1332 (ABJ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

KERRY W. KIRCHER, D.C. Bar # 386816
General Counsel
WILLIAM PITTARD, D.C. Bar # 482949
Deputy General Counsel
CHRISTINE DAVENPORT
Senior Assistant Counsel
TODD B. TATELMAN
Assistant Counsel
MARY BETH WALKER, D.C. Bar # 501033
Assistant Counsel
ELENI M. ROUMEL
Assistant Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
202/225-9700 (telephone)
202/226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and Government Reform, U.S. House of Representatives*

November 21, 2012

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ..................................................................................................... 1

CONSTITUTIONAL CONTEXT ............................................................................... 8

FACTUAL BACKGROUND ..................................................................................... 10

ARGUMENT ........................................................................................................... 11

I.     The Attorney General's Ungrounded, Abstract, and Self-Serving "Separation of
Powers" Notions Are Wrong. ................................................................... 12

     A.     The Attorney General's "It's All Politics" Argument Is Wrong. ................. 12

     B.     The Attorney General's "Balance of Power" Argument Is Wrong. .............. 16

     C.     The Attorney General's "Alternative Remedies" Argument Is Wrong. ......... 17

II.     The Oversight Committee Has Standing. .................................................. 19

     A.     Binding Circuit Precedent Establishes That the Committee Has Standing. ...19

     B.     The Attorney General's "No Standing" Arguments Are Wrong. ................... 24

          1.     The Committee Plainly Has Suffered an Informational Injury. ........ 24

          2.     *Raines v. Byrd* Supports the Committee's Standing. .......................... 27

          3.     The Other Cases the Attorney General Cites Do Not Support His
"No Standing" Argument. ................................................................ 31

III.     The Oversight Committee Has a Cause of Action. ................................... 32

     A.     The Committee Has a Cause of Action under the Declaratory Judgment
Act. ................................................................................................. 32

     B.     The Committee Possesses an Implied Right under the Constitution to Seek
This Court's Aid in Enforcing the Holder Subpoena. ................................ 37

IV.    The Court Should Reach the Merits of the Oversight Committee's Claims................42

       A.    The Court Should Exercise Its Discretion under the Declaratory Judgment
            Act....................................................................................................................42

       B.    The Court Should Not Decline to Hear This Case on the Basis of the Attorney
            General's Generic and Self-Serving Separation of Powers
            Notions.............................................................................................................46

V.    The Court Has Statutory Jurisdiction. ........................................................................47

       A.    The Court Has Jurisdiction under 28 U.S.C. § 1331. .....................................47

       B.    The Court Has Jurisdiction under 28 U.S.C. § 1345. .....................................51

CONCLUSION....................................................................................................................53

CERTIFICATE OF SERVICE

EXHIBITS

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*,
  300 U.S. 227 (1937).........................................................................34, 35

*Allen v. Wright*,
  468 U.S. 737 (1984)..............................................................................19

*Anderson v. Dunn*,
  19 U.S. (6 Wheat.) 204 (1821).............................................................10

*Barenblatt v. United States*,
  360 U.S. 109 (1959)...........................................................................8, 24

*Barnes v. Kline*,
  759 F.2d 21 (D.C. Cir. 1985).................................................................31

*Bowsher v. Synar*,
  478 U.S. 714 (1986)..............................................................................13

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002)...............................................................10

*Buck v. Am. Airlines, Inc.*,
  476 F.3d 29 (1st Cir. 2007)....................................................................37

*Buckley v. Valeo*,
  424 U.S. 1 (1976)..................................................................................10

*Bush v. Lucas*,
  462 U.S. 367 (1983)..............................................................................41

*C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*,
  310 F.3d 197 (D.C. Cir. 2002)...............................................................36

*Campbell v. Clinton*,
  203 F.3d 19 (D.C. Cir. 2000)............................................................31, 47

*Chenoweth v. Clinton*,
  181 F.3d 112 (D.C. Cir. 1999)...............................................................47

*Clinton v. Jones*,
  520 U.S. 681 (1997)..............................................................................14

*Coffman v. Breeze Corp.*,
  323 U.S. 316 (1945)..............................................................................34

*\*Comm. on the Judiciary, U.S. House of Representatives v. Miers*,
  558 F. Supp. 2d 53 (D.D.C. 2008) ................................................. *passim*

*Consumer's Union of U.S., Inc. v. Periodical Correspondent's Ass'n*,
  515 F.2d 1341 (D.C. Cir. 1975)..............................................................53

*Davis v. Passman,*
   442 U.S. 228 (1979) ........................................................................................... 39, 41

*Eastland v. U.S. Serviceman's Fund,*
   421 U.S. 491 (1975) .................................................................................. 8, 10, 14, 24

*Evans v. Stephens,*
   387 F.3d 1220 (11th Cir. 2004) ..................................................................... 13

*Ferry v. Ramsey,*
   277 U.S. 88 (1928) ........................................................................................... 38

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
   528 U.S. 167 (2000) ..................................................................................... 20, 23

*FTC v. Guignon,*
   390 F.2d 323 (8th Cir. 1968) ....................................................................... 52

*Gov't Emps. Ins. Co. v. Pizol,*
   108 F.3d 999 (9th Cir. 1997) ....................................................................... 43

*Humphrey's Ex'r v. United States,*
   295 U.S. 602 (1935) ....................................................................................... 13

*In re Application of U.S. Senate Permanent Subcomm. on Investigations,*
   655 F.2d 1232 (D.C. Cir. 1981) ................................................................... 21

*In re Grand Jury Subpoena Duces Tecum,*
   112 F.3d 910 (8th Cir. 1997) ....................................................................... 16

*In re Sealed Case,*
   121 F.3d 729 (D.C. Cir. 1997) ..................................................................... 15

*INS v. Chadha,*
   462 U.S. 919 (1983) ....................................................................................... 13

*J.W. Hampton, Jr., & Co. v. United States,*
   276 U.S. 394 (1928) ....................................................................................... 52

*Judicial Watch v. Dep't of Justice,*
   365 F.3d 1108 (D.C. Cir. 2004) ................................................................... 15

*Jurney v. MacCracken,*
   294 U.S. 125 (1935) ....................................................................................... 45

*Kennedy v. Sampson,*
   511 F.2d 430 (D.C. Cir. 1974) ..................................................................... 13

*Kucinich v. Bush,*
   236 F. Supp. 2d 1 (D.D.C. 2002) ................................................... 22, 28, 31, 47

*Lardner v. U.S. Dep't of Justice,*
   No. 1:03-cv-00180, 2005 WL 758267 (D.D.C. Mar. 31, 2005) ....................... 30

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ..................................................................................... 20, 22

*Mail Order Ass'n of Am. v. U.S. Postal Serv.,*
  986 F.2d 509 (D.C. Cir. 1993) ................................................................52

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ...................................................................5

*Marshall v. Gordon,*
  243 U.S. 521 (1917) ................................................................................38

*McCulloch v. Maryland,*
  17 U.S. 316 (1819) ..................................................................................39

*McDougald v. Jenson,*
  786 F.2d 1465 (11th Cir. 1986) ...............................................................33

\*McGrain v. Daugherty,*
  273 U.S. 135 (1927) .............................................8, 10, 14, 24, 25, 27, 37

*Md. Cas. Co. v. Pac. Coal & Oil Co.,*
  312 U.S. 270 (1941) ................................................................................34

*Mistretta v. United States,*
  488 U.S. 361 (1988) ................................................................................13

*Mittleman v. U.S. Dep't of the Treasury,*
  919 F. Supp. 461 (D.D.C. 1995) ..............................................................42

*Moore v. U.S House of Representatives,*
  733 F.2d 946 (D.C. Cir. 1984) ................................................................31

*Morrison v. Olsen,*
  487 U.S. 654 (1988) ................................................................................13

*Myers v. United States,*
  272 U.S. 52 (1926) ..................................................................................13

*Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.,*
  670 F. Supp. 424 (D.D.C. 1987) ........................................................43, 44

*Navegar, Inc. v. United States,*
  103 F.3d 994 (D.C. Cir. 1997) ................................................................36

*Nixon v. Adm'r of Gen. Servs.,*
  433 U.S. 425 (1977) ................................................................................15

*Nuvio Corp. v. FCC,*
  473 F.3d 302 (D.C. Cir. 2006) ................................................................38

*Okpalobi v. Foster,*
  244 F.3d 405 (5th Cir. 2001) ..................................................................37

*Pocket Veto Case,*
  279 U.S. 655 (1929) ................................................................................13

*President v. Vance,*
  627 F.2d 353 (D.C. Cir. 1980) ................................................................43

*Raines v. Byrd*,
521 U.S. 811 (1997)............................................................22, 28, 30, 46

*Randolph v. Willis*,
220 F. Supp. 355, 358 (S.D. Cal. 1963) ..............................................53

*Reed v. Cnty. Comm's of Delaware Cnty., Pa.*,
277 U.S. 376 (1928)............................................................................40

*RSM Prod. Corp. v. Freshfield Bruckhaus Deringer U.S. LLP*,
682 F.3d 1043 (D.C. Cir. 2012)...........................................................10

*Rudder v. Williams*,
666 F.3d 790 (D.C. Cir. 2012)..............................................................10

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
366 F. Supp. 51 (D.D.C. 1973)......................................................48, 52

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
498 F.2d 725 (D.C. Cir. 1974)...........................................6, 15, 21, 48

*Schilling v. Rogers*,
363 U.S. 666 (1960).......................................................................33, 36

*Schnapper v. Foley*,
667 F.2d 102 (D.C. Cir. 1981)..............................................................36

*Seized Property Recovery, Corp. v. U.S. Customs and Border Prot.*,
502 F. Supp. 2d 50 (D.D.C. 2007)........................................................37

*Shape of Things to Come, Inc. v. Kane Cnty.*,
588 F. Supp. 1192, 1193 (N.D. Ill. 1984) ...........................................53

*Shelton v. United States*,
404 F.2d 1292 (D.C. Cir. 1968)............................................................37

*Skelly Oil Co. v. Phillips Petroleum Co.*,
339 U.S. 667 (1950).............................................................................33

*Superlease Rent-A-Car, Inc. v. Budget Rent-A-Car, Inc.*,
No. 1:89-cv-00300, 1989 WL 39393 (D.D.C. Apr. 13, 1989).............37

*Tucker v. Comm'r*,
676 F.3d 1129 (D.C. Cir. 2012)............................................................17

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
11 F. Supp. 2d 76 (D.D.C. 1998)..........................................14, 21, 22, 29

*United States v. AT&T*,
551 F.2d 384 (D.C. Cir. 1976)......................6, 20, 21, 28, 29, 30, 49

*United States v. AT&T*,
567 F.2d 121 (D.C. Cir. 1977)..............................................................19

*United States v. Ballin*,
144 U.S. 1 (1892)................................................................................53

*United States v. Burr*,
25 F. Cas. 30 (C.C.D. Va. 1807) ................................................................14

*\*United States v. Nixon*,
418 U.S. 683 (1974) ...................................................5, 6, 15, 16, 23, 51, 52

*United States v. Providence Journal Co.*,
485 U.S. 693 (1988) ...............................................................................51

*United States v. U.S. House of Representatives*,
556 F. Supp. 150 (D.D.C. 1983) ...............................................................7

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ...............................................................................20

*Vander Jagt v. O'Neill*,
699 F.2d 1166 (D.C. Cir. 1983) ...............................................................46

*Walker v. Cheney*,
230 F. Supp. 2d 51 (D.D.C. 2002) ...............................................21, 28, 31

*Walker v. Jones*,
733 F.2d 923 (D.C. Cir. 1984) ...............................................................53

*Warth v. Seldin*,
422 U.S. 490 (1975) ...........................................................................10, 32

*Watkins v. United States*,
354 U.S. 178 (1957) ...............................................................6, 8, 9, 14, 38

*Wilkie v. Robbins*,
551 U.S. 537 (2007) ...............................................................................41

## **Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 1 ...............................................................12

*U.S. Const. art. I, § 5, cl. 2 ...............................................................9, 52

U.S. Const. art. I, § 7, cl. 2 ...............................................................18

U.S. Const. art. II, § 1, cl. 2 ...............................................................13

U.S. Const. art. II, § 2, cl. 2 ...............................................................17

U.S. Const. amend. XII ...............................................................13

U.S. Const. amend. XVII, cl. 1 ...............................................................12

## **Statutes**

2 U.S.C. § 130f ...............................................................................53

2 U.S.C. § 194 ...............................................................................45

28 U.S.C. § 41 (1926) ...............................................................................40

28 U.S.C. § 516.................................................................................................................52

28 U.S.C. § 530D..............................................................................................................53

*28 U.S.C § 1331 .............................................................................5, 47, 48, 49, 50, 51

28 U.S.C. § 1345.........................................................................................................40, 51

28 U.S.C. § 1365......................................................................................................49, 50, 51

*28 U.S.C. § 2201 ...............................................................................32, 33, 35, 46

Homeland Security Act of 2002, Pub. L. No. 107-296 (2002)....................................25

Pub. L. No. 96-486, 94 Stat. 2369 (1980).......................................................................49

Pub. L. No. 94-574, 90 Stat. 2721 (1976)...............................................................49, 50

An Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870) .............25

## Legislative Authorities

119 Cong. Rec. 36,472 (1973)..........................................................................................48

69 Cong. Rec. 1683 (1928)................................................................................................35

13 Reg. Deb. app. 202 (1837).............................................................................................7

H.R. Rep. No. 112-546 (2012)...........................................................................................22

H.R. Rep. No. 99-435 (1985)............................................................................................26

H.R. Rep. No. 83-1079 (1953)..........................................................................................26

H.R. Res. 706, 112th Cong. (2012) (enacted)................................................................29

H.R. Res. 5, 103d Cong. (1993) (enacted).......................................................................52

H.R. Res. 423, 102d Cong. (1992) (enacted)..................................................................52

H.R. Res. 95, 82d Cong. (1952) (enacted)......................................................................26

*Investigation of Hon. Harry M. Daugherty, Formerly Att'y Gen. of the U.S.:  Hr'gs Pursuant
to S. Res. 157 Before the Sen. Select Comm. on Investigation of the Att'y Gen.,*
68th Cong. (1924) ..................................................................................26

*Operation Fast & Furious:  Mgmt. Failures at the Dep't of Justice:
Hr'g Before the Comm. on Oversight & Gov't Reform*, 112th Cong. (2012)...................11

Rule II, Rules of the House of Representatives (112th Cong.)..................................... 53

Rule X, Rules of the House of Representatives (112th Cong.) .......................................9

Rule XI, Rules of the House of Representatives (112th Cong.) ......................................9

S. Rep. No. 95-170 (1977)..................................................................................................50

S. Rep. No. 97-682 (1982)..................................................................................................26

S. Res. 262, 70th Cong. (1928) (enacted) ........................................................................41

## Other Authorities

1 Laurence H. Tribe, American Constitutional Law (3d ed. 2000) ...............................................39

Carlin Meyer, *Imbalance of Powers:  Can Congressional Lawsuits Serve As Counterweight?*,
    54 U. Pitt. L. Rev. 63 (1992)..........................................................................................30

*Developments in the Law:  Declaratory Judgments – 1941-1949*,
    62 Harv. L. Rev. 787 (1949) ...........................................................................................35

DOJ, Office of the Inspector General Oversight & Review Division,
    A Review of ATF's Operation Fast & Furious and Related Matters (Sept. 2012)............45

Donald L. Doernberg & Michael B. Mushlin, *The Trojan Horse:  How the Declaratory
    Judgment Act Created a Cause of Action & Expanded Federal Jurisdiction While the
    Supreme Court Wasn't Looking*, 36 UCLA L. Rev. 529 (1989) ......................................35

Edwin Borchard, Declaratory Judgments (2d ed. 1941)...............................................................43

Erwin Chemerinsky, *Controlling Inherent Presidential Power:  Providing a Framework for
    Judicial Revie*w, 53 S. Cal. L. Rev. 863 (1983)................................................................16

Fed. R. Civ. P. 57.................................................................................................................33, 46

Fed. R. Civ. P. 57 advisory committee notes...........................................................................43, 46

Hasia Diner, *Teapot Dome 1924, in* IV Congress Investigates:  A Documented History 1792-
    1974 (Arthur Schlesinger, Jr. & Roger Burns eds., 1975)................................................26

John C. Grabow, Congressional Investigations:  Law & Practice (1988) .....................................26

Mem. . . . in Supp. of Defs.' Mot. to Dismiss and in Opp'n to Pl.'s Mot. for Partial Summ. J.,
    *Comm. on the Judiciary v. Miers*, No. 1:08-cv-00409
    (D.D.C. May 9, 2008) (ECF No. 16-2)...............................................................................42

Mem. . . . in Opp'n to Defs.' Mot. to Dismiss and in Reply to Defs.' Opp'n to Pl.'s Mot. for
    Partial Summ. J., *Comm. on the Judiciary v. Miers*, No. 1:08-cv-00409 (D.D.C.)
    (D.D.C. May 29, 2008) (ECF No. 26) .............................................................................42

Michael A. Zuckerman, *The Court of Congressional Contempt*, 25 J.L. & Pol. 41 (2009) .........45

Note, *Standing in the Way of Separation of Powers:  The Consequences of* Raines v. Byrd,
    112 Harv. L. Rev. 1741 (1999)........................................................................................30

Prosecution for Contempt of Cong. of an Exec. Branch Official Who Has Asserted a Claim
    of Exec. Privilege, 8 Op. O.L.C. 101 (1984) ....................................................................8

Resp. to Cong. Requests for Info. Regarding Decisions Made under the Indep. Counsel Act,
    10 Op. O.L.C. 68 (1986) ............................................................................................7-8

Woodrow Wilson, Congressional Government (1885) ...................................................................9

# INTRODUCTION

The Committee on Oversight and Government Reform of the U.S. House of Representatives ("Committee" or "Oversight Committee") seeks to enforce a Committee subpoena issued to Attorney General Eric H. Holder, Jr. for Department of Justice ("DOJ") records.[1]  The Committee issued the Holder Subpoena in connection with its investigation of Operation Fast and Furious, a DOJ law-enforcement operation that involved "gun walking," a controversial and now discredited tactic of knowingly permitting firearms purchased illegally in this country to be unlawfully transferred to third-party possessors, with those illegally-purchased and unlawfully-transferred firearms intentionally not being interdicted by law enforcement authorities.

DOJ has acknowledged that the Committee's investigation is appropriate and legitimate. Compl. ¶¶ 6, 35.  DOJ also publicly has acknowledged – principally as a result of the Committee's investigation – that Operation Fast and Furious was fundamentally flawed and that its tactics must not be repeated.  *Id*. ¶ 9.  DOJ did so, however, only after initially denying – in response to two written congressional inquiries to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), a DOJ component bureau – *that any gun walking operations even existed*:

> [T]he allegation . . . that [ATF] "sanctioned" or otherwise knowingly allowed the sale of assault weapons to a straw purchaser who then transported them into Mexico – is false.  ATF makes every effort to interdict weapons that have been purchased illegally and prevent their transportation to Mexico.

Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, at 1 (Feb. 4, 2011) ("Feb. 4, 2011 False Statement Letter"), attached as Ex. 1.  DOJ later – although not until 10 months later – acknowledged publicly that

---

[1]  *See* Subpoena to Hon. Eric H. Holder, Jr., Att'y Gen. (Oct. 11, 2011) ("Holder Subpoena"), attached as Ex. A to Compl. (Aug. 13, 2012) (ECF No. 1).

these statements were false.  *See* Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell

E. Issa, Chairman, Oversight Comm., & Hon. Charles E. Grassley, Ranking Member, Comm. on

the Judiciary, U.S. Senate, at 1 (Dec. 2, 2011), attached as Ex. 2.

Notwithstanding these acknowledgements, DOJ actively resisted cooperating fully with

the Committee's investigation from the very outset, and it has taken the extraordinary position

that the Committee lacks authority to investigate DOJ's concededly false statements to Congress.

The Attorney General's response to the Holder Subpoena has been consistent with DOJ's overall

response to the Committee's investigation – only more so.  In particular, the Attorney General

drew a hard temporal line in the sand and refused to produce documents dated or created after

February 4, 2011 (or otherwise to provide information about events that occurred after February

4, 2011), the exact date DOJ made the false statements to Congress.

Notwithstanding the Attorney General's intransigence, the Committee repeatedly sought

an accommodation (including on May 18, 2012, June 13, 2012, June 15, 2012, and June 19,

2012).  Compl. ¶ 46.  In particular, the Committee offered to narrow the focus of the Holder

Subpoena in order to obtain documents relevant to the Obstruction Component of the

Committee's investigation – without ever obtaining a positive response.  *Id*. ¶¶ 7, 13, 39, 46.

More than eight months *after* the Holder Subpoena was issued, the Attorney General

enlisted the White House – which previously had stood at the periphery of the Committee's

investigation and disclaimed any responsibility for Operation Fast and Furious – to support his

defiance of the Holder Subpoena.  On June 20, 2012, the Committee was informed – indirectly

through the Deputy Attorney General – that the President, at the behest of the Attorney General,

asserted "Executive privilege" over those responsive post-February 4, 2011 internal DOJ

documents that the Attorney General refused to produce.  *See* Letter from James M. Cole, Dep'y

Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm. (June 20, 2012), attached as Ex. 3. This eleventh-hour assertion of Executive privilege came absent any suggestion during the preceding eight-plus months that any documents responsive to the Holder Subpoena were subject to Executive privilege; absent any suggestion that the documents at issue implicate or otherwise involve any advice to the President; and absent any suggestion that the withheld documents implicate any core constitutional function of the President.

The Committee legally is entitled to all documents responsive to the Holder Subpoena that have not been produced. Nevertheless, in this action, the Committee seeks to enforce that subpoena only as to a subset of post-February 4, 2011 responsive documents (the "Post-February 4 Subset," Compl. ¶ 62). That subset is particularly relevant to the Committee's efforts to determine whether DOJ deliberately attempted to obstruct the Committee's investigation by, among other things, lying to the Committee or otherwise providing it with false information.

The principal legal issue presented in this case is whether the Attorney General may withhold this responsive subset on the basis of the President's assertion of Executive privilege over internal agency documents that reflect no advice to or communications with him. The Attorney General would prefer that this Court not address this quintessentially legal issue – not surprisingly given that no court ever has held that Executive privilege extends anywhere near as far as the Attorney General now claims that it does. Accordingly, in an effort to keep this Court from considering the Committee's claims, the Attorney General has moved to dismiss the Complaint on the grounds that (i) the Committee lacks standing; (ii) the Committee has no cause of action; (iii) the Court should exercise its discretion to decline to hear this case; and (iv) the Court lacks statutory jurisdiction. *See* Mem. in Supp. of Def.'s Mot. to Dismiss at 22-45 (Oct. 15, 2012) (ECF No. 13-1) ("AG Mem.").

This is not the first time DOJ has attempted to side-step a congressional subpoena under the guise of an assertion of Executive privilege coupled with an assertion that a congressional committee cannot enforce a subpoena against an Executive official in court. Four years ago, the House Committee on the Judiciary sued to enforce subpoenas it had issued to Harriet Miers and Joshua Bolten (then the former White House Counsel and the sitting White House Chief of Staff, respectively) in connection with that committee's investigation into the mid-Administration resignations of nine U.S. Attorneys. Ms. Miers and Mr. Bolten – like the Attorney General here – not only wrapped themselves in a very expansive interpretation of Executive privilege in refusing to comply with their respective congressional subpoenas, but they also raised the same panoply of jurisprudential arguments in contending that this Court could not even consider the Judiciary Committee's suit. This Court firmly and meticulously rejected each and every one of those arguments. *See Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008) (Bates, J.), *appeal dismissed*, No. 08-5357, 2009 WL 3568649 (D.C. Cir. Oct. 14, 2009). In particular, Judge Bates held as follows:

Standing: "Clear judicial precedent, along with persuasive reasoning in [DOJ Office of Legal Counsel ("OLC")] opinions, establishes that the Judiciary Committee has standing to pursue this action and, moreover, that this type of dispute is justiciable in federal court." *Id*. at 78.

Cause of action: The Judiciary Committee has a cause of action under the Declaratory Judgment Act, *id.* at 82, and "an implied cause of action derived from Article I to seek a declaratory judgment concerning the exercise of its subpoena power," *id.* at 94.

Discretion: Closing the courthouse doors to Congress impermissibly would tilt the balance of power between the two political branches toward the Executive: "[The Supreme

Court in *United States v. Nixon*, 418 U.S. 683 (1974), already] adjusted this balance by clarifying that [the federal courts] must be available to resolve executive privilege claims." *Miers*, 558 F. Supp. 2d at 96.  Judge Bates emphasized that the Executive frequently has sought judicial relief against the Legislative Branch and "separation of powers principles are [no] more offended when the Article I branch sues the Article II branch than when the Article II branch sues the Article I branch." *Id.*; *see also id.* (hearing cases of this type will not "paralyze the accommodations process between the political branches").

Statutory Jurisdiction:  The Court has jurisdiction under 28 U.S.C § 1331.  *Miers*, 558 F. Supp. 2d at 64; *see also id.* at 64 n.8 (noting that "Defendants do not dispute that the Court has statutory subject-matter jurisdiction under 28 U.S.C § 1331").

Just as the Attorney General has prevented the Committee from carrying out its constitutional oversight responsibilities by relying on an insupportably broad assertion of Executive privilege, so too does he now ask this Court to refrain from performing *its* constitutional responsibility "to say what the law is" with respect to that assertion of Executive privilege.  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The Attorney General's Motion to Dismiss – which is virtually identical to the White House officials' motion in *Miers* – relies to a very significant degree on an ungrounded notion of "separation of powers" that reduces essentially to the proposition that the Executive may not be called to account before the Judiciary with respect to its dealings with the Legislative Branch. This extreme notion, if accepted, would significantly hamstring Congress's ability to oversee – and thus to guard against – malfeasance, abuses of authority, and mismanagement by the Executive.  By advocating for this Court to avoid reaching the merits here, the Attorney General really is asking this Court to tilt the balance of powers between the two political branches

radically in favor of the Executive.  Acceding to the Attorney General's position would require this Court to do the following:

1.  *Disregard the Case Law.*  The D.C. Circuit already has determined that a House of Congress has standing to enforce its subpoenas in court.  *See United States v. AT&T*, 551 F.2d 384, 391 (D.C. Cir. 1976) ("*AT&T I*") ("It is clear that the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf.").

2.  *Disregard Congress's Constitutional Oversight Role*.  The Attorney General seeks to minimize the power of Congress to conduct oversight of the Executive, while the Supreme Court has described *in the most expansive* terms Congress's authority to investigate and oversee the Executive in furtherance of Congress's legislative responsibilities under Article I.  *See, e.g.*, *Watkins v. United States*, 354 U.S. 178, 187 (1957).  It is Congress's constitutional obligation to investigate Executive Branch malfeasance and obstruction, like the conduct that appears to have occurred here, so that Congress may remedy by legislation or other means any serious problems that are unmasked.  If the Executive can obstruct legitimate congressional investigations and ignore associated demands for information, with no functional recourse available to the Committee, the constitutional check afforded by congressional oversight disappears.

3.  *Disregard the Quintessentially Judicial Nature of the Issues Presented.*  This type of case – at bottom, a *subpoena enforcement case* – has been brought in and addressed by the courts in this Circuit many times before – most notably in *Miers*, *AT&T*, and a series of cases culminating in *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) ("*Senate Select III*").  Moreover, this case involves the purely legal question of the scope and application of Executive privilege, and the federal courts have been addressing that issue at least since *Nixon*, 418 U.S. 683.

4. *Disregard What Is at Stake in the Committee's Investigation*.  The outstanding issue in the Committee's investigation is whether DOJ intentionally obstructed the Committee's concededly legitimate investigation.  That is a serious matter, particularly where, as here, the investigation concerns a failed gun walking operation that contributed to the death of an American border patrol agent.  If the Court turns away the Committee, as the Attorney General urges, Congress and the American people never will learn whether DOJ intended to obstruct the Committee, and Congress will be unable to fix that wrong if it did.  Obviously, it is no answer to say that a grand jury is an adequate alternative because the agency principally responsible for enforcing federal law is itself the subject of the Committee's investigation; the nation's top law enforcement officer has refused to comply with a Committee subpoena; and the U.S. Attorney charged by statute with convening a grand jury to investigate the Attorney General's actions flatly has refused to do so.  Compl. ¶¶ 54-59.  The Executive's breathtaking flight from accountability here makes a mockery of our nation's core democratic principles.  The Executive should have, but regretfully has not, heeded what President Andrew Jackson once told Congress: "If you are able to point to any case where there is the slightest reason to suspect corruption or abuse of trust, . . . . [t]he offices of all the departments will be opened to you, and every proper facility furnished for this purpose."  13 Reg. Deb. app. 202 (1837).

5. *Disregard DOJ's Own Previous Positions.*  DOJ itself has brought this type of case to this Court before.  *AT&T I* was a case *it* brought, and *it* argued in *United States v. U.S. House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983) ("Gorsuch"), that *it* was entitled to sue to determine the power of a congressional subpoena.  Moreover, OLC lawyers twice have opined formally that Congress is entitled to initiate civil litigation against Executive Branch officials to enforce congressional subpoenas – exactly what the Committee has done here.  *See* Resp. to

Cong. Requests for Info. Regarding Decisions Made under the Indep. Counsel Act, 10 Op. O.L.C. 68, 88 n.33 (1986); Prosecution for Contempt of Cong. of an Exec. Branch Official Who Has Asserted a Claim of Exec. Privilege, 8 Op. O.L.C. 101, 137 (1984).

In short, this Court should deny the Motion to Dismiss and proceed directly to the merits.

## CONSTITUTIONAL CONTEXT

Congress's authority to obtain information – including by use of compulsory process – flows directly from its Article I legislative function. *See, e.g.*, *Eastland v. U.S. Serviceman's Fund*, 421 U.S. 491, 504 n.15 (1975) ("[T]he scope of [Congress's] power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." (quotation marks omitted; ellipsis in original)); *Barenblatt v. United States*, 360 U.S. 109, 111 (1959) ("The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate."); *McGrain v. Daugherty*, 273 U.S. 135, 161, 174 (1927) ("[T]he power to secure needed information by such means [i.e., compulsory process] has long been treated as an attribute of the power to legislate. It was so regarded in the British Parliament . . . . We are of [the] opinion that the power of inquiry – with process to enforce it – is an essential and appropriate auxiliary to the legislative function.").

In *Watkins*, the Supreme Court emphasized the breadth of Congress's power of investigation: "The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes." 354 U.S. at 187. *Watkins* specifically noted that the first Congresses held "inquiries dealing with suspected corruption or mismanagement of government officials," *id*. at 192, and stressed that this constitutional power

to investigate is at its peak where, as here, Congress is focusing on alleged waste, fraud, abuse, or maladministration within a government department, *see id.* at 187, 200 n.33 ("The power of Congress to conduct investigations . . . comprehends probes into departments of the federal government to expose corruption, inefficiency, or waste"; noting "power of the Congress to inquire into and publicize corruption, maladministration, or inefficiencies in the agencies of Government").[2]  And, according to the Supreme Court:

> It is unquestionably the duty of *all citizens* to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action.  It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation.

*Id*. at 187-88 (emphasis added).

The House, pursuant to the Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2, has delegated this substantial and wide-ranging oversight and investigative authority to its standing committees including, in particular, the Oversight Committee.  *See* Rule XI.1(b)(1), Rules of the House of Representatives (112th Cong.) ("Each committee may conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities under rule X."); Rule X.1(n) (vesting Oversight Committee with legislative authority over, among other things, "[g]overnment management and accounting measures generally," "[o]verall economy, efficiency, and management of government operations and activities," and "[r]eorganizations in the executive branch of the Government"); Rule X.4(c)(2) (vesting Oversight Committee with specific authority to "at any time conduct investigations of

---

[2]  *See also* Woodrow Wilson, Congressional Government 297-303 (1885) ("Quite as important as legislation is vigilant oversight of administration . . . .  It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees.  It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents.").

any matter without regard to clause 1, 2, 3, or this clause conferring jurisdiction over the matter to another standing committee").[3]

A necessary corollary of Congress's oversight and investigative authority is the power to issue and enforce subpoenas:  "Issuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate."  *Eastland*, 421 U.S. at 504.  This is so because

> [a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information – which not infrequently is true – recourse must be had to others who do possess it.  Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.  All this was true before and when the Constitution was framed and adopted.  In that period the power of inquiry, with enforcing process, was regarded and employed as a necessary and appropriate attribute of the power to legislate – indeed, was treated as inhering in it.

*McGrain*, 273 U.S. at 175; *see also Buckley v. Valeo*, 424 U.S. 1, 138 (1976); *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 228 (1821) (recognizing Congress's authority to hold persons in contempt as inherent attribute of its legislative authority; if Congress lacked that power, it "would be exposed to every indignity and interruption that rudeness, caprice or even conspiracy may mediate against it").

## FACTUAL BACKGROUND

The factual allegations in the Complaint (and all fair inferences therefrom) must be accepted as true for purposes of the Motion to Dismiss.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *RSM Prod. Corp. v. Freshfield Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012); *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012); *Browning v. Clinton*,

---

[3]  The Rules of the U.S. House of Representatives, 112th Cong., are available at http://rules.house.gov/Media/file/PDF_112_1/legislativetext/112th%20Rules%20Pamphlet.pdf.

292 F.3d 235, 242 (D.C. Cir. 2002).  In accordance with this Court's November 20, 2012 Minute

Order, we have not included here a separate statement of the facts.  Rather, we simply

incorporate by reference all of the factual allegations in the Complaint.  *See* Compl. ¶¶ 1-62.[4]

### ARGUMENT

The Attorney General seeks dismissal here ostensibly on four grounds.  He says (i) the

Committee lacks standing; (ii) the Committee lacks a cause of action; (iii) even if this Court is

entitled to hear this case, it should exercise its discretion to decline to do so; and (iv) this Court

---

[4]  By not including a separate factual statement here, we do not concede the accuracy of the Attorney General's Background section.  *See* AG Mem. at 5-18.  Many of the characterizations in that section are misleading or inaccurate.  For example:

- The Attorney General says he "testified before Congress about Operation Fast and Furious on seven separate occasions before May 2012."  AG Mem. at 11.  In fact, he testified before the Oversight Committee only *once* about Operation Fast and Furious – on February 2, 2012.  *See Operation Fast & Furious:  Mgmt. Failures at the Dep't of Justice:  Hr'g Before the H. Comm. on Oversight & Gov't Reform*, 112th Cong. 124 (2012) ("Feb. 2 Hr'g"), *available at* http://oversight.house.gov/wp-content/uploads/2012/04/2-2-12-Full-Committee-Hearing-Transcript.pdf.

- The Attorney General seeks to excuse the provision of false information to Congress in the February 4, 2011 False Statement Letter on the ground that DOJ "had sought to provide a thorough and accurate response in a tight timeframe."  AG Mem. at 9.  First, while Senator Grassley's January 27, 2011 letter to Acting ATF Director Melson, to which the February 4, 2011 False Statement Letter responded, requested a staff briefing by February 3, 2011, *see* Compl. ¶ 2(v) n.3, DOJ was not under any legal compulsion to write any letter by February 4, 2011.  (Indeed, the course of the Committee's investigation is littered with instances in which DOJ simply ignored deadlines set or proposed by the Committee.  *See, e.g.*, Compl. ¶¶ 31, 33, 34, 42.)  More fundamentally, no time constraint ever would excuse the provision to Congress of false information.

- The Attorney General asserts that, "on May 3, 2012, Chairman Issa sent a memorandum . . . that reflected a sharp escalation in his approach."  AG Mem. at 11.  In fact, the May 3 memorandum followed numerous warnings to DOJ that the Attorney General's continuing refusal to comply with the Holder Subpoena could lead to contempt proceedings (as, eventually, it did).  *See, e.g.*, Feb. 2 Hr'g at 136; Letter from Hon. Darrell E. Issa, Chairman, House Comm. on Oversight & Gov't Reform, to Att'y Gen. Eric H. Holder, Jr. (Jan. 31, 2012), attached as Ex. 4; Letter from Hon. Darrell E. Issa, Chairman, House Comm. on Oversight & Gov't Reform, to Att'y Gen. Eric H. Holder, Jr. at 1 (Feb. 14, 2012), attached as Ex. 5.

lacks statutory jurisdiction.  Permeating all of these arguments, however, is an ungrounded,

abstract, and exceedingly self-serving conception of "separation of powers."  The Attorney

General's "separation of powers" notion – which, he says, requires this Court not to adjudicate

the legitimacy of the President's improper Executive privilege assertion in this case – has several

inter-related components:  (a) the Committee and Attorney General are engaged "in an ongoing

political dispute" and the Court must stay out of such "political" disputes, AG Mem. at 1, 22-24;

(b) judicial intervention here will upset the traditional balance of power between the Legislative

and Executive Branches, *id*. at 25, 28; and (c) the Committee has available to it self-help

remedies that supplant the Court's role in this case, *id*. at 1-2, 19-20.  Because these flawed

"separation of powers" notions are so pervasive in the Attorney General's Memorandum, we

address them first, and then rebut each of his four traditional legal arguments in turn.

**I.    The Attorney General's Ungrounded, Abstract, and Self-Serving "Separation of Powers" Notions Are Wrong.**

**A.    The Attorney General's "It's All Politics" Argument Is Wrong.**

The Attorney General repeatedly characterizes the dispute between the Committee and

the Attorney General as "political."  Indeed, the word "political" appears no less than 56 times in

his Memorandum.  But labeling a dispute "political" is not a legal argument; it is a talking point

masquerading (poorly) as an argument.

The Legislative Branch of the federal government is inherently "political" because its

Members are elected directly by the people.  U.S. Const. art. I, § 2, cl. 1 ("The House of

Representatives shall be composed of Members chosen every second Year by the People of the

several States . . . ."); *id*. at amend. XVII, cl. 1 ("The Senate . . . shall be composed of two

Senators from each State, elected by the people thereof . . . .").  The Executive Branch, likewise,

is inherently "political" because the President is elected, albeit indirectly, also by the people.  *Id*.

at art. II, § 1, cl. 2; amend. XII.  It follows, therefore, that virtually all interactions of significance

between the Legislative and Executive Branches have some "political" component or overtone,

either in the inter-branch sense of "politics," in the political party sense of "politics," or both.

This is a simple fact of life that derives from the nature and structure of our tripartite system of

government.

This reality, however, most emphatically is not a doctrinal reason for the Judiciary to

abstain from discharging its constitutionally-mandated functions.  Accepting the Attorney

General's contention that courts cannot adjudicate "political disputes" would permanently shut

the courthouse doors to virtually all inter-branch disputes, despite longstanding jurisprudence to

the contrary.  Indeed, federal courts have decided countless cases that, like this one, have

political overtones and, also like this one, involve the allocation of power between the branches.[5]

Moreover, the elements making up this purported "political" dispute between the Committee and

the Attorney General are some of the most basic and common to this country's conception of

what courts do.

---

[5]  *See, e.g.*, *Morrison v. Olsen*, 487 U.S. 654 (1988) (resolving constitutionality of independent counsel statute); *Bowsher v. Synar*, 478 U.S. 714 (1986) (adjudicating role of Comptroller General *viz* Executive Branch); *INS v. Chadha*, 462 U.S. 919 (1983) (adjudicating constitutionality of one-house legislative veto); *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) (adjudicating scope of President's removal power *viz* Congress); *Pocket Veto Case*, 279 U.S. 655 (1929) (holding that adjournment of Congress prevented President from returning bill within 10 days as required by Constitution and prohibits its becoming law); *Myers v. United States*, 272 U.S. 52 (1926) (adjudicating scope of President's removal power *viz* Congress); *Evans v. Stephens*, 387 F.3d 1220 (11th Cir. 2004) (upholding judicial appointment by President under Recess Appointments Clause during intra-session recess of Congress); *Kennedy v. Sampson*, 511 F.2d 430 (D.C. Cir. 1974) (holding that bill became law despite President's failure to return it to Congress during recess when originating chamber designated its officials to receive messages from President); *Miers*, 558 F. Supp. 2d 53 (former White House counsel compelled to appear in response to Judiciary Committee subpoena); *see also Mistretta v. United States*, 488 U.S. 361 (1988) (adjudicating ability of members of Judiciary Branch to serve on U.S. Sentencing Commission, an agency with regulatory authority).

*First*, federal courts routinely have reviewed the validity of congressional inquiries, similar to the one at issue here.  *See, e.g.*, *McGrain*, 273 U.S. at 161 ("In actual legislative practice, power to secure needed information by such means has long been treated as an attribute of the power to legislate."); *Watkins*, 354 U.S. at 182 (accepting jurisdiction in congressional subpoena case where "[t]he controversy thus rests upon fundamental principles of the power of Congress and limitations on that power"); *Eastland*, 421 U.S. at 504 ("The power to investigate and to do so through compulsory process plainly falls within [the legitimate legislative sphere].").

*Second*, federal courts have been deciding cases regarding the Executive's compliance with subpoenas since the earliest days of the Republic.  *See, e.g.*, *United States v. Burr*, 25 F. Cas. 30, 37 (C.C.D. Va. 1807) (Marshall, C.J.) (Executive Branch bound to comply with duly issued subpoenas; claims that compliance will reveal national security or privileged presidential information "will have its due consideration on the return of the subpoena"); *Clinton v. Jones*, 520 U.S. 681, 696 n.23 (1997) ("[T]he prerogative [President] Jefferson claimed [in *Burr*] was denied him by the Chief Justice in the very decision Jefferson was protesting, and this Court has subsequently reaffirmed that holding."); *Miers*, 558 F. Supp. 2d at 72 ("Federal precedent dating back as far as 1807 contemplates that even the Executive is bound to comply with duly issued subpoenas."); *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 96 (D.D.C. 1998) ("That a house of Congress may turn to the federal courts for vindication of certain concrete and particularized interests without violating separation of powers is well established. . . .  [L]egislative bodies have been permitted to invoke the power of the federal courts to enforce a subpoena without violating separation of powers.").

*Third*, federal courts have resolved many cases involving Executive privilege claims.

*See, e.g.*, *Nixon*, 418 U.S. at 706 (holding that Judiciary is ultimate arbiter of Executive privilege claims and concluding that "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances"); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 455 (1977) (holding Presidential Recordings and Materials Preservation Act does not violate Executive privilege); *Senate Select III*, 498 F.2d at 731 ("Executive cannot, any more than the other branches of government, invoke a general confidentiality privilege to shield its officials and employees from investigations by the proper governmental institutions into possible criminal wrongdoing."); *Judicial Watch v. Dep't of Justice*, 365 F.3d 1108, 1116-17 (D.C. Cir. 2004) ("Further extension of [Executive] privilege to internal Justice Department documents that never make their way to the Office of the President on the basis that the documents were created for the sole purpose of advising the President on a non-delegable duty is unprecedented and unwarranted."); *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) ("[Executive] privilege only applies to communications that [presidential] advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters."); *Miers*, 558 F. Supp. 2d at 72 ("[M]ere fact that the President himself – let alone his advisors, as here – is the subject of the subpoena in question has not been viewed historically as an insurmountable obstacle to judicial resolution.").

Accordingly, characterizing as "political" the differences between the Committee and the Attorney General regarding the Holder Subpoena is beside the point.  This case presents no threat to the separation of powers doctrine; rather, a decision here will serve the interests of both "political" branches by clarifying the law regarding congressional access to information in the possession of the Executive.

### B.     The Attorney General's "Balance of Power" Argument Is Wrong.

The Attorney General's suggestion that judicial intervention here will upset the balance of power between the Legislative and Executive Branches has it exactly backwards.  If this Court were to abstain, it effectively would grant the Executive Branch *carte blanche* to deny Congress access to vast realms of information critical to Congress's oversight function, a free pass the Executive often has sought and always has been denied.  *See, e.g.*, *Nixon*, 418 U.S. at 692-97; *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 915 (8th Cir. 1997); *Miers*, 558 F. Supp. 2d at 71.  That is, judicial restraint here would be, in actuality, judicial *acquiescence* to Executive Branch recalcitrance with respect to the Congress.  *See, e.g.*, *Miers*, 558 F. Supp. 2d at 95 ("[A] decision to foreclose access to the courts, as the Executive urges, would tilt the balance of power in favor of the Executive here, the very mischief the Executive purports to fear."); Erwin Chemerinsky, *Controlling Inherent Presidential Power:  Providing a Framework for Judicial Review*, 53 S. Cal. L. Rev. 863, 897 (1983) ("The Court's refusal to consider challenges to executive power is an implicit decision in favor of broad inherent Presidential authority.").

Indeed, it is no exaggeration to say that if the courthouse door is closed to Congress in subpoena enforcement cases of this nature, the Executive's incentive to respond to congressional requests for information largely will disappear and, with it, effective congressional oversight of the Executive Branch.  As Judge Bates correctly observed in *Miers*:

> Rather than running roughshod over separation of powers principles, the Court believes that entertaining this case will reinforce them.  Two parties cannot negotiate in good faith when one side asserts legal privileges but insists that they cannot be tested in court in the traditional manner.  That is true whether the negotiating partners are private firms or the political branches of the federal government.

*Miers*, 558 F. Supp. 2d at 99.

### C.       The Attorney General's "Alternative Remedies" Argument Is Wrong.

The third element of the Attorney General's generic "separation of powers" triad is that Congress has alternative remedies available to it that should counsel this Court not to hear this case. *See* AG Mem. at 1, 19-20, 29-30. This is a rehash of alternative remedy arguments that Judge Bates pointedly rejected in *Miers*. *See Miers*, 558 F. Supp. 2d at 91-93. Indeed, while the Attorney General's four "alternative remedies" might make for a robust discussion at a political science seminar, they are anything but a practical and functional way for Congress to obtain information in the face of an astoundingly broad claim of Executive privilege.

The Attorney General first blithely suggests that the Committee can "tie up nominations." AG Mem. at 29. The Constitution, however, grants the power over nominations exclusively to the Senate. *See* U.S. Const. art. II, § 2, cl. 2 (". . . and he shall nominate, and by and with the Advice and Consent of the *Senate*, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law" (emphasis added)); *see also Miers*, 558 F. Supp. 2d at 93 n.29 (noting DOJ concession that its suggestion of power over nominations as an alternative is unavailable to House Committee). The Attorney General either has confused the constitutionally prescribed powers of the two Houses of Congress or he asks this Court to assume, with no support whatsoever, that the Senate would hold up nominations because the Executive has thwarted the constitutional prerogative of a House committee. Either way, this argument manifests a woeful ignorance of the way Congress actually works.[6]

---

[6]  The authority the Attorney General cites – *Tucker v. Commissioner*, 676 F.3d 1129, 1132 (D.C. Cir. 2012) – is not even relevant here, much less does it support the bizarre notion that the House can force the Attorney General to produce subpoenaed documents by refusing to act on nominations. *Tucker* concerned the issue of whether appointments of IRS Appeals employees

(*Continued . . .* )

Equally absurd is the Attorney General's second suggestion that the Committee "slash the budget in the area of concern." AG Mem. at 29. Such an action would require the consent of *both* Houses of Congress, and the President's signature. *See* U.S. Const. art. I, § 7, cl. 2. Given the certainty that no President who asserted Executive privilege then would turn around and sign such legislation (even assuming for the sake of argument that the other House of Congress cooperated in passing such legislation in the first instance), Congress would need to override a presidential veto – which requires a two-thirds majority in both chambers. *Id.* Judge Bates properly rejected out-of-hand DOJ's "just-cut-the-budget" argument:

> The remaining alternative suggested by the Executive branch – . . . including the exercise of other political tools such as withholding appropriations – is not sufficient to remedy the injury to Congress's investigative power. . . . [T]he appropriations process is too far removed, and the prospect of successful compulsion too attenuated, from this dispute to remedy the Committee's injury to its investigative function in a manner similar to a civil action for declaratory relief.

*Miers*, 558 F. Supp. 2d at 92-93.

> Ultimately, the Executive's argument sweeps too broadly. Short of withholding *all* appropriations entirely and shutting down the federal government, the Executive could always claim that the House has alternative remedies that it has failed to explore.

*Id.* at 93 n.29 (emphasis in original).

The Attorney General suggests thirdly that he and the Committee negotiate and accommodate. AG Mem. at 27-29. That sounds good, except that the Committee already tried that, for many months, and it did not work. *See* Compl. ¶¶ 2-18, 28-36, 42-46, 50-51. The Attorney General adamantly refused to produce the limited subset of documents at issue here; the Committee's repeated efforts to reach an accommodation as to that subset repeatedly were rebuffed by the Attorney General; and there is no realistic possibility that such efforts will be

---

were subject to the Appointments Clause.

successful in the future.  It takes two to negotiate and, in this case, there has been only one.  The Attorney General's refusal to negotiate in good faith underscores why this Court should deny his Motion to Dismiss.  When the Court addresses the merits of the Committee's claim, it necessarily will clarify the scope and proper application of Executive privilege – or what the Attorney General is trying to pass off as Executive privilege in this case – in the context of congressional subpoenas.  That, in turn, will make negotiation and accommodation between the branches *more* likely, not less.  Both clarity in the law, and the recognized availability of a judicial remedy, will significantly reduce the incentives for one branch to stake out an untenable legal position, which is exactly what the Attorney General has done here.

Fourthly, the Attorney General says, without explanation, that the Committee can just "make its case to the public."  AG Mem. at 44.  Whatever that means, it obviously is not a particularly salutary way to resolve an inter-branch dispute about access to information.

At bottom, the self-help remedies the Attorney General recommends would be extremely disruptive to the country and the functioning of our government, likely would have adverse collateral consequences for uninvolved third parties, would be very time-consuming, and ultimately would not be particularly effective – and the D.C. Circuit has so recognized:

> Where the dispute consists of a clash of authority between the two branches, . . . judicial abstention does not lead to orderly resolution of the dispute. . . .  If negotiation fails as in a case where one party, because of chance circumstance, has no need to compromise, a stalemate will result, with the possibility of detrimental effect on the smooth functioning of government.

*United States v. AT&T*, 567 F.2d 121, 126 (D.C. Cir. 1977).

## II.     The Oversight Committee Has Standing.

### A.      Binding Circuit Precedent Establishes That the Committee Has Standing.

"Article III of the Constitution confines the federal courts to adjudicating actual cases and controversies."  *Allen v. Wright*, 468 U.S. 737, 750 (1984) (quotation marks omitted).  To

determine whether a "case" or "controversy" exists, the Court must assess whether a party has "standing" to bring its lawsuit; i.e.,

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Where constitutional questions arise as to the actions of the Legislative or Executive Branches, "[p]roper regard for the complex nature of our constitutional structure requires . . . that the Judicial Branch [not] shrink from a confrontation with [those] coequal branches."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982).

Courts in this Circuit repeatedly have recognized that a House of Congress, or its authorized agent, has standing to bring suit to enforce a duly authorized and issued subpoena. "It is clear that the House as a whole has standing to assert its investigatory power, and can designate a member to act on its behalf."  *AT&T I*, 551 F.2d at 391.  *AT&T I* was a suit by the Executive Branch to enjoin AT&T from complying with a congressional subpoena for documents concerning warrantless wiretaps the company had undertaken at the FBI's request. *Id*. at 385.  Despite President Ford's designation of AT&T as an "agent of the United States" and his instruction to the company to ignore the subpoena, AT&T made clear that it intended to comply, and the Executive sued.  *Id*. at 385-87.  The D.C. Circuit held that the fact that the suit had been brought by the Executive against a private entity was of no moment because the suit properly was viewed "as a clash of powers of the legislative and executive branches of the United States."  *Id*. at 389; *see also id*. at 388-89 ("Although this suit was brought in the name of the United States against AT&T, AT&T has no interest in this case . . . .").  The *AT&T I*

Court noted specifically that "the mere fact that there is a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution of the conflict."  *Id.* at 390; *see also In re Application of U.S. Senate Permanent Subcomm. on Investigations*, 655 F.2d 1232 (D.C. Cir. 1981) (permitting Senate subcommittee to obtain order enforcing subpoena for testimony); *Senate Select III*, 498 F.2d 725 (entertaining merits of Senate committee's subpoena enforcement claim).

In *Miers* – a case legally indistinguishable from this one – this Court stated that "the starting point for [standing] analysis is *AT&T I*," and held that the House Judiciary Committee "ha[d] standing to enforce its duly issued subpoena[s to White House staffers Miers and Bolten] through a civil suit."  558 F. Supp. 2d at 68; *see also id.* at 69 ("[T]he House has standing to invoke the federal judicial power to aid its investigative function"); *id.* at 78 ("Clear judicial precedent . . . establishes that the Committee has standing to pursue this action and, moreover, that this type of dispute is judiciable in federal court."); *Walker v. Cheney*, 230 F. Supp. 2d 51, 68 (D.D.C. 2002) (noting "authority in this Circuit indicating that a House of Congress or a committee of Congress would have standing to sue to retrieve information to which it is entitled"); *U.S. Dep't of Commerce*, 11 F. Supp. 2d at 86 (noting "well established" proposition "that a legislative body suffers a redressable injury when that body cannot receive information necessary to carry out its constitutional responsibilities"); *id.* (such injuries "arise[] primarily in subpoena enforcement cases, where a house of Congress or a congressional committee seeks to compel information in aid of its legislative function").

While the Attorney General urges this Court to disregard *Miers*, saying it is at odds with *Walker*, AG Mem. at 32, he ignores the fact that *Walker* was decided by the same judge who decided *Miers* (Judge Bates), and that Judge Bates took great pains to distinguish his decision in

*Walker*, effectively a suit by an individual member of Congress, from his decision in *Miers*, a suit, like this one, effectively brought by the House itself through a duly authorized committee. *See Miers*, 558 F. Supp. 2d at 69-71 ("This case stands in marked contrast to *Walker*. Indeed, all of the missing factors identified in *Walker* are present here . . . .").

As to the standing elements, first, the Committee's inability to obtain documents from the Attorney General plainly is an injury both "actual" and "concrete and particularized." *Lujan*, 504 U.S. at 560 (quotation marks omitted). The responsive documents the Attorney General possesses, if disclosed, will assist the Committee in obtaining answers critical to its investigation. *See, e.g.*, H.R. Rep. No. 112-546, at 31 (2012). The Attorney General's refusal to comply with the Holder Subpoena has inflicted on the Committee "an informational injury," which this Court has held "sufficiently concrete so as to satisfy the irreducible constitutional minimum of Article III." *U.S. Dep't of Commerce*, 11 F. Supp. 2d at 85 (quotation marks omitted); *see also id.* at 86 ("[A] failure to receive sought-after information constitutes an Article III injury to the legislative body."); *Miers*, 558 F. Supp. 2d at 67-68, 77-78.

Moreover, the Committee has a sufficiently "'personal stake' in the alleged dispute," *Raines v. Byrd*, 521 U.S. 811, 819 (1997), because the Committee has invested a significant amount of time and resources in examining the conduct of DOJ and its officials in an effort to determine what happened and whether remedial measures are called for. The Committee conducted hearings, interviewed witnesses, authorized and issued subpoenas, and now waits for the necessary documents to be provided. Unlike the lawsuits brought by *individuals* to vindicate institutional interests in cases such as *Raines* (six Members of Congress), *Walker* (Comptroller General, backed by a single Member of Congress), and *Kucinich v. Bush*, 236 F. Supp. 2d 1 (D.D.C. 2002) (thirty-two individual House Members), in this instance the Committee *itself* is

seeking to obtain judicial relief.

The Committee also satisfies the second and third prongs of the standing analysis.  The Committee's injury – being denied information critical to its lawful investigation – is caused directly by (and thus is clearly traceable to) the Attorney General's failure to comply with the Holder Subpoena.  It is also virtually certain – and thus not "merely speculative," *Friends of the Earth, Inc.*, 528 U.S. at 181 – that a declaration and injunction by this Court mandating the Attorney General's compliance with the Holder Subpoena will redress the Committee's informational injury.  Indeed, the Attorney General does not contend otherwise with respect to the causation and redressability prongs of the standing analysis.  *See* AG Mem. at 24 (limiting argument to injury prong); *see also Miers*, 558 F. Supp. 2d at 66 n.11 (noting DOJ's concession that "[Judiciary] Committee can satisfy the causation and redressability elements").

Thus, all on-point authority supports the Oversight Committee's standing to enforce its subpoena here.  The Committee knows of no case, and the Attorney General certainly has cited none, holding that the issuer of a congressional subpoena lacks standing to enforce its subpoena in court.  *None*.  That should be the end of the matter.

Finally, we note that the Executive Branch has "standing" to enforce subpoenas when it is denied information that it seeks to present to a grand or petit jury.  The Executive's standing to do so is identical to the Committee's in this action; it presents "the kind of controversy courts traditionally resolve."  *Nixon*, 418 U.S. at 696.

> Here at issue is the production or nonproduction of specified evidence . . . sought by one official of the Executive Branch within the scope of his express authority; it is resisted by the Chief Executive on the ground of his duty to preserve the confidentiality of the communications of the President. Whatever the correct answer on the merits, these issues are of a type which are traditionally justiciable.

*Id.* at 696-97 (quotation marks and citation omitted).  Extrapolating from *Nixon*, Judge Bates

correctly concluded in *Miers* that "the fact that the litigants are the political branches of our government is not a barrier to the Committee's standing and a justiciable controversy." *Miers*, 558 F. Supp. 2d at 73.

> **B.    The Attorney General's "No Standing" Arguments Are Wrong.**

> **1.    The Committee Plainly Has Suffered an Informational Injury.**

Notwithstanding the binding precedent cited above, the Attorney General asserts that the Oversight Committee has not suffered an "informational" injury because, he says, (i) the Committee has no "right" to obtain information from the Executive Branch, and (ii) the documents at issue "are not documents pertaining to [DOJ's] performance of its duties." AG Mem. at 34 (quotation marks omitted). Both contentions are wrong.

The Oversight Committee certainly has a right to obtain documents from the Attorney General. Time and again the Judiciary has reviewed Congress's power to obtain information via subpoena, from all sources, including the Executive, and each time it has found that this power is derived directly from and is coextensive with Congress's Article I power to legislate. *See, e.g.*, *McGrain*, 273 U.S. at 174 ("[T]he power of inquiry – with process to enforce it – is an essential and appropriate auxiliary to the legislative function."); *Barenblatt*, 360 U.S. at 111 ("The scope of the power of inquiry, in short, is as penetrating and far reaching as the potential power to enact and appropriate under the Constitution."); *Eastland*, 421 U.S. at 504-05 ("The issuance of a subpoena pursuant to an authorized investigation is similarly an indispensable ingredient of lawmaking. . . ."). No matter how many times the Executive attempts to dispute this firmly-established tenet of our constitutional law, it remains the fact that, "[s]o long as the Committee is investigating a matter on which Congress can ultimately propose and enact legislation, the Committee may issue subpoenas in furtherance of its power of inquiry." *Miers*, 558 F. Supp. 2d

at 77; *see also supra* pp. 8-10.

Here, Congress plainly possesses plenary legislative power regarding DOJ, including its components entities.  Congress created DOJ in 1870, *see* An Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870), and it placed ATF within DOJ effective in 2003, *see* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002).  Accordingly, Congress, which legislatively could abolish DOJ and/or any of its component entities if it so chose (impractical as that may be), certainly possesses the power to legislate the management structure, administrative responsibilities, internal oversight mechanisms, and ultimately the funding provided to these entities.  As a result, it possesses the constitutional *right* to investigate *any* aspect of their operations.

The second of the Attorney General's arguments seems to reprise his wrong-headed earlier statements to the Committee that it lacks a sufficient investigatory interest in the Obstruction Component of its investigation.  *See* Compl. ¶ 11.  That argument was wrong before and it is wrong now:

> [T]he subject to be investigated was the administration of the Department of Justice – whether its functions were being properly discharged or were being neglected or misdirected, and particularly whether the Attorney General and his assistants were performing or neglecting their duties in respect of the institution and prosecution of proceedings to punish crimes and enforce appropriate remedies against the wrongdoers; specific instances of alleged neglect being recited.  Plainly the subject was one on which legislation could be had and would be materially aided by the information which the investigation was calculated to elicit.  This becomes manifest when it is reflected that the functions of the Department of Justice, the powers and duties of the Attorney General, and the duties of his assistants are all subject to congressional legislation, and that the department is maintained and its activities are carried on under such appropriations as in the judgment of Congress are needed from year to year.

*McGrain*, 273 U.S. at 177-78.[7]

Congress repeatedly has investigated DOJ's inner workings, organizational structure, management, and administration.[8]  In circumstances that are particularly analogous to those of this case, the House in 1983 specifically investigated DOJ's role in an Executive agency's inadequate response to a House investigation.  Two House committees issued document subpoenas to Environmental Protection Agency ("EPA") Administrator Anne Gorsuch Burford in connection with the committees' investigation into EPA's enforcement of the "Superfund" law.  *See* H.R. Rep. No. 99-435 (1985).  Ms. Burford relied on an assertion of Executive privilege to withhold certain responsive documents, and the House held her in contempt.  *See id.* at 4.  Believing DOJ had provided inappropriate guidance to Ms. Burford, the House Judiciary Committee then commenced an investigation *into DOJ's role* in her contumacious conduct.  *See*

---

[7]  *McGrain* arose out of the Teapot Dome scandal.  While Teapot Dome originated as a Senate investigation into leases of government owned, oil-rich land in Wyoming, the focus of the investigation shifted when Senate investigators discovered that the leases were the result of corruption and collusion among high-ranking government officials.  *See* John C. Grabow, Congressional Investigations:  Law & Practice, § 2.3[a], [b] (1988); Hasia Diner, *Teapot Dome 1924*, *in* IV Congress Investigates:  A Documented History 1792-1974, at 6-7 (Arthur Schlesinger, Jr. & Roger Burns eds., 1975).  The Senate empowered a select committee to investigate "charges of misfeasance and nonfeasance in the Department of Justice" for the failure to bring criminal prosecutions against the various wrongdoers.  *McGrain*, 273 U.S. at 151.  DOJ resisted providing the select committee access to internal reports and other investigative documents, *see Investigation of Hon. Harry M. Daugherty, Formerly Att'y Gen. of the U.S.: Hr'gs Pursuant to S. Res. 157 Before the Sen. Select Comm. on Investigation of the Att'y Gen.*, 68th Cong. 1015-16 & 1159-60 (1924), just as the Attorney General in this case has resisted providing the Oversight Committee with post-February 4, 2011 documents that are responsive to the Holder Subpoena.  Ultimately, DOJ produced the documents the select committee sought.  *Id.* at 2389-90.

[8]  For example, in 1952, a special subcommittee of the House Judiciary Committee investigated "the administration of the Department of Justice and the Attorney General of the United States," including allegations of abuses and inefficiencies.  H.R. Res. 95, 82d Cong. (1952) (enacted), *quoted in* H.R. Rep. No. 83-1079, at 3 (1953).  Similarly, in 1982, a Senate select committee investigated DOJ conduct in connection with undercover law enforcement activities by the FBI and other DOJ components.  *See generally* S. Rep. No. 97-682 (1982), *available at* https://www.ncjrs.gov/pdffiles1/Digitization/124269NCJRS.pdf.

*id.* at 3.  That committee sought from DOJ, among other things, "all documents prepared by or in the possession of the Department in any way relating to the withholding of documents that Congressional committees have subpoenaed from the EPA."  *Id.* at 605 (quotation marks omitted).  In that case, DOJ sensibly agreed to cooperate and ultimately produced to the committee internal documents from DOJ's Land and Natural Resources Division, Civil Division, Office of Legal Counsel, Office of Legislative Affairs, Office of Public Affairs, and the offices of the Attorney General, Deputy Attorney General, and Solicitor General.  *See id.* at 605, 606, 608.

Here, the fact that DOJ provided two letters to Congress that contained blatantly false information – *see* Feb. 4, 2011 False Statement Letter; Letter from Ronald Weich, Ass't Att'y Gen., to Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate (May 2, 2011), attached as Ex. 6 – and the fact that such false information remained unretracted for so long, provides the Committee with more than ample justification to pursue the Obstruction Component of its investigation.  Moreover, the questions to which the Oversight Committee still is seeking answers are akin to the questions presented in *McGrain*, namely, whether DOJ's response to legitimate oversight requests from Congress is being "properly discharged," 273 U.S. at 177, and whether remedial legislation (e.g., statutorily enhanced internal DOJ oversight mechanisms), or other actions (e.g., impeachment of Senate-confirmed individual determined to be responsible for obstructing the Committee), are necessary to ensure that prompt and accurate information is provided to Congress when requested in the future.

## 2. *Raines v. Byrd* Supports the Committee's Standing.

The Attorney General also contends that *AT&T I*, which held expressly that "the House as a whole has standing to assert its investigatory power, and can designate a member to act on

its behalf," 551 F.2d at 391, "is now an historical artifact, having been overtaken by the Supreme

Court's decision in *Raines* [*v. Byrd*]."   AG Mem. at 31.   That is patently incorrect.   *Raines* –

which concerned the standing of *individual legislators* to challenge a law they had voted against

as legislators, rather than the institutional standing of a House of Congress – never discussed, let

alone expressly overruled, *AT&T I* or, for that matter, any other case involving the judicial

enforcement of congressional subpoenas.   If anything, *Raines* supports the Committee's standing

here.

        In *Raines*, two House Members and four Senators sought a declaratory judgment that the

Line Item Veto Act of 1997, which they each had voted against, was unconstitutional.   *See* 521

U.S. at 814.   The District Court, following the D.C. Circuit's then-applicable doctrine of

legislator standing, held that the individual Members had standing.   *Id.* at 816-17.   On direct

appeal, the Supreme Court reversed, concluding that the injury asserted by the Members was not

to "themselves as individuals" but rather an "institutional injury" and, therefore, that the

individual Members lacked a "sufficient 'personal stake' in th[e] dispute and ha[d] not alleged a

sufficiently concrete injury to have established Article III standing."   *Id.* at 829-30.   *Raines*

specifically highlighted that, unlike here (i) the suing Members "ha[d] not been authorized to

represent their respective Houses of Congress in th[e] action," and indeed (ii) "both Houses

actively oppose[d the] suit."   *Id.* at 829 (citing cases).[9]

        There are many distinctions between *AT&T I*, *U.S. Dep't of Commerce*, and *Miers* on the

---

[9]  In *Walker*, this Court similarly noted that "the Comptroller General here has not been
expressly authorized by Congress to represent its interests in this lawsuit," and the Comptroller
General "has not identified any Member of Congress (other than [one Senator]), who has
explicitly endorsed his recourse to the Judicial Branch."   230 F. Supp. 2d at 68; *see also
Kucinich*, 236 F. Supp. 2d at 11 (noting that individual Members suing President and others
"have not been authorized, implicitly or explicitly, to bring this lawsuit on behalf of the House, a
committee of the House, or Congress as a whole").

one hand, and *Raines* and its progeny on the other.  For example, "the virtue of denying standing in *Raines* was only confirmed by the certainty that a private suit would surely follow," *U.S. Dep't of Commerce*, 11 F. Supp. 2d at 89, unlike here where there is no other party that could vindicate the Committee's informational interests.  "Consequently, if the House does not have standing, this question might evade review . . . ."  *Id.*

Ultimately, however, what distinguishes these cases is that *Raines* involved the attempt by *individual* Members of Congress to litigate an institutional injury, whereas *AT&T I*, *U.S. Dep't of Commerce*, and *Miers* each involved institutional plaintiffs – committees of the House (*AT&T I* and *Miers*) and the full House (*U.S. Dep't of Commerce*) – acting with express authorization to vindicate an institutional injury.  *See AT&T I*, 551 F.2d at 391 ("On August 26, 1976, the House of Representatives passed H. Res. 1420, authorizing Chairman Moss's intervention on behalf of the Committee and the House . . . ."); *Miers*, 558 F. Supp. 2d at 70 ("[A] congressional subpoena has been issued seeking precisely that information, and the full House has specifically authorized filing suit."); *id.* at 71 ("[T]he fact that the House has . . . explicitly authorized this suit . . . is the key factor that moves this case from the impermissible category of an individual plaintiff asserting an institutional interest (*Raines*, *Walker*) to the permissible category of an institutional plaintiff asserting an institutional injury (*AT&T I*, *Senate Select Comm.*)."); *U.S. Dep't of Commerce*, 11 F. Supp. 2d at 84 (finding informational injury based on House's "right to timely receive from the President census information that complies with the Census Act and the Constitution").  In this case, of course, as in *Miers*, the full House has authorized the Committee to file suit to vindicate the House's institutional interests.  *See* H.R. Res. 706, 112th Cong. (2012) (enacted); Compl. ¶ 53.

Indeed, it is worth reiterating that, after *Raines* was decided, this Court twice expressly

relied on *AT&T I* to find institutional standing.  *See Miers*, 558 F. Supp. 2d at 68-78 ("The

Committee and several supporting amici are correct that *AT&T I* is on point and establishes that

the Committee has standing to enforce its duly issued subpoena through a civil suit.  Moreover,

*Raines* and subsequent cases have not undercut either the precedential value of *AT&T I* or the

force of its reasoning."); *U.S. Dep't of Commerce*, 11 F. Supp. 2d at 86 ("In [*AT&T I*], the House

sought information 'necessary for the formulation of new legislation,' and the Executive Branch

asserted its authority to maintain control over the information.  [551 F.2d] at 385.  The court held

that '[i]t is clear that *the House as a whole has standing* to assert its investigatory power,'

thereby holding that a failure to receive sought-after information constitutes an Article III injury

to the legislative body.  *Id.* at 391." (emphasis in original)); *see also Lardner v. U.S. Dep't of

Justice*, No. 1:03-cv-00180, 2005 WL 758267, at *15 n.25 (D.D.C. Mar. 31, 2005) (noting

significance of continued reliance by other District Courts on authority assertedly undermined by

superseding Supreme Court decision).[10]

---

[10]  The Attorney General suggests that *Raines* was focused "on the nature of the injury asserted –
a claimed diminution of congressional authority in relation to the Executive."  AG Mem. at 32.
That reading of *Raines* is wholly inconsistent with the Supreme Court's own description of the
nature of the injury presented.  *See* 521 U.S. at 830 n.11 ("[T]he alleged cause of [Member
plaintiffs'] injury is not [the Executive's] exercise of legislative power but the actions of their
own colleagues in Congress in passing the [Line Item Veto] Act.").  Separation of powers
principles, the Court held, counsel against the Judiciary involving itself in matters *internal* to one
of the political branches, especially when those individuals bringing suit already had an
opportunity to vindicate their interests through recognized internal channels (i.e., voting), and
still possessed other reasonable means of convincing their colleagues to support their position.
*See id.*  This is very different that the *inter-branch* dispute presented by this case.

Despite repeatedly trumpeting his concern for separation of powers concepts, the
Attorney General fails to recognize that, while "*Raines* . . . is best understood as a decision
seeking to preserve separation of powers by restricting congressional [i.e., individual legislator]
standing," taken too far "such special restrictions might result in *inadequate* enforcement of the
principle of separation of powers."  Note, *Standing in the Way of Separation of Powers:  The
Consequences of* Raines v. Byrd, 112 Harv. L. Rev. 1741, 1758 (1999) (emphasis added); *see
also* Carlin Meyer, *Imbalance of Powers:  Can Congressional Lawsuits Serve As*

(*Continued . . .* )

### 3.    The Other Cases the Attorney General Cites Do Not Support His "No Standing" Argument.

The remaining cases cited by the Attorney General – both those that pre-date *Raines*, such as *Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984), *abrogation recognized by Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), and *Barnes v. Kline*, 759 F.2d 21, 28 (D.C. Cir. 1985), as well as those that post-date *Raines* such as *Chenoweth*, *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000), and *Walker*, 230 F. Supp. 2d 51 – are all equally inapposite.  Like *Raines*, each involved *individual legislators* attempting to litigate institutional injuries, and the respective Courts rejected the invitation to involve themselves in what were essentially *intra-branch* disputes.  *See, e.g.*, *Barnes*, 759 F.2d at 28 ("[A] concern for the separation of powers has led this court consistently to dismiss actions by individual congressmen whose real grievance consists of their having failed to persuade *their fellow legislators* of their point of view . . . ." (emphasis added)); *Kucinich*, 236 F. Supp. 2d at 17-18 ("delicate balance of powers under the Constitution" would be "undermine[d]" by hearing such intra-branch matters, because they "might simply encourage congressmen to run to court any time they disagreed with Presidential action").  Judge Bates recognized this fact in *Miers* and correctly noted that "the now-defunct doctrine of 'legislative standing' is more accurately described as '*legislator* standing.'"  558 F. Supp. 2d at 70 n.13 (emphasis added).

Obviously, these intra-branch issues were not present in *AT&T I* or *Miers*, and they certainly are not present here where the Committee actively has been investigating Operation Fast and Furious since February 2011; has been focused on the Obstruction Component of that

---

*Counterweight?*, 54 U. Pitt. L. Rev. 63, 73 (1992) ("Many, if not most, congressional lawsuits are aimed at ensuring that our government remains a government of three branches in the face of the rise of executive power, which was so feared by the Framers.").

investigation since prior to October 2011, when it issued the Holder Subpoena; and has attempted for eight months, without success, to find a way to persuade the Attorney General to fulfill his legal obligations to the Committee.  *See* Compl. ¶¶ 1-18, 28-45.

*     *     *

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Warth*, 422 U.S. at 498.  The Supreme Court long ago in *McGrain* recognized that "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change."  273 U.S. at 175.  Based on the unwavering precedents of this Court and the Court of Appeals, the Oversight Committee plainly has been injured by the Attorney General's contumacious conduct and is entitled to seek redress from this Court.

## III.   The Oversight Committee Has a Cause of Action.

The Attorney General says the "Committee lacks any cause of action."  AG Mem. at 38. That is incorrect.  The Committee has a cause of action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02 ("DJA"), and, separately, directly under the Constitution.

### A.   The Committee Has a Cause of Action under the Declaratory Judgment Act.

The Attorney General devotes barely a page and a half to his "no DJA-cause-of-action" argument.  *See* AG Mem. at 38-39.  This is not surprising.  In *Miers*, DOJ also contended that the Judiciary Committee lacked a cause of action under the DJA.  Judge Bates addressed the issue at considerable length, and meticulously rejected each and every one of DOJ's arguments.  *See Miers*, 558 F. Supp. 2d at 78-88.  The plain language of the DJA, the Supreme Court's unwavering application of the statute (even where no other cause of action exists), and the statute's legislative history and purpose all make clear that the Committee has a cause of action under the DJA.

32

*Plain Language*.  As an initial matter, the plain language of the statute – which must "'be liberally construed to achieve the objectives of the declaratory remedy,'" *Miers*, 558 F. Supp. 2d at 82 (quoting *McDougald v. Jenson*, 786 F.2d 1465, 1481 (11th Cir. 1986)) – makes clear that,

> [i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a); *see also* Fed. R. Civ. P. 57.  Thus, to be entitled to bring suit under the DJA, the Committee need only demonstrate (1) "a case of actual controversy," i.e., that it has standing, which it does, *see supra* p. 19-32; (2) that this Court has jurisdiction, which it does, *see infra* pp. 47-53; and (3) that the Committee filed "an appropriate pleading," which it clearly did, *see* Compl.  Having established those three elements, the Committee is entitled to have its "rights and other legal relations" declared "whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  In this case, those "rights and other legal relations" stem from the investigative authority granted to the Congress under Article I of the Constitution, as definitively interpreted by the Supreme Court.  *See Miers*, 558 F. Supp. 2d at 84-88 ("[T]here can be no question that Congress has a right – derived from its Article I legislative function – to issue and enforce subpoenas, and a corresponding right to the information that is the subject of such subpoenas.").

*Supreme Court Precedent*.  The Supreme Court has proceeded for more than 60 years under the premise that the DJA creates a cause of action, and it has articulated only two limitations to the application of that statute.  First, the Court has made clear that the DJA does not provide federal courts with an independent source of *jurisdiction*.  *See, e.g.*, *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)).  Second, the Court has made clear that there must be an "actual controversy" before

33

the Judiciary may review a party's action under the DJA.  *See, e.g.*, *Coffman v. Breeze Corp.*, 323 U.S. 316, 324 (1945) ("The declaratory judgment procedure is available in the federal courts only in cases involving an actual case or controversy, where the issue is actual and adversary, and it may not be made the medium for securing an advisory opinion in a controversy which has not arisen." (citations omitted)); *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239-41 (1937).

The Supreme Court never has expressed doubt that a party that meets all three statutory elements – as the Committee does here – has a *cause of action* for declaratory and other ancillary relief.  Indeed, the Court has entertained many suits where no traditional cause of action had accrued.  For example, *Haworth*, the first case to reach the Supreme Court that tested the DJA's constitutionality, concerned an action brought by an insurer to secure a declaration that several policies held by the defendant had lapsed and that the insurer only was responsible for a minimum payment upon the defendant's death (which had not yet occurred).  *See id.* at 237-38. The Court held that the DJA provided the insurer with a right to seek a declaratory judgment.  *Id.* at 242 ("[This case] calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts.").  With each prerequisite met, the Court concluded that "the complaint presented a controversy to which the judicial power extends and that authority to hear and determine it has been conferred upon the District Court by the [DJA]." *Id.* at 244; *see also Miers*, 558 F. Supp. 2d at 85 (noting that DJA supplied cause of action, not only in *Gorsuch* where Executive sought declaration that EPA Administrator lawfully refused to comply with congressional subpoena, but also in *AT&T I* where Executive sought to enjoin compliance with congressional subpoena:  "[The] only difference . . . is that the parties are reversed; here [in *Miers*], the House stands in the position of the plaintiff and the Executive is the

defendant.  This Court fails to see why that fact should alter the DJA analysis in any material respect.").

This suit brought by the Committee presents nearly identical elements.  The Committee claims that it has a "present, specific right" to documents the Attorney General possesses.  28 U.S.C. § 2201(a).  The Attorney General says those documents are protected by Executive privilege and, on that basis, refuses to produce them.  The Complaint is the "appropriate pleading" that brings this matter clearly and unequivocally to the Court.  *Id.*  The Committee has demonstrated above that it has standing, *see supra* pp. 19-32, and below that this Court has jurisdiction, *see infra* pp. 47-53.  Under the terms of the DJA, *nothing more is necessary*.  This case is "manifestly susceptible of judicial determination.  It calls . . . for an adjudication of present right upon established facts."  *Haworth*, 300 U.S. at 242.  The statute makes abundantly clear that no other cause of action need exist:  "[C]ourt[s] . . . may declare the rights and other legal relations . . . whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

*Legislative History and Purpose*.  The DJA was enacted primarily to "sanction[] the trial of controversies *before* a conventional cause of action has accrued and another remedy has become available."  *Developments in the Law:  Declaratory Judgments – 1941-1949*, 62 Harv. L. Rev. 787, 808 (1949) (emphasis added); *see also* Donald L. Doernberg & Michael B. Mushlin, *The Trojan Horse:  How the Declaratory Judgment Act Created a Cause of Action & Expanded Federal Jurisdiction While the Supreme Court Wasn't Looking*, 36 UCLA L. Rev. 529, 582-83 (1989) (Act provides cause of action where none existed before); 69 Cong. Rec. 1683 (1928) ("[In a case where] even though . . . there is no existing cause of action upon which a hearing could be had at the time; but there is a substantial controversy as to the [legal rights involved, federal courts may entertain the matter].").

The Committee's suit is precisely the type to which the DJA was intended to apply.  Just as the DJA permits a business that intends to pursue a certain course of conduct that DOJ threatens to prosecute criminally to seek declaratory relief under the DJA, *see, e.g., Navegar, Inc. v. United States*, 103 F.3d 994, 998-99 (D.C. Cir. 1997), so too the Committee is entitled to seek declaratory relief under the statute without awaiting a court action initiated by the Attorney General in response to his arrest, and/or an inherent contempt trial, by the House.  *See Miers*, 558 F. Supp. 2d at 82-83.  Indeed, were the House to exercise its inherent right to arrest and try the Attorney General, he could seek *habeas corpus* review in this Court, and thus exactly the same legal issues would be presented.  Just as a business is entitled to seek declaratory relief before it is charged with a crime, so too the Committee is entitled to seek declaratory relief without going through an extremely disruptive and acrimonious trial before the bar of the House, and without waiting for the Attorney General to seek *habeas* relief in this Court, as Judge Bates recognized:

> By invoking the DJA to gain anticipatory review . . . , the Committee can obtain judicial resolution regarding its subpoena power without the unseemly scenario of the arrest and detention of high-ranking executive branch officials, which would carry the possibility of precipitating a serious constitutional crisis.

*Miers*, 558 F. Supp. 2d at 83.

The cases the Attorney General cites highlight the distinctions between this case and those where resort to the DJA is not allowed.  For example, *Schnapper v. Foley*, 667 F.2d 102, 116-17 (D.C. Cir. 1981), held that declaratory (and other) relief was unauthorized because the remedies the plaintiffs sought were proscribed by statute.  This comports with other cases that recognize that, when Congress expressly "excludes a judicial remedy," the DJA cannot provide one.  *Schilling*, 363 U.S. at 676-77; *see also C&E Servs., Inc. of Wash. v. D.C. Water & Sewer*

*Auth.*, 310 F.3d 197, 201-02 (D.C. Cir. 2002).[11]

Here, of course, there is no statutory scheme that excludes a judicial remedy for the Committee.  Therefore, the Committee has a cause of action under the DJA.

### B.     The Committee Possesses an Implied Right under the Constitution to Seek This Court's Aid in Enforcing the Holder Subpoena.

"It is settled that the power of inquiry – with process to enforce it – is an essential and appropriate auxiliary to the legislative function."  *Shelton v. United States*, 404 F.2d 1292, 1296 (D.C. Cir. 1968).  As part of that power of inquiry, Congress possesses a constitutionally implied right to compel the production of documents:

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information – which not infrequently is true – *recourse must be had to others who do possess it*. . . .  [S]ome means of compulsion are essential to obtain what is needed.

*McGrain*, 273 U.S. at 175 (emphasis added).  Indeed, "the constitutional provisions which commit the legislative function to the two houses are intended to include this attribute to the end that the function may be effectively exercised."  *Id*.  To further effectuate these wide-ranging powers, the Supreme Court also has implied in the Constitution an "unremitting obligation" on those called to testify and produce documents to Congress – as the Attorney General was here –

---

[11]  The other cases the Attorney General cites are equally unavailing.  In *Seized Property Recovery, Corp. v. U.S. Customs & Border Protection*, 502 F. Supp. 2d 50, 64 (D.D.C. 2007), the Magistrate Judge declined to hear the plaintiffs' DJA claim because they failed to identify a source of that Court's *subject matter jurisdiction*.  *See Miers*, 558 F. Supp. 2d at 81 (distinguishing *Seized Property Recovery*).  *Superlease Rent-A-Car, Inc. v. Budget Rent-A-Car, Inc.*, No. 1:89-cv-00300, 1989 WL 39393, at *3 (D.D.C. Apr. 13, 1989), held that the DJA did not provide plaintiffs with *standing*.  The language the Attorney General cites from two non-D.C. Circuit cases – *Buck v. Am. Airlines, Inc.*, 476 F.3d 29 (1st Cir. 2007), and *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) – is dicta and, in any event, rests on misreadings of earlier cases, as Judge Bates pointed out in *Miers*.  *See Miers*, 558 F. Supp. 2d at 80, 81 n.19.

to do so.  *Watkins*, 354 U.S. at 187.

*Marshall v. Gordon*, 243 U.S. 521 (1917), establishes a framework for implying remedies pursuant to Congress's Article I powers:

> What does this implied power [of inherent contempt] embrace? is thus the question. In answering, it must be borne in mind that the [implied] power rests simply upon the implication that the right has been given to do that which is essential to the execution of some other and substantive authority expressly conferred.  The power is therefore but a force implied to bring into existence the conditions to which constitutional limitations apply.  It is a means to an end, and not the end itself.  *Hence it rests solely upon the right of self-preservation to enable the public powers given to be exerted.*
>
> . . . .
>
> . . . [T]he implied power . . . rests only upon the right of self-preservation; that is, the right to prevent acts which, in and of themselves, inherently obstruct or prevent the discharge of legislative duty or the refusal to do that which there is an inherent legislative power to compel in order that legislative functions may be performed.

*Id.* at 541-42 (emphasis added).  *Marshall* makes clear that inherent contempt is only one remedy implied under the Constitution to effectuate Congress's exercise of its legislative powers.  The same constitutional logic also encompasses permitting Congress, under certain circumstances (i.e., when a case is otherwise justiciable), to enforce its subpoenas civilly through the courts.[12]

Indeed, it borders on the nonsensical to suggest that the Judiciary may review Congress's exercise of its inherent contempt power (which the Supreme Court has implied from the Constitution) – by which Congress may enforce demands for information in aid of its investigatory powers (also implied from the Constitution), from witnesses who have an

---

[12]  The law long has recognized in many contexts that the greater power includes the lesser (*a maiore ad minus*).  *See, e.g.*, *Ferry v. Ramsey*, 277 U.S. 88, 94 (1928) (Holmes, J.); *Nuvio Corp. v. FCC*, 473 F.3d 302, 311 (D.C. Cir. 2006) (Kavanaugh, J., concurring).  Thus, if Congress has the right and power to imprison and try a contumacious witness without resort to the Courts (albeit with judicial review available by way of *habeas corpus*), as *Marshall* held that it does, then Congress also has the lesser included authority to seek from the Judiciary less coercive relief in the form of a civil enforcement order.

"unremitting obligation" to comply with such demands (also implied from the Constitution) – but the Judiciary may not entertain an ordinary civil enforcement action by which Congress seeks to enforce those very same rights and obligations.  Accordingly, this Court should recognize that the Committee has a constitutionally implied cause of action to seek declaratory and injunctive relief to enforce its subpoena, just as Judge Bates did in *Miers*.  *See Miers*, 558 F. Supp. 2d at 88-94.

The Attorney General's contrary arguments, such as they are, do not counsel a different result.  He says, *first*, that a plaintiff seeking to imply a cause of action from a statute bears a heavy burden.  AG Mem. at 39.  However, "[t]he inquiry involved in implying a cause of action from the Constitution itself . . . is much different."  *Miers*, 558 F. Supp. 2d at 88.

> Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner.  For example, statutory rights and obligations are often embedded in complex regulatory schemes, so that if they are not enforced through private causes of action, they may nevertheless be enforced through alternative mechanisms, such as criminal prosecutions or other public causes of actions.  In each case, however, the question is the nature of the legislative intent informing a specific statute . . . .
>
> The Constitution, on the other hand, does not "partake of the prolixity of a legal code." *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819).  It speaks instead with a majestic simplicity.  One of "its important objects," *ibid.*, is the designation of rights.  And in "its great outlines," *ibid.*, the judiciary is clearly discernible as the primary means through which these rights may be enforced.

*Davis v. Passman*, 442 U.S. 228, 241 (1979) (citations omitted).  Moreover:

> When a plaintiff asserts constitutional rather than statutory rights, the Court is more willing to imply a private right to sue, both on the theory that defining the means for the enforcement of constitutional rights is the federal judiciary's special focus, and because these cases lack the separation-of-powers concern that the judiciary might find itself essentially rewriting congressional legislation by tacking on implied remedies that Congress could have enacted explicitly but did not.

1 Laurence H. Tribe, American Constitutional Law 483-84 (3d ed. 2000); *see also Miers*, 558 F.

Supp. 2d at 89 (explaining "straightforward" analysis for implying cause of action for enforcing congressional subpoenas).

*Second*, the Attorney General seems to suggest that *Reed v. County Commissioners of Delaware County, Pennsylvania*, 277 U.S. 376, 388 (1928), forecloses implying a cause of action under the Constitution for congressional subpoena enforcement. AG Mem. at 40. That is incorrect. *Reed* involved an attempt by a Senate committee to bring suit to enforce a subpoena for ballot boxes following a disputed senatorial election. When one Pennsylvania county refused to comply with the committee's request, the committee sued to enforce its subpoena. When the case arrived at the Supreme Court, the issue was whether the federal courts had *jurisdiction* to hear the case under 28 U.S.C. § 41(1) (1926) (a predecessor to 28 U.S.C. § 1345), which provided "that the District Courts shall have original jurisdiction 'of all suits of a civil nature, at common law or in equity, brought by the United States, or by any officer thereof authorized by law to sue.'" 277 U.S. at 386 (quoting § 41(1)). The Senate petitioners asserted that the Senate resolution creating the committee and authorizing it "to do such other acts as may be necessary in the matter of said investigation" constituted "authoriz[ation] by law to sue" for purposes of § 41(1). 277 U.S. at 386. The Supreme Court disagreed, holding that the resolution language did not *expressly* grant the committee the right to sue, that it thus was not "authorized by law to sue" within the meaning of § 41(1), and thus that the case had to be dismissed for *lack of jurisdiction*. 277 U.S. at 389. The Court did not reach or even discuss the question of whether the committee had a cause of action. Because *Reed* says absolutely nothing about implied causes of action, it is not an impediment to this Court's implying a cause of action in this case (just as Judge Bates did

in *Miers*).[13]

    *Third*, the Attorney General says the Court may not imply a cause of action because "Congress has authority to create a cause of action for itself."  AG Mem. at 40.  However, the Attorney General cites no authority that so holds.  *Wilkie v. Robbins*, 551 U.S. 537 (2007), which the Attorney General does cite, concerned the implication of a damages remedy from a statute.  But, as we just pointed out, "the question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution."  *Davis*, 442 U.S. at 241 (emphasis in original).  Furthermore, this argument is, to put it charitably, ironic in light of the fact that the Attorney General's own subordinate – the U.S. Attorney for the District of Columbia – flatly has refused to comply with the statutory scheme that Congress has enacted.  *See* Compl. ¶¶ 54-59; *see also Miers*, 558 F. Supp. 2d at 91 (noting that "[Judiciary] Committee's attempt to proceed with a criminal contempt prosecution was thwarted by the executive branch").

    *Finally*, the Attorney General says the "Constitution provides Congress with means of compelling compliance unavailable to a typical plaintiff," and that "there are 'special factors counseling hesitation' here."  AG Mem. at 41 (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1983)).  Aside from referring vaguely to "separation of powers issues," AG Mem. at 41, the Attorney General does not specify what these other "means" or "special factors" are.  To the extent he is referring to "self-help" remedies mentioned elsewhere, *see, e.g.*, *id.* at 19-20, we already have addressed those.  *See supra* pp. 17-19.  We note also that Judge Bates rejected out-of-hand the

---

[13]   The day after *Reed* was decided, the Senate adopted a resolution that expressly authorized the committee to file suit.  *See* S. Res. 262, 70th Cong. (1928) (enacted).  The Senate obviously understood that it had a cause of action inasmuch as the only action it took on the heels of *Reed* was passage of S. Res. 262, which resolved the jurisdictional issue the Supreme Court had identified.

same self-help and special factors notions DOJ advanced in *Miers*. *See Miers* 558 F. Supp. 2d at

92-93 & n.29.[14]

## IV.   The Court Should Reach the Merits of the Oversight Committee's Claims.

The Attorney General says that if this Court concludes, as Judge Bates did in *Miers*, that

the Committee has a cause of action, it nevertheless should exercise its discretion – whether

under the DJA or a doctrine known as "equitable" or "remedial" discretion – to decline to hear

this case. *See* AG Mem. at 42-45. This argument, which largely recycles the ungrounded,

abstract, and self-serving separation of powers notions the Attorney General has raised

elsewhere, must be rejected.

### A.   The Court Should Exercise Its Discretion under the Declaratory Judgment Act.

Whether this Court should exercise its discretion under the DJA to reach the merits of the

Committee's claims turns on

> whether [declaratory relief] would finally settle the controversy between the
> parties; whether other remedies are available or other proceedings pending;
> the convenience of the parties; the equity of the conduct of the declaratory
> judgment plaintiff; prevention of procedural fencing; the state of the record;
> the degree of adverseness between the parties; and the public importance of
> the question to be decided.

*Mittleman v. U.S. Dep't of the Treasury*, 919 F. Supp. 461, 470 (D.D.C. 1995) (quotation marks

---

[14]   The Attorney General also says cryptically that Congress has passed "legislation that excludes
the very suit the Committee now seeks to maintain." AG Mem. at 41. That, of course, is not
true. Indeed, aside from one citation to 2 U.S.C. § 288d, that argument goes no further. To the
extent the Attorney General intended to resurrect a misguided argument advanced by DOJ in
*Miers* – *see* Mem. . . . in Supp. of Defs.' Mot. to Dismiss and in Opp'n to Pl.'s Mot. for Partial
Summ. J. . . . at 41-42, *Comm. on the Judiciary v. Miers*, No. 1:08-cv-00409 (D.D.C. May 9,
2008) (ECF No. 16-2) – the Oversight Committee incorporates here the Judiciary Committee's
response in *Miers* to that argument. *See* Mem. . . . in Opp'n to Defs.' Mot. to Dismiss and in
Reply to Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J. at 44-47, *Comm. on the Judiciary v.
Miers*, No. 1:08-cv-00409 (D.D.C. May 29, 2008) (ECF No. 26); *see also Miers*, 588 F. Supp. 2d
at 86-87 (dismantling DOJ's § 288d argument in that case).

omitted); *see also Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 670 F. Supp. 424, 431

(D.D.C. 1987) ("Two criteria are ordinarily relied upon to determine whether a court should, in

its discretion, render a declaratory judgment:  (1) whether the judgment will 'serve a useful

purpose in clarifying the legal relations in issue' or (2) whether the judgment will 'terminate and

afford relief from the uncertainty, insecurity, and controversy, giving rise to the proceeding.'"

(quoting *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980))).[15]  Here, all these factors

weigh heavily in favor of the Court reaching the merits of the Committee's claims.  *See Miers*,

558 F. Supp. 2d at 95-100 (exercising discretion to hear Judiciary Committee claims).

    *First*, the Court's rendering a declaratory judgment plainly will "serve a useful purpose in

clarifying the legal relations in issue." *Nat'l R.R. Passenger Corp.*, 670 F. Supp. at 431.  The

dispute here revolves around the applicability of the deliberative process privilege – which the

Attorney General casts as a form of Executive privilege – to a congressional subpoena.  By

determining (i) whether this privilege may validly be asserted in response to the Holder

Subpoena, and (ii) whether the Attorney General's failure to produce to the Committee the Post-

February 4 Subset of documents is without legal justification and violates his legal obligations to

the Committee, *see* Compl. ¶¶ 62-81, the Court definitively will resolve the controversy between

the parties.

    *Second*, for exactly the same reasons, the Court's rendering a declaratory judgment here

---

[15]  *See also* Fed. R. Civ. P. 57 advisory committee's note ("A declaratory judgment is appropriate
when it will 'terminate the controversy' giving rise on undisputed or relatively undisputed
facts."); Edwin Borchard, Declaratory Judgments 296 (2d ed. 1941) (to exercise authority to
grant declaratory relief, "the court must have concluded that its judgment will 'terminate the
uncertainty or controversy giving rise to the proceeding' and that it will serve a useful purpose in
stabilizing legal relations" (quoting *Gov't Emps. Ins. Co. v. Pizol*, 108 F.3d 999, 1013 (9th Cir.
1997) (Schroeder, J., dissenting), *opinion vacated on reh'g en banc*, 133 F.3d 1220 (9th Cir.
1998))).

will terminate the "uncertainty, insecurity, and controversy, giving rise to the proceeding." *Nat'l R.R. Passenger Corp.*, 670 F. Supp. at 431.  Once the limits and application of the deliberative process privilege in the context of the Holder Subpoena have been declared, the parties will know how to proceed.  If the Attorney General's claim is found to be legitimate, that will end the matter.  If his claim is found to be inapplicable or not validly asserted, we expect the Attorney General will comply with the Court's order and immediately produce to the Committee the responsive documents it has been seeking – and which the Attorney General has been withholding – since October 2011.

*Third*, the issues raised unquestionably are of great public importance.  No court ever has held that Executive privilege extends anywhere near as far as the Attorney General here contends that it does.  The breathtakingly expansive conception of Executive privilege that the Attorney General advances here, were it to be accepted, would eviscerate congressional oversight of the Executive to the very great detriment of the Nation and our constitutional structure.

*Fourth*, the Committee's conduct has been exemplary.  It has gone to extraordinary lengths to attempt to reach an accommodation with the Attorney General.  *See* Compl. ¶¶ 46-51.  While the Attorney General suggests that the Committee rushed to the courthouse, AG Mem. at 44, that is untrue.  The Committee initiated its investigation in February 2011.  Compl. ¶¶ 1, 28.  It issued the Holder Subpoena in October 2011.  *Id.* ¶¶ 8, 40.  Over the next eight months, against the backdrop of an uncooperative Attorney General and his subordinates, *id.* ¶¶ 5-6, 30-36, 42-43, the Committee repeatedly tried to reach an accommodation with the Attorney General regarding the documents at issue here, *id.* ¶¶ 46, 50-51.  Only when all of those efforts failed, did the House proceed to a contempt vote on June 28, 2012.  *Id.* ¶¶ 52-53.  The Committee did not file suit until August 13, 2012.  Plainly, there was no rush to the courthouse.  *See Miers*, 558 F.

Supp. 2d at 97 ("equity of the conduct of the [Judiciary Committee]" weighs in favor of judicial resolution).[16]

*Fifth*, the convenience factor clearly militates in favor of this Court's exercising its discretion to resolve the quintessentially legal issues in dispute between the Committee and the Attorney General.  The Committee has exhausted the normal remedies, including extensive efforts to negotiate an accommodation, Compl. ¶¶ 46, 50-51, and certification of the Attorney General's contumacious conduct to the U.S. Attorney for referral to a grand jury, *id.* ¶ 55 – a referral that was not made, notwithstanding the U.S. Attorney's statutory obligation to do so. *See* 2 U.S.C. § 194; Compl. ¶¶ 54, 56-59.[17]

---

[16]  The Attorney General argues that the Committee should content itself with a report on Operation Fast and Furious issued on September 19, 2012, by the DOJ Inspector General.  AG Mem. at 45; *see* DOJ, Office of the Inspector General Oversight & Review Division, A Review of ATF's Operation Fast & Furious & Related Matters (Sept. 2012) ("IG Report"), *available at* http://www.justice.gov/oig/reports/2012/s1209.pdf.  The IG Report is not relevant to the Motion to Dismiss for at least the following reasons.  First, it was only after the Committee began its investigation of Operation Fast and Furious in early February 2011, that DOJ undertook its own internal review, which led to the IG Report.  More fundamentally, an investigation conducted by a statutory Executive Branch officer simply has no bearing on Congress's discharge of its constitutional oversight responsibilities.  (The Inspector General's investigative authority is, for example, substantially more limited than the Committee's:  e.g., the Inspector General does not have subpoena power and may require only current DOJ employees to be interviewed; the cooperation of former employees and non-DOJ personnel is strictly voluntary).  Finally, with respect to the Attorney General's observation that DOJ produced to the Committee certain documents in conjunction with the release of the IG Report, AG Mem. at 18, those documents serve only to confirm that the Attorney General has been withholding responsive documents that could not fairly be thought to fall within any conception of "Executive privilege," whether of the presidential communications variety or the asserted deliberative process variety – a point that only reinforces why this Court should deny the Motion to Dismiss and proceed to the merits.

[17]  While the House has inherent contempt authority, that remedy is politically unwieldy and has not been used for seven decades.  *See, e.g.*, *Jurney v. MacCracken*, 294 U.S. 125, 151 (1935) (last use of inherent contempt authority); Michael A. Zuckerman, *The Court of Congressional Contempt*, 25 J.L. & Pol. 41, 43 (2009) ("Congress has not exercised its direct contempt powers in any significant way since 1935.").  Moreover, were the House to arrest the Attorney General and bring him before the bar of the House for trial, that process would, among other things, divert congressional resources and attention from other pressing legislative matters and almost

(*Continued . . .*)

**B.     The Court Should Not Decline to Hear This Case on the Basis of the Attorney General's Generic and Self-Serving Separation of Powers Notions.**

The Attorney General's second "discretion" argument is that this Court should stand

aside because this suit "pits the two political Branches against each other," AG Mem. at 43;

"political solutions to this dispute remain," *id*. at 44; and "200 years of political history and court

decisions make clear that the process of negotiation and accommodation is not simply the

preferred option to resolve inter-Branch disputes over information, but the one that best

preserves the separation of powers," *id*. at 45.  This is a recycled version of the same generic and

self-serving separation of powers notions that we already have addressed.  *See supra* pp. 12-19.[18]

---

certainly escalate tensions between the Legislative and Executive Branches.  Further, were the House to imprison the Attorney General – either during the pendency of or at the conclusion of such an inherent contempt trial – he almost certainly would petition this Court for a writ of *habeas corpus*, which would simply bring the matter full circle, and once again place the legality of the Attorney General's Executive privilege assertion squarely before this Court.  *See Miers*, 558 F. Supp. 2d at 91-92 (rejecting idea that House must utilize inherent contempt proceedings before it can invoke Court's jurisdiction).  Finally, and in any event, the DJA itself makes clear that declaratory relief is available "whether or not further relief is [available] or could be sought."  28 U.S.C. § 2201(a); *see also* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude declaratory judgment that is otherwise appropriate."); Fed. R. Civ. P. 57 advisory committee's note ("The fact that a declaratory judgment may be granted 'whether or not further relief could be prayed' indicates that declaratory relief is alternative or cumulative and not exclusive or extraordinary. . . .  [T]he fact that another remedy would be equally effective affords no ground for declining declaratory relief.").  Indeed, as discussed above, OLC has asserted that the appropriate method to resolve these kinds of disputes is through a civil action initiated by Congress.  *See supra* pp. 7-8.

[18]   The Attorney General refers to the doctrine of "remedial" or "equitable" discretion, AG Mem. at 42-43, but that doctrine is essentially a dead letter in light of *Raines*, 521 U.S. 811.  *Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C. Cir. 1983), which the Attorney General cites and which predates *Raines*, involved fourteen individual Members of the minority party in the House suing to enjoin the majority party leadership of the House from reducing the number of seats on House committees and subcommittees.  *See Vander Jagt*, 699 F.2d at 1167.  The D.C. Circuit found that, while the individual Members had Article III standing, it would invoke its "remedial discretion" to decline to decide the case.  *See id.* at 1175 ("We invoke our remedial discretion in this setting because this case raises separation of powers concerns . . . and the remedial discretion approach . . . provides a more candid and coherent way of addressing those concerns.").  After *Raines*, the remedial discretion doctrine no longer has any vitality because individual Members

(*Continued . . .* )

This lawsuit is a direct result of the Attorney General's *refusal* to attempt in good faith to accommodate the Committee's legitimate need for information, both by adamantly refusing to produce post-February 4, 2011 documents, and by exhorting the President to assert an extraordinarily expansive notion of Executive privilege that has no basis in law.  *See* Compl. ¶¶ 46-47.  Accordingly, a decision by this Court to decline to hear this case, far from promoting accommodation between the branches, would do just the opposite because it effectively would remove all incentives for the Executive to parlay with Congress regarding information access.  On the other hand, if the Court reaches the merits of the Committee's claims, it necessarily will reinforce the separation of powers principles to which the Attorney General purports to pledge such fealty:

> Rather than running roughshod over separation of powers principles, the Court believes that entertaining this case will reinforce them.  Two parties cannot negotiate in good faith when one side asserts legal privileges but insists that they cannot be tested in court in the traditional manner.  That is true whether the negotiating partners are private firms or the political branches of the federal government.

*Miers*, 558 F. Supp. 2d at 99.

## V.     The Court Has Statutory Jurisdiction.

### A.     The Court Has Jurisdiction under 28 U.S.C. § 1331.

In *Miers*, DOJ wisely and correctly acknowledged that the Court had statutory jurisdiction under 28 U.S.C § 1331.  *See Miers*, 558 F. Supp. 2d at 64 n.8 ("Defendants do not dispute that the Court has statutory subject-matter jurisdiction under 28 U.S.C § 1331.").  This time around, with his department having lost in *Miers* on every jurisprudential argument it

---

no longer have standing to assert institutional injuries in the first instance.  *See, e.g.*, *Campbell*, 203 F.3d at 24; *Chenoweth*, 181 F.3d at 117; *Kucinich*, 236 F. Supp. 2d at 17-18; *see also supra* pp. 27-30.

raised, the Attorney General affirmatively challenges the Court's statutory jurisdiction.  AG

Mem. at 36-38.  DOJ had it right the first time.

This Court plainly has jurisdiction under § 1331 because the case "arise[s] under the

Constitution [and] laws . . . of the United States," 28 U.S.C. § 1331, both because the Committee

has causes of action under Article I, *see supra* pp. 37-42, and the DJA, *see supra* pp. 32-37, and

because the right the Committee seeks to vindicate is inherently constitutional, *see supra* pp. 8-

10.  This conclusion is buttressed by the legislative history of the statute and a series of cases that

begins with *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 366 F. Supp.

51 (D.D.C. 1973) (Sirica, J.) ("*Senate Select I*").

In *Senate Select I*, Judge Sirica indicated that the Court would have had § 1331

jurisdiction over the Senate Select Committee's action to enforce its subpoena to President

Nixon but for the then-existing $10,000 amount-in-controversy requirement.  "[F]inding no

possible valuation of the matter which satisfies the $10,000 minimum, the Court cannot assert

jurisdiction by virtue of § 1331."  *Senate Select I*, 366 F. Supp. at 61.  Immediately thereafter,

Congress enacted a special statute giving the District Court for the District of Columbia

jurisdiction over the Senate Select Committee suits.  *See Senate Select III*, 498 F.2d at 727; *see

also* 119 Cong. Rec. 36,472 (1973) (Statement of Sen. Ervin) ("The amendment is necessary

because Judge Sirica held that the District Court . . . had no jurisdiction to entertain the original

suit of the select committee.").

Following President Nixon's resignation, Congress sought to enact a more permanent fix

to the jurisdictional issue identified by Judge Sirica.  In 1976, it did so; Congress amended §

1331 to eliminate the $10,000 amount-in-controversy requirement for "any action brought

against the United States, any agency thereof, or any officer or employee thereof in his official

capacity."  Pub. L. No. 94-574, 90 Stat. 2721 (1976).  The D.C. Circuit specifically noted this

amendment to § 1331 in its *AT&T I* decision in 1976.  *See AT&T I*, 551 F.2d at 389 n.7 (noting

"recent addition to 28 U.S.C. §1331(a) of the following:  [']except that no such sum or value

shall be required in any such action brought against the United States, any agency thereof, or any

officer or employee thereof in his official capacity[']").  Subsequently, in 1980, Congress

eliminated the $10,000 amount-in-controversy requirement for all matters, *see* Pub. L. No. 96-

486, 94 Stat. 2369 (1980), which is where matters stand today.

Following the 1976 amendment to § 1331, the D.C. Circuit held, in a case it treated "as a

clash of the powers of the legislative and executive branches of the United States" regarding a

congressional subpoena, that the District Court had jurisdiction under § 1331 because

"fundamental constitutional rights are involved."  *AT&T I*, 551 F.2d at 389.[19]  And, in *Miers*,

even though DOJ had conceded the issue, this Court satisfied itself, as it was required to do, of

its statutory jurisdiction to hear the case under § 1331.  *See Miers*, 558 F. Supp. 2d at 64 ("[T]his

case arises under the Constitution for purposes of § 1331.").

The Attorney General's jurisdictional argument is predicated entirely on 28 U.S.C. §

1365 (which vests this Court with jurisdiction regarding certain *Senate* subpoenas).  *See* AG

Mem. at 36-38.  As best we can tell, the Attorney General's argument proceeds as follows:  (i)

"prior to 1978, Section 1331 did not provide a basis for subject matter jurisdiction for a suit to

enforce a congressional subpoena . . . because Section 1331 contained an amount-in-controversy

requirement of $10,000,"  AG Mem. at 36; (ii) Congress addressed that problem in the Ethics in

---

[19]  Because the Court in *AT&T I* concluded that the jurisdictional amount-in-controversy
requirement was satisfied "where fundamental constitutional rights [we]re involved," it did not
reach the question of whether the October 1976 amendment to § 1331 applied retroactively or
applied where AT&T was the technical defendant in the case.  *See AT&T I*, 551 F.2d at 389 n.7.

Government Act of 1978 (which included the current 28 U.S.C. § 1365), but only in part by granting this Court, via § 1365, subject matter jurisdiction in connection with certain Senate subpoenas, AG Mem. at 36-37; and, therefore, (iii) when Congress "eliminated the amount-in-controversy requirement from Section 1331" in 1980, the House necessarily was left on the sidelines, AG Mem. at 37.  This argument is badly flawed – for at least three reasons.

*First*, 28 U.S.C. § 1365, by its plain language, applies only to the Senate; it does not apply to, and has nothing to do with, the House.

*Second*, and perhaps most importantly, the Attorney General's chronology of § 1331's legislative history is wrong.  His argument is predicated on the presumption that "Section 1331 contained an amount-in-controversy requirement of $10,000" at the time Congress enacted the Ethics in Government Act in 1978 (which included the current 28 U.S.C. § 1365).  AG Mem. at 36.  But, as noted above, Congress already had eliminated, in 1976, the $10,000 amount-in-controversy requirement with respect to "any action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity."  Pub. L. No. 94-574, 90 Stat. 2721 (1976).  Thus, the federal district courts have had statutory jurisdiction under § 1331 to entertain subpoena enforcement suits by the House – and the Senate – since 1976 with respect to subpoenas directed to the "United States, any agency thereof, or any officer or employee thereof in his official capacity."  *See* S. Rep. No. 95-170, at 91-92 (1977) ("This exception in [§ 1365] is not intended to be a congressional finding that the federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the federal government.").

Properly understood, therefore, § 1365 simply removed the amount-in-controversy requirement with respect to Senate subpoena enforcement actions against *private individuals and*

*entities* because, as of 1978, that amount-in-controversy requirement still existed in § 1331 with respect to *private individuals and entities* (inasmuch as the 1976 amendment only removed the amount-in-controversy requirement for suits directed to the "United States, any agency thereof, or any officer or employee thereof in his official capacity"). That § 1365, as then enacted, excluded subpoena enforcement actions (by the Senate) against officers or employees of the federal government merely reflected the fact that § 1365 was not needed for such jurisdiction given the then-existing (and recently modified) § 1331. *See, e.g.*, S. Rep. No. 95-170, at 91-92.

*Third*, in light of this legislative history, the fact that, in the context of certain Senate subpoenas, there now may be some overlap between § 1331 and § 1365 as a result of the 1980 amendment to § 1331, *see Miers*, 558 F. Supp. 2d at 86-87 ("28 U.S.C. § 1365 provides jurisdiction for actions that also likely fall within the scope of 28 U.S.C. § 1331 – hence, the Senate can likely proceed on either basis where appropriate."), is simply irrelevant. It most assuredly does not constitute, as the Attorney General would have it, an "exclu[sion of] the action the Committee seeks to bring here." AG Mem. at 37.

**B.      The Court Has Jurisdiction under 28 U.S.C. § 1345.**

This Court also has jurisdiction under 28 U.S.C. § 1345 ("Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States . . . .") because this action was commenced "by the United States" against one of its officers. The Legislative Branch (and its authorized agent) clearly is as much "the United States" as the Executive Branch. Any argument that the Congress is not part of the United States ultimately "presumes that there is more than one 'United States' . . . and that the United States is something other than 'the sovereign composed of the three branches.'" *United States v. Providence Journal Co.*, 485 U.S. 693, 701 (1988) (quoting *Nixon*,

418 U.S. at 696).  When presented with that contention in another context, the Supreme Court

dubbed it "somewhat startling," and asserted that "the three branches are but 'co-ordinate parts

of one government.'"  *Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406

(1928)).

In *Senate Select I*, Judge Sirica held that a subcommittee of the Senate was not authorized

to sue as "the United States."  366 F. Supp. at 56.  In reaching that conclusion, he relied on 28

U.S.C. § 516, which states:  "Except as otherwise authorized by law, the conduct of litigation in

which the United States . . . is a party, or is interested . . . is reserved to officers of [DOJ]."  The

Court ruled that § 516's language indicates that only DOJ has "the right to sue as the United

States when jurisdiction derives from § 1345."  *Id.*

This ruling was incorrect because, among other reasons, § 516 – which is codified with

other provisions dealing with the internal administration of DOJ – was not intended to deal with

legal representation of Congress.  Rather, § 516 is a housekeeping statute designed to resolve

conflicts between Executive entities and DOJ over who will represent the former.  *See, e.g.*, *Mail

Order Ass'n of Am. v. U.S. Postal Serv.*, 986 F.2d 509, 527 (D.C. Cir. 1993); *FTC v. Guignon*,

390 F.2d 323, 324-35 (8th Cir. 1968).

However, even if *Senate Select I* was correct on this issue when it was decided, this

aspect of that decision no longer is good law in light of subsequent legal developments impacting

the "[e]xcept as otherwise authorized by law" language in § 516.  In particular, in 1992, pursuant

to its authority under the Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2, the House established

an Office of General Counsel.  H.R. Res. 423, 102d Cong. (1992) (enacted); *see also* H.R. Res.

5, 103d Cong. (1993) (enacted) (incorporating into House Rule I – now House Rule II.8 –

provision regarding "Office of General Counsel for the purpose of providing legal assistance and

representation to the House"). That rule has continued in force ever since. *See, e.g.*, Rule II.8, Rules of the House of Representatives (112th Cong.). And "[House] rules have the force of law . . . ." *Shape of Things to Come, Inc. v. Kane Cnty.*, 588 F. Supp. 1192, 1193 (N.D. Ill. 1984); *accord Randolph v. Willis*, 220 F. Supp. 355, 358 (S.D. Cal. 1963).[20]

As a means to effectuate this representation, in 1999 Congress enacted, and the President signed into law, 2 U.S.C. § 130f, which provides that:

> The General Counsel of the House of Representatives and any other counsel in the Office of the General Counsel of the House of Representatives . . . shall be entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States . . . .

§ 130f(a). This statute addresses, among other things, matters such as this one for which the House requires its own representation. *See also, e.g.*, 28 U.S.C. § 530D(a)(1)(B)(ii).

Accordingly, House Rule II.8 and § 130f "otherwise authorize[] by law" the Office of General Counsel to sue as "the United States" on behalf of the Congress – or an authorized committee of Congress – for purposes of § 516, thereby obviating *Senate Select I*'s concern about the House suing as the "United States" under § 1345.

## CONCLUSION

For all of the foregoing reasons, the Attorney General's Motion to Dismiss should be denied.

---

[20] While House Rules may not ignore constitutional restraints or violate fundamental rights, they otherwise are "absolute and beyond the challenge of any other body or tribunal." *United States v. Ballin*, 144 U.S. 1, 5 (1892); *see also Consumer's Union of U.S., Inc. v. Periodical Correspondent's Ass'n*, 515 F.2d 1341, 1343 (D.C. Cir. 1975) (Rulemaking Clause is "broad grant of authority"); *Walker v. Jones*, 733 F.2d 923, 938 (D.C. Cir. 1984) (MacKinnon, J., concurring in part and dissenting in part) (Rulemaking Clause sits at "the very core of our constitutional separation of powers").

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, D.C. Bar # 386816
General Counsel
WILLIAM PITTARD, D.C. Bar # 482949
Deputy General Counsel
CHRISTINE DAVENPORT
Senior Assistant Counsel
TODD B. TATELMAN
Assistant Counsel
MARY BETH WALKER, D.C. Bar # 501033
Assistant Counsel
ELENI M. ROUMEL
Assistant Counsel

Office of General Counsel
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and*
*Government Reform, U.S. House of Representatives*

November 21, 2012

## CERTIFICATE OF SERVICE

I certify that on November 21, 2012, I served one copy of the foregoing Plaintiff's

Opposition to Defendant's Motion to Dismiss by CM/ECF on all registered parties and by

electronic mail (.pdf format), on:

> John R. Tyler, Assistant Branch Director
> Eric R. Womack, Trial Attorney
> Gregory Dworkowitz, Trial Attorney
> Luke M. Jones, Trial Attorney
> U.S. DEPARTMENT OF JUSTICE
> Civil Division
> Federal Programs Branch
> Washington, D.C. 20001
> john.tyler@usdoj.gov
> eric.womack@usdoj.gov
> gregory.p.dworkowitz@usdoj.gov
> luke.jones@usdoj.gov

*/s/ Kerry W. Kircher*
Kerry W. Kircher
