# Exhibit 1

# Case No. 1:12-cv-1332 (ABJ)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br> 2157 Rayburn House Office Building <br> Washington, D.C. 20515-6143, <br><br> *Plaintiff*, <br><br> v. <br><br> ERIC H. HOLDER, JR., <br> in his official capacity as Attorney General of the United States, <br><br> United States Department of Justice <br> 950 Pennsylvania Avenue, N.W. <br> Washington, D.C. 20530-0001, <br><br> *Defendant*. | Case No. 1:12-cv-1332-ABJ |

## FIRST AMENDED COMPLAINT

Pursuant to the Court's direction at the January 10, 2013 Status Conference, *see* Minute Entry (Jan. 10, 2013), Plaintiff Committee on Oversight and Government Reform of the United States House of Representatives ("Committee" or "Oversight Committee") respectfully submits this First Amended Complaint as follows:

## INTRODUCTION

The Oversight Committee brings this civil action against Defendant Eric H. Holder, Jr., Attorney General of the United States, to enforce a duly authorized, issued and served Committee subpoena for documents, namely, the Subpoena to the Honorable Eric H. Holder, Jr.,

1

Att'y Gen. of the United States (~~Oct. 11, 2011) ("Holder Subpoena"), attached as Exhibit A.~~ Jan. 3, 2013), attached as Exhibit A, which superseded the Subpoena to the Honorable Eric H. Holder, Jr., Att'y Gen. of the United States (Oct. 11, 2011), attached as Exhibit B.  (The October 11, 2011 and the January 3, 2013 subpoenas are substantively identical.  The term "Holder Subpoena," as used herein, refers, where the context so indicates, to the October 11, 2011 subpoena, the January 3, 2013 subpoena, and/or both.)  This lawsuit, which is expressly authorized by the United States House of Representatives ("House"), arises out of:

- the obstruction by the U.S. Department of Justice ("Department" or "DOJ") of an Oversight Committee investigation – an investigation the Department has acknowledged is appropriate and legitimate – of a now-discredited DOJ law-enforcement operation known as "Operation Fast and Furious";

- the Attorney General's contumacious refusal to comply with the Holder Subpoena, in particular, his refusal to produce documents that would enable the Committee (and the American people) to understand how and why the Department provided false information to Congress and otherwise obstructed the Committee's concededly-legitimate investigation into Operation Fast and Furious;

- the President's assertion – not directly, but through the Deputy Attorney General – of "Executive privilege" as to some unproduced documents that are of particular interest to the Committee;[1] and

---

[1]  Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., at 1 (June 20, 2012) ("June 20, 2012 Privilege Letter") ("[T]he President has asserted [E]xecutive privilege over the relevant post-February 4, 2011, documents.").  For the convenience of the Court, documents referenced in this Complaint – other than those with their

(*Continued . . .* )

- the Committee's need for those documents – documents it cannot obtain elsewhere – in order to discharge its Article I responsibility to conduct oversight over the Department so that the Committee, and the Congress more generally, may determine whether the Department's malfeasance warrants additions to, or changes in, existing federal laws.

While the Committee is entitled to all documents responsive to the Holder Subpoena that have not been produced, the Committee seeks in this action to enforce the Holder Subpoena only as to a limited subset of responsive documents, namely those documents relevant to the Department's efforts to obstruct the Committee's investigation.  The principal legal issue presented here is whether the Attorney General may withhold that limited subset on the basis of "Executive privilege" where there has been no suggestion that the documents at issue implicate or otherwise involve any advice to the President, and where the Department's actions do not involve core constitutional functions of the President.

No Court has ever held that "Executive privilege" extends anywhere near as far as the Attorney General here contends that it does.  Indeed, it is no exaggeration to say that the Attorney General's conception of the reach of "Executive privilege," were it to be accepted, would cripple congressional oversight of Executive branch agencies, to the very great detriment of the Nation and our constitutional structure.  Accordingly, the Committee asks this Court to reject the Attorney General's assertion of "Executive privilege" and order him forthwith to comply with the Committee's subpoena, as set forth below.

---

own individual hyperlinks – are available for review at http://oversight.house.gov/documents-in-support-of-civil-action-by-oversight-committee-vs-eric-holder/.

**PRELIMINARY STATEMENT**

1.      In February 2011, the Oversight Committee – the principal investigative Committee of the House – commenced an investigation into a DOJ law enforcement operation known as Operation Fast and Furious (and related matters).  Operation Fast and Furious, which was operational between approximately November 2009 and January 2011, involved "gun walking," a controversial and now discredited tactic of knowingly permitting firearms purchased illegally in the United States to be unlawfully transferred to third-party possessors, with those illegally-purchased and unlawfully-transferred firearms intentionally not being interdicted by law enforcement authorities.  In Operation Fast and Furious, the Department knowingly allowed firearms to be purchased illegally in the United States and then transported across the U.S.-Mexico border into Mexico for the purpose of trying to establish a nexus between leaders of Mexican crime syndicates and the individual(s) who purchased the firearms.

2.      The Committee initiated its investigation, which was conducted jointly with the Honorable Charles E. Grassley, Ranking Member of the Senate Committee on the Judiciary, as a result of several developments including:

  i.      a November 2010 DOJ Inspector General report which found significant weaknesses in the implementation of Project Gunrunner, a comprehensive strategy designed to combat firearms trafficking, of which Operation Fast and Furious was a part;[2]

---

[2]  Review of ATF's Project Gunrunner, U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Div. (Nov. 2010), *available on-line at* http://www.justice.gov/oig/reports/ATF/e1101.pdf.

ii.    allegations by whistleblowers, and news reports, that the Department was utilizing gun walking techniques (allegations and reports that turned out to be true);

iii.   the murder, on or about December 15, 2010, of United States Border Patrol Agent Brian Terry while he was on duty in Arizona;

iv.    allegations by whistleblowers (that turned out to be true), and documentary evidence indicating, that two weapons found at the scene of Border Patrol Agent Terry's murder were weapons that Department officials responsible for Operation Fast and Furious had permitted to "walk"; and

v.     the Department's categorical public denial on February 4, 2011, through Assistant Attorney General Ronald A. Weich – in response to two written inquiries to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), a component bureau of the Department, from Senator Grassley[3] – that *any* gun walking operations even existed:

> [T]he allegation . . . that [ATF] "sanctioned" or otherwise knowingly allowed the sale of assault weapons to a straw purchaser who then transported them into Mexico – is false. ATF makes every effort to interdict weapons that have been purchased illegally and prevent their transportation to Mexico.[4]

---

[3]    Letter from the Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, to Kenneth E. Melson, Acting Dir., ATF (Jan. 27, 2011); Letter from the Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, to Kenneth E. Melson, Acting Dir., ATF (Jan. 31, 2011).

[4]    Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, at 1 (Feb. 4, 2011) ("Feb. 4, 2011 False Statement Letter").

3.      The February 4, 2011 False Statement Letter turned out to be false to such a material degree that, as discussed in paragraph 9 below, the Department later took the extraordinary step of formally withdrawing it, albeit not for another ten months, and not before Assistant Attorney General Weich reaffirmed, in May 2011, the substance of the February 4, 2011 False Statement Letter:  "It remains our understanding that ATF's Operation Fast and Furious did not knowingly permit straw buyers to take guns into Mexico."[5]

4.      Initially, the principal focus of the Committee's investigation was on understanding Operation Fast and Furious itself, and on determining (i) whether there was any malfeasance, abuse of authority, failed supervision, or violation of existing law on the part of the Department and its officials with regard to the conception and implementation of Operation Fast and Furious, and (ii) whether the facts uncovered suggested the need for additions to, or modification of, existing federal laws.  This aspect of the Committee's investigation is referred to herein as the "Operations Component" of the Committee's investigation.

5.      Portentously, the Department from the outset actively resisted cooperating fully with the Committee's investigation.  Among other things, the Department initially declined to produce documents; later produced only very limited numbers of documents in piecemeal fashion; refused to make available to the Committee certain witnesses; and limited the Committee's questioning of other witnesses who were made available.

6.      At the same time the Department was pursuing a general policy of non-cooperation, senior Department officials were acknowledging to the Committee that the

---

[5] Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, at 1 (May 2, 2011) ("May 2, 2011 False Statement Letter").

Committee's investigation was legitimate;[6] that "there's a there there;"[7] and, of particular

importance here, that the Department was managing its response to the Committee's

investigation so as to deny the Committee information, and so as "to push the information away

from [its] political appointees at the Department."[8]

7.      Notwithstanding the Department's lack of cooperation, the Committee managed

to uncover – through various other investigative techniques, in particular, the cooperation of DOJ

whistleblowers – a number of disturbing facts about Operation Fast and Furious itself.  In light of

those facts – especially facts that confirmed the Department's use of gun walking tactics in

Operation Fast and Furious – and in light of Acting ATF Director Melson's suggestion that the

Department deliberately was seeking to obstruct the Committee, the Committee's investigation

developed a second focus:  (i) whether the Department attempted to obstruct the Committee's

investigation by (a) lying to the Committee or otherwise providing it with false information, (b)

continuing to maintain a demonstrably false position about the use of gun walking tactics, and (c)

retaliating against DOJ whistleblowers;[9] (ii) if those things happened, (a) how and why they did,

---

[6]  Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., at 1-2 (Apr. 19, 2011) (DOJ does not "question[] the Committee's responsibility to conduct oversight of [whether, as part of Operation Fast and Furious, ATF promoted gun walking which allowed guns to enter Mexico].").

[7]  H.R. Rep. No. 112-546, at 12 (2012), *available on-line at* http://www.gpo.gov/fdsys/pkg/CRPT-112hrpt546/pdf/CRPT-112hrpt546.pdf.

[8]  Tr. of Interview of Kenneth Melson, Acting Dir., ATF at 123-24 (July 4, 20[1]1) ("Melson Transcript") (incorrectly dated in original as July 4, 2001).

[9]  *See* Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to William J. Hoover, Dep'y Dir., ATF, at 2 (June 21, 2011) ("several ATF agents related that they have already experienced retaliation"); Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to William J. Hoover, Dep'y Dir., ATF, at 1 (July 25, 2011) ("a witness scheduled to testify

(*Continued . . .* )

(b) why they persisted for so long, and (c) who was responsible; and (iii) whether the facts

uncovered suggested the need for additions to, or modification of, existing federal laws.  This

aspect of the Committee's investigation is referred to herein as the "Obstruction Component" of

the Committee's investigation.

8.      On October 11, 2011, pursuant to applicable Committee Rules, Committee

Chairman Darrell E. Issa authorized and, issued, and served on the Attorney General the Holder

Subpoena which directed the Attorney General to produce documents relevant to the Operations

Component and to the Obstruction Component of the Committee's investigation.

9.      Two months after the Committee issued the Holder Subpoena – and ten months

after the February 4, 2011 False Statement Letter asserted that no gun walking operations even

existed, and seven months after the May 2, 2011 False Statement Letter reasserted the substance

of the February 4 False Statement Letter – Deputy Attorney General James M. Cole

acknowledged publicly that the representations in the February 4, 2011 False Statement Letter

were in fact false:

> [F]acts have come to light during the course of th[e Committee's]
> investigation that indicate that the February 4 [False Statement]
> Letter contains inaccuracies.[10]

Indeed, the February 4, 2011 False Statement Letter contained so many inaccuracies that Deputy

Attorney General Cole took the extraordinary additional step of "formally withdraw[ing] the

---

before the Committee . . . received an intimidating letter from [an ATF official] . . . . The timing
and content of this letter strongly suggest that ATF is obstructing and interfering with the
congressional investigation into Operation Fast and Furious.").

[10] Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell E. Issa, Chairman,
Oversight Comm., & Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S.
Senate, at 1 (Dec. 2, 2011) ("Cole Retraction Letter").

February 4 letter," while acknowledging that Operation Fast and Furious "was [so] fundamentally flawed . . . its tactics must never be repeated."[11]

10.     Notwithstanding Deputy Attorney General Cole's acknowledgement that the Department had provided Congress with false information, the Attorney General has treated the Holder Subpoena with the same disregard with which the Department had treated the Committee's investigation from the outset.  Today, nearly ~~ten~~fifteen months after the return date for the Holder Subpoena, the Attorney General has produced, in response, only approximately 4,~~000~~300 pages of documents.  Of particular importance here, the Attorney General has refused, save for the production of approximately 300 pages of documents on or about September 19, 2012, *see infra* ¶¶ 62-63, to produce virtually all documents responsive to the Holder Subpoena dated or created after February 4, 2011 – the precise date of the February 4, 2011 False Statement Letter.  In effect, the Attorney General has refused to produce any documents that might aid the Committee in understanding, among other things, what the Department learned about which DOJ officials were responsible for Assistant Attorney General Weich providing Congress with false information; how the Department went about evaluating the February 4, 2011 False Statement Letter after the fact; what the Department learned that caused it to reverse its position and, eventually, to take the extraordinary step of withdrawing that letter entirely; why that process took so long; and how and why the Department continued to obstruct the Committee's investigation in the interim.

11.     Between October 11, 2011, and June 19, 2012, the Attorney General justified his refusal to produce documents dated or created after February 4, 2011, on the ground that the

---

[11]  Cole Retraction Letter, at 1-2.

Committee lacked sufficient investigatory interest in those documents. That is, the Attorney General purported to assume for himself the role of arbiter of what the Committee was entitled to investigate and not investigate, and to decide – in his role as self-appointed arbiter – that the Committee had an insufficient investigatory interest in the Obstruction Component of its investigation.[12]

12.    At no time between October 11, 2011, and June 19, 2012, did the Attorney General assert that any document responsive to the Holder Subpoena was subject to any claim of any particular privilege, including Executive privilege.

13.    The Committee repeatedly tried during that time period to reach an accommodation with the Attorney General that would result in the production to the Committee of documents responsive to the Holder Subpoena and relevant to the Obstruction Component of the Committee's investigation – without success.

14.    On June 20, 2012, moments before the commencement of a Committee meeting to consider recommending that the Attorney General be held in contempt of Congress for his contumacious refusal to comply with the Holder Subpoena, Deputy Attorney General Cole provided to the Committee a letter stating that "the President has asserted [E]xecutive privilege

---

[12] Tr. of Interview of Gary Grindler, Former Acting Dep'y Att'y Gen., Dept. of Justice, at 21-22 (Dec. 14, 2011) ("Grindler Transcript") ("The Department is entitled to respond to a congressional inquiry without Congress investigating our response . . . ."); Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., at 1 (May 15, 2012) ("[W]e believe that the core questions posed by the Committee about Operation Fast and Furious have been answered."); Letter from Eric H. Holder, Jr., Att'y Gen., to The President, at 1-2 (June 19, 2012) ("June 19, 2012 Letter") (asking President to assert Executive privilege on ground that responsive documents "were not generated in the course of the conduct of Fast and Furious" but, rather, "in the course of the Department's deliberative process concerning how to respond to congressional and related media inquiries into that operation").

over the relevant post-February 4, 2011, documents."[13]  That letter does not identify any

presidential communications that purport to be the subject of the Executive privilege claim, and

does not identify any specific document to which the asserted privilege purports to apply.

Rather, the June 20, 2012 Privilege Letter – although it recites the words "Executive privilege" –

rests entirely on a common law privilege known as the "deliberative process privilege."  *See In*

*re Sealed Case*, 121 F.3d 729, 736-40, 744-45 (D.C. Cir. 1997) (indicating that term "Executive

privilege" encompasses, not only constitutionally-based "presidential communications

privilege," but also common law "deliberative process privilege").  The Attorney General has

confirmed that "the President did not assert the Presidential Communications component of

Executive Privilege over the documents at issue in this case."  Joint Status Report at 5 (Jan. 7,

2013) (ECF No. 32); *see id.* (yet insisting on not stating "definitively whether he intends

[ultimately] to rely upon an assertion of the Presidential Communications component of

Executive Privilege").

15.     The privilege claim contained in the June 20, 2012 Privilege Letter is legally

baseless.  As a result, at its June 20, 2012 meeting, the Committee rejected the claim and

recommended that the full House hold the Attorney General in contempt of Congress.

16.     On June 28, 2012, by a bipartisan vote of 255-67, the full House passed House

Resolution 711, 112th Cong. (2012) (enacted) ("H. Res. 711"), pursuant to which the House

found "Eric H. Holder, Jr., Attorney General of the United States . . . in contempt of Congress

for failure to comply with a congressional subpoena."

---

[13]   June 20, 2012 Privilege Letter, at 1.

17.     The Attorney General's intransigence has prevented the Committee from completing its investigation.  In particular, without those documents, the Committee cannot complete the Obstruction Component of its investigation.

18.     The Legislative Branch is vested by the Constitution with the responsibility and authority to oversee Executive Branch agencies – including the Department – to ensure, among other things, that unelected officials in charge of those agencies are held fully accountable to the American people.  While the Department is charged with enforcing the laws of the land, it does not stand above such constitutionally-mandated congressional oversight.   How the Department conducts its enforcement authority, and how the Department operates and manages itself internally, have long been the subject of extensive congressional oversight.  Indeed, oversight is most essential where there is evidence of serious misconduct on the part of senior-level Department officials.  In this case, as detailed herein, the Department repeatedly misled the Committee about a misguided operation linked to the death of an American border patrol agent.  The Cole Retraction Letter suggests, at best, a serious breakdown in communications and lines of authority within the Department's chain of command, a breakdown that may need to be addressed by legislation; at worst, it suggests a conscious effort on the part of senior Department officials to mislead the Committee and frustrate a legitimate oversight investigation.  Either way, these circumstances make imperative robust congressional oversight to protect the public interest.  Enforcement of the Holder Subpoena is essential to permit such oversight to occur.

## PARTIES

19.     Plaintiff Committee on Oversight and Government Reform is a standing committee of the United States House of Representatives.

20.     Defendant Eric H. Holder, Jr. is, and has been since February 2, 2009, the

Attorney General of the United States.  He is the custodian of documents responsive to the

Holder Subpoena.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.  This case

arises under the Constitution and laws of the United States and is brought by the United States,

i.e., the Oversight Committee, pursuant to a Resolution of the House of Representatives.

22.     This Court has authority to issue a declaratory judgment and order other relief that

is just and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (b)(2) and (e).

## GENERAL ALLEGATIONS

**The Oversight Committee Possesses the Constitutional Authority To Investigate Operation
Fast and Furious, and the Department's Effort To Obstruct the Investigation.**

24.     The Constitution bestows upon the House, by itself and through its committees,

the power to investigate matters and conditions relating to subjects within Congress's legislative

jurisdiction and to conduct oversight of the other branches of the federal government, including

the Executive Branch which includes the Department.  That power includes the constitutional

authority to require the production of documentary evidence from Executive Branch officials and

agencies, by way of subpoenas duces tecum.

25.     The Oversight Committee is a standing committee of the House, duly established

pursuant to House Rule X.1(n), Rules of the House of Representatives (112th Cong.).[14]  The

--------

[14]  The current Rules of the House are *available on-line at*
http://rules.house.gov/Media/file/PDF_112_1/legislativetext/112th%20Rules%20Pamphlet.pdf.

Rules of the House are adopted pursuant to the Rulemaking Clause of the Constitution, U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings . . . .").

26.     The Oversight Committee has specific legislative and oversight jurisdiction over, among other things, "[g]overnment management and accounting measures generally," H.R. Rule X.1(n)(4), "[o]verall economy, efficiency, and management of government operations and activities," *id.* at X.1(n)(6), and "[r]eorganizations in the executive branch of the Government," *id*. at X.1(n)(12).  In addition, the Oversight Committee has broad authority to "at any time conduct investigations of any matter without regard to clause 1, 2, 3 or this clause conferring jurisdiction over the matter to another standing committee."  *Id*. at X.4(c)(2).

27.     The Oversight Committee is specifically authorized to "require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary."  *Id*. at XI.2(m)(l)(B).  House Rule XI also provides that the Committee may delegate to its chairperson the power to issue subpoenas, *id.* at XI.2(m)(3)(A)(i), and the Committee has done that, *see* Rule 12(d), The Rules of the Committee on Oversight and Government Reform, U.S. House of Representatives (112th Cong.) (Chairman may "[a]uthorize and issue subpoenas as provided in House Rule XI, clause 2(m), in the conduct of any investigation or activity or series of investigations or activities within the jurisdiction of the Committee.").[15]

---

[15]  The current Committee Rules are *available on-line at* http://oversight.house.gov/wp-content/uploads/2012/02/1-21-12-OGR-Committee-Rules-for-112th-Congress.pdf.

**The Oversight Committee Investigates Operation Fast and Furious.**

28.     As discussed in paragraphs 1-2 above, the Committee commenced its investigation of Operation Fast and Furious in February 2011, jointly with Senator Grassley.

29.     Initially, the Committee attempted to obtain necessary documents from the Department through informal means.  For example, on March 16, 2011, Chairman Issa wrote to Acting ATF Director Melson to request that certain documents regarding Operation Fast and Furious be produced to the Committee.[16]

30.     Notwithstanding the Committee's efforts to proceed informally, and notwithstanding its efforts to enlist the Department in cooperating with the investigation for the benefit of the American people, the Department actively resisted cooperating fully with the Committee's investigation from the very outset.  For example, twenty minutes prior to the response deadline in the Chairman's March 16, 2011 letter to Acting ATF Director Melson, the Department's Office of Legislative Affairs ("OLA") informed Committee staff in a phone conference that no documents would be produced (and, at the same time, asked for clarification of the Chairman's letter including, remarkably, asking for a definition of the word "list").[17] Senior Department officials, including individuals in OLA and the Office of the Deputy Attorney General ("DAG"), also prevented Mr. Melson from providing the Committee with any documents in response to the Chairman's March 16, 2011 letter.[18]

---

[16]  Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Kenneth E. Melson, Acting Dir., ATF (Mar. 16, 2011).

[17]  Telephone conference between DOJ, Office of Leg. Aff. Staff, & Oversight Comm. Staff (Mar. 30, 2011).

[18]  Melson Tr. at 30-31, 104-06, 124, 126-28.

31.     As a result, on March 31, 2011, Chairman Issa, pursuant to Committee rules, issued to Mr. Melson a Committee subpoena for documents, returnable on April 13, 2011. Notwithstanding the issuance of the Melson Subpoena, the Department continued to decline to produce documents.  Between March 31 and June 9, 2011, the Department did not produce a single non-public document in response to the Melson Subpoena.  When Committee staff agreed, as a preliminary matter, to review certain responsive documents *in camera* at the Department, many of the documents made available were heavily redacted (some completely); others were duplicative; and still others already were publicly available on the Internet.[19]  It was not until June 10, 2011 – one business day before a scheduled Committee hearing on Operation Fast and Furious – that the Department first produced to the Committee any non-public documents, a total of 69 pages.

32.     The Department also refused to make available to the Committee certain Department witnesses, and limited the Committee's questioning of other Department witnesses.

33.     The Committee attempted to obtain relevant information directly from other component entities of the Department.  For example, Chairman Issa and Senator Grassley together wrote to the FBI and the DEA on July 11 and 15, 2011, respectively.[20]  Each letter requested certain documents relevant to the addressee agency's involvement in Operation Fast

---

[19]  Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen. (May 5, 2011).

[20]  Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., and Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, to Hon. Robert S. Mueller, III, Dir., FBI (July 11, 2011); Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, to Hon. Michele M. Leonhart, Administrator, DEA (July 15, 2011).

and Furious, including documents relevant to information sharing, or the lack thereof, among

component agencies of the Department.  The FBI did not produce a single document and the

DEA produced only a very small number of documents.  (The FBI and DEA did later brief

Committee staff.)

34.     On September 1, 2011, Chairman Issa and Senator Grassley wrote to the Acting

U.S. Attorney for the District of Arizona to request documents relating to Operation Fast and

Furious, and to request interviews with three employees of that office who were involved in the

operation.[21]  The Acting U.S. Attorney never responded.  While the Department belatedly

responded several months later on behalf of the Acting U.S. Attorney, the Department did not

produce the requested documents and it refused the Committee's interview request as to two of

the three employees.[22]  The third employee, whom the Department did agree to make available

for an interview – Patrick Cunningham, Chief of the Criminal Division, U.S. Attorney's Office

for the District of Arizona – invoked his Fifth Amendment privilege against self-incrimination,

resigned from government service, and never sat for an interview.[23]

35.     From June 10 to October 11, 2011, the Department produced, piecemeal,

approximately 2,000 pages of documents (i.e., substantially fewer pages than would fit in a

---

[21]  Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon. Charles E.
Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, to Hon. Ann Birmingham
Scheel, Acting U.S. Att'y, Dist. of Ariz. (Sept. 1, 2011).

[22]  Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman,
Oversight Comm., & Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S.
Senate (Dec. 6, 2011) ("We are not prepared to make any of these attorneys available for
interviews.").

[23]  Letter from Tobin J. Romero to Hon. Darrell E. Issa, Chairman, Oversight Comm., at
1-2 (Jan. 19, 2012).

single bankers box).  During this time, the Committee repeatedly sought full and prompt

compliance with the Melson Subpoena.  Despite again acknowledging "the Committee's

legitimate oversight interest in the genesis and strategy pertaining to Fast and Furious,"[24] the

Department continued to refuse to comply fully.

36.     Instead, on October 11, 2011, the Department peremptorily announced that it had

"substantially concluded [its] efforts to respond" to the Melson Subpoena,[25] even though it

remained in possession of substantial numbers of responsive documents that had not been

produced to the Committee.

**The Committee's Investigation Develops a Second Focus: The Obstruction Component.**

37.     As 2011 wore on, and notwithstanding the Department's policy of non-

cooperation, the Committee uncovered enough information, primarily through DOJ

whistleblowers and other confidential sources, to discern the basic facts about Operation Fast and

Furious itself.  For example, the Committee learned that:

  i.     the Department in fact had used risky gun walking techniques in an effort to trace

         illegally-purchased weapons;

  ii.    in Operation Fast and Furious itself, the Department knowingly – indeed

         purposefully – allowed more than 1,000 firearms, including semi-automatic

         assault weapons, to pass into the hands of prohibited purchasers who, the

         Department knew, intended to facilitate the transport of those firearms to Mexico;

---

[24]  Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman,
Oversight Comm., at 1 (June 14, 2011).

[25]  Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman,
Oversight Comm., at 1 (Oct. 11, 2011).

iii.    ATF linked those weapons to the murder of Border Patrol Agent Terry, and Mexican officials linked them to scores of killings in Mexico;

iv.    the "big fish" ATF had been chasing through Operation Fast and Furious (i.e., higher-ups in the gun trafficking ring the Department hoped to identify and prosecute though its gun walking tactics) (a) already were known to the DEA and FBI, and (b) actually were, or had been, on the DEA and/or FBI payrolls;

v.    the U.S. Attorney's Office in Arizona oversaw Operation Fast and Furious on a day-to-day basis once it became an Organized Crime Drug Enforcement Task Force case in early 2010;

vi.    senior Department officials – particularly in ATF, the Department's Criminal Division, and DAG – were responsible for authorizing, and for failing to halt, the gun walking tactics used in Operation Fast and Furious;

vii.    the supervision of Operation Fast and Furious was seriously flawed in that, among other things:

    a.    ATF employees understood their supervisors to include DAG officials, while those same DAG officials told the Committee that they considered themselves to have no supervisory function with respect to the ATF; thus, while ATF officials understood that DAG officials had considered and approved the gun walking tactics used in Operation Fast and Furious, those same DAG officials told the Committee that they considered their review of those tactics to have been informational only.

    b.    Notwithstanding their responsibility under 18 U.S.C. § 2516(1) to review certain wiretap applications before those applications are submitted

19

to an Article III court – which applications in the case of Operation Fast
and Furious contained detailed descriptions of the gun walking tactics
being used – certain senior Department officials told the Committee that
they authorized those wiretap applications without ever actually reviewing
them.[26]

c.      As a result of the failure of DOJ component entities to share
information, Operation Fast and Furious always had been doomed to
failure.

---

[26]  Staff of H. Comm. on Oversight and Gov't Reform & Hon. Charles E. Grassley,
Ranking Member, S. Comm. on Judiciary, 112th Cong., Rep. on Part I of III, Fast and Furious:
The Anatomy of a Failed Operation at 167-76 (Comm. Print 2012) ("Joint Staff Report–Part
One"), *available on-line at* http://oversight.house.gov/wp-content/uploads/2012/07/7-31-12-FF-
Part-I-FINAL-REPORT.pdf.  The Joint Staff Report–Part One is the first of three reports
contemplated by the Committee that will address Operation Fast and Furious, the first two of
which ~~will~~ address the Operations Component of the Committee's investigation.  Part One,
released July 31, 2012, addresses ATF's implementation of Operation Fast and Furious~~, while
Part Two will address the "failure of supervision and leadership by officials at Justice
Department headquarters." *Id.* at 5.~~.  Part Two, released October 29, 2012, addresses the
"management culture at the Department [of Justice]."  Staff of H. Comm. on Oversight and
Government Reform & Hon. Charles E. Grassley, Ranking Member, S. Comm. on Judiciary,
112th Cong., Rep. on Part II of III, Fast & Furious:  The Anatomy of a Failed Operation at 10
(Comm. Print 2012) ("Joint Staff Report–Part Two"), *available on-line at*
http://oversight.house.gov/wp-content/uploads/2012/10/10-29-12-Fast-and-Furious-The-
Anatomy-of-a-Failed-Operation-Part-II-of-III-Report.pdf.

Part Three will address the Obstruction Component of the Committee's investigation,
and its preparation is contingent on the Committee obtaining documents responsive to the Holder
Subpoena as a result of this litigation.

38.     More importantly for purposes of this suit, the Committee concluded that the Department had provided it with false information that obstructed the Committee's investigation, and otherwise actively was attempting to thwart the Committee's investigation.  For example:

i.     As a result of the information uncovered by the Committee, discussed in the preceding paragraph, it became clear that the February 4, 2011 False Statement Letter and the May 2, 2011 False Statement Letter contained information and representations that were materially false.

ii.     On July 4, 2011, Acting ATF Director Melson appeared before Committee staff – with private counsel but without DOJ handlers – and asserted, among other things, that the Department was managing its response to the Committee investigation so as to deny the Committee information, and so as "to push the information away from their political appointees at the Department."[27]

39.     As a result, the Committee's investigation developed a second aspect, the Obstruction Component, described in paragraph 7 above.

**The Committee Issues the Holder Subpoena and the Attorney General Defies It.**

40.     On October 11, 2011, as a result of (i) the Department's October 11, 2011 letter stating that it had "substantially concluded [its] efforts to respond" to the Melson Subpoena after producing only a negligible quantity of responsive documents,[28] and (ii) the Committee's

---

[27]  Melson Tr. at 130.

[28]  Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., at 1 (Oct. 11, 2011).

development of the Obstruction Component of its investigation, Chairman Issa, pursuant to

Committee rules, issued the Holder Subpoena, with an October 25, 2011 return date.

41.     The Holder Subpoena required the Attorney General to produce various

categories of documents, including the following four categories that are particularly significant

for purposes of this lawsuit:

> [Category] 1.  All communications referring or relating to Operation
> Fast and Furious . . . or any Organized Crime Drug Enforcement
> Task Force (OCDETF) firearms trafficking case based in Phoenix,
> Arizona, to or from the following individuals [16 enumerated senior
> Department officials].

> [Category] 4.   All documents and communications referring or
> relating to any instances prior to February 4, 2011 [i.e., prior to the
> February 4 False Statement Letter] where [ATF] failed to interdict
> weapons that had been illegally purchased or transferred.

> [Category] 5.   All documents and communications referring or
> relating to any instances prior to February 4, 2011 where ATF broke
> off surveillance of weapons and subsequently became aware that
> those weapons entered Mexico.

> [Category] 10.  All documents and communications between and
> among [the former U.S. Attorney for the District of Arizona and
> certain enumerated senior Department officials] referring or relating
> to Operation Fast and Furious or any OCDETF case originating in
> Arizona.

Holder Subpoena, Schedule, at 1-2. (Exs. A & B).  The Holder Subpoena directed the Attorney

General, "[i]n the event that a document is withheld on the basis of privilege, [to] provide a

privilege log containing [certain specified] information concerning any such document . . . ." *Id.*

at Schedule Instructions, Instr. 12.

42.     The Attorney General's response to the Holder Subpoena has been consistent

with the Department's overall response to the Committee's investigation:  slow and woefully

incomplete.  Among other things, the Attorney General has refused to produce documents dated

or created after February 4, 2011, that are responsive to Categories 1, 4, 5, and 10 of the Holder

Subpoena.  In particular, the Attorney General's response proceeded as follows:

i.    The Attorney General produced no documents and asserted no privilege by the October 25, 2011 return date.

ii.    Between October 31, 2011, and May 15, 2012, the Attorney General produced only approximately 4,000 pages (i.e., just more than would fit, if printed single-sided, in a single bankers box), which production included virtually no documents that are dated or were created after February 4, 2011.[29]

iii.    After the commencement of this litigation, the Attorney General produced to the Committee approximately 300 pages of documents which postdate February 4, 2011, but only after the existence of those documents was revealed by a September 19, 2012 report of the Department's Inspector General, *see infra* ¶¶ 62-63.

~~iii.~~iv.    Many of the pages produced were redacted (some completely); others previously had been made available publicly on the Internet; and still others were duplicative.[30]

~~iv.~~v.    The Attorney General asserted no privilege, prior to June 20, 2012, as to any withheld document.

---

[29]  The Department's May 15, 2012 production did include three post-February 4, 2011 documents, all of which are self-serving instruments, and none of which are relevant to the Obstruction Component of the Committee's investigation.

[30]  The "managed" nature of the Department's response to the Committee's investigation is reflected in the fact that many of the documents actually produced were shared with the media at the same time they were produced to the Committee.

~~v.~~ vi.     At the same time the Department was withholding documents from the

Committee, it was producing substantial numbers of documents – approximately

80,000 pages of records and over 100,000 e-mails – to the DOJ Inspector General

who also was investigating Operation Fast and Furious.[31]

43.     From October 31, 2011 to May 15, 2012, the Attorney General and his

subordinates reiterated that he would produce no documents responsive to the Holder Subpoena

that were dated or created after February 4, 2011, and would not even permit Department

witnesses to discuss relevant events that occurred after that date.  For example:

i.     On December 8, 2011, the Attorney General testified before the House

Committee on the Judiciary that (a) "with regard to the Justice Department as a

whole – and I'm certainly a member of the Justice Department – we will not

provide memos after February the 4th . . . e-mails, memos"; and (b) "with regard

to provision of e-mails, I thought I've made it clear that after February the 4th it is

not our intention to provide e-mail information."[32]  The Attorney General

proffered no legal basis for this proclamation, and invoked no privilege.

ii.     On December 14, 2011, Department counsel, appearing with Gary Grindler, the

Attorney General's Chief of Staff and former Deputy Attorney General,

broadened the Attorney General's unilateral refusal to produce post-February 4,

2011 documents to any "information," period, as to that time period:  "What I am

---

[31]  Press Release, Sen. Charles E. Grassley, Grassley Reacts to New Fast and Furious Report (Jan. 31, 2012).

[32]  *Oversight Hr'g on the United States Dep't of Justice:  Hr'g Before the H. Comm. on the Judiciary*, 112th Cong. (Dec. 8, 2011) (testimony of Eric H. Holder, Jr., Att'y Gen.).

saying is that the Attorney General made it clear at his testimony last week that we are not providing information to the committee subsequent to the February 4th [False Statement] letter."[33]  Department counsel proffered no legal basis for this proclamation, and invoked no privilege.

    iii.    On January 10, 2012, Deputy Assistant Attorney General Jason Weinstein refused to answer a line of questions put to him by Committee staff because the questions "implicate[] the post-February 4th period."[34]  Mr. Weinstein proffered no legal basis for this proclamation, and invoked no privilege.

44.    The Attorney General adhered to his absolutist "no post-February 4 documents position," notwithstanding the Committee's repeated explanations for why the documents were necessary to the Committee's investigation, particularly the Obstruction Component of that investigation.  For example:

    i.    On January 31, 2012, Chairman Issa advised the Attorney General that (a) the Committee recently had learned that Assistant Attorney General Lanny Breuer, head of the Department's Criminal Division, was in Mexico shortly before February 4, 2011 – i.e., shortly before the February 4, 2011 False Statement Letter was issued to Senator Grassley – advocating a program in which United States law enforcement authorities would allow illegally purchased firearms to be transported across the U.S.-Mexico border; (b) such advocacy by Assistant

---

[33]  Grindler Tr. at 22.

[34]  Tr. of Interview of Jason Weinstein, Dep'y Ass't Att'y Gen. at 177 (Jan. 10, 2012) ("Weinstein Transcript").

Attorney General Breuer in early February 2011 appeared to be inconsistent with the categorical statements in the February 4, 2011 False Statement Letter; and, as a result, (c) "[t]he subpoenaed documents are . . . critical in understanding how the Department mishandled its response to Congress and obstructed our investigative responsibilities."[35]

ii.   On March 27, 2012, Chairman Issa advised the Attorney General that an ATF employee, through his private counsel, recently had provided to the Committee certain DOJ documents – responsive to the Holder Subpoena – that the Department had never produced.  "The Department still has not produced most of these documents, has provided no notice that it is withholding them, and has cited no valid legal privilege to authorize doing so.  Failure to produce documents pursuant to the subpoena merely because they would prove embarrassing for the Department runs contrary to principles of transparency and the Department's obligation to cooperate with the congressional investigation in good faith."[36]

iii.   On May 18, 2012, Chairman Issa, along with the Speaker, Majority Leader and Majority Whip of the House, informed the Attorney General that "two key questions [posed by the Committee's investigation] remain unanswered:  first,

---

[35]  Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen., at 1 (Jan. 31, 2012).  The Committee also learned that Assistant Attorney General Breuer, while engaged in such advocacy with the Mexican government, possessed a draft of the February 4, 2011 False Statement Letter.

[36]  Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., and Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, to Eric. H. Holder, Att'y Gen., at 1 (Mar. 27, 2012).

who on your leadership team was informed of the reckless tactics used in Fast &
Furious prior to Agent Terry's murder; and, second, did your leadership team
mislead or misinform Congress in response to a Congressional subpoena?"[37]

45.     In short, (i) the Department provided Congress with false information in
connection with a legitimate Committee investigation which concerned a law enforcement
operation the Department eventually acknowledged was a debacle, and (ii) the Attorney General
– instead of assisting the Committee in determining how the Department had brought such
discredit upon itself – then responded by unilaterally denying the Committee access to any
information that would have enabled it to understand how those events transpired.  The Attorney
General justified his position with respect to the post-February 4, 2011 documents by claiming
the Committee lacked a sufficient investigatory interest in those documents as discussed in
paragraph 11 above, and with nebulous references to "confidentiality interests" and "separation
of powers concerns."[38]  Through June 19, 2012, he asserted no privilege with respect to any
withheld document.

**The Committee Unsuccessfully Seeks a Negotiated Resolution.**

46.     Notwithstanding the Attorney General's intransigence after the Holder Subpoena
was issued, the Committee repeatedly sought an accommodation with him.  For example:

---

[37]  Letter from Hon. John A. Boehner, Speaker, Hon. Eric Cantor, Majority Leader, Hon.
Kevin McCarthy, Majority Whip, and Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric
H. Holder, Jr., Att'y Gen., at 1 (May 18, 2012).

[38]  Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell E. Issa, Chairman,
Oversight Comm., at 7 (May 15, 2012); *see also* Weinstein Tr. at 178, 237-38, 256-57.

i.  On four occasions after the issuance of the Holder Subpoena – October 12, 2011, November 3, 2011, January 20, 2012, and February 27, 2012 – and seven in all after issuance of the Melson Subpoena, Committee staff traveled to the Department to view documents, notwithstanding the Department's refusal to provide the Committee with copies of those documents.

ii.  The Committee offered to narrow the focus of the Holder Subpoena in an effort to obtain the Attorney General's cooperation in producing documents relevant to the Obstruction Component of the Committee's investigation – without ever obtaining a positive response from the Attorney General.  For example:

a.  On May 18, 2012, Chairman Issa, along with the Speaker, Majority Leader and Majority Whip of the House, offered to narrow the outstanding demand for compliance to two categories of documents:  (1) information showing the involvement of senior officials during Fast and Furious, and (2) post-February 4, 2011 documents related to the Department's response to congressional inquiries and to whistleblower allegations.[39]  While the Department responded with platitudes about compromise – "[w]e are hopeful that . . . ongoing conversations will lead to a mutually acceptable

_____

[39]  Letter from Hon. John A. Boehner, Speaker, Hon. Eric Cantor, Majority Leader, Hon. Kevin McCarthy, Majority Whip, and Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen. (May 18, 2012).

resolution of these issues" – it included no proposal for actually producing

to the Committee documents responsive to the Holder Subpoena.[40]

b.      On June 13, 2012, Chairman Issa sent a letter to the Attorney

General with a specific settlement proposal that, if accepted, would have

allowed the Oversight Committee to cancel its scheduled contempt of

Congress proceeding.  Specifically, the Chairman offered to cease

contempt of Congress proceedings in return for production of only the

post-February 4, 2011 materials related to the Obstruction Component of

the Committee's investigation.[41]

c.      On June 15, 2012, Chairman Issa wrote to the Attorney General

indicating that both he and Senator Grassley were willing to meet with the

Attorney General to discuss the Department's proposal to produce a subset

of post-February 4, 2011 documents detailing how the Department's

understanding of the facts of Operation Fast and Furious evolved during

the post-February 4 period.[42]

d.      On June 19, 2012, Chairman Issa – along with the Honorable

Elijah E. Cummings, Oversight Committee Ranking Member; the

---

[40]  Letter from James M. Cole, Dep'y Att'y Gen., to Hon. John A. Boehner, Speaker, House of Reps., et al. (June 5, 2012).

[41]  Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen. (June 13, 2012).

[42]  Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen. (June 15, 2012).

Honorable Patrick Leahy, Chairman of the Senate Judiciary Committee;

and Senator Grassley – met with the Attorney General in an attempt to

negotiate a resolution to the dispute.  The Attorney General proposed to

disclose a very limited number of post-February 4, 2011 materials, *hand-

selected by political appointees within the Department*, in exchange for (1)

acceptance by the Committee, *sight unseen*, of the Department's subset of

documents as full compliance with the Holder Subpoena, and (2) a

*permanent cancellation* of any contempt of Congress vote.  Because

acceptance of this proposal would have required the Oversight Committee

wholly to abdicate its constitutional oversight responsibilities, something

to which it could never accede, the proposal was rejected.

**The President, Through the Deputy Attorney General, Asserts "Executive Privilege";
The Committee Again Is Rebuffed in Its Efforts to Reach an Accommodation; and
The House Votes to Hold the Attorney General in Contempt of Congress.**

47.     On June 20, 2012, more than eight months after the issuance of the Holder

Subpoena – and literally moments before a scheduled Committee meeting to consider a

resolution recommending to the full House that it adopt a resolution holding the Attorney

General in contempt of Congress – Deputy Attorney General Cole informed the Committee that

the President had asserted Executive privilege "over the relevant post-February 4, 2011,

documents."[43]  The Deputy Attorney General did not provide a privilege log of any kind for, or

otherwise describe, the withheld documents; the letter contained no suggestion that the

---

[43]  June 20, 2012 Privilege Letter, at 1.

documents at issue implicate or otherwise involve any advice to the President; and the letter claiming "Executive privilege" was not signed by the President.

48.     The Oversight Committee met in open session on June 20, 2012, to consider the Attorney General's refusal to comply with the Holder Subpoena.  The Committee rejected the assertion of Executive privilege and voted 23-17 to report the Attorney General's contumacious conduct to the full House.

49.     On June 22, 2012, the Committee's report, H.R. Rep. No. 112-546 (2012), was filed with the Clerk of the House.

50.     On June 25, 2012, Chairman Issa wrote to the President to express a continued willingness on the part of the Committee, even following the Committee's contempt recommendation, to try to reach an accommodation with the Attorney General regarding the dispute over the Holder Subpoena.  "I still believe that a settlement, rendering further contempt of Congress proceedings unnecessary, is in the best interests of the Justice Department, Congress, and those most directly affected by Operation Fast and Furious."[44]  The President never responded.

51.     On June 26, 2012, staff members from both the Oversight Committee and the House leadership met with officials from both the Department and the White House.  At this meeting, Executive Branch officials again insisted that the Committee agree to drop its investigation in return for the receipt, sight unseen, of some documents hand-selected by the Department.  Notably, (i) the Executive Branch officials present could not even identify the

---

[44]  Letter from Hon. Darrell E. Issa, Chairman, Oversight Committee, to The President, at 6 (June 25, 2012).

number of post-February 4, 2011 documents they proposed to produce, and (ii) the handful of

pages the Executive Branch officials brought with them to the meeting – billed as an "illustrative

sample" of a "fair compilation" of documents – shed no meaningful light on the Obstruction

Component of the Committee's investigation.

      52.      On June 28, 2012, the House adopted H. Res. 711 by a bipartisan vote of 255-

67.[45]  H. Res. 711 provides that Attorney General Holder "shall be found to be in contempt of

Congress for failure to comply with a congressional subpoena," and directs that, "pursuant to 2

U.S.C. 192 and 194, the Speaker of the House of Representatives shall certify the report of the

[Oversight Committee], detailing the refusal of Eric H. Holder, Jr., Attorney General . . . to

produce documents to the Committee . . . as directed by subpoena, to the [U.S.] Attorney for the

District of Columbia, to the end that Mr. Holder be proceeded against in the manner and form

provided by law."

      53.      On June 28, 2012, the full House also adopted, by a bipartisan vote of 258-95,

House Resolution 706, 112th Cong. (June 28, 2012) (enacted) ("H. Res. 706").[46]  H. Res. 706

~~authorizes~~authorized the Chairman of the Oversight Committee, among other things, to initiate

this suit on behalf of the Committee to enforce the Attorney General's legal obligations to

comply with the Holder Subpoena.

---

[45]  158 Cong. Rec. H4417 (daily ed. June 28, 2012), *available on-line at*
http://www.gpo.gov/fdsys/search/citation.result.CREC.action?congressionalRecord.volume=158
&congressionalRecord.pagePrefix=H&congressionalRecord.pageNumber=4417&publication=C
REC.

[46]  158 Cong. Rec. H4420-21 (daily ed. June 28, 2012), *available on-line at*
http://www.gpo.gov/fdsys/search/citation.result.CREC.action?congressionalRecord.volume=158
&congressionalRecord.pagePrefix=H&congressionalRecord.pageNumber=4420&publication=C
REC.

54.     Before the Speaker had even certified the House's contempt of Congress resolution and the Committee's Report to the U.S. Attorney, pursuant to H. Res. 711 and 2 U.S.C. § 194, Deputy Attorney General Cole – who is not the official vested by statute with the obligation to take legal action in response to any certification by the Speaker – notified the Speaker that any such certification would be of no concern to the Department:  "[T]he Attorney General's response to the [Holder Subpoena] does not constitute a crime, and therefore the Department will not bring the congressional contempt citation before a grand jury or take any other action to prosecute the Attorney General."[47]

55.     On June 29, 2012, the Speaker certified to the U.S. Attorney for the District of Columbia, Ronald C. Machen, Jr., H. Res. 711 and H.R. Rep. No. 112-546.  Mr. Machen did not respond.

56.     On June 29, 2012, Senator Grassley advised Mr. Machen that he (Mr. Machen) was statutorily obligated to present the matter of the Attorney General's contempt to a grand jury; asked Mr. Machen whether he had "been instructed not to present the contempt citation to a grand jury"; and asked whether Mr. Machen "independently [had] decided not to present the contempt citation to a grand jury."[48]  Again, Mr. Machen did not respond.

57.     On July 16, 2012, Deputy Attorney General Cole – not Mr. Machen – responded to Senator Grassley's June 29, 2012 letter to Mr. Machen as follows:  "[Mr. Machen] has asked

---

[47]  Letter from James M. Cole, Dep'y Att'y Gen., to Hon. John A, Boehner, Speaker of the House, at 2 (June 28, 2012).

[48]  Letter from Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, to Ronald C. Machen, Jr., U.S. Att'y, at 3 (June 29, 2012).

that I convey to you his concurrence with the position" that no criminal prosecution against the Attorney General would be pursued.[49]

58.    On July 26, 2012, the General Counsel of the House wrote to Mr. Machen to inquire "whether Deputy Attorney General Cole's statement that you will not proceed as required by Section 194 represents your position."[50]  On July 30, 2012, Mr. Machen responded that he would not proceed as required by Section 194.[51]

59.    Accordingly, it is clear beyond any doubt that enforcement of the Holder Subpoena by way of criminal prosecution of the Attorney General, pursuant to 2 U.S.C. § 194, is foreclosed (at least as long as Mr. Machen serves as U.S. Attorney).

60.    As a result, the parties arewere (and remain) at an impasse and, accordingly, the Committee now seekssought (and continues to seek) this Court's assistance in enforcing the Holder Subpoena in order to enable the Committee to complete its investigation. If the matter is left unresolved, the Oversight Committee and the American public will suffer substantial injury because the Committee will be prevented from obtaining the information necessary to fulfill its constitutional responsibility to conduct meaningful and effective oversight, and the Congress will be prevented from enacting necessary and appropriate legislation.

---

[49]  Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Charles E. Grassley, Ranking Member, Comm. on the Judiciary, U.S. Senate, at 1 (July 16, 2012).

[50]  Letter from Kerry W. Kircher, General Counsel, U.S. House of Reps., to Ronald C. Machen, Jr., U.S. Attorney (July 26, 2012).

[51]  Letter from Ronald C. Machen, Jr., U.S. Attorney, to Kerry W. Kircher, General Counsel, U.S. House of Reps. (July 30, 2012).

61.      In accordance with H. Res. 706, the Speaker of the House has authorized the General Counsel of the House to initiate this action on behalf of the Committee, and the General Counsel did so.

62.      After the Committee initiated this action, the Department's Inspector General issued a report sharply critical of the Department's conduct of Operation Fast and Furious.[52]

63.      On or shortly after the date of the release of the Inspector General's report, the Attorney General produced to the Committee approximately 300 pages of previously-unproduced documents, responsive to the Holder Subpoena, the existence of which had been exposed by the report.  The Attorney General's document production confirmed, not only that the Department has been withholding responsive post-February 4, 2011 documents, but also that the withheld documents are not in fact privileged, the Attorney General's assertion otherwise notwithstanding.

64.      The 112th Congress ended at noon on January 3, 2013, and the 113th Congress commenced thereafter.  U.S. Const. amend. XX, §§ 1, 2; 159 Cong. Rec. H1, H5 (daily ed. Jan. 3, 2013).  On the afternoon of January 3, 2013, the House of Representatives, among other things, adopted H. Res. 5, 113th Cong. (2013), and H. Res. 6, 113th Cong. (2013).[53]  House Resolution 5, among other things, (i) authorized the Oversight Committee "of the One Hundred Thirteenth Congress to act as the successor in interest to the [Oversight] Committee . . . of the One Hundred Twelfth Congress with respect to" this lawsuit; (ii) authorized the Chair of the

---

[52] U.S. Dep't of Justice, Office of the Inspector Gen., A Review of ATF's Operation Fast & Furious & Related Matters (Sept. 2012), *available on-line at* http://www.justice.gov/oig/reports/2012/s1209.pdf.

[53]  159 Cong. Rec. at H22 (vote on H. Res. 5); *id.* at H23 (vote on H. Res. 6).

Oversight Committee (when elected) "to take such steps as may be appropriate to ensure continuation of" this lawsuit; and (iii) authorized the Chair of the Oversight Committee (when elected) "to issue subpoenas related to the investigation into the United States Department of Justice operation known as 'Fast and Furious' and related matters."[54]  By adopting H. Res. 6, the House of Representatives, among other things, elected the Honorable Darrell E. Issa as Chairman of the Oversight Committee for the 113th Congress.[55]

65.     On January 3, 2013, after the House adopted H. Res. 5 and H. Res. 6, Chairman Issa issued the Holder Subpoena (Ex. A), and caused it to be served on counsel for the Attorney General.  The Holder Subpoena (Ex. A) requires production of the same documents, and provides the same instructions, as the Holder Subpoena (Ex. B).  The response date for the Holder Subpoena (Ex. A) was January 7, 2013, at noon.  The Attorney General produced to the Committee by that time no additional documents responsive to the Holder Subpoena.

61. 66.  This suit is necessary and appropriate because (i) the Attorney General has refused to comply with the Holder Subpoena and produce documents necessary for the Committee's investigation; (ii) the Committee's repeated efforts to reach an accommodation with the Attorney General repeatedly have been rebuffed; (iii) there is no realistic possibility that such efforts will be successful in the future; and (iv) the U.S. Attorney has refused to carry out his statutory obligation to present to a grand jury the facts pertaining to the Attorney General's refusal to comply with the Holder Subpoena.  If the matter is left unresolved, the Oversight Committee and the American public will suffer substantial injury because the Committee will be

---

[54]  H. Res. 5, § 4(a)(2)(A), (B), *reprinted in* 159 Cong. Rec. at H8

[55]  H. Res. 6, *reprinted in* 159 Cong. Rec. at H23.

prevented from obtaining the information necessary to fulfill its constitutional responsibility to conduct meaningful and effective oversight, and the Congress will be prevented from enacting necessary and appropriate legislation.

## SPECIFIC CLAIMS FOR RELIEF

62. 67.   The Department's and the Attorney General's response to the Committee's investigation has been woefully inadequate in every respect.  However, notwithstanding their lack of cooperation, the Committee has managed to obtain sufficient facts – principally through the aid of DOJ whistleblowers – to begin reporting to the American people on the Operations Component of its investigation.[56]  Accordingly, although the Committee has a legal and constitutional right to obtain from the Attorney General all documents responsive to the Holder Subpoena not already produced, the Committee chooses in this action to seek only a limited subset of such responsive but unproduced documents, namely, those documents that are relevant to the Obstruction Component of the Committee's investigation which the Committee cannot obtain from any other source.  To that end, the Committee here seeks to compel the Attorney General to produce those documents dated or that were created after February 4, 2011, that are responsive to Categories 1, 4, 5, and 10 of the Holder Subpoena.  In the Committee's judgment, this limited subset of responsive documents – referred to herein as the "Post-February 4 Subset" – includes or constitutes the documents most likely to be relevant to the Obstruction Component of the Committee's investigation and, when produced, most likely to enable the Committee to complete its investigation.

---

[56] *See* Joint Staff Report–Part One.

**COUNT I**

~~63.~~68.   The Oversight Committee incorporates and re-alleges paragraphs 1 through ~~62~~67,

above, as if set forth fully herein.

~~64.~~69.   The Holder Subpoena was duly authorized, issued and served.

~~65.~~70.   The Holder Subpoena required, and requires, the Attorney General to produce

certain documents, as stated in its Schedule, including the Post-February 4 Subset.

~~66.~~71.   The June 20, 2012 Privilege Letter, which asserts "Executive privilege" as a basis

for the Attorney General's refusal to produce the Post-February 4 Subset, contains no suggestion

that the documents as to which the privilege is asserted implicate or otherwise involve any

advice to the President.

~~67.~~72.   The actions of the Department which would be revealed by the Post-February 4

Subset do not involve core constitutional functions of the President.

~~68.~~73.   The privilege asserted in the June 20, 2012 Privilege Letter ~~appears to be~~is wholly

grounded in a common-law based privilege known as the "deliberative process privilege" which

may not validly be asserted in response to a congressional subpoena, and which does not apply

here in any event.

~~69.~~74.   Accordingly, the Attorney General is legally obligated to produce to the Oversight

Committee, in response to the Holder Subpoena, the Post-February 4 Subset.

~~70.~~75.   The Attorney General has violated that legal obligation by failing to produce to

the Oversight Committee the Post-February 4 Subset.

~~71.~~76.   WHEREFORE, the Oversight Committee prays that this Court (i) declare that the

privilege asserted in the June 20, 2012 Privilege Letter may not validly be asserted in response to

the Holder Subpoena; (ii) declare that the Attorney General's objection to the Holder Subpoena,

as set forth in the June 20, 2012 Privilege Letter, is rejected; (iii) declare that the Attorney General's failure to produce to the Oversight Committee the Post-February 4 Subset is without legal justification and violates the Attorney General's legal obligations to the Committee; and (iv) order the Attorney General forthwith to produce to the Oversight Committee the Post-February 4 Subset.

## COUNT II

72. 77.  The Oversight Committee incorporates and re-alleges paragraphs 1 through 71 76, above, as if set forth fully herein.

73. 78.  The Holder Subpoena was duly authorized, issued and served.

74. 79.  The Holder Subpoena required, and requires, the Attorney General to produce certain documents, as stated in its Schedule, including the Post-February 4 Subset.

75. 80.  The June 20, 2012 Privilege Letter, which asserts "Executive privilege" as a basis for the Attorney General's refusal to produce the Post-February 4 Subset, contains no statement that the documents as to which the privilege is asserted implicate or otherwise involve any advice to the President.

76. 81.  Nevertheless, it is possible that the Attorney General may contend, inconsistently has refused to confirm that he is not withholding Post-February 4 Subset documents pursuant to the course of this litigation, that the privilege assertion contained in the June 20, 2012 Privilege Letter was intended to cover specific presidential communications that are part of the Post-February 4 Subset. privilege.  *See, e.g.*, Joint Status Report at 5 (Jan. 7, 2013) (ECF No. 32).  In the event the Attorney General so contends that this Court were to entertain any such contention on its merits, the Committee is entitled to an order directing the Attorney General to identify all

such documents with sufficient specificity to enable the Court and the Oversight Committee independently to assess any such privilege assertion.

77.82.   Moreover, the "presidential communications privilege"

 i. applies at most only to (a) direct decision-making by the President involving quintessential and non-delegable Presidential power, and/or (b) communications authored or solicited and received by the President's closest advisors in the course of actively formulating advice for the President, i.e., advisors at a level close enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisors;

 ii. is only a qualified privilege and, as such, even if a document responsive to the Holder Subpoena fell within the scope of the "presidential communications privilege," the document nevertheless must be produced if there exists a sufficient need on the part of the Committee for the document and it is in the public interest that the document be produced; and

 iii. when asserted in response to a congressional subpoena, must be in writing and signed by the President.

78.83.   Therefore, to the extent, if any, that (a) the Attorney General contends, in the course of this litigation, that the "presidential communications privilege" covers specific presidential communications that are part of the Post-February 4 Subset, and (b) this Court were to consider any such claim on its merits, that privilege does not apply here because:

 i. The documents that constitute the Post-February 4 Subset do not implicate any direct decision-making by the President involving quintessential and non-delegable Presidential power.

40

ii.    The documents that constitute the Post-February 4 Subset, upon information and belief, do not actually constitute communications authored or solicited and received by the President's closest advisors in the course of actively formulating advice for the President.

iii.   The Oversight Committee has a demonstrated specific need for the documents that constitute the Post-February 4 Subset, and it is unable to obtain that information elsewhere.

iv.    The Committee's interest, on behalf of the American people, in securing the documents that constitute the Post-February 4 Subset, is particularly acute given that those documents may reflect attempts to obstruct Congress by interfering with the Committee's investigative and oversight functions.

v.     The June 20, 2012 Privilege Letter was not signed by the President.

~~79~~ 84.   Accordingly, the Attorney General is legally obligated to produce to the Oversight Committee, in response to the Holder Subpoena, the Post-February 4 Subset.

~~80~~ 85.   The Attorney General has violated that legal obligation by failing to produce to the Oversight Committee the Post-February 4 Subset.

~~81~~ 86.   WHEREFORE, in the event that (a) the Attorney General contends, as he has insisted that he might do in the course of this litigation, that the ~~privilege assertion contained in the June 20, 2012 Privilege Letter was intended to cover specific~~ presidential communications privilege justifies his withholding of any documents that are part of the Post-February 4 Subset, and (b) this Court considers any such contention on its merits, the Oversight Committee prays that this Court order the Attorney General to identify all such documents with sufficient specificity to enable the Court and the Oversight Committee independently to assess any such

privilege assertion, and thereafter (i) declare that any such "presidential communications

privilege" claim as to any documents so identified is rejected; (ii) declare that the Attorney

General's failure to produce to the Oversight Committee any documents so identified is without

legal justification and violates the Attorney General's legal obligations to the Committee; and

(iii) order the Attorney General forthwith to produce to the Oversight Committee any such

document(s) so identified.

## PRAYER FOR RELIEF

WHEREFORE, the Oversight Committee respectfully prays that this Court

A. Enter declaratory and injunctive relief as follows:

 1. With respect to Count I:

  i. Declare that the privilege asserted in the June 20, 2012 Privilege

   Letter may not validly be asserted in response to the Holder

   Subpoena;

  ii. declare that the Attorney General's objection to the Holder

   Subpoena, as set forth in the June 20, 2012 Privilege Letter, is

   rejected;

  iii. Declare that the Attorney General's failure to produce to the

   Oversight Committee the Post-February 4 Subset (i.e., all those

   documents responsive to Categories 1, 4, 5, and 10 of the Holder

   Subpoena that are dated or were created after February 4, 2011) is

   without legal justification and violates the Attorney General's legal

   obligations to the Committee; and

iv.　　Order the Attorney General forthwith to produce to the Oversight Committee the Post-February 4 Subset (i.e., all those documents responsive to Categories 1, 4, 5, and 10 of the Holder Subpoena that are dated or were created after February 4, 2011).

2.　　With respect to Count II, in the event that the Attorney General contends, ~~as he has insisted that he might do~~ in the course of this litigation, that the ~~privilege assertion contained in the June 20, 2012 Privilege Letter was intended to cover specific~~ presidential communications ~~privilege justifies his withholding of any documents~~ that are part of the Post-February 4 Subset (i.e., all those documents responsive to Categories 1, 4, 5, and 10 of the Holder Subpoena that are dated or were created after February 4, 2011~~):), and this Court considers any such contention on its merits:~~

i.　　Order the Attorney General to identify all such documents with sufficient specificity to enable the Court and the Oversight Committee independently to assess any such privilege assertion;

ii.　　Thereafter:

(a) declare that any such "presidential communications privilege" claim as to any documents so identified is rejected;

(b) declare that the Attorney General's failure to produce to the Oversight Committee any documents so identified is without legal justification and violates the Attorney General's legal obligations to the Committee; and

43

                    (c) order the Attorney General forthwith to produce to the

                         Oversight Committee any such document(s) so identified.

B.      Retain jurisdiction to review any disputes that may arise regarding the Attorney General's compliance with this Court's order.

C.      Grant the Oversight Committee such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, General Counsel
   D.C. Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
   D.C. Bar No. 482949
CHRISTINE DAVENPORT, Sr. Assistant Counsel
TODD B. TATELMAN, Assistant Counsel
MARY BETH WALKER, Assistant Counsel
   D.C. Bar No. 501033
ELENI M. ROUMEL, Assistant Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and
Government Reform, U.S. House of Representatives*

August 13, 2012January 15, 2013

## CERTIFICATE OF SERVICE

I certify that on January 15, 2013, I served one copy of the foregoing First Amended

Complaint by electronic mail (.pdf format), on:

Ian H. Gershengorn, Deputy Assistant Attorney General
John R. Tyler, Assistant Branch Director
Eric R. Womack, Trial Attorney
Gregory P. Dworkowitz, Trial Attorney
Luke M. Jones, Trial Attorney
U.S. DEPARTMENT OF JUSTICE
Civil Division
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C.  20001
ian.gershengorn@usdoj.gov
john.tyler@usdoj.gov
eric.womack@usdoj.gov
gregory.p.dworkowitz@usdoj.gov
luke.jones@usdoj.gov


/s/ Kerry W. Kircher
Kerry W. Kircher

1