**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|   |   |   |
|---|---|---|
| COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 12-1332 (ABJ) |
| ERIC H. HOLDER, JR., Attorney General of the United States, | ) ) ) | |
| Defendant. | ) ) | |

_____)

## MEMORANDUM OPINION

The Committee on Oversight and Government Reform of the United States House of Representatives has filed this action to enforce a subpoena it issued to the Attorney General of the United States, Eric H. Holder, Jr. The Attorney General refused to produce a portion of the records called for by the subpoena on the grounds that they are covered by the executive privilege, and the Committee seeks a declaration that the invocation of the privilege is invalid in this instance and that the documents must be produced. The matter is before the Court on defendant's motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6): the Attorney General takes the position that a dispute between the legislative and executive branches must be resolved through negotiation and accommodation, and that the judiciary may not, or at least, should not, get involved.

The motion to dismiss will be denied. The fact that this case arises out of a dispute between two branches of government does not make it non-justiciable; Supreme Court precedent

establishes that the third branch has an equally fundamental role to play, and that judges not only may, but sometimes must, exercise their responsibility to interpret the Constitution and determine whether another branch has exceeded its power.  In the Court's view, endorsing the proposition that the executive may assert an unreviewable right to withhold materials from the legislature would offend the Constitution more than undertaking to resolve the specific dispute that has been presented here. After all, the Constitution contemplates not only a separation, but a balance, of powers.

> In designing the structure of our Government and dividing and allocating the sovereign power among three co-equal branches, the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence.

*United States v. Nixon*, 418 U.S. 683, 707 (1974).

This case arises out of the Committee's investigation into Operation Fast and Furious, a law enforcement operation that was launched by the Bureau of Alcohol, Tobacco, and Firearms ("AFT") and the U.S. Attorney's office in Phoenix, Arizona in October of 2009 to confront the suspected illegal flow of firearms from the United States to drug cartels in Mexico.  In 2011, the Committee began to investigate the use of certain tactics involved in that operation – tactics which had been previously used by the ATF in Phoenix in 2006, and which have become the subject of intense criticism and public debate. The Committee focused in particular on the decision to permit the guns to "walk" – that is, to let straw purchasers from the cartels carry firearms across the border without being apprehended under the theory that agents would be able to track the weapons to their final destination.

The lawsuit before the Court does not address the existence of the operation or the propriety of those tactics.  The facts have been uncovered; the risks inherent in the operation –

risks that were tragically realized in the death of a federal law enforcement officer – have been exposed; and the Department has issued clear directives prohibiting similar conduct in the future. But during the early stages of the investigation, the Department of Justice wrote a letter to the Committee denying that the gun walking had taken place, and that letter, dated February 4, 2011, was wrong.

The Attorney General subsequently informed Congress that the letter was incorrect, and it was officially withdrawn by December of 2011.  But in the meantime, the Committee shifted its focus to investigating how and why the Department of Justice gave it inaccurate assurances. In October 2011, it issued a subpoena for documents generated both before and after February 4, which it maintained would illuminate how the Department came to incorrectly deny on February 4 that the tactic had been utilized.  The Attorney General produced some records, but he declined to produce others. In a letter dated June 20, 2012, the Deputy Attorney General, James M. Cole, stated that the President had asserted executive privilege over documents dated after February 4, 2011 because their disclosure would reveal the agency's deliberative processes.

The Committee then filed this action to enforce its subpoena. It maintains that the assertion of executive privilege is invalid in this situation since there is no claim that the documents contain advice provided to the President or that they touch upon core constitutional functions of the President.  The Attorney General has moved to dismiss the case on the grounds that that the Committee has no standing to bring it and the Court has no jurisdiction to hear it. He urges in the alternative that the Court should exercise its discretion to decline to hear it.

The Court is mindful that "federal courts may exercise power only in the last resort . . . and only when adjudication is consistent with a system of separated powers and [the dispute is

one] traditionally thought to be capable of resolution through the judicial process." *Allen v. Wright,* 468 U.S 737, 752 (1984) (internal citations and quotation marks omitted). But here, the narrow legal question posed by the complaint is precisely the sort of crisp legal issue that courts are well-equipped to address and routinely called upon to resolve.

The defendant warns that an assumption of jurisdiction in this case would mark an unprecedented expansion of the role of an Article III court. But there has been binding precedent to the contrary in this Circuit for more than thirty-five years. In *United States v. AT&T,* 551 F.2d 384, 390 (D.C. Cir. 1976), the Court of Appeals declared: "the mere fact that there is a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution of the conflict." And five years ago, another court in this District carefully considered and rejected the same arguments being advanced by the Attorney General here. In a case involving a different Congress and a different President, *Committee on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008), the court concluded in a persuasive opinion that it had jurisdiction to resolve a similar clash between the branches.

For the reasons set forth in *Miers,* as well as those detailed below, the Court finds that neither the Constitution nor prudential considerations require judges to stand on the sidelines. There is federal subject matter jurisdiction over this complaint, and it alleges a cause of action that plaintiff has standing to bring. The Court cautions that this opinion should not be taken as any indication of its views on the merits of the dispute, which have yet to be briefed, argued, or considered in any way. The defendant's pleadings stress the importance of the privilege and the role it plays encouraging candor in executive branch deliberations and decision making. But at this stage of the proceedings, the sole question before the Court is whether it can and should

exercise jurisdiction to hear the case – not whether the documents are covered by the privilege. This opinion does not grapple with the scope of the President's privilege:  it simply rejects the notion that it is an unreviewable privilege when asserted in response to a legislative demand.

## BACKGROUND[1]

In the autumn of 2009, the Phoenix field office of the ATF launched Operation Fast and Furious, in which the ATF knowingly allowed firearms purchased illegally in the United States to be unlawfully transferred to third-parties and transported into Mexico.  Am. Compl. [Dkt. # 35] ¶ 1.  The goal of the decision to let the guns "walk" without interdiction by law enforcement was to enable ATF to follow the flow of the firearms to the Mexican drug cartels that purchased them.  *Id.*  The tactic was brought to the public's attention after guns that had been illegally purchased in the United States were recovered at the scene of a December 15, 2010 firefight in Arizona in which U.S. Customs and Border Protection Agent Brian Terry was killed.  *See* Am. Compl. ¶ 2.

The following month, Members of Congress began inquiring about Operation Fast and Furious, and Senator Charles Grassley wrote letters to the ATF requesting information about allegations that the agency had used these inappropriate law enforcement tactics.  Am. Compl. ¶ 2 and n.3.  Writing on behalf of the law enforcement agency, the Department of Justice initially denied the allegations.  *Id.* ¶ 2.  Assistant Attorney General Ronald Weich wrote in a February 4,

---

1    In the remainder of this opinion, the Department's Motion to Dismiss [Dkt. # 13] will be cited as "Def.'s Mot," and the Memorandum in Support of Defendant's Motion to Dismiss [Dkt. # 13-1] will be cited as "Def.'s Mem."  The Committee's Opposition to Defendant's Motion to Dismiss [Dkt. # 17] will be cited as "Pl.'s Opp."  The Department's Reply in Support of Defendant's Motion to Dismiss [Dkt. # 27] will be cited as "Def.'s Reply."

2011 letter to Senator Grassley:  "[T]he allegation . . . that [ATF] 'sanctioned' or otherwise knowingly allowed the sale of assault weapons to a straw purchaser who then transported them into Mexico – is false.  ATF makes every effort to interdict weapons that have been purchased illegally and prevent their transportation to Mexico."  *Id.*  Soon after, though, the Attorney General asked the Inspector General of the Department to conduct an investigation into the allegations contained in Senator Grassley's letter.  Def.'s Mem. at 9.  And on March 31, 2011, the Committee on Oversight and Government Reform of the U.S. House of Representatives issued a subpoena to the ATF's Acting Director, Kenneth Melson, for documents about Operation Fast and Furious.  Am. Compl. ¶ 31.

As more circumstances were brought to light, the Department came to acknowledge that ATF had in fact permitted some guns to walk in the course of the Phoenix operation.  It did not embrace or justify ATF's strategy; on October 7, 2011, the Attorney General wrote a letter to the Committee describing the tactics used in Operation Fast and Furious as "fundamentally flawed" and "completely unacceptable."  Letter of Oct. 7, 2011, Ex. B to Def.'s Mot. [Dkt. # 13-3] at 2.

From June 10 to October 11, 2011, the Department produced approximately 2,000 pages to the Committee.  Am. Compl. ¶ 35.  The Department withheld certain materials from production, Am. Compl. ¶ 36, including, according to defendant, grand jury and law enforcement sensitive material such as Reports of Investigation ("ROIs").  Def.'s Mem. at 7–8.  The Department sent a letter to the Committee dated October 11, 2011 in which it stated that it had "substantially concluded [its] efforts to respond" to the subpoena.  Am. Compl. ¶ 36.

In response, the Committee issued a second subpoena – the subpoena at issue in this case. Ex. B to Am. Compl. ("Holder subpoena").  This subpoena was issued to the Attorney General

himself, and it sought communications about Operation Fast and Furious to or from senior Department officials, documents regarding "any instances prior to February 4, 2011" where ATF failed to interdict weapons, and all Fast and Furious ROIs. *Id.* On December 2, 2011, the Department formally withdrew the February 4, 2011 letter that had originally denied the gun walking allegations. Letter from Dep. Att'y Gen. James Cole to Chairman Darrell Issa (Dec. 2, 2011).[2]

According to the Committee, between October 31, 2011, and May 15, 2012, the Department produced approximately 4,000 pages, of which "virtually no documents" were dated or created after February 4, 2011. Am. Compl. ¶ 42. According to the Department, it produced more than 7,600 pages in response to the Holder subpoena, including 1,364 pages about the drafting of the now-withdrawn February 4 letter. Def.'s Mem. at 10–11. But it continued to decline to produce documents dated after February 4, 2011.

The parties engaged in negotiations in an effort to reach an accommodation on the post-February 4 documents, and the Committee states that it offered to narrow the scope of the subpoena. Am. Compl. ¶ 46. But in the meantime, on May 3, 2012, Committee Chairman Issa prepared a memo to the Committee proposing to hold the Attorney General in contempt. Def.'s Mem. at 11–12, citing Mem. from Chairman Issa to Members of the Comm. on Oversight and Gov't Reform. The parties continued to exchange letters and meet and confer about the subpoena up until the day of the scheduled contempt hearing. Am. Compl. ¶ 46.

---

2       A copy of this letter is attached as Exhibit 2 to the Committee's opposition brief. *See* Ex. 2 to Pl.'s Opp. [Dkt. # 17-2].

On June 20, 2012, the day the hearing was scheduled to take place, Deputy Attorney General James Cole informed the Committee that the President had asserted executive privilege "over the relevant post-February 4, 2011[] documents."  Am. Compl. ¶ 47, quoting Letter from Dep. Att'y Gen. James Cole to Chairman Darrell Issa (June 20, 2012) ("June 20, 2012 Letter"), Ex. 3 to Pl.'s Opp.  The letter stated:

> [T]he President, in light of the Committee's decision to hold the contempt vote, has asserted executive privilege over the relevant post-February 4 documents. The legal basis for the President's assertion of executive privilege is set forth in the enclosed letter to the President from the Attorney General.[3]  In brief, the compelled production to Congress of these internal Executive Branch documents generated in the course of the deliberative process concerning the Department's response to congressional oversight and related media inquiries would have significant, damaging consequences. As I explained at our meeting yesterday, it would inhibit the candor of such Executive Branch deliberations in the future and significantly impair the Executive Branch's ability to respond independently and effectively to congressional oversight.  Such compelled disclosure would be inconsistent with the separation of powers established in the Constitution and would potentially create an imbalance in the relationship between these two co-equal branches of the Government.

June 20, 2012 Letter at 4.  The Department did not provide a privilege log or otherwise describe the withheld documents.  Am. Compl. ¶ 47.

On June 20, 2012, the Committee proceeded with the scheduled hearing, rejecting the assertion of executive privilege and voting 23 to 17 to hold the Attorney General in contempt of Congress.  Am. Compl. ¶ 48.  The parties continued to communicate about the subpoena even after the June 20 vote, but to no avail.  Am. Compl. ¶¶ 50–51.  On June 28, 2012, the full House adopted House Resolution 711, holding the Attorney General in contempt by a vote of 255 to 67.

---

3       Neither party attached this letter to its submissions to the Court.

Am. Compl. ¶ 52, citing H.R. Res. 711, 112th Cong., 158 Cong. Rec. H4164 (daily ed. June 28, 2012) (enacted).

Following the vote, Deputy Attorney General Cole notified the Speaker that the Department would not bring the congressional contempt citation before a grand jury or take any other action to prosecute the Attorney General. Am. Compl. ¶ 54. On June 29, 2012, the Speaker of the House certified the House Resolution to the U.S. Attorney for the District of Columbia, Ronald C. Machen, Jr., but the U.S. Attorney did not respond at that time. Am. Compl. ¶ 55. On July 16, 2012, Deputy Attorney General Cole advised Senator Grassley that the U.S. Attorney had asked him to "convey . . . his concurrence with the position" of the Department that no criminal prosecution against the Attorney General would be pursued. Am. Compl. ¶ 57. The U.S. Attorney confirmed this position in a letter to the General Counsel of the House. Am. Compl. ¶ 58. Determining that enforcement of the subpoena through the criminal prosecution of the Attorney General was "foreclosed," the Speaker of the House authorized the General Counsel of the House to initiate this action. Am. Compl. ¶¶ 59, 61.

## PROCEDURAL HISTORY

On August 13, 2012, the Committee filed this lawsuit. Compl. [Dkt. # 1].

On September 19, 2012, the Department Inspector General issued a detailed report on Operation Fast and Furious. *See* Oversight & Review Div., Office of the Inspector Gen., DOJ, A Review of ATF's Operation Fast and Furious and Related Matters (Sept. 2012) ("IG Report"); Am. Compl. ¶ 60.

On October 15, 2012, the defendant filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim.  Def.'s Mot.  The Committee filed its opposition on November 21, 2012, Pl.'s Opp., and the defendant replied on December 17, 2012, Def.'s Reply.

On November 26, 2012, the American Center for Law the Justice filed, with leave of Court, an amicus curiae brief opposing the Department's motion to dismiss.  Mem. of Amicus Curiae The Am. Ctr. for Law and Justice in Opp. to Def.'s Mot. to Dismiss [Dkt. # 19].

On November 27, 2012, the Court held a status conference, and raised the question of whether the release of the IG report had narrowed the areas of difference between the parties, and whether the parties would benefit from the assistance of a neutral mediator.  The parties expressed a desire to continue to confer among themselves.

On December 20, 2012, five United States Representatives, Elijah Cummings, John Conyers, Henry Waxman, Edolphus Towns, and Louise Slaughter, filed a brief as amici curiae with leave of Court.  Brief for Representatives Elijah E. Cummings, *et al.* as Amici Curiae Supporting Defendant ("House Amici Brief") [Dkt. # 30].[4]  The Committee filed a response to that brief on January 11, 2013.  Pl.'s Resp. to Mem. of House Amici [Dkt. # 33] ("Resp. to House Amici Br.").

---

4       When they filed their briefs, amici held the following positions in the House. Representative Elijah E. Cummings was the Ranking Member of the House Committee on Oversight and Government Reform and leader of the Democratic Members of the Committee; Representative John Conyers, Jr., was the Ranking Member of the House Committee on the Judiciary and former Chairman of the House Committee on Government Operations (the predecessor to the Committee on Oversight and Government Reform); Representative Henry A. Waxman was Ranking Member of the House Committee on Energy and Commerce and former Chairman of the House Committee on Oversight and Government Reform; Representative Edolphus Towns was former Chairman of the House Committee on Oversight and Government Reform; and Representative Louise M. Slaughter was Ranking Member and former Chairwoman of the Committee on Rules.  House Amici Brief at 1.

On January 3, 2013, the 112th Congress ended at noon, and the 113th Congress commenced thereafter.  Am. Compl. ¶ 64, citing U.S. Const. amend. XX, §§ 1, 2; 159 Cong. Rec. H1, H5 (daily ed. Jan. 3, 2013).  Following the commencement of the new Congress, the House authorized the Committee to act as successor in interest to the Committee of the 112th Congress with respect to this lawsuit, and the Committee re-issued the Holder subpoena, as authorized by the new Committee.  *Id.* ¶ 64–65.  The new subpoena "requires production of the same documents, and provides the same instructions" as the original Holder subpoena.  Am. Compl. ¶ 65.  On January 15, 2013, the Committee filed an amended complaint, attaching the re-issued subpoena.  *See* Am. Compl.; Holder subpoena.

On March 15, 2013, the parties reported to the Court on the status of their negotiations [Dkt. # 40], and on March 18, the Court issued an order referring the matter to a senior United States District Court judge for purposes of mediation, [Dkt. # 41].  The parties participated in a settlement conference on March 26, 2013, but the matter was not resolved.  The Court heard oral argument on defendant's motion to dismiss on April 24, 2013, and that motion is pending before this Court.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc*., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal citations omitted).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the

11

complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002).

Under Rule 12(b)(1), plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992); *Shekoyan v. Sibly Int'l Corp.,* 217 F. Supp. 2d 59, 63 (D.D.C. 2002). Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA,* 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). Because subject-matter jurisdiction is a requirement embodied in Article III of the Constitution as well as a statutory requirement, no action of the parties can confer subject matter jurisdiction upon a federal court. *Akinseye v. District of Columbia,* 339 F.3d 970, 971 (D.C. Cir. 2003), citing *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982).

When considering a jurisdictional challenge, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States,* 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds,* 482 U.S. 64 (1987). Rather, a court "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics,* 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see also Jerome Stevens Pharm., Inc. v. FDA,* 402 F.3d 1249, 1253 (D.C. Cir. 2005).

The defendant has predicated his motion on Rule 12(b)(6) as well as 12(b)(1). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.*, quoting *Twombly*, 550 U.S. at 555. In ruling upon a motion to dismiss under Rule 12(b)(6), a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).

## ANALYSIS

### I.   The Constitution does not bar the federal judiciary from resolving this dispute between the political branches.

The Attorney General contends that it would threaten the tripartite scheme of government established by the Constitution and subvert 200 years of this country's history if the judiciary were to step in to serve as the arbiter of a dispute between the other two branches of government. He states that "Article III of the Constitution, grounded in the separation of powers, presumes disputes such as this one will be resolved between the political Branches themselves," Def.'s Mem. at 1, and that the "gravest constitutional threat presented by this litigation . . . would be presented by a decision from this Court to assume jurisdiction over this dispute." Def.'s Mem.at 4; *see also id.* at 3 ("Judicial intervention would move the Branches toward litigation, not

accommodation, and would dramatically alter the separation of powers."); *id.* at 20 ("An assumption of jurisdiction here would short-circuit the constitutional design and threaten to alter permanently the relationship among the Branches.") The defendant does not simply suggest that the traditional process of confrontation, compromise, and resolution is the preferable one; he maintains that Article III of the Constitution actually prohibits the Court from exercising jurisdiction over what he characterizes as "an inherently political dispute about the scope of the respective powers and responsibilities of the two political Branches." Def.'s Mem. at 21; *see also id.* at 26 ("Thus, the Judiciary would become the final arbiter of any political dispute between the Branches – or even one between officials of the same Branch – a result that is contrary to our constitutional scheme.").

But although the defense repeatedly characterizes the case as one raising a "political question," the label does not apply simply because the political branches of government are involved or because political calculations may underlie their actions. In *Baker v. Carr,* 369 U.S. 186 (1962), the Supreme Court acknowledged that there is no single defining element of a political question, and it listed the characteristics that ordinarily differentiate a nonjusticiable dispute:

>It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217; s*ee also United States v. AT&T*, 551 F.2d 384, 390 (D.C. Cir. 1976)("*AT&T I*") ("the applicability of the political question doctrine depends on the nature of the conflict, the needs and risks on each side, and the availability of judicial standards to apply in making the decision.").   Since this case does not call upon the Court to invade the province of another branch or second guess its policy decisions, and since there are guiding legal principles to apply, the political question doctrine does not mandate dismissal of the action.

And more specifically, as the court found in *Committee on the Judiciary v. Miers*, 558 F. Supp. 2d 53, Article III of the U.S. Constitution does not bar the federal courts from exercising their jurisdiction under the circumstances presented in this case.

In *Miers,* the House of Representative's Committee on the Judiciary filed for a declaratory judgment that the former White House counsel was required to comply with a Congressional subpoena and appear before the Committee to testify regarding its investigation into the resignation of nine United States Attorneys.   The executive filed a motion to dismiss and the court denied it.  The court held:

> [T]here can be no question that Congress has a right – derived from its Article I legislative function – to issue and enforce subpoenas, and a corresponding right to the information that is the subject of such subpoenas.
>
> * * *
>
> The Court can identify no reason why that right cannot be vindicated by recourse to the federal courts through the [Declaratory Judgment Act]. After all, courts routinely enforce subpoenas in favor of parties with rights to information. The mere fact that this case involves a dispute between the political branches – or that such disputes are normally settled through negotiation and accommodation – is not sufficient to render the Committee's right non-judicially remedial. That argument is foreclosed by precedent dating back to *United States v. Nixon* including case law involving subpoena disputes between the two political branches.

558 F. Supp. 2d at 84–5.

The defendant does not attempt to suggest that the *Miers* case is distinguishable in any way from the instant action; he simply urges the Court to come to a different conclusion.  But the Court is persuaded by the reasoning of the *Miers* opinion and by its own review of the authorities discussed in detail in that opinion.  The Court rejects the notion that merely hearing this dispute between the branches would undermine the foundation of our government, or that it would lead to the abandonment of all negotiation and accommodation in the future, leaving the courts deluged with subpoena enforcement actions.  Indeed, one cannot help but observe that in the five years that have elapsed since the *Miers* decision, the dire consequences prophesied by the Department have not come to pass.[5]  In the end, the civics lesson set out in the Department's brief is flawed and selective, and it ignores the fact that almost 40 years ago the Supreme Court

---

5       The only examples that counsel for the defendant could point to at the hearing were all cases that arose before *Miers*.  Tr. 23–24.

unequivocally rejected the notion that the separation of powers doctrine would bar judicial review of a Presidential claim of privilege.

In *United States v. Nixon,* 418 U.S. 683, the Court acknowledged that each branch of government is empowered to interpret the Constitution in the first instance when defining and performing its own constitutional duties, and that one branch's interpretation of its own powers is due deference from the others.  *Id.* at 703.  But the Court reviewed the history of its own jurisprudence, beginning with *Marbury v. Madison,* and it pointed out that it had repeatedly been called upon to decide whether the executive branch or the legislature had exercised its power in conflict with the Constitution.  *Id.* at 703–04.  The Court quoted *Powell v. McCormack*:  "Our system of government 'requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch.'"  *Id.* at 704, quoting 395 U.S. 486, 549.  And it repeated what it had set forth in *Baker v. Carr*:  "(D)eciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution."  *Id.,* quoting 369 U.S. 186, 211 (1962).

Ultimately, the Supreme Court held that it was "the province and duty" of the Court "'to say what the law is'" with respect to the claim of executive privilege that was presented in that case.  *Id.* at 705, quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803).  "Any other conclusion would be contrary to the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government."  *Id.* at 704.  Those principles apply with equal force here.  To give the Attorney General the final word would elevate and

fortify the executive branch at the expense of the other institutions that are supposed to be its equal, and do more damage to the balance envisioned by the Framers than a judicial ruling on the narrow privilege question posed by the complaint.

To be fair, the Attorney General does not claim that every assertion of executive privilege would absolutely unreviewable, but he takes the position that because the executive is seeking to shield records from the legislature, another co-equal political body, the law forbids the Court from getting involved. But the Department of Justice has pointed to nothing that would suggest that the Court should not follow the clear principles articulated in *Nixon* in this case. There is nothing in the *Nixon* opinion that suggests that the holding was premised on the fact that it arose in a criminal case or that it was an *intra* – as opposed to an *inter* – branch dispute.  And there is no other precedent that holds that an inter-branch dispute, or a dispute that implicates political considerations, is necessarily non-justiciable.

Indeed, the law in this Circuit is clearly to the contrary. The Court of Appeals has declared:

> [T]he mere fact that there is a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution of the conflict.  *United States v. Nixon* resolved an analogous conflict between the executive and judicial branches and stands for the justiciability of such a case.

*AT&T I*, 551 F.2d at 390 (internal citation omitted).  In the *AT&T I* case, the Court of Appeals found that there was jurisdiction to hear an action brought by the executive branch to enjoin the telephone company from complying with a Congressional subpoena.  Contrary to defendant's assertion, the *AT&T I* case is not distinguishable on the grounds that it involved a private party's compliance with a request for production; it was the Department of Justice that brought the suit,

and the opinion specifically notes that "the District Court correctly treated the case as a clash of the powers of the legislative and executive branches of the United States." *Id.* at 389; *see also Senate Select Comm. on Presidential Campaign Activities v. Nixon,* 498 F.2d 725 (D.C. Cir. 1974) (en banc) (reaching the merits of an action brought by Congress to enforce a subpoena issued to the President).

Nonetheless, defendant takes the position that a claim of executive privilege is unreviewable when it is the legislature that is seeking the documents. Counsel for the Department of Justice tells the Court: "[W]hat the Supreme Court has said is it [sic] disputes between the branches are different. It matters who the parties are. It matters where the case comes up . . . ." Transcript of Oral Argument of Apr. 24, 2013 ("Tr."). at 32; *see also* Tr. at 10 (noting that "the parties matter"). Throughout its pleadings and during oral argument, the Department has advanced this constricted view of the role of the courts and maintained that it would violate the separation of powers enshrined in the Constitution if this Court were to undertake to resolve a dispute between the other two branches: "[T]he role of the Article III Courts is to adjudicate the rights of individuals, not to engage in general supervision of the Executive Branch or to act as a willing referee in disputes between branches." Tr. at 6–7. But while this position was adamantly advanced, there was a notable absence of support for it set forth in the defendant's pleadings, and oral argument revealed that the executive's contention rests almost entirely on one case: *Raines v. Byrd*, 521 U.S. 811 (1997). *See* Tr. 6–7, 8–11, 16, 22, 31.

The *Raines* opinion cannot bear the weight of DOJ's argument. It stands for a much narrower principle, and the circumstances that gave rise to that opinion are distinguishable from

the controversy presented here.  And there is no other binding precedent that limits this Court's jurisdiction to the resolution of matters involving the rights of individuals.

*Raines* was a standing case.  In *Raines,* a group of individual Congressmen – four Senators and two Members of the House of Representatives – brought an action against the Director of the Office of Management and Budget.  They sought a declaration that the Line Item Veto Act, which had passed both houses of Congress over their "nay" votes, was unconstitutional.  The Supreme Court held:  "[T]hese individual members of Congress do not have a sufficient 'personal stake' in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing."  521 U.S. at 830.  Therefore, the case was remanded to be dismissed for lack of jurisdiction.

It is true that the *Raines* opinion contains a lengthy discussion about the limited role of Article III courts, and that, in dicta, it anticipates problems that could arise if individual executive officials or Members of Congress were to challenge the merits of decisions committed to the other branch of government in a lawsuit.  *See id.* at 828.  But defendant would have this Court base its opinion on that discussion while ignoring the final paragraph of the opinion, which, as it turns out, contains the holding.  *See* Tr. at 10.  This it cannot do.

A reading of the entire opinion reveals that the problem that prompted the dismissal was not the fact that legislators were suing the executive; it was that the plaintiffs had suffered no concrete, personal harm, and they were simply complaining that the Act would result in some "abstract dilution" of the power of Congress as a whole.  *Id.* at 825–26.  It was in that context that the Court saw fit to quote Justice Powell's observation that the value of the judicial power described in *Marbury v. Madison* "lies in the protection it has afforded the constitutional rights

and liberties of individual citizens and minority groups." *Id.* at 829, quoting *United States v. Richardson*, 418 U.S. 166, 192 (1974).[6] But neither Justice Powell nor the *Raines* court found the role of the courts to be *limited* to the vindication of the rights of individuals; the *Richardson* quotation went on: "It is this role, not some amorphous general supervision of the operations of government, that has . . . permitted the peaceful coexistence of the countermajoritarian implications of judicial review and [] democratic principles . . . ." *Id.*, quoting *Richardson*, 418 U.S. at 192. Thus, even if one looks at the language in *Raines* on which the Attorney General hangs his hat, it is clear that the action in *Raines* was dismissed for lack of jurisdiction because of the "amorphous" nature of the claim, not because it was an inter-branch dispute. This case involves the application of a specific privilege to a specific set of records responsive to a specific request, and the lawsuit does not invite the Court to engage in the broad oversight of either of the other two branches.

Moreover, the fact that it was individual Members of Congress who brought the suit in *Raines* had a bearing on the outcome. The case does not stand for the proposition that Congress

---

6       According to the Department, that reference is the specific authority in *Raines* that prohibits the Court from hearing this case.

   [Counsel for DOJ:   T]he Court should not and the Supreme Court says you cannot . . . .

   The Court:   Read me the quote where the Supreme Court says that I cannot do this.

   [Counsel for DOJ]:   Give you the quote?   It said – I think that comes straight from *Raines* . . . .   The irreplaceable value of the power articulated by Chief Justice Marshall in *Marbury* versus *Madison* lies in the protection it has afforded the constitutional rights and liberties of individual citizens and minority groups . . . ."

*See* Tr. at 16–17.

can never assert its institutional interests in court.   Instead, it expressly leaves that possibility

open:

> In sum, appellees have alleged no injury to themselves as individuals, the
> institutional injury they allege is wholly abstract and widely dispersed, and
> their attempt to litigate this dispute at this time and in this form is contrary
> to historical experience.   We attach some importance to the fact that
> appellees have not been authorized to represent their respective Houses of
> Congress in this action, and indeed both Houses actively oppose their suit.
> We also note that our conclusion neither deprives Members of Congress of
> an adequate remedy (since they may repeal the Act or exempt
> appropriations bills from its reach), nor forecloses the Act from
> constitutional challenge (by someone who suffers judicially cognizable
> injury as a result of the Act). Whether the case would be different if any of
> these circumstances were different we need not now decide.

*Id.* at 829–30 (internal citations omitted).   So the *Raines* decision does not compel the dismissal

of this case, brought by a duly authorized House Committee.   *See Miers*, 558 F. Supp. 2d at 68.

To bolster the *Raines* argument, the defense has endeavored to create the impression that

there is other Supreme Court precedent on point as well.

> What the Court has said in *Marbury* and *Raines* and cases like those is
> when it comes to adjudicating difficult disputes between the branches, the
> Court stays out until they affect the rights of individuals. This is what
> Justice Scalia said in *Moore* . . . .

Tr. at 65.   But the Supreme Court did not say anything in *Moore*, because it was a D.C. Circuit

decision.   *Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984), *abrogated by*

*Chenoweth v. Clinton*, 181 F.3d 112, 115–16 (D.C. Cir. 1999).   And the opinion to which

counsel referred is a concurring opinion which is not binding on this Court.   Moreover, the

concerns expressed by Justice Scalia when he was writing as a Circuit Judge in *Moore* do not

pertain here because his opinion – like the *Raines* opinion – addressed only whether *individual*

officers of the executive or legislative branch should have standing to embroil the courts in governmental disputes.

In *Moore,* eighteen Members of the House sued the House and the Senate, among others, in an effort to challenge the constitutionality of the Tax Equity and Fiscal Responsibility Act of 1982. 733 F.2d at 948. They alleged that the statute was a revenue raising bill that should have originated in the House instead of the Senate. *Id.* The Court of Appeals found that they had standing – that they had alleged a specific, personal injury to their cognizable legal right to participate in the legislative process established by the Constitution. *Id.* at 951. But it concluded that even though there was a justiciable controversy over which it had jurisdiction, it would exercise its discretion to decline to hear the dispute for prudential reasons. *Id.* at 954–56.

In his concurring opinion, Justice Scalia took issue with the panel's application of traditional standing principles, and he maintained that the analysis should be grounded first and foremost in respect for the separation of powers.

> The only test of congressional standing that is both consistent with our constitutional traditions and susceptible of principled application ( *i.e.,* an application undistorted by the *ad-hoc* cry of "remedial discretion") must take as its point of departure the principle that we sit here neither to supervise the internal workings of the executive and legislative branches nor to umpire disputes between those branches regarding their respective powers.

*Id.* at 959 (Scalia, J., concurring).

It is true that in making that point, he observed that the judiciary's "constitutional province" is "solely" to decide the rights of individuals. *Id.*, quoting *Marbury v. Madison* at 170. But the clear focus of the discussion was the particular situation presented in the *Moore* case: a lawsuit brought by individual lawmakers. Justice Scalia wrote:

> In my view no officers of the United States, of whatever Branch, exercise
> their governmental powers as personal prerogatives in which they have a
> judicially cognizable private interest. They wield those powers not as
> private citizens but only through the public office which they hold . . . .
> They have a private right to the office itself . . . but the powers of the
> office belong to the people and not to them.
>
> * * *
>
> To put the point slightly differently:   a proper understanding of the
> doctrine of separation of powers suggests that the personal desires of
> legislative and executive officers to exercise their authority are not within
> the "zone of interests" protected by the provisions of the Constitution and
> laws conferring such authority.

*Id.* at 959–60.  Finally, he concluded:  "[u]nless those powers have been denied in such fashion

as to produce a *governmental result* that harms some entity or individual who brings the matter

before us, we have no constitutional power to interfere."  *Id.* at 959 (emphasis in original).  Thus,

even if this court were bound to follow the reasoning set forth in the concurring opinion in

*Moore*, the opinion would not supply grounds for dismissing this action brought by a

governmental entity asserting its rights.

None of the other cases cited by the defense supports the contention that a court may not

referee a dispute between the political branches.  In *Walker v. Cheney,* 230 F. Supp. 2d 51, 52–

53 (D.D.C. 2002), the court dismissed a suit brought by the Comptroller General of the United

States to compel the Vice President to produce documents to the General Accounting Office

related to his national energy task force.  The opinion contains important admonitory language

about the need to tread with care when separation of powers concerns are implicated:

24

> [T]he standing inquiry should be "especially rigorous" because reaching the merits of this dispute could require deciding whether an action taken by one of the other branches of government was unconstitutional . . . .  As the Supreme Court has observed, the power to declare actions of the other branches unconstitutional should be should be "a tool of last resort" because it "is . . . the ultimate threat to the continued effectiveness of the federal courts in performing that role."

*Id.* at 65, quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982).  But the decision to dismiss the *Walker* action was made solely on standing grounds, under circumstances that are distinguishable from the situation presented here.  Indeed, the court specifically noted that in that case, "neither a House of Congress nor any congressional committee has issued a subpoena for the disputed information or authorized this suit."  *Id.* at 53.

In *Walker,* the same court that decided the *Miers* case found that the Comptroller General had failed to meet his burden to demonstrate that he had suffered a personal and particularized injury:  he had no personal stake in the receipt of the records, and he brought the action solely in his official capacity, to vindicate what the court characterized as a "vague and amorphous" institutional interest in the material.  *Id.* at 66–67.  The court observed that a general interest in oversight or legislation might be too vague to suffice as a premise for a lawsuit, but it did not articulate a general rule that an action to enforce a legislative subpoena could never present a justiciable controversy; indeed, it expressly distinguished the action brought on behalf of the GAO from the situation here:  "there is some authority in this Circuit indicating that a House of Congress or a committee of Congress would have standing to sue to retrieve information to which it is entitled . . . .  But here the record reflects that Congress as a whole has undertaken no effort to obtain the documents at issue, that no committee has requested the documents, and that

no congressional subpoena has been issued." *Id.* at 68 (citations omitted).  Also, as in *Raines,* the court found it to be of "some importance" that the lawsuit had not been expressly authorized by Congress. *Id.* at 68.

So, as the court concluded in *Miers,* the decision and reasoning in *Walker* do not compel the dismissal of a House committee's action to enforce its own subpoena. *Miers*, 558 F. Supp. 2d at 67–68.  There is simply no binding precedent that requires the Court to dismiss this case on the grounds that it presents a political dispute.  That conclusion is reinforced by the fact that the executive branch has itself invoked the jurisdiction of the courts when it sought to enjoin compliance with a Congressional subpoena, *see AT&T I,* 551 F.2d at 384, or to obtain a declaration concerning the validity of a claim of executive privilege asserted in response to a House request. *See United States v. House of Representatives,* 556 F. Supp. 150, 150–51 (D.D.C. 1983)*.*  As the court commented in *Miers*, "[t]he Court does not understand why

separation of powers principles are more offended when the Article I branch sues the Article II branch than when the Article II branch sues the Article I branch." *Miers*, 558 F. Supp. 2d at 96.[7]

The Attorney General has advanced several other grounds for declining jurisdiction, most of which are variations on the same theme. The defendant moves to dismiss the case on the grounds that there is no statutory provision conferring federal subject matter jurisdiction in this case, that the plaintiff lacks standing, and that the complaint seeking a declaratory judgment does not allege a cause of action. Finally, the Attorney General argues that even if this court has jurisdiction to hear the case, it should decline to exercise it in its discretion. None of these arguments carries the day, and they will be addressed in turn below.

---

[7]     Defendant's claims that there are neither constitutional, statutory, or prudential grounds for jurisdiction flow largely from his mischaracterization of the nature of the dispute: "The Committee now asks this Court to enter the fray and decide whether the Committee's remaining interest in pursuing the so-called "Obstruction Component" of its investigation outweighs the Executive's interest in protecting its internal deliberations regarding how to interact with a coordinate Branch of government." Def.'s Mem. at 2; *see also id.* at 43 ("A court would have to weigh the relative interests of the political Branches and decide which interest prevails, either by elevating one over the other on a categorical basis or by enmeshing the court in the minutiae of the dispute between the Branches."). But that is not what this lawsuit seeks. It raises a narrow legal question: can the executive properly assert executive privilege to shield an agency's deliberative processes when the records in dispute do not reveal advice provided to the President himself or address his core constitutional functions? Am. Compl. ¶¶ 71–73. The defense also argues that this court may not "defin[e] the institutional boundaries of the political Branches," Def.'s Mem. at 1, or resolve "an inherently political dispute about the scope of the respective powers and responsibilities of the two political Branches," Def.'s Mem. at 21. While the amended complaint is a certainly a highly argumentative document, that bears a closer resemblance to a press release than the "short and plain statement of the claim" called for by Rule 8 of the Federal Rules of Civil Procedure, it does not actually ask the Court to embark on such a wide-ranging analysis. But even if the lawsuit questioned whether one branch had exceeded the authority granted it under the Constitution, the Supreme Court has already deemed that to be an appropriate inquiry. *See Nixon,* 418 U.S. at 704.

II.     **This Court has subject matter jurisdiction**.

    A.   <u>**This case raises a federal question since it arises under the Constitution, and 28 U.S.C. §1365 does not limit the scope of §1331.**</u>

The Court finds, as did the court in *Miers,* that this case presents a federal question and that therefore, the court has jurisdiction under 28 U.S.C. § 1331.  558 F. Supp. 2d at 64.  That was not a controversial finding in *Miers,* since both sides conceded that section 1331 provided subject matter jurisdiction over the dispute.  *Id.*  But the court went on to observe that since the case involved a failure to comply with a duly issued congressional subpoena, and the subpoena power derives implicitly from Article I of the Constitution, the case arose under the Constitution for purposes of section 1331.  The Court agrees.  This determination comports with Circuit precedent set forth in *AT&T I,* where the Court of Appeals recognized the existence of subject matter jurisdiction under section 1331 in a similar subpoena enforcement dispute due to the "fundamental constitutional rights . . . involved."  551 F.2d at 388–89.

Notwithstanding its previous concession, the Department of Justice now insists that subject matter jurisdiction is lacking.  Defendant argues that the fact that there is a specific statute that vests jurisdiction in the District Court for the District of Columbia for actions brought by the Senate to enforce *its* subpoenas means that in the absence of a parallel statute, this court does not have jurisdiction over an action brought on behalf of the House.  But this does not follow either explicitly or implicitly from 28 U.S.C. § 1365.

The statute provides:

> The United States District Court for the District of Columbia shall have original jurisdiction, without regard to the amount in controversy, over any civil action brought by the Senate or any authorized committee or subcommittee of the Senate to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened refusal or failure to

> comply with, any subpena or order issued by the Senate or committee or subcommittee of the Senate . . . .  This section shall not apply to an action to enforce, to secure a declaratory judgment concerning the validity of, or to prevent a threatened refusal to comply with, any subpena or order issued to an officer or employee of the executive branch of the Federal Government acting within his or her official capacity, except that this section shall apply if the refusal to comply is based on the assertion of a personal privilege or objection and is not based on a governmental privilege or objection the assertion of which has been authorized by the executive branch of the Federal Government.

28 U.S.C. § 1365(a).

The first problem with the defendant's argument is that section 1365 specifically states that it does not have anything to do with cases involving a legislative effort to enforce a subpoena against an official of the executive branch withholding records on the grounds of a governmental privilege.  28 U.S.C. §  1365(a).  So the statute would not confer jurisdiction in an action similar to this one brought by the Senate either, and the Court would be required look to section 1331 only in any event.

Second, the chronology of events surrounding the enactment of section 1365 reveals that the jurisdictional gap it was meant to cure was not a lack of jurisdiction over actions like this one.  In 1973, when the Senate Committee investigating the Watergate scandal brought an action to enforce a subpoena issued to President Nixon, the court held that it lacked jurisdiction because it was impossible to assign a monetary value to the plaintiff's claim, and therefore, it could not be shown that the case satisfied the amount-in-controversy requirement that was included in section 1331 at that time.  *Senate Select Comm. on Presidential Campaign Activities v. Nixon*,

366 F.Supp. 51, 60–61 (D.D.C. 1973).[8]   Congress promptly remedied the situation, passing

legislation that vested jurisdiction for Senate Select Committee suits in the U.S. District Court

for the District of Columbia.  *See Senate Select Comm.*, 498 F.2d at 727, citing Pub. L. No. 93-

190 (Dec. 18, 1973), 87 Stat. 736 (Dec. 18, 1973).   Then, in 1976, as the D.C. Circuit observed

in *AT&T I*, Congress turned its attention to section 1331, and it amended the provision to

eliminate the amount-in-controversy requirement for "any . . . action brought against the United

States, any agency thereof, or any officer or employee thereof in his official capacity."  *See* 551

F.2d at 389 n. 7; Pub. L. No. 94-574, 90 Stat. 2721 (Oct. 21, 1976).   Thus, at the time that section

1365 was enacted as part of the Ethics in Government Act in 1978, it was not necessary to

remedy any lack of jurisdiction for actions brought against a federal officer acting in his official

capacity.  *See* S. Rep. No. 95-170 at 91–92 (1977) ("This exception in the statute is not intended

to be a Congressional finding that the Federal courts do not now have the authority to hear a civil

action to enforce a subp[o]ena against an officer or employee of the Federal government.").

Finally, the Court does not accept DOJ's argument that the lack of specific jurisdictional

provision somehow negates the applicability or availability of the general provision.   The

defense points to *Hinck v. United States*, 550 U.S. 501, 506 (2007), where the Supreme Court

invoked "the well-established principle that, in most contexts, 'a precisely drawn, detailed statute

---

8       In its brief, the Committee asserts that "Judge Sirica indicated that the Court would have
had section 1331 jurisdiction over the Senate Select Committee's action . . . but for the then-
existing $10,000 amount-in-controversy requirement."  Pl.'s Opp. at 48.   But a review of the
opinion reveals that Judge Sirica did not go that far; the court's only focus was the inability to
quantify the amount at stake that was necessary to jurisdiction.
        Judge Sirica also rejected the Senate Select Committee's contention that jurisdiction
could be properly based on 28 U.S.C. § 1345, for actions commenced by the United States.  366
F. Supp. at 56–57.   The Committee here also relies on that provision as a basis for jurisdiction,
but the Court agrees with Judge Sirica that it is only the Department of Justice that is authorized
to institute actions on behalf of the United States.  *See* 28 U.S.C. § 516.

pre-empts more general remedies,'" (internal quotation marks omitted).  But here, the defense is asking the court to draw inferences from the *absence* of a precisely drawn, detailed statute. Furthermore, the situation in *Hinck* is inapposite.

In the *Hinck* case, the plaintiff filed a suit in the Court of Federal Claims seeking to challenge a refusal by the Secretary of Treasury to abate the interest owed on past taxes under section 6404(e)(1) of the Internal Revenue Code, *id.* at 505–06, and the Court found that pursuant to 26 U.S.C. § 6404(h), the Tax Court was the exclusive forum for judicial review of those decisions, *id.* at 503.  The Court stated that it was guided by two general principles:  the general rule acknowledging the primacy of specific statutory remedies cited above, and its "past recognition that when Congress enacts a specific remedy when no remedy was previously recognized, . . . the remedy provided is generally regarded as exclusive." *Id.* at 506.  The Court observed that Congress had enacted section 6404(h) for the specific purpose of altering the state of the law:  there was a previous line of decisions holding that the Secretary's decision was purely discretionary and therefore not subject to challenge under the APA at all.  Then, as part of the Taxpayer Bill of Rights, Congress gave the Tax Court jurisdiction to hear challenges by taxpayers claiming that the Secretary's failure to abate was an abuse of discretion.  Since that statute not only eliminated the original barrier to judicial review – the lack of a standard to apply – but it also set out a serious of other details circumscribing and defining a remedy, such as a specific statute of limitations and a net-worth ceiling on eligible plaintiffs, the Court found that the newly created remedy – including its specification of the forum – was intended to be exclusive.  The Court characterized the statute as a comprehensive remedial scheme, and not

simply a grant of jurisdiction, and it does not follow from its reasoning that a specific provision dealing solely with jurisdiction was meant to preempt section 1331.[9]

In enacting section 1364, Congress was not creating a new cause of action that did not previously exist; it is not a remedial provision at all, and as the D.C. Circuit stated in the *AT&T I* case, section 1331 already supplied federal subject matter jurisdiction at that time.  551 F.2d at 389.

Defendant also points to *Helms v. Master and/or Captain of SS Marshal Konev*, 620 F. Supp. 1488 (E.D. La. 1985), but that two page order does not begin to suggest that the District Court does not have jurisdiction to hear an action brought by a House committee to enforce its own subpoena.  In *Helms*, an individual Senator brought an action in the Eastern District of Louisiana asking the court to bar a Soviet merchant vessel from leaving the territorial waters of the United States.  *Id.* at 1488.  He sought to prevent a threatened refusal to comply with a Senate subpoena that had been served upon a seaman onboard.  *Id.*  The court observed that there were questions about whether the suit had been properly authorized or served, and whether the relief sought was even available, but it ruled that it was powerless to address the matter in any way because 28 U.S.C. §1364 vests exclusive jurisdiction over suits to enforce Senate subpoenas in the United States District Court of the District of Columbia.  *Id.* at 1488–89.  The court's narrow ruling that a Louisiana court therefore lacked jurisdiction over Senator Helms's action has no

---

9       Indeed, the *Hinck* case never mentions the interplay between the specific provision at issue and section 1331 at all – the conflict between the circuits that the court undertook to review concerned whether the federal courts might have concurrent jurisdiction with the Tax Court under section 1346.  *See Beall v. United States*, 336 F.3d 419, 472–30 (5th Cir. 2003), *abrogated by Hinck*, 550 U.S. 501.

bearing upon the case at hand.  Thus, the cases cited by the defense are inapplicable, and section 1364, which addresses the enforcement of Senate subpoenas against private parties, is not germane here.

### B. **The lawsuit presents a case or controversy that plaintiff has standing to assert.**

The defendant also maintains that the suit does not present a case or controversy and that the plaintiff lacks standing because the complaint fails to allege the necessary personal injury that is concrete and particularized, and the issue is not one traditionally thought to be capable of resolution through the judicial process." Def.'s Mem. at 24.  This contention is based largely on the Supreme Court's decision in *Raines*, but the defense has also cited *Chenoweth v. Clinton,* 181 F.3d 112 (D.C. Cir. 1999)*, Campbell v. Clinton*, 52 F. Supp. 2d 34 (D.D.C. 1999), and *Walker v. Cheney*, 230 F. Supp. 2d at 53.  But none of these precedents mandates dismissal of this action on standing grounds.  This case falls squarely under *AT&T I*, where the D.C. Circuit stated, "[i]t is clear that the House as a whole has standing to assert its investigatory power . . . ." *AT&T I*, 551 F.2d at 392; *see also U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 86 (D.D.C. 1998) ("[I]t [is] well established that a legislative body suffers a redressable injury when that body cannot receive information necessary to carry out its constitutional responsibilities.  This right to receive information arises primarily in subpoena enforcement cases, where a house of Congress or a congressional committee seeks to compel information in aid of its legislative function.").

Standing, which is an essential predicate to the exercise of jurisdiction, is comprised of three elements:  injury in fact, causation, and redressability.  First, "the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).   Second, there must be a causal connection between the injury and the conduct complained of, that is, the injury must be traceable to the challenged action of the defendant and not the result of the independent action of a third party.   *Id.*   And third, it must be likely that the injury will be redressed by a favorable decision. *Id.* at 561.   It is the first element that is of significance here.

The Attorney General is correct in observing that after *AT&T I* was decided by the D.C. Circuit, the Supreme Court called for a standing inquiry that is "especially rigorous" when a court is faced with an action that presents separation of powers concerns.   *Raines*, 521 U.S. at 819; *see also Walker*, 230 F. Supp. 2d at 65 ("[I]n light of the 'overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere,' this Court must conduct its standing inquiry 'carefully' . . . .") (quoting *Raines,* 521 U.S. at 820).   To give effect to that admonition, the Court indicated that a plaintiff must satisfy the *Lujan* elements and also show that "the dispute is traditionally thought to be capable of resolution through the judicial process."   *Raines*, 521 U.S. at 819 (internal quotation marks omitted).   But as was discussed above, and as the court in *Miers* observed, the *Raines* case was dismissed because the individual lawmakers who brought the action failed to allege the requisite particularized and concrete injury to themselves, not because a legislative body as an institution would lack standing to bring an action on its own behalf.   Here, the Committee has requested a particular set of documents in the course of an official investigation, it has issued a subpoena for that material, the Attorney General has withheld a clearly delineated subset of that material, and the House of Representatives has specifically authorized the initiation of this action to enforce the subpoena.

34

Twice.  Thus, *Raines* is entirely distinguishable from the situation at hand, and it did not overrule or limit the precedent established in *AT&T I.  See Miers*, 558 F. Supp. 2d at 69–70.

The other cases cited by the defense are distinguishable as well.  In *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), the D.C. Circuit applied the decision in *Raines* when it ruled that individual Members of the House of Representatives lacked standing to pursue an action seeking to enjoin the President's implementation of an initiative created by executive order rather than by statute.  The Members could allege no personal injury beyond a claimed usurpation of Congressional authority, and the court found that abstract allegation to be indistinguishable from the basis for standing rejected in *Raines*.  In *Campbell v. Clinton*, 52 F. Supp. 2d 34 (D.D.C. 1999), the court similarly found, in light of *Raines,* that a claim lodged by individual lawmakers asserting that the President had violated the War Powers Clause alleged an injury that was too generalized to confer standing.  *Id.* at 43.  The court also took note of an additional consideration not present in this case:  "judges traditionally have expressed great reluctance to intercede in disputes between the political branches of government that involve matters of war and peace."  *Id.* at 40.  And in *Walker*, as noted above, the court also rejected the Comptroller General's attempt to launch his own action, without Congressional authorization, and when no subpoena had been issued, on standing grounds.  None of those cases involved a

suit specifically authorized by a legislative body to redress a clearly delineated, concrete injury to the institution, and so those rulings do not support the dismissal of this action.[10]

Furthermore, this case presents the sort of question that the courts are traditionally called upon to resolve. *Miers*, 558 F. Supp. 2d at 73. Count I simply asks whether the privilege that was asserted in the June 20, 2012 letter from the Deputy Attorney General – the executive privilege – may be validly asserted by the Attorney General in response to a Congressional subpoena for the particular set of records involved, which do not implicate advice to the President. Am Compl. ¶¶ 71–73. Federal courts are routinely involved in the enforcement of subpoenas, in both civil and criminal litigation, and even administrative proceedings. And in the FOIA litigation that comprises a significant portion of this court's docket, judges are regularly called upon to rule upon the applicability of privileges or exclusions asserted by the executive.

---

10      This reasoning, and thus the Court's holding, is limited to Count I; Count II asks the Court to issue a declaratory judgment that the Presidential communications privilege would not apply "in the event" the defendant invokes it in the future. Am. Compl. ¶¶ 80–86. This count, which was based on the Attorney General's failure to *disavow* any reliance on that privilege, does not describe an actual or imminent injury to the Committee; it is entirely hypothetical and speculative, and therefore, it was not ripe when it was filed and does not meet the case or controversy requirement. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985) (holding that a claim is not ripe for adjudication if it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all"). And after the Amended Complaint was filed, the Attorney General specifically informed the plaintiff and this Court that he had not asserted the privilege in withholding the documents and did not intend to rely on the privilege in this action. [Dkt. # 32]. In light of those circumstances, Count II will be dismissed. *See Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we being, and end, with an examination of our jurisdiction."); *Doe ex rel. Fein v. District of Columbia*, 93 F.3d 861, 871 (D.C. Cir. 1996) ("A claim that the court lacks jurisdiction under Article III of the Constitution may not be waived, . . . and the court is obliged to resolve it *sua sponte*.").

**C.** **The complaint alleges a cause of action for which declaratory relief may be sought.**

The defendant argues that the matter filed under 28 U.S.C. § 2201(a) should be dismissed because invocation of the Declaratory Judgment Act alone is insufficient to create a valid cause of action.   While he is correct that a party must have valid grounds for federal jurisdiction independent of the Act, and a District Judge may not simply issue advisory opinions, the Court has already determined that this case presents an actual, ripe controversy over which it can exercise subject matter jurisdiction under section 1331.   That is sufficient under the terms of the statute, which unambiguously provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).

The plaintiff here is not looking to the Declaratory Judgment Act as the source of the right it is seeking to vindicate in this Court, but rather as the source of the mechanism to achieve the vindication of a right derived elsewhere.   It is well established that the Committee's power to investigate, and its right to further an investigation by issuing subpoenas and enforcing them in court, derives from the legislative function assigned to Congress in Article I of the Constitution. As the Supreme Court stated in *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927):

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information – which not infrequently is true – recourse must be had to others who do possess it.  Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.  All this was true before

> and when the Constitution was framed and adopted.  In that period the
> power of inquiry – with enforcing process – was regarded and employed
> as a necessary and appropriate attribute of the power to legislate – indeed,
> was treated as inhering in it.  Thus there is ample warrant for thinking, as
> we do, that the constitutional provisions which commit the legislative
> function to the two houses are intended to include this attribute to the end
> that the function may be effectively exercised.

Thus, this case fulfills all of the requirements of the Act.  As the court concluded in *Miers*, since

plaintiff has alleged an actual injury to rights derived from the Constitution, giving rise to Article

III standing and federal question jurisdiction, there is no further requirement that plaintiff include

a substantive count or claim for relief in addition to the request for declaratory relief.

> To be sure, in most cases a plaintiff would *need* to identify a statutory (or
> a common law) cause of action to proceed in federal court, as otherwise
> there would be no basis for the plaintiff's asserted right to relief.  The
> Constitution itself does not confer in most settings the sort of affirmative
> right that the Committee is claiming exists here; instead, the asserted right
> arises from some other source of law.  But where the Constitution is the
> source of the right allegedly violated, no other source of a right – or
> independent cause of action – need by identified.

*Miers*, 558 F. Supp. 2d at 81;[11] *see also Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 670 F.

Supp. 424, 427 (D.D.C. 1987) (explaining that the provision in the Act limiting the availability

of declaratory judgment actions to cases of actual controversy "merely incorporates Article III's

requirement that federal courts may only entertain 'cases or controversies'").  The defendant

cites no cases that stand for the proposition that there is something to the "actual controversy"

---

11      The *Miers* court also found that a cause of action can be implied from the Constitution,
and that the Congressional committee that was the plaintiff in that case had an implied cause of
action derived from Article I to seek a declaratory judgment concerning the exercise of its
subpoena power.  558 F. Supp. 2d at 94.  This Court does not take issue with that legal
conclusion, but it finds that it is not necessary to reach the implied cause of action issue given the
availability of the Declaratory Judgment Act.

requirement in the Act beyond the elements of standing, ripeness, causation, and redressability that create a case or controversy for Article III purposes.

It is true that there is case law that has muddied the waters, in which courts have observed that the Act does not create "a cause of action." *See, e.g.*, *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007); *Okpalobi v. Foster,* 244 F.3d 405, 423, n.31 (5th Cir. 2001). But those cases can be read as simply reiterating the well-established principle that the Act does create substantive rights that would not exist otherwise, and that it does not confer federal jurisdiction by itself. *See, e.g., Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (explaining that the availability of declaratory relief "presupposes the existence of a judicially remediable right"); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950) (noting that the Act did not impliedly repeal or modify the requirements for subject matter jurisdiction in federal courts); *C&E Servs., Inc. of Washington v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) ("[T]he Declaratory Judgment Act 'is not an independent source of federal jurisdiction.'"). Any other interpretation would be inconsistent with the plain text of the statute. But since this action alleges a valid case or controversy, the Declaratory Judgment Act offers an appropriate way to proceed, and there are no grounds to dismiss the case for lack of subject matter jurisdiction.

### III.     The Court need not stay its hand for prudential reasons.

Finally, the Attorney General takes the position that even if the Court is authorized to hear the lawsuit, it should exercise the discretion embodied in the Declaratory Judgment Act and its equitable discretion to decline to do so in favor of a negotiated resolution. His chief argument is the same one that the Court has already rejected:  that this case is an inappropriate attempt by legislators to bring a political dispute into a judicial forum, threatening the separation of powers.

*See* Def.'s Mem. at 42–43. But he also insists that that the suit was brought before the possibilities for compromise had been exhausted.  Def.'s Mem. at 44. The amici echo that sentiment, taking the position that the process of negotiation and accommodation was still underway at the time the Committee made a precipitous decision to file suit.  House Amici Brief at 16–17.  Both the defendant and the House amici take particular umbrage at what they characterize as a rush to the contempt vote, *see* Def.'s Reply at 24; House Amici Brief at 16–17, but the contempt citation is not a matter that is before the Court.  For its part, the Committee takes the position that the Attorney General's position was fixed and that further negotiation would have been pointless.  *See* Pl.'s Opp. at 18–19.

 Based on everything that has been presented to the Court to date, and the amount of time that has elapsed since this dispute arose, the Court does not believe that a discretionary dismissal is warranted.  Moreover, it finds that the equitable considerations tend to favor the assumption of jurisdiction in this instance. While the defense presents its motion as a request that the court remain neutral while the other two bodies work out their difficulties, dismissing the case without hearing it would in effect place the court's finger on the scale, designating the executive as the victor based solely on his untested assertion that the privilege applies.

 Defendant cites *AT&T I,* but this case does not involve the factors that motivated the court to decline jurisdiction there.  First of all, the Court of Appeals in the *AT&T I* case was aware that the parties had already come extremely close to resolving the matter among themselves, and it had received a considerable amount of detail concerning the few remaining sticking points in the negotiation.  Second, the case did not involve a purely legal question about the availability of the privilege; the executive sought to bar the transmittal of the records due to a

series of significant national security concerns, including issues related to the Congressional committee's ability to safeguard the information.  As the court explained:

> To decide this case on the merits, we would be called on to balance the constitutional interests raised by the parties, including such factors as the strength of Congress's need for the information in the [materials], the likelihood of a leak of the information in the Subcommittee's hands, and the seriousness of the harm to national security from such a release.

551 F.2d at 391.  The court also pointed out that the issues presented bore one of the hallmarks of a political question:  the lack of ascertainable standards for the judiciary to apply.  *Id.* at 390–91; *see also id.* at 394 ("A court seeking to balance the legislative and executive interests asserted here would face severe problems in formulating and applying standards.").  The court then exercised its discretion to send the parties back to the negotiating table, recognizing that the courts might be involved again in the future, but in "a more typical judicial role, calling for decision on a narrower, more specific issue." *Id.* at 395.[12]  Thus, the reasoning behind the choice the court made in *AT&T I* does not pertain here, and this case has already been narrowed to a more typical judicial inquiry.

---

12     In *United States v. House of Representatives*, 556 F. Supp. at 150, the District Court also declined to exercise its discretion to hear a declaratory judgment action, but that case involved a pre-emptive strike launched by the executive. The complaint sought a ruling that the Administrator of the Environmental Protection Agency could properly assert the executive privilege over sensitive law enforcement information sought by a House subcommittee subpoena.  But the House had not yet initiated any contempt or enforcement proceedings in which the witness would have been able to raise the privilege as a defense.  The court observed that "[c]ourts have been extremely reluctant to interfere with the statutory scheme by considering cases brought by recalcitrant witnesses seeking declaratory or injunctive relief," *id.* at 152, and it cited the general principle that courts have a duty to avoid deciding constitutional questions unnecessarily.  *Id.*  On that point, the court stated that "[j]udicial resolution of this constitutional claim . . . will never become necessary unless Administrator Gorsuch becomes a defendant in either a criminal contempt proceeding or other legal action taken by Congress." *Id.* at 153.  So, in those circumstances, which do not pertain here, the court decided that it should not exercise its discretion to consider the matter under the Declaratory Judgment Act. *Id.*

In the end, it is the defendant's own brief that makes the best case for why the Court should not predicate its ruling on equitable grounds. The Attorney General argues: "[t]he prudential bases for refusing jurisdiction are especially strong here, where substantial accommodation was continuing and has continued, and where Congress's legitimate informational interests have been largely satisfied." Def.'s Mem. at 21. He goes on: "the Committee had little need to resort to the judicial process in order to conduct meaningful oversight." *Id.* at 45. Making a decision that turns upon on the "legitimacy" of the inquiry, the "need" for the documents, or how "meaningful" the oversight would be would require the Court to wade thigh high into the very waters the defendant spent the first forty pages of his brief telling it to avoid. Getting into the question of who bears responsibility for the impasse here – who negotiated properly or fairly, whether the appropriate amount of time was spent, whether any accommodation offered was "substantial" or merely superficial, and the relative merits of the grounds for the withholding and the stated need for the material – would put the Court squarely in the position of second guessing political decisions and take it well outside of its comfortable role of resolving legal questions that are amenable to judicial determination. And the Court would be wading into the murk without boots: in this case, it is the equitable issues, and not the legal questions posed by the complaint, that lack clear standards to apply and implicate political considerations that the court should be reluctant to assess.

Therefore, following the approach adopted by the court in *Miers,* this Court will not undertake to assign blame for the impasse – it is supposed to be accepting the complaint on its face at this point in the proceedings in any event. It is sufficient that it finds the conclusion that

there is an impasse to be inescapable, and that under those circumstances, it does not appear that there would be any point to sending this matter back.

The Court certainly recognizes that the optimal outcome of a dispute of this nature would involve the parties' crafting their own solution without judicial intervention. But it took it upon itself at the first status conference to prod the parties to re-engage in the process of accommodation,[13] it postponed the first scheduled oral argument on the motion to dismiss for the purpose of permitting settlement conversations to continue, [Dkt. # 38], and, at a later point in the proceedings, it took the further step of referring the case to a senior District Judge for mediation, [Dkt. # 41]. None of these steps was successful, so it does not appear that dismissing the case entirely for that purpose would be productive either. The defendant and the House amici argued when they filed their pleadings that the lawsuit had been filed in haste, and that the parties should be left to continue to try to work it out. But a considerable period of time has gone by, and nothing seems to have happened since then, so the argument has little force now.

The Court rejects the defendant's suggestion that it is the fact that a lawsuit was filed that is the impediment here. *See* Tr. at 20–21, 30–31, 43. Parties negotiate and even resolve their disputes quite often notwithstanding the pendency of a court case. And defendant has given the Court no facts that would provide the basis for a realistic hope that a decision to excuse itself from the conversation would actually facilitate a resolution. There is nothing about the pendency

---

13    At oral argument, counsel for the defendant took the position that the Inspector General's report was a "game changer," and that if the Committee had only waited for the release of the report, the parties could have come to some agreement. *See* Tr. at 20–21, 42–43. But the report had been issued by the time of the first status hearing, and the Court encouraged the parties to try to work things out for just that reason, to no avail.

of the action in particular that limits the ability of the House and the Attorney General to confer

and achieve a mutually satisfactory compromise – perhaps there are other factors at work.

## CONCLUSION

Since for all of the reasons set forth above, neither legal nor prudential considerations

support the dismissal of this action, the defendant's motion to dismiss the action will be denied.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2013