**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | Case No. 1:12-cv-01332-ABJ |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States, | ) ) ) ) | |
| *Defendant.* | ) ) ) | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7, Plaintiff Committee on Oversight and Government Reform of the United States House of Representatives respectfully moves for entry of judgment on Count I of, and the sole remaining count in, the First Amended Complaint (Jan. 15, 2013) (ECF No. 35).[1]  With respect to Count I, there is no genuine issue as to any material fact and, for all the reasons set forth in the accompanying Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment, the Committee is entitled to judgment as a matter of law.

---

[1]  On September 30, 2013, the Court dismissed sua sponte Count II of the First Amended Complaint.  *See* Order (Sept. 30, 2013) (ECF No. 51); Mem. Op. at 36 n.10 (Sept. 30, 2013) (ECF No. 52) ("[A]fter the Amended Complaint was filed, the Attorney General specifically informed the plaintiff and this Court that he had not asserted the [Presidential communications] privilege in withholding the documents and did not intend to rely on the [Presidential communications] privilege in this action. . . .  In light of those circumstances, Count II will be dismissed.").

A proposed order is submitted herewith, as is Plaintiff's Statement of Material Facts as to

Which There Is No Genuine Issue.

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, General Counsel
D.C. Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
D.C. Bar No. 482949
CHRISTINE DAVENPORT, Sr. Assistant Counsel
TODD B. TATELMAN, Assistant Counsel
MARY BETH WALKER, Assistant Counsel
D.C. Bar No. 501033
ELENI M. ROUMEL, Assistant Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and
Government Reform, U.S. House of Representatives*

December 16, 2013

**CERTIFICATE OF SERVICE**

I certify that on December 16, 2013, I filed and served one copy of the foregoing

Plaintiff's Motion for Summary Judgment by CM/ECF on all registered parties.


*/s/ Kerry W. Kircher*
Kerry W. Kircher

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) | |
| *Plaintiff*, | ) ) ) | |
| v. | ) ) | Case No. 1:12-cv-01332-ABJ |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States, | ) ) ) ) ) | |
| *Defendant*. | ) ) ) | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Civil Rule 7(h), Plaintiff

Committee on Oversight and Government Reform of the United States House of Representatives

("Committee") respectfully sets forth the following statement of material facts as to which there

is no genuine issue:

1.      The Committee is a standing committee of the House, duly established at all

pertinent times pursuant to House Rule X.1(n), Rules of the House of Representatives, 112th

Cong., (2011), and House Rule X.1(n), Rules of the House of Representatives, 113th Cong.

(2013).  *See* Answer to First Am. Compl. ¶ 25 (Nov. 15, 2013) (ECF No. 56) ("Answer")

(admitting that the Committee is a standing committee of the House); House Rule X.1(n), Rules

of the House of Representatives, 112th Cong. (2011), *available at*

http://rules.house.gov/publication/rules-house-representatives-112th-congress (click on "PDF");

House Rule X.1(n), Rules of the House of Representatives, 113th Cong. (2013), *available at* http://clerk.house.gov/legislative/house-rules.pdf.

2. The Honorable Darrell E. Issa was and is the chair of the Committee for the 112th and 113th Congresses. *See* H. Res. 6, 112th Cong. (2011) (enacted); H. Res. 6, 113th Cong. (enacted).

3. Defendant Eric H. Holder, Jr. is, and has been since February 2, 2009, the Attorney General of the United States. *See* Answer ¶ 20.

4. In November 2010, the DOJ Inspector General (IG) issued a report finding "significant weaknesses in ATF's implementation of Project Gunrunner," a comprehensive strategy designed to combat firearms trafficking, of which Operation Fast and Furious was a part. U.S. Dep't of Justice, Office of the Inspector Gen., Review of ATF's Project Gunrunner iii, 2, 93 (Nov. 2010), *available at* http://www.justice.gov/oig/reports/ATF/e1101.pdf; *see also* U.S. Dep't of Justice, Office of the Inspector Gen., A Review of ATF's Operation Fast and Furious and Related Matters 106 (Sept. 2012) ("2012 IG Report") (discussing Operation Fast and Furious as part of Project Gunrunner), *available at* http://www.justice.gov/oig/reports/2012/s1209.pdf.

5. On or about December 14 or 15, 2010, United States Customs and Border Protection Agent Brian Terry was killed while on duty in Arizona. *See* Answer ¶ 2(iii); 2012 IG Report at 199-203; *see* J. Staff of H. Comm. on Oversight and Gov't Reform & S. Comm. on the Judiciary, 112th Cong., Rep. on Part I of III, Fast and Furious:  The Anatomy of a Failed Operation 128-36, 157-61 (July 31, 2012) ("Committee Report, Part I") (addressing operational failures of Operation Fast and Furious), *available at* http://oversight.house.gov/report/fast-and-furious-the-anatomy-of-a-failed-operation-part-1-of-3/ (click on 7-31-12 Report); J. Staff of H. Comm. on Oversight & Gov't Reform & S. Comm. on the Judiciary, 112th Cong., Rep. on Part

II of III, Fast and Furious:  The Anatomy of a Failed Operation 91-103 (Oct. 29, 2012)

("Committee Report, Part II") (addressing failures of supervision and leadership by DOJ

officials), *available at* http://oversight.house.gov/report/fast-and-furious-the-anatomy-of-a-

failed-operation-part-2-of-3/ (click on 10-29-12 Report).

      6.     Shortly thereafter, Congress began reporting allegations by whistleblowers, and

the media began reporting to the public, that DOJ was utilizing "gun walking" techniques, and

that two weapons found at the scene of Agent Terry's shooting were weapons that DOJ officials

responsible for Operation Fast and Furious had permitted to "walk."  *See* Decl. of Stephen R.

Castor ¶¶ 2-3 (Dec. 16, 2013) ("Castor Declaration"), Ex. 1 at 1(Letter from Hon. Charles E.

Grassley, Ranking Member, Senate Comm. on the Judiciary, to Kenneth E. Melson, Acting Dir.,

Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), at 1 (Jan. 27, 2011)); *id.*, Ex. 2

at 1 (Letter from Hon. Charles E. Grassley, Ranking Member, Senate Committee on the

Judiciary to Kenneth E. Melson, Acting Dir., ATF, at 1 (Jan. 31, 2011)); Kim Murphy, Guns

tracked by firearms bureau found at firefight scene, L.A. Times, Feb. 2, 2011, *available at*

http://articles.latimes.com/2011/feb/02/nation/la-na-atf-guns-20110203.

      7.     On January 27, 2011, and January 31, 2011, Charles E. Grassley, Ranking

Member of the Senate Committee on the Judiciary, wrote to DOJ, requesting a briefing by

knowledgeable ATF employees about Project Gunrunner.  *See* Castor Decl. ¶¶ 2, 4, Exs. 1-2.

      8.     On February 4, 2011, Assistant Attorney General Ronald A. Weich responded

with a letter stating:

> [T]he allegation . . . that [the Department of Justice's ("DOJ's")
> Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")]
> "sanctioned" or otherwise knowingly allowed the sale of assault
> weapons to a straw purchaser who then transported them into
> Mexico – is false.  ATF makes every effort to interdict weapons that

have been purchased illegally and prevent their transportation to Mexico.

*See* Answer ¶ 2(v); Castor Decl. ¶ 5, Ex. 3 at 1.

9.      In February 2011, the Oversight Committee began investigating Operation Fast and Furious, jointly with Senator Grassley.  *See* Answer ¶¶ 2, 28 ("admit[ting] that the Committee conducted its investigation . . . jointly with the Senate Judiciary Committee"); Castor Decl. ¶ 6.

10.      The Oversight Committee's investigation into Operation Fast and Furious resulted from several developments, including those discussed in paragraphs 4 through 8 above.  *See* Castor Decl. ¶¶ 6-7, Ex. 4 at 1-4 (Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Kenneth E. Melson, Acting Dir., ATF (March 16, 2011)).

11.      Initially the Committee focused on understanding Operation Fast and Furious itself (the "Operations Component" of the investigation).  *See* Castor Decl. ¶ 8.

12.      The Committee at first tried to obtain documents and information from DOJ without resort to a subpoena.  *See* Castor Decl. ¶ 9.

13.      On March 16, 2011, Chairman Issa sent a letter to Kenneth E. Melson, Acting Director of ATF, requesting that documents regarding Operation Fast and Furious be produced to the Committee.  *See* Answer ¶ 29; Castor Decl. ¶ 10, Ex. 4.

14.      On March 30, 2011, DOJ informed Committee staff by telephone that ATF would not produce by the March 30, 2011 deadline any documents in response to Chairman Issa's March 16, 2011 letter to Acting ATF Director Melson.  *See* Decl. of Ashok Pinto ¶ 2 (Dec. 16, 2013).

15.     On March 31, 2011, Chairman Issa issued to Acting ATF Director Melson a subpoena for documents, returnable on April 13, 2011 ("Melson Subpoena").  *See* Answer ¶ 31; Castor Decl. ¶ 11, Ex. 5.

16.     Between March 31 and June 9, 2011, ATF did not produce to the Committee any non-public documents in response to the Melson Subpoena.  *See* Decl. of Carlton J. Davis ¶ 2 (Dec. 16, 2013) ("Davis Declaration").

17.     Committee staff reviewed at DOJ certain documents that were responsive to the Melson Subpoena, many of which were heavily redacted.  *See* Davis Decl. ¶ 3.

18.     On April 19, 2011, Assistant Attorney General Weich sent to Chairman Issa a letter stating that "[w]e [are not] questioning the Committee's responsibility to conduct oversight of this matter."  Castor Decl. ¶ 12, Ex. 6 at 1-2; Answer ¶ 6.

19.     On May 2, 2011, Assistant Attorney General Weich sent to Senator Grassley a letter stating that "[i]t remains our [DOJ's] understanding that ATF's Operation Fast and Furious did not knowingly permit straw buyers to take guns into Mexico."  Castor Decl. ¶ 13, Ex.7, at 1; Answer ¶ 3.

20.     On May 5, 2011, a senior DOJ official informed the Committee, with respect to the Committee's investigation into Operation Fast and Furious, that "there's a there there."  Answer ¶ 6.

21.     On June 10, 2011 (one business day before a scheduled Committee hearing on Operation Fast and Furious), DOJ produced 80 pages in response to the Melson Subpoena.  (In its cover letter for this production, DOJ indicated that the production contained 69 pages.)  Castor Decl. ¶ 14, Ex. 8; Davis Decl. ¶ 4.

22.     On June 14, 2011, Assistant Attorney General Weich sent to Chairman Issa a letter that acknowledged "the Committee's legitimate oversight interest in the genesis and strategy pertaining to Fast and Furious."  Castor Decl. ¶ 15, Ex. 9 at 1; Answer ¶ 35.

23.     On June 21, 2011 Chairman Issa raised concerns with William J. Hoover, ATF Deputy Director, regarding ATF retaliation against Operation Fast and Furious whistleblowers. *See* Castor Decl. ¶ 39, Ex. 27 (Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to William J. Hoover, Deputy Dir., ATF (June 21, 2011)).

24.     On July 4, 2011, Acting ATF Director Melson appeared before Committee staff – with private counsel but without DOJ lawyers or officials – and stated that DOJ was managing its response to the Committee investigation into Operation Fast and Furious so as to deny the Committee information, and so as "to push the information away from their political appointees at the Department."  Castor Decl. ¶ 16, Ex. 10 at 123-24; Answer ¶ 6 (admitting that Mr. Melson appeared before the Committee for an interview on July 4, 2011).

25.     On July 11, 2011, Chairman Issa and Senator Grassley together wrote to Robert S. Mueller, III, Director of the Federal Bureau of Investigation ("FBI"), to request documents relevant to the FBI's involvement in Operation Fast and Furious, including documents relevant to information sharing, or the lack thereof, among DOJ component agencies.  *See* Answer ¶ 33 (admitting that Chairman Issa and Senator Grassley sent a letter to the FBI on July 11, 2011); Castor Decl. ¶ 17, Ex. 11.

26.     The FBI did not produce to the Committee a single document in response to the July 11, 2011 letter.  *See* Davis Decl. ¶ 5.

27.     On July 15, 2011, Chairman Issa and Senator Grassley together wrote to Michele M. Leonhart, Administrator of the Drug Enforcement Administration ("DEA"), to request

documents relevant to DEA's involvement in Operation Fast and Furious, including documents relevant to information sharing, or the lack thereof, among DOJ component agencies.  *See* Answer ¶ 33 (admitting that Chairman Issa and Senator Grassley sent a letter to the DEA on July 15, 2011); Castor Decl. ¶ 18, Ex. 12.

28.     The DEA produced to the Committee of total of approximately 20 pages of documents.  *See* Davis Decl. ¶ 6.

29.     On July 25, 2011, Chairman Issa raised with ATF Deputy Director Hoover new concerns regarding ATF intimidation of Operation Fast and Furious whistleblowers.  *See* Castor Decl. ¶ 40, Ex. 28 (Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to William J. Hoover, Deputy Dir., ATF (July 25, 2011)).

30.     On September 1, 2011, Chairman Issa and Senator Grassley wrote to the Acting U.S. Attorney for the District of Arizona to request documents relevant to that office's involvement in Operation Fast and Furious, and to request interviews with three employees of that office who were involved with Operation Fast and Furious.  *See* Answer ¶ 34; Castor Decl. ¶ 19, Ex. 13.

31.     The Acting U.S. Attorney for the District of Arizona never responded to the September 1, 2011 letter.  *See* Answer ¶ 34; Castor Decl. ¶ 20.

32.     The U.S. Attorney's Office for the District of Arizona never produced any documents in response to the September 1, 2011 letter.  Davis Decl. ¶ 7.

33.     Rather, on December 6, 2011, Assistant Attorney General Weich sent to Chairman Issa and Senator Grassley, in response to their September 1, 2011 letter, a letter that refused their request for interviews as to two of the three employees of the office of the U.S. Attorney for the District of Arizona who were involved with Operation Fast and Furious.  *See*

Answer ¶ 34 (admitting that Mr. Weich sent a letter to Chairman Issa and Senator Grassley on December 6, 2011); Castor Decl. ¶ 20, Ex.14.

34.     The third employee, whom DOJ did agree to make available for an interview – Patrick Cunningham, Chief of the Criminal Division, U.S. Attorney's Office for the District of Arizona – invoked his Fifth Amendment privilege against self-incrimination, resigned from government service, and never sat for an interview.  *See* Answer ¶ 34 ("The fourth sentence of this paragraph is admitted.").

35.     From March 31, 2011 to October 11, 2011, DOJ produced to the Committee in response to the Melson Subpoena fewer than 2,100 pages of documents.  Davis Decl. ¶ 8; *accord* Castor Decl. ¶ 22, Ex. 16.

36.     On October 11, 2011, Assistant Attorney General Weich sent to Chairman Issa a letter that stated that DOJ had "substantially concluded [its] efforts to respond" to the Melson Subpoena.  Castor Decl. ¶ 22, Ex. 16 at 1; Answer ¶ 36.

37.     By the fall of 2011, the Committee's investigation had developed a second focus, namely whether DOJ deliberately was attempting to obstruct the Committee's underlying investigation into Operation Fast and Furious.  *See* Castor Decl. ¶ 21, 23, Ex. 15 (Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen. (Oct. 9, 2011)).

38.     The Committee had developed this second focus based on several factors including (i) Acting ATF Director Melson's statement to Committee staff on July 4, 2011, that DOJ was managing its response to the Committee investigation so as to deny the Committee information, and so as "to push the information away from their political appointees at the Department"; (ii) information the Committee obtained, principally from DOJ whistleblowers and

other confidential sources, that DOJ in fact had used risky gun walking techniques; and (iii) the Committee's conviction that the February 4, 2011 and May 2, 2011 letters from Assistant Attorney General Weich contained information and representations that were materially false. *See* Castor Decl. ¶ 21, 23, Ex. 15.

39.     On October 11, 2011, the Committee issued to Eric H. Holder, Jr., Attorney General of the United States, a document subpoena with a return date of October 25, 2011 ("Original Holder Subpoena"), and on January 3, 2013, the Committee reissued to Eric H. Holder, Jr., Attorney General of the United States, a document subpoena with a return date of January 7, 2013 ("Reissued Holder Subpoena"), which was substantively identical to the subpoena issued on October 11, 2011 (collectively, the "Holder Subpoena").  *See* Answer ¶¶ 8, 40, 41, 65; Castor Decl. ¶¶ 24, 36, Exs. 17, 26.

40.     The Attorney General produced no documents and provided no privilege log by the October 25, 2011 return date on the Original Holder Subpoena.  *See* Answer ¶ 42(i); Davis Decl. ¶ 9; Castor Decl. ¶¶ 25-26.

41.     On December 2, 2011, Deputy Attorney General Cole sent to Chairman Issa and Senator Grassley a letter that stated that "facts have come to light during the course of th[e Committee's] investigation that indicate that the February 4[, 2011] Letter contains inaccuracies"; stated that Operation Fast and Furious "was [so] fundamentally flawed . . . its tactics must never be repeated"; and "formally withdr[ew] the February 4[, 2011] letter."  *See* Castor Decl. ¶ 27, Ex. 18 at 1-2; Answer ¶ 9 (admitting that Mr. Cole sent a letter to Chairman Issa and Senator Grassley on December 2, 2011).

42.     Between October 11, 2011 and the date of the filing of this lawsuit, the Attorney

General produced fewer than 4,100 pages of documents responsive to the Original Holder

Subpoena.  *See* Davis Decl. ¶¶ 10.

43.     Many of the documents produced between October 31, 2011 and the filing of this

lawsuit on August 13, 2012 were redacted (some completely), while others were duplicative.

*See* Davis Decl. ¶ 11.

44.     DOJ produced approximately 100,000 pages of records and thousands of e-mails

to the DOJ IG in connection with the DOJ IG's investigation of Operation Fast and Furious.  *See*

Answer ¶ 42(vi); 2012 IG Report at 4-5.

45.     On December 8, 2011, Attorney General Holder stated to the House Committee

on the Judiciary that (i) "with regard to the Justice Department as a whole, and I am certainly a

member of the Justice Department, we will not provide memos after February the 4th . . . e-

mails, memos"; and (ii) "with regard to provision of e-mails, I thought I had made it clear that

after February the 4th, it is not our intention to provide e-mail information."  *U.S. Dep't of*

*Justice: Hr'g Before the H. Comm. on the Judiciary*, 112th Cong. 90, 91 (Dec. 8, 2011)

(testimony of Eric H. Holder, Jr., Att'y Gen.); Answer ¶ 43(i) (admitting that Attorney General

Holder testified before House Committee on the Judiciary).

46.     On December 14, 2011, DOJ counsel, appearing with Gary Grindler, the Attorney

General's Chief of Staff and former Deputy Attorney General, stated that "[w]hat I am saying is

that the Attorney General made it clear at his testimony last week that we are not providing

information to the committee subsequent to the February 4th letter."  Castor Decl. ¶ 28, Ex. 19 at

21; Answer ¶ 43(ii) (admitting that Mr. Grindler appeared for an interview on December 14,

2011).

47.     On January 10, 2012, Deputy Assistant Attorney General Jason Weinstein declined to answer questions put to him by Committee staff because, he said, the questions "implicate[] the post-February 4th period."  Castor Decl. ¶ 29, Ex. 20, at 177; Answer ¶ 43(iii).

48.     On June 20, 2012, Deputy Attorney General Cole sent to Chairman Issa a letter that stated that "the President has asserted executive privilege over the relevant post-February 4, 2011, documents"; acknowledged the "Committee's legitimate interest in [DOJ's] management of its response to congressional inquiries into Fast and Furious"; and stated that "[t]he legal basis for the President's assertion of executive privilege is set forth in the enclosed [June 19, 2012] letter to the President from the Attorney General."  Castor Decl. ¶ 30, Ex. 21, at 1, 2, 4; Answer ¶¶ 14, 42(v), 45.

49.     The Attorney General never provided a privilege log in response to the Original Holder Subpoena.  *See* Castor Decl. ¶26.

50.     On June 20, 2012, the Committee rejected the assertion of Executive privilege set forth in the June 20, 2012 letter from Deputy Attorney General Cole to Chairman Issa, and voted 23-17 to report the Attorney General's contumacious conduct to the full House.  *See* Answer ¶ 48; H. Rep. No. 112-546, at 45 (2012).

51.     On June 28, 2012, the House adopted, by a vote of 255-67, a resolution which provided that Attorney General Holder "shall be found to be in contempt of Congress for failure to comply with a congressional subpoena."  *See* Answer ¶ 52; H. Res. 711, 112th Cong. (June 28, 2012) (enacted); 158 Cong. Rec. H4417 (daily ed. June 28, 2012).

52.     Pursuant to 2 U.S.C. § 194, the House referred the contempt matter to the Attorney General for prosecution.  *See* H. Res 711, 112th Cong. (2012); Castor Decl. ¶¶ 31-32, Exs. 22-23.

53.     On July 30, 2012, Ronald C. Machen Jr., U.S. Attorney for the District of Columbia, sent a letter to Kerry W. Kircher, General Counsel for the House, indicating that he would not prosecute the Attorney General, and stating that "I concur with the longstanding position of the Department of Justice . . . :  The President, through a United States Attorney, need not, indeed may not, prosecute criminally a subordinate for asserting on his behalf a claim of executive privilege."  Castor Decl. ¶ 33, Ex. 24 at 1(quotation marks omitted).

54.     On July 31, 2012, the Committee issued part one of a planned three-part series of reports on Operation Fast and Furious.  *See* Castor Decl. ¶ 34; Comm. Report, Part I.

55.     On October 29, 2012, the Committee issued part two of its planned three-part series of reports on Operation Fast and Furious.  *See* Castor Decl. ¶ 34; Comm. Report, Part II.

56.     The Committee has not yet drafted part of three of its planned three-part series, which part is expected to address DOJ's response to the Committee's underlying investigation into Operation Fast and Furious, because the Committee does not yet have all of the relevant documents.  *See* Castor Decl. ¶ 34.

57.     On September 19, 2012, the DOJ IG issued a report concerning Operation Fast and Furious.  *See* Answer ¶ 62; DOJ IG Report.

58.     On September 19, 2012, DOJ produced to the Committee approximately 300 pages of documents referenced in the DOJ IG Report.  *See* Answer ¶ 63; Castor Decl. ¶ 35, Ex. 25; Davis Decl. ¶ 12.

59.     On January 4, 2013, the Committee issued the Attorney General a new document subpoena (the "Reissued Holder Subpoena").  *See* Answer ¶ 65 ("The first sentence of this paragraph is admitted."); Castor Decl. ¶ 36. Ex. 26.

60.     The Attorney General produced no additional documents and provided no privilege log by the January 7, 2013 return date on the Reissued Holder Subpoena.  *See* Answer ¶ 65 (admitting that Department produced no additional documents by the January 7, 2013 response date);  Castor Decl. ¶¶ 37-38.

61.     The Attorney General has provided no privilege log at any time since the issuance of the Reissued Holder Subpoena.  Castor Decl. ¶ 38.

62.     After the commencement of this litigation, the Attorney General acknowledged that he had not asserted the Presidential communications privilege in withholding documents responsive to the Holder subpoena, and does not intend to rely on the Presidential communications privilege in this action.  *See* Mem. Op. at 36 n.10 (Sept. 30, 2013) (ECF No. 52).

63.     On November 15, 2013, the Attorney General further acknowledged that he is withholding documents responsive to the Holder Subpoena that "do not . . . contain material that would be considered deliberative under common law or statutory standards."  Def.'s Mot. for Certification of This Ct.'s Sept. 30, 2013 Order for Interlocutory Appeal . . . at 8-9 (Nov. 15, 2013) (ECF No. 57).

64.     Also on November 15, 2013, DOJ produced to the Committee eight pages of documents together with a cover letter stating:  "In response to requests that [DOJ] has received pursuant to the Freedom of Information Act (FOIA) for certain documents relating to Operation Fast and Furious, ATF has identified eight pages of additional materials previously made available for review by the Committee. . . .  [W]e are enclosing these documents in the form that they are being released to the FOIA requestor."  *See* Castor Dec. ¶ 41, Ex. 29.

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, General Counsel
D.C. Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
D.C. Bar No. 482949
CHRISTINE DAVENPORT, Sr. Assistant Counsel
TODD B. TATELMAN, Assistant Counsel
MARY BETH WALKER, Assistant Counsel
D.C. Bar No. 501033
ELENI M. ROUMEL, Assistant Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and
Government Reform, U.S. House of Representatives*

December 16, 2013

**CERTIFICATE OF SERVICE**

I certify that on December 16, 2013, I filed and served one copy of the foregoing

Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue by CM/ECF on all

registered parties.


*/s/ Kerry W. Kircher*
Kerry W. Kircher

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | Case No. 1:12-cv-01332-ABJ |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States, | ) ) ) ) | |
| *Defendant.* | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Kerry W. Kircher, General Counsel
William Pittard, Deputy General Counsel
Christine Davenport, Senior Assistant Counsel
Todd B. Tatelman, Assistant Counsel
Mary Beth Walker, Assistant Counsel
Eleni M. Roumel, Assistant Counsel

OFFICE OF GENERAL COUNSEL,
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and
Government Reform, U.S. House of Representatives*

December 16, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................v

GLOSSARY OF ACRONYMS AND SHORT CITES ................................................. xi

INTRODUCTION ..........................................................................................................1

CONSTITUTIONAL CONTEXT ..................................................................................5

    I. Congressional Oversight Generally......................................................................5

    II. Congressional Oversight of the Department of Justice.........................................7

STATEMENT OF THE CASE......................................................................................10

LEGAL STANDARD...................................................................................................19

ARGUMENT ...............................................................................................................19

    I. The Deliberative Process Privilege Does Not Apply Here Because the Committee Is Investigating DOJ Misconduct. ....................................................................21

    II. Deliberative Process Does Not Excuse the Attorney General's Non-Compliance Because the Privilege Does Not Apply to Congressional Subpoenas. ..........................25

        A. Deliberative Process Is a Common Law Privilege. ................................................25

        B. The Committee Was Not Required to Recognize, and Properly Rejected, the Attorney General's Deliberative Process Assertion. .............................................27

    III. The Attorney General's Deliberative Process Privilege Assertion Is Invalid Because It Was Not Made in Compliance with the Terms of the Holder Subpoena. ..................33

    IV. Deliberative Process Does Not Excuse the Attorney General's Non-Compliance with the Holder Subpoena Because He Has Not Satisfied, and Cannot Satisfy, the Elements of the Privilege. .......................................................................................36

        A. The Attorney General Already Has Acknowledged That Some Withheld Responsive Documents "Do Not . . . Contain Material That Would Be Considered Deliberative Under Common Law or Statutory Standards." ..............37

        B. The Attorney General Has Not Satisfied, and Cannot Satisfy, His Burden of Establishing, on a Document-by-Document Basis, That the Withheld Responsive Documents Are Both Pre-decisional and Deliberative......................37

        C. The Committee's Need for the Post-February 4 Subset Outweighs Any Possible Interest Served by the Continued Withholding of Those Documents. ....40

CONCLUSION..................................................................................................................44

CERTIFICATE OF SERVICE

ATTACHMENTS

   Declaration of Stephen R. Castor (Dec. 16, 2013)

         Ex. 1 - Letter from Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the
                 Judiciary, to Kenneth E. Melson, Acting Dir., ATF (Jan. 27, 2011)

         Ex. 2 -  Letter from Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the
                 Judiciary, to Kenneth E. Melson, Acting Dir., ATF (Jan. 31, 2011)

         Ex. 3 - Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Charles Grassley,
                 Ranking Member, Sen. Comm. on the Judiciary (Feb. 4, 2011)

         Ex. 4 - Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Kenneth E.
                 Melson, Acting Dir., ATF (Mar. 16, 2011)

         Ex. 5 - Subpoena to Kenneth Melson, Acting Dir., ATF (Mar. 31, 2011)

         Ex. 6 - Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa,
                 Chairman, Oversight Comm. (Apr. 19, 2011)

         Ex. 7 - Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Charles E. Grassley,
                 Ranking Member, Sen. Comm. on the Judiciary (May 2, 2011)

         Ex. 8 - Letter from Ronald Weich, Ass't Att'y Gen., to the Hon. Darrell E. Issa,
                 Chairman, Oversight Comm. (June 10, 2011)

         Ex. 9 - Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa,
                 Chairman, Oversight Comm. (June 14, 2011)

         Ex. 10 - Tr. of Interview of Kenneth E. Melson, Acting Dir., ATF (July 4, 20[1]1)
                 (incorrectly dated in original as July 4, 2001)

         Ex. 11 - Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon.
                 Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, to Hon.
                 Robert S. Mueller III, Dir., FBI (July 11, 2011)

         Ex. 12 - Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon.
                 Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, to Hon.
                 Michele M. Leonhart, Adm'r, DEA (July 15, 2011)

         Ex. 13 - Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon.
                 Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, to Hon.
                 Ann Birmingham Scheel, Acting U.S. Att'y, Dist. of Ariz. (Sept. 1, 2011)

Ex. 14 - Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary (Dec. 6, 2011)

Ex. 15 - Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen. (Oct. 9, 2011)

Ex. 16 - Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm. (Oct. 11, 2011)

Ex. 17 - Subpoena to Eric H. Holder, Jr., Att'y Gen. (Oct. 11, 2011)

Ex. 18 - Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary (Dec. 2, 2011)

Ex. 19 - Tr. of Interview of Gary Grindler, Chief of Staff & Counselor to the Att'y Gen., and Former Acting Dep'y Att'y Gen. (Dec. 14, 2011)

Ex. 20 - Tr. of Interview of Jason Weinstein, Dep'y Att'y Gen. (Jan. 10, 2012)

Ex. 21 - Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm. (June 20, 2012)

Ex. 22 - Certification of H. Rep. No. 112-546 (2012) by Hon. John A. Boehner, Speaker of the U.S. House of Representatives (June 29, 2012)

Ex. 23 - Transmittal Sheet, Re: Certification of H. Rep. No. 112-546 (2012), Office of the Clerk for the U.S. House of Representatives to the office of the U.S. Att'y for the District of Columbia (June 29, 2012)

Ex. 24 - Letter from Ronald C. Machen, Jr., U.S. Att'y, to Kerry W. Kircher, Gen. Counsel, U.S. House of Reps. (July 30, 2012)

Ex. 25 - Letter from Judith C. Appelbaum, Acting Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., et al. (Sept. 19, 2011)

Ex. 26 - Subpoena to Eric H. Holder, Jr., Att'y Gen. (Jan. 3, 2013)

Ex. 27 - Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to William J. Hoover, Dep'y Dir., ATF (June 21, 2011)

Ex. 28 - Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to William J. Hoover, Dep'y Dir., ATF (July 25, 2011)

Ex. 29 - Letter from Peter J. Kadzik, Principal Dep'y Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm. (Nov. 15, 2013)

Declaration of Ashok Pinto (Dec. 16, 2013)

Declaration of Carlton J. Davis (Dec. 16, 2013)

# TABLE OF AUTHORITIES

## Cases

*Alexander v. FBI*,
    186 F.R.D. 154 (D.D.C. 1999)................................................................22, 25

*Alexander v. FBI*,
    186 F.R.D. 170 (D.D.C. 1999)................................................................22, 43

*Amster v. Lucey*,
    904 F.2d 78 (D.C. Cir. 1990)........................................................................40

*Arthur Andersen & Co. v. IRS*,
    679 F.2d 254 (D.C. Cir. 1982)................................................................37, 38

*Ashland Oil, Inc. v. FTC*,
    409 F. Supp. 297 (D.D.C. 1976).................................................................31

*Ashland Oil, Inc. v. FTC*,
    548 F.2d 977 (D.C. Cir. 1976)......................................................................31

*Barenblatt v. United States*,
    360 U.S. 109 (1959).......................................................................................6

*Bureau of Nat. Affairs, Inc. v. U.S. Dep't of Justice*,
    742 F.2d 1484 (D.C. Cir. 1984)....................................................................26

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*,
    40 F.R.D. 318 (D.D.C. 1966)........................................................................40

*Chaplaincy of Full Gospel Churches v. Johnson*,
    217 F.R.D. 250 (D.D.C. 2003).......................................................................22

*Coastal States Gas Corp. v. Dep't of Energy*,
    617 F.2d 854 (D.C. Cir. 1980)..........................................................19, 37, 38

*Comm. on the Judiciary, U.S. House of Representatives v. Miers*,
    558 F. Supp. 2d 53 (D.D.C. 2008) ..............................................................34

*Convertino v. U.S. Dep't of Justice*,
    674 F. Supp. 2d 97 (D.D.C. 2009)................................................................22

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
    532 U.S. 1 (2001)...........................................................................................43

*Dominion Cogen, D.C., Inc. v. District of Columbia*,
    878 F. Supp. 258 (D.D.C. 1995)...................................................................25

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975).........................................................................................5

*Estate of Parsons v. Palestinian Auth.*,
    651 F.3d 118 (D.C. Cir. 2011)......................................................................19

*Exxon Corp. v. FTC*,
589 F.2d 582 (D.C. Cir. 1978) ................................................................31, 35

*Fonville v. District of Columbia*,
230 F.R.D. 38 (D.D.C. 2005) ...........................................................................36

*FTC v. Anderson*,
631 F.2d 741 (D.C. Cir. 1979) .........................................................................35

*FTC v. Owens-Corning Fiberglas Corp.*,
626 F.2d 966 (D.C. Cir. 1980) .........................................................................35

*Hannah v. Larche*,
363 U.S. 420 (1960)..........................................................................................29

*In re Apco Liquidating Trust*,
420 B.R. 648 (Bankr. M.D. La. 2009) ..............................................................42

*In re Provident Life & Accident Co.*,
1990 U.S. Dist. LEXIS 21067 (E.D. Tenn. June 19, 1990)...............................30

*In re Sealed Case (Espy)*,
121 F.3d 729 (D.C. Cir. 1997)........................................20, 21, 22, 25, 26, 37, 40, 42, 43

*In re Subpoena*,
967 F.2d 630 (D.C. Cir. 1992)..........................................................................44

*In re Subpoena Duces Tecum*,
145 F.3d 1422 (D.C. Cir. 1998)........................................................................22

*In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of Fed.
Reserve Sys.*,
967 F.2d 630 (D.C. Cir. 1992)..........................................................................22

*Jordan v. U.S. Dep't of Justice*,
591 F.2d 753 (D.C. Cir. 1978)..............................................................26, 37, 38

*Judicial Watch, Inc. v. Dep't of Justice*,
365 F.3d 1108 (D.C. Cir. 2004)........................................................................20

*Landry v. FDIC*,
204 F.3d 1125 (D.C. Cir. 2000)..........................................................20, 25, 38, 39

*McGrain v. Daugherty*,
273 U.S. 135 (1927)..............................................................................5, 8, 43

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
566 F.2d 242 (D.C. Cir. 1977)..........................................................................38

*Morley v. CIA*,
508 F.3d 1108 (D.C. Cir. 2007)........................................................................38

*Murphy v. Dep't of Army*,
613 F.2d 1151 (D.C. Cir. 1979)..................................................................30, 31

*N. Pacifica, LLC v. City of Pacifica*,
274 F. Supp. 2d 1118 (N.D. Cal. 2003) ...........................................................42

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977)............................................................................19, 40, 43, 44

*Paisley v. CIA*,
    712 F.2d 686 (D.C. Cir. 1983).......................................................................37, 38

*Petroleum Info. Corp. v. U.S. Dep't of Interior*,
    976 F.2d 1429 (D.C. Cir. 1992)............................................................................37

*Schreiber v. Soc'y for Sav. Bancorp, Inc.*,
    11 F.3d 217 (D.C. Cir. 1993)..............................................................................41

*Senate of P.R. on Behalf of the Judiciary Comm. v. U.S. Dep't of Justice*,
    823 F.2d 574 (D.C. Cir. 1987).................................................................37, 38, 39

*Sikorsky Aircraft Corp. v. United States*,
    106 Fed. Cl. 571 (Fed. Cl. 2012) ........................................................................36

*Talavera v. Shah*,
    638 F.3d 303 (D.C. Cir. 2011) ............................................................................19

*Tax Reform Research Group v. IRS*,
    419 F. Supp. 415 (D.D.C. 1976).........................................................................25

*Texaco P.R., Inc. v. Dep't of Consumer Affairs*,
    60 F.3d 867 (1st Cir. 1995).................................................................................22

*Thomas v. Cate*,
    715 F. Supp. 2d 1012 (E.D. Cal. 2010)..............................................................43

*United States v. Am. Tel. & Tel. Co.*,
    567 F.2d 121 (D.C. Cir. 1977)............................................................................35

*United States v. House of Representatives*,
    556 F. Supp. 150 (D.D.C. 1983).........................................................................34

*United States v. Morgan*,
    313 U.S. 409 (1941)............................................................................................26

*United States v. Nixon*,
    418 U.S. 683 (1974)......................................................................................20, 40

*Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975).................................................38

*Waters v. U.S. Capitol Police Bd.*,
    218 F.R.D. 323 (D.D.C. 2003)...........................................................................39

*Watkins v. United States*,
    354 U.S. 178 (1957).....................................................................................5, 6, 43

*Wolfe v. HHS*,
    839 F.2d 768 (D.C. Cir. 1988)............................................................................26

**Constitutional Provisions, Statutes, and Federal Rules**

U.S. Const. art. I, § 5, cl. 2.................................................................................6

2 U.S.C. § 190d...................................................................................................6

5 U.S.C. § 552...................................................................................................30

18 U.S.C. § 1505...............................................................................................32

18 U.S.C. § 2516...............................................................................................41

Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870) .......................7

Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73 (1789) .............................................7

Fed. R. Civ. P. 45.............................................................................................36

Fed. R. Civ. P. 56.............................................................................................19

**Legislative Authorities**

Rule X, Rules of the House of Representatives.................................................7

Rule XI, Rules of the House of Representatives ..........................................6, 7

Rule 12, Rules of the Comm. on Oversight & Gov't Reform  ..........................7

Rule 15, Rules of the Comm. on Oversight & Gov't Reform ........................30

H. Res. 95, 82d Cong. (1952) .........................................................................9

H. Res. 711, 112th Cong. (June 28, 2012) (enacted)...................................17

Final Rep. of the [Sen.] Select Comm. to Study Undercover Activities of Components of the
    Dep't of Justice, S. Rep. No. 97-682 (1982)..........................................9

H. Judiciary Comm., Rep. on Investigation of the Role of the Dep't of Justice in the
    Withholding of EPA Docs., H. Rep. No. 99-435, vol. I (1985)................9, 10

H. Rep. No. 112-546 (2012) .........................................................................17

Investigation of the Dep't of Justice, H. Rep. No. 83-1079 (1953)................9

S. Rep. No. 95-170 (1977)............................................................................32

*Health Care Fraud/Medicare Secondary Payer Program:  Hr'g Before the S. Permanent
    Subcomm. on Investigations of the Comm. on Gov'tal Affairs*, 101st Cong. (1990).........30

*Int'l Uranium Cartel:  Hr'gs Before the Subcomm. on Oversight and Investigations of the H.
    Comm. on Interstate and Foreign Commerce*, 95th Cong., vol. I (1977).........................29

*Investigation into Allegations of Justice Dep't Misconduct in New England – Vol. I:  Hr'gs
    Before the H. Comm. on Gov't Reform*, 107th Cong. (2002) ............................................34

*Investigation of Hon. Harry M. Daugherty, Formerly Att'y Gen. of the U.S.: Hr'gs Before the Select Comm. on Investigation of the Att'y Gen., U.S. Senate*, 68th Cong., vol. I and vol. II (1924) ...........................................................................................8

*Iran-Contra Investigation:  Joint Hr'gs Before the H. Select Comm. to Investigate Covert Arms Transactions with Iran & the S. Select Comm. on Secret Military Assistance to Iran & the Nicaraguan Opposition*, 100th Cong., (1987) .............................................30

J. Staff Rep. (Part I of III), H. Comm. on Oversight and Gov't Reform & Sen. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, 112th Cong., *Fast & Furious: The Anatomy of a Failed Operation* (July 31, 2012)..................................................18, 22

J. Staff Rep. (Part II of III), H. Comm. on Oversight and Gov't Reform & Sen. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, 112th Cong., *Fast & Furious: The Anatomy of a Failed Operation* (Oct. 29, 2012)..................................................18, 22

*U.S. Dep't of Justice: Hr'g Before the H. Comm. on the Judiciary*, 112th Cong. (Dec. 8, 2011) ....................................................................................................16

158 Cong. Rec. H4417 (daily ed. June 28, 2012) .........................................................17

Cong. Globe, 34th Cong., 3d Sess. (1857)...................................................................29

## Other Authorities

3 Weinstein's Fed. Evid. § 509.21[3]  ........................................................................26

Alissa Dolan & Todd Garvey, Cong. Research Serv., R42811, *Congressional Investigations of the Department of Justice 1920-2012:  History, Law, and Practice* (2012).........................................................................................................................34

Arvo Van Alstyne, Congressional Investigations, 15 F.R.D. 471 (1954) ....................................................................................................27

Congress Investigates:  A Documented History 1792-1974, vol. IV (Arthur Schlesinger, Jr. & Roger Burns eds., 1983) ............................................................................................8

*Congressional Requests for Confidential Executive Branch Information*, 13 Op. OLC 153 (1989)...........................................................................................35

*Congressional Subpoenas of Department of Justice Investigative Files*, 8 Op. OLC 252 (1984) ........................................................................................... 25

D.C. Bar Legal Ethics Comm. Op. 288, *Compliance with Subpoena from Congressional Subcomm. to Produce Lawyer's Files Containing Client Confidences or Secrets* (Feb. 16, 1999)...................................................................................................31

Gerald Wetlaufer, *Justifying Secrecy:  An Objection to the General Deliberative Privilege*, 65 Ind. L.J. 845 (1990)...........................................................................................26

John C. Grabow, Congressional Investigations:  Law and Practice (1988).....................................8

Kim Murphy, *Guns tracked by firearms bureau found at firefight scene*, L.A. Times,
    Feb. 2, 2011......................................................................................................11

Luther Stearns Cushing, Elements of the Law & Practice of Legislative Assemblies in
    the United States of America § 983 (1856) ........................................................29

Mem. from Michael E. Horowitz, DOJ IG, to Att'y Gen. & Dep'y Att'y Gen., Re: Top
    Management and Performance Challenges Facing the Dep't of Justice – 2013
    (Dec. 11, 2013) .................................................................................................24

Raoul Berger, Executive Privilege:  A Constitutional Myth (1974)...............................28

Ronald L. Claveloux, *The Conflict Between Executive Privilege & Congressional Oversight:
    The Gorsuch Controversy*, 1983 Duke L.J. 1333 (1983)...................................27

Thomas Erskine May, Erskine May's Treatise on the Law, Privileges, Proceedings,
    and Usage of Parliament (20th ed. 1983)..........................................................29

U.S. Dep't of Justice, Office of the Inspector Gen., A Review of ATF's Operation Fast &
    Furious & Related Matters (Sept. 2012)....................................11, 14, 15, 18, 23

U.S. Dep't of Justice, Office of the Inspector Gen., Review of ATF's Project Gunrunner
    (Nov. 2010)........................................................................................................11

Woodrow Wilson, Congressional Government (1885) ..................................................28

# GLOSSARY OF ACRONYMS AND SHORT CITES

## Executive Branch Agencies and Offices

ATF          Bureau of Alcohol, Tobacco, Firearms and Explosives, United States Department of Justice

DEA          Drug Enforcement Agency, United States Department of Justice

DOJ          United States Department of Justice

DOJ IG       Office of the Inspector General, United States Department of Justice

FBI           Federal Bureau of Investigation, United States Department of Justice

OLA          Office of Legislative Affairs, United States Department of Justice

OLC          Office of Legal Counsel, United States Department of Justice

## Other Acronyms

FOIA        Freedom of Information Act

## Documents

AG's 1292(b) Motion      Defendant's Motion for Certification of This Court's Sept. 30, 2013 Order for Interlocutory Appeal . . . (Nov. 15, 2013) (ECF No. 57)

April 19, 2011 DOJ Letter      Letter from Ronald Weich, Assistant Attorney General, to Honorable Darrell E. Issa, Chairman, Oversight Committee (Apr. 19, 2011), Ex. 6 to Castor Declaration

Castor Declaration      Declaration of Stephen R. Castor (Dec. 16, 2013)

Cole Retraction Letter      Letter from James M. Cole, Deputy Attorney General, to Honorable Darrell E. Issa, Chairman, Oversight Committee, & Honorable Charles E. Grassley, Ranking Member, Senate Committee on the Judiciary (Dec. 2, 2011), Ex. 18 to Castor Declaration

xi

| | |
|---|---|
| Committee Report, Part I | Joint Staff Report (Part I of III), House Comm. on Oversight and Government Reform & Senator Charles E. Grassley, Ranking Member, Senate Committee on the Judiciary, 112th Cong., *Fast & Furious: The Anatomy of a Failed Operation* (July 31, 2012) |
| Committee Report, Part II | Joint Staff Report (Part II of III), House Committee on Oversight and Government Reform & Senator Charles E. Grassley, Ranking Member, Senate Committee on the Judiciary, 112th Cong., *Fast & Furious: The Anatomy of a Failed Operation* (Oct. 29, 2012) |
| Davis Declaration | Declaration of Carlton J. Davis (Dec. 16, 2013) |
| February 4, 2011 False Statement Letter | Letter from Ronald Weich, Assistant Attorney General, to Honorable Charles E. Grassley, Ranking Member, Senate Committee on the Judiciary (Feb. 4, 2011), Ex. 3 to Castor Declaration |
| Grindler Transcript | Transcript of Interview of Gary Grindler, Chief of Staff and Counselor to the Attorney General and Former Acting Deputy Attorney General (Dec. 14, 2011), Ex. 19 to Castor Declaration |
| Holder Subpoena | Subpoenas to Eric H. Holder, Jr., Attorney General (Oct. 11, 2011, and Jan. 3, 2013) |
| June 14, 2011 DOJ Letter | Letter from Ronald Weich, Assistant Attorney General, to Hon. Darrell E. Issa, Chairman, Oversight Comm. (June 14, 2011), Ex. 9 to Castor Declaration |
| June 19, 2012 AG Letter | Letter from Eric H. Holder, Jr., Attorney General to The President (June 19, 2012), Ex. 21 to Castor Declaration |
| June 20, 2012 Privilege Letter | Letter from James M. Cole, Deputy Attorney General, to Honorable Darrell E. Issa, Chairman, Oversight Committee (June 20, 2012), Ex. 21 to Castor Declaration |
| May 2, 2011 False Statement Letter | Letter from Ronald Weich, Assistant Attorney General, to Honorable Charles E. Grassley, Ranking Member, Senate Committee on the Judiciary (May 2, 2011), Ex.7 to Castor Declaration |
| Melson Subpoena | Subpoena to Kenneth E. Melson, Acting Director, Bureau of Alcohol, Tobacco, Firearms and Explosives (March 31, 2011), Ex. 5 to Castor Declaration |

| | |
|---|---|
| Melson Transcript | Transcript of Interview of Kenneth E. Melson, Acting Director, Bureau of Alcohol, Tobacco, Firearms and Explosives (July 4, 20[1]1), Ex. 10 to Castor Declaration |
| Original Holder Subpoena | Subpoena to Eric H. Holder, Jr., Attorney General (Oct. 11, 2011), Ex. 17 to Castor Declaration |
| Reissued Holder Subpoena | Subpoena to Eric H. Holder, Jr., Attorney General (Jan. 3, 2013), Ex. 26 to Castor Declaration |
| September 2012 DOJ IG Report | U.S. Department of Justice, Office of the Inspector General, A Review of ATF's Operation Fast & Furious & Related Matters (Sept. 2012) |
| Weinstein Transcript | Transcript of Interview of Jason Weinstein, Deputy Attorney General (Jan. 10, 2012), Ex. 20 to Castor Decl. |

**INTRODUCTION**

Congressional oversight of Executive Branch agencies, programs, and officers is fundamental – indeed essential – to our tripartite system of checks and balances.  The Attorney General, above all other Executive Branch officials, should understand and respect the salutary purpose and effect of this constitutional imperative, and should strive diligently to ensure that Congress has the information it requires to carry out its oversight responsibilities.  In this case, Attorney General Eric H. Holder, Jr. most assuredly did not.  Instead, he and the Department of Justice ("DOJ") he heads, obstructed an investigation conducted by the House Committee on Oversight and Government Reform ("Committee" or "Oversight Committee"); withheld, and continue to withhold, documents essential to that investigation; and hid behind a privilege assertion that was unsustainable at the outset and only became more so as time passed.

The story begins with the Attorney General presiding over Operation Fast and Furious, a DOJ law-enforcement operation in which DOJ knowingly permitted firearms to be purchased illegally in this country and then transported into Mexico for the purpose of trying to establish a nexus between the purchasers and Mexican crime syndicate leaders (a practice known as "gun walking").  The operation, DOJ later confessed, "was [so] fundamentally flawed . . . its tactics must never be repeated."[1]  Congress, quite appropriately, had questions, particularly after U.S. Border Patrol Agent Brian Terry was killed while on duty in December 2010, and allegations quickly surfaced that weapons found at the scene were weapons that DOJ officials responsible

---

[1]  Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, at 1-2 (Dec. 2, 2011) ("Cole Retraction Letter"), Ex. 18 to Decl. of Stephen R. Castor (Dec. 16, 2013) ("Castor Declaration"), attached.

for Operation Fast and Furious had permitted to "walk."  In response to Congress' questions, the Attorney General and DOJ have gone to great lengths to avoid supplying answers.

1.  <u>First False Statement Letter</u>.  On February 4, 2011, the Attorney General, through a subordinate, first falsely denied to Congress that DOJ ever had engaged in gun-walking.[2]

2.  <u>Obstruction, Including the Second False Statement Letter</u>.  The Attorney General then attempted to thwart the Committee's investigation, notwithstanding DOJ's explicit acknowledgement that the investigation was appropriate and legitimate.[3]  This obstruction took the form of, among other things, a reaffirmation in May 2011 of the substance of the February 4, 2011 False Statement Letter.[4]

3.  <u>Non-Compliance with the Holder Subpoena</u>.  The Attorney General then went to great lengths to avoid complying with the October 11, 2011 Committee document subpoena that is at the heart of this case and which sought documents relevant both to Operation Fast and Furious itself and to DOJ's response to the Committee's underlying investigation.

---

[2]  *See* Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Charles Grassley, Ranking Member, Sen. Comm. on the Judiciary, at 1 (Feb. 4, 2011) ("February 4, 2011 False Statement Letter") ("[A]llegation . . . that ATF [Bureau of Alcohol, Tobacco, Firearms and Explosives] 'sanctioned' or otherwise knowingly allowed the sale of assault weapons to a straw purchaser who then transported them into Mexico – is false.  ATF makes every effort to interdict weapons that have been purchased illegally and prevent their transportation to Mexico."), Ex. 3 to Castor Decl.

[3]  *See* Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., at 1-2 (Apr. 19, 2011) ("April 19, 2011 DOJ Letter") (DOJ does not "question[] the Committee's responsibility to conduct oversight of [whether, as part of Operation Fast and Furious, DOJ promoted gun walking]."), Ex. 6 to Castor Decl.; Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., at 1 (June 14, 2011) ("June 14, 2011 DOJ Letter") (acknowledging "Committee's legitimate oversight interest in the genesis and strategy pertaining to Fast and Furious"), Ex. 9 to Castor Decl.

[4]  *See* Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, at 1 (May 2, 2011) ("May 2, 2011 False Statement Letter") ("It remains our understanding that ATF's Operation Fast and Furious did not knowingly permit straw buyers to take guns into Mexico."), Ex. 7 to Castor Decl.

Notwithstanding DOJ's acknowledgement that it had provided false information to Congress, and that the Committee had a "legitimate interest" in conducting oversight of DOJ's "management of its response to congressional inquiries into Fast and Furious,"[5] the Attorney General:

- produced no documents and asserted no privilege by the return date;

- produced no privilege log – ever;

- proclaimed that he would produce no responsive documents dated or created after February 4, 2011 – the exact date of the February 4, 2011 False Statement Letter;

- produced fewer than 4,100 responsive pages (one banker's box); and

- on June 20, 2012 – moments before a scheduled Committee meeting to consider a contempt resolution – invoked privilege for the first time, as in "the President has asserted [E]xecutive privilege over the relevant post-February 4, 2011, documents," June 20, 2012 Privilege Letter at 1.

4. <u>Shape-Shifting Privilege</u>.  Given this last second privilege assertion – and the contention that it justified withholding all documents dated or created after a particular point in time – it was inevitable that the Attorney General's privilege claim would unravel, as it has.

- He eventually conceded that "he had not asserted the [Presidential communications] privilege" – the constitutional aspect of Executive privilege – "in withholding the documents and did not intend to rely on the [Presidential communications] privilege in this action."  Mem. Op. at 36 n.10 (Sept. 30, 2013) (ECF No. 52).

---

[5]  Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., at 2 (June 20, 2012) ("June 20, 2012 Privilege Letter"), Ex. 21 to Castor Decl.

- That left the Attorney General clutching the common law aspect of Executive privilege, a/k/a deliberative process.  But it was facially implausible to claim that *every responsive post-February 4, 2011 document* is pre-decisional and deliberative (the basic elements of deliberative process), leaving aside the fact that that common law privilege is not applicable here at all.

- This obvious flaw quickly was exposed.  In September 2012, shortly after the release of a DOJ Inspector General ("DOJ IG") report, *see infra* at 11 n.9, DOJ produced approximately 300 pages of responsive but previously unproduced documents, the existence of which the report had revealed.  This small, belated production consisted almost entirely of post-February 4, 2011 documents, none of which reasonably can be characterized as pre-decisional and deliberative.

- And one month ago, the Attorney General admitted that some of the withheld responsive documents "do not . . . contain material that would be considered deliberative under common law or statutory standards."  Def.'s Mot. for Certification of This Ct.'s Sept. 30, 2013 Order for Interlocutory Appeal . . . at 8-9 (Nov. 15, 2013) (ECF No. 57) ("AG's 1292(b) Motion").  Unabashed, he says he will ask this Court to invent for him a new privilege – "congressional response work product," *id.* at 9 – a fig leaf apparently just broad enough to cover the withheld documents.

The Attorney General's privilege claim resembles the emperor's new clothes, and the Court should say as much by entering judgment in favor of the Committee on Count I of its First Amended Complaint (Jan. 15, 2013) (ECF No. 35), and directing the Attorney General to produce to the Committee all documents encompassed by Count I.

## CONSTITUTIONAL CONTEXT

### I.     Congressional Oversight Generally.

"[The] power of the Congress to conduct investigations is inherent in the legislative

process.  That power is broad.  It encompasses inquiries concerning the administration of

existing laws as well as proposed or possibly needed statutes."  *Watkins v. United States*, 354

U.S. 178, 187 (1957).  *Watkins* specifically noted that the first Congresses held "inquiries dealing

with suspected corruption or mismanagement of government officials," *id.* at 192, and stressed

that Congress' power to investigate is at its peak when focused on alleged waste, fraud, abuse, or

incompetent administration within a government department, *see id.* at 187, 200 n.33.

A direct corollary of Congress' constitutionally-mandated oversight and investigative

responsibility is the authority to obtain information, including by use of compulsory process.

> [The] power to secure needed information by such means [i.e., compulsory process] has long been treated as an attribute of the power to legislate.  It was so regarded in the British Parliament . . . .
> . . . .
> We are of [the] opinion that the power of inquiry – with process to enforce it – is an essential and appropriate auxiliary to the legislative function.
>
> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information – which not infrequently is true – recourse must be had to others who do possess it.  Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.  All this was true before and when the Constitution was framed and adopted.  In that period the power of inquiry, with enforcing process, was regarded and employed as a necessary and appropriate attribute of the power to legislate – indeed, was treated as inhering in it.

*McGrain v. Daugherty*, 273 U.S. 135, 161, 174-75 (1927); *see also Eastland v. U.S.*

*Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975) ("[T]he scope of [Congress'] power of inquiry is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." (ellipsis and quotation marks omitted)); *id.* at 504 ("Issuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate."); *Barenblatt v. United States*, 360 U.S. 109, 111 (1959) ("The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate."). And, when Congress does resort to compulsory process,

> [i]t is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation.

*Watkins*, 354 U.S. at 187-88.

Pursuant to the Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings . . . .") – and also by statute, *see* 2 U.S.C. § 190d – the House has delegated this substantial and wide-ranging oversight and investigative authority to its committees. *See* Rule XI.1(b)(1), Rules of the House of Representatives ("Each committee may conduct at any time such investigations and studies at it considers necessary or appropriate in the exercise of its responsibilities under rule X.").[6] The House has delegated particularly broad responsibilities to the Oversight Committee, including authority to conduct oversight regarding

---

[6] The Rules of the House for the 112th Congress (Jan. 2011 – Jan. 2013) are available at http://rules.house.gov/sites/republicans.rules.house.gov/files/other%20home%20files/112th%20Rules%20Pamphlet.pdf, and those for the 113th Congress (Jan. 2013 – Jan. 2015) are available at http://clerk.house.gov/legislative/house-rules.pdf. Because the Rules cited in this Memorandum did not change from the 112th to the 113th, their citations do not specify a particular Congress, and may be understood to refer to both.

"[g]overnment management and accounting measures generally," "[o]verall economy, efficiency, and management of government operations and activities," and "[r]eorganizations in the executive branch of the Government."  House Rule X.1(n).  In addition, the Oversight Committee is authorized to "*at any time conduct investigations of any matter* without regard to . . . this clause conferring jurisdiction over the matter to another standing committee."  House Rule X.4(c)(2) (emphasis added).

To carry out these responsibilities, the Committee may issue subpoenas for testimony and documents.  *See* House Rule XI.2(m)(1)(B), (3)(A)(i); Rule 12(d), Rules of the Comm. on Oversight & Gov't Reform (vesting chair with authority to "authorize and issue subpoenas . . . in the conduct of any investigation or activity . . . within the jurisdiction of the committee").[7]

## II.    Congressional Oversight of the Department of Justice.

In 1789, Congress created the Office of the Attorney General.  *See* Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 92-93 (1789).  One hundred years later, Congress created DOJ, to which Congress' oversight authority unquestionably extends.  *See* Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870).  Over the years, Congress has investigated DOJ on many occasions, repeatedly probing its inner workings, organizational structure, management, and administration, as well as its conduct in responding to congressional investigations.

For example, in the 1920s, Congress investigated DOJ's role in the Teapot Dome scandal.  The investigation began as a Senate inquiry into leases of government-owned, oil-rich

---

[7]  The Rules of the Committee for the 112th Congress are available at http://www.gpo.gov/fdsys/pkg/CPRT-112HPRT68229/pdf/CPRT-112HPRT68229.pdf, and those for the 113th Congress are available at http://www.gpo.gov/fdsys/pkg/CPRT-113HPRT78973/html/CPRT-113HPRT78973.htm.  Because the Committee Rules cited in this Memorandum did not change from the 112th to the 113th, their citations do not specify a particular Congress, and may be understood to refer to both.

lands in Wyoming, but the focus shifted when investigators discovered that the leases resulted

from wrongdoing by high-ranking government officials.  *See generally* John C. Grabow,

Congressional Investigations:  Law and Practice, § 2.3 (1988); Congress Investigates:  A

Documented History 1792-1974, vol. IV, 6-7 (Arthur Schlesinger, Jr. & Roger Burns eds.,

1983).  The Senate empowered a select committee to investigate "charges of misfeasance and

nonfeasance" at DOJ for its failure to bring criminal prosecutions against various wrongdoers.

*McGrain*, 273 U.S. at 151.  DOJ initially balked at providing the select committee with internal

reports and other investigative documents.  *See Investigation of Hon. Harry M. Daugherty,*

*Formerly Att'y Gen. of the U.S.:  Hr'gs Before the Select Comm. on Investigation of the Att'y*

*Gen., U.S. Senate*, 68th Cong., vol. I at 1015-16, and vol. II at 1159-60 (1924).  Ultimately,

however, the select committee gained broad access to DOJ's files, including factual findings and

recommendations compiled by DOJ line employees.  *See id.*, vol. III at 2389.  The Supreme

Court expressed no discomfort whatsoever with Congress' investigation:

> [T]he subject to be investigated was the administration of [DOJ] –
> whether its functions were being properly discharged or were
> being neglected or misdirected, and particularly whether the
> Attorney General and his assistants were performing or neglecting
> their duties in respect of the institution and prosecution of
> proceedings to punish crimes and enforce appropriate remedies
> against the wrongdoers . . . .  Plainly the subject was one on which
> legislation could be had and would be materially aided by the
> information which the investigation was calculated to elicit.  *This*
> *becomes manifest when it is reflected that the functions of [DOJ],*
> *the powers and duties of the Attorney General, and the duties of*
> *his assistants are all subject to regulation by congressional*
> *legislation, and that [DOJ] is maintained and its activities are*
> *carried on under such appropriations as in the judgment of*
> *Congress are needed from year to year.*

*McGrain*, 273 U.S. at 177-78 (emphasis added).

In 1952, a House subcommittee investigated "the administration of the Department of

Justice and the Attorney General of the United States." H. Res. 95, 82d Cong. (1952). The

investigation covered, among other things, whether DOJ had attempted improperly to curb a

grand jury inquiry into its failure to enforce federal tax fraud laws, and whether DOJ was

dilatory in handling certain cases. *See* Investigation of the Dep't of Justice, H. Rep. No. 83-

1079, at 26, 54, 69 (1953). The subcommittee reviewed thousands of pages of testimony on a

range of allegations of abuses and inefficiencies at DOJ, as well as deliberative materials

obtained from the agency, including internal correspondence and memoranda, and transcripts of

interdepartmental telephonic communications. *See, e.g.*, *id.* at 22, 35, 61.

In 1982, a Senate committee investigated undercover activities at the Federal Bureau of

Investigation ("FBI") and other DOJ component entities. *See* Final Rep. of the [Sen.] Select

Comm. to Study Undercover Activities of Components of the Dep't of Justice, S. Rep. No. 97-

682 (1982), *available at* https://www.ncjrs.gov/pdffiles1/Digitization/124269NCJRS.pdf. As

part of the investigation, the committee demanded and obtained "almost all of the confidential

documents generated during the covert stage of the undercover operation." *Id.* at V. While the

select committee allowed DOJ to retain certain documents that the committee determined might

compromise ongoing DOJ investigations, it did so only after DOJ provided the committee with a

satisfactory log of the documents and a briefing on their contents. *See id.* at V, 479, 483.

And, in 1983, the House investigated DOJ's role in the response of the Environmental

Protection Agency ("EPA") to an underlying congressional investigation into EPA's

enforcement of the Superfund law. In connection with the underlying investigation, two House

committees issued document subpoenas to EPA Administrator Anne Gorsuch Burford, *see* H.

Judiciary Comm., Rep. on Investigation of the Role of the Dep't of Justice in the Withholding of

EPA Docs., H. Rep. No. 99-435, vol. I at 3-4 (1985). On DOJ's advice, Ms. Burford asserted

Executive privilege and withheld responsive documents, whereupon the House held her in contempt.  *See id.* at 4.  Believing DOJ may have provided improper guidance to Ms. Burford, a House committee sought from DOJ "all documents prepared by or in the possession of [DOJ] in any way relating to the withholding of documents that Congressional committees have subpoenaed from the EPA."  *Id.* at 605, 613, 640, 645.

The committee agreed to review certain responsive documents and, once that review was complete, to consider narrowing its request.  *See id.* at 605.  The documents reviewed included internal records of the offices of the Attorney General, Deputy Attorney General, Solicitor General, Office of Legal Counsel ("OLC"), and Office of Legislative Affairs ("OLA").  *See id.* Ultimately, the committee demanded and obtained copies of many of the reviewed documents, along with others DOJ had not made available for the committee's review.  *See id.* at 606, 608.

In sum, there is nothing unusual or unprecedented about the Committee's investigation, either of Operation Fast and Furious itself or of DOJ's response thereto.  What is remarkable is the lengths to which DOJ has gone to try to thwart a concededly legitimate Committee investigation, and the lengths to which the Attorney General has gone to avoid answering the Committee's also concededly legitimate questions about that obstruction.

## STATEMENT OF THE CASE[8]

In or about February 2011, the Committee, jointly with Senator Grassley, began investigating Operation Fast and Furious (operative between approximately October 2009 and

---

[8]  Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue (Dec. 16, 2013), filed simultaneously herewith, recites individual factual statements that underpin this case, including references to the parts of the record relied on to support each statement.  In this section of the Memorandum, we describe the pertinent facts in a more concise and narrative fashion, with references where appropriate to the relevant record citations.

January 2011).[9]  The Committee initiated its investigation as a result of several developments

including (i) a November 2010 DOJ IG report that found significant weaknesses in DOJ's

implementation of Project Gunrunner, a comprehensive strategy designed to combat firearms

trafficking, of which Operation Fast and Furious was a part;[10] (ii) the killing on December 15,

2010 of Border Patrol Agent Terry;[11] (iii) congressional and news reports describing allegations

by whistleblowers that DOJ was utilizing gun walking techniques, and that weapons found at the

scene of Border Patrol Agent Terry's killing were weapons that DOJ officials responsible for

Operation Fast and Furious had permitted to "walk";[12] and (iv) DOJ's public denial on February

4, 2011, that any gun-walking operations even existed.[13]  *See* Castor Decl. ¶ 7.

Initially, the Committee focused on understanding Operation Fast and Furious itself (the

"Operations Component" of the investigation), *see id.* ¶ 8, and it tried at first to obtain

documents and information from DOJ through informal means, *see id.* ¶ 9.  For example, on

March 16, 2011, Chairman Issa wrote to Acting ATF Director Melson to request relevant

---

[9]  *See* Answer to First Am. Compl. ¶¶ 2, 28 (Nov. 15, 2013) (ECF No. 56) ("Answer"); Castor Decl. ¶ 6; U.S. Dep't of Justice, Office of the Inspector Gen., A Review of ATF's Operation Fast & Furious & Related Matters at 103-208 (Sept. 2012) ("September 2012 DOJ IG Report"), *available at* http://www.justice.gov/oig/reports/2012/s1209.pdf.

[10]  *See* Answer ¶ 2(i); U.S. Dep't of Justice, Office of the Inspector Gen., Review of ATF's Project Gunrunner at iii, 2, 93 (Nov. 2010), *available at* http://www.justice.gov/oig/reports/ATF/e1101.pdf; Sept. 2012 DOJ IG Rep. at 106.

[11]  *See* Answer ¶ 2(iii); Sept. 2012 DOJ IG Rep. at 199-203.

[12]  *See* Letter from Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, to Kenneth E. Melson, Acting Dir., ATF, at 1 (Jan. 27, 2011), Ex. 1 to Castor Decl.; Letter from Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, to Kenneth E. Melson, Acting Dir., ATF, at 1 (Jan. 31, 2011), Ex. 2 to Castor Decl.; Kim Murphy, *Guns tracked by firearms bureau found at firefight scene*, L.A. Times, Feb. 2, 2011, *available at* http://articles.latimes.com/2011/feb/02/nation/la-na-atf-guns-20110203.

[13]  *See* Answer ¶ 2(v); Feb. 4, 2011 False Statement Letter.

documents.[14]  DOJ, however, immediately pushed back.  For example, on March 30, 2011,

shortly before the response deadline in the Chairman's March 16, 2011 letter, DOJ informed

Committee staff that no documents would be produced by the deadline.  *See* Decl. of Ashok

Pinto ¶ 2 (Dec. 16. 2013), attached.  As a result, on March 31, 2011, the Committee issued to Mr.

Melson a document subpoena, returnable on April 13, 2011.[15]

Issuance of the Melson Subpoena did little to alter DOJ's behavior.  Between March 31

and June 9, 2011, DOJ did not produce a single non-public document in response to the Melson

Subpoena.  *See* Decl. of Carlton J. Davis ¶ 2 (Dec. 16. 2013) ("Davis Declaration"), attached.

When Committee staff reviewed certain responsive documents at DOJ, many of the documents

made available to them were heavily redacted.  *Id.* ¶ 3.  It was not until June 10, 2011 – one

business day before a scheduled Committee hearing on Operation Fast and Furious – that DOJ

first produced to the Committee any non-public documents, and then only 80 pages.  *Id.* ¶ 4.[16]

Over the next several months, the Committee attempted to obtain relevant information

directly from other DOJ component entities including the FBI, the Drug Enforcement

Administration ("DEA"), and the Acting U.S. Attorney for the District of Arizona.[17]  The FBI

---

[14]  *See* Answer ¶ 29; Castor Decl. ¶ 9; Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Kenneth E. Melson, Acting Dir., ATF (Mar. 16, 2011), Ex. 4 to Castor Decl.

[15]  *See* Answer ¶ 31; Subpoena to Kenneth Melson, Acting Dir., ATF (Mar. 31, 2011) ("Melson Subpoena"), Ex. 5 to Castor Decl.

[16]  *See also* Letter from Ronald Weich, Ass't Att'y Gen., to the Hon. Darrell E. Issa, Chairman, Oversight Comm. (June 10, 2011) (transmittal letter, mistakenly asserting that production consisted of 69 pages), Ex. 8 to Castor Decl.

[17]  *See* Answer ¶¶ 33, 34; Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, to Hon. Robert S. Mueller III, Dir., FBI (July 11, 2011), Ex. 11 to Castor Decl.; Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, to Hon. Michele M. Leonhart, Adm'r, DEA (July 15, 2011), Ex. 12 to Castor Decl.; Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon. Charles E. Grassley, Ranking

(*Continued . . .* )

produced nothing, *see* Davis Decl. ¶ 5; DEA produced approximately 20 pages of documents, *id.* ¶ 6; and the Acting U.S. Attorney simply never responded, *see* Answer ¶ 34; Castor Decl. ¶ 20. When, several months later, DOJ responded on behalf of the Acting U.S. Attorney, DOJ did not produce the requested documents; it refused the Committee's interview request as to two of three witnesses; and the third employee, whom DOJ did agree to make available for an interview, invoked his Fifth Amendment right against self-incrimination, resigned his position, and never sat for an interview.[18]

From March 31 to October 11, 2011 – as (i) DOJ was acknowledging "the Committee's legitimate oversight interest in the genesis and strategy pertaining to Fast and Furious," June 14, 2011 DOJ Letter at 1, and (ii) a senior DOJ official informed Committee staff (on May 5, 2011), with respect to the Committee's investigation into Operation Fast and Furious, that "there's a there there," Answer ¶ 6 – the agency produced to the Committee fewer than 2,100 pages of responsive documents (one-half of one banker's box). *See* Davis Decl. ¶ 8. Ultimately, on October 11, 2011, DOJ peremptorily announced that it had "substantially concluded [its] efforts to respond" to the Melson Subpoena.[19]

By Fall 2011, the Committee's investigation had developed a second focus, i.e., whether DOJ deliberately was attempting to obstruct the Committee's underlying investigation into Operation Fast and Furious (the "Obstruction Component"). The development of this second

---

Member, Sen. Comm. on the Judiciary, to Hon. Ann Birmingham Scheel, Acting U.S. Att'y, Dist. of Ariz. (Sept. 1, 2011), Ex. 13 to Castor Decl.

[18] *See* Answer ¶ 34; Castor Decl. ¶ 20; Davis Decl. ¶ 7; Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., & Hon. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary (Dec. 6, 2011), Ex. 14 to Castor Decl.

[19] Letter from Ronald Weich, Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., at 1 (Oct. 11, 2011) ("Oct. 11, 2011 DOJ Letter"), Ex. 16 to Castor Decl.; *see also* Answer ¶ 36.

focus resulted from several factors including (i) Acting ATF Director Melson's statement to

Committee staff on July 4, 2011, that DOJ was managing its response to the Committee's

underlying investigation so as to deny the Committee information, and so as "to push the

information away from their political appointees at the Department";[20] (ii) information the

Committee obtained, principally from DOJ whistleblowers and other confidential sources, that

DOJ in fact had used risky gun walking techniques; and (iii) the Committee's conviction that the

February 4, 2011 and May 2, 2011 False Statement Letters contained information and

representations that were materially false.[21]

Thereafter, on October 11, 2011, the Committee issued to the Attorney General a

document subpoena with an October 25, 2011 return date.  (On January 3, 2013, the Committee

reissued a substantively identical document subpoena with a January 7, 2013 return date.  The

two subpoenas collectively are referred to herein as the "Holder Subpoena.")[22]  The Holder

Subpoena directed the Attorney General to produce 22 categories of documents relevant to both

the Operations and Obstruction Components of the Committee's investigation.  And it directed

him, "[i]n the event that a document is withheld on the basis of privilege," to "provide a privilege

---

[20] Tr. of Interview of Kenneth E. Melson, Acting Dir., ATF, at 123-24 (July 4, 20[1]1) (incorrectly dated in original as July 4, 2001) ("Melson Transcript"), Ex. 10 to Castor Decl.  We have included only the pertinent excerpts of the Melson Transcript; other parts of that transcript contain sensitive information.  Accordingly, should the Court or the Attorney General wish to review the transcript in its entirety, we will move to file it under seal and may seek an appropriate protective order.

[21] *See* Castor Decl. ¶ 23; Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen. (Oct. 9, 2011), Ex. 15 to Castor Decl.  The DOJ IG was particularly critical of DOJ's provision to Congress of the February 4, 2011 and May 2, 2011 False Statement Letters.  *See* Sept. 2012 DOJ IG Rep. at 467-69.

[22] *See* Subpoena to Eric H. Holder, Jr., Att'y Gen. (Oct. 11, 2011) ("Original Holder Subpoena"), Ex. 17 to Castor Decl.; Subpoena to Eric H. Holder, Jr., Att'y Gen. (Jan. 3, 2013) ("Reissued Holder Subpoena"), Ex. 26 to Castor Decl.

log containing [specified] information."  Holder Subpoena (Instr. No. 12).  And the Original

Holder Subpoena directed that, "[i]f compliance with the subpoena cannot be made in full by

October 25, 2011 at 12:00 noon, compliance shall be made to the extent possible by that date.

An explanation of why full compliance is not possible shall be provided no later than October

23, 2011 at 12:00 noon."  Original Holder Subpoena (Instr. No. 11).  (The corresponding

compliance date and time for the Reissued Holder Subpoena was January 7, 2013 at 12:00 noon.)

The Attorney General did not produce a single document, or otherwise respond to the

Original Holder Subpoena, by the October 25, 2011 response date.  *See* Answer ¶ 42(i); Castor

Decl. ¶ 25; Davis Decl. ¶ 9.  The Attorney General never produced a privilege log, ever, *see*

Castor Decl. ¶¶ 26, 38.  By August 13, 2012, when this suit was filed, the Attorney General had

produced in response to the Original Holder Subpoena fewer than 4,100 pages of documents, *see*

Davis Decl. ¶ 10, many of which were redacted (some completely), and others of which were

produced in duplicate (or even triplicate).  *See id*. ¶ 11.[23]

On December 2, 2011 – ten months after the February 4, 2011 False Statement Letter

asserted that no gun-walking operations existed, and seven months after the May 2, 2011 False

Statement Letter reasserted the same thing – DOJ acknowledged publicly that those

representations were in fact false.  *See* Cole Retraction Letter at 1 ("[F]acts have come to light

during the course of th[e Committee's] investigation that indicate that the February 4 [False

Statement] Letter contains inaccuracies.").  Indeed, the February 4, 2011 False Statement Letter

contained so many inaccuracies that Deputy Attorney General Cole took the extraordinary

additional step of "formally withdraw[ing] the February 4 letter."  *Id.* at 1-2.

---

[23]  During this same time period, DOJ was producing approximately 100,000 pages of records
and thousands of e-mails to the DOJ IG who also was investigating Operation Fast and Furious.
*See* Answer ¶ 42(vi); Sept. 2012 DOJ IG Rep. at 4.

At the same time DOJ was admitting it misled Congress, the Attorney General was doing everything possible to prevent the Committee from investigating how or why that happened, and how or why it took DOJ ten months to come clean.  He refused to produce responsive documents dated or created after February 4, 2011 – and information about events that occurred after that date – a date coinciding exactly with the date of the February 4, 2011 False Statement Letter.[24]

On June 20, 2012 – more than eight months after the issuance of the Original Holder Subpoena, and moments before a Committee meeting to consider recommending that the House hold the Attorney General in contempt – the President (at the Attorney General's urging, but through the Deputy Attorney General) asserted "[E]xecutive privilege" as to all post-February 4, 2011 responsive documents.  June 20, 2012 Privilege Letter at 1.  The June 20, 2012 Privilege Letter acknowledged the Committee's "legitimate interest in [DOJ's] management of its response to congressional inquiries into Fast and Furious."  *Id*. at 2.  At the same time, it deliberately impeded the Committee's ability to vindicate that interest.  Moreover, it was not accompanied by a privilege log of any kind; did not otherwise describe the withheld documents;

---

[24]  *See U.S. Dep't of Justice:  Hr'g Before the H. Comm. on the Judiciary*, 112th Cong., at 90, 91 (Dec. 8, 2011) (testimony of Eric H. Holder, Jr., Att'y Gen.) ("with respect to [DOJ] as a whole . . . we will not provide memos after February the 4th . . . e-mails, memos"; "with regard to provision of emails, I thought I had made it clear that after February the 4th, it is not our intention to provide e-mail information"); Tr. of Interview of Gary Grindler, Chief of Staff & Counselor to the Att'y Gen., and Former Acting Dep'y Att'y Gen., at 22 (Dec. 14, 2011) ("Grindler Transcript") (statement of counsel) ("What I am saying is that the Attorney General made it clear at his testimony last week that we are not providing information to the committee subsequent to the February 4th letter."), Ex. 19 to Castor Decl.; Tr. of Interview of Jason Weinstein, Dep'y Att'y Gen., at 177, 238 (Jan. 10, 2012) ("Weinstein Transcript") (statement of counsel) (refusing to answer questions that "implicate[d] the post-February 4th period"; asserting that discussion of events occurring after February 4, 2011 "falls within the department's prohibition"), Ex. 20 to Castor Decl.; *see also* Answer ¶¶ 11, 43(i)-(iii).

We have included only the pertinent excerpts of the Grindler and Weinstein Transcripts; other parts of those transcripts contain sensitive information.  Accordingly, should the Court or the Attorney General wish to review either or both of those transcript in their entirety, we will move to file them under seal and may seek an appropriate protective order.

and did not specify whether the "Executive privilege" being asserted was of the constitutional (Presidential communication) or common law (deliberative process) variety.

However, the June 20, 2012 Privilege Letter does state that "[t]he legal basis for the President's assertion of executive privilege is set forth in [a June 19, 2012 letter from the Attorney General to the President]," *id*. at 4, in which the Attorney General asks the President to assert Executive privilege on the ground that responsive documents "were not generated in the course of the conduct of Fast and Furious," but rather "in the course of [DOJ's] deliberative process concerning how to respond to congressional and related media inquiries into that operation."[25]   Indeed, the June 19, 2012 AG Letter uses the word "deliberative," or a variant thereof, 16 times.

On June 20, 2012, the Committee rejected the Attorney General's Hail Mary privilege assertion and voted to report his contumacious conduct to the full House.  *See* Answer ¶ 48; H. Rep. No. 112-546 (2012).  On June 28, 2012, the House adopted, by a bipartisan vote of 255-67, H. Res. 711, which provided that Attorney General Holder "shall be found to be in contempt of Congress for failure to comply with a congressional subpoena."  H. Res. 711, 112th Cong. (June 28, 2012) (enacted); *see also* 158 Cong. Rec. H4417 (daily ed. June 28, 2012); Answer ¶ 52.

The Committee sued on August 13, 2012, to enforce the Holder Subpoena as to a limited subset of documents responsive to Categories 1, 4, 5, and 10 of the Holder Subpoena, and that are dated or were created after February 4, 2011 ("Post-February 4 Subset").  *See* First Am. Compl. ¶¶ 67-86, Prayer for Relief.  In the Committee's judgment, this subset includes or constitutes the documents most likely to be relevant to the Obstruction Component of the

---

[25]  Letter from Eric H. Holder, Jr., Att'y Gen., to the President, at 1-2 (June 19, 2012) ("June 19, 2012 AG Letter"), Ex. 21 to Castor Decl.

Committee's investigation and, when produced, the documents most likely to enable the Committee to complete its investigation.[26]

Shortly after the release of the September 2012 DOJ IG Report, DOJ produced to the Committee approximately 300 pages of responsive but previously unproduced post-February 4, 2011 documents referenced in that report,[27] none of which reasonably or fairly can be characterized as pre-decisional and deliberative.[28]  And on November 15, 2013, DOJ produced to the Committee eight pages "previously made available for review by the Committee" because they "are appropriate for public disclosure," and were contemporaneously "being released to [a] FOIA [Freedom of Information Act] requester."[29]

---

[26]  On July 31, 2012, and October 29, 2012, respectively, the Committee released the first two parts of a planned three-part series of reports on Operation Fast and Furious.  *See* J. Staff Rep. (Part I of III), H. Comm. on Oversight and Gov't Reform & Sen. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, 112th Cong., *Fast & Furious:  The Anatomy of a Failed Operation* (July 31, 2012) ("Committee Report, Part I") (addressing operational failures of Operation Fast and Furious), *available at* http://oversight.house.gov/report/fast-and-furious-the-anatomy-of-a-failed-operation-part-1-of-3/; J. Staff Rep. (Part II of III), H. Comm. on Oversight and Gov't Reform & Sen. Charles E. Grassley, Ranking Member, Sen. Comm. on the Judiciary, 112th Cong., *Fast & Furious:  The Anatomy of a Failed Operation* (Oct. 29, 2012) (addressing failures of supervision and leadership by DOJ officials) ("Committee Report, Part II"), *available at* http://oversight.house.gov/report/fast-and-furious-the-anatomy-of-a-failed-operation-part-2-of-3/.  Part III, for which the Committee requires the documents sought in this lawsuit, will address DOJ's response to the Committee's underlying investigation.  *See* Castor Decl. ¶ 34.

[27]  *See* Letter from Judith C. Appelbaum, Acting Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., et al. (Sept. 19, 2011) (transmitting documents Bates numbered HOGR DOJ 006989 to HOGR DOJ 007297), Ex. 25 to Castor Decl.; Davis Decl. ¶ 12.

[28]  For example, one document, HOGR 007163-007169, excerpts the text of ATF Order 3310.4B – Firearms Enforcement Program, which Order has been ATF policy (publicly) for over 20 years.  And yet another document is a memorandum from the Office of the U.S. Attorney for the District of Arizona providing purely factual information regarding Jamie Avila, Jr., a subject of the Fast and Furious investigation.  *See* HOGR DOJ 007057-007059.

[29]  Letter from Peter J. Kadzik, Principal Dep'y Ass't Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm. (Nov. 15, 2013) (transmitting documents), Ex. 29 to Castor Decl.

During the course of this litigation, "the Attorney General specifically informed the plaintiff and the Court that he had not asserted the [Presidential communications] privilege in withholding the documents and did not intend to rely on the [Presidential communications] privilege in this action," Mem. Op. at 36 n.10, thereby effectively acknowledging that his justification for not producing the Post-February 4 Subset rests entirely on deliberative process.

And one month ago, the Attorney General acknowledged that the "documents covered by the President's claim of Executive Privilege . . . do not all contain material that would be considered deliberative under common law or statutory standards." AG's 1292(b) Mot. at 8-9. Notwithstanding this damning admission, the Attorney General still has not produced to the Committee any additional post-February 4, 2011 documents.

## LEGAL STANDARD

A court "shall grant summary judgment" where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the nonmoving party bears the burden, as does the Attorney General here on his claim of privilege, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980), "'[s]ummary judgment is appropriate if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 132 (D.C. Cir. 2011) (quoting *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011)).

## ARGUMENT

The Supreme Court in two cases has recognized a *limited* Executive privilege, rooted in the Constitution, for Presidential communications (although in both cases it rejected the proposed application of that privilege). *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 446,

453 (1977) ("*Nixon II*") ("qualified" privilege, overcome by "substantial public interest[]," including exercise by Congress of its "broad investigat[ory] power" to "gauge the necessity for remedial legislation"); *United States v. Nixon*, 418 U.S. 683, 707, 710 (1974) ("*Nixon I*") ("legitimate needs" of other branches "may outweigh" privilege, particularly outside areas of "military or diplomatic secrets"; not "expansively construed," in part because, like all privileges, operates "in derogation of the search for truth"); *see also In re Sealed Case (Espy)*, 121 F.3d 729, 744 (D.C. Cir. 1997) ("The *Nixon* cases establish the contours of the presidential communications privilege."). As the Attorney General has acknowledged, this constitutionally-rooted, and yet still limited and qualified, form of Executive privilege is not at issue here. *See* Mem. Op. at 36 n.10.

That leaves the Attorney General with deliberative process. *See* June 19, 2012 AG Letter at 2 (explaining that legal basis for privilege assertion is that withheld responsive documents were generated "in the course of [DOJ's *deliberative process* concerning how to respond to congressional and related media inquiries into that operation" (emphasis added)); *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (characterizing deliberative process as form of Executive privilege – FOIA context); *Landry v. FDIC*, 204 F.3d 1125, 1135 (D.C. Cir. 2000) (same – civil litigation context); *Espy*, 121 F.3d at 737 (same – grand jury context). Deliberative process – a common law privilege that is "Executive," not because it has any constitutional basis, but only in the sense that it is asserted by the Executive – is substantially weaker than the already limited Presidential communications privilege. *See, e.g.*, *Espy*, 121 F.3d at 750 ("does not extend to purely factual material"); *id.* at 745 (allows withholding only of relevant part of document); *id.* (more easily overcome by showing of need).

Leaving aside that (i) it is utterly fanciful to suggest, as the June 20, 2012 Privilege Letter

did, that *every* document dated or created after February 4, 2011, is shielded by the deliberative

process privilege, and (ii) none of the approximately 300 pages of post-February 4, 2011

documents produced in September 2012, are even arguably privileged, deliberative process does

not justify the Attorney General's refusal to produce the Post-February 4 Subset for at least four

reasons:

1.  The privilege does not apply at all – anywhere – when, as here, "there is any reason to

believe government misconduct occurred," *Espy*, 121 F.3d at 746.  *See infra* at Part I.

2.  The privilege has no application to a congressional subpoena.  *See infra* at Part II.

3.  The Attorney General's privilege assertion is invalid because it was not made in

compliance with the terms of the Holder Subpoena.  *See infra* at Part III.

4.  Even if the deliberative process privilege otherwise were applicable here as a general

matter – which it is not – it would not justify the Attorney General's withholding of the Post-

February 4 Subset because (i) the Attorney General has admitted that at least some of the

withheld documents are not even arguably subject to the privilege; (ii) he cannot carry his burden

of demonstrating, on a document-by-document basis, that the withheld documents are pre-

decisional and deliberative; and (iii) the Committee's need for the Post-February 4 Subset

outweighs any possible interest served by their continued withholding.  *See infra* at Part IV.[30]

## I.     The Deliberative Process Privilege Does Not Apply Here Because the Committee Is Investigating DOJ Misconduct.

The deliberative process privilege does not apply – anywhere – "when there is any reason

to believe government misconduct occurred," *Espy*, 121 F.3d at 746.  "[T]he privilege is

---

[30]  To the extent the Attorney General intends to follow through on his "congressional response work product" contrivance, AG's 1292 Mot. at 8-9, he presumably will do that in a cross-motion for summary judgment to which the Committee will respond in due course.

routinely denied . . . where there is reason to believe the documents sought may shed light on government misconduct . . . [because] shielding internal government deliberations . . . does not serve the public's interest in honest, effective government." *Id.* at 738.[31]  In particular, "it makes no sense to permit the government to use [the deliberative process privilege] as a shield" where the "nature of governmental officials' deliberations [is] *the* issue." *In re Subpoena Duces Tecum*, 145 F.3d 1422, 1424 (D.C. Cir. 1998) (emphasis in original); *see also id.* ("The privilege was fashioned in cases where the governmental decisionmaking process is collateral to the plaintiff's suit.").

Here, of course, DOJ misconduct is precisely the issue, to some extent with respect to the Operations Component of the Committee's investigation, *see, e.g.,* Comm. Rep., Part I at 9; Comm. Rep,, Part II at 9-10, but more particularly with respect to the Obstruction Component of that investigation – and with good reason.

*First*, DOJ misled Congress on February 4, 2011, *see* Feb. 4, 2011 False Statement Letter, as DOJ itself subsequently admitted.  *See* Cole Retraction Letter at 1.

*Second*, DOJ clung to those false statements for *ten months*, not withdrawing them until December 2, 2011, when it euphemistically acknowledged "inaccuracies" that long since had

---

[31]  *See also, e.g.*, *In re Subpoena Served Upon Comptroller of Currency, & Sec'y of Bd. of Governors of Fed. Reserve Sys.*, 967 F.2d 630, 634 (D.C. Cir. 1992); *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995) ("[W]here the documents sought may shed light on alleged government malfeasance, the privilege is routinely denied."); *Convertino v. U.S. Dep't of Justice*, 674 F. Supp. 2d 97, 102-05 (D.D.C. 2009) ("The deliberative process privilege does not apply when the government's intent is squarely at issue." (quotation marks omitted)); *Chaplaincy of Full Gospel Churches v. Johnson*, 217 F.R.D. 250, 256-58 (D.D.C. 2003) ("Under this government-misconduct exception, the court does not engage in the usual balancing test, but simply concludes that the privilege does not enter the picture at all." (quotation marks omitted; citing additional cases)), *rev'd on other grounds sub. nom. In re England*, 375 F.3d 1169 (D.C. Cir. 2004); *Alexander v. FBI*, 186 F.R.D. 170, 176-79 (D.D.C. 1999) (same); *Alexander v. FBI*, 186 F.R.D. 154, 163-66 (D.D.C. 1999) (same).

been obvious to everyone else who was paying attention, and then took the extraordinary step of

formally "withdraw[ing] the February 4 letter." *Id.*

    *Third*, in the interim, DOJ again lied to Congress.  *See* May 2, 2011 False Statement

Letter.  The DOJ IG was sharply critical of this letter:

> [T]he Department should not have made this statement in [the May
> 2, 2011 False Statement Letter, referring to statement in that letter
> that "[i]t remains our understanding that ATF's Operation Fast and
> Furious did not knowingly permit straw buyers to take guns into
> Mexico."]. . . .
>
>  [T]he Department should not have resorted to a narrowly worded
> denial of such a serious allegation, particularly when officials in
> the Office of the Deputy Attorney General knew or should have
> known by that date that they could not reaffirm the accuracy of the
> entire February 4 letter.
> . . . .
> [T]o Congress and the public, [DOJ's] May 2 letter reasonably
> could be understood as at least a partial reaffirmation of the
> February 4 letter at a time when [DOJ] officials knew or should
> have known that the February 4 letter contained inaccurate
> information.

Sept. 2012 DOJ IG Rep. at 467-68; *see also id.* at 469 (blame lies not only with DOJ

"component officials," e.g., ATF and U.S. Attorney's Office personnel, but also with senior DOJ

officials "who included this inaccurate information in the February 4 letter").

    *Fourth*, also in the interim – and contemporaneously with DOJ's acknowledgement that

the Committee's underlying investigation was legitimate and proper, s*ee* April 19, 2011 DOJ

Letter at 1-2; June 14, 2011 DOJ Letter at 1 – the agency was managing its response to that

investigation so as to deny the Committee information, and so as "to push the information away

from their political appointees at the Department," Melson Tr. at 123-24.

    *Fifth*, after DOJ admitted in December 2011 that it had misled Congress, *see* Cole

Retraction Letter, the Attorney General – by withholding post-February 4, 2011 documents

responsive to the Holder Subpoena, and refusing even to provide any information about events that occurred after that date – attempted to stymie the Committee's efforts to investigate how and why DOJ lied in the first place, and how and why it took DOJ ten months to come clean.  *See supra* at 14-16.  And he did this even though DOJ subsequently acknowledged the Committee's "legitimate interest in [DOJ's] management of its response to congressional inquiries into Fast and Furious."  June 20, 2012 Privilege Letter at 2.

*Sixth*, on June 20, 2012, the Attorney General asserted in response to the Holder Subpoena a privilege (deliberative process) as to a universe of documents (all responsive documents dated or created after February 4, 2011) that was patently unsustainable at the time, and that he subsequently has admitted is unsustainable:  "[The] documents covered by the President's claim of Executive Privilege . . . do not all contain material that would be considered deliberative under common law or statutory standards."  AG's 1292(b) Mot. at 8-9.  And yet the Attorney General still has not produced those documents.

*Seventh*, just five days ago, the DOJ IG suggested that DOJ officials may have made other misrepresentations to Congress in connection with its Fast and Furious investigation, aside from those made in the February 4, 2011 and May 2, 2011 False Statement Letters:

> [I]n the [Sept. 19, 2012] Fast and Furious report . . . the [DOJ IG] found that senior [DOJ] and ATF officials shared responsibility for providing inaccurate information in two letters to Congress.  *The [DOJ IG] also raised concerns about subsequent representations to Congress by [DOJ] officials about Operation Fast and Furious*.

Mem. from Michael E. Horowitz, DOJ IG, to Att'y Gen. & Dep'y Att'y Gen., Re: Top Management and Performance Challenges Facing [DOJ] – 2013, at Part 6 (Dec. 11, 2013) (emphasis added), *available at* http://www.justice.gov/oig/challenges/2013.htm.

If all the above is not adequate "reason to believe government misconduct occurred," *Espy*, 121 F.3d at 746 – indeed, egregious government misconduct – then nothing is.  *Cf. Alexander v. FBI*, 186 F.R.D. 154, 163-66 (in FOIA context, inclusion of misinformation in *draft* responses to Congress adequate reason to believe government misconduct had occurred for purposes of making deliberative process privilege unavailable); *Dominion Cogen, D.C., Inc. v. District of Columbia*, 878 F. Supp. 258, 268 (D.D.C. 1995) (deliberative process inapplicable where questions raised about role of "illegitimate political motives" in government decisions not to issue permits); *Tax Reform Research Grp. v. IRS*, 419 F. Supp. 415, 426 (D.D.C. 1976) (in FOIA context, communications relating to White House use of IRS to target opposition political party "simply cannot be construed as being part of any proper governmental process").[32]

Accordingly, the Court should hold that the circumstances of this case render the deliberative process privilege inapplicable to the Holder Subpoena as a matter of law.

## II. Deliberative Process Does Not Excuse the Attorney General's Non-Compliance Because the Privilege Does Not Apply to Congressional Subpoenas.

### A. Deliberative Process Is a Common Law Privilege.

Deliberative process is a common law evidentiary privilege (also codified for application in the FOIA context).  *See, e.g.*, *Landry*, 204 F.3d at 1135 ("deliberative process . . . [is a] qualified, common law executive privilege"); *Espy*, 121 F.3d at 737 ("[Deliberative process] . . . originated as a common law privilege."); *id*. at 745 ("The presidential [communications] privilege is rooted in constitutional separation of powers principles and the President's unique constitutional role; the deliberative process privilege is primarily a common law privilege.");

---

[32] Indeed, the Attorney General's deliberative process assertion appears to be inconsistent with DOJ's own internal policy.  *See Congressional Subpoenas of [DOJ] Investigative Files*, 8 Op. OLC 252, 267 (1984) ("The privilege should not be invoked to conceal evidence of wrongdoing or criminality on the part of executive officers.").

*Wolfe v. HHS*, 839 F.2d 768, 773 (D.C. Cir. 1988) ("The common law discovery privilege at issue is the executive or deliberative process privilege."); *Bureau of Nat. Affairs, Inc. v. U.S. Dep't of Justice*, 742 F.2d 1484, 1496 (D.C. Cir. 1984) ("The purpose of [FOIA Exemption 5] is to incorporate the government's common law privileges in the civil discovery context into FOIA . . . [including] the executive privilege regarding the government's deliberative process."); *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 772 (D.C. Cir. 1978) (en banc) ("One of the traditional evidentiary privileges available to the Government in the civil discovery context is the common-sense, common law deliberative process privilege.").[33]

---

[33]   In a footnote, *Espy* states that "[s]ome aspects of the [deliberative process] privilege, for example, the protection accorded to the mental processes of agency officials . . . have roots in the constitutional separation of powers." 121 F.3d at 737 n.4.  That statement is dicta because only the Presidential communications privilege was at issue in *Espy*.  Furthermore, the statement relies on two authorities – *United States v. Morgan*, 313 U.S. 409, 421-22 (1941), and 3 Weinstein's Fed. Evid. § 509.21[3] at 509-16 – neither of which supports the proposition for which they are cited.

*Morgan* involved a challenge by stockyards market agencies to a Secretary of Agriculture order fixing, after a quasi-judicial proceeding, the maximum rates the agencies could charge for their services, an order the Supreme Court sustained.  *See* 313 U.S. at 421.  After concluding that the Secretary's order was appropriate, the Supreme Court proceeded to consider another "matter not touching the validity of the order," *id.*, namely, the questioning of the Secretary at trial "regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates," *id.* at 422.  The Supreme Court concluded that "the Secretary should never have been subjected to this examination." *Id.* That conclusion was itself self-evidently dicta, and it was not predicated on the Constitution.  *See, e.g.*, Gerald Wetlaufer, *Justifying Secrecy:  An Objection to the General Deliberative Privilege*, 65 Ind. L.J. 845, 906 (1990) ("[T]he *Morgan* decisions represent a category of cases that are analytically and functionally distinct from those that fall within the realm of the general deliberative privilege.").

The Weinstein treatise cites no case law in support of the proposition for which it is cited by *Espy*.  Moreover, at most, it opines that the deliberative process privilege rests on the "impropriety of judicial interference with executive functions."  3 Weinstein's Fed. Evid. § 509.21[3].  It says nothing at all about deliberative process in the context of Legislative and Executive Branch relations.

**B.      The Committee Was Not Required to Recognize, and Properly Rejected, the Attorney General's Deliberative Process Assertion.**

Congress' authority to oversee Executive Branch agencies and officials, and to compel the production of testimony and documents in furtherance of that authority, is derived directly from the Constitution. *See supra* at 5-7. There can be no dispute that this responsibility is critical, indeed foundational, to our constitutional system of checks and balances which is the most basic guarantee of our liberty as a people.

Deliberative process, a common law evidentiary privilege designed to protect the confidentiality of some intra-agency deliberations in the context of adjudicatory proceedings (and FOIA), simply is not consistent with an overarching constitutional principle that requires the Congress to oversee Executive Branch agencies precisely by peering inside them.

> *Congress's exercise of oversight protects the liberties of the American people by serving as a check on unbridled executive power.* Congress, by "acquainting itself with the acts and dispositions of the administrative agents of the Government," will be able to uncover corruption, waste, inefficiency, and rigidity and to ensure that the President is enforcing the laws as enacted by Congress.

Ronald L. Claveloux, *The Conflict Between Executive Privilege & Congressional Oversight: The Gorsuch Controversy*, 1983 Duke L.J. 1333, 1339 (1983) (emphasis added).

> [T]he investigatory power plays an indispensable role as a check upon the untrammeled exercise of executive power. The great bulk of special investigations have been directed historically at specific functions, activities, or individuals in the executive branch. The very possibility that a government official may be called to account for his stewardship before a Congressional investigating committee undoubtedly exerts a beneficent influence for more responsible administration.

Arvo Van Alstyne, Congressional Investigations, 15 F.R.D. 471, 473-75 (1954) (emphasis added).

> Quite as important as legislation is vigilant oversight of administration . . . . *It is the proper duty of a representative body to look diligently into every affair of government* and to talk much about what it sees. It is meant to be the eyes and the voice, and to embody the wisdom and will of its constituents.

Woodrow Wilson, Congressional Government 297-303 (1885) (emphasis added).

> If the House of Representatives, as the grand inquest of the nation, should at any time have reason to believe that there has been malversation in office by an improper use or application of public money by a public officer, and should think proper to institute an inquiry into the matter, *all the archives and papers* of the Executive Department, public or private, would be subject to inspection and control of a committee of their body and *every facility* in the power of the Executive *be afforded* to enable them to prosecute the investigation. . . . [T]o investigate the conduct of *all* public officers under the Government . . . the power of the House in the pursuit of this object *would penetrate into the most secret recesses* of the Executive Departments. It could command the attendance of any and every agent of the government, and compel them to produce all papers, public or private, official or unofficial, and to testify on oath to tell all facts within their knowledge.

President James K. Polk (1846), *reprinted in* Raoul Berger, Executive Privilege:  A

Constitutional Myth 262-63 (1974) (emphasis in original).

> [C]ases may occur in the course of [Congress'] proceedings in which it may be indispensable to the proper exercise of its power that it should inquire or decide upon the conduct of the President or other pubic officers, and in every case its constitutional right to do so is cheerfully conceded.

President Andrew Jackson (1834), *reprinted in* Raoul Berger, Executive Privilege:  A

Constitutional Myth 182 (1974) (emphases omitted).

Moreover, congressional investigations are qualitatively different from adjudicatory

proceedings.  Congressional investigations are fact-finding inquiries convened to produce

information upon which Congress can bring its legislative judgment to bear; they are not

intended to resolve disputes between parties and are not subject to rules of evidence, as the

Supreme Court long has recognized:  "[W]hen governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used."  *Hannah v. Larche*, 363 U.S. 420, 442 (1960).

Commenting specifically on congressional investigations, the Supreme Court noted that "the history of these committees clearly demonstrates that only infrequently have witnesses appearing before congressional committees been afforded the procedural rights normally associated with an adjudicative proceeding."  *Id.* at 445.  Indeed, since the very founding of the Republic, Congress itself has determined whether and when to recognize common law privileges raised in response to congressional subpoenas, as the Committee did here.[34]

---

[34]  The early Congresses adopted many of the practices and precedents of the British Parliament and, consistent with that practice, common law privileges and general claims of confidentiality were not available of right to congressional witnesses.  *See, e.g.*, Thomas Erskine May, Erskine May's Treatise on the Law, Privileges, Proceedings, and Usage of Parliament 746 (20th ed. 1983); Luther Stearns Cushing, Elements of the Law & Practice of Legislative Assemblies in the United States of America § 983 (1856) ("A witness cannot excuse himself from answering, on the ground that . . . the matter was a privileged communication to him . . . .").  In the years since, each House of Congress consistently has rejected the notion that common law privileges must apply to proceedings before it.

In 1857, Congress debated whether common law privileges should apply to congressional proceedings.  *See* Cong. Globe, 34th Cong., 3d Sess. 431 (1857) (statement of Rep. Orr) ("With reference to communications made to counsel, . . . the common law of England does not exempt a witness from testifying on any such ground. . . .  Either the House of Commons or House of Lords can extract such communication.").  The Senate defeated an amendment that would have required recognition of common law evidentiary privileges.  *See id.* at 434-35 (proposal of Sen. Seward); *id.* at 443 (amendment defeated).

In 1977, a House subcommittee rejected a witness' attorney client privilege claim.  *See Int'l Uranium Cartel: Hr'gs Before the Subcomm. on Oversight and Investigations of the H. Comm. on Interstate and Foreign Commerce*, 95th Cong., vol. I at 46 (1977).  Chairman John Moss observed that "the commonwealth precedents, customs of both the Commons and the House, fully sustain rejecting a claim of attorney-client privilege if it impedes in any manner whatsoever the necessary inquiries of the Congress in determining whether a law of the United States may have been violated or whether that law accords sufficient protection to the American people."  *Id.* at 123 (statement of Chairman Moss).

*(Continued . . . )*

Insofar as we are aware, no court ever has held that a common law privilege, such as deliberative process, validly may be asserted in response to a congressional subpoena; rather, the case law indicates the opposite.  For example, in 1990, a Senate subcommittee subpoenaed documents and testimony from a Provident Life & Accident Insurance Company employee.  *See Health Care Fraud/Medicare Secondary Payer Program:  Hr'g Before the S. Permanent Subcomm. on Investigations of the Comm. on Gov'tal Affairs*, 101st Cong. at 3-4 (1990).  The company declined to produce the materials on attorney-client privilege grounds, and moved to enjoin its employee from responding to the subpoena.  The district court declined to issue the injunction and held as follows:  "Congress . . . stands as a separate and co-equal branch of government which is capable of making its own determinations regarding privileges asserted by witnesses before it."  *In re Provident Life & Accident Co.*, 1990 U.S. Dist. LEXIS 21067, *6 (E.D. Tenn. June 19, 1990).

In *Murphy v. Dep't of Army*, 613 F.2d 1151 (D.C. Cir. 1979), the D.C. Circuit considered 5 U.S.C. § 552(c) – now 5 U.S.C. § 552(d) – which provides that FOIA (including exemption five, the FOIA version of deliberative process) "is not authority to withhold information from Congress."  The Court stated that

> Congress, whether as a body, through committees, or otherwise, *must have the widest possible access to executive branch information if it is to perform its manifold responsibilities effectively*.  If one consequence of the facilitation of such access is

---

On the other hand, committees not infrequently accede to common law privilege assertions when reasoned and persuasive arguments are advanced in their support.  *See, e.g.*, *Iran-Contra Investigation:  Joint Hr'gs Before the H. Select Comm. to Investigate Covert Arms Transactions with Iran & the S. Select Comm. on Secret Military Assistance to Iran & the Nicaraguan Opp'n*, 100th Cong., at 199 (1987) (accepting assertion of attorney-client privilege by Richard Secord).  Indeed, some committees have adopted rules for resolving such privilege assertions.  *See, e.g.*, Comm. Rule 15(h) (setting forth procedures for resolving privilege assertions raised in depositions).

30

> that some information will be disclosed to congressional
> authorities but not to private persons, that is but an incidental
> consequence of the need for informed and effective lawmakers.

613 F.2d at 1158 (emphasis added).

And, in *Ashland Oil, Inc. v. FTC*, 548 F.2d 977 (D.C. Cir. 1976) (per curiam), and *Exxon Corp. v. FTC*, 589 F.2d 582 (D.C. Cir. 1978), this Circuit considered – and rejected – private party efforts to use a statute to block the FTC from producing documents to a congressional committee in response to committee letter requests (which the Court treated as the functional equivalent of subpoenas).  In *Ashland Oil*, the district court denied the company's request for an injunction to block the FTC from producing statutorily-protected trade secret information to Congress, and the D.C. Circuit affirmed:  "'[T]he courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties.'"  *Ashland Oil*, 548 F.2d at 979 (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 308 (D.D.C. 1976)).  In *Exxon Corp.*, the Circuit Court refused to direct the FTC to provide written notice to affected parties before providing trade secret information to Congress:  "For this court on a continuing basis to mandate an enforced delay on the legitimate investigations of Congress whenever these inquiries touched on trade secrets could seriously impede the vital investigatory powers of Congress and would be of highly questionable constitutionality."  589 F.2d at 588. *Ashland Oil* and *Exxon Corp.* both evince a marked judicial distaste on the part of this Circuit for rulings that would hinder or delay congressional investigations.[35]

---

[35]  In 1999, the D.C. Bar tacitly acknowledged Congress' authority to accept or reject common law privileges.  *See* D.C. Bar Legal Ethics Comm. Op. 288, *Compliance with Subpoena from Congressional Subcomm. to Produce Lawyer's Files Containing Client Confidences or Secrets* (Feb. 16, 1999) (lawyer discharges responsibility under D.C. Rule of Professional Conduct if s/he produces assertedly attorney-client privileged materials subpoenaed by Congress after the committee/subcommittee overrules the privilege assertion, orders the documents produced, and

(*Continued . . .*)

Judicial recognition of a deliberative process privilege in the context of congressional subpoenas would downgrade Congress' ability to obtain information from the Executive Branch to the level of civil litigants and FOIA requesters, a consequence this Circuit already has rejected. *See Murphy*, 613 F.2d at 1158. More importantly, such judicial recognition would seriously distort the balance of powers between the Legislative and Executive Branches in favor of the Executive, diminish Congress' Article I powers, and wreak havoc on Congress' ability to conduct oversight of Executive Branch misconduct. In narrow terms, Congress is the only bulwark when high-level Executive Branch officials obstruct Congress, as there is every reason to believe that DOJ has here. This is so because, while obstruction of Congress is a crime, *see* 18 U.S.C. § 1505, it is a crime that effectively is inapplicable to high-level Executive Branch officials because "[DOJ] has difficulty investigating alleged criminal activity by high-level government officials." *See* S. Rep. No. 95-170, at 5 (1977). That problem is compounded when DOJ's own misconduct is at issue, both because DOJ is even less likely to investigate and prosecute itself,[36] and because DOJ sets the tone for the rest of the Executive Branch. More broadly, when the Executive goes unchecked, misconduct by public officials goes unexposed, policy-making is subject to manipulation, accountability for poor policy decisions disappears, and the people are poorly served.

The Court's entering judgment in favor of the Committee here would not mean that the Executive never could shield its internal deliberations from Congress. When the Executive makes reasoned and persuasive arguments as to why internal deliberative information should be

---

moves to hold the attorney in contempt absent compliance), *available at* http://www.dcbar.org/bar-resources/legal-ethics/opinions/opinion288.cfm.

[36] *See also* Letter from Ronald C. Machen, Jr., U.S. Att'y, to Kerry W. Kircher, Gen. Counsel, U.S. House of Reps. (July 30, 2012) (confirming that he would not proceed against Attorney General as *required* by 2 U.S.C. § 194), Ex. 24 to Castor Decl.

withheld, Congress historically has agreed to exercise its discretion to accede to those concerns. That is, the accommodation and negotiation process that DOJ is so fond of touting, *see, e.g.*, Mem. in Supp. of Def.'s Mot. to Dismiss (Oct. 15, 2012) (ECF No. 13-1), will endure.

But when Congress determines that it *needs* to obtain and review internal deliberative materials, as here, it must be able to do so, and the common law deliberative process privilege cannot stand in its way.

### III. The Attorney General's Deliberative Process Privilege Assertion Is Invalid Because It Was Not Made in Compliance with the Terms of the Holder Subpoena.

The Attorney General's privilege assertion did not comply with the terms of the Holder Subpoena; as a result, it undermined the Committee's Article I authority and must be rejected.

As discussed above, the Holder Subpoena contained an explicit return date (October 25, 2011 originally, and January 7, 2013 when the subpoena was reissued), Holder Subpoena at 1, 11; it also directed him, "[i]n the event that a document is withheld on the basis of privilege," to "provide a privilege log containing [specified] information concerning any such document," *id.* at 6, 16 (Instr. No. 12); and further directed that, "[i]f compliance with the subpoena cannot be made in full by [the return date], compliance shall be made to the extent possible by that date [and] [a]n explanation of why full compliance is not possible shall be provided no later than October 23, 2011 [January 7, 2013, for the reissued subpoena]," *id.* at 6, 16 (Instr. No. 11). The Attorney General simply ignored *all* of this.

- By the original October 25, 2011 return date, he produced no documents, no privilege log, and no explanation for his failure to comply.

- He waited nearly eight months to assert privilege and, when he did so, it was in a manner that appeared intended to obfuscate. While the assertion ostensibly was made by the President – raising the obvious implication that Presidential

communications were involved – the Attorney General only much later admitted that he was relying *entirely* on deliberative process, *see* Mem. Op. at 36 n.10, a privilege that did not need to be asserted by the President, *see infra* at 38.

- By the January 7, 2013 return date for the reissued subpoena, he produced no documents and no privilege log.

Subpoenas issued by congressional committees normally mandate timely privilege assertions for a reason:  congressional investigations are always on a time clock because of the two-year election cycle established by the Constitution, and timely privilege assertions enable committees promptly (i) to assess the policy considerations that favor or disfavor honoring a privilege claim in a given situation; (ii) to assess the importance of the information at issue and whether that information can be obtained from other sources; and (iii) to determine whether some accommodation is possible, all in the interest of moving the investigation along.  *See generally* Alissa Dolan & Todd Garvey, Cong. Research Serv., R42811, *Congressional Investigations of the Dep't of Justice 1920-2012:  History, Law, and Practice* 13 (2012) ("CRS Report").  Indeed, historically privilege assertions to congressional subpoenas, including those by the Executive, have been registered by the subpoena return date or, at the latest, soon thereafter.[37]

Accordingly, belated privilege assertions, such as the Attorney General's eight-month tardy assertion here, undercut Congress' ability to carry out its constitutional responsibilities.

---

[37]  *See, e.g.*, *Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 61-62 (D.D.C. 2008) (Presidential communications privilege asserted on or before subpoena return dates); *United States v. House of Representatives*, 556 F. Supp. 150, 151 (D.D.C. 1983) (same); *Investigation into Allegations of Justice Dep't Misconduct in New England – Vol. I: Hr'gs Before the H. Comm. on Gov't Reform*, 107th Cong., 520-56 (2002) (statement of Prof. Charles Tiefer) (chronicling such instances); CRS Report (chronicling such instances).

*Cf., e.g., Exxon Corp.*, 589 F.2d at 588 ("[E]nforced delay [of ten days] on the legitimate investigations of Congress . . . could seriously impede the vital investigatory powers of Congress and would be of highly questionable constitutionality."); *id*. at 594 (noting "clear public interest in maximizing the effectiveness of the investigatory powers of Congress"); *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 133 n.40 (D.C. Cir. 1977) ("*AT&T*") (noting, in context of congressional subpoena, "there is a plain duty on both the executive and judicial branches to advance any problems for prompt consideration"); *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 970 (D.C. Cir. 1980) ("[C]ourts may not require [subpoena recipient] to delay surrendering documents to Congress [pending advance notification of] affected parties . . . , for the judiciary must refrain from slowing or otherwise interfering with the legitimate investigatory functions of Congress."); *FTC v. Anderson*, 631 F.2d 741, 747 (D.C. Cir. 1979) (same).

Indeed, the accommodation and negotiation process is seriously hampered and cannot be effective where, as here, the Executive makes an untimely privilege assertion, or where, as here, the nature of the privilege claim repeatedly changes. *See supra* at 16-19. As DOJ itself has acknowledged, a timely, accurate, and precise assertion of privilege contributes significantly to an effective accommodation and negotiations process: "The process of accommodation requires that each branch explain to the other why it believes its needs to be legitimate. Without such an explanation, it may be difficult or impossible to assess the needs of one branch and relate them to those of the other." *Congressional Requests for Confidential Executive Branch Information*, 13 Op. OLC 153, 159 (1989); *see also AT&T*, 567 F.2d at 127, 130 (negotiation and accommodation is constitutionally-based process which "positively promotes the functioning of our system"; "Each branch should take cognizance of an implicit constitutional mandate to seek

optimal accommodation through a realistic evaluation of the needs of the conflicting branches in a particular fact situation.").

In this case, the Attorney General's eight-month delay in asserting privilege, and his subsequent shell-game approach to disclosing the basis for that assertion, made effective accommodation and negotiation virtually impossible.  Moreover, the Attorney General's indiligence has directly delayed the Committee's completion of its investigation.  These are substantial injuries to our constitutional framework – all exacerbated by the Attorney General's non-compliance with the terms of the Holder Subpoena.

In short, if the constitutionally-mandated authority for Congress to issue compulsory process means anything, it must mean that subpoena recipients – including the Attorney General – cannot blithely ignore the terms of a congressional subpoena without consequence.  Therefore, the Court should conclude that the Attorney General's deliberative process assertion was invalid in its entirety because not made in compliance with the terms of the Holder Subpoena.[38]

## IV.    Deliberative Process Does Not Excuse the Attorney General's Non-Compliance with the Holder Subpoena Because He Has Not Satisfied, and Cannot Satisfy, the Elements of the Privilege.

Even assuming for the sake of argument that deliberative process otherwise applied in the context of the Holder Subpoena – and, for the reasons articulated above, it does not – that

---

[38]  *Cf.* Fed. R. Civ. P. 45(d)(2)(B), (e)(2) (persons objecting to subpoena under claim of privilege must lodge objection within "the earlier of the time specified for compliance or 14 days after the subpoena is served," and must provide information sufficient to "enable the parties to assess the claim"); *Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571, 580-82 (Fed. Cl. 2012) ("[I]nvocation of the deliberative process privilege, as with other [common law] privileges, is subject to a timeliness requirement . . . . and there is no basis to refrain from extending the waiver to instances of indiligence, indolence, or dawdling"; holding that Executive Branch waived privilege by untimely assertion (citing cases)); *Fonville v. District of Columbia*, 230 F.R.D. 38, 42 (D.D.C. 2005) (Executive Branch waived qualified, common law deliberative process privilege by untimely assertion).

privilege does not justify the Attorney General's non-compliance, as we now explain.

A.   **The Attorney General Already Has Acknowledged That Some Withheld Responsive Documents "Do Not . . . Contain Material That Would Be Considered Deliberative Under Common Law or Statutory Standards."**

On November 15, 2013 – nearly 17 months after Deputy Attorney General Cole wrote to Chairman Issa stating that "the President has asserted [E]xecutive privilege over the relevant post-February 4, 2011, documents," June 20, 2012 Privilege Letter at 1 – the Attorney General acknowledged that he is in fact withholding responsive documents that "do not . . . contain material that would be considered deliberative under common law or statutory standards." AG's 1292(b) Mot. at 8-9. Put another way, the Attorney General has withdrawn his deliberative process claim as to at least some of the documents that comprise the Post-February 4 Subset, in much the same way that he, through Deputy Attorney General Cole, withdrew the February 4, 2011 False Statement Letter in December 2011. *See* Cole Retraction Letter at 1.

B.   **The Attorney General Has Not Satisfied, and Cannot Satisfy, His Burden of Establishing, on a Document-by-Document Basis, That the Withheld Responsive Documents Are Both Pre-decisional and Deliberative.**

As a general proposition, "[t]wo requirements are essential to the deliberative process privilege: the material must be predecisional *and* it must be deliberative." *Espy*, 121 F.3d at 737 (emphasis added); *see also, e.g.*, *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1436 n.9 (D.C. Cir. 1992) (determination that material not "deliberative" sufficient; further consideration of whether material "predecisional" unnecessary).[39]

---

[39] The pre-decisional element concerns "whether [a particular document] was generated before the adoption of an agency policy." *Coastal States*, 617 F.2d at 868; *accord Senate of P.R. on Behalf of the Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987); *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984); *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982); *Jordan*, 591 F.2d at 774. The document must correlate to an identifiable agency decision; that is,

(*Continued . . .* )

The Attorney General bears the burden of establishing, on a document-by-document basis, that the withheld responsive documents are both pre-decisional and deliberative. *See, e.g.*, *Coastal States*, 617 F.2d at 868 ("[T]he agency has the burden of establishing what deliberative process is involved . . . ."); *id.* at 867 ("[T]he deliberative process privilege is . . . dependent upon the individual document and the role it plays in the administrative process.").

"Assertion of [the] . . . qualified, common law [deliberative process] privilege[] requires: (1) a formal claim of privilege by the 'head of the department' having control over the requested information; (2) assertion of the privilege based on actual personal consideration by that official; and (3) a detailed specification of the information for which the privilege is claimed, with an explanation why it properly falls within the scope of the privilege." *Landry*, 204 F.3d at 1135.

With respect to the third of these requirements, deliberative process may not be asserted in a blanket or wholesale fashion. *See, e.g.*, *Morley v. CIA*, 508 F.3d 1108, 1126-27 (D.C. Cir. 2007) (rejecting CIA privilege claim where agency asserted elements of privilege, but did not provide court with relevant dates, authors, or other information necessary to determine applicability of privilege); *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 258

---

"a court must be able to pinpoint an agency decision or policy to which the document contributed." *Senate of P.R.*, 823 F.2d at 585 (quotation marks omitted). And the agency decision upon which the privilege assertion rests must be "final." *See, e.g.*, *Paisley*, 712 F.2d at 698 ("If there is no definable decisionmaking process that results in a final agency decision, then the documents are not pre-decisional.").

The deliberative element concerns "whether [a particular document] reflects the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 868; *see also Paisley*, 712 F.2d at 698 (deliberative documents are those that illustrate or reflect "the 'give-and-take' of the deliberative process" and which contain "opinions, recommendations, or advice about agency policies"); *Arthur Andersen & Co.*, 679 F.2d at 257 (documents must "reflect the agency 'give-and-take' leading up to a decision that is characteristic of the deliberative process"); *Jordan*, 591 F.2d at 774 ("[T]he communication must be 'deliberative,' that is, it must actually be related to the process by which policies are formulated."); *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975) ("[T]he document must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters.").

(D.C. Cir. 1977) (agency "must show by specific and detailed proof" that privilege assertion proper).  Put another way, "conclusory assertions of privilege will not suffice to carry the agency's burden. . . .  [And] where no factual support is provided for an *essential* element of the claimed privilege or shield, the label 'conclusory' is sure apt."  *Senate of P.R.*, 823 F.2d at 585 (rejecting as "conclusory" DOJ's deliberative process assertion where agency provided, as to each assertedly privileged document, its "issue date, its author and intended recipient, and the briefest of references to its subject matter") (emphasis in original).

Here the Attorney General claimed privilege – in the most wholesale, blanket, non-detailed, non-specific, and conclusory fashion possible – as to all "relevant post-February 4, 2011, documents."  June 20, 2012 Privilege Letter at 1.  He provided exactly zero "detailed specification[s] of the information for which the privilege is claimed," and exactly zero "explanation [for] why [the documents withheld] properly fall[] within the scope of the privilege."  *Landry*, 204 F.3d at 1135.  As a result, the Attorney General necessarily fails to discharge his burden of establishing, on a document-by-document basis, that the withheld responsive documents are pre-decisional and deliberative.

Separately, the Attorney General cannot carry his burden because he has articulated no "policy" to which the privilege applies.  What the Attorney General has said is that he seeks to shield documents that concern how "how [DOJ] respond[ed] to congressional and related media inquiries into th[e] [Fast and Furious] operation," June 19, 2012 AG Letter at 2.  But deciding how to stiff Congress and spin the media regarding Congress' investigation into Operation Fast and Furious simply is not a "policy" to which the privilege attaches.  *See, e.g.*, *Waters v. U.S. Capitol Police Bd.*, 218 F.R.D. 323, 324 (D.D.C. 2003) (records "that speak to a particular investigation rather than the adoption of a policy that applies to all cases of a particular nature or

type" not privileged).

### C.    The Committee's Need for the Post-February 4 Subset Outweighs Any Possible Interest Served by the Continued Withholding of Those Documents.

"The deliberative process privilege," like the Presidential communications privilege, "is a qualified privilege and can be overcome by a sufficient showing of need," *Espy*, 121 F.3d at 737, but the bar is higher and "more difficult to surmount" in the case of Presidential communications, and consequently lower and "more ad hoc in the context of the deliberative process privilege," *id.* at 746.  *See also Amster v. Lucey*, 904 F.2d 78 (D.C. Cir. 1990) ("In assessing a claim that intra-agency materials are protected by the common law 'deliberative process' privilege, the court must 'weigh[] the detrimental effects of disclosure against the necessity for production shown' by the party seeking disclosure." (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 327 (D.D.C. 1966), *aff'd*, 384 F.2d 979 (D.C. Cir. 1967))).[40]

*Espy* indicated that the factors the Court should consider in conducting this balancing include "[1] the relevance of the evidence, [2] the availability of other evidence, [3] the seriousness of the litigation, [4] the role of the government, and [5] the possibility of future timidity by government employees."  *Id.* at 737-38 (quotation marks omitted); *see also Schreiber*

---

[40]  *Cf. Nixon I*, 418 U.S. at 707, 710, 713 (Presidential communications privilege must be interpreted in light of "essential functions of each branch" of government implicated by the assertion of privilege; "legitimate needs" of other branches "may outweigh Presidential privilege," particularly where privilege is asserted outside areas of "military or diplomatic secrets"; holding that privilege insufficient to shield from disclosure to grand jury tape recordings of President Nixon's Oval Office conversations); *Nixon II*, 433 U.S. at 446, 453, 446-55 (Presidential communications privilege is "qualified" privilege that can be overcome by "substantial public interest[]," including the exercise by Congress of its "broad investigative power" to "gauge the necessity for remedial legislation"; holding that privilege did not bar implementation of law directing General Services Administration to take possession of, and screen, presidential materials accumulated by President Nixon during tenure in office).

*v. Soc'y for Sav. Bancorp, Inc.*, 11 F.3d 217, 220 (D.C. Cir. 1993) (same).  *Espy*, of course, was a

Presidential communications privilege case.  However, even if the Court assumes the same

factors apply here, each factor weighs in favor of disclosure to the Committee.

*First*, the documents the Committee seeks in this litigation – the Post-February 4 Subset –

are directly and self-evidently relevant to the Obstruction Component of the Committee's

investigation.  Indeed, the Post-February 4 Subset encompasses precisely the documents that are

most likely to enable the Committee to determine, among other things, (i) whether DOJ

intentionally sought to obstruct the Committee's underlying investigation; (ii) whether DOJ

retaliated against DOJ whistleblowers who provided information to the Committee;[41] (iii) if

those things happened, how and why they did, why they persisted for so long, and who was

responsible; and (iv) whether DOJ's conduct suggests the need for additions to, or modification

of, existing federal laws.[42]

*Second*, the Committee self-evidently cannot obtain the Post-February 4 Subset from any

other source, principally because those documents concern officials at the highest levels of DOJ

---

[41]  *See, e.g.*, Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to William J. Hoover, Dep'y Dir., ATF, at 2 (June 21, 2011) ("several ATF agents related that they have already experienced retaliation"), Ex. 27 to Castor Decl.; Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to William J. Hoover, Dep'y Dir., ATF, at 1 (July 25, 2011) ("A witness scheduled to testify before this Committee . . . received an intimidating letter from [an ATF official] . . . .  The timing and content of this letter strongly suggest that ATF is obstructing and interfering with the congressional investigation into Operation Fast and Furious."), Ex. 28 to Castor Decl.

[42]  Depending on the facts ultimately uncovered, legislative initiatives might include, among others, (i) the reorganization of ATF, including by removing it from DOJ control; (ii) creating a DOJ ombudsman to address whistleblower complaints seriously and even-handedly; (iii) imposing mandatory communications protocols in DOJ task force cases (such as the Organized Crime Drug Enforcement Task Force of which Operation Fast and Furious was a part); (iv) amending the wiretap statute, 18 U.S.C. § 2516(1), to ensure *substantive* review by senior DOJ officials; and (v) resurrecting some form of independent counsel statute to prosecute criminal wrong-doing by high-level Executive Branch officials.

who have made it their business not to cooperate with the Committee's investigation. *See* Melson Tr. at 105. "[A]vailability or unavailability of comparable evidence from other sources" is "perhaps the most important factor" in evaluating the applicability of the deliberative process privilege. *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1124 (N.D. Cal. 2003); *see also In re Apco Liquidating Trust*, 420 B.R. 648, 654 (Bankr. M.D. La. 2009) (trustee entitled to documents over which deliberative process privilege claimed where no "other source for that information exists").

*Third*, it is self-evident that the Obstruction Component of the Committee's investigation is extraordinarily serious. That component of the investigation is focused squarely on an apparent effort, over a period of many months, by high-level DOJ officials to hinder and impede the Committee's investigation into a law-enforcement operation gone seriously awry, an operation DOJ itself has acknowledged "was [so] fundamentally flawed . . . its tactics must never be repeated," Cole Retraction Letter at 1-2. That effort began with a lie to Congress, *see* Feb. 4, 2011 False Statement Letter, a lie that was repeated three months later, *see* May 2, 2011 False Statement Letter, and a lie that was not acknowledged until ten months later, *see* Cole Retraction Letter. DOJ itself has acknowledged both that the Operations Component of the Committee's investigation was appropriate and legitimate, *see* April 19, 2011 DOJ Letter; June 14, 2011 DOJ Letter, and that the Committee has a "legitimate interest" in conducting oversight of DOJ's "management of its response to  congressional inquiries into Fast and Furious," June 20, 2012 Privilege Letter at 2. Accordingly, there is no question that the Committee's investigation meets the test of "seriousness."

*Fourth*, DOJ's role here, as the target of the Committee's investigation, weighs heavily in favor of disclosure to the Committee of the Post-February 4 Subset. *See, e.g.*, *Espy*, 121 F.3d at

749 ("The argument for a narrow construction [of the Presidential communications privilege] is particularly strong in cases like this one where the public's ability to know how its government is being conducted is at stake."); *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1028 (E.D. Cal. 2010) ("The fact that a governmental entity's action is the focal point of litigation weighs against upholding the deliberative process privilege.").

*Fifth*, while the deliberative process privilege is designed to promote the "open and frank discussion among those who make [agency decisions] within the Government," *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001), it is not designed to promote discussions – open and frank or otherwise – among high-level Executive Branch officials about how to subvert a congressional investigation.

> It is unquestionably the[ir] duty . . . to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation.

*Watkins*, 354 U.S. at 187-88. Accordingly, the fifth *Espy* factor, concern about the "possibility of future timidity by government employees," *Espy*, 121 F.3d at 738, counsels in favor of disclosure to the Committee inasmuch as "the public value of protecting government misconduct is negligible," *Alexander v. FBI*, 186 F.R.D. 170, 177.

In *McGrain*, the Supreme Court noted that Congress' oversight authority over DOJ is "manifest" because "the functions of [DOJ], the powers and duties of the Attorney General, and the duties of his assistants are all subject to regulation by congressional legislation, and that [DOJ] is maintained and its activities are carried on under such appropriations as in the judgment of Congress are needed from year to year." 273 U.S. at 178. And in *Nixon II*, the Supreme Court recognized that Congress' interest in obtaining information in support of its legislative

function overcame even the Presidential communications privilege:

> [T]he [Presidential Records] Act may be thought to aid the legislative process and thus to be within the scope of Congress' broad investigative power. . . .   [W]e believe that the claims of Presidential privilege clearly must yield to the important congressional purposes of preserving the materials and maintaining access to them for lawful governmental and historical purposes.

*Nixon II*, 433 U.S. at 453-54.

If Congress' legislative and investigative interests outweighed President Nixon's Presidential communications claims, as the Supreme Court held, then surely the Committee's need for the Post-February 4 Subset trumps any possible interest of DOJ – a mere Executive Branch agency – in the continued withholding of those documents (even if deliberative process did otherwise apply here, which it does not).   Simply put, that privilege must give way where, as here, "the public's interest in effective government would be furthered by disclosure."   *In re Subpoena*, 967 F.2d 630, 634 (D.C. Cir. 1992) (quotation marks omitted).

## CONCLUSION

For all of the foregoing reasons, this Court should grant the Committee's motion for summary judgment.

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, General Counsel
D.C. Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
D.C. Bar No. 482949
CHRISTINE DAVENPORT, Sr. Assistant Counsel
TODD B. TATELMAN, Assistant Counsel
MARY BETH WALKER, Assistant Counsel
D.C. Bar No. 501033
ELENI M. ROUMEL, Assistant Counsel

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and
Government Reform, U.S. House of Representatives*

December 16, 2013

**CERTIFICATE OF SERVICE**

I certify that on December 16, 2013, I filed and served one copy of the foregoing

Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment

by CM/ECF on all registered parties.


*/s/ Kerry W. Kircher*
Kerry W. Kircher