**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COMMITTEE ON OVERSIGHT AND | ) | |
| GOVERNMENT REFORM, | ) | |
| UNITED STATES HOUSE OF | ) | |
| REPRESENTATIVES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:12-cv-1332 (ABJ) |
| v. | ) | |
| | ) | |
| ERIC H. HOLDER, JR., | ) | |
| in his official capacity as | ) | |
| Attorney General of the United States, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 4

     A.     The Inception of Congressional Oversight and the February 4, 2011 Letter .......... 5

     B.     The Department's Efforts to Accommodate the Committee's Legitimate Oversight Needs ....................................................................................................... 7

     C.     The Focus of the Committee's Demands in Advance of the Contempt Proceedings ......................................................................................................... 9

     D.     The Assertion of Executive Privilege and the Contempt Vote ........................... 11

     E.     Department Reforms Addressing Operation Fast and Furious ........................... 12

ARGUMENT .............................................................................................................. 14

I.     THE LONG-RECOGNIZED EXECUTIVE PRIVILEGE UNDER THE CONSTITUTION IS FOUNDED UPON THE SEPARATION OF POWERS AND ENSURES THE INDEPENDENT FUNCTIONING OF THE EXECUTIVE BRANCH .................................................................................. 14

II.     EXECUTIVE PRIVILEGE IS NOT LIMITED TO PRESIDENTIAL COMMUNICATIONS, AND WAS VALIDLY ASSERTED BY THE PRESIDENT IN THIS MATTER ............................................................... 18

     A.     The Assertion of Executive Privilege Here was Properly Based on the Need to Protect Documents Created in the Course of the Executive's Deliberative Process of Responding to a Congressional Investigation and Related Media Inquiries ....................................................................................... 21

     B.     The Assertion of Executive Privilege Here was Properly Based on the Executive's Protection of the Process for Responding to a Congressional Subpoena ........................................................................................................... 27

     C.     The Documents Covered by the President's Assertion of Executive Privilege Were Properly Withheld ........................................................................ 30

III.     LIMITATIONS OF COMMON-LAW AND STATUTORY PRIVILEGES ARE INAPPLICABLE TO THE EXECUTIVE PRIVILEGE ASSERTION HERE ............... 32

i

A.    The Committee's Reliance on Rules Applicable to Common Law and
      Statutory Privileges Is Misplaced ........................................................................33

B.    The President Did Not Waive His Ability to Assert Executive
      Privilege ...............................................................................................................34

C.    The Committee's Allegation of Wrongdoing Does Not Override the
      Executive Privilege Assertion...............................................................................36

D.    This Court Should Reject the Committee's Attempt to Expand the Scope
      of Relief It Seeks Following Denial of Defendant's Motion to Dismiss...............39

IV.   ALTHOUGH NO RELIEF IS WARRANTED, THE COURT SHOULD IN NO
      EVENT GRANT ANY RELIEF BEYOND THE MATERIAL SOUGHT BY
      THE COMMITTEE AT THE TIME THE HOUSE AUTHORIZED
      THE LAWSUIT.........................................................................................................43

CONCLUSION..................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Ass'n of Am. Physicians and Surgeons Inc. v. Clinton,*
  997 F.2d 898 (D.C. Cir. 1993) ......................................................................................23

*Black v. Sheraton Corp. of Am.,*
  564 F.2d 531 (D.C. Cir. 1977) ......................................................................................19

*Cheney v. U.S. Dist. Ct. for Dist. of Columbia,*
  542 U.S. 367 (2004) ..............................................................................................21, 35

*Coastal States Gas Corp. v. Dep't of Energy,*
  617 F.2d 854 (D.C. Cir. 1980) ................................................................................28, 29

*Comm. on Judiciary, House of Reps. v. Miers,*
  558 F. Supp. 2d 53 (D.D.C. 2008) ....................................................................36, 42, 44

*Dep't of the Interior v. Klamath Water Users Protective Ass'n,*
  532 U.S. 1 (2001) ................................................................................................. 21-22

*FTC v. Boehringer Ingelheim Pharm., Inc.,*
  286 F.R.D. 101 (D.D.C. 2012) ......................................................................................28

*\*Hickman v. Taylor,*
  329 U.S. 495 (1947) ................................................................................20, 21, 28, 29

*ICM Registry, LLC v. U.S. Dep't of Commerce,*
  538 F. Supp. 2d 130 (D.D.C. 2008) ..............................................................................38

*Judicial Watch, Inc. v. Dep't of Justice,*
  432 F.3d 366 (D.C. Cir. 2005) ......................................................................................28

*Kaiser Aluminum & Chem. Corp. v. United States,*
  157 F. Supp. 939 (Ct. Claims 1958) ..............................................................................28

*Mistretta v. United States,*
  488 U.S. 361 (1989) ......................................................................................................25

*Nat'l Whistleblower Ctr. v. HHS,*
  903 F. Supp. 2d 59 (D.D.C. 2012) ................................................................................38

*\*Nixon v. Sirica,*
  487 F.2d 700 (D.C. Cir. 1973) .............................................................................. passim

iii

*In re Rail Freight Fuel Surcharge Anti-Trust Litigation*,
   268 F.R.D. 114 (D.D.C. 2010)........................................................................29

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*,
   789 F.2d 26 (D.C. Cir. 1986) ........................................................................28

*\*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) ............................................................... passim

*In re Sealed Case*,
   146 F.3d 881 (D.C. Cir. 1998).......................................................................27

*\*Senate Select Comm. on Pres. Campaign Activities v. Nixon*,
   498 F.2d 725 (D.C. Cir. 1974)................................................................ passim

*Sikorsky Aircraft Corp. v. United States*,
   106 Fed. Cl. 571 (2012) ...............................................................................35

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971) ....................................................................19

*Stiftung v. V.E.B Carl Zeiss*,
   40 F.R.D. 318 (D.D.C. 1966) ........................................................................21

*Tax Reform Research Grp. v. IRS*,
   419 F. Supp. 415 (D.D.C. 1976) ...................................................................38

*\*United States v. AT&T Co. ("AT&T I")*,
   551 F.2d 384 (D.C. Cir. 1976)..................................................17, 22, 25, 44

*\*United States v. AT&T Co. ("AT&T II")*,
   567 F.2d 121 (D.C. Cir. 1977) ............................................................... passim

*United States v. Burr*,
   25 F. Cas. 187 (C.C. Va. 1807).....................................................................33

*\*United States v. Nixon*,
   418 U.S. 683 (1974) ................................................................................ passim

*United States v. Reynolds*,
   345 U.S. 1 (1953)..........................................................................................35

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981).......................................................................................28

iv

# FEDERAL RULES

Fed. R. Evid. 501 ................................................................................................33

Fed. R. Evid. 1101 ..............................................................................................33

# LEGISLATIVE AUTHORITIES

The Congressional Right to Information Act (Statement of Antonin Scalia)
    Hearing on S.2170 (Oct. 23, 1975) ........................................................... 33-34

H.R. Rep. No. 112-546 (2012)........................................................12, 42, 43

# OTHER AUTHORITIES

*Assertion of Exec. Privilege Concerning the Dismissal and Replacement of U.S.*
    *Attorneys*,
    2007 WL 5038036 (U.S.A.G. June 27, 2007) .....................................17, 18, 20

*Assertion of Exec. Privilege Concerning the Special Counsel's Interviews of the*
    *Vice President and Senior White House Staff*,
    2008 WL 5458939 (U.S.A.G. July 15, 2008) ............................................16, 17

*Assertion of Exec. Privilege in Response to Congressional Demands for Law*
    *Enforcement Files*,
    6 Op. O.L.C. 31 (1982) ............................................................................17

*Assertion of Exec. Privilege over Commc'ns Regarding EPA's Ozone Air Quality*
    *Standards & Cal.'s Greenhouse Gas Waiver Request*,
    2008 WL 5506397 (U.S.A.G. June 19, 2008) ..................................................17

*Assertion of Exec. Privilege Regarding White House Counsel's Office Docs.*,
    1996 WL 34386607 (U.S.A.G. May 23, 1996) .........................................17, 18

*Assertion of Exec. Privilege with Respect to Clemency Decision*,
    1999 WL 33490208 (U.S.A.G. Sept. 16, 1999)................................................17

*Assertion of Exec. Privilege with Respect to Prosecutorial Documents*,
    25 O.L.C. 1 (Dec. 10, 2001) .............................................................................17

*Congressional Requests for Confidential Executive Branch Info.*,
    13 Op. O.L.C. 153 (1989) .......................................................................... passim

*Dwight D. Eisenhower, Letter to the Secretary of Defense Directing Him to*
*Withhold Certain Information from the Senate Committee on Government*
*Operations (May 17, 1954)* ................................................................................................16

*The Federalist No. 51 (James Madison)* ...............................................................................2, 25

*History of Refusals by Executive Branch Officials to Provide Info. Demanded by*
*Congress: Part I - Presidential Invocations of Exec. Privilege Vis-a-Vis*
*Congress,*
6 Op. O.L.C. 751 (1982) .............................................................................................15

*John Tyler, Special Message (January 31, 1843)* .....................................................................15

*Louis Fisher, The Politics of Executive Privilege (2004)* .........................................................15

*The President,*
43 Op. Att'y Gen. 327 (1981) ...................................................................................17, 24

*Woodrow Wilson, Congressional Government: A Study in American Politics*
*(1885)* ...............................................................................................................33, 37

# INTRODUCTION

The core issue presented by this lawsuit is whether the President may validly assert Executive Privilege "in response to a Congressional subpoena for the particular set of records involved" in this case, "which do not implicate advice to the President." Mem. Op. (ECF No. 52) at 36. The answer to that question is "yes." The Committee's contrary position would give Congress unfettered access to all Executive information other than presidential communications, in contravention of both the constitutional separation of powers and well over two centuries of dealings between the Legislative and Executive Branches.

Congress has an unquestioned ability to obtain information from the Executive Branch and other sources in aid of its legislative function. But the President also has constitutional responsibilities, including the duty under the Constitution to "take Care that the Laws be faithfully executed" – a responsibility for which candid deliberations and independent decisionmaking by Executive Branch officials are critical. The need for an Executive sphere of confidentiality is particularly strong in the present context, which involves a congressional demand for information that would reveal the process by which the Executive responds to congressional inquiries. The absence of confidentiality in these circumstances would impair Executive officials' ability to perform their constitutional functions, which include responding independently and effectively to requests for information and participating in the negotiation and accommodation process that is an integral part of the constitutional framework and separation of powers. *United States v. AT&T Co. ("AT&T II")*, 567 F.2d 121, 130 (D.C. Cir. 1977).

Unlike cases arising in the context of civil or criminal litigation, this case presents a direct conflict between the political Branches: Congress claims that it should have absolute access to all Executive information other than presidential communications, notwithstanding the

1

President's assertion of Executive Privilege.  If Congress were to assume absolute power to control the ability of the Executive to maintain privileges or otherwise establish appropriate limits on Executive disclosures, it would necessarily take that power at the expense of the Executive, its co-equal Branch.  *See* THE FEDERALIST NO. 51 (James Madison).  The separation of powers would be directly impacted, and forever disrupted, if the Committee were to gain unfettered access to Executive documents despite an assertion of Executive Privilege by the President himself.  Such documents could reveal, for example, the deliberative process of Executive Branch officials, the Executive's work product in responding to Congress, open law enforcement investigations, or matters concerning national security and foreign relations.  No court has ever held Executive Privilege to be so limited, or the power of Congress to extend so far.

What preserves the separation and balance of powers under the Constitution, including in the context of Congress seeking information from the Executive Branch, is that neither Branch has absolute power in the negotiation and accommodation process.  Rather, consistent with precedent and history, a President is constitutionally entitled to assert a qualified Executive Privilege in response to a congressional demand for information about the Executive Branch's response to a congressional request for information.  That framework reserves to the Legislature the ability to demand information in furtherance of its legislative function, while providing the Executive with the corresponding ability to resist congressional requests on those infrequent occasions when the President determines it necessary to protect the Executive's function.

The Department takes seriously its responsibility to respond to congressional requests for information, and has satisfied the Committee's inquiries regarding the underlying law enforcement operations at issue in this particular matter – the original basis for the Committee's

investigation.  It also has addressed the flawed law enforcement activities that were at issue.  The

Attorney General referred the matter to the Department's Inspector General, who issued a

voluminous report that the Committee Chair described as "comprehensive" and "independent."

The Department also has acknowledged and addressed the inaccurate information in the

February 4, 2011 letter, and the IG report did not conclude that there was an intent to obstruct.

And, in an extraordinary accommodation, the Department has provided the Committee with over

1,300 pages of internal documents regarding how the erroneous February 4, 2011 letter came to

be drafted.  The Department thus has recognized and addressed the problems associated with

both the underlying law enforcement operations and that response to Congress.

What the President determined should be protected by his assertion of Executive

Privilege in this case are the Department's internal records related to its response to Congress –

essentially its "work file" on how it responds to this ongoing inquiry – generated *after* the

drafting of the February 4 letter.  These documents were properly the subject of an Executive

Privilege claim for two related reasons:  first, the Executive Branch's deliberative process with

respect to its engagement with Congress is a core part of the constitutional scheme, and one that

requires Executive Branch independence and confidentiality; and, second, the adversarial

investigatory context presented by this case requires a sphere of Executive confidentiality for its

congressional response "work product," in order to preserve the negotiation and accommodation

process with Congress and safeguard the separation of powers.  Because the President validly

invoked Executive Privilege over the documents at issue, judgment should be entered for

Defendant.[1]

---

[1] This brief accepts this Court's ruling on the motion to dismiss as the law of the case, without
waiving the Department's position that the Court lacks jurisdiction and that this suit otherwise is
not properly before the Court, or its right to make such arguments on appeal.

## FACTUAL BACKGROUND

The Department dedicated significant resources to responding to the dozens of inquiries it received from Congress as part of its broad and evolving investigation into Operation Fast and Furious. *See* Letter from Deputy Attorney General Cole to Chairman Issa 3 (May 15, 2012) ("Cole May 15 Letter") (attached to Def.'s Mot. for Summ. J. as Ex. A). The Department professionals who were tasked with this responsibility endeavored to provide responsive, accurate information to Congress in a timely manner. *See* Burton Decl. (attached to Def.'s Mot. for Summ. J.) ¶¶ 3, 8, 14, 21-23; Letter from Deputy Attorney General Cole to Chairman Issa 1 (Nov. 16, 2011) (attached to Def.'s Mot. for Summ. J. as Ex. B). When the Department had concerns about the nature and scope of various aspects of the congressional requests, it took steps quickly to make its concerns known to Congress, and to seek compromise solutions that would enable Congress to meet its investigative goals while simultaneously protecting important institutional interests of the Executive Branch. *See* Burton Decl. ¶¶ 4, 11-12, 14-18, 21; *see also, e.g.*, Letter from Assistant Attorney General Weich to Chairman Issa 1-2 ("Weich Apr. 8 Letter") (attached to Def.'s Mot. for Summ. J. as Ex. C); Letter from Assistant Attorney General Weich to Chairman Issa 1-2 (Oct. 11, 2011) ("Weich Oct. 11 Letter") (ECF No. 61-17). The Department ultimately produced thousands of pages of documents to Congress, a large number of written letter responses, and numerous witnesses both for interviews with Committee staff and to testify at hearings. *See* Cole May 15 Letter at 3-5. Far from supporting the Committee's allegations of "obstruction," the record shows that the Department responded to the congressional investigation into Operation Fast and Furious in a serious and detailed manner. *See* Burton Decl. ¶¶ 8, 22-23; Cole May 15 Letter at 3-5.

The Committee has since indicated that it was able to complete to its satisfaction its investigation concerning ATF's Fast and Furious law enforcement operation – the basis for the Committee's investigation in the first place.  Pl.'s Mem. at 18 n.26.  With respect to the inaccurate information in a letter sent to Congress on February 4, 2011, the Department has provided the Committee with comprehensive information and documents about how that letter was drafted.  *See* Letter from Deputy Attorney General Cole to Chairman Issa ("Cole Dec. 2 Letter") (ECF No. 17-2).  As those documents make clear, and consistent with the conclusions of the Report of the Inspector General (IG) for the Department of Justice, *see* U.S. Dep't of Justice, Office of the Inspector Gen., A Review of ATF's Operation Fast and Furious and Related Matters at 395-414 (2012) ("IG Report"), *available at* http://www.justice.gov/oig/reports/2012/s1209.pdf), the inclusion of inaccurate information in the February 4 letter was unintentional.  And the IG report, which the Department publicly released along with over 300 pages of documents referred to by that report, *see* Burton Decl. ¶ 22, does not conclude that the Department intended to obstruct or thwart the investigation.

### A.   The Inception of Congressional Oversight and the February 4, 2011 Letter

Congressional inquiries related to Operation Fast and Furious began on January 27, 2011, when Senator Grassley sent a letter to ATF seeking information about allegations by ATF whistleblowers regarding the use of inappropriate law enforcement tactics.  *See* Letter from Senator Grassley to ATF Acting Director Melson (Jan. 27, 2011) (ECF No. 61-2).[2]  Four days later, Senator Grassley again wrote to ATF, outlining his concern that such whistleblowers were

---

[2] Although a Ranking Member does not have independent authority to conduct oversight, the Chairman of the Senate Judiciary Committee subsequently made a formal request to the Department.  *See* Letter from Chairman Leahy to Attorney General Holder 1 (June 23, 2011) (attached to Def.'s Mot. for Summ. J. as Ex. D).

not getting appropriate treatment within the Department.  *See* Letter from Senator Grassley to ATF Acting Director Melson (Jan. 31, 2011) (ECF No. 61-3).

When the Department receives requests from Congress, it typically identifies the components within the Department that would have substantive information about the subject matter, and then works with those components to prepare a response.  *See* Burton Decl. ¶ 3.  That is precisely what the Department did upon receipt of Senator Grassley's January 2011 letters, resulting in the Department's initial February 4, 2011 response to Congress regarding this matter. *See* IG Report at 329-60.

It is undisputed that the February 4 letter contained inaccurate information about the tactics used in Operation Fast and Furious; that inaccurate information has been acknowledged by the Department and ultimately was the basis for the Department's formal withdrawal of the February 4 letter on December 2, 2011.  *See* Cole Dec. 2 Letter.  That formal withdrawal occurred after the Department's extensive effort to get to the bottom of the matter.  *See* Burton Decl. ¶¶ 19-21.  On February 28, 2011, the Attorney General asked the Department's Acting Inspector General to review the issues that had arisen regarding Fast and Furious.  *See* Cole May 15 Letter at 10.  On several occasions during the spring and summer of 2011, Department officials made public statements reflecting their increasing concern about Fast and Furious.  *See* *id.* at 10-11.  In October 2011, the Attorney General acknowledged the "fundamentally flawed" nature of the tactics employed in Operation Fast and Furious.  *See* Letter from Attorney General Holder to Chairman Issa, *et al.*, 2 (Oct. 7, 2011) (ECF No. 13-3).  And on December 2, 2011, the Department provided the Committee with a written explanation of what had occurred, along with more than 1,300 pages documenting how the February 4 letter had been drafted.  *See* Cole Dec. 2

Letter; *see also* Burton Decl. ¶¶ 19-21; IG Report at 389-90; Letter from Deputy Attorney

General Cole to Chairman Issa 1 (June 19, 2012) ("Cole June 19 Letter") (ECF No. 13-6).

The Report of the IG's independent and thorough investigation was consistent with what

the December 2011 letter and the documents related to the drafting of the February 4 letter had

conveyed to Congress:  that the inaccurate information in the February 4 letter was simply a

product of a flawed fact-gathering and drafting process.  *See* IG Report at 395-414.  Although

critical of the Department, the IG Report also did not conclude that there was an intent to

obstruct by the Department during the time period between the February 4 letter and the

December 2, 2011 formal withdrawal, including with respect to the Department's May 2, 2011

letter, or the timing of its December 2, 2011 formal withdrawal of the February 4 letter.  *See id.*

at 414-17.  Chairman Issa praised the IG report as "extremely comprehensive, strong and

independent."  *Hearing Before the H. Comm. on Oversight and Gov't Reform*, 112th Cong.

(2012) (ECF No. 13-8 at 1) (statement of Chairman Issa).

> **B.**    **The Department's Efforts to Accommodate the Committee's Legitimate Oversight Needs**

It was not until after the exchange of letters between the Department and Senator

Grassley in January and February 2011 that the House Committee formally began its

investigation into Operation Fast and Furious.  The Committee sent its first letter on the matter to

the Department on March 16, 2011, *see* Letter from Chairman Issa to ATF Acting Director

Melson (Mar. 16, 2011) (ECF No. 61-5), and issued its first subpoena, addressed to Acting ATF

Director Kenneth Melson, on March 31, 2011.

The Melson subpoena sought documents regarding the genesis of Operation Fast and

Furious and related operations, the authorization of and concerns about so-called "gunwalking,"

whether the shooting of United States Customs and Border Protection Agent Brian Terry was

related to "gunwalking," and communications with a cooperating gun dealer.  *See* Comm. on Oversight & Gov't Reform, Subpoena (Mar. 31, 2011) (ECF No. 61-6).  The Department quickly initiated communication with the Committee regarding the subpoena, including discussion of significant confidentiality concerns raised by the subpoena, which sought a large amount of information about ongoing criminal investigations and other sensitive law enforcement matters.  *See* Letter from Assistant Attorney General Weich to Chairman Issa 1 (Apr. 1, 2011) (attached to Def.'s Mot. for Summ. J. as Ex. E); Weich Apr. 8 Letter at 1-2.  The Department ultimately produced or made available *in camera*, over six months, 3,245 pages of material in response to this subpoena.  *See* Weich Oct. 11 Letter at 1.  In so doing, the Department made an extraordinary exception to its longstanding policy regarding the confidentiality of records relating to pending law enforcement matters.  *See id.* at 1-2; Burton Decl. ¶¶ 4-5, 14-15.

On October 11, 2011, the Committee issued a second subpoena, directed to the Attorney General.  The October subpoena, portions of which are the subject of this suit, contained twenty-two broad requests for documents and reflected a shift in the focus of the Committee's investigation to include the Department's response to Congress.  *See* Comm. on Oversight & Gov't Reform, Subpoena at 2-5 (Oct. 11, 2011) (ECF No. 61-18).  The October subpoena sought, among many other things, all communications regarding Operation Fast and Furious to or from 16 senior Department officials, *see id.* at 2 (¶ 1); documents relating to "any instances prior to February 4, 2011" where ATF failed to interdict weapons, *see id.* at 2-3 (¶¶ 4-5); and all Reports of Investigation ("ROIs"), *see id.* at 3 (¶ 8).  *See also* Letter from Chairman Issa to Attorney General Holder 1-2, 5 (Oct. 9, 2011) (ECF No. 13-2).

Shortly after the Department received the subpoena, it engaged in extensive telephone discussions with Committee staff regarding the Department's response.  *See* Burton Decl. ¶¶ 11-

12.  The Department made clear during those discussions, as it did both before and after, that the Committee's inquiries implicated sensitive institutional interests of the Executive Branch.  *See id.* ¶¶ 4, 11-12, 21; Weich Oct. 11 Letter at 2 (letter sent before receipt of October subpoena); Cole Dec. 2 Letter at 1; Cole May 15 Letter at 5-8.  Nevertheless, the Department proceeded with a good-faith response consistent with those interests over the ensuing months, *see* Burton Decl. ¶¶ 8, 14-23, ultimately providing the Committee with more than 5,000 pages of documents responsive to the October subpoena, *see* Cole May 15 Letter at 4.

### C.   The Focus of the Committee's Demands in Advance of the Contempt Proceedings

Although the October 11, 2011 subpoena contained twenty-two separate and broad requests for documents, as well as a demand for a privilege log, that broad universe was not the material at issue as the Committee moved toward a contempt vote in June 2012.  Rather – consistent with the negotiation and accommodation process that has long governed the Executive Branch's response to congressional inquiries – the Department and the Committee had negotiated about the response to the subpoena since its issuance, and by June 2012, the Committee had expressly taken a number of topics off the table.  Thus, what remained in dispute as the date for a contempt vote neared was a narrower category of documents concerning one aspect of the Committee's investigation:  the Department's alleged "obstruction."

Specifically, on May 3, 2012, Chairman Issa explained that only three questions remained in the Committee's investigation: (1) "How did the Justice Department finally come to the conclusion that Operation Fast and Furious was 'fundamentally flawed'?"; (2) "What senior officials at the Department of Justice were told about or approved the controversial gunwalking tactics that were at the core of the operation's strategy?"; and (3) "How did inter-agency cooperation in a nationally designated Strike Force fail so miserably in Operation Fast and

Furious?"  Mem. from Chairman Issa to Members of the Comm. on Oversight and Gov't Reform 7-10 (May 3, 2012) ("Issa May 3 Mem."), *available at* http://oversight.house.gov/wp-content/uploads/2012/05/Update-on-Fast-and-Furious-with-attachment-FINAL.pdf.  Chairman Issa referred to these as the "three categories of documents necessary for Congress to complete its investigation."  Letter from Chairman Issa to Attorney General Holder 1 (June 13, 2012) ("Issa June 13 Letter") (attached to Def.'s Mot. for Summ. J. as Ex. F).

After further discussions, House Leadership indicated that the Committee's demands had been narrowed further.  In a May 18, 2012 letter to the Attorney General, House Leadership stated that only "two key questions" remain unanswered:  "first, who on [the Attorney General's] leadership team was informed of the reckless tactics used in Fast & Furious prior to Agent Terry's murder; and, second, did your leadership team mislead or misinform Congress in response to a Congressional subpoena?"  Letter from John Boehner, *et al.*, to Attorney General Holder 1 (May 18, 2012) ("Boehner May 18 Letter") (attached to Def.'s Mot. for Summ. J. as Ex. G).

More talks ensued, and soon the Committee agreed to "effectively eliminate[] the dispute over information gathered during the criminal investigation of Operation Fast and Furious, prior to the announcement of indictments."  Issa June 13 Letter at 1.  It did so because it recognized and wanted "to alleviate the Department's concerns about preserving the integrity of the ongoing prosecutions."  H.R. REP. NO. 112-546, at 38-39 (2012).  As of June 13, 2012, then, the Committee had narrowed its demands to include only "documents from after February 4, 2011, related to the Department's response to Congress and whistleblower allegations."  Issa June 13 Letter at 1.  The Committee made clear that these documents concerning the Department's

response to Congress were the only documents "the Justice Department needed to produce to avoid contempt." *Id*.

The next day, the Attorney General proposed an accommodation to "fully address the remaining concerns identified" by House leadership.  Letter from Attorney General Holder to Chairman Issa 2 (June 14, 2012) (ECF No. 13-4).  Specifically, the Department proposed to provide the Committee with "a briefing, based on documents that the Committee could retain, explaining how the Department's understanding of the facts of Fast and Furious evolved during the post-February 4 period, and the process that led to the withdrawal of the February 4 letter." *Id*.

On June 19, 2012, the eve of the Committee's scheduled contempt vote, the Attorney General personally met with Chairman Issa and others and reiterated his offer of a briefing and a production of documents in an effort to reach an accommodation and avoid a contempt vote. Cole June 19 Letter at 1.  His offer was rejected.  *See id*.

**D.     The Assertion of Executive Privilege and the Contempt Vote**

Despite the Department's willingness to continue to try to reach an accommodation, it became clear that the Committee was intent on proceeding with the contempt vote it had scheduled for the following morning.  *See id*. at 1-2.  On June 19, the Attorney General sent a letter to the President in which he recommended that the President assert Executive Privilege. *See* Letter from Attorney General Holder to the President (June 19, 2012) ("Holder June 19 Letter") (attached to Def.'s Mot. for Summ. J. as Ex. H).  Specifically, the Attorney General requested that the President assert Executive Privilege over documents post-dating February 4, 2011, that were responsive to the October subpoena and were "created . . . in the course of the Department's deliberative process concerning how to respond to congressional and related media

inquiries" about Operation Fast and Furious.  *Id*.  As the Attorney General explained, consistent with the longstanding position of the Executive Branch, compelled release of such documents "would have significant, damaging consequences" by "inhibit[ing] the candor of such Executive Branch deliberations in the future and significantly impair[ing] the Executive Branch's ability to respond independently and effectively to congressional oversight."  *Id.* at 2.  In response to the Attorney General's request, the President asserted Executive Privilege, and the Department so informed the Committee on the morning of June 20, 2012.  *See* Letter from Deputy Attorney General Cole to Chairman Issa 1 (June 20, 2012) (ECF No. 17-3).

Notwithstanding the assertion of Executive Privilege, the Committee that day voted 23-17 to hold the Attorney General in contempt.  Thereafter, on June 22, 2012, the Committee issued its contempt report to the full House, in which it expressly described the narrowing of its demands that had occurred during the preceding weeks.  *See* H.R. REP. NO. 112-546, at 38-40. The Committee made clear that it recommended contempt based only on the Attorney General's purported "fail[ure] to turn over lawfully subpoenaed documents explaining the Department's role in withdrawing the false letter it sent to Congress."  *Id.* at 40.

On June 28, 2012, the House voted, 255-67, to hold the Attorney General in contempt.

### E.     Department Reforms Addressing Operation Fast and Furious

At the same time that the Department was working to accommodate the congressional investigation in 2011 and 2012, it was also taking steps to address the issues implicated by Operation Fast and Furious.  As discussed above, the Attorney General referred the matter to the Department's IG in February 2011, and in September 2012, the IG produced an exhaustive report concerning both the underlying operations and the Department's response to congressional

inquiries about the operations.  When the IG released its report to Congress and the public, the Department provided Congress with over 300 pages of documents referred to in the report.

However, even before the IG completed his investigation and report, in light of what had come to light about Fast and Furious and related operations, the Department instituted a number of reforms.  For example, the Attorney General instructed the Deputy Attorney General to "issue a directive to the field making clear" that the inappropriate tactics employed in Operation Fast and Furious "should not be used again."  Cole May 15 Letter at 1.  In November 2011, ATF issued a memorandum clarifying its firearms transfer policy.  *See* Letter from Deputy Attorney General Cole to Chairman Issa *et al*. 2-3 (Jan. 27, 2012) (attached to Def.'s Mot. for Summ. J. as Ex. I).  In the same month, ATF revised its policies governing the use of confidential informants, and strengthened oversight over undercover operations.  *See id.* at 3-4.

Also prior to the completion of the IG investigation, the Department took steps to address the manner in which its components handle congressional requests for information.  Specifically, the Deputy Attorney General in January 2012 issued a memorandum requiring components to, among other things, assign to senior managers the ultimate responsibility for fact-checking and vetting responses to Congress; solicit information from employees with detailed personal knowledge of the relevant issues; and consult relevant records if available.  *See id.* at 7-8.  The Department also took personnel action with respect to officials who were involved in the Operation and the congressional response.  *See* Statement by Attorney General Holder (Sept. 19, 2012), *available at* http://www.justice.gov/opa/pr/2012/September/12-ag-1134.html.

13

**ARGUMENT**

I.     **The Long-Recognized Executive Privilege Under the Constitution Is Founded Upon the Separation of Powers and Ensures the Independent Functioning of the Executive Branch**

The historical analysis that permeates the Committee's brief is one-sided, incomplete, and unsupported by the caselaw, resulting in a cramped and novel notion of the constitutionally based Executive Privilege.  Defendant does not dispute that, flowing from its constitutional authority to legislate, Congress may gather information and conduct investigations as necessary to further legitimate legislative ends, including through investigations into the activities of the Executive Branch.  *See* Pl.'s Mem. at 5-10.  However, missing from the Committee's analysis is the equally vital role that the Executive Branch plays in our constitutional system, and the resulting consequences for congressional demands for information.  As courts have long recognized, the Executive Branch's role in enforcing the law requires that some materials remain confidential so that the Executive's proper functioning under the Constitution is preserved and protected.  In select cases, the President preserves this fundamental constitutional balance by asserting Executive Privilege, a constitutionally-based privilege that is "a necessary corollary of the executive function vested in the President by Article II of the Constitution."  Congressional Requests for Confidential Executive Branch Info., 13 Op. O.L.C. 153, 154 (1989); *see also United States v. Nixon*, 418 U.S. 683, 712-13 (1974).

"[N]umerous Presidents from the earliest days of our nation" have asserted Executive Privilege to protect certain confidential Executive Branch information.  13 Op. O.L.C. at 154. As early as 1792, President Washington, in response to a congressional inquiry into a campaign by General St. Clair, expressed the position that records could be withheld from Congress in the public interest.  *See Nixon v. Sirica*, 487 F.2d 700, 733-34 (D.C. Cir. 1973) (per curiam)

(MacKinnon, J., concurring in part and dissenting in part).  In a separate matter just two years later, President Washington responded to a Senate request by withholding "those particulars which, in [his] judgment, for public considerations, ought not to be communicated."  History of Refusals by Executive Branch Officials to Provide Info. Demanded by Congress: Part I – Presidential Invocations of Exec. Privilege Vis-À-Vis Congress, 6 Op. O.L.C. 751, 753 (1982).

Consistent with historical practice from President Washington forward, administrations have long based their withholding of certain information from Congress on the ground that disclosure would interfere with the constitutional functioning of the Executive Branch.  Such withholdings include:

- President Jackson's refusal in 1837 to comply with a Senate investigation into the "integrity and efficiency of the executive departments," explaining that he would "repel all such attempts as an invasion of the principles of justice, as well as of the Constitution . . . ."  *Sirica*, 487 F.2d at 734 (MacKinnon, J., concurring in part and dissenting in part).

- President Tyler's refusal in 1843 to provide to the House certain information regarding an Executive investigation into allegations of fraud against the Cherokee Nation, explaining that "it is well settled, and the doctrine has been fully recognized in this country, that . . . the head of a department cannot be compelled to produce any papers, or to disclose any transactions relating to the executive functions of the Government which he declares are confidential, or such as the public interest requires should not be divulged . . . ."  John Tyler, Special Message (January 31, 1843), *available at* http://www.presidency.ucsb.edu/ws/?pid=67367.

- President Cleveland's "confrontation" with Congress over a request for the papers and reasons related to the dismissals of numerous officeholders by the incoming administration, in which President Cleveland asserted that the Senate was assuming "the right . . . to sit in judgment upon the exercise of my exclusive discretion and Executive function, for which I am solely responsible to the people."  *Sirica*, 487 F.2d at 735 (MacKinnon, J., concurring in part and dissenting in part).

- President Theodore Roosevelt's instruction, in 1909, that the Attorney General refuse to state reasons for his nonaction with respect to a merger involving the United States Steel Corporation.  *Id.* at 735-36.

- President Eisenhower's restriction in 1954 on the testimony of Executive Branch officials or the production of documents related to the Army-McCarthy hearings.  He explained that "it is essential to efficient and effective administration that employees of the

15

> Executive Branch be in a position to be completely candid in advising with each other on official matters" in order "to maintain the proper separation of powers between the Executive and Legislative Branches."  Dwight D. Eisenhower, Letter to the Secretary of Defense Directing Him To Withhold Certain Information from the Senate Committee on Government Operations (May 17, 1954), *available at* http://www.presidency.ucsb.edu/ws/?pid=9890.

"In each of these instances," and numerous others not listed, "the Congress sought information from the President or the executive branch in order to enable it to legislate upon subjects within its constitutional power, and in each instance the request was refused by the President, who determined that to furnish the information would be an unconstitutional intrusion into the functioning of the executive branch and contrary to the public interest."  *Sirica*, 487 F.2d at 737 (MacKinnon, J., concurring in part and dissenting in part).  Indeed, through political history leading up to Watergate, "[w]hen made, the Executive assertion of privilege ha[d] always prevailed."  *Id*. at 778 (Wilkey, J., dissenting).

Watergate, though posing a unique set of challenges, led to the reaffirmation of these same principles:  the congressional inquiries into Watergate-related activities were clearly legitimate, but the courts nonetheless recognized the importance of Executive Branch confidentiality where disclosure would interfere with the functioning of the Executive Branch.  Thus, in the era following Watergate and the rulings in the *Nixon* line of cases, *see infra*, presidential administrations of both parties have continued the longstanding practice of safeguarding Executive interests vital to the separation of powers, including in situations where such safeguarding counsels against disclosure to Congress.  Indeed, in the last four decades, Executive Privilege has been asserted over varying types of information, including congressional demands for:

- Presidential communications, *see, e.g.*, Assertion of Exec. Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff, 2008 WL 5458939 (U.S.A.G. July 15, 2008);

- Deliberations of Executive officials, including lower-level officials engaged in execution of the laws of the United States, *see id.*; Assertion of Exec. Privilege over Commc'ns Regarding EPA's Ozone Air Quality Standards & Cal.'s Greenhouse Gas Waiver Request, 2008 WL 5506397, *2 (U.S.A.G. June 19, 2008); The President, 43 Op. Att'y Gen. 327, 329-30 (1981);

- Records concerning the Executive's response to congressional investigations and related media inquiries, *see* Assertion of Exec. Privilege Concerning the Dismissal and Replacement of U.S. Attorneys, 2007 WL 5038036, *1 (U.S.A.G. June 27, 2007); Assertion of Exec. Privilege Regarding White House Counsel's Office Docs., 1996 WL 34386607 (U.S.A.G. May 23, 1996);

- Information relating to law enforcement efforts by the Executive Branch (including clemency determinations and open law enforcement investigations), *see, e.g.*, 2008 WL 5458939; Letter for the President from John Ashcroft, Attorney General, Re: Assertion of Executive Privilege with Respect to Prosecutorial Documents at 2, 25 O.L.C. 1 (Dec. 10, 2001), *available at* http://www.justice.gov/olc/2001/executive-privilege-2001-12-10.pdf; Assertion of Exec. Privilege with Respect to Clemency Decision, 1999 WL 33490208 (U.S.A.G. Sept. 16, 1999); Assertion of Exec. Privilege in Response to Congressional Demands for Law Enforcement Files, 6 Op. O.L.C. 31 (1982); and

- Information concerning national security and foreign affairs, *see, e.g.*, 13 Op. O.L.C. at 154; 43 Op. Att'y Gen. 327; *see also United States v. AT&T Co.* ("*AT&T I*"), 551 F.2d 384, 387-88, 392 (D.C. Cir. 1976).

These disputes varied in subject matter, but the Executive Privilege assertions were all based on the same fundamental proposition: that disclosure of confidential Executive Branch information to Congress would interfere with the functioning of the Executive Branch and would therefore be contrary to the public interest. *See, e.g.*, *Sirica*, 487 F.2d at 737 (MacKinnon, J., concurring in part and dissenting in part).

The longstanding concern about congressional intrusion into the Executive's independent functioning has been recognized by past administrations as particularly acute when a committee of Congress demands Executive Branch records generated in the course of responding to a congressional investigation and related media inquiries. In 1996, for example, Attorney General Janet Reno explained that Executive Privilege applies to documents prepared in response to an

ongoing congressional investigation.  *See* 1996 WL 34386607.  Attorney General Reno noted

that "it is clear that congressional needs for information in that context will weigh substantially

less in the constitutional balancing than a specific need in connection with the consideration of

legislation." *Id.* at *2.  In 2007, Acting Attorney General Paul Clement explained in connection

with "possible responses to congressional and media inquiries about the dismissal[]" of United

States Attorneys, *see* 2007 WL 5038036 at *1, that compelled disclosure of such material to

Congress would "'significantly impair[]'" the ability of the Executive Branch to respond to

congressional inquiries.  *See id.* (quoting Attorney General Reno).

        In short, an assertion of Executive Privilege is not – as the Committee's account claims –

a sign that the Executive is trying to "obstruct" or "thwart" the Committee's investigation.

Rather, the Executive Privilege invocation at issue in this case is part of an established history of

Executive Privilege invocations deemed necessary by the President, over a range of confidential

materials, during disputes of the sort that have existed for more than two centuries between the

Executive and Legislative Branches, where – as here – compelled disclosure of information

would interfere with the Executive's constitutional function.

## II.     Executive Privilege Is Not Limited to Presidential Communications, and Was Validly Asserted by the President in This Matter

        The Committee's core legal argument is that Executive Privilege exists as a constitutional

matter only to protect presidential communications, *see* Pl.'s Mem. at 19-20, that recognition by

Congress of any other privilege assertion is a matter of grace, and that the privilege is abrogated

whenever Congress demands information, *see id.* at 32-33.[3]  The Committee's cramped

---

[3] Even with respect to the presidential communications component of Executive Privilege, the Committee provides an incomplete account.  Discussing the privilege in the context of presidential communications, the Committee states that the Supreme Court "rejected the proposed application" in two cases.  Pl.'s Mem. at 19.  However, in *United States v. Nixon* the

conception of Executive Privilege, if accepted, would fundamentally interfere with the

functioning of the Executive Branch and upend the essential separation and balance of power

between the Branches.  Whatever the specific basis for a President's assertion of Executive

Privilege in response to a congressional subpoena – be it the need to protect the confidentiality of

presidential communications or Executive deliberations; to protect law enforcement operations,

foreign affairs, or national security; to protect the process by which the Executive responds to a

congressional subpoena; or a combination of such interests – the President's assertion of

Executive Privilege in response to a congressional demand is consistently grounded in the

"executive function vested in the President by Article II of the Constitution."[4]  Holder June 19

Letter at 2; *see also Nixon*, 418 U.S. at 711 (describing the interest in "confidentiality" relating to

the effective discharge of  President's powers as "constitutionally based"); *Black v. Sheraton

Corp. of Am.*, 564 F.2d 531, 541 (D.C. Cir. 1977) (recognizing that a claim of Executive

Privilege concerning "diplomatic or military secrets" or "intra-governmental documents

reflecting policy deliberations" "may have constitutional underpinnings"); *Soucie v. David*, 448

F.2d 1067, 1072 n.9 (D.C. Cir. 1971) ("The doctrine of executive privilege is to some degree

inherent in the constitutional requirement of separation of powers.").

---

Supreme Court did not reject the "application" of the privilege, but rather held that the privilege
applied but was overcome by the needs of the criminal justice system in a specific pending case.
*See* 418 U.S. 683 (1974).  Moreover, the D.C. Circuit *upheld* the application of the privilege to
withhold information when a congressional committee sought information generally relating to
"'the extent of malfeasance in the executive branch'" during Watergate.  *Senate Select Comm. on
Pres. Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974).

[4] Indeed, as opposed to the assertion of common law evidentiary privileges by the Executive,
which happens frequently by lower-level Executive Branch officials in the context of litigation,
an assertion of Executive Privilege is made by the President himself, demonstrating the
constitutional dimension of the Privilege and ensuring public awareness and political
accountability for its assertion.

A ruling to the contrary would place the Executive Branch at the mercy of Congress in a context in which the ability of each political Branch to negotiate with the other, and the corresponding benefit to the constitutional design, is directly at stake.  The Committee ignores this context, and the implications for the separation of powers, by labeling the assertion of Executive Privilege here as nothing more than an attempted assertion of the common law "deliberative process" privilege.  In so doing, the Committee conflates the President's assertion of the constitutionally-based Executive Privilege with the justifications for its assertion in a particular case.  There is only one Executive Privilege, grounded in the Constitution, with at least two underlying justifications in this context.

First, the Executive Branch's deliberative process with respect to its engagement with Congress is a core part of the constitutional scheme, and one that requires Executive Branch independence and confidentiality.  In the specific context of congressional investigation, the process of preparing the Executive Branch's response to a request for information is inherently deliberative, and necessarily entails consideration of how to balance Congress' desire for information against the constitutional prerogatives of the Executive Branch.  "Compelled disclosure of such material, regardless of whether a given document contains deliberative content, would raise 'significant separation of powers concerns,' by 'significantly impair[ing]' the Executive Branch's ability to respond independently and effectively to matters under congressional review."  Holder June 19 Letter at 3; *see also*, *e.g.*, 2007 WL 5038036 at *1.

Second, when Congress subpoenas records from the Executive Branch, the often adversarial investigatory context in which such records are sought mirrors the litigation context, in which parties are assured confidentiality in the material that they generate and assemble in anticipation of litigation.  Just as confidentiality over attorney work product is necessary to

20

preserve the integrity of the Judicial or administrative process, *see Hickman v. Taylor*, 329 U.S. 510 (1947), confidentiality over the materials related to the Executive's response to Congress – its congressional response work product – is necessary to preserve the integrity of the negotiation and accommodation process and the separation of powers.  *See* Holder June 19 Letter at 4.

Executive Privilege is a qualified privilege that may be overcome by an appropriate showing of sufficient need.  Thus, Executive Privilege preserves, rather than disrupts, the separation of powers and the process of negotiation and accommodation.  Were Congress to have absolute discretion whether to accept a claim of Executive Privilege beyond presidential communications – the position that the Committee takes here – the negotiation and accommodation process would become entirely one-sided, disrupting the separation and balance of powers and enabling Congress to insert itself at will into the internal affairs of a co-equal Branch.  *See AT&T II*, 567 F.2d at 129, 130.

A.   **The Assertion of Executive Privilege Here Was Properly Based on the Need to Protect Documents Created in the Course of the Executive's Deliberative Process of Responding to a Congressional Investigation and Related Media Inquiries**

In the litigation context, there has been a "longstanding judicial recognition of Executive privilege" over Executive deliberative process, where courts have "responded to Executive pleas to protect from the light of litigation 'intra-governmental documents reflecting . . . deliberations comprising part of a process by which governmental decisions and policies are formulated,'" in order to protect "the candor of Executive aides and functionaries."  *Sirica*, 487 F.2d at 713 (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)); *see also Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004) ("[S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated."); *Dep't of the*

21

*Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8-9 (2001) (internal citations and quotation marks omitted) (noting that the "object" of the common law deliberative process privilege is to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government").

For most of this Nation's history, the question whether deliberative process – or any other justification – could support a constitutionally-based Executive Privilege assertion against another Branch was not the subject of judicial decision.  Rather, where the issue arose – in connection with congressional requests for information from the Executive – it was a political matter for resolution between the Branches.  It took Watergate to prompt the Supreme Court's seminal decision on the constitutional dimension of Executive Privilege, *Nixon*, 418 U.S. 683, where the information was sought through a formal request pursuant to established judicial process in a pending criminal case.  In *Nixon*, the Supreme Court recognized the constitutional basis for one aspect of Executive Privilege – the presidential communications component – in the context of President Nixon's response to a criminal subpoena.  *See id.*  Contrary to the Committee's argument, however, *Nixon* did not limit the constitutionally-based Executive Privilege to the context of presidential communications; that was simply the aspect of Executive Privilege before the Court in *Nixon.  See AT&T I*, 551 F.2d at 392 (referring to the presidential communications component of Executive Privilege as "another executive privilege").  Notably, the Court's explanation of the constitutional foundation of Executive Privilege in *Nixon* was based on the same principles of effective Executive functioning and separation of powers that have historically animated assertions of Executive Privilege over other types of information – such as the documents concerning the Executive's response to Congress at issue in this case.

In *Nixon*, the Court emphasized the "valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties," noting that "the importance of this confidentiality is too plain to require further discussion":

> Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. Whatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Art. II powers, the privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties.

418 U.S. at 705; *see Ass'n of Am. Physicians and Surgeons Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("The ability to discuss matters confidentially is surely an important condition to the exercise of executive power."); *Sirica*, 487 F.2d at 713 ("[T]he candor of Executive aides and functionaries would be impaired if they were persistently worried that their advice and deliberations were later to be made public.").

The Court in *Nixon* then proceeded to evaluate these general principles about the need for Executive confidentiality as they related to the particular type of records sought in that case – presidential communications – and explained that "[t]he privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." 418 U.S. at 708. Although the Court noted that there is no "explicit reference to a privilege of confidentiality" in the Constitution, the Court nevertheless recognized that the privilege "is constitutionally based" to the extent there is an interest that "relates to the effective discharge of a President's powers." *Id*. at 711.

The concerns expressed in *Nixon* about the confidentiality of Executive deliberations, rooted in the separation of powers, have equal application in the present case, where the President has asserted Executive Privilege to protect confidential Executive Branch information

that was generated in response to a congressional subpoena, placing the separation of powers between the political Branches – and the independence of those Branches – at the heart of the dispute.[5]  "[D]isclosure to Congress could . . . deter the candor of future Executive Branch deliberations, because officials at all levels would know that they could someday be called by Congress to account for the tentative policy judgments which they had earlier advanced in the councils of the Executive Branch."  43 Op. Att'y Gen. at 330.  And unlike criminal prosecutions implicating Executive Branch documents, "congressional requests for executive branch deliberative information are anything but infrequent," 13 Op. O.L.C. at 156, and they often sweep quite broadly.  *See also In re Sealed Case*, 121 F.3d 729, 753 (D.C. Cir. 1997) (recognizing that the unique "constitutional considerations" in the "congressional-executive context" render limitations on Executive Privilege in the Judicial context inapposite); *Senate Select*, 498 F.2d at 732 ("[L]egislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events. . . .  In contrast, the responsibility of the grand jury turns entirely on its ability to determine whether there is probable cause to believe that certain named individuals did or did not commit specific crimes.").[6]

---

[5] This case illustrates the overly rigid dichotomy the House seeks to draw between direct presidential communications on the one hand and agency deliberations on the other.  Issues that ultimately require presidential attention often originate within an Executive Branch department or agency before reaching the White House, and the options for deciding the issue are first shaped by agency officials.  Ensuring that  agency deliberations remain candid and robust is therefore important to the functioning of the Executive and the quality of presidential decision-making even when direct presidential communications are not at issue.

[6] In *In re Sealed Case*, 121 F.3d 729, the D.C. Circuit engaged in a lengthy comparison of the differences between the constitutionally-based presidential communications component of Executive Privilege and the common-law form of deliberative process privilege, but had no occasion to address whether the constitutionally-based Executive Privilege could be invoked by the Executive to protect its deliberative process and work product against congressional incursion.  Indeed, the D.C. Circuit went to great lengths to note that its opinion "should not be

Moreover, when these concerns give rise to a presidential assertion of the constitutional Executive Privilege against Congress (as opposed to an agency invocation of the common-law privilege against individuals under FOIA or in civil litigation), that assertion does not merely implicate a generalized need for confidentiality, but relates directly to the Executive's independence from the other political Branch and its relationship with Congress in a process of negotiation and accommodation that is itself derived from the Constitution.  *See AT&T I*, 551 F.2d at 394; *see also AT&T II*, 567 F.2d at 127.

Indeed, the assumption of power contemplated by the Committee in this case (*i.e.*, the unfettered power to peer into and abrogate all confidentiality of Executive Branch deliberations about how the Executive Branch will respond to the Committee itself) is directly contrary to the separation of powers, which protects against the aggregation of powers in any particular Branch of government by "giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others."  THE FEDERALIST NO. 51 (James Madison); *see also Mistretta v. United States*, 488 U.S. 361, 382 (1989) ("[W]e have not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch.").

The threat to the proper functioning of the Executive Branch and the separation of powers that would be posed by unfettered congressional access to Executive deliberations about the process by which it communicates with a coordinate Branch of government is demonstrated by

---

read as in any way affecting the scope of the privilege in the congressional-executive context, the arena where conflict over the privilege of confidentiality arises most frequently."  *Id*. at 753.  As this important caveat in *In re Sealed Case* reflects, and for the reasons discussed throughout this brief, the Executive Privilege has a constitutional foundation – one necessary to protect the separation of powers and the proper functioning of the Executive – when asserted against Congress in circumstances such as those presented here.

the types of documents at issue here.  Such documents include deliberations by officials (including senior Department officials) about how to accommodate the asserted congressional interest in the investigation while at the same time safeguarding Executive Branch prerogatives. Among other things, the documents reveal: the thought processes behind decisions about providing witnesses or documents; discussions about how to develop media strategies in response to the investigation; and even negotiations with Members of Congress about means of resolving nomination holds placed on individuals in connection with the Department's response. *See* Colborn Decl. (attached to Def.'s Mot. for Summ. J.) ¶¶ 18-26.  Even purely "factual" information in such documents, such as records of meetings involving particular individuals or time stamps showing when an email was received and read, when taken together, can reveal information about how and when decisions in the Department were made.[7]  *See id.* ¶ 25.

Under the Committee's view, however, the Executive Branch must engage in the constitutionally-rooted process of negotiation and accommodation with Congress without any protection of confidentiality whatsoever for the Executive's deliberations about how to respond (short of communications involving the President or his senior advisors).  Such an unprecedentedly narrow view of Executive Privilege would not only chill Executive deliberations (decreasing the openness and quality of those deliberations), but also would provide Congress overwhelming leverage in any investigation or request for information.  The ability of the Executive Branch to negotiate effectively would be impaired, knowing that

---

[7] Indeed, in the context of the constitutionally-based Executive Privilege (there, the presidential communications component), the D.C. Circuit has explained that, unlike the common-law form of deliberative process privilege, the Executive Privilege "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones."  *In re Sealed Case*, 121 F.3d at 745.  According to the D.C. Circuit, "[t]he release of final and post-decisional materials would also limit the President's ability to communicate his decisions privately, thereby interfering with his ability to exercise control over the executive branch."  *Id.* at 746.

Congress would be privy to all of the Executive's internal deliberations and negotiation strategies, particularly when Congress would presumably claim absolute confidentiality over its own internal deliberative process.  Indeed, there would be no reason for Congress to negotiate at all, and the accommodation process would be drastically undermined.  If the Committee's cramped vision of Executive Privilege were the law, then the "constructive modus vivendi" characterizing the process governing congressional requests for information, which "positively promotes the functioning of our [constitutional] system," would be reduced to a demand by Congress and unthinking acquiescence by the Executive Branch.  *AT&T II*, 567 F.2d at 130.

### B.   The Assertion of Executive Privilege Here was Properly Based on the Executive's Protection of the Process for Responding to a Congressional Subpoena

Not only is the assertion of Executive Privilege grounded in the need to preserve the functioning of the Executive Branch by protecting the confidentiality of the Executive's deliberative process, but it is further supported by the particular context of those deliberations: the Executive's response to an ongoing congressional investigation.  In that context, in which the danger of congressional encroachment on the Executive sphere is particularly acute, Executive Privilege plays an important role in maintaining the independence of the Executive Branch and the proper balance of power between the Branches.

The attorney work product doctrine provides an apt analogy for understanding the importance of the constitutional interests at stake.  Ordinarily, the work of an attorney engaged in litigation, including the potential defense of a client in response to a subpoena, is entitled to confidentiality pursuant to the attorney work product privilege, which applies to work performed "in anticipation of litigation."  FED. R. CIV. P. 26(b)(3)(A); *see also In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998).

27

At its core, the attorney work product doctrine recognizes that confidentiality is necessary to allow for an attorney's independent functioning, which is critical for discharging the attorney's obligations and ensuring the integrity of the Judicial process.  In recognizing this privilege, the Supreme Court explained that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).  Indeed, "[w]ere such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.  An attorney's thoughts, heretofore inviolate, would not be his own." *Id.*  The result for the legal process would be "demoralizing," and "the interests of the clients and the cause of justice would be poorly served," as "[i]nefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice."[8]  *Id.*; *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980) ("The purpose of the privilege . . . is not to protect any interest of the attorney . . . but to protect the adversary trial process itself.").  Consequently, the attorney work product privilege applies broadly to protect documents prepared in anticipation of litigation, regardless of whether the documents are factual or deliberative in nature.  *See, e.g.*, *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 371 (D.C. Cir. 2005).

For analogous reasons, disclosure to Congress of the documents at issue here would interfere with the Executive Branch's ability to perform its constitutional functions, including,

---

[8] The Committee has made clear that the documents it seeks in this suit concern the mental processes of agency decisionmakers regarding their views as to Congress's prior requests for information.  *See* Am. Compl. (ECF No. 35), Attachment A, Subpoena ¶ 1.  Of course, these are the interests that lie at the very core of the protections provided by both the deliberative process and work product privileges at common law.  *See San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n*, 789 F.2d 26, 44 (D.C. Cir. 1986); *Kaiser Aluminum & Chem. Corp. v. United States*, 157 F. Supp. 939, 947 (Ct. Claims 1958); *see also* FED. R. CIV. P. 26(b)(3)(B); *Upjohn Co. v. United States*, 449 U.S. 383 (1981); *FTC v. Boehringer Ingelheim Pharm., Inc*., 286 F.R.D. 101, 107 (D.D.C. 2012).

but not limited to, engaging with Congress regarding its requests for information.  Like attorneys engaged in litigation or an administrative process, attorneys and other agency professionals responsible for responding to congressional requests within the Executive Branch consult with one another on the specifics of that response, including deciding how best to accommodate the congressional interest without sacrificing important Executive interests.  Such consultation may include advice from the Office of Legal Counsel on these issues.  *See* Colborn Decl. ¶¶ 2, 4-8.  Executive Privilege serves to protect against the harm that disclosure of such material would have on the negotiation and accommodation process and on the independence of the Executive Branch as it engages with a coordinate Branch that would insist on the confidentiality of its own internal deliberations and work product.

Like litigation, the investigation of the Executive Branch by Congress often is an adversarial process, because the potential for disagreement is inherent and the prospect of a need for active engagement very real.  *See* 13 Op. O.L.C. at 157 ("Finally, when Congress is investigating, it is by its own account often in an adversarial position to the executive branch and initiating action to override judgments made by the executive branch."); *see also In re Rail Freight Fuel Surcharge Anti-Trust Litigation*, 268 F.R.D. 114, 117 (D.D.C. 2010) (noting that the crux of whether work product attaches is the adversarial nature of the proceeding).  Accordingly, it is vital that (as in the Judicial process) each of the opposing sides be able to operate assured that it will not be required to disclose its confidential preparations to the other side.  Otherwise, each side's critical independence and freedom from intrusion would be undermined by the ability to "probe each other's thoughts and plans."  *Hickman*, 329 U.S. at 511; *Coastal States Gas*, 617 F.2d at 864.  Such a negative impact would be magnified were only *one side* to the process able to probe and access the other side's thoughts and plans.

As the D.C. Circuit has recognized, "[n]egotiation between the two branches should . . . be viewed as a dynamic process affirmatively furthering the constitutional scheme." *AT&T*, 567 F.2d at 130. That process would be undercut if Congress were, as the Committee envisions, given license to employ a two-step strategy in which it demanded information from the Executive Branch about a matter, and then subsequently requested all documents prepared by the Executive Branch in the course of responding to the previous demand for information. A congressional right of access to the Executive's congressional response work product would enable Congress to intimidate or exert coercive influence over the Executive in a context where the Executive's independence is essential, weakening the dynamic accommodation process and thus harming both the separation of powers and the constitutional system that it supports.

### C.    The Documents Covered by the President's Assertion of Executive Privilege Were Properly Withheld

As the Colborn Declaration details, the President's June 2012 claim of Executive Privilege covered documents dated after February 4, 2011 that were responsive to the October 2011 subpoena and were created in the course of the Department's deliberative process concerning the Department's response to congressional and related media inquiries. *See* Colborn Decl. ¶¶ 13, 19; Holder June 19 Letter at 1-2. Accordingly, among the privileged materials are a variety of documents, including ones relating to "the receipt, dissemination, and analysis of congressional inquiries; the drafting of letters, testimony, and other statements to Congress; strategic deliberations on how to engage with Congress; the Department's internal review to discover the facts regarding the events that were the subject of the congressional inquiries; the logistics of the response effort, including document review efforts; and the Department's response to media coverage arising from the Congressional inquiries." Colborn Decl. ¶ 19.

The general categories of documents to which the assertion of privilege applies include:

- Documents reflecting "the receipt, dissemination, and analysis of Congressional inquiries," ranging from the transmission of congressional requests to substantive discussions regarding the content of the congressional requests and how the Department might appropriately act in response.  *Id.* ¶ 20.

- Documents concerning the preparation, review, and revising of letters to Congress, witness testimony, and responses to Questions for the Record.  *See id.* ¶ 21.

- Documents implicating the Department's engagement approach regarding the Committee's various demands for information—that is, how the Department decided to communicate information to Congress and the media, what offers of accommodation to make, and how to weigh various priorities, such as management of internal resources, preservation of Executive Branch institutional interests, and political considerations.  *See id.* ¶ 22.

- Documents generated in the course of the Department's internal review to discover the facts concerning the subject matter of the Committee's inquiries.  *See id.*

- Documents reflecting the logistics of the Department's response, including materials reflecting the process by which the Department assembled personnel to engage in the document collection, review, and production effort, as well as documents reflecting the process of arranging for Department personnel to be made available to Congress for testimony, briefings or interviews.  *See id.* ¶ 23.

- Documents relating to the Department's response to media coverage arising from the Congressional inquiries.  *See id.* ¶ 24.

Such documents are at the heart of the Department's response to a congressional investigation and the related media inquiries, revealing the Department's decisionmaking process throughout the entire investigation.

The assertion of Executive Privilege also encompasses factual material connected with the deliberations about responding to Congress, *see* Holder June 19 Letter at 3, including documents showing meeting times or the time and date that emails were received and read, as well as documents aggregating relevant news articles for agency decisionmakers, *see* Colborn Decl. ¶ 25.  Although such documents do not reflect the core deliberations of Department employees (and presumably are not the documents that the Committee is focused on in its investigation and this suit), turning over such documents on demand would still have a chilling

effect on Executive employees in responding to congressional requests because, taken together, they reveal various facets of the Department's actions taken in responding to Congress, such as which employees were involved in various meetings and the date and time that decisionmakers met to discuss aspects of the congressional response.

Also subject to the assertion of Executive Privilege are Department documents that were not specifically prepared in the course of responding to congressional or related media inquiries, but were prepared to address issues that arose as a result of the Committee's investigation.[9] Such documents may indirectly reveal aspects of the Department's approach for responding to that investigation, such that producing these documents would vitiate the confidentiality interest that the privilege assertion was intended to protect. *See id.* ¶ 26.

For the reasons set forth above, *see supra* Sections II.A-B, such documents are properly protected by the President's Executive Privilege assertion, notwithstanding that they do not involve presidential communications.

## III. LIMITATIONS ON COMMON-LAW AND STATUTORY PRIVILEGES ARE INAPPLICABLE TO THE EXECUTIVE PRIVILEGE ASSERTION HERE

The Committee spends the majority of its summary judgment brief rebutting a straw man, arguing that the common law (or statutory) deliberative process privilege could not be asserted, or was asserted improperly, by the Executive in the present context. *See* Pl.'s Mem. at 19-44. However, this case is not about the common law deliberative process privilege. It is about the constitutionally-based Executive Privilege, which here is grounded in the Executive's need to protect information about its internal deliberative processes in responding to congressional

---

[9] To the extent that a document in this category, although causally related to the overall investigation into Operation Fast and Furious, does not specifically reveal information about the Department's response to Congress, it does not appear that the Committee seeks such documents in this litigation. *See infra* Section IV.

inquiries.[10]  Thus, the Committee's various arguments about rules applicable to common-law and statutory privileges are inapplicable to this dispute.

### A.  The Committee's Reliance on Rules Applicable to Common Law and Statutory Privileges Is Misplaced

As Chief Justice Marshall admonished in 1807, if the President were to "subject[]" information to "certain restrictions, and state[] that in his judgment the public interest required certain parts of it to be kept secret," then "all proper respect would [be] paid to" that decision. *United States v. Burr*, 25 F. Cas. 187, 192 (C.C.Va. 1807) (Marshall, C.J.).  The Committee's notion – that the President's invocation of Executive Privilege should be treated no differently than that of an ordinary individual or litigant – would render this principle a nullity.  Rather, when the President is asserting Executive Privilege against the co-equal political Branch of Government, common law and statutory rules must yield to fundamental separation of powers principles.[11]  *See* Statement of Antonin Scalia, Assistant Attorney General, Hrg. on S. 2170, The

---

[10] Although the President's assertion of Executive Privilege is dispositive here, and thus questions concerning common-law and statutory privileges need not be considered, such privileges could well further protect the documents at issue here from disclosure, in light of the Committee's decision to attempt to enforce its subpoena in a judicial forum.  *See* FED. R. EVID. 501, 1101.

[11] The lack of historical support for the Committee's conception of Executive Privilege is demonstrated by the very Presidents whom the Committee quotes for the supposed proposition that Congress may "peer[] inside" Executive Branch agencies whenever it sees fit.  *See* Pl.'s Mem. at 27-28.  Certainly President Wilson (writing in support of Congress long before he became President) recognized, as Defendant acknowledges here, the ability of Congress to investigate the Executive Branch.  But President Wilson also acknowledged the practical limits on congressional investigations, outside the context of impeachment.  *See* WOODROW WILSON, CONGRESSIONAL GOVERNMENT: A STUDY IN AMERICAN POLITICS 270 (1885).  And President Wilson further recognized that every congressional investigation is supposedly aimed at "malfeasance," which inevitably creates a chilling effect on the Executive.  *See id.* at 278.  Such distrust of an overly deferential approach to Congress was evinced by Presidents Polk and Jackson as well, both of whom refused to comply with a congressional demand for information. *See* Pl.'s Mem. at 28.  Indeed, as the Committee fails to note, the statement of President Polk cited by the Committee was specific to Congress's power of impeachment, and the passage was

Congressional Right to Information Act, at 110 (Oct. 23, 1975) ("The Constitutional basis of Executive privilege means that the President may exercise it without Congressional leave and in spite of Congressional disapproval."); *see also In re Sealed Case*, 121 F.3d at 753.

Certainly the House has important investigative authority in aid of its legislative function. But that does not mean that Congress has the power to treat the Executive's constitutionally-based invocation of Executive Privilege as nothing more than a common law or statutory privilege that can be overridden by unilaterally-imposed congressional exceptions.  As courts have recognized, the separation of powers is preserved not by subjecting an assertion of Executive Privilege to common law or statutory standards, but by giving a presidential assertion of Executive Privilege the "proper respect" that it is due, which is to recognize the Executive Privilege, but also to recognize that it is qualified.  *See Senate Select*, 498 F.2d at 731.

### B.   The President Did Not Waive His Ability to Assert Executive Privilege

In the Committee's view, the President's assertion of Executive Privilege is invalid because the Executive did not, in the span of fourteen days, complete its search for all documents, conclude negotiations with the Committee, produce every responsive page, analyze every privilege that could be asserted, assert all applicable privileges, and submit a privilege log. *See, e.g.*, Pl.'s Mem. at 33-34.  The Committee does not cite a case to support that remarkable, novel and erroneous proposition that would imperil the accommodations process.[12]

---

made in the context of his *refusal* to provide certain information to Congress.  *See* President Polk, Statement to the House of Representatives (Apr. 20, 1846), *available at* http://www.gutenberg.org/files/12463/12463.txt.  President Jackson similarly used Executive Privilege to resist wide ranging investigations into purported government malfeasance.  *See* LOUIS FISHER, THE POLITICS OF EXECUTIVE PRIVILEGE 53, 55 (2004), *available at* http://www.loc.gov/law/help/usconlaw/pdf/fisher_politics_ch_03.pdf.

[12] The Committee cites *Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571, 580-82 (2012), for the proposition that there is a timeliness requirement for the assertion of the common-

As the Supreme Court has recognized, "[e]xecutive privilege is an extraordinary assertion of power 'not to be lightly invoked.'"  *Cheney*, 542 U.S. at 389 (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953)).  "Once executive privilege is asserted, coequal branches of the Government are set on a collision course."  *Id.*  Accordingly, the Court has opposed the requirement that Executive Privilege must be asserted before alternative avenues have been explored, as "[t]hese 'occasion[s] for constitutional confrontation between the two branches' should be avoided whenever possible."  *Id.* at 389-90 (quoting *Nixon*, 418 U.S. at 692).

The Committee's claim that a mandatory and premature assertion deadline (*i.e.*, the subpoena return date unilaterally established by the Committee) is required to protect the negotiation and accommodation process is nonsensical.  *See* Pl.'s Mem. at 35-36.  The accommodation process would be short-circuited, not enhanced, by such an abbreviated period for resolving all issues.  *See* Colborn Decl. ¶ 7.  As a matter of longstanding practice, as in this case, the Executive Branch generally negotiates with Congress past the subpoena return date – largely in an effort to work toward an agreement that accommodates congressional needs, thereby avoiding the constitutional conflict entailed in a presidential assertion of Executive

---

law deliberative process privilege.  Pl.'s Mem. at 36 n.38.  However, the court in *Sikorsky* expressly noted that such a requirement may be "inapplicable or, at least, unwise," for constitutionally-based assertions of Executive Privilege.  106 Fed. Cl. at 582.  Moreover, even if the Federal Rules were applicable to the present subpoena when issued by the Committee, the Committee could prove no prejudice as a result of the timing of the Executive Privilege assertion in the present case, where the Committee filed the present suit and amended the subpoena, all the while knowing that the President had asserted Executive Privilege over the documents at issue. *See In re Sealed Case*, 121 F.3d at 741 ("Nor did the White House have an obligation to formally invoke its privileges in advance of the motion to compel.").  Indeed, Defendant advised the Committee throughout the negotiation and accommodation process of its concerns about the sensitivity of the documents at issue.  *See* Burton Decl. ¶¶ 4-5, 11-12, 21.

Privilege.  *See id.*  It was the Committee's scheduling of a contempt vote – not the timing of the privilege assertion – that short-circuited the accommodation and negotiation process.[13]

Moreover, the Committee's argument ignores the fact that the accommodation process in this case involved discussions about the sensitivity of the very documents at issue well before the privilege was asserted and the contempt vote was held.  *See, e.g.*, Weich Oct. 11 Letter at 2; Burton Decl. ¶¶ 11-12.

### C. The Committee's Allegation of Wrongdoing Does Not Override the Executive Privilege Assertion

Drawing on common law and statutory standards, the Committee claims that the assertion of Executive Privilege should be invalidated "because the Committee is investigating DOJ misconduct."  Pl.'s Mem. at 21-25.  This contention is wrong as a matter of historical practice and judicial precedent.  Indeed, were a constitutionally-based assertion of Executive Privilege invalidated by a congressional claim of "misconduct," then numerous Presidents throughout history, including Washington, Jackson, Roosevelt, and Eisenhower, would have invalidly resisted legislative demands for information related to claimed "misconduct" by the Executive.

In the context of Executive Privilege, the D.C. Circuit already has decided that, contrary to the Committee's argument, a claim of "misconduct" does not invalidate an assertion of Executive Privilege.  In *Senate Select*, the Senate Committee sought documents and tape recordings from the President to resolve conflicts in testimony "relating to 'the extent of malfeasance in the executive branch,'" and argued that such an interest "alone must defeat any

---

[13] Likewise, the Committee's insistence that the Executive Privilege assertion is invalid for lack of providing a privilege log or similar specification of withheld documents by the subpoena return date is equally unsupported (and unwise) in the context of an Executive Privilege assertion.  *See Comm. on Judiciary, House of Reps. v. Miers*, 558 F. Supp. 2d 53, 107 (D.D.C. 2008) ("[I]n the absence of an applicable statute or controlling case law, the Court does not have a ready ground by which to *force* the Executive to [provide a privilege log] strictly in response to a congressional subpoena.").

presumption of privilege that might otherwise prevail." 498 F.2d at 731.  Rejecting that

argument, the D.C. Circuit explained that "the showing required to overcome the presumption

favoring confidentiality turned, not on the nature of the presidential conduct that the subpoenaed

material might reveal, but, instead, on the nature and appropriateness of the function in the

performance of which the material was sought, and the degree to which the material was

necessary to its fulfillment."  *Id.*; *see also id.* ("On the contrary, we think the sufficiency of the

Committee's showing must depend solely on whether the subpoenaed evidence is demonstrably

critical to the responsible fulfillment of the Committee's functions.").  Thus, even in the context

of Watergate, with a pending impeachment proceeding, the D.C. Circuit made clear that a claim

of "wrongdoing" was not dispositive of a claim of Executive Privilege.

No other holding would suffice to preserve the separation of powers.  Congressional

investigations rely, as a matter of course, on allegations of wrongdoing:  "Congress cannot

control the officers of the executive without disgracing them.  Its only whip is investigation,

semi-judicial examination into corners suspected to be dirty."  WOODROW WILSON,

CONGRESSIONAL GOVERNMENT: A STUDY IN AMERICAN POLITICS 278 (1885), *available at*

http://www.gutenberg.org/files/35861/35861-h/35861-h.htm.  Thus, if the Committee's proposed

standard applied in the context of constitutionally-based Executive Privilege assertions by the

President in response to congressional demands for information, there would be few, if any,

instances in which Executive Privilege would apply.[14]

---

[14] The Committee's reliance on the "misconduct" language in *In re Sealed Case*, 121 F.3d 729
(D.C. Cir. 1997), concerning the common-law form of the deliberative process privilege, is
inapplicable to the present context of a dispute between the political Branches, which presents a
constitutional context not at issue in *In re Sealed*.  *See id.* at 753 (noting that its opinion "should
not be read as in any way affecting the scope of the privilege in the congressional-executive
context, the arena where conflict over the privilege of confidentiality arises most frequently").

In the present context, for example, the purported "wrongdoing" – the basis for the Committee's "obstruction" investigation – was inaccurate information provided by the Department in a February 4, 2011 letter to Congress and the amount of time that followed before withdrawing the letter.  But the Department indicated to Congress on several occasions after submitting that letter that it had doubts about the information contained therein, and, after conducting its own review, ultimately withdrew the letter and provided the Committee with more than 1,300 pages of internal documents detailing the preparation of that letter.  In addition, the Attorney General referred the matter to the Department's Inspector General, who issued a voluminous report detailing, *inter alia*, the Department's response to Congress between February 4 and December 2, 2011, without concluding that there was an intent to deceive or obstruct.  *See* IG Report at 395-417.  The Department also produced over 300 pages of documents referred to by that report, *see* Burton Decl. ¶ 22, further confirming the lack of an intent to obstruct.

---

Moreover, even in the context of the common-law deliberative process privilege, the so-called "misconduct" exception applies much more narrowly than the Committee claims:

> Whatever the boundaries of the misconduct exception, they cannot be as expansive as [plaintiff] declares them to be.  The exception runs counter to the purposes that animate the deliberative process privilege, and it thus makes sense to apply it narrowly.  If every hint of marginal misconduct sufficed to erase the privilege, the exception would swallow the rule.  In the rare cases that have actually applied the exception, the "policy discussions" sought to be protected with the deliberative process privilege were so out of bounds that merely discussing them was evidence of a serious breach of the responsibilities of representative government. The very discussion, in other words, was an act of government misconduct, and the deliberative process privilege disappeared.

*ICM Registry, LLC v. U.S. Dep't of Commerce*, 538 F. Supp. 2d 130, 133 (D.D.C. 2008); *see also Nat'l Whistleblower Ctr. v. HHS*, 903 F. Supp. 2d 59, 69 (D.D.C. 2012); *Tax Reform Research Grp. v. IRS*, 419 F. Supp. 415, 426 (D.D.C. 1976).  The Committee cannot contest the legitimacy of Executive Branch "policy discussions" related to negotiating with and responding to congressional and related media inquiries.  Whatever "wrongdoing" the Committee alleges with regard to the February 4, 2011 letter that was subsequently withdrawn, that allegation cannot suffice to eliminate any interest in confidentiality with respect to documents created over the ensuing nine months.

Thus, the alleged "wrongdoing" – if any – represented by the February 4 letter has already been fully investigated by the Committee.  And to the extent the Committee seeks to investigate the reasons for why the Department did not formally withdraw the February 4 letter prior to December 2011 – in the face of an IG report lauded by the Committee Chairman that covered events during that time period – the Committee has not established that such information is "demonstrably critical" to the "responsible fulfillment" of an "appropriate" congressional function.  *Senate Select*, 498 F.2d at 731.  To the contrary, the Committee's continued demands amount to a fishing expedition in an investigation that has long since run its course.

The President invoked Executive Privilege to preserve important confidentiality interests, the preservation of which are vital to the separation of powers, not to "hide" evidence of wrongdoing.  To the extent the Committee now asks this Court to reject those interests in light of the Committee's assertion of need for the documents, the Committee asks this Court to engage in the same balancing of interests that it previously made clear would be inappropriate.  *See infra*.

> **D.      This Court Should Reject the Committee's Attempt to Expand the Scope of the Relief It Seeks Following Denial of Defendant's Motion to Dismiss**

The Committee's Motion for Summary Judgment concludes by arguing that, even assuming the conceptual validity of the President's assertion of Executive Privilege in this case, the assertion is invalid because the privilege has not been applied on a document-by-document basis, and that the "privilege must give way where, as here, 'the public's interest in effective government would be furthered by disclosure.'"  Pl.'s Mem. at 44; *see also id*. at 36-44.  Thus, the Committee now asks this Court to engage in a document-by-document privilege analysis, as well as the very weighing of the interests of the Legislative and Executive Branches that the Court deemed unnecessary in denying Defendant's motion to dismiss.  The Committee's attempt to expand the scope of its requested relief should be rejected.

In its Amended Complaint, the Committee indicated that "[t]he principal legal issue presented here is whether the Attorney General may withhold that limited subset [of documents] on the basis of 'Executive privilege' where . . . the Department's actions do not involve core constitutional functions of the President."  Am. Compl. (ECF No. 35) at 3.  Thus, the Committee sought only a declaration that the privilege asserted by the President "may not validly be asserted," that the Attorney General's objection to production of the documents on the basis of the President's assertion of Executive Privilege is "rejected," that the Attorney General's failure to produce is "without legal justification," and an "order [that] the Attorney General forthwith . . . produce" the documents at issue.  *Id.* ¶ 76; *see id.* at 41-42.

Moreover, in response to the assertion in the Defendant's Motion to Dismiss that "[a] court would have to weigh the relative interests of the political Branches and decide which interest prevails, either by elevating one over the other on a categorical basis or by enmeshing the court in the minutiae of the dispute between the Branches,"  Def.'s Mot. to Dismiss (ECF No. 13-1) at 43, the Committee again emphasized that the issue presented by its lawsuit was narrow. Indeed, the Committee asserted that the issue presented was "quintessentially legal" – "whether the Attorney General may withhold this responsive subset [of documents] that reflect no advice to or communications with [the President]."  Pl.'s Opp. to Def.'s Mot. to Dismiss (ECF No. 17) at 3.

In light of these representations by the Committee, this Court denied the Motion to Dismiss, explaining that "Count I [of the Amended Complaint] simply asks whether the privilege that was asserted . . . – the executive privilege – may be validly asserted by the Attorney General in response to a Congressional subpoena for the particular set of records involved."  Mem. Op. at 36.  Indeed, the Court expressly rejected Defendant's assertion that the Committee "now asks

this Court to enter the fray and decide whether the Committee's remaining interest . . . outweighs the Executive's interest in protecting its internal deliberations regarding how to interact with a coordinate Branch of government." *Id*. at 27 n.7.  Rather, the Court held that the issue presented by the Committee was "a narrow legal question," *i.e.* whether the Executive may properly assert the privilege at issue. *Id*.; *see also id*. at 40-41 (rejecting the applicability of "*AT&T I*" because "the case did not involve a purely legal question about the availability of the privilege").

The Committee now ignores its own Amended Complaint and the Court's ruling on the Department's motion to dismiss, asking the Court to do exactly what Defendant warned this case would involve:  a weighing of the respective institutional interests of the political Branches.  In light of the Court's ruling on Defendant's Motion to Dismiss, and the Committee's own framing of its Amended Complaint, the Committee should not now be permitted to transform its claim into one calling for a document-by-document balancing analysis.

In contrast, guided by this Court's motion-to-dismiss ruling and the Committee's claims in the Amended Complaint, Defendant moves for summary judgment on the "legal question" of the validity of the President's assertion of Executive Privilege – *i.e.*, whether the Privilege can be maintained over documents generated in the course of the Department's response to congressional and related media inquiries involving Operation Fast and Furious, which "do not implicate advice to the President." Mem. Op. at 36.  A more detailed description of the documents that have been withheld pursuant to that Privilege assertion, numbering roughly 15,000 (a figure that accounts for, among other things, duplicate documents based on multiple custodians, multiple emails that together comprise larger email chains, and attachments), *see* Colborn Decl. ¶ 19, is unnecessary to answer that legal issue concerning the scope of the qualified Executive Privilege and is unwarranted here, never mind unrequested by the Amended

41

Complaint.[15]  And the evaluation of the competing interests of the Branches in these materials would draw the Court – impermissibly and unwisely – into an inherently political dispute, as the Department earlier emphasized.

To the extent the Court deems it relevant, however, the Department strongly disputes that the Committee has shown the level of need required to overcome the President's assertion of Executive Privilege.  *See Senate Select*, 498 F.2d at 731.  If the Court allows the Committee to refashion its Amended Complaint to add the question of whether the Committee has shown a sufficient need to overcome Executive Privilege, Defendant respectfully requests the opportunity to submit supplemental briefing on that question.

## IV. ALTHOUGH NO RELIEF IS WARRANTED, THE COURT SHOULD IN NO EVENT GRANT ANY RELIEF BEYOND THE MATERIAL SOUGHT BY THE COMMITTEE AT THE TIME THE HOUSE AUTHORIZED THE LAWSUIT

As explained above, in the weeks leading up to the House votes for contempt and to authorize this suit, the Committee and House Leadership, through a series of letters, "narrow[ed] the scope of documents the Department needed to provide in order to avoid contempt proceedings."  H.R. REP. NO. 112-546, at 4, 38 (2012); *see also, e.g.*, Am. Compl. ¶ 46(ii); Issa May 3 Mem.; Boehner May 18 Letter; Issa June 13 Letter.  Many of the documents the Committee had previously been seeking during the negotiation and accommodation process were determined by the Committee to be "outside the scope of the narrowed request," and production of others, particularly materials relating to law enforcement efforts, could be deferred "to

---

[15] In *Miers*, the district court did not order the Executive Branch to produce a privilege log. Indeed, counsel for the Committee in that case "candidly admitted that there is 'no statute or case law' that dictates that those individuals must produce privilege logs."  *Comm. on Judiciary, House of Reps. v. Miers*, 558 F. Supp. 2d 53, 107 (D.D.C. 2008).  Rather, after rejecting the defendants' immunity claims, the court held that the "Executive should produce a more detailed list and description of the nature and scope of the documents it seeks to withhold on the basis of executive privilege sufficient to enable resolution of any privilege claims."  *Id.*

alleviate the Department's concerns about preserving the integrity of the ongoing prosecutions." H.R. REP. NO. 112-546, at 38-39.  Because these materials had been taken off the table, the President was not asked to, and did not, assert Executive Privilege over them.

The Committee instead reported to the House that it was recommending contempt only for the Attorney General's purported "fail[ure] to turn over lawfully subpoenaed documents explaining the Department's role in withdrawing the false letter it sent to Congress."[16]  *Id.* at 40. Consistent with that narrowing of the Committee's demands, the Complaint says that the Committee seeks to enforce the subpoena "only as to a limited subset of responsive documents, namely those documents relevant to the Department's efforts to obstruct the Committee's investigation."  Am. Compl. at 3; *see also id.* ¶ 7 (defining the Obstruction Component).  But the Complaint elsewhere appears to ask the Court to compel the production of *all* documents responsive to categories 1, 4, 5, and 10 of the subpoena that were "dated or . . . created after February 4, 2011."  *Id.* ¶ 67; *see also* Proposed Order (ECF No. 61-36) at 2.

If read broadly, the Committee's request could sweep in materials having nothing to do with the "Obstruction Component" of the Committee's investigation and that are therefore unrelated to the legal issue the Committee seeks to litigate in this case (*i.e.*, the viability of the claim of Executive Privilege).  *See* H.R. REP. NO. 112-546, at 40.  Such material would include law enforcement documents—documents whose sensitivity the Committee already has acknowledged and expressly taken off the table, and that are related to the closed "Operations" component of the Committee's investigation.  *See id*. at 38-39; *see also* Colborn Decl. ¶ 12.

---

[16] The Committee phrased this ultimate interest in different ways.  *See* H.R. REP. NO. 112-546, at 38 (2012) (seeking documents regarding "How the Department Concluded that Fast and Furious was 'Fundamentally Flawed'"); Issa June 13, 2012 Letter (focusing on "documents from after February 4, 2011, related to the Department's response to Congress and whistleblower allegations").

Also included would be nonpublic information regarding Department deliberations that were determined to be unrelated to the Department's response to Congress concerning Operation Fast and Furious. *See* Colborn Decl. ¶ 12.

There is no basis for reading the Amended Complaint in such a broad fashion or providing such broad relief.[17]  After all, the Committee itself states in the Complaint that it seeks to enforce the subpoena "only as to a limited subset of responsive documents, namely those documents relevant to the Department's efforts to obstruct the Committee's investigation."  Am. Compl. at 3.  Moreover, as past decisions of this Court have made clear, the exercise of jurisdiction over suits like this one is appropriate, if at all, only to the extent they concern "access to *sought-after* information."  *Comm. on Judiciary, U.S. House of Reps. v. Miers*, 558 F. Supp. 2d 53, 96 (D.D.C.) (emphasis added); *see also id*. at 98.  In this case, the Court premised its assumption of jurisdiction in part on its conclusion that there was an "impasse" between the Committee and the Department.  Mem. Op. at 42-43.  Any impasse between the parties could, of course, concern only documents over which they were *actually negotiating*.  Accordingly, the Court should decline to exercise its jurisdiction in any way that would provide the Committee material beyond what it was seeking at the time of the votes for contempt and authorization to sue, especially when the Committee recommended contempt for failure to produce only that smaller set.  *See AT&T I*, 551 F.2d at 394.

---

[17] The scope of the documents over which the Attorney General requested that the President assert Executive Privilege was not a concession that these documents were all relevant to the Committee's purported need for information about the "Obstruction Component" of the investigation.  *See* Colborn Decl. ¶ 13.  Rather, the Attorney General noted in his letter to the President that the documents included materials as to which the Committee had not "articulated *any* particularized interest in or need . . . , let alone a need that would further a legislative function."  Holder June 19 Letter at 7.

44

In short, whatever its ultimate view of the merits, the Court should not compel the Department to produce information that the Committee was not seeking at the time of the vote authorizing this suit, including confidential information unrelated to the "Obstruction Component" of the Committee's investigation.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court deny Plaintiff's Motion for Summary Judgment and grant Defendant's Motion for Summary Judgment.

Dated: January 21, 2014                          Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

KATHLEEN R. HARTNETT
Deputy Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Branch Director

_____/s/ Eric Womack_____
ERIC R. WOMACK
(IL Bar No. 6279517)
GREGORY DWORKOWITZ
(NY Bar Registration No. 4796041)
LUKE M. JONES
(VA Bar No. 75053)
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
Washington, D.C. 20001
Tel: (202) 514-4020
Fax: (202) 616-8470

eric.womack@usdoj.gov

Counsel for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2014, I caused a true and correct copy of the

foregoing Memorandum in Support of Defendant's Motion for Summary Judgment and in

Opposition to Plaintiff's Motion for Summary Judgment and the attached materials to be served

on plaintiff's counsel electronically by means of the Court's ECF system.


 */s/ Eric Womack*
ERIC R. WOMACK