*Comm. on Oversight & Gov't Reform, U.S. House of Reps. v. Holder*, No. 12-1332 (ABJ)

DEFENDANT'S RESPONSE TO
PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE

Ex. E



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General

*Washington, D.C. 20530*

January 5, 2012

The Honorable Darrell E. Issa
Chairman
Committee on Oversight
 and Government Reform
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

      This responds to your subpoena dated October 11, 2011, which requested documents regarding the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) investigation known as Operation Fast and Furious and related matters.  It also responds to your subpoena of March 31, 2011 to then-Acting ATF Director Kenneth Melson requesting documents about Operation Fast and Furious, your letter dated July 11, 2011, requesting communications of twelve named Department employees, and your letter dated September 1, 2011, requesting documents and communications of six current or former employees in the United States Attorney's Office for the District of Arizona.

      We are delivering today to your office 482 pages of material responsive to these requests.[1]  Further, we have identified an additional 80 pages of law-enforcement sensitive material that we are prepared to make available at the Department for review by staff of your Committee, as well as staff of the Senate and House Committees on the Judiciary.[2]

---

[1] These documents bear limited redactions to protect specific details about pending investigations, including text that would identify targets and sensitive techniques or disclose prosecutorial deliberations, plus limited information relating to line employees, such as their cellular phone numbers, and we have withheld entire pages for these same reasons in some instances.  We also have withheld text that implicates individual privacy interests, including information about individuals who have been investigated but not prosecuted.  In addition, we have redacted text from multi-subject documents that is not responsive to your requests.  In some substantial multi-subject documents, such as regular ATF reports, we have not included entire pages that contained text that was either not responsive or contained details of investigations outside of the scope of your inquiry.  In response to requests from Chairman Smith and Chairman Leahy, we will deliver to the House and Senate Committees on the Judiciary the same documents that we deliver to you.

[2] There are limited redactions of text in these pages that would identify law-enforcement sensitive details and techniques as well as information implicating individual privacy interests.

The Honorable Darrell E. Issa
Page 2

      To assist the Committee in its oversight duties, we appreciate the opportunity to provide relevant and necessary context for some of the documents in today's production. The single largest group of materials produced today relates to the Wide Receiver investigation.[3] Previously, on October 31, 2011, we provided the Committee with documents regarding the involvement in Wide Receiver of the Gang Unit of the Justice Department's Criminal Division. Those documents focused largely on the 2009-10 time period and reflected the Gang Unit's entry into the matter after the prosecution had languished in the United States Attorney's Office for the District of Arizona following the completion of the investigation near the end of 2007. After the Gang Unit became involved, individuals who would not otherwise have been prosecuted were charged in indictments returned in May and October 2010 and, to date, six of these defendants have been convicted.

      By way of background, our prior production included a memorandum dated July 13, 2006 from Arizona AUSAs Maldonado and Petermann to then-U.S. Attorney Paul Charlton. That memorandum noted a question "as to the U.S. Attorney's Office's position on the possibility of allowing an indeterminate number of illegal weapons, both components of which (the upper and the lower) were provided to the criminals with ATF's knowledge and/or participation, to be released into the community, and possibly into Mexico, without any further ability by the U.S. Government to control their movement or future use." HOGR WR 003364. Our prior production also included a response from U.S. Attorney Charlton on July 14, 2006 that "I'm meeting with the ATF SAC on Tuesday and I'll discuss it with him then." HOGR WR 003366. Today's production includes a June 20, 2006 U.S. Attorney's Office memorandum reviewing legal authorities on issues related to the Wide Receiver investigation and bearing a handwritten note on the first page reading "Check w/ Agent – Is this still an issue? Any response from PKC following my memo of 7-13-06?" HOGR WR 005231.

      Today's production of Wide Receiver materials generally focuses on the investigative phase of the matter during the time period 2006-07. Today's documents reflect that in March 2006, ATF's Tucson field office received information that an individual was purchasing large quantities of AR-15 lower receivers from a federal firearms licensee. HOGR WR 005200. By June, according to the documents, three suspects had purchased a total of 126 lower receivers in four separate firearms transactions. HOGR WR 005200. One of the suspects told a confidential source that the firearms were being converted into machine guns and that upper receivers were being purchased on the Internet. HOGR WR 005201. ATF believed that the gun-purchasing ring had ties to a "very powerful, aggressive and violent" Mexican drug cartel. HOGR WR 005201. Despite this, it appears from the documents that a decision was made during early 2006 not to charge the case at that time. As one ATF official explained in March 2006, "[w]e have two AUSA[s] assigned to this matter, and the USAO @ Tucson is prepared to issue Search and Arrest Warrants. We already have enough for the 371 [conspiracy] and 922 a6 [false statement in purchase of a firearm] charges, but we want the Title II [sic] manufacturing and distribution

---

[3] Other investigations reflected in today's production include the Hernandez, Medrano and Fast and Furious matters. Our collection and review of documents related to all of these matters is ongoing.

The Honorable Darrell E. Issa
Page 3

pieces also – we want it all." HOGR WR 005176. A June 15, 2006 email from an ATF supervisor in Arizona to other ATF personnel observed that "we believe at this point there is more value in the surveillance, identification of locations, persons, vehicles and asset [sic] rather than making sight arrests." HOGR WR 005189. A June 2006 ATF memorandum noted that a "strategy meeting" had recently been held with the United States Attorney's Office and that the "AUSAs concurred with the current investigative strategy and its progression." HOGR WR 005205.

In August 2006, ATF's Phoenix Field Division prepared a briefing paper on Wide Receiver for "Law Enforcement Command Staff." HOGR WR 005243-005246. The briefing paper explained that the "state of affairs in Mexico" is "basically one of daily violence, including the routine murder of police officers and other government officials." HOGR WR 005243. According to the briefing paper, the "primary and [sic] source of firearms used by [these Mexican cartels] is the United States, specifically Arizona and Texas." HOGR WR 005244. The briefing paper went on to say that "[i]t is highly unlikely in view of the very limited recovery within the United States of firearms transfers identified in this case [sic], that the remaining firearms have not entered into the conduit of illegally trafficked firearms to Mexico." HOGR WR 005244. Like the March 2006 memorandum discussed above, the August 2006 briefing paper made clear that "[t]here is currently sufficient documentation to conclude a historical criminal case on individuals involved in the illegal purchase and transfer of firearms identified as of this date." HOGR WR 005244.

Despite this, the August 2006 briefing paper does not reflect that arrests were contemplated any time soon. Rather, the briefing paper explained that one of the "[e]xpected [o]utcomes" of the investigation was the "[i]dentification and development of sufficient evidence to dismantle, disrupt and prosecute levels of this trafficking organization up to and including the primary conspirators responsible for providing the funds, direction and ultimate delivery and criminal implementation of the firearms in question." HOGR WR 005245. An October 2006 ATF Operational Plan explicitly stated that "[w]e are not prepared to make any arrests at this time because we are still attempting to coordinate our efforts with AFI in Mexico." HOGR WR 005272. Consistent with the desire to coordinate with Mexican law enforcement ("MLE") officials, the August 2006 briefing paper contemplated "[t]ravel to Mexico by ATF Case Agents to brief the MCO as to this investigation in preparation for initiation of joint investigative activity with vetted MLE." HOGR WR 005245. The ATF MCO was to "coordinate law enforcement activity within Mexico through the appropriate vetted MLE." HOGR WR 005245.

By December 2006, the documents reflect that targets of the investigation had purchased 136 lower rifle receivers from a federal firearms licensee, as well as 45 firearms purchased from other sources. HOGR WR 005296. ATF reported in December that "[t]he Tucson II Field Office has maintained contact with the ATF Mexico City Country Office in an effort to secure the cooperation and joint investigation with" Mexican officials. HOGR WR 005299. ATF further noted that "[t]hree Tucson II Field Office SA have obtained official U.S. Government passports in anticipation of a coordination meeting" with Mexican officials "during calendar year 2007." HOGR WR 005299.

The Honorable Darrell E. Issa
Page 4

The documents reflect ATF efforts in the spring of 2007 to enlist Mexican law enforcement assistance. In an April 10, 2007 email, a Special Agent in ATF's Phoenix Field Division reported on a call with an ATF Assistant Attaché in Mexico, saying that the ATF Mexico City Office "would coordinate the involvement of Mexican Federal law enforcement and security agencies in investigating in Mexico the recipients of the firearms purchased in Tucson." HOGR WR 005315. The email observed that ATF in Tucson "wished that once the trafficker moved into Mexico that LE on that side follow the load to it's [sic] ultimate destination and that all phones and other means be utilized to identify the organization involved." HOGR WR 005315. The email also made clear that "it was not in Tucson II's interest to engage in a long term surveillance if the end result would be a Border entry stop or traffic stop in Mexico" and that a particular purchase and trafficking of firearms by the suspects in the case "was only one piece of a potentially much larger future movement of firearms into Mexico." HOGR WR 005315. The documents reflect ATF "viewed a successful operation in Mexico as a potential CCE [Continuing Criminal Enterprise] of a DTO." HOGR WR 005315. In another email that same day, the ATF supervisor in Arizona observed that "[w]e are looking at this as a test of the Mexican interest and capability. If the Mexican authorities decline to participate we anticipate arresting those subjects prior to their leaving the U.S. If the Mexican authorities decline to surveil or further this investigation, merely arresting the individuals once they get to the Mexico side we will proceed accordingly in the future." HOGR WR 005316. The ATF supervisor observed "[o]bviously, a lot has to go right for this op to work – I won't give odds. Certainly, if successful, ATF can point to this matter as part of the SWB initiative. The plan certainly won't work if we don't give it a try." HOGR WR 005316.

An ATF Operational Plan dated April 11, 2007 asserted that Wide Receiver was by that point in time being conducted by "[t]he Tucson II field Ofc in conjunction w/ the Tucson Police Department, Special Investigation Division (TPD SID), the ATF Mexico City Office, and Mexican Federal law enforcement authorities," who "intend to work jointly to determine violations of U.S. and Mexican law." HOGR WR 005322. A late-April 2007 ATF memorandum noted that "Government passports have been obtained by four (4) Tucson II Field Office special agents. A meeting between Tucson II Field Office agents, ATF Mexico City Agents, and the Mexican Federal law enforcement officials is anticipated during May 2007." HOGR WR 005344. A May 12, 2007 ATF email, however, reflects that a meeting between ATF and Mexican officials was delayed: "[w]e will not be traveling to Hermosillo this coming Tuesday per our conversation with Edgar today [sic] we hope that we can reschedule this in the next couple of weeks and that the PGR will by that time have information on some of these players." HOGR WR 005370.

The documents produced today paint a mixed picture of events in May and June 2007. An ATF Operational Plan dated May 7, 2007 indicates that ATF officials planned to monitor a purchase of weapons by the suspects and that "[d]etectives and officers will subsequently follow these individuals to their border crossing at the U.S./Mexico border, where Mexican enforcement authorities will follow the firearms to their final destination in Mexico. If the Mexican authorities decline or fail to participate, the firearms traffickers will be arrested prior to leaving

the United States." HOGR WR 005357. A May 29, 2007 email from a prosecutor in the U.S. Attorney's Office in Arizona to the ATF supervisor in Arizona said that "[m]y understanding his [sic] you guys will probably take them down on the next purchase. Keep me posted." HOGR WR 005403. By June, an ATF official observed that "[w]e already have numerous charges up here and actually taking it into Mexico doesn't add to our case specifically at that point. We want the money people in Mexico that are orchestrating this operation for indictment but obviously we may never actually get our hands on them for trial, so the real beneficiary is to PGR [sic]." HOGR WR 005404. And, a late-June 2007 email exchange between the ATF supervisor in Arizona and the OCDETF coordinator for the Southwest Region reflects that:

> the southbound firearms trafficking investigation has gathered even more steam. We anticipate surveillance this evening where the subject(s) of interest are scheduled to purchase approx. $20K of assorted firearms for further shipment to Caborca, Mx, and we are coordinating with the Mexican authorities in the event that the surveillance is successful. We have reached that stage where I am no longer comfortable allowing additional firearms to 'walk,' without a more defined purpose.

HOGR WR 005412.

Today's production reflects that by late 2008, concerns about the tactics used in the investigation were expressed by the Arizona AUSA then-assigned to the case. In December 2008, the prosecutor -- who took over the matter after the original prosecution team had departed -- wrote that she had reviewed the prosecution memo prepared by her predecessor and "I don't like the case. I think it is wrong for us to allow 100s of guns to go into Mexico to drug people knowing that is where they are going." HOGR WR 005430. In August 2009, just a month before the Gang Unit of the Criminal Division took over the matter, an ATF email summarized the case as follows:

> AUSA was also pushing back w/ moral dilemma w/ the G allowing the targets to traffic 300+ firearms to Mexico. I advised AUSA that the case was investigated within ATF Trafficking guidelines and in furtherance of attempting to identify and secure evidence on targets inside Mexico receiving the firearms for the drug cartels. The case stands on its own merit and a prosecution decision should be made.

HOGR WR 005432.

In September 2009, as the case was about to be transferred to the Gang Unit, ATF's Phoenix SAC prepared to send a summary of the investigation to the head of the Gang Unit. Before doing so, he told the Phoenix ASAC "I want Dennis Burke to be aware of what we've done to try to get this case prosecuted. Can you e-mail me some bullets on the meetings we've had (quantity and date – approx), with whom at the USAO, and what was said." HOGR WR 005438. As noted earlier and in our October letter to you, the Gang Unit agreed to assume responsibility for prosecuting the Wide Receiver defendants notwithstanding the problematic

The Honorable Darrell E. Issa
Page 6

history of the case and, to date, six defendants have been convicted of offenses connected to the trafficking of these firearms in 2006 and 2007.

We hope that this information is helpful. Please do not hesitate to contact this office if we may be of additional assistance in this or any other matter.

Sincerely,

Ronald Weich
Assistant Attorney General

Enclosures

cc: The Honorable Elijah E. Cummings
Ranking Minority Member