*Comm. on Oversight & Gov't Reform, U.S. House of Reps. v. Holder*, No. 12-1332 (ABJ)

DEFENDANT'S RESPONSE TO
PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE

Ex. I



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

March 16, 2012

The Honorable Darrell E. Issa
Chairman
Committee on Oversight and Government Reform
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

      This letter supplements our previous responses to your subpoena dated October 11, 2011, which requested documents regarding the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) investigation known as Operation Fast and Furious and related matters, and your letter dated September 1, 2011, requesting documents and communications of six current or former employees in the United States Attorney's Office of the District of Arizona. This letter also describes the Department's response to the Committee's subpoenas and numerous other requests regarding Operation Fast and Furious.

      As you know, soon after learning in early 2011 of the inappropriate tactics allegedly employed in Fast and Furious, the Attorney General asked the Department's Inspector General to conduct a review. He also directed the Deputy Attorney General to make clear to Department personnel that such inappropriate tactics should not be utilized. Since these events, there is new leadership in place at both ATF and the Arizona United States Attorney's Office (USAO). And, as enumerated in our January 27, 2012 letter, both ATF and the Department as a whole have adopted important reforms, including more rigorous oversight of significant gun trafficking investigations and clarification of ATF's firearms transfer policy. These reforms are designed to ensure that the inappropriate tactics used in Fast and Furious and in operations in the prior administration, including the Wide Receiver, Medrano, and Hernandez matters, will not be utilized in the future. Moreover, the Department remains firmly committed to eliminating illicit gun trafficking networks and bringing the killers of Customs and Border Protection Agent Brian Terry to justice.

The Honorable Darrell E. Issa
Page 2

## I.    Today's Production

We are delivering today to your office 357 pages of material.[1]  In addition to your letter
of September 1, 2011, the documents are responsive to subpoena items 1, 4, 5, and 21.
Consistent with established third-agency practice, we are in the process of consulting with the
Department of Homeland Security and the Department of State regarding documents that
implicate their equities.  We will supplement this response when those consultations are
completed.

To assist the Committee in its oversight duties, we appreciate the opportunity to provide
relevant and necessary context for some of the documents in today's production.  The majority of
today's documents relate to the Fidel Hernandez investigation that occurred in 2007, and about
which we previously have provided documents.  Today's production reflects that, in July 2007,
ATF anticipated that Hernandez and his confederates would be prosecuted in Mexico by
Mexican authorities.  (HOGR DOJ 006300)  Consistent with this, a September 26, 2007 ATF
Operational Plan anticipated a purchase of weapons by Hernandez from an FFL in Arizona and
that ATF would surveil Hernandez "to the border, and Mexico police will continue with the
operation."  (HOGR DOJ 006305)  In an email that same day, ATF's William Newell remarked,
"This has the potential to be a very good 'leap of faith' for us and something the Mexicans have
been wanting us to do for a long time.  I'm all for it and have cleared it with the U.S. Attorney's
Office."  (HOGR DOJ 006307)  Another email that same day prepared by a different ATF
official reflected that Hernandez and a confederate "have collectively purchased over 200
firearms" and that four of those weapons were associated with a kidnapping investigation in
Mexico.  (HOGR DOJ 006336)  Today's production reflects, however, that on the day of the
operation, ATF agents observed Hernandez's vehicle cross the border but "the ATF MCO did
not get a response from the Mexican side until 20 minutes later, who then informed us that they
did not see the vehicle cross."  (HOGR DOJ 006348)

Today's documents indicate that, by early October 2007, ATF was considering another
coordinated effort with Mexico on the case.  Newell wrote to an ATF official on October 2,
2007, "We are potentially going to give it another shot this weekend if everything goes as
planned."  (HOGR DOJ 006364)  The initial Operational Plan for this event reflected that ATF
would "coordinate with Mexican authorities to conduct a vehicle stop of the target vehicle after it
transports the firearms into Mexico" (HOGR DOJ 006396), but a later version of the plan
indicated that "agents will direct a uniformed Border Patrol stop.  Agents will take subjects into
custody and conduct post-arrest interview."  (HOGR DOJ 006404)  An ATF After Action Report
dated October 20, 2007 said that "Surveillance was conducted without incident – no enforcement
action taken."  (HOGR DOJ 006409)  A later Operational Plan dated November 1, 2007

---

[1] These documents bear limited redactions to protect law-enforcement sensitive details, including text that would
identify targets and sensitive techniques, plus limited information implicating individual privacy interests.  In
addition, we have redacted text that implicates equities of the Departments of State and Homeland Security.  In
response to requests from Chairman Smith and Chairman Leahy, we will deliver to the House and Senate
Committees on the Judiciary the same documents that we deliver to you.

The Honorable Darrell E. Issa
Page 3

indicates that ATF again intended to surveil a purchase of weapons by Hernandez and his
confederates in Arizona and "Once the subjects cross into Mexico, ATF attache's [sic] will
liaison with Mexican authorities to coordinate the arrest of the subjects." (HOGR DOJ 006443)
The email covering this Operational Plan says, in part, "keep your fingers crossed maybe we'll
be successful this time." (HOGR DOJ 006442)

A November 2007 briefing paper prepared by ATF discusses the Hernandez case, saying
that "ATF Phoenix has been attempting to complete one of the first Federal cross-border firearms
trafficking investigations with ultimate prosecution by the Republic of Mexico Attorney
Generals [sic] Office. Unfortunately this case has been a trial and error process." (HOGR DOJ
006458) The briefing paper goes on to say, "Nonetheless we believe we have made
breakthroughs in coordinating such operations through PFP-CENAPI and we want to thank
Mexico City Office for the diligence. I think we're going to 'knock one out of the park' soon."
(HOGR DOJ 006458) A November 14, 2007 email among ATF officials reflects that a briefing
paper on the case was prepared "For meeting with Mex. Attorney General and U.S. Attorney
General." (HOGR DOJ 006390) The email reflects that ATF "briefed DOJ on this case and told
them it is ongoing. They asked for a BP. Attached." (HOGR DOJ 006390) The attached
briefing paper discusses the unsuccessful efforts that ATF had made to that date to enlist the
support of Mexican law enforcement authorities in making a stop of Hernandez in Mexico.
(HOGR DOJ 006392) The briefing paper nevertheless reflected that ATF's investigative plan
continued to be for Hernandez and a confederate to be "arrested on the Mexican side of the
border with a large load of 'weapons of choice.'" (HOGR DOJ 006393)

The latest Operational Plan for the case in today's production is dated November 26,
2007, and says that ATF intended to surveil a purchase of weapons in Arizona by Hernandez and
confederates and "units will then follow the vehicle and its occupants from the FFL in Phoenix,
AZ to the Mexican port of entry in Nogales, Arizona. Once the subjects cross into Mexico, ATF
attache's [sic] will liaison with Mexican authorities to coordinate the arrest of the subjects."
(HOGR DOJ 006489) However, an After Action Report dated that same day indicates that
"Contact made w/ F/A trafficking suspects at border, 2 arrested for conspiracy to violate Arms
Control Export Act. Nine firearms seized." (HOGR DOJ 006494)

Also in today's production is an affidavit and statement of probable cause filed in the
Medrano case.[2] (HOGR DOJ 006603-006606) We previously have produced documents
relating to the Medrano matter. The affidavit reflects that, on June 17, 2008, ATF agents and
local police officers observed Medrano and an associate "purchase six (6) 'weapons of choice'
firearms from an FFL in Tucson, Arizona and place them in the back seat of the associate's
vehicle." (HOGR DOJ 006605) While the agents briefly lost contact with Medrano's vehicle
following the purchase, they ultimately found it in a parking lot in Douglas, Arizona. "The
vehicle then exited the parking lot with Alejandro MEDRANO driving and immediately crossed
the International Border through the Douglas POE. Your affiant believes that the firearms were
still in the vehicle." (HOGR DOJ 006605) An ATF record documenting the events of that day

---

[2] The redactions in the document appear in the version that was unsealed by the court in the Medrano case.

The Honorable Darrell E. Issa
Page 4

says, under the heading "Type of Operation," "Buy Walk/Surveillance." (HOGR DOJ 006598)
An ATF Operational Plan dated August 2008 reflects an ATF operation in the case in which
ATF agents would surveil a purchase of weapons by Medrano and his cohorts in Arizona and
"Following any purchases, agents and officers will conduct surveillance on the vehicle and the
individuals in an attempt to determine the firearms [sic] final destination." (HOGR DOJ
006602) The Operational Plan indicates that "If determined that the target vehicle intends to
cross into Mexico, SA Garcia will coordinate with Mexican law enforcement to continue the
surveillance into Mexico." (HOGR DOJ 006602) However, "if Mexican authorities are unable
to respond, SA Garcia will coordinate a stop on the identified vehicle at the Port of Entry into
Mexico[.]" (HOGR DOJ 006602)

We previously have produced to you communications between former Arizona U.S.
Attorney Dennis Burke and former Deputy Chief of Staff to the Attorney General Monty
Wilkinson from the December 2010 time period that relate to whether the Attorney General
might attend the January 2011 press conference announcing the Fast and Furious indictments.
Today's production contains an additional email on this subject dated December 21, 2010 in
which Mr. Burke tells Mr. Wilkinson "I would not recommend the AG announce this case. I can
explain in detail at your convenience. Thx." (HOGR DOJ 006614) Mr. Wilkinson replies, "Ok.
Family obligation tonight. I'll call tomorrow. Thanks." (HOGR DOJ 006614) We have
previously advised you that neither Mr. Burke nor Mr. Wilkinson recalls the specifics of these
exchanges.

Also in today's production is a draft of a speech delivered by then-Deputy Attorney
General David Ogden in Albuquerque, New Mexico on June 30, 2009 at an ATF Firearms
Trafficking Summit.[3] (HOGR DOJ 006607-006613) The draft in today's production, and the
version prepared for delivery, include the following language:

> As you know, firearms trafficking cases take time to develop and are
> not always glamorous. Prosecuting individual straw purchasers may
> not seem in isolation to have a lot of jury appeal or to be making a
> dent in the trafficking problem. But that straw purchase was not a
> victimless "paperwork" violation – it was the action that provided
> the guns to the drug trafficker, who used them in horrific acts of
> violence. [By] purs[u]ing that seemingly unglamorous case each of
> you – as prosecutors and agents – help reduce violence outside your
> jurisdictions.

(HOGR 006612)

Finally, we previously have produced weekly reports to the Attorney General from NDIC
for a period in 2010 that referenced the Fast and Furious investigation. Today, we produce
additional NDIC weekly reports from the period after the Fast and Furious indictments were

---

[3] The version of this speech as prepared for delivery is available on the Department's website at
http://www.justice.gov/dag/speeches/2009/dag-speech-090630.html.

The Honorable Darrell E. Issa
Page 5

announced in 2011 that refer to that matter. These post-indictment references do not include
substantive discussion of the case but simply reflect continued activity by NDIC during the post-
indictment phase of the matter.

## II.     The Department Is Working in Good Faith to Respond to the Committee's
            Subpoenas and Related Requests for Information

        The Department has and will continue to work in good faith to respond to your subpoenas
and cooperate with your requests for information about this matter. Indeed, consistent with our
recent practice, we intend to continue making documents available on a rolling basis
approximately twice a month until our production is complete.

        To date, we have provided over 7,200 pages of documents to the Committee as part of
more than 40 separate productions. Since our first production in response to the Committee's
March 31, 2011 subpoena to ATF, and continuing with the Department's productions in response
to the October 11, 2011 subpoena, we have endeavored to produce and make documents
available to the Committee on a regular basis; more recently, we have done so on a rolling basis
approximately twice each month. In addition, we have provided information informally to
Committee staff and provided briefings as requested by the Committee. We intend to continue
our rolling production schedule until we have produced all responsive documents to which the
Committee is entitled, consistent with longstanding policies of the Executive Branch across
administrations of both parties.

        The Department has devoted significant information technology resources and personnel
to responding to the Committee's numerous requests. We have collected a large volume of
emails, documents and data from approximately 240 custodians in various Department divisions
and components. In an effort to ensure that we had access to potentially responsive information,
we typically collected electronic records of relevant custodians regardless of the date and subject
matter of those materials. In addition, we collected and processed electronically stored
information that derived from overlapping universes of data (*e.g.,* from active data systems,
archival systems or backup tapes), which resulted in significant duplication in our data set. After
de-duplication, broad search terms were then used in an effort to identify information to which
the Committee is entitled. Because we collected and processed records so broadly, our data set
was comprised of an overwhelming number of non-responsive materials.

        As part of our effort to be thorough, we have learned, and want to advise you, that there
are some gaps in electronic databases of the Arizona USAO and of ATF that date back to 2006
and may relate to some electronic records covered by your requests. Specifically, we understand
that email from the Arizona USAO for the periods February 2006 to August 2006 and May 2007
to October 2008 is generally not available because the backup tapes for these periods were
maintained pursuant to the then-applicable records retention policy established by the Executive
Office of United States Attorneys (EOUSA), which required the preservation of backup tapes for
no more than six months. We understand that, pursuant to litigation hold instructions from
EOUSA in an unrelated matter, some backup tapes of the Arizona USAO from the period August

The Honorable Darrell E. Issa
Page 6

2006 to May 2007 were preserved.  After October 2008, the Arizona USAO began using a
different Department email system, which automatically archived users' email traffic in real-time
and preserved those emails for a period of several years.

        We also understand that there are gaps in the data available from ATF's email exchange
servers prior to September 2008.  Certain backup tapes during that time period are unavailable
either because of irrevocable damage to the backup tapes, or, during the period between
November 2007 and September 2008, due to procedural errors in the preservation of the tapes.
We understand that the damage on certain of these tapes is due to repetitive use of these recycled
tapes for backup purposes and physical hardware failures.

## III.    Conclusion

        Our efforts to identify documents responsive to your subpoena are continuing and we will
supplement this response when additional documents become available.   We will continue to
work in good faith to satisfy the Committee's legitimate requests for information.  Please do not
hesitate to contact this office if we may be of additional assistance in this or any other matter.

                                        Sincerely,

                                        Ronald Weich
                                        Assistant Attorney General


cc:    The Honorable Elijah E. Cummings
        Ranking Minority Member

        The Honorable Patrick J. Leahy
        Chairman
        Committee on the Judiciary
        United States Senate

        The Honorable Charles E. Grassley
        Ranking Minority Member
        Committee on the Judiciary
        United States Senate