**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
COMMITTEE ON OVERSIGHT AND          )
GOVERNMENT REFORM, UNITED STATES  )
HOUSE OF REPRESENTATIVES,             )
                                                    )
     *Plaintiff*,               )
                                                    )
  v.                                    )  Case No. 1:12-cv-01332-ABJ
                                                    )
ERIC H. HOLDER, JR.,                         )
in his official capacity as Attorney General of the  )
United States,                                   )
                                                    )
     *Defendant*.              )
_____)


**PLAINTIFF'S RESPONSE TO
DEFENDANT'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

   Pursuant to Local Civil Rule 7(h)(1), Plaintiff Committee on Oversight and Government

Reform of the United States House of Representatives ("Committee") responds to Defendant's

Statement of Material Facts as to Which There Is No Genuine Issue (Jan. 21, 2014) (ECF No.

63) ("AG Rule 56 Statement").  The Committee maintains that there are no genuine issues of

material fact with respect to the grounds entitling the Committee to summary judgment.

   The paragraph numbers for these responses refer to the corresponding numbers in the AG

Rule 56 Statement:

   1.  The statement in paragraph 1 of the AG Rule 56 Statement is undisputed.

However, the Committee observes that the cited material, paragraph 7 of the Declaration of M.

Faith Burton . . . (Jan. 21, 2014) (ECF No. 63-1) ("Burton Declaration"), does not support the

statement because the Attorney General has not established that Ms. Burton has personal

knowledge of when the Department of Justice ("DOJ") first received congressional inquiries regarding the Department's Operation Fast and Furious.  Also, the Committee objects to the Burton Declaration in its entirety for the reasons stated in the Committee's Memorandum of Points and Authorities in Support of [Committee's] Motion to Strike the Declarations of Paul P. Colborn and M. Faith Burton (Feb. 14, 2014) ("Committee Strike Memorandum").

2.      The statement in paragraph 2 of the AG Rule 56 Statement is undisputed but subject to clarification.  To the extent that the statement is intended to suggest that DOJ negotiated with the Committee in good faith, the Committee disputes that characterization.  *See, e.g.*, Decl. of Carlton J. Davis ¶¶ 2, 3, 5, 7, 10, 11 (Dec. 16, 2013) (ECF No. 61-34); Second Decl. of Carlton J. Davis ¶¶ 5, 6 (Feb. 14, 2014) ("Second Davis Declaration"), attached. Additionally, the Attorney General supports the statement only with a citation, en masse, to paragraphs 9 through 18 of the Burton Declaration, to which the Committee objects for all the reasons set forth in the Committee Strike Memorandum.

3.      The statement in paragraph 3 of the AG Rule 56 Statement is disputed to the extent that it asserts that, "[b]y the fall of 2011, the Committee's focus had shifted."  The focus of the Committee's investigation never "shifted" in the way that the Attorney General asserts; rather, the Committee's investigation developed an additional component, without abandoning the first component.  *See* Decl. of Stephen R. Castor ¶ 23 (Dec. 16, 2013) (ECF No. 61-1) ("Castor Declaration") ("[T]he Committee's investigation had developed a second focus.").  Moreover, the cited material, paragraphs 9 and 10 of the Declaration of Paul P. Colborn . . . (Jan. 21, 2014) (ECF No. 63-2) ("Colborn Declaration"), does not support the statement because (i) the declarant, Mr. Colborn, does not have personal knowledge of the Committee's internal operations, yet purports to opine on the focus of the Committee's investigation, and (ii) the

Colborn Declaration does not support, on its face, the proposition that the Committee had "shifted" its focus.  Additionally, the Committee objects to the entirety of the Colborn Declaration for all the reasons stated in the Committee Strike Memorandum.

4.     The statement in paragraph 4 of the AG Rule 56 Statement is undisputed but subject to clarification.  The interest of the Committee identified in the statement was only one of the Committee's interests in conducting its investigation.  *See* Castor Decl. ¶¶ 7-8, 23. Moreover, the cited material, paragraph 10 of the Colborn Declaration, does not support the statement because (i) the declarant, Mr. Colborn, does not have personal knowledge of the Committee's internal operations, but purports to opine on the Committee's interests; and (ii) the Colborn Declaration does not establish, as a factual matter, any "stated interests" of the Committee, instead offering the declarant's own speculation and/or opinions regarding those interests.  Additionally, the Committee objects to the entirety of the Colborn Declaration for all the reasons stated in the Committee Strike Memorandum.

5.     The statement in paragraph 5 of the AG Rule 56 Statement is undisputed but subject to clarification.  Of the approximately 1,300 pages that DOJ produced in December 2011, many were redacted, some heavily, while others were duplicative.  *See* Second Davis Decl. ¶ 6. The Committee respectfully refers the Court to the letter referenced in the statement for a complete and accurate statement of its contents.  The Committee also observes that the neither the Attorney General's citation to paragraph 21 of the Burton Declaration nor his citation to paragraph 10 of the Colborn Declaration supports his statement, because he has not established that either declarant had personal knowledge of their relevant assertions.  Additionally, the Committee objects to the Burton Declaration and the Colborn Declaration in their entireties, for all the reasons stated in the Committee Strike Memorandum.

6.      The statement in paragraph 6 of the AG Rule 56 Statement is disputed.  The cited material, paragraph 12 of the Burton Declaration, does not support the statement because (i) that material does not establish that DOJ expressed "institutional interests of the Executive Branch" (only the concerns of "the Department"); and (ii) it does not establish that the declarant had personal knowledge of communications between the Committee and "OLA attorneys" other than herself.  Burton Decl. ¶ 12.  Additionally, the Committee objects to the Burton Declaration for all the reasons stated in the Committee Strike Memorandum.

7.      The statement in paragraph 7 of the AG Rule 56 Statement is not material and is disputed.  Any offers by the Committee to modify the scope of the documents it would accept in response to the Committee's October 11, 2011 subpoena to Attorney General Eric H. Holder, Jr. ("Holder Subpoena") were made in the context of failed settlement negotiations.  *See* Second Decl. of Stephen R. Castor ¶¶ 11, 12, 15, Exs. 6, 7 (Feb. 14, 2014) ("Second Castor Declaration"), attached.  For this reason, the statement has no factual relevance to the parties' motions for summary judgment, and should be disregarded on that basis.

Moreover, the statement's characterization of the scope of the Committee's settlement offer is inaccurate.  The information that the Committee offered to accept to postpone a contempt vote at the Committee level was broader than now characterized by the Attorney General. Indeed, the Attorney General's letter to Chairman Issa on June 14, 2012, reflected an understanding of this broader scope:  "[T]he Department is prepared to provide documents that . . . are responsive to how [DOJ]'s understanding of the facts regarding that matter evolved throughout 2011 and how [DOJ] came to withdraw its February 4, 2011, letter to Senator Grassley."  Letter from Att'y Gen. Holder to Chairman Issa at 1 (June 14, 2012), Ex. 6 to Second Castor Decl.  In other words, the Attorney General offered to produce not only information

4

related to DOJ's response to Congress, but also information about "how [DOJ's] understanding of the facts regarding the matter evolved throughout 2011," regardless of whether that evolution related directly to its response to Congress – information that necessarily also would have included extensive operational material, given that it is that material that would have allowed DOJ management to "understand[]" what its field-level employees had been doing.  *Id*.  The Committee was willing to accept the Attorney General's June 14 offer in exchange for postponing the Committee's vote on contempt.  *See* Letter from Chairman Issa to Att'y Gen. Holder (June 15, 2012), Ex. 7 to Second Castor Decl. ("Again, production of the documents noted in your letter and outlined yesterday in a meeting with Committee staff would be sufficient for me to justify a postponement of the Committee's scheduled vote on contempt to facilitate their review and discussions with the Department.").

Additionally, the cited material, paragraph 12 of the Colborn Declaration, does not support the statement because the declarant, Mr. Colborn, does not have personal knowledge of the Committee's internal operations, but purports to opine on the focus of the Committee's investigation.  Finally, the Committee objects to the entirety of the Colborn Declaration for all the reasons stated in the Committee Strike Memorandum.

8.     The statement in paragraph 8 of the AG Rule 56 Statement is disputed.  The Attorney General cites no factual material for the statement that he actually "sent the letter to the President in which he asked the President to assert Executive Privilege."  Rather, the only material the Attorney General references in support of this assertion is a copy of his apparent June 19, 2012 letter to the President, which apparent letter is an attachment to the June 20 letter from Deputy Attorney General Cole to Chairman Issa ("June 20, 2012 Privilege Letter").  *See* Ex. 21 to Castor Decl. (ECF No. 61-22).  The apparent June 19 letter, unlike the June 20, 2012

Privilege Letter, is not authenticated.  (The Committee authenticated the June 20, 2012 Privilege

Letter.  *See* Castor Decl. ¶ 30, Ex. 21).  Accordingly, the June 19 letter is not admissible for the

truth of the assertions therein.

9.      The statement in paragraph 9 of the AG Rule 56 Statement is disputed in part.

The statement that "the President asserted Executive Privilege" is unsupported by admissible

evidence, and therefore is disputed.  The letter cited in support (the June 20, 2012 Privilege

Letter) is not admissible evidence that "the President asserted Executive Privilege," including

because that letter (i) does not establish that Deputy Attorney General Cole had personal

knowledge of the President's purported assertion of executive privilege, and (ii) is not a sworn

statement.  Nor does the Attorney General offer any evidence in support of his assertion that, if

the President took any particular action, he did it "[i]n response to" any other particular action,

including "the Attorney General's request," and therefore this also is disputed.  The Committee

does not dispute that it received the June 20, 2012 Privilege Letter, reciting the President's

purported privilege assertion, on June 20, 2012.

10.     The statement in paragraph 10 of the AG Rule 56 Statement is disputed in part.

For the same reason that the Committee disputes the statement "the President asserted Executive

Privilege" in paragraph 9 of the AG Rule 56 Statement, the Committee disputes the statement

insofar as it references "the President's assertion of Executive Privilege."  The Committee does

not dispute that it adopted a resolution "recommending that the House hold the Attorney General

in contempt," or that the Committee subsequently "issued its contempt report to the full House,"

subject to the clarification that the Committee respectfully refers the Court to H. Rep. No. 112-

546 (2012) for a complete and accurate statement of its contents.

11.     The statement in paragraph 11 of the AG Rule 56 Statement is disputed in part.

The authorization to the Committee from the U.S. House of Representatives to enforce the

Holder Subpoena is found in H. Res. 706, 112th Cong. (June 28, 2012) (enacted), and H. Res. 5,

113th Cong. (Jan. 3, 2013) (enacted).

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, General Counsel
D.C. Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
D.C. Bar No. 482949
TODD B. TATELMAN, Assistant Counsel
MARY BETH WALKER, Assistant Counsel
D.C. Bar No. 501033
ELENI M. ROUMEL, Assistant Counsel
ISAAC B. ROSENBERG, Assistant Counsel
D.C. Bar No. 998900

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and*
*Government Reform, U.S. House of Representatives*

February 14, 2014

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) | |
| *Plaintiff*, | ) ) ) | |
| v. | ) ) | Case No. 1:12-cv-01332-ABJ |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States, | ) ) ) ) | |
| *Defendant*. | ) ) ) ) | |

**PLAINTIFF'S CONSOLIDATED (I) REPLY TO DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND (II) OPPOSITION TO
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Kerry W. Kircher, General Counsel
William Pittard, Deputy General Counsel
Todd B. Tatelman, Assistant Counsel
Mary Beth Walker, Assistant Counsel
Eleni M. Roumel, Assistant Counsel
Isaac B. Rosenberg, Assistant Counsel

OFFICE OF GENERAL COUNSEL,
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and
Government Reform, U.S. House of Representatives*

February 14, 2014

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

GLOSSARY OF ACRONYMS AND SHORT CITES ................................................ ix

INTRODUCTION ............................................................................................... 1

COUNTER STATEMENT OF THE CASE ............................................................... 5

ARGUMENT ...................................................................................................... 6

I.   The Attorney General Effectively Has Conceded the Committee's Arguments on
     His Common Law Deliberative Process Privilege Assertion. ............................ 7

II.  The Court Should Reject the Attorney General's Request That It Manufacture for
     Him a New Constitutional Privilege. ........................................................... 11

     A.   The Attorney General's Proposed New Privilege Was Not Asserted in
          Reasonable Compliance with the Terms of the Holder Subpoena and,
          Therefore, Should Not Be Considered. .................................................. 12

     B.   The Court Should Decline to Recognize a New Constitutional Privilege. ...... 15

          1.   Existing Precedent Strongly Supports Non-Recognition. ..................... 15

          2.   The Attorney General's Asserted Policy Rationales Are Not Tenable ...... 18

          3.   Self-Serving Executive Branch Authorities Should Be Disregarded. ....... 27

III. The New Privilege the Attorney General Asks the Court to Recognize Necessarily
     Would Be Qualified, and the Committee's Need for the Post-February 4 Subset Is
     Sufficient to Overcome Any Such Privilege. ................................................. 29

     A.   The Proposed New Privilege Necessarily Would Be Qualified. ................... 29

     B.   The Need Standard for Any New Qualified Privilege Necessarily Would Be
          Less Onerous Than the "Demonstrated Specific Need" Standard Applicable
          in the Presidential Communications Privilege Context. ............................. 31

     C.   The Committee Has a Sufficient Need for the Post-February 4 Subset. ......... 33

IV.  The Attorney General's Efforts to Limit the Committee's Relief Are Baseless. ....... 37

     A.   The Committee Has Not Expanded the Scope of the Relief It Seeks. ............ 39

     B.   The Committee's Requested Relief Is Not Limited by Positions Taken in
          Prior Settlement Negotiations. ............................................................. 41

i

CONCLUSION ................................................................................................................45

CERTIFICATE OF SERVICE

ATTACHMENTS

Second Declaration of Steven R. Castor (Feb. 14, 2014)

      Ex. 1 – Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen. (May 10, 2012)

      Ex. 2 – Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm. (May 15, 2012)

      Ex. 3 – Letter from Hon. John A. Boehner, Speaker of the House, Darrell E. Issa, Chairman, Oversight Comm., et al., to Eric H. Holder, Jr., Att'y Gen. (May 18, 2012)

      Ex. 4 – Advisory, Comm. on Oversight & Government Reform,  Oversight Committee to Consider Operation Fast & Furious Contempt Report on June 20 (June 11, 2012)

      Ex. 5 – Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen. (June 13, 2012)

      Ex. 6 – Letter from Eric H. Holder, Jr., Att'y Gen. to Hon. Darrell E. Issa, Chairman, Oversight Comm. (June 14, 2012)

      Ex. 7 – Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Jr., Att'y Gen. (June 15, 2012)

Second Declaration of Ashok Pinto (Feb. 14, 2014)

Second Declaration of Carlton J. Davis (Feb. 14, 2014)

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Alexander v. FBI*,
    186 F.R.D. 154 (D.D.C. 1999)............................................................................8

*Am. Historical Ass'n v. Nat'l Archives & Records Admin.*,
    402 F. Supp. 2d 171 (D.D.C. 2005)..................................................................33

*Bancoult v. McNamara*,
    227 F. Supp. 2d 144 (D.D.C. 2002)..................................................................10

*Bradshaw v. Office of the Architect of the Capitol*,
    856 F. Supp. 2d 126 (D.D.C. 2012)..................................................................10

*Branzburg v. Hayes*,
    408 U.S. 665 (1997)..........................................................................................15

*Buggs v. Powell*,
    293 F. Supp. 2d 135 (D.D.C. 2003)..................................................................10

*Cheney v. U.S. Dist. Ct. for the D.C.*,
    542 U.S. 367 (2004)....................................................................................17, 32

*Comm. on Judiciary v. Miers*,
    558 F. Supp. 2d 53 (D.D.C. 2008)........................................................13, 14, 31

*Day v. D.C. Dep't of Consumer. & Regulatory Affairs*,
    191 F. Supp. 2d 154 (D.D.C. 2002)..................................................................10

*Dellums v. Powell*,
    561 F.2d 242 (D.C. Cir. 1977)......................................................................31, 32

*FDIC v. Bender*,
    127 F.3d 58 (D.C. Cir. 1997)............................................................................10

*Hannah v. Larche*,
    363 U.S. 420 (1960)..........................................................................................23

*Herbert v. Lando*,
    441 U.S. 153 (1979)..........................................................................................15

*Hickman v. Taylor*,
    329 U.S. 495 (1947)..........................................................................................24

*Hoffman v. United States*,
    341 U.S. 479 (1951)..........................................................................................30

*Hopkins v. Women's Div., Gen. Bd. of Global Ministries*,
    238 F. Supp. 2d 174 (D.D.C. 2002)..................................................................10

*In Re:  A Witness Before the Special Grand Jury 2000-2*,
  288 F.3d 289 (7th Cir. 2002) .........................................................................15

*In re Grand Jury Proceedings*,
  601 F.2d 162 (5th Cir. 1979) .........................................................................24

\* *In re Sealed Case (Espy)*,
  121 F.3d 729 (D.C. Cir. 1997) ....................3, 14, 15, 16, 17, 20, 22, 31, 32, 33, 36, 39, 40

*In re Sealed Case*,
  148 F.3d 1073 (D.C. Cir. 1998) .....................................................................16

*Judicial Watch, Inc. v. Clinton*,
  880 F. Supp. 1 (D.D.C. 1995) ..........................................................................8

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
  736 F. Supp. 2d 202 (D.D.C. 2010) ..................................................................8

\* *Judicial Watch, Inc. v. Dep't of Justice*,
  365 F.3d 1108 (D.C. Cir. 2004) ................................17, 22, 31, 32, 33, 36, 39

*Lardner v. U.S. Dep't of Justice*,
  No. 03-cv-0180, 2005 WL 758267 (D.D.C. Mar. 31, 2005) ...........................16

*Lewis v. Dist. of Columbia*,
  No. 10-5275, 2011 WL 321711 (D.C. Cir. Feb. 2, 2011)..................................9

*Loving v. United States*,
  517 U.S. 748 (1996).........................................................................................18

*Mack v. WP Co.*,
  923 F. Supp. 2d 294 (D.D.C. 2013) ................................................................10

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803).........................................................................19

*Marriott Int'l Resorts, L.P. v. United States*,
  437 F.3d 1302 (Fed. Cir. 2006).......................................................................16

*Mich. Gambling Opp'n v. Kempthorne*,
  525 F.3d 23 (D.C. Cir. 2008) .........................................................................10

*Morrison v. Olson*,
  487 U.S. 654 (1988)........................................................................................20

*Nat'l Sec. Archive v. FBI*,
  759 F. Supp. 872 (D.D.C. 1991)........................................................................8

*Newspaper Ass'n of Am. v. Postal Regulatory Comm'n*,
  734 F.3d 1208 (D.C. Cir. 2013) .....................................................................10

*Nixon v. Adm'r of Gen. Servs.* ("*Nixon II*"),
  433 U.S. 425 (1977).................................................................................29, 30

iv

*Nixon v. Sirica*,
  487 F.2d 700 (D.C. Cir. 1973) ........................................................17, 19, 29, 30

*Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*,
  714 F.2d 163 (D.C. Cir. 1983) ........................................................................34

*Public Citizen v. Burke*,
  843 F.2d 1473 (D.C. Cir. 1988) ......................................................................27

*Ryan v. Dep't of Justice*,
  617 F.2d 781 (D.C. Cir. 1980) ........................................................................17

*Senate Select Comm. on Pres. Campaign Act. v. Nixon*,
  498 F.2d 725 (D.C. Cir. 1974) ..............................................................13, 32, 37

*Sun Oil Co. v. United States*,
  514 F.2d 1020 (Ct. Cl. 1975) ..........................................................................33

*United States ex rel. Purcell v. MWI Corp.*,
  238 F.R.D. 321 (D.D.C. 2006) ........................................................................24

*United States v. AT&T*,
  567 F.2d 121 (D.C. Cir. 1977) ..............................................................14, 21, 41

*United States v. Bryan*,
  339 U.S. 323 (1950) ..............................................................................9, 13, 15

*United States v. Burr*,
  25 F. Cas. 30 (C.C.D. Va. 1807) ....................................................................14

*United States v. Davis*,
  596 F.3d 852 (D.C. Cir. 2010) ........................................................................39

\* *United States v. Nixon* ("*Nixon I*"),
  418 U.S. 683 (1974) ..............................13, 15, 17, 18, 22, 30, 31, 32, 33, 34

*United States v. One Tract of Real Property*,
  95 F.3d 422 (6th Cir. 1996) ............................................................................24

*United States v. Poindexter*,
  727 F. Supp. 1501 (D.D.C. 1989) ....................................................................13

*Watkins v. United States*,
  354 U.S. 178 (1957) ......................................................................................24

## Constitutional Provisions, Statutes, and Federal Rules

U.S. Const. art. I, § 2, cl. 5 ............................................................................35

U.S. Const. art. I, § 3, cl. 2 ............................................................................20

5 U.S.C. app. 3 § 2 ....................................................................................................37

5 U.S.C. app. 3 § 3 ....................................................................................................37

5 U.S.C. app. 3 § 8E ..................................................................................................37

Fed. R. Evid. 408 ......................................................................................................42


**Legislative Authorities**

H. Res. 5, 113th Cong. (2013) (enacted) ...................................................................42

H. Res. 706, 112th Cong. (2012) (enacted) ...............................................................42

H. Res. 711, 112th Cong. (2012) (enacted) ...............................................................43

17 Cong. Rec. 2212 (1886) ........................................................................................28

13 Reg. Deb. App'x 208 (1837) ..................................................................................29

H. Rep. No. 112-546 (2012) ......................................................................................43

Committee on Oversight and Gov't Reform Report:  *Everything Secret Degenerates,
     The FBI's Use of Murderers As Informants*, H. Rep. No. 108-414 (2004) .....................13

*Environmental Crimes at the Rocky Flats Nuclear Weapons Facility:  Hr'gs before the
     Subcomm. on Investigations & Oversight of the H. Comm. on Science, Space & Tech.,
     vol. I*, 102d Cong. (1992) ........................................................................................13

*Mem. of Understanding Between the Comm. on Public Works and Transp. and the Dep't of
     Justice, Concerning Docs. Subpoenaed from the Envtl. Prot. Age*ncy, Feb. 18, 1983,
     *reprinted in* H. Rep. No. 98-323 (1983) .................................................................


**Other Authorities**

Bernard A. Schwartz, Executive Privilege and Congressional Investigatory Power,
     47 Cal. L. Rev. 3, 47 (1959) ..................................................................................26

Brief for [then-President] Nixon, *United States v. Nixon*,
     Nos. 73-1766 & 73-1834, 1974 WL 174855 (June 21, 1974) ...........................................34

David P. Currie, The Constitution in Congress:  The Federalist Period, 1789-1801
     (Chicago 1997)....................................................................................................28

George C. Chalou, St Clair's Defeat, 1792, *in* Congress Investigates:  A Documented History
     1792-1974 (Schlesinger, Jr. & Burns eds., 1983)......................................................28

John Tyler, Special Message (Jan. 31, 1843), *available at*
     http://www.presidency.ucsb.edu/ws/?pid=67367............................................................29

Louis Fisher, The Politics of Executive Privilege (2004).............................................28

Michael J. Gerhardt**,** The Forgotten Presidents:  Their Untold Constitutional Legacy (2013) .....28

Press Briefing by Press Sec'y Jay Carney (June 21, 2012), *available at*
    http://www.whitehouse.gov/the-press-office/2012/06/21/press-briefing-press-secretary-
    jay-carney-62112 ....................................................................................................35

Richard M. Nixon, T.V. Interview with David Frost (May 19, 1977), *available at*
    http://www.youtube.com/watch?v=tYdJqSG3K6c .........................................................19

Sharyl Attkisson, *Fast and Furious questions linger as IG continues investigation*,
    CBSNews.com, Jan. 21, 2014, http://www.cbsnews.com/news/fast-and-furious-
    questions-linger-as-ig-continues-investgation/ ...................................................36

## Executive Branch Documents

*Assertion of Exec. Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*,
    2007 WL 5038036 (U.S.A.G. June 27, 2007) ............................................................27, 34

*Assertion of Exec. Privilege Concerning the Special Counsel's Interviews of the Vice President
    and Senior White House Staff*,
    2008 WL 5458939 (U.S.A.G. July 15, 2008) .............................................................27, 29

*Assertion of Exec. Privilege in Resp. to a Congressional Subpoena*,
    43 Op. Att'y Gen. 327 (1981) ......................................................................................27

*Assertion of Exec. Privilege in Resp. to Congressional Demands for Law Enforcement Files*,
    6 Op. O.L.C. 31 (1982) .............................................................................................27, 35

*Assertion of Exec. Privilege over Commc'n Regarding EPA's Ozone Air Quality Standards &
    Cal.'s Greenhouse Gas Waiver Req.*, 2008 WL 5506397 (U.S.A.G. June 19, 2008) .......27

*Assertion of Exec. Privilege Regarding White House Counsel's Office Docs.*,
    1996 WL 34386607 (U.S.A.G. May 23, 1996) ...............................................................28

*Assertion of Exec. Privilege with Respect to Clemency Decision*,
    1999 WL 33490208 (U.S.A.G. Sept. 16, 1999)...............................................................27

*Cong. Subpoenas of Dep't of Justice Investigative Files*,
    8 Op. O.L.C. 252 (1984) ............................................................................................35

*Congressional Reqs. for Confidential Exec. Branch Info.*,
    13 Op. O.L.C. 153 (1989) ...........................................................................................27

*History of Refusal by Exec. Branch Officials to Provide Info. Demanded by Congress*,
    6 Op. O.L.C. 751, 769 (1982) .....................................................................................28

## GLOSSARY OF ACRONYMS AND SHORT CITES

### Executive Branch Agencies and Offices

| | |
|---|---|
| DOJ | United States Department of Justice |
| DOJ IG | Office of the Inspector General, United States Department of Justice |
| OLC | Office of Legal Counsel, United States Department of Justice |

### Other Acronyms

| | |
|---|---|
| FOIA | Freedom of Information Act |
| CDP privilege | Constitutionalized Deliberative Process privilege |

### Documents

| | |
|---|---|
| AG MTD Memorandum | Memorandum in Support of Defendant's Motion to Dismiss (Oct. 15, 2012) (ECF No. 13-1) |
| AG Rule 56 Response | Defendant's Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue (Jan. 21, 2014) (ECF No. 64-1) |
| AG SJ Memorandum | Memorandum in Support of Defendant's Motion for Summary Judgment & in Opposition to Plaintiff's Motion for Summary Judgment (Jan. 21, 2014) (ECF No. 63) |
| AG's 1292(b) Motion | Defendant's Motion for Certification of This Court's Sept. 30, 2013 Order for Interlocutory Appeal . . . (Nov. 15, 2013) (ECF No. 57) |
| Amended Complaint | First Amended Complaint (Jan. 15, 2013) (ECF No. 35) |
| Answer | Answer to First Amended Complaint (Nov. 15, 2013) (ECF. No. 56) |

Burton Declaration

Declaration of M. Faith Burton . . . (Jan. 21, 2014) (ECF No. 63-1)

Colborn Declaration

Declaration of Paul P. Colborn . . . (Jan. 21, 2014) (ECF No. 63-2)

Committee Rule 56 Statement

Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue (Dec. 16, 2013) (ECF No. 61)

Committee SJ Memorandum

Memorandum of Points &Authorities in Support of Plaintiff's Motion for Summary Judgment (Dec. 16, 2013) (ECF No. 61)

Davis Declaration

Decl. of Carlton J. Davis ¶ 2 (Dec. 16, 2013) (ECF No. 61-34)

Holder Subpoena

Subpoenas to Eric H. Holder, Jr., Attorney General (Oct. 11, 2011, & Jan. 3, 2013), Exhibits 17 & 26 to Castor Declaration (ECF Nos. 61-18 & 61-30)

June 14, 2012 AG Letter

Letter from Eric H. Holder, Attorney General to Hon. Darrell E. Issa, Chairman, Oversight Committee (June 14, 2012), Exhibit 6 to Second Castor Declaration

June 15, 2012 Chairman Letter

Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Attorney General (June 15, 2012), Ex. 7 to Second Castor Declaration

June 19, 2012 AG Letter

Letter from Eric H. Holder, Jr., Attorney General to The President (June 19, 2012), Exhibit 21 to Castor Declaration (Dec. 16, 2012) (ECF No. 61-22)

June 20, 2012 Privilege Letter

Letter from James M. Cole, Deputy Attorney General, to Honorable Darrell E. Issa, Chairman, Oversight Committee (June 20, 2012), Exhibit 21 to Castor Declaration (Dec. 16, 2013) (ECF No. 61-22)

Motion to Strike

Plaintiff's Motion to Strike . . . (Feb. 14, 2014)

Second Castor Declaration

Declaration of Stephen R. Castor (Feb. 14, 2014)

**INTRODUCTION**

The Attorney General – like many Executive Branch officials – disdains robust congressional oversight.  Unlike most such officials, the Attorney General allowed that disdain to ripen into outright defiance of the Holder Subpoena,[1] at least insofar as that subpoena sought documents dated or created after February 4, 2011.  Forced by this lawsuit to justify that defiance, the Attorney General has struggled, and continues to struggle, to settle on a justification.  *Prior* to his most recent filing, his legal position had developed as follows:

1.  For eight months after the October 25, 2011 Holder Subpoena return date, the Attorney General defied the subpoena without cover of any claim of any privilege.[2]

2.  On June 20, 2012, the Deputy Attorney General delivered to the House Committee on Oversight and Government Reform ("Committee" or "Oversight Committee") a letter stating that the President asserted "executive privilege over the relevant post-February 4, 2011, documents."[3]  Given the nature of the documents, and the law of this Circuit, the June 20, 2012 Privilege Letter could fairly be interpreted only as asserting the presidential communications privilege, the common law deliberative process privilege, or both.  *See* Mem. of P.&A. in Supp. of Pl.'s Mot. for Summ. J. at 3-4, 16-20 (Dec. 16, 2013) (ECF No. 61) ("Committee SJ Memorandum").

3.  Subsequently, the Attorney General acknowledged that "he had not asserted the [presidential communications] privilege" – a version of executive privilege rooted in separation

---

[1]  *See* Pl.'s Statement of Material Facts as to Which There Is No Genuine Issue ¶ 39 (Dec. 16, 2013) (ECF No. 61) ("Committee Rule 56 Statement") (describing "Holder Subpoena").

[2]  *See* Comm. Rule 56 Statement ¶¶ 40, 48 (both undisputed).

[3]  Letter from James M. Cole, Dep'y Att'y Gen., to Hon. Darrell E. Issa, Chairman, Oversight Comm., at 1 (June 20, 2012) ("June 20, 2012 Privilege Letter"), including as attachment Letter from Eric H. Holder, Jr., Att'y Gen., to the President (June 19, 2012) ("June 19, 2012 AG Letter"), collectively Ex. 21 to Decl. of Stephen R. Castor (Dec. 16, 2013) (ECF No. 61-22).

of powers principles which protects, in qualified fashion, certain advice to the President – "in withholding the documents and did not intend to rely on th[at] privilege in this action."  Mem. Op. at 36 n.10 (Sept. 30, 2013) (ECF No. 52).  If the decisions of the D.C. Circuit mean anything here – as we believe they do – that necessarily left the Attorney General asserting only the common law deliberative process privilege.  *See* Comm. SJ Mem. at 3-4, 16-20.  That this was the intent of the June 20, 2012 Privilege Letter is confirmed by (i) repeated use of the words "deliberative" and "deliberative process" in that letter and in the June 19, 2012 AG Letter, *see* Comm. SJ Mem at 17, and (ii) specific references to "response to congressional oversight and related media inquiries" by the Department of Justice ("DOJ"), June 20, 2012 Privilege Letter at 4; June 19, 2012 AG Letter at 3.  The "congressional and related media inquiries response" notion is plucked from the Freedom of Information Act ("FOIA") context where the Executive Branch long has resisted producing such information on the ground that it is protected by the common law deliberative process privilege, and where courts long have analyzed such information under that common law rubric.  *See infra* Argument, Part I.

4.  In September 2012, DOJ released 300 or so pages of responsive but previously unproduced documents – virtually all of which post-date February 4, 2011, and none of which reasonably can be characterized as pre-decisional and deliberative.  *See* Comm. SJ Mem. at 18. Thereafter, the Attorney General admitted for the first time that some withheld responsive documents "do not . . . contain material that would be considered deliberative under common law or statutory standards."  Def.'s Mot. for Certification . . . for Interlocutory Appeal . . . at 8-9 (Nov. 15, 2013) (ECF No. 57) ("AG's 1292(b) Motion").  Unfazed, he said he would ask the Court to constitutionalize for him the FOIA-derived notion, described above, which he then labelled alternatively as "congressional response work product" and "deliberative process

concerning [DOJ's] response to congressional and related media inquiries." *Id*. at 8-9.

    With the filing of his cross-motion for summary judgment, the Attorney General's position has morphed still further:

    5.  The Attorney General now suggests he will maintain his common law deliberative process privilege assertion, at least as to some documents, but that he wants the Court *first* to rule on his new constitutionalized congressional response idea. *See* Mem. in Supp. of Def.'s Mot. for Summ. J. & in Opp'n to Pl.'s Mot. for Summ. J. at 33 n.10 (Jan. 21, 2014) (ECF No. 63) ("AG SJ Memorandum").  If the Court adopts his new construct, then, the Attorney General says, "questions concerning common-law . . . privileges need not be considered." *Id*.  If, however, the Court rebuffs his new idea, it *then* can reach the common law privilege issue, *id*. – as well as any as-yet-unidentified statutory privileges the Attorney General might decide to assert later, *id*. – apparently in the belief that the Holder Subpoena and this enforcement litigation constitute some sort of interminable game.

    6.  The predicate for the Attorney General's proposal is a kind of grand unified theory of everything, as in, there is but one executive privilege; it is always constitutional in nature; and it applies to everything (i) deemed confidential by the President, or (ii) the disclosure of which, in his view, would interfere with the functioning of the Executive Branch.  *See id*. at 14-18.  (The D.C. Circuit, we note, already has rejected this theory.[4])

    7.  From this flawed predicate, the Attorney General goes on to say that, in the context of this case, he now wants the Court to locate in the Constitution a new privilege – presaged earlier

---

[4]  *See, e.g*., *In re Sealed Case (Espy)*, 121 F.3d 729, 735 n.2, 745 (D.C. Cir. 1997) (term "'executive privilege' is generally used to refer to a wide variety of evidentiary and substantive privileges that courts accord the executive branch," and these various privileges "are distinct and have different scopes").

in the AG's 1292(b) Motion – that will cover "information about [DOJ's] internal deliberative processes in responding to congressional [and related media] inquiries." *Id*. at 32-33. The Attorney General does not articulate elements or parameters for this proposed new privilege, which we will refer to here, for ease of reference, as the "CDP privilege" (for constitutionalized deliberative process privilege). However, he does make clear that his proposed CDP privilege (i) is sufficiently elastic to cover some of the documents that constitute the Post-February 4 Subset,[5] and (ii) is beyond blessing its creation, this Court would have no role in applying it since "the President's assertion of [the CDP privilege] is dispositive here . . . ." *Id*. at 33 n.10.

The Attorney General's current position can be viewed in several different ways: an effort to constitutionalize the common law deliberative process privilege; an effort to extend downstream the protections that apply to presidential communications; an effort to set the stage for attacking *Espy* and its progeny on appeal; or simply an effort to patch over a privilege assertion that was ill-conceived at the outset (and perhaps formulated with little or no review of the documents actually responsive to the Holder Subpoena). However one views the Attorney General's proposal, it clearly would provide a dangerous free pass for Executive Branch obstruction of Congress, if adopted.

We urge the Court to find that there is no basis in the Constitution to do what the Attorney General proposes; to conclude, even if the Court were to recognize a CDP privilege,

---

[5] *See* First Am. Compl. ¶ 67 (Jan. 15, 2013) (ECF No. 35) ("Amended Complaint") (defining "Post-February 4 Subset"). The Attorney General suggests elsewhere that he is withholding some Post-February 4 Subset documents as to which the President and he have *not asserted any privilege*. *See* AG SJ Mem. at 43 ("Because these materials [allegedly] had been taken off the table [in the course of pre-contempt and pre-litigation discussions that ultimately went nowhere], the President was not asked to, and did not, assert Executive Privilege over them."). We address below the Attorney General's mistaken view that pre-contempt, pre-suit settlement discussions restrict the scope of the relief the Committee may obtain here. *See infra* Argument, Part IV.B.

that the Committee still would be entitled to the Post-February 4 Subset; and to enter judgment in favor of the Committee on Count I of the First Amended Complaint, directing the Attorney General to produce to the Committee the Post-February 4 Subset without further delay.

## COUNTER STATEMENT OF THE CASE

In its opening memorandum, the Committee recited the factual information relevant to the issue now before the Court. *See* Comm. SJ Mem. at 10-19. In now opposing the Attorney General's cross-motion, the Committee relies on that earlier factual recitation as well as the Committee's Rule 56 Statement ¶¶ 1-64; its Response to Defendant's Rule 56 Statement of Material Facts as to Which There Is No Genuine Issue (Feb. 14, 2014); all supporting declarations and associated documentary materials filed with the Committee's opening memorandum and this memorandum; and the Committee's objections to the Declarations of M. Faith Burton . . . (Jan. 21, 2014) (ECF No. 63-1) ("Burton Declaration"), and Paul P. Colborn . . . (Jan. 21, 2014) (ECF No. 63-2) ("Colborn Declaration"), set forth in the Committee's motion to strike, *see* Pl.'s Mot. to Strike . . . (Feb. 14, 2014) ("Motion to Strike").

In addition, the Committee responds very briefly to three issues raised in Defendant's Response to Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue (Jan. 21, 2014) (ECF No. 64-1) ("AG Rule 56 Response"). *First*, the Attorney General identified only three paragraphs from the Committee Rule 56 Statement as "disputed," *see* AG Rule 56 Resp. ¶¶ 16, 17, 59. None of those "disputes" is genuine or material.[6]

---

[6] With respect to paragraph 16 of the Committee Rule 56 Statement, the parties first dispute whether DOJ produced a single document to the Committee on June 8, 2011. *Compare* Burton Decl. ¶ 11, *with* Decl. of Carlton J. Davis ¶ 2 (Dec. 16, 2013) (ECF No. 61-34) ("Davis Declaration"), Second Decl. of Stephen R. Castor ¶¶ 2-4 (Feb. 14, 2014) ("Second Castor Declaration"), Second Decl. of Ashok Pinto ¶¶ 2-4 (Feb. 14, 2014), *and* Second Decl. of Carlton J. Davis ¶¶ 2-4 (Feb. 14, 2014). That dispute is self-evidently immaterial. The parties also dispute whether documents shared only in camera should be counted as "produced" to the

*Second*, the Attorney General grumbled that he lacked access to the full transcripts of the Committee's interviews of Kenneth E. Melson, Gary Grindler, and Jason Weinstein. *See id.* ¶¶ 24, 46, 47. He now has them. *See* Pl.'s Provisionally Unopposed Mot. for Leave to File under Seal Three Interview Trs. (Feb. 3, 2014) (ECF No. 65) (indicating service of transcripts).

*Third*, the Attorney General asserted as fact that the DOJ Inspector General ("DOJ IG") may review "law enforcement sensitive material of the sort that cannot be shared with Congress." AG Rule 56 Response ¶ 44. However, he cited nothing for the proposition that law enforcement sensitive materials "cannot be shared with Congress," and elsewhere has admitted that DOJ does – and in this case did – provide "sensitive law enforcement" information to Congress. AG SJ Mem. at 8.

## ARGUMENT

Our argument proceeds as follows: In Part I, we explain why summary judgment on the Attorney General's common law deliberative process assertion is appropriate at this time. *See infra* pp. 7-10. In Part II, we explain why the Court should neither consider the Attorney

---

Committee. *Compare* AG Rule 56 Resp. ¶ 16 (citing unauthenticated letters for truth of their assertions regarding number of pages made available to Committee), *with* Davis Declaration ¶¶ 8, 10 (noting number of pages actually produced). Given the Attorney General's lack of record evidence, this dispute is not genuine; nor in any event is it material.

With respect to paragraph 17 of the Committee Rule 56 Statement, the Attorney General "disputes" the Committee's characterization of redactions applied to documents reviewed *in camera*. The Committee's position is that "many" documents were redacted; the Attorney General's position is that DOJ made only "limited" redactions. The only support for the Attorney General's position is a single citation to a June 13, 2011 letter from Assistant Attorney General Weich to Chairman Issa, which never was authenticated and apparently is offered for the truth of its assertions. This dispute also is neither genuine nor material.

Finally, with respect to paragraph 59 of the Committee Rule 56 Statement, the "dispute" appears to relate to the Committee's inadvertent reference to January 4, 2013, instead of January 3, 2013. That dispute is not material, particularly given that the Attorney General has admitted the substance of paragraph 59. *See* Answer to First Am. Compl. ¶ 65 (Nov. 15, 2013) (ECF. No. 56) ("Answer").

General's CDP privilege proposal, nor recognize it if the Court does consider it. *See infra* pp.

11-29. In Part III, we explain why the Committee would be entitled to the Post-February 4

Subset, even if the Court recognized a new CDP privilege. *See infra* pp. 29-37. And, in Part IV,

we respond to the Attorney General's flawed efforts to limit the relief available to the Committee

in this action. *See infra* pp. 37-44.

**I.     The Attorney General Effectively Has Conceded the Committee's Arguments on His Common Law Deliberative Process Privilege Assertion.**

Notwithstanding the Attorney General's late-breaking effort to put some distance

between himself and his original common law privilege assertion, *see, e.g.*, AG SJ Mem. at 33

("[R]ules applicable to common-law and statutory privileges are inapplicable to this dispute."),

the validity of that assertion is before the Court, and the Court should rule on it, regardless of

whether the Court also elects to rule on the Attorney General's new CDP privilege proposal.

While the Supreme Court has recognized a limited privilege, rooted in constitutional

separation of powers principles, for presidential communications, *see* Comm. SJ Mem. at 19-20,

this Circuit has held that the deliberative process privilege – sometimes characterized as a type of

executive privilege – is a common law privilege. *See id*. at 20, 25-26. Because (i) the June 20,

2012 Privilege Letter asserts "executive privilege"; (ii) the Attorney General has foresworn

reliance on the presidential communications privilege, *id*. at 20; (iii) the Attorney General was

explicit about seeking to protect responsive documents generated "'in the course of [DOJ's]

deliberative process concerning how to respond to congressional and related media inquiries into

[the Fast and Furious] operation,'" *id*. at 17 (quoting June 19, 2012 AG Letter at 1-2); and

(iv) Circuit law is so explicit that deliberative process is a common law privilege, *id*. at 20, 25-

26, the Attorney General's "executive privilege" assertion *necessarily* translates, in legal terms,

into an assertion of the common law deliberative process privilege. *Id*. at 20.

This is confirmed by the fact, as noted above, that the "congressional and related media inquiry response" construct is lifted from the FOIA context where the Executive Branch consistently has resisted producing such documents to FOIA requesters on the ground that such documents are protected by the common law deliberative process privilege.[7]  And that is exactly the legal rubric under which the courts have analyzed such documents.[8]

Since it is clear to us that the June 20, 2012 Privilege Letter, at least initially, asserted the common law deliberative process privilege – and clearly, we believe, to this Court as well[9] – the Committee moved for summary judgment on the following grounds:  (i) the deliberative process privilege does not apply here because the Committee is investigating DOJ misconduct, *see* Comm. SJ Mem. at 21-25; (ii) that privilege may not be asserted in response to a congressional subpoena, *see id*. at 25-33; (iii) it is invalid here because it was not asserted in compliance with the terms of the Holder Subpoena, *see id*. at 33-36; (iv) the Attorney General has admitted that

---

[7]  *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 208 (D.D.C. 2010) (DOJ asserted deliberative process privilege as to "email messages involving recommendations and evaluations for how to respond to Congressional and media requests for information"); *Alexander v. FBI*, 186 F.R.D. 154, 163 (D.D.C. 1999) (Department of Defense asserted deliberative process privilege as to various documents, including "those pertaining to responses to Congressional inquiries [and drafts of press releases] regarding the release of Tripp's background security information"); *Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 12 (D.D.C. 1995) (Office of Government Ethics asserted deliberative process privilege as to "draft responses to a congressional inquiry"); *Nat'l Sec. Archive v. FBI*, 759 F. Supp. 872, 882 (D.D.C. 1991) (FBI asserted deliberative process privilege as to briefing book prepared to assist FBI director in testimony before congressional subcommittee).

[8]  *See, e.g.*, *Judicial Watch*, 736 F. Supp. 2d at 207-09; *Alexander*, 186 F.R.D. at 163-66; *Judicial Watch*, 880 F. Supp. at 12-13; *Nat'l Sec. Archive*, 759 F. Supp. at 879-82.

[9]  *See* Mem. Op. at 27 n.7 (This case "raises a narrow legal question:  can the executive properly assert executive privilege to shield an agency's deliberative processes when the records in dispute do not reveal advice provided to the President himself or address his core constitutional functions?"); *id.* at 3 ("In a letter dated June 20, 2012, the Deputy Attorney General . . . stated that the President had asserted executive privilege over documents dated after February 4, 2011 because their disclosure would reveal the agency's deliberative processes."); *id.* at 36; Minute Order (Feb. 4, 2014).

some withheld responsive documents do not satisfy the elements of the privilege, *see id*. at 37;

and (v) even if the privilege could be asserted in response to a congressional subpoena, (a) the

Attorney General had not, and could not, satisfy *his obligation* to demonstrate that each withheld

responsive document was both pre-decisional and deliberative, and (b) the Committee's

substantial need for the documents requires that they be produced in any event, *see id*. at 37-44.

The Attorney General has elected not to address *any* of these arguments, apparently in the

firm conviction that the Court must rule first on his heretofore unrecognized CDP idea.  *See* AG

SJ Mem. at 33 n.10 (suggesting that if Court unpersuaded, it can consider Attorney General's

common law privilege claims later).  But that is not how subpoena enforcement litigation works:

> A subpoena has never been treated as an invitation to a game of
> hare and hounds, in which the witness must testify only if cornered
> at the end of the chase.  If that were the case, then, indeed, the
> great power of testimonial compulsion, so necessary to the
> effective functioning of courts and legislatures, would be a nullity.

*United States v. Bryan*, 339 U.S. 323, 331 (1950) (rejecting, in context of contempt of Congress

prosecution, objection to congressional subpoena lodged after return date).  The common law

privilege issue clearly is before this Court (and it has been since day one); the Attorney General

has had ample opportunity to respond to the Committee's arguments; and he has chosen to stand

aside and wager all his chips on a constitutional roll of the dice.[10]

Under these circumstances, the Attorney General effectively has conceded the

Committee's arguments with respect to his common law deliberative process assertion by

waiving the opportunity to respond to them.  *See, e.g*., *Lewis v. Dist. of Columbia*, No. 10-5275,

---

[10]  The Attorney General addresses our misconduct and subpoena non-compliance arguments,
but only with respect to CDP, *not* with respect to his common law deliberative process assertion.
*See* AG SJ Mem. at 34-39.  And he addresses the Committee's "substantial need" argument, but
only to the extent of contending that the Court cannot reach that issue, *see* AG SJ Mem. at 39-42,
an untenable position we refute below, *see infra* Argument, Part IV.A.

2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011) (per curiam) (district court did not abuse its discretion in granting motions as conceded where response failed to address motions' substance); *Mack v. WP Co.*, 923 F. Supp. 2d 294, 302 (D.D.C. 2013) ("'It is understood in this Circuit that when a [responding party] files an opposition to a dispositive motion and addresses only certain arguments raised by the [moving party], a court may treat those arguments that the [responding party] failed to address as conceded.'" (quoting *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003), and citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997))); *Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149 (D.D.C. 2002) ("[I]f the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case.").[11]

Furthermore, the Attorney General may not address for the first time in his reply – or at *any* later date – the common law deliberative process privilege arguments advanced by the Committee in its opening memorandum. *See, e.g.*, *Newspaper Ass'n of Am. v. Postal Regulatory Comm'n*, 734 F.3d 1208, 1212 (D.C. Cir. 2013) ("[W]e have repeatedly held that we do not consider arguments raised only in a reply brief." (citing cases)); *Mich. Gambling Opp'n v. Kempthorne*, 525 F.3d 23, 29 n.4 (D.C. Cir. 2008) ("Absent extraordinary circumstances[,] we do not entertain an argument raised for the first time in a reply brief." (quotation marks, brackets, and ellipses omitted)).

Accordingly, judgment for the Committee on the common law deliberative process issue is appropriate at this time.

---

[11]   *See also Bradshaw v. Office of the Architect of the Capitol*, 856 F. Supp. 2d 126, 143-44 (D.D.C. 2012); *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002); *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002).

**II.    The Court Should Reject the Attorney General's Request That It Manufacture for Him a New Constitutional Privilege.**

At this point, the Attorney General effectively has acknowledged that he has *no* justification for withholding *any* Post-February 4 Subset document under *any* recognized version of executive privilege.  And so, having effectively conceded that his assertion of a common law privilege in response to the Holder Subpoenas is not consistent with constitutional principles that mandate congressional oversight of DOJ, *see* Comm. SJ Mem. at 27-33, he now asks the Court to fashion for him a "constitutionally-based Executive Privilege . . . grounded in the Executive's need to protect information about its internal deliberative processes in responding to congressional [and related media] inquiries," AG SJ Mem. at 32-33, i.e., a CDP privilege.

The Attorney General eschews any description of principles or parameters that might constrain or actually define his proposed CDP privilege.  He does, however, say that his proposed CDP privilege would:

- apply to all levels of the Executive Branch, *id.* at 24 n.5;

- cover "[DOJ's] internal records related to its response to Congress . . . generated *after* the drafting of the February 4 [False Statement] letter," *id.* at 3 (emphasis in original); and

- cover documents "not specifically prepared in the course of responding to congressional . . . inquiries," including documents "prepared in the course of responding to . . . related media inquiries," and even documents that merely "address issues that arose as a result of the Committee's investigation," *id.* at 32.

Thus, although the Attorney General says any "detailed description of the documents that have been withheld pursuant to [the CDP privilege] . . . is unnecessary," *id.* at 41, his proposed CDP

privilege clearly is intended to cover Post-February 4 Subset documents (although perhaps not all of them, *see supra* note 5).

Finally, the Attorney General makes clear that the President, not the courts, would determine whether Congress would receive any information when the CDP privilege was asserted.  *See, e.g.*, AG SJ Mem. at 33 n.10 ("President's assertion of Executive Privilege is dispositive"); *id.* at 41-42 (any "evaluation" by Court of Committee's need for Post-February 4 Subset "unwarranted" because President already has performed that function).  The only authority for this "executive-always-wins-and-Congress-always-loses" proposal is DOJ itself, in the form of various DOJ Office of Legal Counsel ("OLC") and Attorney General opinions on which the Attorney General heavily relies.  *See, e.g.*, *id*. at 14-18, 20, 24, 29, 33.

The Court should decline to consider the Attorney General's CDP privilege proposal because it was not asserted in compliance with the terms of the Holder Subpoena.  *See infra* Argument, Part II.A.  If, however, the Court does consider the merits of the Attorney General's proposal, it should decline to recognize a new CDP privilege.  *See infra* Argument, Part II.B.

> **A.      The Attorney General's Proposed New Privilege Was Not Asserted in Reasonable Compliance with the Holder Subpoena and, Therefore, Should Not Be Considered.**

The Attorney General's proposed new CDP privilege was not asserted in reasonable compliance with the terms of the Holder Subpoena; it is, therefore, invalid, for the same reasons that his common law deliberative process privilege assertion is invalid, *see* Comm. SJ Mem. at 33-36, and, accordingly, the Court need not, and should not, even consider it.

The Attorney General, anticipating this argument, says that "the Executive Branch" often "negotiates with Congress past the subpoena return date," AG SJ Mem. at 35, and from there argues that (i) timely invocation of a privilege necessarily will "short circuit" that negotiation

process, and (ii) the Committee can establish "no prejudice as a result of the timing of the Executive Privilege assertion" here.  *Id*. at 34-36 & n.12.  While the Attorney General's observation that Congress and the Executive sometimes negotiate past the return date on a congressional subpoena is true (though overstated), his two subsequent conclusions are not.

1.  We explained earlier why timely privilege assertions are important as a structural matter, *see* Comm. SJ Mem. at 34, and how historically the Executive Branch has *not* routinely withheld privilege assertions until long after the subpoena return date, as the Attorney General implies.  *See* Comm. SJ Mem. at 34 & n.37.[12]  Indeed, timely assertion is what the law requires:

> [I]f [a] respondent [to a Committee's subpoena] ha[s] legitimate reasons for failing to produce the records . . . , a decent respect for the House of Representatives, by whose authority the subpoenas issued, . . . require[s] that []he state h[is] reasons for noncompliance upon the return of the writ.

*Bryan*, 339 U.S. at 332.[13]  The Attorney General must comply in a timely fashion with judicial subpoenas, and congressional subpoenas are entitled to no less respect.[14]

---

[12]  *See also Senate Select Comm. on Pres. Campaign Act. v. Nixon*, 498 F.2d 725, 727 (D.C. Cir. 1974) (privileges timely asserted in response to congressional subpoena); Committee on Oversight and Gov't Reform Report: *Everything Secret Degenerates, The FBI's Use of Murderers As Informants*, H. Rep. 108-414, 129, 134-35 (2004) (same); *Environmental Crimes at the Rocky Flats Nuclear Weapons Facility: Hr'gs before the Subcomm. on Investigations & Oversight of the H. Comm. on Science, Space & Tech.*, vol. I, 102d Cong. 25-31 (1992) (same); *cf. United States v. Nixon*, 418 U.S. 683, 687-88, 713 (1974) ("*Nixon I*") (privilege asserted by return date of criminal discovery subpoena); *United States v. Poindexter*, 727 F. Supp. 1501, 1503 (D.D.C. 1989) (same).

[13]  *See also Bryan*, 339 U.S. at 331 (congressional subpoena respondents "have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative . . . machinery"); *id*. at 332-33 (rejecting, in context of contempt of Congress prosecution, objection to congressional subpoena lodged after return date); *id*. at 344 (Jackson, J., concurring) (withholding objections to congressional subpoena "profits only the witness who seeks a concealed defect to exploit"); *cf. Nixon I*, 418 U.S. at 713 ("If a President concludes that compliance with a subpoena would be injurious to the public interest he may properly, as was done here, invoke a claim of privilege *on return of the subpoena*." (emphasis added)); *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 72 (D.D.C. 2008) ("federal precedent

13

Moreover, it should be self-evident that timely privilege assertions do not automatically preclude or "short-circuit" negotiations; in fact, just the opposite is true.[15]  Indeed, the Attorney General has identified no instance, and we are aware of none, in which a timely privilege assertion by the Executive "short-circuited" negotiations with Congress.

In reality, the success or failure of such inter-branch negotiations turns on a variety of factors, including the importance of the interests at stake; the political relations between the branches; whether the Executive, philosophically, views congressional oversight as an essential component of our constitutional system of checks and balances or merely a nuisance to be avoided if possible; and whether the parties are negotiating in good faith, which, in turn, requires timely privilege assertions and full disclosure of the reasons why documents are being withheld. *Cf. United States v. AT&T*, 567 F.2d 121, 133 n.40 (D.C. Cir. 1977) (both parties have "a plain duty . . . to advance any problems for prompt consideration").[16]

---

dating back as far as 1807 contemplates that even the Executive is bound to comply with duly issued subpoenas"); *United States v. Burr*, 25 F. Cas. 30, 37 (C.C.D. Va. 1807) (claims of presidential privilege "will have [their] due consideration on return of the subpoena").

[14]  The Attorney General justifies his position principally on the basis of paragraph 7 of the Colborn Declaration, which reiterates the Attorney General's legal conclusions in the guise of a sworn statement.  This Court should not credit the Colborn Declaration.  *See* Mot. to Strike; *see also* AG SJ Mem., Ex. N ¶¶ 2, 5 (DOJ policy requires, in regard to possible executive privilege claim in response to congressional inquiry, prompt notice to President's Counsel and congressional entity).

[15]  *See, e.g.*, *Miers*, 558 F. Supp. 2d at 63-64 ("prolonged period of negotiation" between House committee and White House followed timely executive privilege assertion); *cf. Espy*, 121 F.3d at 735, 740-41 (White House timely informed Office of Independent Counsel of likely assertion of executive privilege and produced privilege log; assertion "provoke[ed] lengthy negotiations" over next seven months).

[16]  The Attorney General's statement that "the Committee's scheduling of a contempt vote . . . short-circuited the accommodation and negotiation process," AG SJ Mem. at 36, is belied by the facts.  The contempt vote was the culmination of a long process that failed primarily because the Attorney General, early on, drew a hard February 4, 2011 line in the sand – and then never budged.  *See* Comm. SJ Mem. at 16 & n.24.

2.  The Attorney General's contention that the Committee has not been prejudiced here also cannot be taken seriously.  *See Bryan,* 339 U.S. at 333 (failure promptly to raise objection contributed to delay of congressional investigation); Comm. SJ Mem. at 34 (explaining why Congress harmed by untimely privilege assertions, as general matter); *id.* at 36 (explaining particular prejudice to Committee in this case); *cf. Espy*, 121 F.3d at 735, 740-41 (no prejudice to Office of Independent Counsel where White House informed that office, prior to subpoena return date, that it "likely would be asserting privilege").

For these reasons, the Court should decline to reach the merits of the Attorney General's CDP privilege proposal.

**B.      The Court Should Decline to Recognize a New Constitutional Privilege.**

If the Court elects to consider the merits of the Attorney General's CDP privilege proposal, it should decline to recognize such a privilege.

**1.      Existing Precedent Strongly Supports Non-Recognition.**

As a general proposition, federal courts are discouraged from recognizing new privileges, whether of the constitutional or common law variety.  *See, e.g., Herbert v. Lando*, 441 U.S. 153, 169-70, 174-75 (1979) (refusing "to modify firmly established constitutional doctrine" to create a new, constitutionalized privilege, when justification for "modification is by no means clear and convincing"); *Nixon I*, 418 U.S. at 710 (new privileges "are not lightly created"); *Branzburg v. Hayes*, 408 U.S. 665, 689, 702-04 (1972) (refusing to create new First Amendment privilege, and asserting disinclination to "embark the judiciary on a long and difficult journey . . . [that, in administering such a new, constitutionalized privilege] would present practical and conceptual difficulties of a high order"); *In Re:  A Witness Before the Special Grand Jury 2000-2*, 288 F.3d 289, 292 (7th Cir. 2002) (federal courts are to "avoid . . . extending privileges to new,

unchartered waters absent compelling considerations"); *In re Sealed Case*, 148 F.3d 1073, 1076 (D.C. Cir. 1998) ("Even in cases where the proposed privilege is designed in part to protect constitutional rights, the Supreme Court has demanded that the proponent come forward with a compelling empirical case for the necessity of the privilege."); *id*. at 1078 ("[W]e are constrained not to recognize any new privilege the need for which is less than 'clear and convincing.'").  The Attorney General has not made anything close to a "clear and convincing" case of need for the recognition of his proposed CDP privilege.

Furthermore, this Circuit already has rejected the Attorney General's predicate argument that "[t]here is only one Executive Privilege, grounded in the Constitution." AG SJ Mem. at 20. In *Espy*, the Executive asserted the presidential communications and deliberative process privileges.  *See* 121 F.3d at 740.  The Court stated that the term "'[e]xecutive privilege' is generally used to refer to a wide variety of evidentiary and substantive privileges that courts accord the executive branch," *id*. at 735 n.2, and then explained that, while both the presidential communications and deliberative process privileges are aspects of executive privilege, *see id*. at 737-38, 745, they nonetheless "are distinct and have different scopes," *id*. at 745.[17]

*Espy* makes clear that the deliberative process privilege is *not* a constitutional privilege, and that the presidential communications privilege "is rooted in constitutional separation of powers principles" because of "the President's unique constitutional role" in our system of government.  121 F.3d at 745; *see also id*. at 752 (presidential communications "bottomed on a

---

[17]  *See also, e.g.*, *Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302, 1305 n.3 (Fed. Cir. 2006) ("The deliberative process privilege is but one of several privileges that generally fall within the scope of the more general executive privilege." (quotation marks omitted)); *Lardner v. U.S. Dep't of Justice*, No. 03-cv-0180, 2005 WL 758267, at *5 (D.D.C. Mar. 31, 2005) ("Although closely affiliated, the two privileges are distinct and have different scopes." (quotation marks omitted)).

recognition of the unique role of the President"); *Judicial Watch v. Dep't of Justice*, 365 F.3d 1108, 1121 (D.C. Cir. 2004) (same); Comm. SJ Mem. at 25-26.  Plainly, the Attorney General is not the President and occupies no unique place in our constitutional structure; he is only the head of a congressionally-created Executive Branch agency.

Moreover, his proposed CDP privilege is the mirror image of another argument earlier advanced by the Executive Branch and rejected by this Circuit, namely, the contention that the scope of the presidential communications privilege should be extended beyond the President's immediate advisors to officials further downstream.  *See Judicial Watch*, 365 F.3d at 1121 (rejecting expansion of presidential communications privilege to cabinet officers – including Attorney General – and their staffs on ground that doing so would "'pose a significant risk of expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President'" (quoting *Espy*, 121 F.3d at 788)); *id.* (rejecting argument that Attorney General is part of "'President's immediate personal staff'" (quoting *Ryan v. Dep't of Justice*, 617 F.2d 781, 788 (D.C. Cir. 1980))); *cf. Nixon I*, 418 U.S. at 710 (presidential communications privilege must not be "expansively construed"); *Nixon v. Sirica*, 487 F.2d 700, 716 n.70 (D.C. Cir. 1973) (Constitution and separation of powers concepts "do not mandate a decision which blindly applies the same privilege to the entire executive branch.").

Finally, in non-congressional contexts, the Executive Branch already has a vehicle – the common law deliberative process privilege – by which it can, in appropriate circumstances, protect congressional and media response documents.  *See supra* Argument, Part I.  Accordingly, recognition of a CDP privilege would serve no purpose other than to impair *Congress's* ability to obtain information from the Executive Branch in certain circumstances.  But impairment by one branch of the "essential functions of [another] branch is impermissible."  *Cheney v. U.S. Dist. Ct.*

*for D.C.*, 542 U.S. 367, 384 (2004) (citing *Nixon I*, 418 U.S. at 707); *see also Loving v. United States*, 517 U.S. 748, 757 (1996) (separation of powers doctrine "requires that a branch not impair another in the performance of its constitutional duties").  And plainly, oversight of the Executive Branch, including DOJ, is an essential constitutional function of the Legislative Branch; indeed it is a core component of Congress's Article I legislative responsibilities.  *See* Comm. SJ Mem. at 5-10.  (Non-recognition of CDP, on the other hand, will not impair any essential function of the Executive Branch.  It will be able to carry out all of its essential functions, even if, from time to time, it also must provide information to Congress.)

In sum, what the Attorney General seeks here flies directly in the face of all existing judicial precedent.

### 2. The Attorney General's Asserted Policy Rationales Are Not Tenable.

Because the judicial authorities cited by the Attorney General do not justify the recognition of a CDP privilege, *see supra* Argument, Part II.B.1, he must resort to policy arguments that break out as follows:  (i) when the President asserts Executive privilege in response to a congressional subpoena, his assertion, without more, automatically vests the privilege with "constitutional dimension," AG SJ Mem. at 18, 19 & n.4;[18] (ii) responding to congressional subpoenas is "a core part of the constitutional scheme, and one that requires Executive Branch independence and confidentiality," *id*. at 20; (iii) responding to a

---

[18]   *See also* AG SJ Mem. at 19 ("Whatever the specific basis for a President's assertion of Executive Privilege in response to a congressional subpoena, . . . the President's assertion of Executive Privilege in response to a congressional demand is consistently grounded in the 'executive function vested in the President by Article II of the Constitution.'" (quoting June 19, 2012 AG Letter at 2)); *id*. at 19 n.4 ("[A]n assertion of Executive Privilege . . . made by the President himself[] demonstrate[s] the constitutional dimension of the Privilege . . . ."); *id*. at 25 ("[P]residential assertion of the constitutional Executive Privilege . . . is . . . derived from the Constitution.").

congressional inquiry is an adversarial undertaking and, in that context, "the danger of congressional encroachment on the Executive sphere is particularly acute," *id.* at 27, such that the Executive requires a privilege that "mirrors" privileges available in "the litigation context," such as the work product doctrine, *id.* at 20-21; and (iv) if the Court does not do as the Attorney General asks, dire separation of powers consequences will follow, *id.* at 25-27.  None of these arguments is tenable.

(i).  <u>The Presidential Assertion Rationale</u>.  The first asserted justification – when the President asserts a privilege, that privilege necessarily is rooted in the Constitution – is supported by no authority, ignores *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), and is just wrong. Not everything the President touches takes on a constitutional dimension merely because it is the President doing the touching.[19]  Indeed, if this were so, the President's power over Executive Branch information would be virtually unlimited.  He could, for example, gut FOIA merely by asserting privilege as to any document the Executive Branch wished to withhold.  *Cf. Sirica*, 487 F.2d at 714-16 (merely because President asserts "executive privilege" does not make it so).

(ii)(a).  <u>The Congressional Subpoena Rationale</u>.  The Attorney General explains his contention that the Executive Branch's *response to a congressional subpoena* necessarily is "a core part of the constitutional scheme," AG SJ Mem. at 20, as follows:  "[T]he process of preparing the Executive Branch's response to a request for information is inherently deliberative, and necessarily entails consideration of how to balance Congress' desire for information against the constitutional prerogatives of the Executive Branch."  *Id*.

---

[19]  *Cf.* Richard M. Nixon, Television Interview with David Frost (May 19, 1977) ("when the President does it that means that it is not illegal"), *available at* http://www.youtube.com/watch?v=tYdJqSG3K6c.

However, while it is beyond question that the Committee's authority to issue subpoenas, and to oversee the Executive Branch generally (and DOJ in particular), is firmly rooted in Article I, *see* Comm. SJ Mem. at 5-10, the fact that a subpoena issues from Congress simply does not render the Executive's response a constitutional function.  Moreover, the only concrete "constitutional prerogative[] of the Executive Branch" identified by the Attorney General is the Take Care Clause, U.S. Const. art. II, § 3, cl. 2, to which he refers just once.  *See* AG SJ Mem. at 1.  However, if the Take Care Clause is the "constitutional prerogative" the Attorney General has in mind, it cannot bear the weight the Attorney General places on it.

*First*, the Take Care Clause responsibility is not one of the President's non-delegable powers, as to which the presidential communications privilege might provide protection in certain circumstances.[20]  *Second*, the Take Care Clause is predicated on Congress's Article I legislative authority; that is, the laws the President is obligated to "take Care" be "faithfully executed" are adopted by Congress.  It would be peculiar, to say the least, to construe that Clause as justifying the creation of a privilege that would interfere with Congress's ability to obtain the information it needs to enact laws for the Executive to enforce.  *Third*, congressional oversight simply is not inherently at odds with, and thus need not be "balanced" by the Attorney General against, the Executive's obligation to faithfully execute the laws.  *Fourth*, the Attorney General's reliance on the Take Care Clause proves too much:  If that Clause justifies the creation of a CDP privilege, it also would support the creation of a constitutional privilege covering operational and

---

[20]  *See, e.g.*, *Espy*, 121 F.3d at 752-53 (in determining applicability of presidential communications privilege to certain documents, expressly contrasting "quintessential and non-delegable Presidential power" under Appointments Clause with general executive powers, such as under the Take Care Clause); *cf. Morrison v. Olson*, 487 U.S. 654, 691-92 (1988) (holding that independent counsel statute did not infringe on executive prerogatives in part because law enforcement functions are not "so central to the functioning of the Executive Branch").

programmatic information that even more directly concerns the Executive's enforcement of the laws.  In this case, that would be the operational aspects of Fast and Furious which the Attorney General repeatedly has said *are* legitimate objects of the Committee's investigative efforts.  *See* Comm. SJ Mem. at 13.

Another version of the Attorney General's "constitutional prerogative" argument – packaged in more convoluted language – is that responding to congressional subpoenas "*relates* directly to the Executive's independence from the other political Branch and its *relationship* with Congress in a process of negotiation and accommodation that is itself *derived* from the Constitution."  AG SJ Mem. at 25 (emphasis added).  This is a non sequitur.  Because the toe bone is connected to the foot bone, and the foot bone is connected to the ankle bone, and so on up to the head bone, does not make the toe bone the head bone.

Moreover, even if negotiation is an "implicit constitutional mandate," *AT&T*, 567 F.2d at 127, that simply is not a basis for locating in the Constitution a privilege that would shield from congressional oversight the Executive Branch's response to congressional and related media inquiries.  Indeed, the recognition of such a privilege would have the perverse effect of *stunting* the negotiation and accommodation process by reducing still further the Executive Branch's incentive to compromise.

And finally, it is difficult to take seriously the Attorney General's concerns about "negotiation and accommodation," given that his proposal would have the President (or, in this case, the Attorney General) making all the decisions – whether and when to assert the CDP privilege, whether Congress has any legitimate interest in the documents sought, and whether Congress's interests are sufficient to require the documents' release – and Congress inevitably getting nothing beyond what the Executive chooses to dole out.

(ii)(b).   <u>The Confidentiality/Chilling Rationale</u>.   Also wrong is the Attorney General's related contention that responding to the Holder Subpoena "requires Executive Branch independence and confidentiality."   AG SJ Mem. at 20.   In support, the Attorney General relies heavily on statements made in *Nixon I*.   *See id.* at 23.   However, while *Nixon I* justified the qualified presidential communications privilege on the need to protect the "expectation of a President to the confidentiality of *his* conversations and correspondence," 418 U.S. at 708 (emphasis added), that ruling was predicated on the unique place of the President in our constitutional scheme, *see id.*; *Judicial Watch*, 365 F.3d at 1121; *Espy*, 121 F.3d at 745, 752.   As noted, the Attorney General is not the President or even a constitutional actor.   He, like the agency he heads, is a creation of the Congress, *see* Comm. SJ Mem. at 7-10, and it would be surpassingly strange for the Court to locate in the Constitution a privilege that necessarily would stymie Congress's oversight of its creation.   That is especially true where, as here, the Committee is investigating DOJ's obstruction of Congress.

Only an absolute privilege would provide the confidentiality the Attorney General apparently believes necessary.   But even the presidential communications privilege is not absolute (meaning that even the President cannot be certain his conversations with his close advisors will remain confidential), and certainly the Attorney General's proposed CDP privilege likewise would not be absolute.   *See* AG SJ Mem. at 21; *infra* Argument, Part III.A.

Finally, the Court should reject the implicit premise of the Attorney General's argument that confidentiality in agency decision-making leads to greater candor which, in turn, translates into better decisions.   It certainly did not in the Holder DOJ in this case (just as it did not in the Nixon White House 40 years ago).   *See* Comm. SJ Mem. at 2, 10-16, 21-25.   The balance struck by the deliberative process privilege is an appropriate one.   It – in both its common law and

FOIA manifestations – protects certain aspects of Executive Branch decision-making from intrusion by private litigants and the general public, but it ensures enough sunshine to provide some incentive for good behavior.  And, importantly, it does not prevent Congress from carrying out its critical constitutional responsibility to oversee the Executive Branch, including in instances, as here, where there is evidence, and/or there are credible allegations, that the Executive has acted in a manner inconsistent with the public interest.  The possibility of congressional oversight is a *good thing* for agency decision-making and, by extension, the Nation at large; it is not a threat, and the manifest implication of the Attorney General's position – that there be *no oversight* whatsoever in these kinds of situations – should be rejected.[21]

(iii).  The Adversarial Investigation Rationale.  The Attorney General's argument that congressional investigations are always adversarial to the Executive Branch also is wrong.

*First*, the Supreme Court already has rejected that notion.  *See Hannah v. Larche*, 363 U.S. 420, 442, 444 (1960) (distinguishing between adjudicatory proceedings, which are adversarial in nature and thus require judicial procedures, and fact-finding investigations, which are not, and for which "it is not necessary that the full panoply of judicial procedures be used"; noting quintessential example of a non-adversarial investigative body is a legislative committee); *see also* Comm. SJ Mem. at 28-29.

*Second*, while it is true that sparks sometimes fly when Congress investigates, history indicates that this is the exception, not the rule.  In furtherance of its legislative responsibilities, Congress investigates daily to collect information, in many different ways, on all sorts of

---

[21]  The case law the Attorney General cites does not support his argument.  None of his cases involves a congressional subpoena or concerns an Executive Branch response to Congress, and none even purports to rely on the expansive conception of executive privilege the Attorney General advocates here.

subjects. *See, e.g.*, Burton Decl. ¶ 2 (in 2010, 2011, 2012, and 2013, DOJ received from Congress 719, 776, 632, and 589 requests for information, respectively). The vast majority of these efforts are not adversarial even in a colloquial sense, and none are adversarial in a legal sense, as *Hannah* makes clear.

*Third*, the contention that "the danger of congressional encroachment on the Executive sphere is particularly acute" in the context of congressional investigations, AG SJ Mem. at 27, makes no sense. "Congressional investigation" is but another name for congressional oversight, and oversight of the Executive is mandated by the Constitution and is essential to the separation of powers principles embodied in the Constitution. *See* Comm. SJ Mem. at 5-10. The Attorney General, of course, has an "unremitting obligation to respond to congressional subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation." *Watkins v. United States*, 354 U.S. 178, 187-88 (1957). Accordingly, it is just plain silly to suggest that the existence of the Committee's investigation justifies the creation of a constitutional privilege to enable the Attorney General to avoid producing to the Committee records that concern the obstruction of that very investigation.

*Fourth*, contrary to the Attorney General's suggestion otherwise, the "attorney work product doctrine" does not provide an "apt analogy" for the proposed CDP privilege. AG SJ Mem. at 27. This argument is premised on the notion that congressional investigations are inherently adversarial, which they are not, as discussed above. Moreover, the work product doctrine is a highly qualified common-law privilege,[22] which hardly advances the Attorney General's case for the creation of a new constitutional privilege. And finally, the Attorney

---

[22] *See, e.g.*, *Hickman v. Taylor*, 329 U.S. 495, 511 (1947); *United States v. One Tract of Real Prop.*, 95 F.3d 422, 428 (6th Cir. 1996); *In re Grand Jury Proceedings*, 601 F.2d 162, 169 n.2 (5th Cir. 1979); *United States ex rel. Purcell v. MWI Corp.*, 238 F.R.D. 321, 326 (D.D.C. 2006).

General's work-product argument ultimately leads right back to his generalized confidentiality concern:  "At its core, the attorney work product doctrine recognizes that confidentiality is necessary . . . ."  AG SJ Mem. at 28.  We already have addressed that concern.

(iv).  <u>The Separation of Powers Consequences Rationale</u>.  Finally, the Attorney General says dire separation of powers consequences will follow if the Court does not recognize a new CDP privilege.  *See, e.g.*, AG SJ Mem. at 18 ("compelled disclosure of information [in this case] would interfere with the Executive's constitutional function"); *id*. at 25 (Holder Subpoena poses a "threat to the proper functioning of the Executive Branch and the separation of powers").  The principal problem with these sky-is-falling type claims is that the Attorney General does not, because he cannot, identify any specific constitutional function that will be interfered with if he has to produce the Post-February 4 Subset.

His generalized concern that the "ability of the Executive Branch to negotiate effectively would be impaired, knowing that Congress would be privy to all of the Executive's internal deliberations and negotiation strategies," AG SJ Mem. at 26-27, is misplaced.  Congress has finite resources with which to conduct oversight; Congress – the House in particular – is directly accountable to the voters on a two-year election cycle; and Members of Congress have significant official responsibilities aside from oversight (including preparing and developing support for legislation; providing information and services to their constituents; and monitoring the political pulse of their constituencies on specific issues of the day).  Members, in addition, also must devote significant time to other unofficial, but very practically necessary, matters such as campaigning and raising re-election funds.

What this means, practically, is that congressional committees must make oversight decisions very carefully; determine as precisely as possible what kinds of information is needed;

and utilize their investigative resources in a manner best calculated to move the process forward in a timely and expeditious manner. The notion that, if the Court rules in favor of the Committee, congressional committees routinely will be issuing subpoenas to obtain all of "the Executive's internal deliberations and negotiation strategies," is overcooked. Congress has many important things to do, and the voters would not tolerate what the Attorney General imagines.

But when Congress determines that it *needs* to obtain and review agency deliberative materials, as here, it *must* be able to get that information. That is Congress's constitutional responsibility, and much hinges on its ability to carry out that responsibility:

> Whenever you take away from the legislative body . . . the power of investigation, the power to look into the executive department and every other department of the government, you have taken a full step that will eventually lead into absolute monarchy and destroy any government such as ours.

Bernard A. Schwartz, *Executive Privilege and Congressional Investigatory Power*, 47 Cal. L. Rev. 3, 47 (1959) (quoting Senator George W. Norris). It is worth keeping in mind that if Congress does not possess the ability to examine the manner in which an Executive agency responds to an underlying investigation concerning an agency's programs or operations, then Congress ultimately lacks the ability to ensure that information it receives about those programs and operations is complete and accurate. In Fast and Furious terms, Congress must have the ability to do the Obstruction Component in order to ensure that it gets complete and accurate information regarding the Operations Component (which it did not in this case).[23]

---

[23] The Attorney General seems to suggest at one point that it would be unfair to require the Executive Branch to produce its "internal deliberations and negotiation strategies . . . when Congress would presumably claim absolute confidentiality over its own internal deliberative process." AG SJ Mem. at 27. But the Constitution vests Congress with the responsibility to oversee the Executive; it does not vest the Executive with a parallel responsibility to oversee Congress. Co-equal does not mean identical.

### 3.    Self-Serving Executive Branch Authorities Should Be Disregarded.

As discussed above, no case law supports the Attorney General's proposal that this Court

recognize a new CDP privilege, *see supra* Argument, Part II.B.1, and the policy rationales on

which he relies are not tenable, *see supra* Argument, Part II.B.2.  As a result, the Attorney

General resorts repeatedly to self-serving OLC and Attorney General opinions that carry no

weight because "[t]he federal Judiciary does not . . . owe deference to the Executive Branch's

interpretation of the Constitution."  *Public Citizen v. Burke*, 843 F.2d 1473, 1476-80 (D.C. Cir.

1988) (rejecting view stated in OLC memorandum).

Moreover, and in any event, most of the OLC and Attorney General opinions cited do not

actually support the Attorney General's position.  For example, one states explicitly that "[DOJ]

has recognized the [Senate and House Judiciary] Committees' interest in investigating the extent

to which [DOJ] officials may have provided inaccurate or incomplete information to Congress."

*Assertion of Exec. Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 2007

WL 5038036, at *3 (U.S.A.G. June 27, 2007).  Several predate this Circuit's key executive

privilege decisions, including *Judicial Watch* and *Espy*, and are, therefore, not based on current

law.[24]  And still others that do discuss a constitutionally-based privilege concern only White

House/presidential communications, which are not at issue here.[25]

---

[24]  *See Congressional Reqs. for Confidential Exec. Branch Info.*, 13 Op. O.L.C. 153 (1989); *Assertion of Exec. Privilege in Resp. to Congressional Demands for Law Enforcement Files*, 6 Op. O.L.C. 31 (1982); *Assertion of Exec. Privilege in Resp. to a Congressional Subpoena*, 43 Op. Att'y Gen. 327 (1981).

[25]  *See, e.g.*, *Assertion of Exec. Privilege Concerning the Special Counsel's Interviews of the Vice President and Senior White House Staff*, 2008 WL 5458939 (U.S.A.G. July 15, 2008); *Assertion of Exec. Privilege over Commc'n Regarding EPA's Ozone Air Quality Standards & Cal.'s Greenhouse Gas Waiver Req.*, 2008 WL 5506397 (U.S.A.G. June 19, 2008); *Assertion of Exec. Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 2007 WL 5038036 (U.S.A.G. June 27, 2007); *Assertion of Exec. Privilege with Respect to Clemency Decision*, 1999

The Attorney General also cites some historical examples for the proposition that Presidents have "asserted Executive Privilege to protect certain confidential Executive Branch information."  AG SJ Mem. at 14.  But these examples do not help the Attorney General.

*First*, with one exception, all of the historical examples cited involved informal congressional requests for information (as opposed to congressional subpoenas).[26]

*Second*, none of the historical examples reference CDP or anything like it.

*Third*, it is neither surprising nor instructive that some Presidents have resorted to over-the-top rhetoric regarding their powers.  More telling are the "statements against interest" uttered by various Presidents.  *See* Comm. SJ Mem. at 28.

*Fourth*, in many of the cited examples, the Executive in fact produced to Congress the records sought, notwithstanding earlier privilege posturing.[27]

---

WL 33490208 (U.S.A.G. Sept. 16, 1999); *Assertion of Exec. Privilege Regarding White House Counsel's Office Docs.*, 1996 WL 34386607 (U.S.A.G. May 23, 1996).

[26]  *See, e.g.*, George C. Chalou, St. Clair's Defeat, 1792, *in* Congress Investigates:  A Documented History 1792-1974, at 10 (Schlesinger, Jr. & Burns eds., 1983) ("Congress Investigates") (noting the adoption of House Resolution calling for executive papers from President Washington's secretary of war); Louis Fisher, The Politics of Executive Privilege, 55 (2004) (explaining that on January 24, 1837, Congressman Harry Wise wrote to President Andrew Jackson requesting documents); Michael J. Gerhardt, The Forgotten Presidents:  Their Untold Constitutional Legacy, 53 (2013) ("On May 18, 1842, the House approved a resolution requesting that [President] Tyler's secretary of war . . . produce documents and information relating to the investigation . . . into the possible frauds in land sales to Cherokee Indians."); 17 Cong. Rec. 2212 (1886) (describing how on January 25, 1886, Senate adopted resolution calling for President Cleveland's Attorney General to transmit papers relevant to its inquiry).

The one subpoena example concerns President Theodore Roosevelt who, in 1909, apparently asserted executive privilege as to documents in his personal possession in response to a Senate subpoena to the Commissioner of Corporations.  *See History of Refusal by Exec. Branch Officials to Provide Info. Demanded by Congress*, 6 Op. O.L.C. 751, 769 (1982).

[27]  For example, President Washington ultimately ordered his Secretary of War "to turn over copies of the pertinent records to the [C]ommittee."  Congress Investigates at 3; *see also* David P. Currie, The Constitution in Congress:  The Federalist Period, 1789-1801, 164 (Chicago 1997).  President Jackson ultimately absolved a Senator, whom a House committee wished to question

*Fifth*, all of the cited examples are justified by Presidential proclamation or opinions of Executive Branch legal advisors (e.g., Attorney General or OLC), which then rest primarily on other opinions from similar sources.[28]  It is neither surprising nor instructive that the Executive Branch functions as an echo chamber when it comes to executive privilege.

In short, with respect to the Attorney General's Executive Branch authorities, there is no "there there."

### III.   The New Privilege the Attorney General Asks the Court to Recognize Necessarily Would Be Qualified, and the Committee's Need for the Post-February 4 Subset Is Sufficient to Overcome Any Such Privilege.

#### A.   The Proposed New Privilege Necessarily Would Be Qualified.

Even if the Court were to consider the Attorney General's CDP privilege proposal (which it should not), and even if this Court were to recognize such a privilege (which it also should not), the new privilege necessarily would be qualified.  This is so because any such new CDP

---

about his conversations with the President, of "all obligations of confidence with regard to anything that has passed between us . . . on all and every subject."  13 Reg. Deb. App'x  208 (1837).  While President Tyler invoked executive privilege in response to a House inquiry, *see* AG SJ Mem. at 15, he subsequently delivered to Congress *all* the relevant papers and documents. The same Tyler message the Attorney General quotes makes clear that all requested documents either had been or were being transmitted to Congress.  *See* John Tyler, Special Message (Jan. 31, 1843), *available at* http://www.presidency.ucsb.edu/ws/?pid=67367.

The Attorney General repeatedly relies on Judge MacKinnon's single judge concurrence and dissent, as well as Judge Wilkey's dissent, in *Sirica*, 487 F.2d at 734 (D.C. Cir. 1973).  *See* AG SJ Mem. at 14-17, 21, 23.  Aside from the fact that those opinions are not opinions of the Court, they also predate *Nixon I* and *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 450 (1977) ("*Nixon II*"), as well as *Espy* and *Judicial Watch*; inaccurately and incompletely recount some historical events; and, in the case of the Wilkey dissent, rely on a journal article authored by a then-DOJ employee (Herman Wolkinson) which contains similar errors.  *See supra* notes 26 & 27 (citing authorities that provide more accurate and complete rendition of relevant historical events).

[28]  *See, e.g.*, *Assertion of Exec. Privilege Concerning the Special Counsel's Interviews of the Vice President & Senior White House Staff*, 2008 WL 5458939 (U.S.A.G. July 15, 2008); *Assertion of Exec. Privilege Regarding White House Counsel's Office Documents*, 1996 WL 34386607 (U.S.A.G. May 23, 1996).

privilege necessarily would be a weaker form of executive privilege than the already qualified

presidential communications privilege:

> [N]either the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances.

*Nixon I*, 418 U.S. at 706.

> An absolute barrier to all outside disclosure is not practically or constitutionally necessary. . . . [T]here has never been an expectation that the confidences of the Executive Office are absolute and unyielding.

*Nixon II*, 433 U.S. at 450.

While the Attorney General pays lip service to the idea of a qualified privilege, *see* AG

SJ Mem. at 21 ("Executive Privilege is a qualified privilege that may be overcome by an

appropriate showing of sufficient need."), his idea of a qualified privilege is one in which the

President makes all the determinations, including evaluating the needs of the Committee, *see id*.

at 33 n.10 ("President's assertion of Executive Privilege is dispositive here"); *id*. at 41-42 (any

such "evaluation" by Court "unwarranted" because President already has performed that

function).  That, of course, would make the President both the asserter and the arbiter of the

privilege – a neat trick, but one which the courts rightfully have rejected.[29]

---

[29]  *See, e.g., Hoffman v. United States*, 341 U.S. 479, 486 (1951) ("The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself – his say-so does not of itself establish the hazard of incrimination.  It is for the court to say whether his silence is justified . . . ."); *Sirica*, 487 F.2d at 717 ("[N]o executive official or agency can be given absolute authority to determine what documents in his possession may be considered by the court in its task."); *id*. at 715 ("To leave the proper scope and application of Executive privilege to the President's sole discretion would represent a mixing rather than a separation, of Executive and Judicial functions.").

The Attorney General's argument in this regard is a repackaged version of his argument that his privilege claims are non-justiciable, an argument this Court already has rejected.  *See* Mem. Op.

**B.** **The Need Standard for Any New Qualified Privilege Necessarily Would Be Less Onerous Than the "Demonstrated Specific Need" Standard Applicable in the Presidential Communications Privilege Context.**

The qualified presidential communications privilege can be overcome by a showing of a "demonstrated, specific need" for the subpoenaed information, particularly where the privilege claim rests on a "generalized interest in confidentiality." *Nixon I*, 418 U.S. at 713; *see also, e.g.*, *Judicial Watch*, 365 F.3d at 1114 ("[P]residential communications privilege . . . can be overcome by a sufficient showing of need."); *Espy*, 121 F.3d at 756 (need showing satisfied by "demonstrat[ion] with specificity why it is likely that the subpoenaed materials contain important evidence and why this evidence, or equivalent evidence, is not practically available from another source"); *Dellums v. Powell*, 561 F.2d 242, 249 (D.C. Cir. 1977) ("plaintiffs-appellees established a specific need for the requested information sufficient to overcome the rebuttable presumption of [the presidential communications] privilege").

Thus, because the Attorney General's proposed CDP privilege, if recognized, would apply to records below the presidential context and, therefore, would be weaker than the presidential communications privilege, the need standard that attaches necessarily must be less rigorous than the "demonstrated, specific need" standard applicable in the presidential communications privilege context. *See, e.g.*, *Espy*, 121 F.3d at 745 (noting that need standard relaxed as to deliberative process aspect of executive privilege, as compared to presidential communications aspect of executive privilege).

---

at 17-18 ("To give the Attorney General the final word would elevate and fortify the executive branch at the expense of the other institutions that are supposed to be its equal, and do more damage to the balance envisioned by the Framers than a judicial ruling on the narrow privilege question posed by the complaint."); *see also Miers*, 558 F. Supp. 2d at 71 ("[T]he Supreme Court has held that the judiciary is the final arbiter of executive privilege . . . .").

The Attorney General – predictably and illogically – argues for a *more* stringent showing of need for congressional entities than is required of those attempting to overcome the presidential communications privilege.  *See* AG SJ Mem. at 39 (arguing for "demonstrably critical" standard, citing *Senate Select*, 498 F.2d at 731).  The Court should reject this argument, as well as the reasoning that underpins it, for the following reasons.

*First*, *Senate Select* pre-dates *Nixon I*.  Thus, to the extent *Senate Select* purports to articulate a need standard more stringent than the "demonstrated, specific need" standard established in *Nixon I* (as to presidential communications), *Senate Select* no longer is good law.

*Second*, *Senate Select* applies, at most, to presidential communications, *see* 498 F.2d at 733, and presidential communications are not at issue here.

*Third*, all subsequent D.C. Circuit decisions that have considered presidential communications privilege claims have applied the *Nixon I* standard.  *See, e.g.*, *Judicial Watch*, 365 F.3d at 1114; *Espy*, 121 F.3d at 756; *Dellums*, 561 F.2d at 246, 249.

*Fourth*, to the extent the "demonstrably critical" standard is in fact a higher standard, it could not be applied to the Attorney General's proposed CDP privilege (if recognized) because that would "place [an impediment] in the way of the primary constitutional dut[ies] of [Congress]," *Nixon I*, 418 U.S. at 707; "gravely impair the role of [Congress] under Art. I[]," *id.*; and "hamper [Congress's] ability to perform its 'essential functions,'" *Cheney*, 542 U.S. at 384 (quoting *Nixon I*, 418 U.S. at 707).[30]

---

[30]  In addition, *Senate Select*'s "demonstrably critical" language is directly linked to *Sirica*.  *See Senate Select*, 498 F.2d at 731 ("[U]nder *Nixon v. Sirica*, the showing required to overcome the presumption favoring confidentiality turned . . . on the nature and appropriateness of the function in the performance of which the material was sought and the degree to which the material was necessary to its fulfillment.").  Here, as with the grand jury that issued the subpoena at issue in *Sirica*, the Committee cannot fulfill its oversight functions without the Post-February 4 Subset.

*Fifth*, the practical effect of the Attorney General's proposed higher-standard would be that the Congress of the United States, with oversight responsibilities that are firmly tethered to Article I of the Constitution and critically important to our tripartite system of checks and balances, would be required to make a stronger showing of need to obtain documents from a mere agency than the showing required of FOIA requesters, grand juries, and civil litigants seeking to obtain records subject to the presidential communications privilege.[31]  That is absurd on its face.

### C.    The Committee Has a Sufficient Need for the Post-February 4 Subset.

At this point in the litigation, it is as transparent as it possibly can be that the Attorney General's privilege claim rests solely on a "generalized interest in confidentiality."  *Nixon I*, 418 U.S. at 713.  Nothing the Attorney General has said in any pleading filed to date, including the memorandum in support of his cross-motion for summary judgment, indicates otherwise.  *See, e.g.*, AG SJ Mem. at 1 ("The absence of confidentiality in these circumstances would impair Executive officials' ability to perform their [never specified] constitutional functions . . . ."); *id.* at 3 ("[T]he Executive Branch's deliberative process with respect to its engagement with Congress . . . requires . . . confidentiality."); *id.* at 20 (same); *id.* at 27 ("[T]he assertion of Executive Privilege [is] grounded in the need to preserve the functioning of the Executive Branch by protecting the confidentiality of the Executive's deliberative process . . . .").

The Attorney General's confidentiality claims here are virtually identical to those of then-President Nixon:

---

[31]  *See, e.g.*, *Judicial Watch*, 365 F.3d at 1114 (FOIA); *Espy*, 121 F.3d at 756-57, 762 (grand jury); *Sun Oil Co. v. United States*, 514 F.2d 1020, 1024-25 (Ct. Cl. 1975) (per curiam) (civil litigant); *Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 402 F. Supp. 2d 171, 182-84 (D.D.C. 2005) (same).

> In this case the President challenges a subpoena served on him . . . on the claim that he has a privilege against disclosure of confidential communications.  He does not place his claim of privilege on the ground they are military or diplomatic secrets.
>
> . . . .
>
> No case of the Court . . . has extended this high degree of deference [due to claims predicated on military or diplomatic secrets] to a President's generalized interest in confidentiality.

*Nixon I*, 418 U.S. at 710-11; *see also* Brief for [then-President] Nixon, *United States v. Nixon*, Nos. 73-1766 & 73-1834, 1974 WL 174855, at *59-68 (June 21, 1974) (describing generalized confidentiality interest).  Like then-President Nixon, the Attorney General has identified no documents that merit some specific attention (and he should not be permitted to start making those kinds of arguments in his reply memorandum).

As against the Attorney General's generalized confidentiality interests, the Committee easily can demonstrate a showing of need for the Post-February 4 Subset that is sufficient to satisfy any standard that might be applicable (including the "demonstrated specific need" and "demonstrably critical" standards that, for the reasons discussed above, necessarily set the bar higher than it logically should be).

*First*, the Committee indisputably has a legitimate interest in completing its Fast and Furious investigation including, in particular, the Obstruction Component of that investigation. *See generally* Comm. SJ Mem. at 5-10; *Peter Kiewit Sons' Co. v. U.S. Army Corps of Eng'rs*, 714 F.2d 163, 170 (D.C. Cir. 1983) ("Congressional oversight serves as a vital control on the quality and propriety of low visibility executive decisionmaking.").  The Attorney General, through his deputy, has admitted as much.  *See* June 20, 2012 Privilege Letter at 2 (acknowledging that Committee has "legitimate interest" in conducting oversight of DOJ's "management of its response to congressional inquiries into Fast and Furious"); *see also* *Assertion of Exec. Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 2007

34

WL 5038036, at *3 (U.S.A.G. June 27, 2007) ("[DOJ] has recognized [Congress's] interest in

investigating the extent to which [DOJ] officials may have provided inaccurate or incomplete

information to Congress.").

This Obstruction Component of the Committee's investigation was set in motion by an

apparent effort, over a period of many months, by high-level DOJ officials to impede the

Committee's underlying investigation into a badly flawed law-enforcement operation, and the

evidence that DOJ actively sought to thwart the Committee's underlying investigation is

substantial, *see* Comm. SJ Mem. at 22-24, and unrefuted.[32]

Depending on the facts ultimately uncovered, the Committee and the House could take

various actions, including pursuing legislative initiatives, *see id*. at 41 n.42 (itemizing five such

possible initiatives, including instituting new procedures for responses to congressional requests

for information); issuing a detailed report to deter obstructive behavior by Executive Branch

agencies and officials in the future; and/or initiating impeachment proceedings against any

Senate-confirmed individual determined to bear or share responsibility for obstructing the

Committee, *see* U.S. Const. art. I, § 2, cl. 5.[33]

---

[32] *Cf. Cong. Subpoenas of Dep't of Justice Investigative Files*, 8 Op. O.L.C. 252, 267 (1984)
("[Executive] privilege should not be invoked to conceal evidence of wrongdoing or criminality
on the part of executive officers."); *Assertion of Exec. Privilege in Resp. to Congressional
Demands for Law Enforcement Files*, 6 Op. O.L.C. 31, 36 (1982) ("These [Executive Privilege]
principles will not be employed to shield documents which contain evidence of criminal or
unethical conduct by agency officials from proper review.").

DOJ's misconduct even may have extended to misleading the White House about the obstacles
DOJ had erected to the Committee's investigation.  *See* Press Briefing by Press Sec'y Jay Carney
(June 21, 2012), *available at* http://www.whitehouse.gov/the-press-office/2012/06/21/press-
briefing-press-secretary-jay-carney-62112 (repeatedly stating that "every document that relates
to the Fast and Furious operation has been provided").

[33] Notwithstanding his earlier admission that the Obstruction Component of the Committee's
investigation is legitimate, *see* June 20, 2012 Privilege Letter at 2, the Attorney General now
characterizes that aspect of the investigation as "a fishing expedition in an investigation that has

*Second*, the Post-February 4 Subset is directly and self-evidently relevant to the

Obstruction Component of the Committee's investigation.  *See* Comm. SJ Mem. at 41.

*Third*, as we explained earlier, the Committee cannot obtain the Post-February 4 Subset

from any other source.  *See* Comm. SJ Mem. at 10-19; *Espy*, 121 F.3d at 756 (in presidential

communications context, need showing satisfied by "demonstrat[ion] with specificity why it is

likely that the subpoenaed materials contain important evidence and *why this evidence, or*

*equivalent evidence, is not practically available from another source*" (emphasis added)).

*Fourth*, the public's interest in knowing how the operations of the Nation's principal law

enforcement agency are being managed and conducted – or mismanaged and misconducted –

support the Committee's showing of need.  *See* Comm. SJ Mem. at 42-43; *Judicial Watch*, 365

F.3d at 1122 ("[O]urs is a democratic form of government where the public's right to know how

its government is conducting its business has long been an enduring and cherished value.").

To the extent the Attorney General addresses the need issue at all, he suggests that the

Committee does not need the Post-February 4 Subset because (i) DOJ altered the way it responds

to congressional requests and demands for information, *see* AG SJ Mem. at 13, and (ii) the DOJ

IG investigated some aspects of Operation Fast and Furious, *see id*. at 6, 12-13, 38.  But the

---

long since run its course."  AG SJ Mem. at 39.  That is ironic, given that (i) the Attorney General
– more than two years after the Holder Subpoena was served on him – still has not produced to
the Committee any documents dated or created after February 4, 2011 (other than the 300 or so
pages produced in September 2012, after this suit was filed); (ii) his intransigence is the reason
the Committee has been unable to complete the Obstruction Component of its investigation;
(iii) the Committee managed to make progress on the Operations Component of its investigation
in spite of, not because of, the Attorney General and DOJ; and (iv) questions continue to be
raised about the operational aspects of Operation Fast and Furious.  *See, e.g.*, Sharyl Attkisson,
*Fast and Furious questions linger as IG continues investigation*, CBSNews.com, Jan. 21, 2014,
http://www.cbsnews.com/news/fast-and-furious-questions-linger-as-ig-continues-investgation/.
In short, the Committee's investigation has not "run its course," and it is for the Committee – not
the Attorney General – to decide when it has.

Committee is not required to pack its bags either because DOJ has made some policy changes, or because the DOJ IG investigated (and is still investigating) some aspects of Operation Fast and Furious.  The Committee has oversight responsibilities independent of anything DOJ and/or the DOJ IG may have done.  Indeed, if, as the Attorney General implies, prior to January 2012, "senior managers [did not have] the ultimate responsibility for fact-checking and vetting responses to Congress," and those who responded to Congress were not required "to solicit information from employees with detailed personal knowledge of the relevant issues" or "consult relevant records," *id*. at 13, then it is all the more important for the Committee to get to the bottom of what happened with DOJ's response to the Committee's investigation.[34]

In short, even if the Court accedes to the Attorney General's request to create a new qualified privilege, the Committee clearly has a sufficient need for the Post-February 4 Subset under any possibly applicable standard.[35]

## IV.    The Attorney General's Efforts to Limit the Committee's Relief Are Baseless.

The relief the Committee seeks on Count I has never varied:

WHEREFORE, the Oversight Committee prays that this Court

---

[34]  With respect to the DOJ IG, he is not truly independent.  He is appointed and removed by the President, and "report[s] to and [is] under the general supervision of the [Attorney General]." 5 U.S.C. app. 3 § 3(a)-(b); *see also id.* § 8E(a)(1).  Moreover, the DOJ IG's role is much narrower than the Committee's responsibilities.  *See* 5 U.S.C. app. 3 § 2 (enumerating purposes of the Office of Inspector General); *id.* § 8E(b) (enumerating powers of DOJ IG).

[35]  While the Attorney General relies here on *Senate Select*, *see* AG SJ Mem. at 19 n.3, that decision is easily distinguished.  *First*, as noted above, *Senate Select* pre-dates *Nixon I* and, therefore, may no longer be good law.  *See supra* Argument, Part III.B.  *Second*, *Senate Select* involved presidential communications which are not at issue here.  *See* 498 F.2d at 726-27. *Third*, the *Senate Select* Court was heavily influenced by the fact that the information in question there (White House tapes) already were in the possession of another congressional committee. *Id.* at 732.  That is not the case here.

(i) declare that the privilege asserted in the June 20, 2012 Privilege Letter may not validly be asserted in response to the Holder Subpoena;

(ii) declare that the Attorney General's objection to the Holder Subpoena, as set forth in the June 20, 2012 Privilege Letter, is rejected;

(iii) declare that the Attorney General's failure to produce to the Oversight Committee the Post-February 4 Subset is without legal justification and violates the Attorney General's legal obligations to the Committee; and

(iv) order the Attorney General forthwith to produce to the Oversight Committee the Post-February 4 Subset.

Am. Compl. ¶ 76, Prayer for Relief; *see also* Compl. ¶ 71, Prayer for Relief (Aug. 13, 2012)

(ECF No. 1).  Likewise, the definition of the documents that comprise the Post-February 4

Subset has never varied:

[T]he Committee here seeks to compel the Attorney General to produce those documents dated or that were created after February 4, 2011, that are responsive to Categories 1, 4, 5, and 10 of the Holder Subpoena [defined for purposes of the complaint as the Post-February 4 Subset].

Am. Compl. ¶ 67; *see also* Compl. ¶ 62.

Notwithstanding this clarity and consistency, the Attorney General advances two bizarre

arguments aimed at limiting the relief available to the Committee.  The Committee, he says,

(i) somehow improperly expanded the scope of the relief it requested in its Amended Complaint

by the manner in which it articulated legal arguments in support of its summary judgment

motion, *see* AG SJ Mem. at 39-42, and (ii) limited the relief available to it by positions

supposedly taken in failed settlement discussions occurring prior to the contempt vote (and well

before the initiation of this litigation).  *See id*. at 42-45.  Both arguments are wrong.

### A.    The Committee Has Not Expanded the Scope of the Relief It Seeks.

According to the Attorney General, the Committee, in its original memorandum, expanded the scope of its requested relief by "ask[ing] this Court to engage in a document-by-document privilege analysis, as well as the very weighing of the interests of the Legislative and Executive Branches that the Court deemed unnecessary in denying Defendant's motion to dismiss." AG SJ Mem. at 39. Not so.

1. Count I seeks the relief described above. In moving for summary judgment, the Committee articulated a series of reasons why the Court should find invalid and reject the common law deliberative process privilege the Attorney General asserted on June 20, 2012. *See* Comm. SJ Mem. at 21-44; *supra* Argument, Part I. The Committee's arguments are straightforward and do not require the Court to engage in a document-by-document analysis. Indeed, because the Attorney General defaulted on his burden to justify his privilege assertion as to each withheld document, – or, thus far, even to establish that the President in fact has asserted executive privilege in the first instance[36] – the Court cannot uphold his privilege assertion as to any of the documents. *See* Comm. SJ Mem. at 37-40. It is particularly unnecessary for the Court in this case to engage in any document-by-document analysis inasmuch as the Attorney General has articulated no interest in his continued withholding of the Post-February 4 Subset other than a generalized interest in confidentiality, *see* AG SJ Mem. at 31-32, 45, and that clearly is insufficient, *see* Comm. SJ Mem. at 40-44; *supra* Argument, Part III.C.

---

[36] *See, e.g.*, Pl.'s Response to Def.'s Statement of Material Facts as to Which There is No Genuine Issue ¶¶ 8-10 (Feb. 14, 2014); *see also Judicial Watch*, 365 F.3d at 1114 (expressing concern regarding absence in record of sworn statement with respect to President's claim of privilege, but declining to reach issue because not raised below); *Espy*, 121 F.3d at 744 n.16 (noting that record contained affidavit from White House Counsel asserting personal knowledge of privilege claim by President).

2.   The Attorney General's "weighing" gripe is even more peculiar.  The Committee

seeks a ruling in this case that the privilege the Attorney General himself chose to assert

(deliberative process), as to a specific set of documents (the Post-February 4 Subset), is not valid

and should be rejected.  It is appropriate for the Committee to advance in support of that

contention all legal arguments available to it; those arguments, which are set forth above and in

our original memorandum, are dictated by, among other things, the deliberative process case law

of this Circuit, including cases holding that "the deliberative process privilege . . . can be

overcome by a sufficient showing of need."  *Espy*, 121 F.3d at 737; *see also* Comm. SJ Mem. at

40-44.  While the Court can – and, in our view, should – find the Attorney General's June 20,

2012 privilege assertion invalid, without consideration of the Committee's need for the Post-

February 4 Subset versus any interest served by its continued withholding, *see id.* at 19-40, there

is no reason the Court cannot make that latter legal determination if necessary.  Put another way,

the Attorney General cannot assert a privilege, and then object when the Committee seeks to

overcome that assertion on the basis of arguments squarely grounded in existing law.[37]

Finally, contrary to the Attorney General's suggestion otherwise, *see* AG SJ Mem. at 40-

41, nothing in this Court's September 30, 2013 Memorandum Opinion supports the Attorney

General's contention.  The Court's discussion on page 27, footnote 7, of its Opinion responded to

the Attorney General's overwrought reliance on the D.C. Circuit's two *AT&T* decisions, *see*

Mem. in Supp. of Def.'s Mot. to Dismiss at 43-44 (Oct. 15, 2012) (ECF No. 13-1) ("AG MTD

---

[37]  Ironically, the Attorney General finds it perfectly appropriate for him and/or the President – as opposed to the Court – to weigh the parties' respective interests.  *See* June 19, 2012 AG Letter at 7-8 ("[W]hen *I* balance the Committee's . . . need . . . against the Executive Branch's . . . interest . . ." (emphasis added)); AG SJ Mem. at 33 n.10 ("[T]he President's assertion of Executive Privilege is dispositive . . . ."); *id*. at 41-42 (any weighing by Court "unwarranted" because President already has performed that function).

Memorandum").  Those cases involved a direct clash of constitutional authorities – the

Legislative Branch's Speech or Debate Clause and the Executive Branch's national security

responsibilities, *see AT&T*, 567 F.2d at 128-29 – that is not present here.  This case involves the

Legislative Branch's critically important constitutional obligation to conduct oversight of

Executive Branch agencies versus, at most, a generalized confidentiality interest on the part of

DOJ that is not of constitutional dimension.

Moreover, and in any event, nothing in either *AT&T* decision prevents courts from

engaging in whatever inquiry is necessary and appropriate to resolve questions about the validity

of an Executive Branch privilege assertion.  "[E]ven if th[is] lawsuit questioned whether one

branch had exceeded the authority granted to it under the Constitution, the Supreme Court has

already deemed that to be an appropriate inquiry."  Mem. Op. at 27 n.7.[38]

### B.    The Committee's Requested Relief Is Not Limited by Positions Taken in Prior Settlement Negotiations.

In a final bizarre twist, the Attorney General says that, "in the weeks leading up to the

House votes for contempt and to authorize this suit," the Committee "narrow[ed its] . . .

demands," and therefore the Committee's complaint should be read to bar it here from obtaining

any "material beyond what it was seeking at the time of the votes for contempt and

authorization."  AG SJ Mem. at 42, 43, 44.  This is wrong on every level.

---

[38] The actual rationale for the Attorney General's "weighing" contention may be his perceived
need to generate a justification for the submission of additional briefing.  *See* AG SJ Mem. at 42.
The Court should reject such gamesmanship.  The Committee submitted its motion for summary
judgment on December 16, 2013; thereafter, the Attorney General had five weeks to respond,
pursuant to the Court's scheduling orders.  *See* Minute Order (Oct. 30, 2013); Minute Order
(Nov. 19, 2013).  The Attorney General has had his opportunity to make arguments in response
to the Committee's summary judgment motion.

*First*, and most obviously, the Committee's complaint defines the scope of what it seeks

here; not positions it may or may not have taken in prior failed settlement discussions.  Those

positions no more define the scope of the relief to which the Committee is entitled than do

positions the Committee may have taken in mediation discussions mandated by this Court.[39]

And the Committee's complaint makes crystal clear that it seeks an "order [directing] the

Attorney General forthwith to produce to the Oversight Committee the Post-February 4 Subset."

Am. Compl. ¶ 76(iv); *accord id.* ¶ 67 ("[T]he Committee here seeks to compel the Attorney

General to produce [the Post-February 4 Subset]."); *id.* at Prayer for Relief (A)(1)(i-iv), (B),

(C).[40]

    *Second*, on June 28, 2012, the full House adopted the following resolution:

> Resolved . . . That the Chairman of the Committee on Oversight
> and Government Reform is authorized to initiate or intervene in
> judicial proceedings in any Federal court of competent jurisdiction,
> on behalf of the Committee on Oversight and Government Reform,
> *to seek declaratory judgments affirming the duty of Eric H. Holder,*
> *Jr., Attorney General, U.S. Department of Justice, to comply with*
> *any subpoena that is a subject of the resolution accompanying*
> *House Report 112-546 issued to him by the Committee as part of*
> *its investigation into the United States Department of Justice*
> *operation known as "Fast and Furious" and related matters, and*
> *to seek appropriate ancillary relief, including injunctive relief.*

H. Res. 706, 112th Cong. (2012) (enacted) (emphasis added); *see also* H. Res. 5, 113th Cong.

(2013) (enacted) (authorizing Committee to continue litigation).  The relief the Committee seeks

---

[39]  *Cf.* Fed. R. Evid. 408; *United States v. Davis*, 596 F.3d 852, 859 (D.C. Cir. 2010) ("Rule [408] is meant to promote settlements.  If one party attempts to initiate negotiations with a settlement offer, the offer is excluded from evidence . . . ." (citation omitted)).

[40]  In the spirit of good sportsmanship, we acknowledge that the Attorney General is not bound now to produce portions of the Post-February 4 Subset merely because he previously said he would.  *See, e.g.*, Letter from Eric H. Holder, Att'y Gen. to Hon. Darrell E. Issa, Chairman, Oversight Comm., at 2 (June 14, 2012) ("June 14, 2012 AG Letter"), Ex. 6 to Second Castor Decl.; Letter from Hon. Darrell E. Issa, Chairman, Oversight Comm., to Eric H. Holder, Att'y Gen. at 1-2 (June 15, 2012) ("June 15, 2012 Chairman Letter"), Ex. 7 to Second Castor Decl.

here – including the particular documents it seeks – is entirely consistent with the authorizing resolutions which are not limited in any way by what may or may not have occurred earlier.

*Third*, the Attorney General grounds his argument to a significant extent on the Committee's report. *See* AG SJ Mem. at 42, 43 (referring to H. Rep. No. 112-546 (2012)). That report (which explains the Committee's recommendation that the full House hold the Attorney General in contempt), and the other events surrounding the contempt vote – including the resolution itself, H. Res. 711, 112th Cong. (2012) (enacted), and the U.S. Attorney's failure thereafter to carry out his statutory obligations, *see* Am. Compl. ¶¶ 48-49, 52, 54-58[41] – may have been relevant for purposes of the already-resolved jurisdictional issues. But they do not in any way limit the scope of what the Committee is entitled to seek in this lawsuit.

*Fourth*, the complaint language explaining *why* the Committee seeks production only of the post-February 4 Subset – *see, e.g.*, Am. Compl. ¶¶ 3, 7, 67 ("'Post-February 4 Subset' . . . includes or constitutes the documents most likely to be relevant to the Obstruction Component of the Committee's investigation and, when produced, most likely to enable the Committee to complete its investigation.") – does not change the scope of *what* the Committee has sought here, notwithstanding the Attorney General's suggestion otherwise. *See* AG SJ Mem. at 45. The Committee (not the Attorney General) decides which aspects of the Holder Subpoena it will seek to enforce, and the Committee (not the Attorney General) decides – if and when the Post-February 4 Subset is produced – which documents are or are not relevant to its investigation.[42]

---

[41]  These allegations have all been admitted. *See* Answer ¶¶ 48-49, 52, 54-58.

[42]  It is worth noting here that "Operations Component" and "Obstruction Component" are Committee constructs designed to assist it in explaining to the Court the nature and scope of its Fast and Furious investigation. They do not describe mutually exclusive categories of DOJ documents, and DOJ may not use them to decide which Post-February 4 Subset documents are

*Fifth*, the Attorney General's argument would, if adopted, severely distort (if not destroy) the negotiation and accommodation process he otherwise is so fond of touting.  *See, e.g.*, AG SJ Mem. at 1-3, 9, 21, 25-27, 29, 34-36; AG MTD Mem. at 1, 3-4, 14, 20-21, 27-30, 44-45.  No self-respecting committee would negotiate with the Executive Branch regarding a congressional subpoena – at least not for anything less than the committee's maximum demands – if its negotiating position thereafter cabined its ability to seek enforcement of its subpoena.

*Sixth*, as a purely factual matter, the Committee never narrowed the Holder Subpoena in the manner the Attorney General suggests, i.e., by agreeing to forego production of *all* documents that might shed some light on the Operations Component of the Committee's investigation.  In particular, following the May and June 2012 letters cited by the Attorney General, *see* AG SJ Mem. at 42, the Attorney General offered to produce not only information related to DOJ's response to Congress, but also information about "how [DOJ's] understanding of the facts regarding that matter [i.e., the operational aspects of Operation Fast and Furious] evolved throughout 2011."  June 14, 2012 AG Letter at 1; *see also* June 15, 2012 Chairman Letter (expressing willingness to postpone Committee vote on contempt recommendation if such documents actually produced).[43]

---

and are not relevant to the Committee's investigation.  That is the Committee's prerogative, once it receives the documents.

[43] One explanation for the Attorney General's strange "narrowing" argument may be found in his suggestion that he is withholding some Post-February 4 Subset documents without even the fig leaf of an assertion of any privilege.  *See supra* note 5; AG SJ Mem. at 43.

## CONCLUSION

This Court should grant the Committee's motion for summary judgment and deny the

Attorney General's cross-motion.

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, General Counsel
D.C. Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
D.C. Bar No. 482949
TODD B. TATELMAN, Assistant Counsel
MARY BETH WALKER, Assistant Counsel
D.C. Bar No. 501033
ELENI M. ROUMEL, Assistant Counsel
ISAAC B. ROSENBERG, Assistant Counsel
D.C. Bar No. 998900

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
202/225-9700 (phone); 202/226-1360 (fax)

*Counsel for Plaintiff Committee on Oversight and
Government Reform, U.S. House of Representatives*

February 14, 2014

**CERTIFICATE OF SERVICE**

I certify that on February 14, 2014, I filed and served one copy of the foregoing

Plaintiff's Consolidated (i) Reply to Defendant's Opposition to Plaintiff's Motion for Summary

Judgment, and (ii) Opposition to Defendant's Cross-Motion for Summary Judgment, by

CM/ECF on all registered parties.


*/s/ Kerry W. Kircher*
Kerry W. Kircher