**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | )   Case No. 1:12-cv-01332-ABJ |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States, | ) ) ) ) |
| *Defendant*. | ) ) ) ) |

**PLAINTIFF'S MOTION TO STRIKE
THE DECLARATIONS OF PAUL P. COLBORN AND M. FAITH BURTON**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7, Plaintiff Committee on Oversight and Government Reform of the United States House of Representatives ("Committee") respectfully moves this Court for an order striking the Declarations of Paul P. Colborn and M. Faith Burton, both filed in conjunction with the Attorney General's cross-motion for summary judgment. The grounds for the motion are set forth in the accompanying memorandum of points and authorities.

On February 14, 2014, counsel for the Committee conferred with counsel for the Attorney General who advised that the Attorney General opposes the relief sought by this motion.

A proposed Order is attached. The Committee does not request oral argument on this motion.

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, General Counsel
D.C. Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
D.C. Bar No. 482949
TODD B. TATELMAN, Assistant Counsel
MARY BETH WALKER, Assistant Counsel
D.C. Bar No. 501033
ELENI M. ROUMEL, Assistant Counsel
ISAAC B. ROSENBERG, Assistant Counsel
D.C. Bar No. 998900

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and*
*Government Reform, U.S. House of Representatives*

February 14, 2014

**CERTIFICATE OF SERVICE**

I certify that on February 14, 2014, I filed and served one copy of the foregoing

Plaintiff's Motion to Strike the Declarations of Paul P. Colborn and M. Faith Burton by CM/ECF

on all registered parties.


*/s/ Kerry W. Kircher*
Kerry W. Kircher

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM, UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cv-01332-ABJ |
| | ) | |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States, | ) ) ) ) | |
| | ) | |
| *Defendant*. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION TO STRIKE
THE DECLARATIONS OF PAUL P. COLBORN AND M. FAITH BURTON**

Kerry W. Kircher, General Counsel
William Pittard, Deputy General Counsel
Todd B. Tatelman, Assistant Counsel
Mary Beth Walker, Assistant Counsel
Eleni M. Roumel, Assistant Counsel
Isaac B. Rosenberg, Assistant Counsel

OFFICE OF GENERAL COUNSEL,
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and
Government Reform, U.S. House of Representatives*

February 14, 2014

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.      The Colborn Declaration Is Improper, and This Court Should Strike It from
        the Summary Judgment Record. .......................................................................... 4

        A.      The Attorney General Has Not Established, and Cannot Establish, That
                Mr. Colborn Possesses Personal Knowledge. ........................................... 4

        B.      The Attorney General Has Not Established, and Cannot Establish, That
                Mr. Colborn's Declaration Consists of Admissible Statements of Fact. ................ 9

II.     The Burton Declaration Suffers from Many of the Same Defects as the Colborn
        Declaration, and It Too Should Be Stricken in Its Entirety. ............................................. 16

        A.      As to Substantial Portions of the Burton Declaration, the Attorney General
                Has Not Established, and Cannot Establish, That Ms. Burton Possesses
                Personal Knowledge. ......................................................................... 16

        B.      The Attorney General Has Not Established, and Cannot Establish, That
                Ms. Burton's Declaration Consists of Admissible Statements of Fact. ................ 19

CONCLUSION ............................................................................................................ 22

CERTIFICATE OF SERVICE

## INTRODUCTION

The Committee on Oversight and Government Reform of the U.S. House of Representatives ("Committee") has moved for summary judgment on its claim for declaratory and injunctive relief regarding the Post-February 4 Subset. *See* Pl.'s Mot. for Summ. J. (Dec. 16, 2013) (ECF No. 61); Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. (Dec. 16, 2013) (ECF No. 61) ("Committee SJ Memorandum"). The Attorney General has opposed that motion and cross-moved for summary judgment. *See* Def.'s Mot. for Summ. J. (Jan. 21, 2014) (ECF No. 63); Mem. in Supp. of Def.'s Mot. for Summ. J. & in Opp'n to Pl.'s Mot. for Summ. J. (Jan. 21, 2014) (ECF No. 63) ("AG SJ Memorandum").

In conjunction with his cross-motion, the Attorney General submitted the declarations of two Department of Justice ("DOJ") employees, Paul P. Colborn, an attorney in DOJ's Office of Legal Counsel ("OLC"),[1] and M. Faith Burton, an attorney in DOJ's Office of Legislative Affairs ("OLA").[2] These declarations are replete with statements that have no place in a summary judgment record meant exclusively for evidence supporting the parties' "factual positions." Fed. R. Civ. P. 56(c)(1)(A). Among the improprieties plaguing these declarations are (i) assertions of "fact" for which the declarants have not established (and cannot establish) personal knowledge; (ii) hearsay; (iii) conclusory and unsubstantiated assertions (including sweeping pronouncements by these DOJ employees purporting to speak for the entire Department of Justice and/or the entire Executive Branch); (iv) subjective opinions and speculation; and (v) legal conclusions.

These declarations effectively seek to bolster the Attorney General's legal arguments by recasting them as sworn statements of "fact." But "'[a] party . . . cannot push the other party out

---

[1] Decl. of Paul P. Colborn . . . (Jan. 21, 2014) (ECF No. 63-2) ("Colborn Declaration").

[2] Decl. of M. Faith Burton . . . (Jan. 21, 2014) (ECF No. 63-1) ("Burton Declaration").

of court by swearing he has no case.'" *Transport Props., Inc. v. ABC Treadco, Inc.*, 589 F. Supp. 445, 450 n.16 (S.D.N.Y. 1984) (quoting *Belanger v. Hopeman Bros.*, 6 F.R.D. 459, 461 (D. Me. 1947)).  Consequently, for the reasons discussed below, the Court should strike both Mr. Colborn's and Ms. Burton's declarations in their entirety.

## ARGUMENT

A summary judgment "record" should contain only materials evidencing the "*factual* positions" underlying any disputed legal question.  Fed. R. Civ. P. 56(c)(1) (emphasis added). This is because, barring a "genuine dispute as to any material *fact*[,] . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  Parties may support their "factual positions" through affidavits or declarations.  Fed. R. Civ. P. 56(c)(1)(A).  But the only affidavits or declarations suitable for the summary judgment record are ones that (1) are "made on personal knowledge," (2) "set out facts that would be admissible in evidence," and (3) "show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Ultimate or conclusory facts, hearsay, re-argument of the party's case, bald denials of the other party's assertions, and conclusions of law have no place in an affidavit or declaration.  *See* 10B Charles Alan Wright, Arthur R. Miller, et al., Federal Practice and Procedure § 2738 (3d ed. 2013) ("Wright & Miller"); *see also Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 224 F.R.D. 261, 264 (D.D.C. 2004) ("[S]tatements that are impermissible hearsay, conclusory or self-serving are generally precluded.").[3]

---

[3]  "When Rule 56 was rewritten in 2010, the substantive requirements for affidavits set out in Rule 56(e)(1) were moved to Rule 56(c)(4)."  Wright & Miller § 2738; *accord* Fed. R. Civ. P. 56 advisory committee's note on 2010 amendments.  Accordingly, cases applying the substantive requirements for declarations under prior-Rule 56(e) remain good law for purposes of current-Rule 56(c)(4).

When statements in an affidavit or declaration violate these requirements, the offending statements should be stricken.  *See, e.g.*, *Londrigan v. FBI*, 670 F.2d 1164, 1174-75 (D.C. Cir. 1981); *Ng v. LaHood*, 952 F. Supp. 2d 85, 92 (D.D.C. 2013); *Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 815 F. Supp. 2d 148, 162-63 (D.D.C. 2011).  And when the offending statements are so interwoven or inextricably intertwined with any admissible statements that it is practically impossible to separate them, the Court should strike the affidavit or declaration *in its entirety.  See, e.g.*, *Gebhard v. GAF Corp.*, 59 F.R.D. 504, 508 (D.D.C. 1973); *accord Hatch v. Boulder Town Council*, No. 07-4239, 2009 WL 82699, at *1 (10th Cir. 2009) (per curiam), *aff'g*, No. 2:01-cv-00071, 2007 WL 2985001, at *1 (D. Utah Oct. 10, 2007); *Loadman Grp., L.L.C. v. Banco Popular N. Am.*, No. 4:10-cv-1759, 2013 WL 1154528, at *1, *11 (N.D. Ohio Mar. 19, 2013) (citing cases); *Southard v. State Farm Fire Ins. & Cas. Co.*, No. 4:11-cv-243, 2013 WL 209224, at *10 (S.D. Ga. Jan. 17, 2013); *see also Buruca v. District of Columbia*, 902 F. Supp. 2d 75, 82 & n.3 (D.D.C. 2012) (recognizing that "the court would be fully justified in striking the [plaintiff's] affidavit" because it "suffer[ed] from serious infirmities," but declining to do so because affidavit "constitute[d] the sum of the plaintiff's evidentiary showing").

The declarations of Mr. Colborn and Ms. Burton violate the straightforward requirements described above, and because their defects are so pervasive, they should be stricken wholesale.[4]

---

[4]  Alternatively, in lieu of striking a declaration, a court may note the objections under Rule 56(c)(2) and ignore the offending statements contained therein when ruling on the motions for summary judgment.  *See, e.g.*, *United States ex rel. Folliard v. Govplace*, 930 F. Supp. 2d 123, 128-29 (D.D.C. 2013); *Bowyer v. District of Columbia*, 910 F. Supp. 2d 173, 196 n.17 (D.D.C. 2012); *Riggsbee v. Diversity Servs., Inc.*, 637 F. Supp. 2d 39, 46 (D.D.C. 2009); *cf.* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

I.     **The Colborn Declaration Is Improper, and This Court Should Strike It from the Summary Judgment Record.**

A.     **The Attorney General Has Not Established, and Cannot Establish, That Mr. Colborn Possesses Personal Knowledge.**

As a summary judgment declarant – just like a witness at trial[5] – Mr. Colborn cannot assert facts unless he has personal knowledge of them.  Fed. R. Civ. P. 56(c)(4); *see also Londrigan*, 670 F.2d at 1174 ("[Rule 56's] requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented.").  That is, he must "be a percipient witness whose testimony is grounded in first-hand information obtained through one of his . . . five senses." Paul F. Rothstein, Federal Rules of Evidence, Rule 602 (3d ed. 2013).[6]

But in his declaration, Mr. Colborn makes numerous statements of "fact" about which he apparently lacks (and, in many instances, could not possibly have) personal knowledge.  Indeed, Mr. Colborn flags these problems right up front by stating that "[t]his declaration is based on my personal knowledge and experience, *on information provided to me by OLC attorneys working under my direction, and on information provided to me by others within the Executive Branch*." Colborn Decl. ¶ 3 (emphasis added).  Such reliance on information provided by others amounts to a recitation of hearsay, for which the Attorney General has not established (and cannot

---

[5]  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Fed. R. Evid. 701 (non-expert witness testimony may come "in the form of an opinion" only if it is "rationally based on the witness's perceptions").

[6]  *Accord United States v. Davis*, 596 F.3d 852, 856 (D.C. Cir. 2010) ("If the testimony on its face purports to be based on direct perception of the facts described but is actually based on an out-of-court statement about those facts, the objection should be lack of personal knowledge." (quotation marks omitted)); *Judicial Watch*, 224 F.R.D. at 264 (declarant cannot discuss matters of which he "ha[s] no first-hand basis of perception or personal experience"); *see also* 29 Charles Alan Wright, Kenneth W. Graham, Jr., et al., Federal Practice and Procedure – Evidence § 6254 (1st ed. 2013) ("Personal knowledge is comprised of four elements: (1) sensory perception, (2) comprehension of what was perceived, (3) present recollection, and (4) ability to testify based on what was perceived.").

4

establish) any applicable exception to the rule of presumptive inadmissibility.  *See, e.g.*, *Austracan (U.S.A.) Inc. v. Neptune Orient Lines, Ltd.*, 612 F. Supp. 578, 586-87 (S.D.N.Y. 1985) (explaining that statement in affidavit of United States Customs Director, based on his "consult[ation]" of Customs record prepared by "unnamed Customs Inspector," did not satisfy personal knowledge requirement because affiant Customs Director could not "testify as to what the unnamed Customs Inspector . . . actually did"); *see also infra* Argument, Part I.B.1 (discussing hearsay).

Because it is impossible to discern which sources of information (or combination of sources) informs individual statements in Mr. Colborn's declaration, the entire declaration is insufficient under the first prong of Rule 56(c)(4).

In addition to this general problem, individual statements in the Colborn Declaration fail to satisfy the personal knowledge requirement.  These offending statements fall into at least three categories:  (i) statements about the Committee's investigation into Fast and Furious and DOJ's response to that investigation; (ii) statements about the state of mind of third parties; and (iii) "historical" events.

1. Statements About Committee's Investigation and DOJ Response.  In his declaration, Mr. Colborn purports to discuss "facts" concerning the Committee's investigation and DOJ's response to it.  As to the *Committee's investigation*, Mr. Colborn offers statements about (i) the focus of the investigation at various times, *id.* ¶¶ 9, 10, 12; (ii) whether the Committee had shifted and/or narrowed the scope of its investigation, *id.* ¶¶ 10, 12; (iii) what documents the Committee wanted in order to avoid a contempt vote, *id.* ¶ 12; and (iv) what documents the Committee remains "focused on," *id.* ¶ 25.  Nothing in Mr. Colborn's declaration, however, establishes that he has personal knowledge of the Committee's investigation, nor could he

establish such knowledge:  As a DOJ lawyer, he could not possibly have personal knowledge of the inner workings of an investigation spearheaded by a congressional committee.

Similarly, as to *DOJ's response* to the Committee's investigation, Mr. Colborn offers statements about (i) whether certain documents produced to the Committee "showed that the Department . . . intended to mislead Congress" in its February 4, 2011 letter, or instead that the letter resulted from "a flawed drafting process," *id.* ¶ 10; (ii) the apparent efforts DOJ made to accommodate the Committee's investigation, despite longstanding Executive Branch policy against doing so, *id.* ¶¶ 10, 11, 14, 18; and (iii) the "general categories" of documents that are responsive to the Committee's subpoena, *id.* ¶ 19.  But Mr. Colborn never states that he personally was (or currently is) involved in any way in DOJ's response to the Committee's investigation.

None of Mr. Colborn's statements – save for his three introductory paragraphs – ever uses the first-person.  Nor does Mr. Colborn ever claim, to any extent that he would have personal knowledge of such things, that *anyone* in the particular office within DOJ for which he works – OLC – actually has been involved in DOJ's response to the Committee's investigation.

Simply put, because the Attorney General does not establish that Mr. Colborn possesses a "first-hand basis of perception or personal experience" concerning the above-recited matters, *Judicial Watch*, 224 F.R.D. at 264, Mr. Colborn's statements outside the first three paragraphs of his declaration violate Rule 56(c)(4).

2.  <u>Statements About Third-Party State of Mind</u>.  Mr. Colborn's declaration also repeatedly makes statements about the states of mind of other individuals, or even other entities. For example, Mr. Colborn provides a sworn statement regarding "the Committee's desire," and whether that "desire" extends beyond "the present case."  Colborn Decl. ¶ 17.  He also purports

to pronounce what "Congress believes" when it "seeks to hold the subpoena recipient in contempt." *Id.* ¶ 7; *see also, e.g.*, *id.* ¶ 12 ("[T]he Committee was *focused* on investigating its claim that the Department had intentionally tried to obstruct its oversight investigation . . . ." (emphasis added)); *id.* ¶ 18 ("The Department *strove* to provide responsive documents germane to the Committee's stated interests . . . ." (emphasis added)).  Mr. Colborn, of course, could not possibly have personal knowledge of anyone's state of mind but his own.[7]

     3.   <u>Statements About Historical Events</u>.  Mr. Colborn also proceeds to pronounce on the teachings of "history," including, for example, the history of "oversight disputes between the Branches."  Colborn Decl. ¶ 6; *see also, e.g.*, *id.* ¶ 7 (discussing history of "good faith negotiations between Congress and the Executive Branch" (quotation marks omitted)); *id.* ¶¶ 10,

---

[7]  *See, e.g.*, *Granberry v. Baptist Mem'l Hosp.*, 145 F.3d 1331 (6th Cir. 1998) ("Granberry seeks to introduce her *own* statement as to Reed's state-of-mind, a matter about which Granberry possesses no personal knowledge."); *Jenkins v. Heintz*, 124 F.3d 824, 831 (7th Cir. 1997) ("Jenkins is correct that Vician cannot testify to the knowledge of another of his firm's members . . . ."); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1367 (8th Cir. 1983) (affirming trial court's rejection of statement in affidavit that "price was not the determining factor in [a third party]'s decision to shop elsewhere" because statement was "a mere surmise on [the affiant's] part, not a fact of which he ha[d] knowledge"); *Lombardelli v. Halsey*, No. 1:08-cv-00658, 2012 WL 2529225, at *5 n.18 (E.D. Cal. June 29, 2012) ("Plaintiff contends that he merely told Cobo to lock up and deal with the situation later.  However, Plaintiff cannot testify as to Defendant Carter's state of mind, as he lacks personal knowledge of such information."); *In re Rezulin Prods. Liab. Litig.*, 168 F. Supp. 2d 136, 143 & n.28 (S.D.N.Y. 2001) ("Although Pollard purports to have 'personal knowledge of the matters contained' in the affidavit, Pollard does not state she was present with Temple or Smith at the time in question, and in any event could not have personal knowledge of either's state of mind." (citation omitted)); *Guzman v. Abbott Labs.*, 59 F. Supp. 2d 747, 757 (N.D. Ill. 1999) ("[P]aragraph 58 alleges that Moore purposely made comments so that Guzman could hear them, and paragraph 59 contends that Moore knew what he wanted to tell Guzman but, instead of telling her directly, he would speak loud enough so she could overhear him.  The court finds that these statements are outside Guzman's personal knowledge because Guzman could not have known Moore's subjective intent when he was speaking." (citations omitted)); *Bolen v. Paragon Plastics, Inc.*, 754 F. Supp. 221, 225 (D. Mass. 1990) ("The next portion of the affidavit . . . states that 'It is thus clear to me that Beinhocker never had any intention of fulfilling this promise.' . . .  Certainly, Bolen has no personal knowledge of Beinhocker's state of mind at the time the alleged statement was made.").

16-17 (discussing history of congressional inquiries into Executive Branch's response to congressional investigations). "[C]onclusory statement[s] concerning . . . alleged historical event[s]," like these, "are presumptively violative of Rule 56[]." *Hall v. CIA*, 538 F. Supp. 2d 64, 68 (D.D.C. 2008).

Worse still, Mr. Colborn never specifies when these "historical" events occurred, let alone states that they (either individually or collectively) occurred during his tenure at OLC when he *might* conceivably have been witness to them personally.[8] *Cf. Londrigan*, 670 F.2d at 1174-75 (suggesting affiant FBI agent could testify about "the agency's procedures with respect to investigations during his own tenure therewith and earlier practices *of which he possesse[d] personal knowledge*" (emphasis added)). Oversight disputes between Congress and the Executive Branch, of course, date back to the beginning of the Republic, long before Mr. Colborn began working as a DOJ lawyer in OLC. *See generally* AG SJ Mem. at 14-15 (citing examples dating "[a]s early as 1792"); Pl.'s Consol. (i) Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J., & (ii) Opp'n to Def.'s Cross-Mot. for Summ. J. at 28 nn.26 & 27 (Feb. 14,

---

[8] For instance, Mr. Colborn offers a short primer on the history of "Executive Branch policy" vis-à-vis responding to congressional subpoenas, Colborn Decl. ¶¶ 4-7, which he apparently bases on a White House memorandum that itself predates his time as an OLC lawyer, *see id.* ¶ 2. It is noteworthy, however, that this very memorandum contradicts Mr. Colborn's claim that the Executive Branch generally does not raise with Congress the specter of executive privilege until "after a committee seeks to hold the subpoena recipient in contempt." *Id.* ¶ 7. Instead, the memorandum tells "Department Head[s]" that they must "request the Congressional body to hold its request for the information in abeyance" until "a final Presidential decision on the matter [of executive privilege]," and in doing so must "expressly indicate that the purpose of the request is to protect the privilege pending a Presidential decision." Mem. from Ronald Reagan, President, to Heads of Exec. Dep'ts & Agencies, Procedures Governing Responses to Congressional Requests for Information ¶ 5 (Nov. 4, 1982), Ex. N to AG's SJ Mem. (ECF No. 63-16).

2014) ("Committee SJ Reply & Opposition") (similar); Comm. SJ Mem. at 7-10 (citing

examples dating as early as 1920s).[9]

### B. The Attorney General Has Not Established, and Cannot Establish, That Mr. Colborn's Declaration Consists of Admissible Statements of Fact.

Summary judgment declarations may only "set out *facts* that would be *admissible* in

evidence." Fed. R. Civ. P. 56(c)(4) (emphases added). Mr. Colborn's declaration, on the other

hand, makes statement after statement (i) relating hearsay, (ii) offering conclusory assertions,

(iii) rendering opinions, and (iv) making legal arguments. This is plainly improper. *See, e.g.*,

*Gebhard*, 59 F.R.D. at 508 ("The affidavit consists of conclusions of law and opinion testimony

and, therefore, is improper under Rule 56.").

1. <u>Hearsay Statements</u>. Hearsay is presumptively inadmissible. *See* Fed. R. Evid. 802.

Yet Mr. Colborn's declaration necessarily relates the hearsay statements of others to the extent

that his statements are based on information "provided to [him] by OLC attorneys" and "others

within the Executive Branch." Colborn Decl. ¶ 3; *see, e.g.*, *id.* ¶ 15 (offering for truth of matter

asserted certain statements from June 19, 2012 letter addressed to President from Attorney

General). These hearsay statements have no place in a summary judgment declaration. *See, e.g.*,

*Wash. Post Co. v. Keogh*, 365 F.2d 965, 971 (D.C. Cir. 1966) ("[T]he affidavit does not set forth

facts admissible in evidence, as the allegations are almost all hearsay." (citations omitted));

*Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949) (similar); *Judicial Watch*, 224 F.R.D. at

265 ("[T]he overwhelming majority of the Stewart Declaration is composed of hearsay

---

[9] Further underscoring his lack of personal knowledge of the events to which he has sworn, Mr. Colborn's recounting of "history" appears to be, at best, incomplete in many respects. *Compare, e.g.*, Colborn Decl. ¶ 7 (asserting that executive privilege "will generally not be asserted by the [subpoena] return date"), *with* Comm. SJ Mem. at 34 & n.37, *and* Comm. SJ Reply & Opp'n at 13 & n.12 (citing numerous examples of privilege assertions before subpoena return date).

statements for which no hearsay exceptions would apply.  As such, they are subject to strike."
(citations omitted).[10]  Because Mr. Colborn never bothers to distinguish between statements
about which he might have personal knowledge and those statements based on information
obtained from others, all of his statements should be stricken as hearsay.

2.  Conclusory Assertions.  Mr. Colborn makes numerous assertions that are conclusory,
generalized, and unsubstantiated.  Many of these involve assertions that something "historically,"
"traditionally," "typically," "ordinarily," "often," and/or "generally" occurs.[11]

"The object of [Rule 56]," however, "is not to replace conclusory allegations of the
complaint or answer with conclusory allegations of an affidavit."  *Lujan v. Nat'l Wildlife Fed'n*,

---

[10]  *See also, e.g.*, *Riggsbee*, 637 F. Supp. 2d at 46 ("[O]n summary judgment, statements that are impermissible hearsay or that are not based on personal knowledge are precluded from consideration by the Court."); *Larouche v. Dep't of Treasury*, No. 91-cv-1655, 2000 WL 805214, at *15 (D.D.C. Mar. 31, 2000) ("Although not every paragraph of the Canning declaration is inadmiss[i]ble due to the personal knowledge requirement, that portion of the declaration that accurately reflects Canning's firsthand, personal knowledge, fails to meet other requirements of Rule 56(e) due to the inclusion of irrelevant information or hearsay."); *Hatcher-Capers v. Haley*, 762 F. Supp. 393, 400 (D.D.C. 1991) ("Affidavits composed of hearsay and opinion evidence do not satisfy the requirements of Fed. R. Civ. P. 56(e) and must be disregarded." (quotation marks omitted)); *Gov't of Republic of China v. Compass Commc'ns Corp.*, 473 F. Supp. 1306, 1308 (D.D.C. 1979) ("To the extent that Mr. Bernstein's affidavit contains hearsay and generalized, conclusionary and unsubstantiated statements, it is insufficient to create genuine factual disputes and will not be considered by the Court in deciding the motion for summary judgment.").

[11]  *See, e.g.*, Colborn Decl. ¶ 5 ("the *often* adversarial nature of congressional demands for information in the oversight context" (emphasis added)); *id.* ¶ 6 ("*Historically*, oversight disputes . . . have not been litigated in the courts . . . ." (emphasis added)); *id.* ("[T]he process has *traditionally* been confined to the political sphere . . . ." (emphasis added)); *id.* ¶ 7 ("Congressional subpoenas *typically* include a 'return date' by which the recipient is instructed to comply with the subpoena." (emphasis added)); *id.* ("[T]he resulting process of negotiation and accommodation . . . *often* continues beyond the subpoena's return date." (emphasis added)); *id.* ("[T]he fact that committee subpoenas . . . are *often* quite broad and burdensome . . . *generally* means that it is not possible . . . to reach a resolution by the subpoena's return date." (emphases added)); *id.* ("[Executive privilege] will *generally* not be asserted by the return date . . . ." (emphasis added)); *id.* ¶ 10 ("*Ordinarily*, . . . the Department does not provide to Congress internal materials generated in the course of responding to a congressional inquiry." (emphasis added)); *id.* ¶ 26 ("*Often*, such documents are so inextricably intertwined with the Department's efforts to respond to the Committee's inquiries . . . ." (emphasis added)).

497 U.S. 871, 888 (1990).  Accordingly, these sweeping, unsubstantiated allegations of

purported "fact" do not belong in the summary judgment record.  *See, e.g.*, *Ass'n of Flight*

*Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 466 (D.C. Cir. 2009) ("[T]he affidavit's

assertion of causation has no more force under the summary judgment standard we apply than if

it were alleged in a complaint."); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)

("Accepting such conclusory allegations [lacking supporting facts] as true . . . would defeat the

central purpose of the summary judgment device, which is to weed out those cases insufficiently

meritorious to warrant the expense of a jury trial."); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir.

1993) (when plaintiff "must support his allegations of superior qualifications with facts in the

record," "a mere unsubstantiated allegation of superior qualifications" does not suffice for

purposes of Rule 56); *Herbert v. Architect of the Capitol*, 839 F. Supp. 2d 284, 292 n.4 (D.D.C.

2012) ("The allegation is the sort of conclusory statement, unaccompanied by supporting facts or

a basis for concluding that it rests on personal knowledge, that should be disregarded on a

motion for summary judgment.").

    3.  <u>Improper Opinion and "Expert" Testimony</u>.  Mr. Colborn's assertions that something

"historically," "traditionally," "typically," "ordinarily," "often," and/or "generally" occurs

likewise reflect, at best, his subjective impressions about the frequency of events – i.e., his

opinions – which are "impermissible under [Rule 56]'s personal knowledge, competency and

admissibility requirements." *Judicial Watch*, 224 F.R.D. at 265 (striking opinions in affidavit

that "the practices employed were 'improper,' 'inconsistent,' or 'flawed'" because such

statements were "mere conjecture" "given that [affiant] ha[d] no independent basis of personal

knowledge" about practices).

Mr. Colborn goes beyond simply opining on the past and present.  He purports to foretell the future, offering his opinions about what might happen if "congressional response work product" is not insulated from congressional inquiry, *see* Colborn Decl. ¶¶ 15-17, 25, 26, and predicting a potential "chilling effect on Executive employees in responding to congressional oversight requests," *id.* ¶ 25; *see also id.* ¶ 15 ("[C]ompelled release of the documents would have significant, damaging consequences for the separation of powers . . . ." (quotation marks omitted)); *id.* ¶ 16 ("A congressional power to access congressional response work product . . . could impair the ability of Executive officials and their advisors to formulate effective responses and arrogate to Congress undue leverage over the Executive Branch in that investigation (and perhaps in dealings more generally)."); *id.* ¶ 26 ("[R]evealing such material would undermine the Executive's confidentiality interest . . . .").

It is axiomatic that a prediction about the future cannot be a fact.  Mr. Colborn's predictions of "chilling" – and "the wide ramifications" that the Court's ruling might have "for the Executive Branch, and the separation of powers, as a whole," *id.* ¶ 17 – amount to rank speculation.  The Attorney General is certainly entitled to advance a "chilling" argument in support of his legal position, but Mr. Colborn cannot declare it as a "fact."[12]

---

[12]  Indeed, to credit Mr. Colborn's prediction of a "chilling effect" and the "impair[ment]" of Executive Officials, Colborn Decl. ¶¶ 15, 16, one has to pile assumption upon assumption.  *First*, one must assume that Congress will investigate the Executive Branch's response to congressional investigations in the future.  *Second*, one must assume that such "congressional response" investigations will occur with such frequency in the future that their mere possibility will actively be on the minds of Executive Branch employees responding to other types of congressional investigations.  *Third*, one must assume that any Executive Branch employees who actually would be fearful of "congressional response" investigations, in fact, would temper their candor and independence in responding to other types of congressional investigations.  *Finally*, one must assume that there will be enough of these fearful Executive Branch employees who hold back in responding to other types of congressional investigations that the Executive Branch in general would cease to function properly in responding generally to congressional investigations.

At bottom, Mr. Colborn's declaration seems designed to read like an expert report, inviting the reader to give it talismanic significance.  Out of the gate, the declaration highlights Mr. Colborn's "extensive expertise and experience in the nature of Executive Privilege and the process for asserting it," *id.* ¶ 2 – which he presumably honed during his time in a DOJ office whose "principal function . . . is to assist the Attorney General in his role as *legal advisor* to the President" and to "prepare[] *opinions* addressing a wide range of *legal questions* involving the operations of the Executive Branch."  *Id.* ¶ 1 (emphases added).  This expertise, of course, is exceedingly one-sided:  Mr. Colborn acknowledges that his career has been focused on "helping Executive Branch officials to understand and protect the . . . *institutional* interests [of the Executive Branch]."  *Id.* ¶ 2 (emphasis added).

The Attorney General has not disclosed Mr. Colborn as an expert.  Nor could he.  The Committee does not concede Mr. Colborn's expertise on any matter, let alone executive privilege.[13]  Beyond that, Mr. Colborn's legal opinions about executive privilege would not "help the [Court] to understand the evidence or to determine a *fact* in issue."  Fed. R. Evid. 702(a) (emphasis added).  Moreover, expert opinions cannot, as the Colborn Declaration does, invade the province of the judge to decide the law or the role of the judge as fact finder to apply the law to the facts.  *Cf.* Fed. R. Evid. 704 advisory committee's note (stating that Fed. R. Evid. 701 and 702 "afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day" and

---

[13]  It further goes without saying that, based on his declaration, Mr. Colborn would not qualify as an expert historian, behavioral or organizational psychologist, or constitutional scholar – three of the other hats he purports to wear in his declaration.

"also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria").[14]

As a matter of law, this Court owes no deference to a formal OLC opinion analyzing the circumstances presented here.  *See, e.g.*, *Pub. Citizen v. Burke*, 843 F.2d 1473, 1476-80 (D.C. Cir. 1988).  The personal opinions of a single lawyer in OLC, thinly disguised as fact, merit even less deference.

4.  <u>Improper Legal Arguments</u>.  Finally, Mr. Colborn's declaration repeatedly offers improper legal arguments.  For instance, he opines in several places about what the Constitution requires and how power between the branches of government should be balanced.  *See, e.g.*, Colborn Decl. ¶ 16 ("A congressional power to access congressional response work product . . . could . . . arrogate to Congress *undue* leverage over the Executive Branch in that investigation (and perhaps in dealings more generally)." (emphasis added)); *id.* ("critical concerns of constitutional dimension"); *id.* ("the candor among Executive Branch officials that is *necessary* for the performance of their functions and to preserve the *proper* balance of powers between the political branches" (emphases added)).

Worse, Mr. Colborn purports to instruct this Court on what constitutes executive privilege.  He lectures on why certain "components of Executive Privilege exist," complete with citations to several provisions of the U.S. Constitution.  *Id.* ¶ 8.  He offers his musings on executive privilege.  *See, e.g.*, *id.* ¶¶ 15, 16, 25, 26.  And then he concludes that executive privilege applies to certain information and documents – including the very "congressional response work product" materials sought by the Committee here.  *See, e.g.*, *id.* ¶¶ 20-24

---

[14]  In addition, it is impossible to tell from Mr. Colborn's declaration whether his opinions are "based on sufficient facts or data," whether they are "the product of reliable principles and methods," and whether Mr. Colborn "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)-(d).

(referring to "the privileged material"); *id.* ¶ 26 (discussing "additional documents" that are "[a]lso subject to the assertion of Executive Privilege"); *see also id.* ¶ 8 (offering "[e]xamples of confidential information that may be protected by Executive Privilege").

Whether a privilege applies, and what the Constitution requires, are ultimate legal questions.  *See United States v. Nixon*, 418 U.S. 683, 705 (1974) ("We therefore affirm that it is the province and duty of this Court to say what the law is with respect to the claim of privilege presented in this case." (quotation marks omitted)); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  And whether the very documents sought by the Committee in this case are privileged is *the* legal question that this Court must decide.  *See* Mem. Op. at 27 n.7 (Sept. 30, 2013) (ECF No. 52) ("[T]his lawsuit . . . raises a narrow legal question:  can the executive properly assert executive privilege to shield an agency's deliberative processes when the records in dispute do not reveal advice provided to the President himself or address his core constitutional functions?"); Minute Order (Feb. 4, 2014) ("[T]his action raises only one issue:  Whether [the Attorney General] could properly assert the executive privilege to withhold subpoenaed documents dated after February 4, 2011 on the grounds that their disclosure would reveal the [Department of Justice]'s deliberative processes.").

Mr. Colborn's declaration serves as little more than an echo chamber for the Attorney General's legal arguments against complying with the Committee's subpoena.  Most notably, in describing "the importance of the executive privilege assertion," the declaration proclaims that "compelled release" of the documents sought by the Committee "'would have significant, damaging consequences' for the separation of powers."  Colborn Decl. ¶ 15 (quoting Letter from Eric H. Holder, Jr., Att'y Gen., to the President (June 19, 2012) (ECF No. 63-10)).  Yet in so

proclaiming, Mr. Colborn quotes directly from a letter he apparently wrote to the President on

June 19, 2012, by which the Attorney General advocated for the assertion of executive privilege

*in this very case*.  This is absurdly recursive, and it belies an attempt to insulate the Attorney

General's legal position from judicial scrutiny by enshrining it as a "fact" in the record – a ploy

this Court should reject.

*      *      *

Because the defects in Mr. Colborn's declaration are so pervasive, and because his

improper statements are inextricably interwoven into every corner of his declaration, this Court

should strike it in its entirety.

## II.     The Burton Declaration Suffers from Many of the Same Defects as the Colborn Declaration, and It Too Should Be Stricken in Its Entirety.

### A.     As to Substantial Portions of the Burton Declaration, the Attorney General Has Not Established, and Cannot Establish, That Ms. Burton Possesses Personal Knowledge.

Ms. Burton's declaration is not based exclusively on her own personal knowledge.  To

the contrary, her statements also are based, in some unspecified part, "on information provided to

[her] in [her] official capacity by others in the Department," i.e., hearsay.  Burton Decl. ¶ 1.  In

fact, in only three substantive paragraphs of her declaration does Ms. Burton expressly state that

she personally was involved in the events described.  *See id.* ¶ 6 ("In *my* experience,

Congressional requesters usually recognize and accept important Executive Branch

confidentiality interests in pending law enforcement investigations." (emphasis added)); *id.* ¶ 8

("The amount of work required to retrieve and process the sheer quantity of documents

potentially responsive to this congressional inquiry has been . . . likely the most extraordinary in

16

*my* career in OLA." (emphasis added);[15] *id.* ¶ 12 ("OLA attorneys, including *me*, explained to Committee staff . . . that documents responsive to that subpoena included material concerning the Department's efforts to respond to the congressional requests, and that this category of records presented particular sensitivities for the Department." (emphasis added)).

Moreover, Ms. Burton repeatedly uses the first-person plural – "we," "us," and "our" – in an ambiguous way that makes it virtually impossible to discern which of her statements reflect personal knowledge as opposed to a shorthand reference to one of at least four possible different groups she purports to speak for/about throughout her declaration, including:  (i) OLA attorneys who responded to the Committee's investigation, *see, e.g.*, *id.* ¶ 12; (ii) everyone in OLA, *see, e.g.*, *id.* ¶¶ 2-3, 5, 19; (iii) everyone in DOJ involved in responding to the Committee's investigation, *see, e.g.*, *id.* ¶¶ 7, 8, 10, 14-16, 19, 21-23; and (iv) everyone in DOJ, *see, e.g.*, *id.* ¶¶ 8, 14, 15, 16, 19, 20-23.  Indeed, the fact that, for three statements in her declaration, Ms. Burton does use the first-person singular strongly suggests that her other statements using the first-person plural are *not* based on personal knowledge but instead derive from "information provided to [her] . . . by others in the Department," *id.* ¶ 1.  Knowledge based purely on hearsay is not "personal knowledge."  *See* 3 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 6:6 (4th ed. 2013) ("The personal knowledge requirement means that a lay witness is not to testify to the acts, events, or conditions that he only heard about from others, which would amount to hearsay in the most blatant sense if the witness actually quoted or paraphrased what others told her, and would be what amounts to hidden or indirect hearsay if she simply parroted in her own words what she heard from others." (footnotes omitted)).

---

[15]  Even this statement does not reflect the extent of Ms. Burton's personal involvement in OLA's and/or DOJ's response to the Committee's investigation, as opposed to what she might have heard from others about that response and then measured against congressional responses that have occurred since she joined OLA.  *See* Burton Decl. ¶ 1.

Additionally, like Mr. Colborn, Ms. Burton repeatedly purports to speak to the states of mind of other people, and even entities, including entire components within DOJ and, indeed, DOJ itself.  *See supra* Argument, Part I.A.2 (citing cases).  One example of this involves Ms. Burton's claim that "*the Department*, on February 4, 2011, had *unintentionally* provided inaccurate information in a letter to Senator Grassley about Fast and Furious."  Burton Decl. ¶ 19 (emphases added).  Ms. Burton could not possibly have firsthand knowledge of what everyone in DOJ involved in preparing that letter was thinking.  In another statement, Ms. Burton even purports to discuss the state of mind of congressional staff whom, she claims, "usually *recognize* and *accept* important Executive Branch confidentiality interests in pending law enforcement activities."  *Id.* ¶ 6 (emphases added).[16]

All of these statements lack any apparent basis in personal knowledge and should be stricken.

---

[16]  *See also, e.g.*, Burton Decl. ¶ 3 ("OLA . . . *takes seriously* its responsibility to work with committees to accommodate their information needs as effectively and efficiently as possible." (emphasis added)); *id.* ¶ 4 (purporting to discuss the "inten[t]" behind a "long-standing Department policy"); *id.* ¶ 8 ("The Department *took seriously* the task of responding to this oversight, and recognizing the size and scope of the undertaking . . . ." (emphasis added)); *id.* ¶ 10 ("This process became a primary *mission* for OLA for more than a year . . . . (emphasis added)); *id.* ¶ 14 ("We *recognized* that the Committee had an oversight interest in obtaining information about such actions . . . ." (emphasis added)); *id.* ¶ 17 ("[W]e were *willing* to address any Committee concerns about the nature of redactions." (emphasis added)); *id.* ¶ 19 ("We were *distressed* when we learned that the February 4 letter contained inaccurate information." (emphasis added)); *id.* ¶ 20 ("As we *learned* more, Department officials communicated repeatedly to the Committee that we had significant and growing *concerns* about the Operation." (emphases added)); *id.* ("We were also *mindful* that we did not yet fully *understand* what had happened, and *did not want* to risk providing any erroneous information in our representations to Congress in trying to rectify prior inaccurate information in the February 4 letter." (emphases added)); *id.* ¶ 21 ("[W]e *concluded* that it would be appropriate to make an exception to our general policy with regard to the creation of the February 4 letter." (emphasis added)); *id.* ¶ 22 (discussing DOJ's "*good-faith* efforts to accommodate the Committee's legitimate oversight needs relating to Fast and Furious" (emphasis added)); *id.* ¶ 23 ("The process of responding to congressional oversight of Fast and Furious took longer than we at the Department *anticipated* . . . ." (emphasis added)); *id.* ("The Department . . . was *dedicated* to working through the issues with Committee staff in *good faith* . . . . (emphases added)).

**B.      The Attorney General Has Not Established, and Cannot Establish, That Ms. Burton's Declaration Consists of Admissible Statements of Fact.**

1. <u>Hearsay Statements</u>.  Ms. Burton's declaration also is replete with inadmissible hearsay statements.  For instance, she offers for its truth a prior conversation "we" had with the Committee "*explain[ing]* that oversight is fairly directed at the Department's substantive activities, policies, and programs, but generally not at the internal process by which the Department determines how to respond to congressional requests."  Burton Decl. ¶ 21 (emphasis added).  This statement, and the many others like it, would not be admissible and do not belong in Ms. Burton's declaration.[17]  *See supra* Argument, Part I.B.1 (citing cases).

2. <u>Conclusory Assertions</u>.  Ms. Burton's declaration likewise is rife with improper conclusory assertions masquerading as "fact."  For example, as noted above, she baldly asserts that "the Department, on February 4, 2011, had *unintentionally* provided inaccurate information in a letter to Senator Grassley about Fast and Furious," Burton Decl. ¶ 19 (emphasis added), and frequently purports to vouch for how "seriously" OLA and DOJ approached/approach their

---

[17]  *See also, e.g.*, Burton Decl. ¶ 11 ("During these *discussions*, OLA *made HOGR aware* of many of the challenges posed by the subpoena." (emphases added)); *id.* ¶ 12 ("OLA attorneys, including me, *explained* to Committee staff after receipt of the October 2011 subpoena, and on or before October 25, 2011, that documents responsive to that subpoena included material concerning the Department's efforts to respond to the congressional requests, and that this category of records presented particular sensitivities for the Department." (emphasis added)); *id.* ("We also *reiterated* our concern that the Committee was asking for records concerning ongoing law enforcement activities, which presented significant issues . . . ." (emphasis added)); *id.* ("We *indicated* that some of the material responsive to the subpoena as written seemed to be wholly unrelated to what the Department understood to be the subject of the Committee's investigative interests." (emphasis added)); *id.* ¶ 16 ("As *set forth in the letters* accompanying our disclosures of documents to the Committee, the Department took steps, such as redactions, to protect individual privacy interests and, consistent with established practice, consulted with other Executive Branch agencies where responsive materials implicated their equities." (emphasis added)); *id.* ¶ 17 ("We also *made clear* that we were willing to address any Committee concerns about the nature of redactions." (emphasis added)); *id.* ¶ 20 ("Department officials *communicated repeatedly* to the Committee that we had significant and growing concerns about the Operation." (emphasis added)).

obligation to cooperate with the Committee's investigation.[18]   Again, that is precisely one of the issues the Committee is investigating here, and Ms. Burton cannot resolve it by fiat.

Additionally, like Mr. Colborn, Ms. Burton repeatedly tries to characterize, in broad strokes, how frequent or typical something is.  For instance, she says that, "[p]rior to the Committee's investigation at issue here, congressional committees had not *generally* requested internal communications about how the Department prepares its responses to oversight requests." Burton Decl. ¶ 21.[19]  These types of "conclusory allegations" are not proper for purposes of summary judgment.  *Lujan*, 497 U.S. at 888; *see also supra* Argument, Part I.B.2 (citing cases).

---

[18]  *See, e.g.*, Burton Decl. ¶ 3 ("OLA . . . *takes seriously* its responsibility to work with committees to accommodate their information needs as effectively and efficiently as possible." (emphasis added)); *id.* ¶ 8 ("The Department *took seriously* the task of responding to this oversight, and recognizing the size and scope of the undertaking, *endeavored* to commit the personnel and resources that were required by the extensive information requests." (emphases added)); *see also id.* ¶ 5 ("[U]sually requests for non-public documents are information about pending investigations are *respectfully*, but wholly, declined." (emphasis added)); *id.* ¶ 10 ("This process became a *primary mission* for OLA for more than a year . . . . (emphasis added)); *id.* ¶ 19 ("OLA *strives* to provide accurate and timely information in response to congressional requests. . . . We were *distressed* when we learned that the February 4 letter contained inaccurate information." (emphases added)); *id.* ¶ 20 ("The Department was *learning* of the details of the ATF Operation over time . . . ." (emphasis added)); *id.* ¶ 23 ("The Department, through attorneys within and outside of OLA, *was dedicated* to working through the issues with Committee staff in good faith, and tried to strike the proper balance between protecting important Executive Branch equities while also accommodating the Committee's legitimate interest in learning about this flawed law enforcement operation." (emphasis added)).

[19]  *See also, e.g.*, Burton Decl. ¶ 4 ("*On occasion*, congressional oversight requests seek documents and information pertaining to ongoing law enforcement matters . . . ." (emphasis added)); *id.* ¶ 5 ("*[U]sually* requests for non-public documents are information about pending investigations are respectfully, but wholly, declined." (emphasis added)); *id.* ¶ 8 ("The amount of work required to retrieve and process the sheer quantity of documents potentially responsive to this congressional inquiry has been *extraordinary* . . . ." (emphasis added)); *id.* ¶ 9 ("Congressional oversight requests *generally* pertain to the activities of one Department component, or two *on occasion*." (emphases added)); *id.* ¶ 10 ("The Department also took the *unusual* step of enlisting a contractor . . . ." (emphasis added)); *id.* ¶ 15 (discussing "documents that congressional committees would not receive *under normal circumstances*" and "*extraordinary* exception to the Department's long-standing policy and practice regarding congressional requests for non-public documents about pending law enforcement matters" (emphases added)); *id.* ¶ 17 ("Consistent with our *usual* practice . . . . " (emphasis added)).

3. <u>Improper Opinion Testimony</u>.  As with Mr. Colborn's unsubstantiated assertions of "fact," virtually all of Ms. Burton's conclusory statements discussed above also amount to improper opinions, in that they reflect only Ms. Burton's subjective impressions of the matters she discusses.  *See, e.g.*, *supra* Argument, Part II.B.2 (citing examples); Burton Decl. ¶ 22 ("The transmittal letters explaining the productions often described the documents and provided *helpful* context." (emphasis added)); *see also supra* Argument, Part I.B.3 (citing cases).

4. <u>Improper Legal Arguments</u>.  Finally, Ms. Burton's declaration repeatedly advances legal arguments.  For example, she swears that "oversight is *fairly* directed at the Department's substantive activities, policies, and programs, but generally not at the internal process by which the Department determines how to respond to congressional requests."  Burton Decl. ¶ 21 (emphasis added).  Ms. Burton offers similar legal arguments concerning the supposed "legitimacy" of DOJ's interests in nondisclosure.  *See, e.g.*, *id.* ¶ 14 ("We recognized that the Committee had an oversight interest in obtaining information about such actions, and endeavored to provide such information, while still protecting the Department's *legitimate* law enforcement interests." (emphasis added)); *id.* ¶ 23 (discussing "*important* Executive Branch equities" (emphasis added)).

Ms. Burton's statement that "the Department, on February 4, 2011, had *unintentionally* provided inaccurate information in a letter to Senator Grassley about Fast and Furious," *id.* ¶ 19 (emphasis added), also is plainly argumentative and offers a legal conclusion.  In this same vein, Ms. Burton repeatedly offers legal conclusions about the "good faith" of those responding to the Committee's investigation.  *See, e.g.*, *id.* ¶ 22 ("As a result of its *good-faith* efforts to accommodate the Committee's legitimate oversight needs relating to Fast and Furious . . . ." (emphasis added)); *id.* ¶ 23 ("The Department . . . was dedicated to working through the issues

21

with Committee staff in *good faith* . . . ." (emphasis added)).  Ms. Burton also swears under oath, as a matter of fact, that certain DOJ materials could not be disclosed to the Committee because such "disclosure . . . was prohibited by Rule 6(e) of the Federal Rules of Criminal Procedure." Burton Decl. ¶ 13.[20]  Finally, many of the gratuitous headings in Ms. Burton's declaration smack of advocacy, including, for example:  "The Department Succeeded in Accommodating the Committee's Needs."  Burton Decl. at 10; *see also, e.g.*, *id.* at 4, 6.

These are all misplaced legal arguments.  None of them belongs in a declaration of fact. *See Gebhard*, 59 F.R.D. at 508 (finding affidavit "improper under Rule 56" because it "consist[ed] of conclusions of law and opinion testimony"); *accord* Wright & Miller § 2738.

\*        \*        \*

As with Mr. Colborn's declaration, the defects in Ms. Burton's declaration are pervasive, and because her improper statements are inextricably interwoven into every corner of her declaration, this Court should strike her declaration in its entirety.

## CONCLUSION

For the reasons discussed above, this Court should strike the Colborn and Burton Declarations.

---

[20]  *See also, e.g.*, Burton Decl. ¶ 15 (discussing "materials that *could not be disclosed* for the reasons described above" (emphasis added)); *id.* ¶ 16 ("Congressional inquiries into Fast and Furious also *required* the Department to protect additional confidentiality interests." (emphasis added)).

Respectfully submitted,

*/s/ Kerry W. Kircher*
KERRY W. KIRCHER, General Counsel
D.C. Bar No. 386816
WILLIAM PITTARD, Deputy General Counsel
D.C. Bar No. 482949
TODD B. TATELMAN, Assistant Counsel
MARY BETH WALKER, Assistant Counsel
D.C. Bar No. 501033
ELENI M. ROUMEL, Assistant Counsel
ISAAC B. ROSENBERG, Assistant Counsel
D.C. Bar No. 998900

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

*Counsel for Plaintiff Committee on Oversight and
Government Reform, U.S. House of Representatives*

February 14, 2014

**CERTIFICATE OF SERVICE**

I certify that on February 14, 2014, I filed and served one copy of the foregoing

Memorandum of Points and Authorities in Support of Plaintiff's Motion to Strike the

Declarations of Paul P. Colborn and M. Faith Burton by CM/ECF on all registered parties.


*/s/ Kerry W. Kircher*
Kerry W. Kircher