1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3

4    COMMITTEE ON OVERSIGHT AND      :  CR No. 12-CV-1332
     GOVERNMENT REFORM, UNITED STATES :
5    HOUSE OF REPRESENTATIVES         :
                                      :
6                                     :
                                      :
                Plaintiff,            :
7                                     :
     v.                               :
8                                     :
     ERIC H. HOLDER, JR.,             :
9                                     :
                Defendant.            :
10   --------------------------------------------------------

11

12                TRANSCRIPT OF MOTIONS HEARING
           BEFORE THE HONORABLE AMY BERMAN JACKSON
13              UNITED STATES DISTRICT JUDGE

14                  Thursday, May 15, 2014

15   APPEARANCES:

16     For the Plaintiff:      KERRY KIRCHER, ESQUIRE
                               ISAAC B. ROSENBERG, ESQUIRE,
17                             Office of the General Counsel
                               219 Cannon Building
18                             Washington, DC   20515
                               202-225-9700
19
       For the Defendant:      KATHLEEN HARTNETT, ESQUIRE
20                             Dep. Assistant Attorney General
                               U.S. DOJ Civil Division
21                             950 Pennsylvania Avenue NW
                               Washington DC   20530
22

23

24   Barbara DeVico, FOCR, CRR, RMR

25     (202)354-3118                         Room 6509

                                                          1

1              P R O C E E D I N G S

2              DEPUTY CLERK:  Your Honor, calling Case

3    No. 12-CV-1332, Committee on Oversight and Government

4    Reform, United States House of Representatives v. Eric H.

5    Holder, Jr.  Will arguing counsel please approach the

6    lectern, identify yourself and your colleagues for the

7    record and the party or parties that you represent.

8              MR. KIRCHER:  Good morning, Your Honor.  Kerry

9    Kircher on behalf of the committee.  I'm joined at the

10   counsel table by my colleagues Bill Pittard, Todd

11   Tatelman, Mary Bette Walker, Eleni Roumel and Isaac

12   Rosenberg.  Mr. Rosenberg will argument the motion to

13   strike, if you hear argument on that piece.

14             THE COURT:  All right.  Thank you.  Good

15   morning.

16             MS. HARTNETT:  Good morning, Your Honor.

17   Kathleen Hartnett from the Department of Justice for the

18   defendant.  With me at counsel table also from the

19   Department of Justice are Eric Womack and Greg Dworkowitz.

20             THE COURT:  Okay.  Good morning.  All right.  As

21   I noted at the beginning of the last hearing, we're here

22   because the Committee on Oversight and Government Reform

23   in the U.S. House of Representatives has been engaged in

24   an investigation of Operation Fast and Furious since early

25   2010.  This was a law enforcement operation launched by

2

the Bureau of Alcohol, Tobacco, and Firearms and the U.S.
Attorney's Office in Phoenix, Arizona, in October of 2009
to confront the suspected illegal flow of firearms from
the United States to drug cartels in Mexico.

The tactics involved in that operation, tactics
which apparently had previously been used by the ATF in
Phoenix in 2006, have been the subject of intense
criticism.  In particular, during the course of the
operation, law enforcement officials permitted the guns to
walk.  That is, to let straw purchasers from the cartels
carry the firearms across the border without being
apprehended under the theory that the agents would then be
able to track where the guns were ending up.

I feel the need to point out, again, that
neither this case nor this hearing are about the existence
of the operation or the propriety of those tactics.  The
facts have been revealed.  The risks and flaws in such an
operation, risks that were tragically realized when a law
enforcement officer was killed, have been the subject of
extensive public discussion, and the department has issued
clear directives prohibiting the use of the tactics in the
future.

The case is also not about whether a
congressional investigation into the operation is
appropriate.  The parties are agreed that, of course, it's

1    a legitimate subject of a legislative inquiry.

2          During the early stages of the investigation,

3    though, on February 4, 2011, the Attorney General wrote a

4    letter to the committee denying that gun walking had taken

5    place.  The letter is not the subject of this hearing

6    either; nor is the fact that the letter was wrong.  The

7    fact that it was wrong is not in dispute.  The Attorney

8    General subsequently informed Congress that the letter was

9    incorrect and the letter was officially withdrawn in

10   December of the same year.

11         But the committee remains interested in

12   investigating how or why the Department of Justice gave it

13   inaccurate assurances and why they stood uncorrected for

14   the time that they did.  So its investigation was expanded

15   to include this second focus, which the committee refers

16   to as the obstruction portion of the investigation.

17         We're not here this morning to discuss whether

18   that inquiry was necessary or appropriate either.  That's

19   not being challenged by the Attorney General.  We're here

20   because the committee is seeking to enforce the subpoena

21   it issued on October 11, 2011, to the Attorney General of

22   the United States.  I don't believe that there's any

23   disagreement that despite the characterization of the

24   level of effort or the timeliness of the effort, that

25   subpoena has been complied with in part.

4

1          Also, requests have been narrowed through

2     negotiation.   However, among other records, the subpoena

3     sought documents generated after February 4, 2011, which

4     it believed would illuminate how it was that the

5     department came to incorrectly deny on from February 4,

6     2011, that the gun walking had taken place.   There were

7     many meetings and much correspondence back and forth about

8     what needed to be produced and when.   Many documents have

9     been produced that relate to the creation of the letter.

10         But on June 20, 2012, through a letter signed by

11    the Deputy Attorney General Cole, the department declined

12    to produce the post-February 4 documents in question.   The

13    letter stated that the President had asserted the

14    executive privilege over the documents because their

15    disclosure would reveal the agency's deliberative

16    processes.

17         A committee filed this action to declare that

18    assertion invalid and to enforce the subpoena on August 3,

19    2012.   The complaint was amended in January 2013 after the

20    new Congress reissued the subpoena.

21         The Attorney General then moved to dismiss the

22    case on the grounds that the committee had no standing to

23    bring it, the Court had no jurisdiction to hear it.   He

24    also argued that the Court should exercise its discretion

25    to decline to hear it.

5

1          The Department of Justice warned that it would

2     threaten the constitutional balance of powers between the

3     three branches if the Court waded into the merits of a

4     political dispute and undertook to assess for itself the

5     comparative weight of the legislature's stated need for

6     the records versus the executive's interest in

7     confidentiality or to determine whether the parties had

8     engaged in sufficient negotiation and accommodation.

9          In response the committee took a very clear and

10    strong position that the case was definitely justiciable

11    because it involved a discreet narrow pure question of

12    law:  Could the Attorney General lawfully withhold

13    documents on the grounds of executive privilege when the

14    documents did not involve communications with the

15    President or the performance of his core constitutional

16    functions?

17         And ultimately, as other judges of this court

18    have found before me, and in accordance with both Supreme

19    Court and circuit precedent, I agreed that deciding such a

20    legal question, the legitimacy of a claim of executive

21    privilege fell squarely within this Court's jurisdiction.

22    In *United States v. Nixon* the Supreme Court held that when

23    the chief executive resists the production of specified

24    evidence on privilege grounds, that is a traditionally

25    justiciable controversy.

1          The Court said that our system of government

2     actually requires federal courts to interpret the

3     Constitution and determine whether another branch has

4     exceeded the authority that has been committed to it.

5          "Any other conclusion would be contrary to the

6     basic concept of separation of powers and the checks and

7     balances that flow from the scheme of a tri-party

8     government."

9          We're not here today to reargue that issue.  I

10    ruled, and there's my opinion, explains why this Court has

11    jurisdiction to mediate this dispute.  I then directed the

12    parties to brief the merits of what I have been assured

13    was a pristine legal question, and we're now here on their

14    cross motions for summary judgment.

15         I have to say I found reading the briefs to be

16    somewhat distressing.  I feel a little bit like I'm the

17    victim of a bait and switch because the committee's brief

18    was exactly what it assured me it wouldn't be.  It was a

19    length vituperative account of the facts surrounding the

20    operation itself and all of the contentious back and forth

21    between the parties, who was more reasonable, who was more

22    accommodating, which wasn't supposed to be the issue,

23    which had already been laid out in full, and I urged the

24    plaintiff not to repeat.  It gets to the discussion of the

25    of pristine legal issue on page 21.  The government noted

7

1    this disconnect in its brief as well.

2         Also, the committee's brief was pitched at such

3    an accusatory level with such a pejorative term it seems

4    to have been directed more to the press than to me.  I

5    just want to state at the outset that we're not at a press

6    conference this morning.  I made it through the avalanche

7    of outrage, and I can assure the committee that I've

8    received loud and clear the message that was meant to

9    convey, but I'm hoping that the presentation this morning

10   will be more tightly focused on the legal question before

11   us.

12        I also discovered to my dismay that the briefs

13   were largely based on such things as OLC opinions, law

14   review articles and pure argument rather than binding

15   pertinent authority.  That's not at all the fault of the

16   lawyering, though, because it appears, as far as I can

17   tell, that there is very little case law to help me make

18   this decision.  This was a fact, though, that neither side

19   seemed quite ready to admit and it probably means that we

20   didn't need all the excess pages.

21        What I have to address is the unique situation

22   of when the requester is the legislature.  In particular,

23   a legislative committee engaged in oversight, and the

24   privilege involved is that subset of the executive

25   privilege that involves executive branch deliberations and

1    not conversations with the President himself.

2           I can tell you that after reviewing all of the

3    materials, I have concerns that both the defendants'

4    showing of harm and the plaintiff's showing of need are

5    weak.  The explanation of the need for confidentiality

6    asserted by the government is very generalized, and it's

7    weaker in this case than in much of the authority

8    provided.  But the committee's need may also be being

9    understated, particularly given how far we've wandered

10   from the core subject of the committee's inquiry.  The

11   briefs are really more like ships passing in the night

12   than two parties wrestling with the single legal question.

13          The Attorney General relies heavily on cases and

14   SG opinions that relate specifically to communications

15   with the President himself.  Or it cites other documents

16   in which a former executive official asserted the

17   privilege as authority for the existence of the privilege.

18          Meanwhile, the committee acts as if this is an

19   ordinary evidentiary privilege being asserted by any old

20   witness as opposed to by the President of the United

21   States.  So both the situation that one side briefed and

22   the situation that the other side briefed are

23   distinguishable from the situation we actually have.

24          The Attorney General says I should uphold his

25   assertion of the privilege without looking behind the

                                                              9

1    assertion to the records themselves, and the committee

2    says I should accept their claim of entitlement without a

3    closer examination of the need for the records and the

4    basis for rejecting the privilege.  I'm not confident that

5    either side is right about that.  I think the cases

6    clearly indicate that under these circumstances I have to

7    go beyond "because I told you so."  Even in cases

8    involving presidential communications, which are clearly

9    privileged, Courts have reviewed the documents and engaged

10   in an individualized determination.

11          Since the parties have filed cross motions, I'm

12   going to hear from one side and then the other without

13   giving the moving side the last word or we'll be here all

14   day.  After we've talked about the motion to strike, I'm

15   going to hear from each side briefly -- after we talked

16   about the motion for summary judgment, I'm going to hear

17   from each side briefly on the motion to strike.

18          And I'd like to hear from counsel for the

19   committee first.

20          MR. KIRCHER:  Thank you, Your Honor.

21          Let me assure you at the outset that the briefs

22   we submitted to this Court were not intended to be press

23   releases.  They were intended to be serious legal

24   documents to address the legal issues that are presented

25   in this case.  And if you perceive them otherwise, I

1    apologize on behalf of the committee.

2           As the Court is aware, on June 20, 2011, the

3    Deputy Attorney General in a letter to the committee

4    stated that, quote/unquote, the President has asserted

5    executive privilege over the relevant post-February 4,

6    2011, documents.

7           As you yourself just noted, Your Honor, in the

8    same letter, the Deputy Attorney General acknowledged "The

9    committee's legitimate interest in the department's

10   management of its response to congressional inquiries into

11   Fast and Furious."  And that acknowledgment echoed a

12   June 2007 Attorney General opinion which is cited in both

13   parties' briefs which states that "The department has

14   recognized that Congress has interest in investigating the

15   extent to which the department officials may have provided

16   inaccurate or incomplete information to Congress."

17          So on the one hand what we have here is we have

18   the department acknowledging the legitimacy -- the

19   Article I legitimacy of what the committee was doing here,

20   which is trying to find out about the committee's -- I'm

21   sorry, the department's response to the committee's

22   underlying Fast and Furious investigation.

23          On the other hand, we have the Attorney General

24   doing everything he can to prevent the committee from

25   doing exactly that; from initially in December through the

11

1    assertion of the privilege refusing to produce documents

2    dated or created after February 4 to the assertion of the

3    privilege on January 20 itself.

4              THE COURT:  In the letter, I believe, the --

5              MR. KIRCHER:  The privilege letter.

6              THE COURT:  -- the privilege letter -- actually

7    I think it's in the letter to the President asking about

8    the privilege, the day before, there's a statement that

9    even some post-February 4 documents have been produced if

10   they relate to the facts coming to light that the

11   February 4 letter was false.  Is that correct?

12             MR. KIRCHER:  I'm not aware that that's correct,

13   Your Honor.  It may be that there are a handful, two or

14   three or four documents, post February 4 that we received,

15   that the committee received during that time period prior

16   to the assertion of the privilege.  If they were, they

17   were de minimis in number.

18             THE COURT:  All right.  Well, let me get to the

19   core of what I think the issue is.  Your entire brief

20   seems to be premised upon the argument that what is well

21   known in the law as the, quote/unquote, executive

22   privilege.  It's coextensive with that aspect of the

23   privilege, according to presidential communications.  And

24   the deliberative materials fall completely outside of its

25   scope.

                                                          12

 1          And I don't really see that in the case law you

 2     provided.  Are you relying on any particular case for what

 3     appears to be your fundamental contention, which is that

 4     the executive privilege means communications to the

 5     President only and not the executive branch?

 6          MR. KIRCHER:  That's not our position, Your

 7     Honor.  Our position is that executive privilege is an

 8     umbrella notion.  It encompasses a number of different

 9     privileges that are asserted by the executive branch.

10     From state secrets and military secrets to Presidential

11     communications to deliberative process, to I think there's

12     a recognition in some quarters of a common-law law

13     enforcement provision.  All of those are types of

14     executive privilege.

15          And what we have asserted in this brief is when

16     the Attorney General -- or when the Deputy Attorney

17     General asserted the privilege, executive privilege in

18     June 2012, that letter is larded with references to

19     deliberative process.

20          Under the law that is set forth in the *Espy*

21     case, the D.C. Circuit very carefully distinguished

22     between the deliberative process aspect of executive

23     privilege and the presidential communications aspect of

24     privilege.  So when we went into this lawsuit, our working

25     assumption, not unreasonable assumption, was it's one or

                                                              13

1    the other or both of those.

2            THE COURT:  Right.

3            MR. KIRCHER:  And that's why you got a counter

4    complaint from us.

5            THE COURT:  But is it your position that just

6    because we're talking about confidential deliberative

7    material here that there are no constitutional or

8    separation of powers implications?  I realize that we

9    might go down a different track for how the interests are

10   weighed and what the agency has to prove, but don't the

11   cases suggest -- they don't really get to the point that

12   you got to, which is saying, you know, we don't even

13   really need to think about the Constitution or separation

14   of powers here.  It's just a privilege being asserted by a

15   witness and we, Congress, don't recognize privileges.

16           MR. KIRCHER:  I'm not saying that we don't

17   recognize it, Your Honor.  The D.C. Circuit circuit has

18   not recognized deliberative process as a constitutional

19   privilege.  So if we are --

20           THE COURT:  Well, it says they are

21   constitutional implications in a lot of footnotes, and it

22   doesn't reach the question that quotes some Law Review

23   articles say there is, some Law Review articles say there

24   aren't.  But if you have the President of the United

25   States telling a congressional committee I am asserting

                                                        14

1    privilege over these documents, are you really saying that

2    that just has no separation of powers or constitutional

3    implications at all?

4          MR. KIRCHER:  I'm saying, Your Honor, that first

5    of all, you have to decide whether there is a privilege

6    that applies here.  And there are two possibilities.

7          THE COURT:  That -- that -- I'm just talking

8    about -- let's -- we're going to get to whether these

9    documents are deliberative and whether the assertion has

10   been properly asserted.

11         But my question is neither *Espy* nor any of the

12   other cases I read seem to indicate that only the

13   communications privilege raises constitutional concerns.

14   And even if they are more deluded in one situation than

15   the other, is there any specific case law that you're

16   pointing me to that says that there's nothing

17   constitutional about the deliberative process aspect of

18   the executive privilege?

19         MR. KIRCHER:  I do, in fact, think that is what

20   *Espy* stands for, Your Honor.  With all due respect, I

21   think that's what *Espy* stands for.

22         THE COURT:  Can you direct me to a particular

23   page in *Espy* that you think says that?

24         MR. KIRCHER:  The entire beginning section that

25   discusses the background of the executive privilege goes

                                                        15

1      through a constitutional piece of that, which is the

2      presidential communications piece, and distinguishes that

3      very clearly from the common-law piece, which is the

4      deliberative process piece.

5              THE COURT:  Well, there's a sentence in *Espy*

6      where the Court says, "Although the deliberative process

7      privilege is most commonly encountered in FOIA litigation,

8      it originated as a common-law privilege."  But isn't that

9      point of that sentence to distinguish the fact that before

10     it ever got embodied in FOIA, it was a creature of case

11     law and not to rule out constitutional implications?

12             MR. KIRCHER:  I don't read it that way, Your

13     Honor.  The entire discussion is to separate out the

14     presidential communications piece in that case from the

15     deliberative process.  The whole point of that case was

16     whether the documents sought fell within the scope of the

17     former or the latter.  And the discussion, I think, leads

18     inevitably to the conclusion that the D.C. Circuit

19     concluded that the deliberative process is a common-law

20     privilege.  That is a privilege certainly that can be

21     asserted by the executive branch in many instances, but

22     it's not constitutionally based like the presidential

23     communications, which is routed in considerations that are

24     peculiar to the office of the President.

25             THE COURT:  Well, I don't think they ruled it

                                                                16

1    out completely.  I think they clearly indicated that the

2    constitutional implications are strong.  I think you're

3    somewhat overstating the implications of the distinction

4    they drew in *Espy*.

5            But if one of your arguments is that this is a

6    common-law privilege, Congress doesn't recognize

7    common-law privileges, we don't have to, you made the

8    decision to enforce the subpoena in a court of law where

9    the privilege is unquestionably recognized.  So why am I

10   bound by your internal house rules instead of legal

11   precedent, whether it's rooted in common law or somewhere

12   else?

13           MR. KIRCHER:  You're not bound by internal house

14   rules, Your Honor.  What we have said was they asserted a

15   privilege against us, and we came to the Court to find out

16   whether that privilege could, in fact, be asserted against

17   a congressional subpoena.

18           They have -- they have walked out on that

19   argument.  They no longer assert that the common-law

20   deliberative process privilege is -- they have abandoned

21   that argument.  They say they might resurrect it at some

22   later point in this litigation, but they have not defended

23   on that ground.  What -- the ground on which they have

24   defended is we want you, the Court -- and they acknowledge

25   that there is no case law that accepts the justification

1    for a constitutionally based congressional response in

2    related media's inquiries privilege.  There is no case law

3    that supports that constitutionally rooted privilege of

4    that nature.  They admit that.

5           But so what we --

6           THE COURT:  I don't think anybody has got a case

7    on point.  We're all dealing with another world in between

8    the cases that you provided and the cases -- it's not FOIA

9    either.  We're somewhere else.

10          MR. KIRCHER:  I -- I respectfully disagree, Your

11   Honor.  I think where we are is they want you to invent

12   something new.  The Supreme Court and the D.C. Circuit

13   says we're not getting into the business of inventing new

14   privileges without either a compelling empirical showing

15   or some clear and convincing showing.  They can hardly

16   make an empirical showing of a need for a new

17   congressional response in related media inquiries

18   privilege when -- when Congress has ventured into this

19   area three or four times at most over the last 30 years.

20   And if we actually start going through their rationales --

21          THE COURT:  Well, I think you are -- I think

22   they are trying to put this squarely within the

23   deliberative process privilege as it was defined in *Espy*.

24   I don't think they are asking me to create a new

25   privilege.

1           And I realize that your argument is the

2   documents aren't privileged at all and this isn't a

3   privilege that Congress needs to recognize.  But if I

4   disagree with you about that and I say the privilege

5   exists, would you agree then that what I'd have to do is

6   then balance that privilege, which may not have a strong

7   constitutional underpinning to it against your need for

8   the records, that I have to go there?

9           MR. KIRCHER:  Yes, I believe you do.  It's a

10  qualified privilege.  Deliberative process itself is

11  qualified.  This new thing that they are asking you to

12  invent, at least in our conception of the world, is also a

13  qualified privilege.  They've admitted that.  Qualified

14  means it could be overcome.  So I don't see how you avoid

15  the question of our need, assessing our need for the

16  documents.

17          THE COURT:  Well, if I assess your need for the

18  documents, they've told me a lot about your need for the

19  documents, and am I wading right into the speech or debate

20  clause if I ask you to be more specific about your need

21  for the documents?

22          MR. KIRCHER:  I don't think so.  I'm here to

23  answer your questions, Your Honor.

24          THE COURT:  All right.  Well, one of the things

25  that *Espy* said is that the deliberative process privilege,

                                                        19

1    as you say, is qualified.  It can be overcome, but it

2    doesn't give me any kind of clear standard to apply as the

3    select committee case does in the communications

4    situation.  It says the determination is supposed to be

5    made flexibly, ad hoc.  "Each time the privilege is

6    asserted, the District Court must undertake a fresh

7    balancing," and then it lists a number of factors that I'm

8    supposed to consider.

9          Now, the last time around when we talked about

10   the AT&T case, one of the factors that I looked at in

11   determining whether this case was justiciable or not was

12   whether or not there were clear standards to apply.  And

13   now they are telling me, okay, be flexible, ad hoc,

14   basically make up your own test, Judge.

15         So does the fact that the standards are so

16   elastic mean that we were wrong in the first place about

17   whether the case is justiciable or not?

18         MR. KIRCHER:  I certainly don't think so.  I, of

19   course, cannot answer for what the Court said about this

20   flexibility.  I do think the balancing has to be conducted

21   anew each time, just by virtue of the nature that there

22   are new cases.  But I think the standards are fairly

23   clear.

24         I mean, you have -- in the presidential

25   communications area, the standard is demonstrably specific

                                                            20

1  need; right?  *Nixon* says that.  *Espy* says that.  *Judicial*

2  *Watch* says that.  That -- that appears to be the standard,

3  at least for the presidential communications privilege.

4  At least in some sort of hierarchical sense is going to be

5  up here.

6          THE COURT:  Right.  It has to be critical to the

7  committee's function.

8          MR. KIRCHER:  Well, *Senate Select* uses that

9  critical language.  And if you view that as one in the

10  same, then I agree.  If you view -- I think the -- I think

11  the department argues that demonstrably critical is some

12  sort of a higher standard than demonstrated specific need.

13          We don't.  But if you viewed it as a higher

14  standard, then our argument is that *Senate Select* doesn't

15  apply here because, No. 1, it's in the presidential

16  communications context.  It was pre-*Nixon*.  You know, *Espy*

17  went the other way.

18          So it seems to me sort of the starting point

19  here is the presidential communications standard, which is

20  a demonstrably specific language.  We obviously think we

21  can satisfy that, and we've told you at some length why we

22  think we can satisfy that.

23          THE COURT:  Well, I am not -- I don't understand

24  why is it critical to the committee's function for you to

25  oversee not only executive decision-making but how the

21

1    executive responds to congressional inquiries about

2    executive decision-making.  And even more so, how it talks

3    to the media.  How does that go to your core ability to

4    function as a legislative committee what they are saying

5    to the press?

6              MR. KIRCHER:  What they are saying to the press?

7              THE COURT:  They are talking about -- one of the

8    things they are saying is privileged, and I know you're

9    saying it isn't.  But let's say I think it is.  Is how

10   we're going to respond to media inquiries, and there are

11   presumably communications back and forth, but what about

12   this?  Let's try this.  I like this scenario.  I don't

13   like this scenario.  This is what I think could happen if

14   we do this.  This is what I think we could happen if we do

15   that.  And ultimately whatever they say to the press is

16   public.  And you have that.  And you can say it was a

17   truth.  It was a half truth.  It was a lie.  You have all

18   that.

19             MR. KIRCHER:  Uh-huh.

20             THE COURT:  How is the internal discussion about

21   what they are going to do critical to the committee's

22   ability to perform its constitutional function?

23             MR. KIRCHER:  Well, again, just to be clear, we

24   do not accept that the Senate Select --

25             THE COURT:  I know that.

22

1              MR. KIRCHER:  Okay.

2              THE COURT:  But you said you can meet it.  So I

3     want to know how.

4              MR. KIRCHER:  All right.  What we have here,

5     Your Honor, here is in a specific -- we're talking about

6     the specific context of this case.  All right?  We've

7     got -- let me back up.

8              The larger framework is, and I've tried to

9     explain in our brief, is Congress 99 percent of the time

10    is not interested in how they respond to Congress's

11    inquiries.  Congress wants to know about operations and

12    programs:  Are they working?  Are they being managed

13    right?  Are they being mismanaged?  Is the money being

14    spent well?  Do we need to spend more money?  That's what

15    Congress is principally interested in.  But if --

16             THE COURT:  Don't we have at least three

17    investigations going on right now where the house's focus

18    is on how the executive responded to Congress's inquiries?

19    I mean, if that --

20             MR. KIRCHER:  Specifically?  I don't believe so.

21             THE COURT:  Well, it seems like the Benghazi one

22    talks about that.  The IRS one talks about that.  It seems

23    like if we say that that's something that's going to

24    outweigh a privilege claim, where does that end?

25             MR. KIRCHER:  Well, the Benghazi committee was

                                                        23

1    just created a couple of days ago, so I don't think we can

2    comment on that.  I don't think that's where the IRS

3    investigation has focused.  There is certainly an issue

4    with respect to one particular witness has made the news.

5    But I don't think it's fair to say that the committee's

6    underlying focus is on how the IRS responded to its

7    inquiries on what was going on in those parts of the

8    Internal Revenue Service.

9         This one is quite different because as you

10   yourself pointed out, Your Honor, we got, we got -- we got

11   false information on February 1.  We got more false

12   information on May 5.  On July 4 the acting director of

13   the ATF told us that internally the department is trying

14   to push the -- push the underlying investigation away from

15   political appointees; right?  Then we get virtually no

16   information prior to the issuance of the Holder subpoena.

17   Then we get virtually no information after the issuance of

18   the Holder subpoena.  On top that we later have the

19   inspector general telling us that it found, you know,

20   inaccuracies and had serious questions about the way the

21   May 2 letter in particular was drafted.

22        It takes ten months before the original false

23   statement is -- is withdrawn.  Now, in that particular

24   context the point I'm trying to make here, Your Honor, is

25   if we can't investigate -- if the committees in Congress

                                                        24

1    can't go after that kind of stuff and find out about

2    deception or -- certainly allegations of deception, false

3    information, foot dragging, obstruction, if it can't look

4    into that, if it can't find out how the executive branch

5    delivers information that's relevant to the underlying

6    investigation, then it can never effectively do the

7    underlying part of the piece.  We can't do the operations

8    component of Fast and Furious if we can't also do the

9    obstruction component when it's necessary to do that.

10         We have no way to check whether we're getting

11    full and complete information on the programs and the

12    operations part of what we need to do, which is the most

13    critical part of what we need to do.  Nobody wants to be

14    doing what the committee is having to do here.  But the

15    committee can't turn away in the face of information

16    that -- that's of the nature of what we've put in our

17    papers for you.  It just can't responsibly do that.

18         THE COURT:  So one of the things that concerns

19    me is that by balancing the kinds of things you're asking

20    me to balance, it seems to me, first of all, you're

21    specifically opening up the substance and the legitimacy

22    and the goals and the techniques of the investigation --

23    of your investigation to my scrutiny, and you're

24    complaining about the timeliness and the quality of their

25    subpoena responses, the reasonableness of their

                                                          25

1    negotiation positions.  And aren't you drawing me straight

2    into the intrabranch dispute that everybody told me I

3    wasn't going to have to get into?

4           MR. KIRCHER:  Well, your Honor, in all fairness

5    I don't think we ever told you that you might not have to

6    get into a balancing -- I think what we told you was we

7    don't think the privilege they asserted should be

8    recognized at all.  And if you agree with us, then you

9    certainly don't have to get into that.

10          I don't think we ever said if you disagree with

11   that, you don't have to go on to the balancing piece.

12   That is a -- that is a -- it's certainly not in our

13   complaint.  I've gone back to look at the transcript.  I

14   don't think we ever made that kind of a representation to

15   the Court, that if you disagreed with us that the

16   privilege itself should not be recognized, that you

17   wouldn't also -- that we're just going to go home and say

18   Well, thanks, we don't need the documentation.

19          THE COURT:  Right.

20          MR. KIRCHER:  We still need the documents.

21          THE COURT:  But even your arguments about why

22   the privilege should or shouldn't be recognized turn much

23   more on because we're investigating misconduct, because

24   they dragged their feet, because they were -- that's they

25   were -- that the privilege doesn't.  So the legal

26

1    question, before we ever even get to the balancing, you've

2    imported all that stuff into your -- your first argument

3    for why I should reject the privilege is because you are

4    looking into misconduct.  And part of the misconduct that

5    you're pointing to is the fact that they are withholding

6    the documents that you're asking for.  So --

7              MR. KIRCHER:  Yeah.  And I don't think there's a

8    huge amount of dispute on that.  I don't think there's a

9    huge amount of dispute on what was going on at the

10   department here.  They have not really --

11             THE COURT:  It's hard to read these briefs

12   without feeling there's a huge amount of dispute about

13   just about everything.

14             MR. KIRCHER:  Well, I don't think there's been

15   any dispute about the February 4 letter.  I don't think

16   there's a dispute about the February 2 letter.  I don't

17   think there's a dispute about the Ken Melson --

18             THE COURT:  There's a dispute -- well,

19   Mr. Melson's transcript that you gave me was full of his

20   opinion, in my view, my characterization, my thought, my

21   views.  So I don't know how much weight to give that.

22             MR. KIRCHER:  He was acting director of the

23   Bureau of Alcohol, Tobacco and Firearms.

24             THE COURT:  Right.  And he is giving you --

25             MR. KIRCHER:  He was a high ranking official.

                                                            27

1          THE COURT:  -- about what they are doing over at

2    DOJ.  Putting that aside, I don't put as much weight on

3    that as you do.

4          MR. KIRCHER:  Okay.

5          THE COURT:  Plus you said there was no question

6    about the February 4 letter, but you call it a lie

7    throughout your -- a lie, a lie, a lie, a lie.  They lied.

8    They compounded the lie.  When I think the fact that

9    whether it was intentional falsehood is the question.

10         So by assuming the answer to the question, then

11   saying to me we're talking about misconduct, there's

12   something circular to your argument.

13         MR. KIRCHER:  I don't -- I don't think we've

14   reached -- I don't think there's been any conclusion as to

15   whether the inaccurate information or the lie was

16   intentional or not.  It was false.

17         THE COURT:  That's what a lie is.

18         MR. KIRCHER:  Well, actually I checked the

19   dictionary definition, Your Honor, and a lie could be

20   unintentional.

21         THE COURT:  Come on.

22         MR. KIRCHER:  Anyway, I don't want to quibble

23   with you about that.  But certainly, yes, intention is an

24   issue.

25         Something went wrong here.  The wheels fell off

                                                           28

1    the bus on the department's response to the committee's

2    underlying investigation to one degree or another here.

3    And it seems to me -- and the Attorney General has

4    acknowledged, as you said at the beginning in your opening

5    statement, has acknowledged the legitimacy of the

6    committee's investigation into that response process.

7              THE COURT:  All right.  Well, let me ask you

8    what I think is actually a perfectly legal question.

9              MR. KIRCHER:  Okay.

10             THE COURT:  Putting aside the question of

11   whether the deliberative process privilege can be invoked

12   before Congress, in your view are there any differences

13   between the elements and the definition of the privilege

14   under FOIA and the deliberative process privilege that

15   arose as a matter of common law under the auspices of the

16   executive privilege?  Are we talking about the same

17   animal?  I think we are, because everybody is citing FOIA

18   cases to me, but I just want to make sure.  It has to be

19   predecisional and it has to be distributive.

20             MR. KIRCHER:  Yes.  I think the exemption 5 to

21   FOIA in many cases, it was intended to import the

22   deliberative process.  So, yes, I think it's the same

23   deliberative process privilege, whether it arises in the

24   ordinary context outside of FOIA or it's asserted as a --

25   as a privilege in response to a FOIA request.  One of the

1    differences may be that I'm not sure that balancing

2    necessarily takes place in the FOIA context.

3             THE COURT:  Right.  I'm just asking about the

4    definition of the privilege, not what happens after you

5    find out that it's privileged.

6             Well, you lay out the limits of the privilege,

7    but what's your authority for the proposition that the

8    decision that's being deliberated about has to be a

9    formal -- a policy decision, sort of an operations, "this

10   is what we're going to do today" decision as opposed to

11   any decision about how to proceed in some manner that the

12   agency has to make a decision about?  Why is respond --

13   how should we respond to Congress, how should we respond

14   to the media, not a decision that they are allowed to

15   shield their deliberations about?

16            In general, putting aside the question of

17   whether the misconduct in that then outweighs it.  What

18   you're saying is not even privilege in the first place.

19            MR. KIRCHER:  Right.  If you're going to accept

20   that there is a privilege here, then yes, I think we're in

21   the decision -- you know, it's predecisional and

22   deliberative realm.  I mean, all the case law in the

23   deliberative process area has those two basic elements to

24   it.  Now, it may well be that, again, if you're going to

25   accept the fact that -- the argument that there's a

                                                            30

1    privilege here, that some of these things that they did

2    may be predecisional and deliberative.  I'm not -- I'm not

3    disputing that possibility.  Of course --

4            THE COURT:  So you're not saying, then, that the

5    decision the documents have to precede can only be a

6    formal policy decision?  Are you -- I'm not sure what your

7    answer to my question just was, but . . .

8            MR. KIRCHER:  Well, it's hard for me to talk

9    about specific documents or categories of documents, Your

10   Honor, given we know nothing to this date, two and a half

11   years after the subpoena was issued, we still have nothing

12   about what they have withheld.

13           THE COURT:  I have questions for them.

14           MR. KIRCHER:  Okay.  I'm sure you do.

15           THE COURT:  All right.  So we're going to get to

16   that.

17           But my question to you is, is it your position

18   that if they are literally deciding internally about what

19   should we say to Congress, who should testify, what should

20   he say, what should we say to the press, what's the press

21   release going to say, who are we going to put on TV to

22   talk about this, are those decisions to which

23   deliberation -- about which deliberations could be

24   privileged?

25           MR. KIRCHER:  Well, certainly -- I'm sorry.

                                                         31

1          Certainly I don't think that every single decision merits

2     protection under the deliberative process protection.  I

3     don't think that's where the case is going.  I think they

4     have to be policy-oriented kinds of decisions.  I think

5     that's what the case law says.  So, yeah, we're going to

6     shaft the committee today, yeah, I don't think that really

7     qualifies as a policy decision, if that's -- if that's

8     what you're asking me.

9          THE COURT:  Well, I'm asking you where -- where

10    does this concept that it has to be a policy decision come

11    from as opposed to a decision about which people

12    deliberate internally?

13         MR. KIRCHER:  Well, I think it's set forth -- I

14    cannot give you a case right off the top of my head, Your

15    Honor.  We did cite a number of cases in our opening brief

16    when we thought we were dealing with the common-law

17    privilege.  We gave a number of cases in our briefs which

18    talk about the predecisional and deliberative pieces of

19    that, and I would rely on the cases that we cited in that

20    part of our brief.

21         THE COURT:  All right.  I guess what concerns me

22    is just in the climate we're in where the parties are

23    polarized, and this may continue for some time, that --

24    how to respond to the other side's inquiries and to me,

25    inquiries -- something that there's going to be a lot of

1    internal discussion about.  And the administration -- the

2    administration is saying we want people to be candid.  We

3    want people to be honest.  We want people to be frank.  We

4    want them to spit out all the various scenarios.  And if

5    everything -- if all you're talking about is how to

6    respond to Congress.  If that's just not covered by the

7    deliberative process at all, could that chill people's

8    candor in saying, look, I think you should say this, I

9    think you should say that, if they think all of it's going

10   to end up on Capitol Hill?

11              I mean, is there some legitimacy to their

12   argument that some of this might actually be covered?

13              MR. KIRCHER:  Maybe a smidgen, Your Honor, but

14   not much beyond that.

15              THE COURT:  Smidgen.

16              MR. KIRCHER:  Yeah, a smidgen.  And the reason

17   is this:  As I told you before, Congress is not

18   principally interested in doing what it's having to do

19   here.  It's principally interested in getting the stuff it

20   needs to get about operations and programs.  So the

21   scenario that they are painting presupposes an underlying

22   investigation.  If we get the stuff, if the committees and

23   the Congress get the stuff that they want and that they

24   need, they have absolutely no reason to go back and ask

25   about how you did this.  There is no --

33

1          THE COURT:  Well, whether you get what you need

2    can be a subjective --

3          MR. KIRCHER:  Granted.  But I've also talked at

4    length in an earlier opinion about the structural

5    limitations on Congress's ability to do -- it cannot do

6    everything.  It's got a two-year election cycle.  It's

7    responsible to the voters.  It's got limited resources.

8    It's got limited staff.

9          The notion that somehow we are going to turn

10   around every single time we do an underlying investigation

11   and then go back and subpoena the department or some other

12   aspect of the executive branch to produce their

13   information, you know, the records that relate to their

14   response is laughable.  It's laughable.

15         THE COURT:  One of the things you said to me is

16   they can't possibly assert this privilege on an omnibus

17   basis.  Everything from February 4 forward.  So let's say

18   I agree with you about that.  They can't.  But you then

19   said in your complaint I'm supposed to declare that they

20   can't do that and order them to produce them all.  If I

21   can't declare them privileged on an omnibus basis, how can

22   I declare them to be not privileged and producible on a

23   blanket basis?  Doesn't there have to be, before you can

24   get what you want, even if they are wrong, some sort of

25   individualized --

                                                          34

1           MR. KIRCHER:  Well, in the ordinary case, the

2      answer to that would be yes.  I don't think so here since

3      they haven't come forward with any justification on their

4      side of the scale other than a very, very generalized

5      confidentiality type of claim.  That's it.  That's all

6      they've got.  That's all that they have come forward.

7           We've been at this for more than a year and a

8      half now, going on two years.  And that's all that they

9      have come forward.  We have laid out in considerable

10     detail why we think the stuff is important, why we are

11     asking for it, why -- the things that we could do if we

12     had, the possibility, the legislative possibilities, the

13     impeachment possibility if there was a senate-confirmed

14     individual who was directing the obstruction here.  You

15     know, we have been very upfront, very clear about that,

16     and you've got that now.

17          On the other side of that, all you've got from

18     them is a very, very, very generalized We don't want to

19     turn this stuff over and it might chill us.  And that's

20     it.  And I think under those circumstances you don't have

21     to get into privilege logs and elaborate descriptions and

22     in-camera reviews and all that other stuff that sometimes

23     flows in this area.  I don't think that you have to get

24     into that here given what you have before you in the

25     briefs as they are today.

                                                          35

1           THE COURT:  Well, you seem to have acknowledged

2     a couple of questions ago that, yes, somewhere in the pile

3     there could be things that legitimately fall under the

4     deliberative process privilege.  So before I order them,

5     contrary to the assertion of privilege made by the

6     President of the United States to give you every single

7     piece of paper, don't I have some obligation to give them

8     a chance to say Okay, well, we're withholding this for

9     this reason, we're withholding that for that reason, and

10    to hear from you because it's an ad hoc elastic flexible

11    balancing test as to why, with respect to these documents

12    as opposed to the group as a whole, which you've already

13    told me you don't even know what they are, why you're

14    entitled to them.

15           MR. KIRCHER:  Yes, but they do, Your Honor, and

16    they've known since October 2011 when we issued the

17    subpoena and we are now in May of 2014, and they still

18    have yet to say –– to point to any specific documents that

19    raise the kinds of questions that you're raising.  Not a

20    single document have they focused to in any specific way.

21    They've got the documents, and they've had them all of

22    this time and they have yet to say a word about those.

23           THE COURT:  Right.

24           MR. KIRCHER:  I think it's too late.  Let me

25    just –– because I can add one more piece on the

                                                        36

1    presidential --

2            THE COURT:  That's it?  That's why I can't go

3    back to them and say you need to give me something more

4    particularized just because they've lost their chance?

5            MR. KIRCHER:  That's why you should not go back

6    and let them --

7            THE COURT:  All right.

8            MR. KIRCHER:  -- have another chance.  I'm not

9    telling you what you can and you cannot do.

10           THE COURT:  Well --

11           MR. KIRCHER:  That's why you should not do that.

12           THE COURT:  In the *Miers* case there was some

13   issue about whether the Court could actually order the

14   government to produce a Vaughn index.  And Judge Bates

15   said that even the plaintiffs had conceded there that

16   there was no law or statute that authorized the Court to

17   do that.  Can I do that?  Can I tell them we need an index

18   here?

19           MR. KIRCHER:  Yes, of course, you can.  I mean,

20   *Miers* did that.  I mean, it didn't call it a privileged

21   log.

22           THE COURT:  Right.  I couldn't figure out the --

23           MR. KIRCHER:  But it was for all intents and

24   privilege a privileged log.  That's what *Miers* did.

25           Let me just back up for one question just to get

37

1    this off the table before it disappears.  On this

2    presidential assertion point, factually they have not

3    established that the President actually asserted the

4    privilege.

5              THE COURT:  But you have the letter from the

6    Department of Justice to the President saying

7    Mr. President, would you authorize us to assert executive

8    privilege?  This is why we think it should be asserted.

9              And then you have a letter from Mr. Cole, which

10   I'm pretty sure says the President of the United States is

11   asserting the privilege.  Am I not supposed to take that

12   at face value from the Deputy Attorney General of the

13   United States?

14             MR. KIRCHER:  No, you're not, Your Honor.

15   Certainly context of cross motions for summary judgment.

16   They have the responsibility to -- that is the predicate

17   to their entire argument, that the President of the United

18   States made this assertion personally.  That's a predicate

19   to their entire argument.  It's not factually established.

20             The only things upon which they rely, if you

21   read their brief, the only things upon they relied to

22   establish that point is they cite to our amended

23   complaint, the introduction to our amended complaint where

24   we recite what the privilege letter says.  The President's

25   assertion, we refer to that.  Right?  They deny that in

                                                            38

1    their answer.  They deny -- they deny the introductory

2    paragraphs of our complaint in their answer.  So that

3    hardly establishes that the President asserted as a matter

4    of fact.

5            Then they refer to Exhibit 21 to the Caster

6    declaration, which is the privilege letter.  Caster

7    obviously could not testify -- Caster is a committee

8    staffer.  Obviously he had no ability to say whether the

9    President asserted or not.  All he was doing was saying

10   this is a true and correct copy of the letter that we

11   received on or about June 20.  So it was nothing in the

12   Caster declaration that establishes that as a matter of

13   fact.

14           THE COURT:  Well, in any case where there's a

15   privilege assertion, when the lawyer says my client

16   asserts this privilege, do we have to bring the client in

17   to swear --

18           MR. KIRCHER:  No.  I think they need to do at

19   the very least what was done in *Espy* where the White House

20   counsel filed an affidavit to say the President authorized

21   me to assert privilege.  There was a --

22           THE COURT:  But those were White House

23   documents.  These are Department of Justice documents.  So

24   why can't Mr. Cole, who is the Deputy Attorney General of

25   the United States overseeing the Department of Justice,

1   whose documents you're asking for, say the President

2   authorized me to assert this privilege?

3            MR. KIRCHER:  Mr. Cole has not said that.  There

4   is no affidavit establishing as a factual matter --

5            THE COURT:  So he has to swear to the letter?

6            MR. KIRCHER:  Yes.  As a summary judgment

7   matter, yes, of course.  Yes.  They've got to put in

8   facts.  And that is a material fact upon which their

9   entire argument rests, Your Honor.  This was an issue in

10  *Espy*.  It was also an issue in *Judicial Watch*, and it's an

11  issue here.

12           THE COURT:  Well, let's say I conclude that

13  you're wrong about the general concept and the Attorney

14  Genera general may, as a matter of general principle,

15  lawfully assert executive privilege over deliberative

16  documents when dealing -- when responding to a

17  congressional subpoena.  So I'm not going to issue a

18  declaratory judgment that says it can't, and I'm not going

19  to order him to turn over them all since some of them may

20  be subject to that privilege.

21           But I also agree with you that he can't do it on

22  a wholesale basis without demonstrating that the

23  particular documents withheld satisfy the particular legal

24  requirements for the existence of the privilege, and that

25  I agree with you that the privilege is qualified.  So I

40

1    can't enter a judgment for the defendant and rule that he

2    doesn't have to turn over anything because, even if they

3    are privileged, the privilege might be outweighed by your

4    need.

5           So if that's how I feel, that you're both right

6    and you're both wrong, what do I do?  Do I deny your

7    motion for summary judgment and deny their motion for

8    summary judgment, and we just keep going and then I enter

9    some order requiring them to particularize?  Do I enter a

10   judgment in your -- what's my ruling if that's how I think

11   this situation falls?

12          MR. KIRCHER:  If that's where you're going, Your

13   Honor, I think your ruling is pretty much you enter an

14   order that says I've -- you know, I've reviewed the

15   motions and this is my finding about the existence of the

16   privilege, and therefore, there are further proceedings --

17   and you go where Judge Bates went in *Miers*, which is give

18   us a privilege log but don't call it a privilege log and

19   we'll start going document by document.

20          THE COURT:  And so your motion essentially is

21   denied and their cross motion is denied?

22          MR. KIRCHER:  Well, for all intents and

23   purposes.

24          THE COURT:  All right.  Now, I'm sure it came as

25   no surprise to you that I took you off your outline about

                                                          41

1    two minutes in and asked you a lot of questions, but you

2    also know that I'm going to give you the chance, if

3    there's something that you feel I haven't divined from

4    your briefs and from this morning's argument that you

5    wanted to say, you should say it.

6              MR. KIRCHER:  Well, let me make clear that what

7    the committee's position is before I stand before the

8    Court today is that this is a common-law deliberative

9    process claim, and that's all it is.  That's all it was

10   asserted in that June 20 privilege letter.  They have

11   abandoned that and we're entitled to judgment.

12             This new thing that they have brought up is 20,

13   25 months too late.  It's out of time, and you should not

14   even consider it on that basis alone, that it was not

15   timely.

16             THE COURT:  Okay.  Can you explain to me why you

17   keep telling me that they've abandoned their deliberative

18   process claim?  I'm not sure I understand that

19   characterization.

20             MR. KIRCHER:  The common-law part of that.

21   Because that's what they say.  They say we're not

22   defending it.  They say this is not about that; this is

23   about this other thing.  But there's every reason to -- to

24   construe that in light of *Espy*, there's every reason to

25   construe that --

                                                        42

1           THE COURT:  Well, all they are saying is it's

2     not common law in the way you're describing it.  They are

3     saying it's under the umbrella of executive privilege.

4     It's not something else.  It's a form of executive

5     privilege.

6           They haven't abandoned the claim that this is

7     covered by something called the deliberative process

8     privilege under the umbrella of the President of the

9     executive privilege that grew up as a matter of common law

10    with some constitutional underpinnings possibly.

11          MR. KIRCHER:  Which they have not identified.

12          THE COURT:  That question has been left open,

13    never been decided.  And was ultimately embodied in the

14    FOIA statute which doesn't apply here.  I mean, aren't we

15    all talking about the same thing, just trying to

16    characterize it differently?

17          MR. KIRCHER:  Well, when I say "abandoned," I

18    mean we briefed up that -- we briefed up that issue

19    because that's what we understood they were claiming, and

20    then didn't respond to it.  And they went off in a

21    different direction.  That seems to me is fairly

22    characterized under abandonment under the case law of this

23    circuit, and we ought to be entitled to judgment on that.

24          And then this other thing that they've sort of

25    come up with -- I mean, remember how this thing has

                                                              43

1    proceeded, Your Honor, is on June 25 after the privilege

2    letter was issued, we wrote a letter.  The committee wrote

3    a letter to the White House to ask for clarification of

4    the privilege assertion.  That letter is in the -- is an

5    attachment to the complaint.  And it explained the way we

6    understand the law, the way the committee understands the

7    law in the District of Columbia to be, that you've got the

8    presidential communication's privilege over here and

9    you've got the deliberative process common-law privilege

10   over here.  There was no response to that.

11           THE COURT:  All right.  Well, you're the one

12   that keeps saying one is over here and one is over here.

13   All the cases say they both are part of the executive

14   privilege, and that's the only thing that I hear the two

15   of you saying that's different.  And I think the law

16   clearly supports that they are both forms of executive

17   privilege.

18           We have, in this case at your request, I asked

19   them to tell us are we talking about presidential

20   communications.  So you're absolutely right.  That more

21   constitutionally based, more serious, higher standard

22   needed to breach it privilege, form of the executive

23   privilege.  It's not involved in this case.  There's no

24   dispute about that.

25           MR. KIRCHER:  Right.

                                                          44

1          THE COURT:  But nobody has stopped saying that

2     the deliberative process privilege is involved in this

3     case.  We're still talking about what we've been talking

4     about since they wrote the letter, as far as I could tell.

5          MR. KIRCHER:  Well, I disagree obviously.

6          THE COURT:  All right.  All right.  Okay.  So

7     that's what you mean by abandoned.

8          What else do you want to tell me that you didn't

9     get to tell me?

10          MR. KIRCHER:  Well, let me check my notes real

11     quick.

12          THE COURT:  Please do.  Take your time.

13          MR. KIRCHER:  If I could just briefly go through

14     the rationales that they have advanced to justify this

15     connection to the Constitution here.  I talked about the

16     presidential assertion piece of it, which obviously the

17     President himself doesn't get to turn something into a

18     constitutional privilege just by asserting it.

19          Then they say that their response to a

20     congressional subpoena is itself inherently

21     constitutional, which obviously it is not.  The fact that

22     Congress has Article I authority to seek the kind of

23     information that's sought here doesn't convert their

24     response to it into something that is constitutionally

25     based.

                                                        45

1          The adversary relationship notion, that somehow

2    because there was, you know, there was some political

3    friction in this and some sparks flying in this case, as

4    there sometimes are but frequently are not, that somehow

5    that makes this a constitutionally based privilege.

6          I've talked about their generic confidentiality

7    concerns and how those are misplaced.  They talk about the

8    distorting of the negotiations process.  My concern with

9    that rationale is once -- if they have this privilege,

10   they will assert it and we will be back -- we'll actually

11   have the opposite impact, which is the recognition of the

12   privilege will distort the negotiations process.  If they

13   have the privilege, it will get asserted, and we will not

14   get things and we will have to come back here.  That is --

15   that is, in fact, what will be the consequence of the

16   recognition here.

17         And their last justification has to do with

18   general separation of powers concerns, about the Court

19   putting its finger on one side of the scale or the other.

20   The reality is the Court -- whatever the Court does here

21   it's going to put -- it's going to, you know -- it's going

22   to unbalance things a little bit.  In light of the

23   fundamental and critical nature of Congress's Article I

24   responsibility to do oversight and how critical that is to

25   the very foundation of our government, if you're going to

                                                          46

1    put your finger on one side of the scale, you ought to put

2    it on our side of the scale and find that this privilege

3    doesn't exist.

4          Thank you, Your Honor.

5          THE COURT:  All right.  Thank you.

6          Let me hear from the Department of Justice.

7          MS. HARTNETT:  Good morning, Your Honor.  We

8    agree the proper question before the Court today is the

9    scope of the constitutionally based executive privilege;

10   and as Your Honor has identified, the documents here that

11   are at issue are ones that were developed in the course of

12   the department's deliberative process regarding its

13   response to congressional oversight, specifically the

14   operation of Fast and Furious and related media inquiries.

15   I just did want to make clear that not all the

16   documents -- and we've tried to do that both in our brief

17   and our declaration that describes the documents by

18   category -- that not every document is itself

19   deliberative, but they all are collectively part of the

20   department's deliberative process in response to

21   Congress --

22         THE COURT:  How can you possibly assert

23   privilege over documents that you just told me aren't

24   deliberative, if that is one of the two elements of the

25   privilege?

47

1          MS. HARTNETT:  That's a good question, Your

2     Honor, and I would like to explain that.  The way that the

3     department has understood this aspect of the

4     constitutionally based executive privilege was -- is that

5     it covers the -- essentially the department's work file on

6     a matter when it's responding to Congress.  It's somewhat

7     akin to the Attorney Genera work product privilege where

8     we basically have the work file.  It's not physically one

9     file for the entire department, but each person that is

10    working on the oversight investigation of course has

11    deliberative materials of the type that you're describing.

12    Should we --

13         THE COURT:  What is the case law that creates a

14    constitutionally based work file privilege that covers

15    every single piece of paper in the work file --

16         MS. HARTNETT:  There is --

17         THE COURT:  -- whether it's deliberative or not?

18         MS. HARTNETT:  Your Honor, there is no case law

19    supporting the -- directly recognizing this work product

20    privilege in the context of a congressional investigation

21    of the executive branch because there are so few cases

22    about the Congress and the executive branch having a

23    dispute over documents.  The cases that exist largely

24    concern presidential communications, and as Your Honor

25    pointed out, there is a more robust case law generally

                                                              48

1    about the deliberative process from which this privilege

2    comes.

3            THE COURT:  Well, neither the presidential

4    communications privilege or the deliberative process

5    privilege has an entire work file -- is there any case

6    anywhere that talks about that, even the presidential

7    communications cases, the *Espy*, they said all right, now,

8    yes, you have to turn them over, but you have to turn them

9    over is to the court.  You have to give us an

10   individualized explanation.

11           I don't know what you're talking about.

12           MS. HARTNETT:  Your Honor, this is something

13   that's come up more often recently where Congress has been

14   seeking not only the underlying material about the vision

15   but actually the work file or the materials about how we

16   respond to Congress.  And this is something that, Your

17   Honor, correctly identified as not just happening in this

18   case but is actually becoming more routinely requested.

19           So I would just make the point that this is just

20   not an issue that was really teed up for the courts in the

21   past.  It was not the subject of extensive inquiry.  There

22   were two past executive privileges assertions that were

23   based on a similar theory of Congress response work

24   product, and that was the administrations of both parties,

25   1996.  There was an assertion over some congressional

1    response work product under -- and then following that

2    there was an assertion in 2007 that was the subject of

3    part of the Myers case with the U.S. Attorney Generas

4    matter.

5            And the theory there was that even in addition

6    to the deliberative process and more well established in

7    the case law type of privilege that it was necessary to

8    protect the work file because that's the sphere of

9    confidentiality that lets each side meet each other as

10   equals in the oversight process.

11           THE COURT:  But there's no Attorney Genera work

12   product legal common law concept that I'm aware of, no

13   deliberative process under FOIA that I'm aware of that

14   says that if it made it into the file, but it itself

15   contains no deliberation, that it's covered.  Where could

16   that theory possibly come from?

17           That's like saying everything in Attorney

18   Genera's files is covered by the attorney-client privilege

19   or Attorney Genera work product, even if it has no

20   communications in it and no thoughts or impressions in it.

21   No Court would accept that.

22           MS. HARTNETT:  Your Honor, I don't think we're

23   going that broad.  I think the point is that it's material

24   protected -- Attorney Genera work product would be

25   material prepared at the direction of Attorney Genera in

1    anticipation of litigation.  And so to the extent that

2    that can include factual material or mental impressions

3    that are not themselves deliberative in the sense of

4    leading to a decision but that are within the scope of

5    preparing a case for trial or an anticipated case for

6    trial, and that's the analogy that the executive branch

7    has drawn in its public explanation of asserting this

8    privilege twice before, and in this case.  And we believe

9    that's an important, separate but related component to the

10   deliberative process, particularly here where you have the

11   two branches.  It's not a general work file privilege for

12   any matter that the department might be working on.

13        It's the work file when we are actually meeting

14   the Congress in the context of Congress seeking

15   information from us and trying to preserve a sphere of

16   allowing that investigation, regardless of whether it's

17   about a particular deliberation leading to a particular

18   decision, but the broader -- the broader scope of our

19   confidential deliberations allowing us to meet the other

20   branch as an equal.

21        And what -- even some of the information under

22   that privilege, again, would be, example, meeting times or

23   how -- who is part of the team working on responding to

24   guess, all that type of detail.  Were that to be regularly

25   available to Congress in an investigation or essentially

51

1    an investigation into the investigation, that would chill

2    the ability of the executive branch to, you know, with

3    openness and candor discuss amongst itself how to respond

4    and it would always be this specter of having your work

5    file on the matter that's being investigated actually

6    itself be subject to congressional oversight.

7             In the past, that's been able to be resolved

8    either because the material was not sought or we would be

9    able to accommodate and negotiate with the branch and

10   focus the inquiry where it should be, on the underlying

11   oversight matter.  And so we submit that as supported by

12   these past assertions of privilege, the same theory that

13   applies to both deliberative process does make sense to

14   recognize the work product privilege in this limited

15   context of us engaging with Congress in oversight.

16            THE COURT:  All right.  Well, I understood your

17   brief to be saying we're asserting the deliberative

18   process privilege, and under *Espy*, not just the FOIA

19   casings, the deliberative process form of the executive

20   privilege has elements.  One element is that the document

21   be predecisional, and the second is that it be

22   deliberative.

23            Are you saying that's not the test?  You can --

24   there's more that gets swept under this privilege than

25   things that meet those two fundamental elements of the

                                                            52

1    privilege that is being asserted based on that case that

2    you cited to me?  We're not using that test anymore?

3              MS. HARTNETT:  That test, that is the

4    appropriate test for a deliberative process.

5              THE COURT:  Okay.  So are you telling me that

6    everything that you've withheld from February 4 forward is

7    both predecisional and deliberative?  You've already told

8    me some of it isn't.

9              MS. HARTNETT:  That's correct, Your Honor.

10             THE COURT:  Okay.  So why don't you have to turn

11   it over?  How could a date be the defining determining

12   factor as to whether things are predecisional and

13   deliberative?  What does the date have to do with whether

14   they are deliberative or not?

15             MS. HARTNETT:  Your Honor, I think it's the

16   same.  Just going back to at least the Nixon case, the

17   Supreme Court case where it was about presidential

18   communications in that case, but the Court explained the

19   theory of what -- why there is an executive privilege.

20   And that referred to the notion of, you know, that

21   actually recognized the element of deliberative process,

22   that those who expect kind of public disclosure of all of

23   their deliberations will be less candid.

24             The same -- I would submit, and this is the

25   rationale that's been provided in the two privilege

                                                          53

1    assertions before this case that were based on this work

2    product rationale.   In addition to the deliberative

3    process documents that would be obviously part of the work

4    file is that it would be chilling and disruptive to the

5    executive branch's ability to independently respond to

6    congressional oversight if it had to turn over every

7    document in its work file on the matter.

8            Now, it's a good question of why they would even

9    need those documents.

10           THE COURT:  Does that mean they shouldn't have

11   to turn over any document?  My question is, are you

12   telling me that there's some test that applies other than

13   the two elements of predecisional and deliberative?  Do

14   the -- are you saying that you can withhold documents even

15   if they don't meet that test?

16           MS. HARTNETT:  Yes, Your Honor.  We believe we

17   can, under the theory of executive privilege articulated

18   here and in those past examples.  Again, I would agree

19   that it's unclear why they would even want that type of

20   material, but that is within the scope of what they were

21   seeking from us at the time of the executive privilege

22   assertion which unfortunately, you know, necessitated a

23   privilege assertion to protect that work file.  It's very

24   possible that they don't want forwards of e-mails that

25   have to talk about news reports or other documents that

1     may be part of the person's work file who is working on

2     the oversight matter.  But again, when the -- when it came

3     time to -- you know, moving toward contempt, there was a

4     question of whether this material was properly protected

5     under the executive privilege precedent that the executive

6     branch turns to when it determines whether to make an

7     assertion of privilege.

8              And here, building on those past assertions,

9     which themselves built on case law such as Nixon,

10    recognizing the need for that sphere of confidentiality,

11    that's why the assertion was made here.

12             THE COURT:  But the need for confidentiality,

13    even recognizing Nixon, and all of the communications

14    cases that followed, No. 1, was qualified.  So ultimately

15    the Court gets to balance.  And No. 2, was individualized.

16    If *Espy* required an individualized document-by-document

17    procedure to be followed when dealing with what I think

18    you would agree to me are even more confidential and even

19    more constitutionally fraught materials, which is the

20    communications, how could a lesser process be required

21    now?  How can you just say my file, sorry, no?

22             MS. HARTNETT:  Well, Your Honor, ideally that

23    wouldn't be what we would say.  We would have a continued

24    dialogue with the -- with the legislative branch.

25             THE COURT:  But that's what you're asking me to

55

1    do.

2           MS. HARTNETT:  Well, right.  Because we're here

3    now.  So we're at the process where we have been unable to

4    accommodate that away and make clear that they don't

5    actually need whatever would be covered in the edges of

6    the work file or whatever.  Because they actually -- we

7    were at that point of them seeking to hold the Attorney

8    General in contempt and us having to decide whether that

9    material is properly subject to a claim of privilege.

10          Ordinarily we would not want to be at this

11   point, but be able to find an accommodated resolution.

12   But --

13          THE COURT:  Well, both of you are pointing me to

14   what happened in the interim.  And I don't think the time

15   period that went by is compelling to me because everybody

16   has told me that process is a process you, Judge, really

17   need to stay out of.  And I agree that.  So I'm not going

18   to sit here or we'll never finish this litigation and

19   assess whether every single negotiating position was

20   appropriate.  You don't even agree as to what the

21   negotiating positions are.

22          The point is we're here now and your position is

23   still, if it's after February 4, it's privileged.  The

24   privilege I'm relying on, while it derives, it is a form

25   of executive privilege.  It's something called the

56

1    deliberative process privilege.  It has elements.  One is

2    that it's predecisional.  The second is that it's

3    deliberative.

4           But you're also telling me I don't actually have

5    to demonstrate to you that any of the documents in the

6    file are actually predecisional or deliberative.

7           MS. HARTNETT:  If I may, I don't -- I think we

8    agree that we should -- we should tell the Court -- make

9    clear to the Court that the documents that we're

10   withholding under the claim of executive privilege do

11   match up to the privilege that we're asserting.  I think

12   the one place where we may, and I'm hopefully trying to

13   communicate it, is that we don't believe that the

14   deliberative process rationale that you articulated alone,

15   that was not solely the basis for the constitutionally

16   based privilege claim.

17          That claim derived from the separation of powers

18   and the need to protect the independent functioning of the

19   executive branch, particularly in this context here where

20   we're responding to Congress directly as they seek to

21   conduct oversight.  I don't know if this will helpful and

22   I certainly don't mean to be --

23          THE COURT:  Well, what -- what case embraces

24   deliberative process materials, deliberative materials

25   under that separation of power's theory that the case law

                                                          57

1    seems to just step away from the question.  It says that

2    the whole idea of candor has a constitutional function,

3    and I think -- but they are very unclear and murky about

4    the extent to which the Constitution covers these

5    materials.  But to the extent it does, what it's trying to

6    cover is candor in deliberations.

7            So don't the materials have to be deliberative

8    themselves for this privilege to apply?

9            MS. HARTNETT:  No, Your Honor.  And I think

10   maybe one helpful example, again, because there is limited

11   judicial precedent on the question of the Congress trying

12   to seek our documents directly in Court, and specifically

13   this type of document, there is not a case about these

14   type of documents that went to a merit's decision.

15           But, for example, we point in our brief to the

16   1954 assertion by President Eisenhower.  And that was in

17   the context of him issuing a directive across the

18   executive branch not to provide materials that were

19   internal agency materials to the -- in the context of the

20   Army McCarthy hearings.  There was not a case that didn't

21   go generate a case that then validated that privilege, but

22   there is a broad -- that's a broad assertion and one

23   that's in our briefs described.  And I would commend that

24   to the Court's attention.  Because it does show that the

25   privileged assertions in the past, ones that have been few

1    and far between, but have happened, and there was

2    specifically about the deliberative process was not a

3    neatly tied to the definition of deliberative process in

4    the common law but was a broader assertion in order to

5    preserve the executive independence in that -- in the

6    area.

7            THE COURT:  Well, parties can assert things.

8    And if the other side says I'm going to respect that, that

9    doesn't mean it was legally required.  It just means that

10   that's the way it worked out.

11           People are less respectful of each other's

12   positions these days when it comes to asking for

13   documents.  And so now you're asking me, a third party,

14   the third branch, to get in the middle.  And so don't I

15   need more than, well, the executive has done this before

16   as a legal basis to tell them you can't have it?  That's

17   what you're asking me to tell them.  You can't have it.

18           Don't I need more than, well, in the past the

19   executive has withheld this and they weren't upset?

20           MS. HARTNETT:  Your Honor, I think we've tried

21   to cite whatever -- just to be clear, of course, we're

22   not -- we were coming here to seek your endorsement of the

23   privilege in this case.  We believe that these have been

24   matters --

25           THE COURT:  Okay.  You moved for summary

                                                              59

1    judgment.

2          MS. HARTNETT:  Well, only after the case was

3    brought against us.  I mean, we have to try to find some

4    way to end the case.  And so we believe that judgment in

5    the context of the Court having assumed jurisdiction over

6    the legal question at issue, we did move for judgment.

7          But I guess my broader point is that we are not

8    trying to seek to gain something from this lawsuit,

9    some -- you know, something that we didn't may have

10   before.  We, as we've explained to the Court, believe that

11   the accommodation and negotiation process generally works.

12   And, again, since Watergate there have been only 15

13   assertions of privilege, indicating that there's not a

14   rampant problem with an overassertion of the executive

15   privilege.

16         If I may, just back to the work product notion.

17   And I appreciate the deliberative process is a core

18   important privilege and one that will protect a lot of the

19   executive's interests, it might be helpful to think from

20   the judicial perspective of having your file or a clerk's

21   work in a matter where -- again, I'm not suggesting at all

22   that that would be subject to some sort of judicial

23   oversight or disclosure, but just the idea of having to

24   produce not only the core part of the file that talks

25   about the opinions in the cases and the wrangling that

1    goes on as you work through a case, but also just the

2    edges of when you were going to talk to your clerks about

3    the case or what someone else may have said about it,

4    things that are not core to the deliberations but are part

5    of the independence that you enjoy being a judge.

6          And I think the point of what that we're trying

7    to make here is it's a similar chill that would happen if

8    we knew that in every investigation -- because, again,

9    this would be something that would be outside of privilege

10   and therefore not even subject to a showing of need that

11   they could regularly ask for and receive without any

12   showing of need, the material that we collect as we have

13   tried to respond to them as a co-equal.  And so that's the

14   point we are trying to --

15         THE COURT:  Was that distinguishable from a case

16   where we know that, when you responded to them, you said

17   it didn't happen?  The guns did not walk.  The United

18   States does not conduct itself that way.  That turned out

19   to be wrong.

20         And they want to know why such a blanket

21   statement would be made that was not true.  And you've

22   said, okay, well, we'll give you everything internal that

23   led to the creation of that statement.  We're willing to

24   give it to you.

25         So clearly if you can do that, why would your

                                                          61

1    internal conversations about afterwards when you said,

2    oops, we need to fix that, how are we going to fix that,

3    what are we going to say now, why is that going to inhibit

4    candor in deliberations and impair the executive's ability

5    to respond effectively to oversight more than giving the

6    documents that happened before?  And why doesn't the fact

7    that there is a trigger here, this misstatement, change

8    the situation?

9         MS. HARTNETT:  Your Honor, that's -- I think

10   that the point is that the same chill in the institutional

11   interests would be at interest for all of those documents,

12   both the pre-February 4 and post, and that's why they all,

13   in our view, you know, were properly subject -- could be

14   subject to a congressional response work product.  That's

15   what those documents are.

16        I think as the department explained in the

17   December 2 letter when they conveyed the over 1300 pages

18   of documents about the creation of the February 4 letter,

19   that they made an exception to their long-standing

20   practice of not providing their work product in responding

21   to Congress in order to help explain and show how that

22   misstatement in that letter came to be.

23        And so that was seen as an accommodation, and

24   one that I think shows the responsible functioning of the

25   executive branch in order to meet a demonstrated -- a need

1    that was specifically identified by the Congress to

2    understand how did that -- or by the committee about how

3    to understand why that misstatement came to be.

4           So my point is that at that level the

5    confidentiality is at some level threatened or -- the

6    candor in the deliberations are affected any time you turn

7    over some executive branch documents.  But here a decision

8    was made by the department and publically explained that

9    that was -- it was important to help the committee

10   understand how that misstatement came to be.

11          But we would submit that there -- it doesn't

12   open the door.  And that's kind of how the oversight

13   process works generally, is to the extent you make an

14   accommodation for one thing where there's been a specific

15   explanation why they need it and the parties have met and

16   decided to accommodate, that to the extent that that would

17   then open the door for any additional work product that we

18   generated would create a very bad incentive at that point

19   to make an accommodation.

20          And here we would submit the department did the

21   right thing by providing that material to the committee to

22   help it understand that, even though it did have some

23   confidentiality costs for the people that were identified

24   in the documents produced.

25          THE COURT:  Well, all right.  Well, in your

1    introduction to your initial brief, you stated that the

2    nature of the nature of the department's objection to

3    production is that deliberative communications may

4    implicate the agency's internal decision-making processes,

5    foreign policy, and national security concerns.

6            Just want to make clear, there's no claim here

7    that any particular documents being withheld implicate

8    foreign policy or national security concerns.  Is that

9    right --

10           MS. HARTNETT:  I'd have to look specifically

11   because there's a couple of -- one of our categories of

12   documents that were like less central to the actual

13   assertion was that it had some -- there was some

14   discussions.  I'm looking at the Colburn declaration

15   involving foreign relations issues dealing with the

16   government of Mexico.  Those are more of a --

17           THE COURT:  But weren't those carved out?  They

18   are not even part of what they are talking about --

19           MS. HARTNETT:  They were -- there are some that

20   became -- due to the fact that they were connected to the

21   congressional response, a few documents, I believe, that

22   the declaration explains of that nature were there.  But

23   that wasn't the basis for the privilege assertion.  The

24   privilege assertion's basis was the need to protect the --

25   our response to Congress and our response to the documents

                                                        64

1    generated in our deliberations about how to respond to

2    Congress.

3              THE COURT:  All right.  Well, we've talked and

4    talked and talked, I think, about whether these documents

5    are deliberative or not and whether that matters.  I think

6    it clearly matters.  And that *Espy* makes me look at that

7    and makes me look at it on, not a wholesale basis, but an

8    individualized basis.  I don't see how we can get around

9    that even if *Espy* says I have to do that even for

10   communications.

11             There -- wasn't one problem with the District

12   Court's decision that led to the reversional on Espy the

13   fact that the District Court ruled on the documents as an

14   unit and didn't make individualized decisions?  Wasn't

15   that one of the things they were upset about?

16             MR. KIRCHER:  Well, Your Honor --

17             THE COURT:  Why they said we can't even give him

18   any difference at all because he didn't do anything?  I

19   don't want an opinion like that.

20             MS. HARTNETT:  No.  No.  Understandably, Your

21   Honor, but I think just one key point on *Espy*, just to the

22   extent that I know you've referred to the presidential

23   communications privilege as sort of being on the hot top

24   of the hierarchy in this deliberative process privilege

25   being possibly below that.  From our conception of it is

                                                          65

1    that it is one constitutional executive privilege when we

2    assert it as against Congress, and therefore, to us they

3    are both in the same category.

4         In other words, the proper way to concede the

5    privilege is that we would get the way that the privilege

6    would attach to once the assertion was made.  And so it

7    doesn't matter -- the rationale that supported the

8    constitutional claim is less important than the fact that

9    it was an assertion of privilege made by the President

10   with respect to congress.  And I think that's -- we

11   just -- I wanted to make that point clear.

12        THE COURT:  So in your view the showing that has

13   that outweigh it is the senate collect committee's

14   showing?

15        MS. HARTNETT:  Correct.  Yes.

16        THE COURT:  But all the cases you rely on for

17   that proposition are communications privilege questions

18   that talk about national security and the President's

19   ability to get the best advice from his aides.  How --

20   there's no case that equates those to an *Espy*.  Certainly

21   seems to set out different tests for the two.

22        Was *Espy* wrong?

23        MS. HARTNETT:  Not at all.  I mean, no.  That's

24   not our submission at all.  I think *Espy* is helpful on two

25   points in this respect.

1           First, early in the opinion, it does note that

2     assertions against congress -- they were discussing kind

3     of the historical assertion of privilege in describing the

4     various elements.  They said over time against Congress,

5     and this is a quote from Espy at 739, were most often

6     essentially assertions of the deliberative process

7     privilege.  So I think *Espy* itself was recognizing that

8     there was that history of a different type of assertion.

9           And then the most important part of the Espy, I

10    believe, is where it does state expressly that the case

11    should not be read as in any way affecting the scope and

12    the privilege in the congressional executive context.  And

13    I think at first you might think which way does it push

14    you, I guess is the question.

15          The question is there is an assertion of whether

16    the privilege should allow information not to be part of

17    the criminal justice process where you have an individual

18    person there, somebody submitted subject to a grand jury

19    investigation from having that -- and the idea of somehow

20    comprising the criminal justice process by withholding

21    information presented distinct concerns that the Court

22    discussed in *Espy*; whereas I think --

23          THE COURT:  Right.  So that might mean a greater

24    need for disclosure in *Espy*.  On the other hand, there's

25    not a constitutional imperative on the other side of Espy.

67

1    So the committee would say no, the need is greater for us

2    because we're talking about a constitutional function

3    versus a constitutional function.

4            So -- but let's assume there's constitutional

5    underpinnings to what you're doing, and the committee is

6    doing, and there's also constitutional underpinnings to

7    the notion that the executive is entitled to candor in its

8    deliberations.  The question is then, what test do I have

9    to apply?  And doesn't *Espy* suggest if what you're talking

10   about is the deliberations within an agency, as opposed to

11   within the White House, you look at the test for

12   deliberative process.  And then there's a very flexible

13   ad hoc balancing District Court.  You figure out what the

14   test is test to be applied.

15           MS. HARTNETT:  I think that you're right.  There

16   is not a lot of case law on this point.  Because, again,

17   there's just so few cases that have had the executive and

18   the Congress going, you know, head-to-head in the Court on

19   this question.  Senate Select is the one that has kind of

20   actually reached a decision.  You have other materials at

21   issue with AT&T.  That was national security information,

22   and you have a couple other cases that implicated

23   different information.

24           I guess my point is that to the extent this is a

25   constitutionally based executive privilege, not a common

1    law assertion.  And the reason why the Court --

2         THE COURT:  Well, don't all the cases -- I don't

3    think they go as far as the committee says to rule out any

4    constitutional basis for the deliberative process

5    privilege.  But don't they say that it's weaker?  Don't

6    they quote Law Review articles that say it's not the same,

7    and say, well, we're not going that far, but this has been

8    said.  I mean, don't they suggest that there are tiers

9    here?  T-i-e-r-s.

10        MS. HARTNETT:  Yes.  Both probably.

11        And I think that Nixon really is instructive

12   here, Your Honor, because that was about tapes and about

13   the presidential communications.  But the principle that

14   was recognized in that case by the Supreme Court was about

15   those who expect public dissemination of their remarks may

16   well temper candor.  It's the typical deliberative process

17   rationale.

18        And so I don't think not only has it not been

19   ruled out that deliberative process is a equally weighty

20   component of executive privilege of presidential

21   communications when it's being asserted against Congress

22   for all the separation of power's reasons we tried to

23   describe.  I think that that case actually supports the

24   assertion here.

25        And again, Nixon itself had a footnote

69

1    distinguishing the Congressional context.  Not --

2    remember, both in Nixon and in -- you have the actual --

3    in an Espy you have the information being subject to some

4    disclosure.  And so I think the point there being in both

5    cases that the criminal process need is one where you may

6    be able to allow the disclosure that wouldn't actually

7    attach in a congressional dispute with the executive.

8         So I do think that -- again, you can't -- you

9    don't want to overread the cases, and I appreciate that,

10   but on the other hand I think we gleaned from those cases

11   that the point is that we have a stronger basis for

12   withholding when we are trying to meet our political

13   branch coequal counterpart.

14        And, again, particularly here in the context of

15   them trying to figure out how are we responding to what

16   they are trying to figure out, which becomes even one step

17   removed.  I mean, that really would start to compromise

18   our ability to function independently and feel like we

19   have a separate existence and one that allows us to meet

20   them as an equal branch.

21        THE COURT:  Well, if we're going to apply the

22   privilege, we've talked about the deliberative element.

23   The other element is that the documents be predecisional.

24        What is the decision that these documents

25   preceded?

70

1          MS. HARTNETT:  I think you -- the discussion

2     earlier kind of suggested that there be some restriction

3     to a policy decision.  I don't think that's supported by

4     the case law.  It's certainly not the scope of the

5     privilege that we described here.  As Your Honor noted,

6     there would be many decisions made throughout the entire

7     process of figuring out how to respond to congressional

8     oversight, including what witness to send up, you know,

9     how to write a letter, you know, various -- you know,

10    any -- any number of decisions come up throughout a

11    department's response to congressional oversight.  And so

12    certainly those decisions and documents preceding those

13    decisions would be covered by the assertion of the

14    privilege.

15          And then more broadly, and I agree that it's a

16    more categorical sense of the work file, but it's in each

17    of the pieces, if you take them out may not themselves

18    reveal a deliberation.  Although, as I also pointed out,

19    some of them that may seem innocuous would.  For example,

20    how long did it take someone to open an email?  That could

21    be on a read receipt.  Who is on the distribution line for

22    a certain letter?  Some things that may seem less

23    deliberative in nature, but that would give an overall

24    picture to the committee of how we conducted ourselves and

25    how we decided to strategize and organize ourselves in

71

1    response to oversight, again, not particularly tied to a

2    particular situation but in the aggregate would reveal and

3    chill our deliberative process were they have ready access

4    to that.  And that's --

5         THE COURT:  Are we in a different world?

6    Haven't you agreed that how you responded to their

7    oversight in this case is a legitimate subject of inquiry

8    for them?

9         MS. HARTNETT:  I think what we -- we certainly

10   said was that the misstatement that was made in the

11   December 2 letter raised a legitimate concern for them

12   to -- and I don't want to -- I don't want to go beyond

13   what was said in the December 2 letter, but we -- yes,

14   that we noted that because we had had an inaccurate letter

15   that we believed that it was appropriate to provide them

16   with documents explaining that letter.

17        THE COURT:  Right.  And it's a significant

18   inaccuracy made by a very high official about a very

19   important matter.

20        MS. HARTNETT:  Yes.

21        THE COURT:  So everybody agrees that they have

22   the right to say how did that happen.  And if you agree

23   that they have the right to say how did that happen,

24   how -- but then you say everything after that happened is

25   going in our work file, how can they do their job that you

72

1    just said was a legitimate job that they are allowed to

2    do?

3            MS. HARTNETT:  Your Honor, I think we think

4    they've done their job.  Again, we're here before the

5    Court, and the Court now has that under advisement.  And

6    to the extent -- and this does get a little bit into the

7    need balancing that Your Honor recognized that it would be

8    an uncomfortable place for the Court to be in when

9    you're --

10           THE COURT:  But inevitable.

11           MS. HARTNETT:  I mean, and certainly only

12    once -- I mean, Senate Select was the only case where you

13    had a Court at the end of the day actually doing the need

14    balancing in the context of the two political branches

15    going head to head.  That was the only one.  And there it

16    was, not to minimize the task that was before the Court

17    there, but that was a question of whether the second copy

18    of the tapes was needed because Congress already had one.

19           And so at some level, even though, again there

20    is an institutional question about how the Court balancing

21    those needs makes a difference, but there it also did

22    not -- it would not emmesh the Court potentially in the

23    way that this would, which is that they say they need

24    more.  We say that they already have enough to satisfy

25    their obstruction investigation.  And to the extent that

                                                          73

1     they have --

2             THE COURT:  Were there any post-February 4

3     materials presented?  I understood, I believe from the

4     letter to the President, I believe that's where I got

5     that.  It was a statement that the President was told that

6     how the facts unfolded and were discovered to have been

7     false, even though that was post-February 4, that that's

8     been produced.  Is that correct?

9             MS. HARTNETT:  I think with respect to the

10    post-February 4 documents that have been produced are

11    largely those that are related to the IG report.  So there

12    are over 300 documents that were produced in conjunction

13    with our -- the release of the IG report in a highly

14    unredacted form.  And I think to provide further public

15    explanation and to the committee about what happened, and

16    so there would be post-February 4 documents in those.

17            THE COURT:  The IG report refers to exhibits

18    that aren't publically available with the IG report.  Did

19    they get the exhibits to the IG report?

20            MS. HARTNETT:  We produced -- I can clarify this

21    if needed, but we produced 300 pages of documents cited in

22    the IG report.  So they have those.

23            THE COURT:  Are those all the exhibits cited in

24    the IG report?  Some of the exhibits cited?  If you gave

25    them the IG report, did they get all the documents the IG

                                                            74

1    looked at in reaching his conclusions?

2           MS. HARTNETT:  No, they did not get all the

3    documents that the IG looked at.  But what's important is

4    that to the extent there's some additional need that

5    they -- first of all, there is a question of whether the

6    need balancing should even be before the Court now.  And I

7    think what we would submit -- that they haven't really

8    made or tried to make the Senate Select showing, and so

9    that would be one way to kind of resolve this after a

10   finding of privilege without having to get into the need.

11          Another way would be to make a ruling on the

12   legal question that was kind of the crux of what brought

13   us here, which was whether the privilege could extend

14   beyond presidential communications, and then send the

15   parties back to mediation where we have been to some

16   extent over the past several months.

17          THE COURT:  You can go to mediation any time you

18   want.  You just call my chambers and say we want to go

19   back to mediation.  I will order you back to mediation.

20   Please do that before I write an opinion.  We've got other

21   cases that are ready to go that I would love to focus on.

22          But let me take you there.  Because, I think --

23   and I haven't decided this case, but I think you can tell

24   from my questions to both sides that I'm pretty confident

25   that the law recognizes a deliberative process privilege

                                                        75

1    for intraagency deliberations that is a form of the

2    executive privilege that has some constitutional

3    implications and underpinnings, even if they are less

4    compelling than those attached to presidential

5    communications.  So the Attorney General -- the President

6    and the Attorney General may, I believe, I'm leaning to

7    determine that he may assert executive privilege over

8    deliberative documents in response to a congressional

9    subpoena.

10           But for that privilege to withstand a test

11   that's been brought to this Court, it cannot be a blanket

12   omnibus this is in my file privilege, but the individual

13   materials have to, in fact, meet the elements of the

14   privilege.  The privilege does not apply to a box.  It

15   applies to the materials in the box.

16           So you're right that the privilege exists.  He's

17   right that you can't say anything from February 4

18   thereafter and that's all, Judge, we don't have to do

19   anymore.  It must be demonstrated that the individual

20   documents contain deliberative matter.

21           That has to be determined before balancing, but

22   if I determine that they are -- that any of them are

23   privileged, because you've made the showing that I think

24   you have to make, that doesn't mean they win.  It's a

25   qualified privilege, and then there's a balancing test

                                                        76

1    that needs to be applied.  I think it is probably the *Espy*

2    test and not the Senate Select committee test, but there's

3    a balancing in any event that has to be applied.

4           So if that's what I think, that you're right

5    that some documents are privileged, that the committee is

6    right that this assertion of privilege is inadequate to

7    shield every single post-February 4 document, that

8    something further needs to be done.

9           I'm asking you the same question I asked him.

10   What does my opinion look like?  Am I saying you lose, no

11   summary judgment for you, no summary judgment for you, and

12   then I give you time to let me know if you want to mediate

13   the next step, or presumably the next step would be so

14   this case is still pending before me, they are asking for

15   the documents.  If you're asserting privilege, you need to

16   give me -- you need to substantiate that on at least

17   categories of documents, if not every single page.  There

18   would be some further showing you need to make to me.

19          Is that what I need to do next?

20          MS. HARTNETT:  Your Honor, I guess, I may take

21   one more run at the congressional response work product

22   portion because what you just described -- because I think

23   you're describing a more limited ruling about the

24   privilege, and in light of some of the other recent

25   investigations and attempts to get this material, I do

1    think that that ruling -- it would be important to at

2    least recognize the availability of the privilege for a

3    broader set of documents.  But I don't want to -- I don't

4    think that was your exact question.

5              THE COURT:  Okay.  But what you've told me is

6    your authority for that is that you've done it before and

7    there's no actual case law that says there's something

8    even broader under the executive privilege than the

9    deliberative process privilege.

10             MS. HARTNETT:  Well --

11             THE COURT:  I mean, there may be more and

12   greater constitutional dimension to the deliberative

13   process privilege, if you've got a coequal branch on the

14   other side.  But that doesn't mean it's different

15   documents are privileged.  That just might mean you

16   balance it differently, doesn't it?

17             MS. HARTNETT:  That's right, Your Honor.  It may

18   be something -- these are materials that in the ordinary

19   course if they were sought in some FOIA or whatever, it

20   may very well be that it wouldn't be important enough for

21   the -- as a matter of deliberation or revealing something

22   about a deliberation for these documents to attempt to be

23   protected.

24             But in the context of the Congress trying to

25   seek information from us in the context of an

1    investigation about how we're actually responding to the

2    investigation, that is not made up for this case.  That is

3    something that there is not a judicial case for because it

4    has never been put to a Court before.  You're the first

5    Court that I'm aware of that has had the question.

6           The reason why it is because it historically was

7    not sought.  Historically there was a respect for that, at

8    least that sphere of confidentiality, notwithstanding the

9    request for other information.  It's been asserted twice

10   before, so it's not novel.  And the same principles do

11   apply.  And, for example, you know, despite the attempt to

12   minimize the attempt to seek that, in other investigations

13   that has been the subject of -- including the -- I

14   believe -- my opposing counsel referenced the select

15   committee having just been set up for Benghazi, but I

16   believe at least a couple elements of there were to

17   investigate whether the response to the oversight

18   investigation was appropriate.  That certainly was a topic

19   that was addressed in a recent letter to Secretary Kerry.

20          So this is not something where this is a

21   one-off, and if we actually just allow them a legal ruling

22   saying that they could have access to our work file would

23   only have application to this case, this would create a

24   new authority and precedent for allowing them to routinely

25   look into our oversight files when they either -- because

1    they think something is wrong there or just as a routine

2    part of asking for oversight on the underlying substantive

3    matter.

4            So that's -- I guess I just want to emphasize

5    from our perspective, even though the deliberative process

6    privilege is obviously more well established in the case

7    law because it applies in situations other than just the

8    pleas executive vis-a-vis Congress, this is a special type

9    of privilege that really doesn't come to pass except when

10   we're trying to resist a request from Congress.  And that

11   is why it has been something that we've asserted before

12   and that we believe has a proper foundation.

13           But more to your point about what do we do next,

14   I think our position has been that the Court has the case

15   before it now.  We're not disputing the jurisdictional

16   ruling, but it should make the most limited ruling at this

17   point on the law, on the narrow legal question before the

18   Court, and potentially send the parties back to further

19   mediation with that ruling in mind.

20           Of course, we could try to attempt to mediate

21   further before that the judge's opinion were to -- before

22   Your Honor's opinion were to issue.  But I do think that

23   that would make sense.  As to whether we provided enough

24   of a basis for the Court to actually enter judgment for

25   us, assuming that you were to recognize the full scope of

1    the privilege that we've asserted, I believe we have put

2    that before the Court.  We have a declaration at the point

3    which is to describe the categories of documents that are

4    at issue and show the Court how they fit within the

5    congressional response work product framing that was the

6    basis of the privilege here.

7            Now, were the Court to issue a ruling that had a

8    more narrow conception of what that privilege would be, at

9    that point we would be happy to provide some additional

10   information to the Court to make clear, you know, what

11   portion of our documents were subject to that privilege.

12   But I do think that the Colburn declaration was designed,

13   and if there were any questions, we would be happy to

14   supplement that to show that there were categories of

15   documents at issue here, all of which map on to the

16   privilege claim made.

17           And I would also note that --

18           THE COURT:  Okay.  I didn't understand

19   Mr. Kircher's abandonment argument before, and I don't

20   think you've abandoned your argument.  But I -- I don't

21   believe I was quite aware until you started to speak how

22   much you've broadened your argument.

23           The Deputy Attorney General's letter, as was

24   pointed out by the committee says deliberative,

25   deliberative, deliberative, deliberative over and over

1     again.  Your brief cites me to deliberative process cases.

2     And now you're saying, even if they are not deliberative,

3     if they are just generally anything related to our

4     internal response to them, there's something even broader

5     than the deliberative process privilege that lives under

6     the executive privilege umbrella that we're asserting.

7          So that's a little bit news to me, frankly.  I'm

8     not sure it exists.  We're having enough trouble with even

9     the deliberative process privilege that they don't think

10    you're even entitled to that much.  They clearly don't

11    think you're entitled to anything, and they point out in

12    other pleadings where you've said some of it isn't even

13    deliberative.

14         So everybody has agreed that there is some stuff

15    in there that isn't deliberative that you're saying is

16    privileged anyway.  So I hear you.

17         I think -- I certainly believe in the first half

18    of the privilege.  I don't know if I believe that there is

19    a basis to go further.  If I agree with you that it's

20    broad as it is, then I guess it's all privilege but we

21    still have to do a balancing.  If I am going to do a

22    balance, don't I need to know the content of the

23    documents, because wouldn't the balance be different?

24         So it seems like I'm going to need to know the

25    content of the documents in more detail, no matter which

                                                              82

1     way I go.

2              MS. HARTNETT:  Well, just on -- to the point of

3     whether, you know, kind of -- we've tried at least --

4     through the use of the Attorney Genera work product case

5     law and some of the other material we cited, I think we've

6     tried to make clear in the briefs, and we apologize if it

7     wasn't more clear, that the assertion here being documents

8     created in the deliberative process, including some

9     nondeliberative documents, would be again, that's -- it's

10    the whole process of our deliberation regarding how to

11    respond to congress.  And so that's why we both relied on

12    the deliberative process case law but also drew the

13    analogy to Hickman v Taylor and the work product case law,

14    acknowledging that there are not cases on point decided if

15    there is a congressional --

16             THE COURT:  But even work product case law does

17    not protect the file.  You have to look at the document.

18    How many times are judges given documents that don't have

19    any thoughts and impressions in it.  It's not work

20    product.  It's factual.  So the thing you're analogizing

21    to isn't an analogy at all.

22             MS. HARTNETT:  More an analogy as to why

23    nondeliberative material -- the nondeliberative material

24    could be important in a system why you're trying to

25    preserve two equal sides coming at each other and trying

                                                          83

1    to preserve a sphere of confidentiality, but we agree

2    that -- we were not arguing that the attorney work product

3    doctrine itself covers the documents.

4         It was really more to help provide a broader

5    legal basis for the assertion here, which again is based

6    on -- there's not case law, because that's not what forms

7    the basis of the executive privilege.  The doctrine has

8    flowed from a principle that began and assertions over

9    time, and it agreed that all opinions are not judicial

10   authority.  But they are the public explanation, and

11   there's a couple that actually just lay out all the

12   assertions over time.

13        For us to understand and to -- to limit

14   ourselves to make sure we're not asserting privilege over

15   material that is not properly within the scope.  And

16   that's why here we have the two previous assertions

17   that -- of the same sort, and those assertions themselves

18   drew on prior case law and prior assertions.

19        And so, anyway, that's -- that's the -- the

20   separation of powers rationale and others that we've

21   described, and have been presented to the committee

22   throughout.  So the notion that this was somehow a common

23   law assertion from the start I think is simply not played

24   out in all the letters that we've -- you know, that are --

25   that have been exchanged between the parties, and

84

1      certainly not the Attorney General's letter to the

2      President from last -- from June of 2012, make clear that

3      this was a constitutional privilege.  And then he

4      explained those past assertions that were on all fours.

5            THE COURT:  I -- I grant you that.  I think this

6      case has always had those concerns, and even that aspect

7      of the privilege has those concerns.  So I'm not unaware

8      of those concerns, but the fact that we're talking about a

9      congressional subpoena also throws the Constitution on the

10     other side of the equation as well.

11           MS. HARTNETT:  We believe that comes in through

12     me, but yes, you're right, Your Honor, there is another

13     cite here.

14           THE COURT:  Is there anything that you wanted to

15     say that my questions didn't get you to in your remarks?

16     Because I think I don't have any more questions for you at

17     this point.  So if you want to just take a minute, that's

18     fine.

19           MS. HARTNETT:  I'm just on the need point, which

20     I think was your question before I started possibly

21     answering a different question.  It's just that, you know,

22     I think we believe that kind of consistent with our

23     jurisdictional briefing that the Court should issue the --

24     you know, the most narrow ruling that it believes

25     appropriate at this juncture, that we have tried to lay

                                                              85

1    out the Colburn declaration that types of materials at

2    issues, so the Court should be able to have an

3    understanding of those.  We agree that if you were to

4    sustain a privilege over these documents, we think, based

5    on that, the Court could enter a judgment for us and

6    return the dispute along with others to the political

7    process where we can continue to have them.

8          But short of that, we would want to -- I think

9    it would make sense for the parties to try to mediate

10   before a more elaborate proceeding -- proceedings were to

11   follow about need.  Because I think that does weigh the

12   Court toward the area that it had sought to avoid in the

13   jurisdictional ruling.

14          THE COURT:  All right.  Thank you.

15          MS. HARTNETT:  Thank you.

16          THE COURT:  I want to hear -- I guess I want to

17   hear from Mr. Kircher.

18          MR. KIRCHER:  Your Honor, may I just say one

19   thing?

20          THE COURT:  One thing.

21          MR. KIRCHER:  All right.  One.

22          Understand that the privilege that they are

23   articulating here today, the committee will do better

24   under FOIA.  We will do better issuing FOIA requests to

25   the Department of Justice to get this information than we

                                                      86

1    will pursuant to Article I.  Because they are well beyond

2    deliberative and well beyond --

3              THE COURT:  I take your -- I understand your

4    point.

5              MR. KIRCHER:  Thank you.

6              THE COURT:  All right.  Thank you.

7              Just for the court reporter's benefit, I'm going

8    to go on to the second motion, but this isn't going to

9    take very long, I can assure you.  Let me hear from the

10   committee first on the motions to strike.  I just have a

11   couple of questions for you.

12             I've read the motion, and so I'm not going to

13   let you give your introductory argument.  Your -- your

14   pleading says I shouldn't rely on the cases the Attorney

15   General cites about using hearsay in declarations because

16   they arise in the FOIA context and they arise in the APA

17   context.  But aren't you also expressly relying on FOIA

18   case law when you're telling me that the department hasn't

19   made out the elements of the privilege?  Isn't everybody

20   citing FOIA cases to me?

21             MR. ROSENBERG:  I think it's important to make a

22   distinction between concepts that might apply with respect

23   to disclosure of documents and response to requests, and

24   concepts that should apply for purposes of creating a

25   factual record on summary judgment.  Setting aside what

                                                            87

1    the FOIA cases may have to say and what effect they may

2    have on the Court's determination of what should be

3    discoverable and what shouldn't be, the FOIA cases and the

4    leeway granted to the agencies cases is unique to FOIA

5    context and summary judgment.  And that leeway is not

6    required in the context of congressional requests for

7    documents from executive agency.

8            THE COURT:  Was this plea really necessary?  I

9    mean, is there any likelihood that the Coburn declaration

10   is going to be taken as evidence of what the committee was

11   thinking any more than the committee's repeated use of the

12   word "lied" is evidence that the letter was a knowing

13   falsehood?

14            I mean, if I tell everybody I know hearsay when

15   I see it, and I know rhetoric when I see it, I'm going to

16   give it the weight it deserves, I mean, it wasn't a

17   factual declaration.  There were facts in it, but he also

18   went through essentially a legal discussion about why we

19   have this privilege in the first place.  I know that.

20            Does -- does this motion to strike really

21   matter?  Do I -- if I understand and give everybody the

22   weight that their rhetoric deserves, do we need to deal

23   with this?  And if I deny the government's cross motion

24   for summary judgment, is it moot?

25            MR. ROSENBERG:  Your Honor certainly can treat

1    the motion to strike as an assertion of objections and

2    where they were well taken, sustain those objections and

3    disregard the material that is improper under Rule 56.

4    But in a circumstance like this where the violations of

5    the rule are so extensive and so pervasive, and it's so

6    difficult to tease them out from what would otherwise be

7    proper Rule 56 material, the appropriate remedy is to

8    strike it.

9         THE COURT:  Well, aren't there some hearsay and

10   opinions in your exhibits to them?  Such as you attached

11   transcript from Mr. Melson who says about three times, I

12   think, my view, my characterization.  That's not facts.

13        MR. ROSENBERG:  That's right.

14        THE COURT:  So should I strike that, too, while

15   I'm at it?

16        MR. ROSENBERG:  The difference between what you

17   get in the Melson transcript, for example, or a letter

18   with an identifiable declarant is that in these

19   declarations they make assertions that clearly are based

20   on hearsay or statements made by others but you can't

21   identify who they are.

22        Now, the Court, under the rule has discretion to

23   permit things that would be reducible to admissible form,

24   even if they are hearsay, but the problem is when couched

25   in statements made by the declarants alone without

                                                              89

1        identifying the specific sources on whom they are relying,

2        who is to say.  We have no idea if this is one layer of

3        hearsay, two layers of hearsay, three layers of hearsay.

4              The Melson transcript is a transcript of

5        something he said.  We know who said it.  And if it got to

6        that point, we can have him come in and say -- say

7        something.  That's dealing with the hearsay issue.  But

8        now whether it's -- the Court should consider his opinion

9        or his views, that's a totally separate argument from the

10       hearsay problem.

11             THE COURT:  Well, I mean, one thing that makes

12       me wonder about how much I have to deal with this is what

13       fact or consequence the declaration is material to.  The

14       whole discussion about the history and purpose of the

15       executive privilege is in their brief.  It's a legal

16       argument.  He's a lawyer.  When he gets to this is what

17       the documents contain, that's factual.

18             Is there any reason why those parts I can't

19       accept?  I mean, do I have to get it from Eric Holder

20       because he's the defendant?

21             MR. ROSENBERG:  The biggest problem with talking

22       about the nature and the contents of the records is that,

23       based on the four corners of these declarations, there's

24       nothing showing that these declarants actually laid eyes

25       on them.  If the Court were inclined to adopt principles

                                                              90

1    from the FOIA context and allow the declarant's to relate

2    hearsay from people that work in their office and they

3    received information in their official capacity, there are

4    still limits on the appropriate things -- the types of

5    information that it can relate.

6            And when a declarant, at least in the FOIA

7    context, is going to talk about the nature and the

8    contents of documents, that person has to swear that they

9    actually reviewed the documents.  If they are going to

10   talk about the search for responsive records, which is a

11   duty that agencies have under FOIA to conduct an adequate

12   search, it's not enough that they know something about the

13   search.  They have to be the person who supervised it.

14   And it's not just -- you know, they can't speak for every

15   single component in the entire agency if there are

16   multiple components involved.  They have to be the person

17   who is intimately familiar with the procedures used, the

18   terms used for the search, the places that are searched.

19   And if they are not that person, they are not a proper

20   declarant.

21           THE COURT:  Well, if I determine -- and, again,

22   I caution everybody that I think about things after

23   hearings and I haven't decided this case yet.

24           If I -- if I decide that they haven't given me

25   enough to establish the privilege and they have to give me

                                                          91

1   a particularized showing, some sort of indexlike

2   substance, is this moot?

3          MR. ROSENBERG:  These declarations do not give

4   you enough information to make the determination on

5   balancing.

6          THE COURT:  Right.  So let's say I say I don't

7   even know if they are privileged yet; give me something

8   else.  Your motion for summary judgment is denied without

9   prejudice.  You need to support your assertion of the

10  privilege on a more individualized basis.

11         At that point is this controversy, your piece of

12  this, the motion to strike, moot?

13         MR. ROSENBERG:  Not the entire motion.  There

14  are paragraphs in the declarants that discuss the contents

15  and nature of records.  Those will have to be supplemented

16  for the Court to do the balancing, if it gets to that.

17  But there are all these other aspects of the declarations

18  involving arguments, conclusory assertions, opinions, all

19  the things that you mentioned before that are still

20  improper, irrespective of -- you know, that don't have

21  anything to do necessarily with the content and the nature

22  of the records involved.

23         So, no, the motion would not be moot with

24  respect to those aspects.

25         THE COURT:  All right.  Thank you.

1              MR. ROSENBERG:   Thank you, Your Honor.

2              THE COURT:   All right.   Is there someone on the

3    Attorney General's side that wants to talk about the

4    motion to strike briefly?

5              The Colburn declaration is certainly largely not

6    factual.   It doesn't really look like typical FOIA

7    declaration.   There are many introductory paragraphs that

8    are lawyerly descriptions of the importance of negotiation

9    and accommodation, the history of negotiation and

10   accommodation, justifications for the privilege.

11             So is it your position that those are facts that

12   appropriately go in a declaration?   I mean, doesn't he

13   have a point about that?

14             MS. HARTNETT:   Your Honor, I think we -- we

15   believe our declarations are appropriate and consistent

16   with the rules, to the extent that they provide -- these

17   are official capacity declarants.   They are providing

18   information that we hoped would be helpful to the Court

19   and based on, you know, their personal knowledge

20   meaning --

21             THE COURT:   But are they facts?   They seem to be

22   legal conclusions largely.   Are you talking about --

23             MS. HARTNETT:   Sorry.

24             THE COURT:   -- the historical importance of

25   negotiation and accommodation, are we really talking about

                                                           93

1    facts anymore?  Isn't that what you told me in your brief?

2            MS. HARTNETT:  I think the most important part

3    of the declaration from our -- from our perspective is to

4    show the Court what the documents are that were being

5    withheld under the claim of privilege and how they map on

6    to our theory.

7            THE COURT:  All right.  About halfway through

8    the declaration we get to the fact portion, which is what

9    these documents consist of and how they fit under the

10   privilege.  So if facts that are going to be material to

11   my ruling on the motion for summary judgment are material,

12   don't they have to be presented by people with knowledge?

13           MS. HARTNETT:  The declarant does have

14   knowledge.  Some of it has been provided to him by others

15   that are -- he works with.  That's regularly part of how

16   we submit official capacity declarants.  He has personal

17   knowledge based on his own information and information

18   provided to him in his official capacity.

19           To the extent the Court would like a further

20   specification of the documents, we're happy to provide

21   that and make sure that it's as complete as the Court

22   would seek.  But the point is for the instant motion is

23   that this declaration is appropriate, and even the legal

24   part, that's not dissimilar from the information that is

25   regularly provided to Courts, particularly here in this

1    Court where you face cases involving new -- you know,

2    distinct areas of legal concern or legal frame works that

3    may be relatively novel.

4           And so, like, for example, there was a recent

5    case, the Rawls court case I think before Your Honor where

6    there was an official capacity declarant that at least

7    provided some legal background as a segue into the meat of

8    the declaration.

9           And so I guess the point here is particularly in

10   light of some of the representations that were made in the

11   brief on the opening summary judgment brief about the

12   nature of oversight process and how it all works, I think

13   we thought in the course of providing information about

14   the document themselves, it would also be helpful to

15   provide information from someone who's practiced oversight

16   for several decades at the department to provide some of

17   that context in a more factual matter.

18          But at the end of the day, the Court should

19   really -- to the extent that the Court finds the

20   information useful could consider it in summary judgment,

21   but as we explained in our brief, there's really no basis

22   for a separate free-standing motion to strike or a need to

23   strike that.  It should just be considered and given the

24   weight it's due in the course of the Court's ruling on the

25   summary judgment.

1          THE COURT:  So if I say I am going to consider

2    it and give it its weight it's due and I know a legal

3    conclusion when I see one, and I know hearsay when I see

4    it, that's how I can rule on the motion to strike?

5          MS. HARTNETT:  I think the Court would not need

6    to resolve that.  It could either deny it as unnecessary

7    and incorporate whatever points that's been made in the

8    motion to -- within the summary judgment ruling itself.

9    And that was, as we pointed out, what the notes to Rule 56

10   suggest would be the proper procedure.  And I think that

11   some of the case law that we've cited from this Court

12   makes it clear that the Court would just be able to give

13   it the weight that it's due.

14         THE COURT:  All right.  Okay.  Thank you.

15         MS. HARTNETT:  Thanks.

16         THE COURT:  I appreciate everyone's

17   participation in the hearing this morning and the patience

18   in getting through the long hearing this morning.

19   Notwithstanding my comments about the tone of the brief, I

20   appreciated the briefs from both sides.  It's always

21   wonderful to be told that you're deciding something that

22   no one has ever decided before.  So I'm going to be

23   thinking about it, and I'm going to be thinking about it

24   hard.

25         I think, though, you bolt have a very clear idea

96

1    of what my concerns are about the positions being put

2    forward by both sides.  So while I have this under

3    advisement, I'm going to ask you to meet and confer with

4    each other.  What is today?  Today is May 15 apparently.

5            And so I'm going to ask you to submit a joint

6    status report by May 30 indicating to me whether the

7    parties are agreed or not about whether they had like to

8    be referred back to Judge Rawstein at this time.  You

9    don't have to tell me why or why not.

10           I understand you both feel very strongly about

11   your legal positions in this matter.  But I think you have

12   some indication about what the likely -- what some

13   possible outcomes could be.  And so you can think about

14   how you'd like to handle that and let me know.  And if you

15   need more time, because these are matters that you have to

16   run up multiple flag poles, you can jointly request more

17   time and I'll be happy to give it to you.

18           All right.  Thank you very much, everybody.

19           (Proceedings adjourned at 11:59 a.m.)

20

21

22

23

24

25

97