*Comm. on Oversight & Gov't Reform, U.S. House of Reps. v. Holder*, No. 12-1332 (ABJ)

DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION TO COMPEL

Ex. H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

COMMITTEE ON THE JUDICIARY )
)
Plaintiff, )
)
v. )   **Case No. 1:08-cv-00409 (JDB)**
)
HARRIET MIERS, et al. )
)
Defendants. )
_____)

## MEMORANDUM AMICI CURIAE OF REPRESENTATIVES
## JOHN BOEHNER, ROY BLUNT, LAMAR SMITH AND CHRIS CANNON

## IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

DANIEL M. FLORES
RICHARD A. HERTLING
  Counsel of Record
ZACHARY N. SOMERS
Committee on the Judiciary, Republican Staff
United States House of Representatives
Washington, DC 20515
(202) 225-6906

Of Counsel:

JO-MARIE ST. MARTIN
General Counsel to the Republican Leader
MELANIE LOONEY
Counsel to the Republican Whip
SEAN P. MCLAUGHLIN
Republican Chief Counsel,
  Committee on the Judiciary
United States House of Representatives
Washington, DC 20515
(202) 225-6906

May 9, 2008                       Counsel for Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... i

INTRODUCTION ................................................................................................................... 1

STATEMENT OF INTEREST ................................................................................................ 2

STATEMENT OF THE CASE ................................................................................................. 3

ARGUMENT ......................................................................................................................... 19

    I.      Standard Of Review ................................................................................................ 19

    II.     The Court Should Dismiss The Complaint For Lack Of Ripeness ............................... 20

        A. Standards for Determining Ripeness ........................................................................ 21

        B. Because Non-Judicial Means Have Not Even Remotely Been Exhausted by the Plaintiff, It Is at Best Impossible for the Court To Assess Whether There Is a "Demonstrated, Specific Need" for Evidence from Ms. Miers and Mr. Bolten .......... 22

            1.   Failure to exhaust means of gathering information from other witnesses ....... 24

            2.   Failure to exhaust negotiating options with the White House ........................ 25

            3.   The possibility of awaiting the results of investigations by the Inspector General and the Office of Professional Responsibility .................................... 26

            4.   The Committee Chairman's Concessions During Floor Debate Show That The Matter is Unripe ..................................................................................... 28

        C. . Unless and Until the Plaintiff Can Present a "Demonstrated, Specific Need," the Plaintiff's Challenge to the Executive's Absolute Immunity Theory Should Not Be Considered Ripe .................................................................................................. 29

        D. The Potential for Other Jurisdictional Issues To Sway the Balance of Power Between the Branches Places a Premium on Assuring Ripeness before Consideration of Any Other Question ....................................................................... 30

    III.    The Court Should Refrain From Exercising Jurisdiction To Grant Relief ................... 31

        A.     The Court's Authority To Grant Relief under the Declaratory Judgment Act Is Discretionary ....................................................................................................... 31

B.    The Court Should Refrain from Exercising any Authority To Grant Relief, Because the Plaintiff Has Not Sufficiently Exhausted Non-Judicial Means of Obtaining the Information Sought ...................................................................32

    1.   The Plaintiff's Speculative Quest Does Not Merit the Requested Relief ........32

    2.   The Potential Harms of Granting the Requested Relief far Outweigh the Potential Benefits ...........................................................................................33

    3.   The Requested Relief Might Well Fail to Settle the Controversy ...................36

    4.   The Remaining Considerations Also Suggest that the Relief Requested Should Not Be Granted....................................................................................39

C.    The Nature of the Legal Theory in Dispute Calls for the Court to Refrain from Granting the Requested Relief on the Basis of the Instant Record ...............39

CONCLUSION.....................................................................................................................40

## TABLE OF AUTHORITIES

**CASES**

*In re Sealed Case, 121 F.3d 729, 754 (D.C. Cir. 1997) ........................................................ passim

Am. Historical Ass'n v. Nat'l Archives & Records Admin.,
    516 F. Supp. 2d 90 (D.D.C. 2007) ...........................................................................19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .................................................20

Briggs v. Wash. Metro. Area Transit Auth., 481 F.3d 839 (D.C. Cir. 2007) ...............20

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...........................................................20

Citizens for Responsibility & Ethics v. Dep't of Justice,
    535 F. Supp. 2d 157 (D.D.C. 2008) .........................................................................20

City of Kenosha v. Bruno, 412 U.S. 507 (1973).........................................................19

Eccles v. Peoples Bank, 333 U.S. 426 (1948) ...........................................................32

Grand Lodge of Fraternal Order of Police v. Ashcroft,
    185 F. Supp. 2d 9 (D.D.C. 2001)..............................................................................19

Hanes Corp. v. Millard, 531 F.2d 585 (D.C. Cir. 1976)..............................................32

Hewitt v. Helms, 482 U.S. 755 (1987) ......................................................................31

Jackson v. Culinary Sch. of Washington, Ltd., 27 F.3d 573 (D.C. Cir. 1994) ........32, 36

Land v. Dollar, 330 U.S. 731 (1947) ........................................................................19

Liverpool, New York & Philadelphia S. S. Co. v. Commissioners of Emigration,
    113 U.S. 33 (1885).................................................................................................20

Mittleman v. United States Dep't of the Treasury, 919 F. Supp. 461 (D.D.C. 1995) ............31, 32

Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803 (2003)..................................21, 31

Nixon v. Sirica, 487 F.2d 700 (D.C. Cir. 1973).........................................................22

Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998)........................................21, 27, 31

*Senate Select Committee on Presidential Campaign Activities v. Nixon:
    366 F. Supp 51 (D.D.C. 1973) (Senate Select Comm. I) ......................................................34

498 F.2d 725 (D.C. Cir. 1974) (Senate Select Comm. II) ....................................................22

Srour v. Barnes, 670 F. Supp. 18 (D.D.C. 1987) .........................................................19

*United States v. House of Representatives, 556 F. Supp. 150 (D.D.C. 1983)......................20, 29

United States v. Nixon, 418 U.S. 706 (1974) ..............................................................22

Wilton v. Seven Falls Co., 515 U.S. 277 (1995) ........................................................31

## STATUTES

18 U.S.C. § 1001 (2004) .............................................................................................6, 38

5 U.S.C. app. § 2 (2004) ...............................................................................................27

## LEGISLATIVE MATERIALS

154 Cong. Rec. H 948 (2008) .........................................................................19, 28, 32

Report of the Committee on the Judiciary of the House of Representatives together with
    Additional Views and Minority Views is available at
    http://judiciary.house.gov/Media/PDFS/ContemptReport071105.pdf .......................... passim

Oversight Hearing on the Continuing Investigation Into the U.S. Attorneys Controversy and
    Related Matters (Part 1): Hearing Before the House Comm. On the Judiciary, 110th Cong.
    (2007) available at http://judiciary.house.gov/media/pdfs/printers/110th/35603.pdf ...........18

Oversight Hearing on the United States Department of Justice: Hearing Before the
    House Comm. On the Judiciary, 110th Cong. (2007) available at
    http://judiciary.house.gov/media/pdfs/printers/110th/35245.pdf ...........................................8

## SECONDARY AUTHORITIES

13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3532.1 (2008)...........21

## INTRODUCTION

This matter offers the Court a number of provocative questions.  Are the President's most intimate advisers immune from compelled testimony before the Congress?  Are executive officials through whom the President asserts executive privilege subject to enforcement of congressional contempt citations?  Does the Congress have Article I authority to restrict the President's dismissal of Article II political appointees serving at his pleasure?

Provocative as these questions are, the prospect of judicial answers to them threatens to upset the balance of power between the political branches.  Indeed, answers to them may undermine the very oversight power of Congress that the instant plaintiff seeks to vindicate.

Additional, drier, but equally fundamental questions also present themselves in this case.  These questions may dispose of the matter without disturbing the balance of power.  Because the Court is asked to exercise its discretionary equitable jurisdiction, the Court should consider and resolve these other basic inquiries before turning to any others.

These inquiries include whether the matter is even ripe for judicial resolution.  The Plaintiff has yet to exhaust a host of non-judicial means of obtaining the information it seeks.  Whether there ever will be a "demonstrated, specific need" for evidence directly from the Defendants will at best remain speculative until the Plaintiff avails itself of these alternative means.  See In re Sealed Case, 121 F.3d 729, 754 (D.C. Cir. 1997).  These questions also include whether, because of these and other aspects of the case, the Court should refrain prudentially from exercising any jurisdiction it may have to issue declaratory and injunctive relief.  For example, the potential harm this matter threatens to Congress' institutional oversight prerogatives and the public interest far outweigh any asserted need by the Plaintiff for the information sought from the Defendants.  This counsels strongly against a grant of the requested relief.

When the Court considers questions such as these, Amici are confident that it will find wise and ample reason either to decline jurisdiction or to find it wanting, leaving this matter, at least for the present, in the hands of the political branches. Amici urge the Court to take this route, and to dismiss this case. Congress's oversight authority is a lifeline of liberty in our Republic. The Court should pause and give measured and careful consideration to the questions Amici raise before attempting to untie knots in that lifeline that once undone could precipitate its unraveling.

## STATEMENT OF INTEREST

Amici are the Republican Leader of the United States House of Representatives, the House Republican Whip, the Ranking Member of the House Committee on the Judiciary (the "Committee"), and the Ranking Member of the Committee's Subcommittee on Commercial and Administrative Law (the "Subcommittee"). Republican Leader John Boehner and Republican Whip Roy Blunt led the House Republican Conference in the consideration on the House floor of H. Res. 980, the resolution under which the Plaintiff seeks to bring this lawsuit. Committee Ranking Member Lamar Smith and Subcommittee Ranking Member Chris Cannon likewise participated in the consideration of H. Res. 980 on the House floor. They also led Republican members of the Committee during its investigation that yielded the subpoenas at issue; during the Committee's consideration and vote regarding whether the subjects of the subpoenas should be held in contempt of the House and prosecuted; and in the preparation of the Minority Views reported to the House following the Committee vote.

When the question of contempt reached the House floor, Republican Leader Boehner and Republican Whip Blunt opposed the approval of H. Res. 980. In Committee, Ranking Members Smith and Cannon opposed the Committee's vote to report a resolution of contempt to the House floor, and they opposed H. Res. 980 on the floor. High among Amici's reasons for opposing the

actions of the Plaintiff were their deeply held concerns that this suit invites the courts to enter

into a political thicket, and that a decision against enforcing the subpoenas could severely

undermine the House's institutional authority and its ability to execute its oversight authority

over the Executive Branch in the future.[1]  It is their continuing interest in the preservation of the

House's robust oversight prerogatives, and in sparing the courts a premature need to enter into a

partisan political dispute, that prompts them to offer their views to the Court as Amici.

## STATEMENT OF THE CASE

For their statement of the case, Amici incorporate by reference and generally refer the

Court to the Minority Views contained in H. Rep. 110-423, as well as the evidence appended by

the Committee minority to those views.  See Pl.'s Ex. 1 (Committee's Contempt Report together

with Additional Views and Minority Views).[2]  Amici wish, however, to highlight here certain

aspects of the case that bear prominently on whether the Court has jurisdiction or, if it does,

whether it should exercise its discretion to grant relief.

I.      The Plaintiff's Failure To Exhaust Non-Judicial Means Of Obtaining Information

The controversy that produced this litigation began with the Department of Justice's

dismissal of several U.S. Attorneys in late 2006.  Central to the controversy and the investigation

were allegations that the White House and the Department sought the dismissals out of partisan

political concerns.  The disputed subpoenas were issued to help investigate those allegations.

As discussed below, see infra at 22–24, to enforce its subpoenas over the White House's

claims of executive privilege, the Plaintiff must prove a "demonstrated, specific need" for the

---

[1] For instance, in the Committee's Contempt report, the Republican members of the Committee, including Ranking
Members Smith and Cannon, wrote that "[t]he threat that a losing court battle poses to the institutional interests of
the Congress, and the fact that no wrongdoing in the U.S. Attorney dismissals has thus far even been remotely
proven, strongly counsel against finding Harriet Miers or Joshua Bolten in contempt of Congress."  Pl.'s Ex. 1
at 154.
[2] Plaintiff's Exhibit 1, the Report of the Committee on the Judiciary of the House of Representatives together with
Additional Views and Minority Views, is available online at
http://judiciary.house.gov/Media/PDFS/ContemptReport071105.pdf.

information subpoenaed.  Amici submit that, based on the current record, any determination as to whether there is now or ever will be a demonstrable, specific need for that information would at best be speculative.  Amici set forth below the facts describing the steps that the Plaintiff has and has not undertaken to investigate the allegations of White House partisanship, other processes available to obtain information adequate to answer the Plaintiff's questions, and whether the Plaintiff already has information sufficient to show a lack of improper White House partisanship.

Amici submit that this brief will place before the Court a more fulsome recitation of the facts than the parties may, given the partisan nature of the legislative proceedings and the filing of this civil action.  The complete facts reveal an investigation that appeared designed to generate a rapid confrontation with the White House, in concert with initial interviews of senior Department of Justice ("Department") officials; discarded at the very outset the opportunity to obtain voluntary information from the White House; declined to pursue information from a number of other witnesses that could have clarified whether information from White House sources was needed; ignored exculpatory evidence pertaining to the White House's role in the dismissals; declined the benefit of the results of a more exhaustive investigation conducted by the Department's Office of the Inspector General ("OIG") and Office of Professional Responsibility ("OPR"); chose instead to pursue premature contempt citations; considered the issue of the subpoenas and contempt after many months of dormancy in the full House under an extraordinary rule precluding both full debate and a direct vote on the contempt resolutions; and culminated with an admission by the Committee chairman on the House floor that the Committee had no evidence against Ms. Miers and Mr. Bolten, and was engaged essentially in a fishing expedition.

A.  The Initiation of the Plaintiff's Investigation, and the Plaintiff's Rejection of
     Voluntary Information from Ms. Miers, Mr. Bolten and other White House Officials

The Plaintiff's oversight of the matter began formally on March 6, 2007, in a hearing

before the Subcommittee on Commercial and Administrative Law (the "Subcommittee").[3]  Six

of the eight dismissed U.S. Attorneys testified at this hearing, along with a Department witness.

See Pl.'s Ex. 1 at 107.

Two weeks after the March 6th hearing, on March 20, 2007, the Subcommittee

authorized the Committee Chairman to subpoena testimony and documents from then-aides and

advisors to the President Karl Rove, William Kelley, and Scott Jennings, former Counsel to the

President Harriet Miers, and the former Chief of Staff to the Attorney General D. Kyle Sampson.

Id. at 4.  The Subcommittee also generally authorized the Chairman to subpoena the Executive

Office of the President ("White House") for documents.  Id.

In response, the White House offered informal interviews with the named White House

officials, along with documents recording relevant communications between the White House

and the Department, Congress, and other parties outside the White House.  Complaint ¶ 34.  If

taken, this offer would have resolved more than a year ago whether there was any further need

for testimony or documents from Ms. Miers and for documents from Mr. Bolten.

The Plaintiff immediately rejected this offer.  Complaint ¶ 35.  During ensuing

negotiations, the Plaintiff claimed that the White House unreasonably limited the body of

documents it was willing to provide and unreasonably refused to permit on-the-record interviews

and to allow follow-up interviews or other process before the Committee.  Complaint ¶ 34.

The White House held to the terms of its initial offer, however, Complaint ¶ 38, and the

Plaintiff never exhausted the bargaining territory between the two positions.  For example, the

---

[3] The Subcommittee on Commercial and Administrative law has oversight jurisdiction over the Executive Office of
U.S. Attorneys.

Plaintiff never agreed to accept the White House's insistence on unrecorded interviews, while reserving the right to subsequent, on-the-record interviews if any evidence of wrongdoing was found.  Indeed, even if the Plaintiff had agreed to untranscribed interviews without a reservation for further process, it is hard to imagine that it could not have forced a transcribed, second round through political means, had it found evidence of wrongdoing during the unrecorded interviews.[4]  It is also worth noting that even untranscribed interviews would have carried significant guarantees of truthfulness, as each would have been subject to the criminal penalties contained in 18 U.S.C. § 1001 for misleading Congress.

The Plaintiff's approach contrasted significantly to that taken by other committees in Congress.  The House's Committee on Oversight and Government Reform ("OGR"), for example, garnered all of the information it required in a high-profile oversight investigation by adopting a bipartisan approach allowing for staggered interviews, while respecting the White House's prerogatives to assert privilege.  In that matter, with regard to senior White House officials – officials with seniority similar to that of Defendants – OGR agreed to informal, off-the-record interviews with counsel for the White House present.  As OGR Chairman Waxman and Ranking Member Davis described the interviews in a letter to White House Counsel Fred Fielding, "[t]hese interviews will allow us to assess whether these individuals have information that is relevant to the Committee's investigation.  If they do not have relevant information, an unnecessary dispute between the branches will be avoided."  See Amici Ex. 1 at 1–2.

---

[4] The release of damaging information based on interview notes, for example, could have forced the White House's hand, and any eventual court proceedings seeking more information could have rested on a showing of whatever evidence of wrong-doing was found and an explanation of the need for further evidence.  Further, because even untranscribed interviews would have been subject to criminal sanctions under 18 U.S.C. § 1001 (which prohibits, inter alia, knowingly and willfully making a materially false, fictitious, or fraudulent statement or representation to Congress), the Committee could have held follow-up hearings to enforce its prerogatives under that provision.  Finally, Amici note that, even without the benefit of information from the untranscribed White House interviews, the Committee's investigation had the extraordinary effect of triggering the resignations of a number of the Department's senior-most leaders.  This is powerful evidence of the ability of the Committee to force its ends through political means.

B.  Further Committee Hearings, Interviews and Document Review

After the March 6, 2007 hearing and its rejection of the White House's offer, the

Committee did not conduct further discovery of witnesses until March 30, 2007,[5] when it began

an as yet to be concluded interview with Michael J. Elston, then chief of staff to then Deputy

Attorney General Paul J. McNulty.  See Pl.'s Ex. 1 at 334–48.

In April 2007, the Committee continued with several other witness interviews, holding

them with Mr. Sampson; Mr. McNulty; then Associate Attorney General and U.S. Attorney for

the District of Montana William W. Mercer; then Principal Associate Deputy Attorney General

William Moschella; and former Director of the Executive Office of U.S. Attorneys ("EOUSA")

Michael A. Battle.  The Committee also voted to extend use immunity to Monica Goodling, the

Department's former White House liaison, in order to obtain her testimony.  Id. at 3.

In May 2007, the Committee continued its discovery efforts through a number of

hearings, witness interviews and document reviews.[6]  The Subcommittee held a hearing on May

3, 2007, with former Deputy Attorney General James B. Comey.  Id.  The Committee,

meanwhile, held a hearing on May 23, 2007, at which Ms. Goodling delivered her immunized

testimony.  Id.  The Committee also interviewed Associate Deputy Attorney General David

Margolis, the senior career official at the Department; Larry Gomez, the acting U.S. Attorney for

the District of New Mexico and First Assistant U.S. Attorney to Mr. Iglesias; and Counsel to the

Attorney General Matthew Friedrich.[7]

Also, on May 10, 2007, the Committee held an oversight hearing with former Attorney

General Alberto Gonzales.  This hearing presented the Committee with its first opportunity to

---

[5] Earlier in March 2007, the Committee began receiving intermittent document disclosures from the Department.
Those disclosures have continued even past the date of the Complaint.  See, e.g., Letter of Brian A. Benczkowski,
Principal Deputy Assistant Attorney General, to the Honorable John Conyers, Jr. (March 19, 2008).
[6] As the Complaint alleges, the Department eventually provided the Committee with at least 8,500 pages of
documents.  See Complaint at ¶ 32.
[7] Excerpts of the most relevant portions of these interviews and the interviews of other officials can be found in Pl.'s
Ex. 1 at 157–532.  The full transcripts are on file with the Committee.

hear from the person who actually decided to ask for the eight U.S. Attorneys' resignations.  The

Committee majority focused a great deal of its questioning on other topics.[8]  Amicus Smith, the

Committee's Ranking Member, however, asked Attorney General Gonzales pointedly about the

issue of alleged White House influence on the dismissal decisions.  Their colloquy included the

following exchange:

> Ranking Member Smith: "Did the White House ever ask you to seek the
> resignation of any U.S. attorney in order to retaliate for, interfere with, or gain a
> partisan advantage in any case or investigation, whether about public corruption
> or any other offense?"
>
> Attorney General Gonzales:  "Not that I recall . . . I don't believe that the White
> House ever did."[9]

In June, the Committee interviewed current U.S. Attorney for the Western District of

Pennsylvania and former EOUSA Director Mary Beth Buchanan.  The Subcommittee,

meanwhile, held a hearing with Mr. McNulty.

After this initial spate of discovery, the Committee turned to pursuing subpoenas against

Ms. Miers and Mr. Bolten.  Ms. Miers had been directed by the President to assert executive

privilege.  Nevertheless, the Committee Chairman subpoenaed Ms. Miers to appear at a July 12,

2007 Subcommittee hearing.  Complaint ¶ 42.  Ms. Miers declined to attend the hearing, citing

the President's assertion of executive privilege and his order that she not appear.  Complaint

¶¶ 43–44.  The Subcommittee held the hearing in any event, and, in Ms. Miers' absence,

Subcommittee Chairwoman Linda Sánchez ruled on the privilege claims asserted, rejecting them

all.  Complaint ¶ 48.  Similarly, when, at the President's instruction, Mr. Bolten asserted

executive privilege in defense of a document subpoena issued to him on June 13, 2007, the

Subcommittee held a hearing in his absence and overruled the asserted claims.  Complaint ¶ 57.

---

[8] See generally Oversight Hearing on the United States Department of Justice: Hearing Before the House Comm. On the Judiciary, 110th Cong. (2007), available at http://judiciary.house.gov/media/pdfs/printers/110th/35245.pdf.
[9] Id. at 35.

On July 25, 2007, the full Committee met to vote on whether to recommend to the full
House resolutions that Ms. Miers and Mr. Bolten be held in contempt of Congress.  Complaint
¶ 60.  The Committee approved a criminal contempt resolution on a party line vote.  No civil
contempt resolution was brought before the Committee or considered by the Committee.

Following this vote, an interlude of nearly three-and-a-half months passed before the
Committee, on November 5, 2007, transmitted its report on the criminal resolution to the House
floor.  Complaint ¶ 62.  The Plaintiff undertook no further investigative activity into the
dismissals following its contempt vote.  In the end, nearly seven months elapsed before the
House Democratic leadership scheduled the matter for a vote by the House on February 14,
2008.

Significantly, the House did not vote on the contempt resolutions themselves.  In an
extraordinary decision, the House majority chose to bring the criminal contempt resolution
considered by the Committee and a new, civil contempt resolution that was not considered by the
Committee[10] to the House floor under a procedure that put before the House a resolution in the
form of a special order of the House that, once adopted, would effect the automatic adoption of
both the civil and the criminal contempt resolutions.[11]  This extreme parliamentary maneuver
prevented both a full debate on the resolutions and their consequences as well as a direct vote on
either resolution.[12]  The resolution containing the automatic adoption special order passed by a
bare majority, on an almost entirely party-line vote.

---

[10] At the Rules Committee hearing prior to the vote, a civil resolution, H. Res. 980, had been added to the criminal
resolution.  See H. Res. 982, 110th Cong. (2008).
[11] This special order was incorporated into H. Res. 982.
[12] Had the House's majority leadership permitted it, the House could have had a much fuller debate on the merits of
the contempt resolutions.  It is entirely possible that such a debate could have led to the defeat of the resolutions and
the avoidance of this suit.
   The majority's partisan approach also appears to have colored the Speaker's pre-filing consultation with the
House's Bipartisan Legal Advisory Group (the "BLAG," members of which include the Speaker, majority and
minority leaders and majority and minority whips).  Both H. Res. 980 and House Rule II, cl. 8, required the Speaker
to consult with the BLAG before authorizing the House General Counsel to file suit.  The Speaker requested BLAG

C.   Other Steps the Plaintiff Could Have Taken To Acquire Information Before It Issued the Subpoenas or Pursued Contempt Proceedings

As noted above, following the initial flurry of interviews and hearings – and the swift run-up to a constitutional confrontation with the White House – the Plaintiff's investigation into the U.S. Attorney dismissals went dormant.  It has remained dormant to this day.

Continuing with the investigation during or after its subpoena and contempt practice, however, would clearly have been feasible for the Plaintiff.  It is also possible that such continuation would have been quite productive.  For example, the Plaintiff could have taken any of the steps described below to continue with its investigation.  All of these options could have produced relevant and material information on the events that yielded the U.S. Attorney dismissals, and thus could have helped to clarify whether there was any demonstrable, specific need for information from Ms. Miers and Mr. Bolten.  Because the allegations in the Complaint focus on issues concerning former U.S. Attorney David Iglesias, and, to a lesser extent, former U.S. Attorney John McKay, Amici focus on the investigation of these two dismissals in discussing this question.  Other steps could also have been taken to investigate further the other six dismissals; the Plaintiff, however, appears effectively to have ended its fishing expedition for them.

1.   Additional steps that could have been taken to investigate the case of U.S. Attorney Iglesias

Since the early days of the controversy, much of the Plaintiff's concern has fallen upon the dismissal of David Iglesias, the former U.S. Attorney for the District of New Mexico.  Complaint ¶ 29.  There are, however, a host of steps the Plaintiff failed to exhaust in its

---

members' views through a letter dated Wednesday, March 5, 2008, but with no specific deadline.  On Monday, March 10, 2008, while minority leadership was preparing its written views, the Speaker did authorize the House Counsel to file suit; minority leadership learned of the event through the press.

investigation of Mr. Iglesias' case before it attempted to force information from White House sources.

First, although Mr. Iglesias did testify briefly at the Subcommittee's March 6, 2007 hearing, the Committee never called him for the same type of in-depth interview conducted with other Department witnesses.  It was not until after the March 6th hearing that the Committee obtained information from another witness about the contacts from concerned New Mexico citizens that are at the heart of speculation over the decision to dismiss Mr. Iglesias.  See Pl.'s Ex. 1 at 522–26.  A Committee interview with Mr. Iglesias after that date could have been very informative.  Likewise, the March hearing occurred before the Committee had received and reviewed the vast bulk of documentary evidence in this matter.  An interview with Mr. Iglesias after document review could have helped the Committee ask many more informed questions than were possible at the March hearing.

Unlike the Plaintiff, the Senate Ethics Committee has proven the value of taking such additional steps.  In its investigation of allegedly improper congressional contact with Mr. Iglesias, the Senate Ethics Committee did interview Mr. Iglesias.  Amici Ex. 2 at 2.  It also gathered information from a substantial number of other witnesses.  Id.  In its recently issued decision in the matter, the bipartisan committee concluded unanimously that there was "no substantial evidence" of wrongdoing in contact Senator Pete Domenici made with Mr. Iglesias, although it did find an appearance of impropriety.  Id. at 1.

The Plaintiff also never called the New Mexico citizens themselves for interviews.  Nor did the Plaintiff call the full set of Department officials allegedly connected with those contacts.  The Committee did interview Matthew Friedrich, of the former Attorney General's staff, and asked him questions about the contacts.  But the Committee never interviewed the other Department officials to whom Mr. Friedrich referred the individuals.  Nor did the Committee

interview the career official who was present during Mr. Friedrich's meeting with the New Mexico citizens. Pl.'s Ex. 1 at 523. Further, the Committee never called for an interview Monica Goodling, the other Department official on the Attorney General's staff alleged to have had contact with the individuals from New Mexico. At such an interview, the Committee could have fully probed Ms. Goodling for information on this issue.[13]

The Plaintiff also never interviewed former Attorney General Gonzales to interview him about the Iglesias matter. Mr. Gonzales did appear before the Committee at a hearing while still at the Department. That hearing, however, took place only as Mr. Friedrich's evidence concerning the New Mexico citizens' contacts was first coming to light. Certainly, after Mr. Friedrich's evidence had not only emerged but been more fully considered – and much more so after Mr. Gonzales had left the Department – the Plaintiff could have attempted to call Mr. Gonzales for an interview to explore this matter particularly and in depth. But it has not.

Further, the Committee never completed the March 2007 interview it began with Michael Elston, the former chief of staff to former Deputy Attorney General Paul McNulty. It also therefore never called Mr. McNulty for a follow-up interview after completing the questioning of Mr. Elston and the emergence of the information about the New Mexico citizens' contacts. This failure is of no small importance. As discussed in the Committee Report, the timing of Mr. Iglesias' placement on the U.S. Attorneys dismissal list coincided with the involvement of Mr. Elston and Mr. McNulty in this matter, and it also coincided with contacts between Senator Domenici of New Mexico and Mr. McNulty about Mr. Iglesias' performance. Complaint ¶ 29.

---

[13] Because Ms. Goodling had received testimonial immunity and was no longer at the Department, she could have been expected to have been particularly forthcoming in and amply available for an extensive interview with Committee staff. While it is true that she was called before the Committee for a hearing, questions in that setting necessarily extended to other issues or were required to be made within a compressed timeframe. A follow-up staff interview could have provided the Committee with a much freer means of focusing precisely on the matter of Mr. Iglesias' dismissal with Ms. Goodling and probing her evidence until it was exhausted.

Completing Mr. Elston's interview and following up thereafter with Mr. McNulty could well have shed additional light on this dismissal.

The Plaintiff also failed to pursue White House officials other than Ms. Miers and Mr. Bolten. The Senate, for example, was able to obtain the subpoenaed testimony of two lower-level White House officials, Mr. Jennings and Sara Taylor. Complaint ¶ 47. Mr. Jennings was within the Committee Chairman's March 20, 2007 subpoena authority, and the Committee could readily have considered whether to extend the Chairman's authority to Ms. Taylor. Yet the Committee neither subpoenaed them nor called them for staff interviews. As their Senate testimony demonstrated, they were willing and able in an open hearing to provide answers to a number of Senate questions. See generally Pl.'s Ex. 1 at 794–858. In a Committee hearing, and perhaps even more so in a Committee staff interview, these officials may have been willing to offer testimony directly responsive to the Committee's questions. The Committee may also have been more able to obtain information from Mr. Kelley, Ms. Miers' deputy, who likewise was included in the March 20th subpoena authority, and Mr. Christopher Oprison, a subordinate to Ms. Miers and Mr. Kelley who was involved in at least some communications between the Department and the White House. See Pl.'s Ex. 1 at 110–11. Any of these witnesses might have offered relevant and material evidence, and thus helped the Committee better determine whether there was any need for evidence from Ms. Miers or Mr. Bolten.

> 2. Additional steps that could have been taken in the case of U.S. Attorney McKay

Similar steps could also have been taken to explore further the dismissal of former U.S. Attorney John McKay. The Plaintiff, for example, never called Mr. McKay for an individual interview. Likewise, the Plaintiff never questioned Attorney General Gonzales in depth about Mr. McKay, either at Attorney General Gonzales' May 10, 2007 hearing or in a separate interview. Nor did it attempt to subpoena or call for staff interviews Mr. Jennings, Ms. Taylor,

Mr. Kelley, or Mr. Oprison.  As noted above, the Committee neither completed the interview of Mr. Elston nor recalled Mr. McNulty after the Elston interview concluded.  Again, it appears that Mr. McNulty was at the heart of the issue, because it was Mr. McKay's alleged insubordination on one of Mr. McNulty's priorities that formed a central part of the Department's rationale for Mr. McKay's dismissal.[14]

The Plaintiff also never questioned others who might have shed additional light on Mr. McKay's case, including others involved in matters that the Department cited for his dismissal. The Department offered a number of grounds, including not only Mr. McKay's record of insubordination in the development of the Department's information-sharing policy, but also Mr. McKay's poor records in achieving sentences within sentencing guidelines and in appealing sentences falling below the guidelines.  Pl.'s Ex. 1 at 117–19.  Yet the Plaintiff never called for an interview Mr. McKay's First Assistant U.S. Attorney, others in Mr. McKay's criminal division leadership, or officials in the Department's Criminal Division to investigate any of these other grounds.  Similarly, the Plaintiff never called any of the many federal, state and local officials who might also have been familiar with Mr. McKay's activities on information-sharing, such as any of the eighteen U.S. Attorneys whom Mr. McKay recruited to sign a letter lobbying Mr. McNulty on the issue.[15]

---

[14] As Associate Deputy Attorney General David Margolis, the Department's highest ranking career official, explained regarding U.S. Attorney McKay's insubordination:

> [I]f he didn't have a -- if he didn't have an adequate explanation to me, if I'm making the calls, then I don't -- I am not certain I would give him a second chance. This isn't, you know, <u>Douglas</u> factors for a career government employee. That kind of insubordination, if true, might be a capital offense to me. It might very well be a capital offense.

Pl.'s Ex. 1 at 117–18.

[15] Letter from John McKay et al., U.S. Attorney for the W. Dist. of Wash., to Paul J. McNulty, Deputy Attorney General (Aug. 30, 2006), <u>available at</u> http://judiciary.house.gov/media/pdfs/DOJDocsPt1-2070319.pdf.

3.   The Investigations by the Inspector General and the Office of Professional
     <u>Responsibility and the Senate Ethics Committee</u>

In addition to the above, the Plaintiff also could have taken the step of deferring subpoena and contempt practice against Ms. Miers and Mr. Bolten until it had received the results of investigations by the Department's OIG and OPR and the Senate Ethics Committee.

The joint OIG/OPR investigation began near the outset of this controversy, in March 2007, when former Attorney General Gonzales referred the matter to these bodies.[16]  According to press accounts, OIG and OPR have conducted a "sprawling inquiry," interviewing, at a minimum, "all nine [U.S.] attorneys," the chairman of the New Mexico Republican Party, and "scores of staffers as well as other attorneys who were targeted for firings and some who left their posts before being replaced[.]"[17]  Indeed, while the Plaintiff's investigation into the U.S. Attorney dismissals has lain dormant since July 2007, OIG's and OPR's investigation has pressed forward.  Based on media reports, OIG and OPR can be expected to issue their report sometime in the near future.[18]

The Committee minority has on multiple occasions supported OIG's and OPR's efforts, trusting that, in a non-partisan manner, OIG and OPR will carry out the duties entrusted to them by Congress and the Department in their enabling legal authorities.  <u>See</u>, <u>e.g.</u>, Pl.'s Ex. 1 at 139. Others, including former U.S. Attorney Iglesias, also have recognized the importance of the OIG/OPR investigation.[19]  Amici fully expect that, whatever the outcome of the investigation

---

[16] <u>See</u>, <u>e.g.</u>, Statement of Alberto R. Gonzales, Attorney General, before the Committee on the Judiciary, United States Senate, Concerning Oversight of the Department of Justice at 2 (April 17, 2007); Scott Shane, "Glare of Publicity Finds an Inspector General," N.Y. Times (Mar. 26, 2007).

[17] <u>See</u>, <u>e.g.</u>, Manu Rahu, "Attorneys Probe Deepens," The Hill (Jan. 22, 2008); <u>see also</u> Bill Morlin, "Gonzales Could Be Prosecuted, McKay Says," SpokesmanReview.com (Oct. 20, 2007) (reporting that former U.S. Attorney McKay "was summoned to Washington, D.C. in June [2007] and questioned for eight hours about possible reasons for his firing by investigators with the Office of Inspector General, who will forward their final report to Congress").

[18] <u>See</u>, <u>e.g.</u>, Manu Rahu, "Attorney Probe Deepens," The Hill (Jan. 22, 2008).

[19] <u>Id.</u> ("'I think it could be historic,' said David Iglesias, former U.S. Attorney in New Mexico' . . . 'Arguably it's the most significant investigation OPR and OIG have done in a generation, or maybe ever.'"); <u>see also</u> Editorial, "Investigating Mr. Gonzales:  The Justice Department's Inspector General Should Take the Lead," Wash. Post (Aug. 2, 2007).

may be, the report by OIG and OPR will give all concerned a clearer idea of whether or not there is a critical need for evidence from Ms. Miers and Mr. Bolten in the matter of the U.S. Attorney dismissals.

Similarly, in March 2007 the Senate Ethics Committee began an investigation of contact Senator Pete Domenici made with Mr. Iglesias.  As mentioned above, the Senate committee's investigation recently concluded with a unanimous finding that there was "no substantial evidence" of wrongdoing.[20]

II.   **Evidence In The Record Bearing On Whether The Plaintiff Already Has Information Sufficient To Answer Its Questions About Allegedly Improper Partisanship**

Finally, in addition to availing itself of a myriad of other means of gathering relevant and material information, the Plaintiff could have taken into full account the ample exculpatory evidence that it had gathered.  The Committee minority believed this evidence supported the conclusion that the White House was not involved inappropriately in the U.S. Attorney dismissals, and that there could in fact be no "demonstrated, specific need" for the subpoenaed information from Ms. Miers and Mr. Bolten.

In general, Amici refer the Court to the Minority Views for a fuller discussion of this evidence.  Amici do wish to highlight several of the most salient portions of the record –

---

[20] The independent Office of Special Counsel also opened in 2007 an investigation of the U.S. Attorney dismissals. A January 18, 2008, draft report from OSC staff to the head of the OSC discussing this and other investigations recently appeared in the public domain.  In the draft report, OSC staff stated, inter alia, that:  (1) it "has not found any evidence that anyone in the Executive Branch of government attempted to influence any of the nine US Attorneys to take some action to affect the result of an election;" (2) that Mr. Iglesias himself, in an interview with OSC, had "stated that no one in the Executive Branch of government attempted to interfere with or affect his office's handling of the voter fraud or public corruption cases;" and (3) OSC should "agree to stand down its investigation of the US Attorney Firings until the DOJ" – i.e., OIG and OPR – "concludes its criminal investigation[.]"  Amici Ex. 3 at 4, 6 (Draft Memorandum to Scott Bloch, Special Counsel, from OSC Task Force Advisors and Task Force Members (Jan. 18, 2008)).

particularly in light of allegations in the Complaint that the Plaintiff lacks credible record

explanations concerning White House involvement in the dismissals.[21]

    First, the record reveals a process in which White House involvement was limited and

non-continuous, and in which Department decisions were not made until roughly two years after

the review of U.S. Attorneys began.  See, e.g., Pl.'s Ex. 1 at 110.  The results of the process were

that First Assistant U.S. Attorneys and other career officials replaced the dismissed political

appointees.[22]  See, e.g., id. at 113 n.65.  The Committee minority concluded that these facts did

not demonstrate a process driven by the White House to serve any improper political ends.  See,

e.g., id. at 110 ("Such a course, obviously, was inconsistent with the notion that the White House

was trying to force through replacements of U.S. Attorneys to obtain partisan advantages in cases

or investigations in any district, to exact retribution for any partisan failures, or to promote other

partisan ends.").

    Second, Mr. Sampson, the fulcrum of interactions between the White House and the

Department, testified that the White House never, to his knowledge, sought the resignation of

any of the dismissed U.S. Attorneys in order to seek a partisan advantage in a given case or

investigation or for any other reason unrelated to ordinary performance concerns.  Id. at 122–26.

Mr. Sampson specifically stated that he neither witnessed nor heard of such an attempt by Ms.

---

[21] See, e.g., Complaint at ¶ 5 (alleging that because of an "absence of any credible explanation for the forced
resignations," and "unexplained involvement of Ms. Miers and other White House personnel," the Committee
"determined that it could not complete its Investigation, render conclusions or propose corrective legislation or other
action without access to testimony from, and documents in the possession of, key White House personnel, including
Ms. Miers and Mr. Bolten"); id. at ¶ 96 (alleging that "[t]he Committee, through the exercise of due diligence, has
been unable, during its year-long Investigation, to obtain elsewhere . . . demonstrably critical information that is
available only from Ms. Miers and Mr. Bolten").

    As discussed below, see infra at 22–31, facts pointing against the conclusion of "demonstrated, specific need" are
relevant to the Court's ripeness inquiry.  Amici do not mention or argue these facts to seek a final decision on the
merits of any claim by the Committee that it has demonstrated a specific need for the subpoenaed information, but
rather because they also bear on the Court's jurisdictional inquiry.

[22] In all but one of the other districts involved, the resigning U.S. Attorney similarly was replaced by a career
Department employee.  The only exception was the Eastern District of Arkansas, in which Mr. Griffin replaced Mr.
Cummins.  There is no allegation that an attempt to gain a partisan advantage in a case or investigation may have
been at play in this district.  See Pl.'s Ex. 1 at 113 n.65.

Miers, Mr. Rove, Mr. Kelley, Mr. Oprison, Mr. Jennings, Ms. Taylor, or anyone else at the

White House.  Id.

 Third, the other two Department officials at the center of allegations of impropriety –

former Attorney General Gonzales and former Department White House Liaison Monica

Goodling – testified consistently with Mr. Sampson.  They did so, moreover, notwithstanding

their disunity of interests and the fact that they were testifying against a developing testimonial

and documentary record.  As described above, in response to Ranking Member Smith's direct

questioning, Attorney General Gonzales testified that he did not recall the White House ever

asking him to "seek the resignation of any U.S. attorney in order to retaliate for, interfere with, or

gain a partisan advantage in any case or investigation, whether about public corruption or any

other offense[.]"  Id. at 111.  Ms. Goodling testified similarly – under immunity – that:

> To the best of my recollection, I have never had a conversation with Karl Rove or
> Harriet Miers while I served at the Department of Justice; and I am certain that I
> never spoke to either of them about the hiring or firing of any U.S. attorney.
> Although I did have discussions with certain members of their staffs regarding
> specific aspects of the replacement plan, I never recommended to them that a
> specific U.S. attorney be added to or removed from Mr. Sampson's list; and I do
> not recall that they ever communicated any such recommendation to me.[23]

Ms. Goodling likewise stated that she was "not aware of anybody within the Department ever

suggesting the replacement of these U.S. attorneys to interfere with a particular case or in

retaliation for prosecuting or refusing to prosecute any particular case for political advantage."[24]

 There are many other portions of the record that further elucidate the same point.  See

generally Pl.'s Ex. 1 at 109–131.  However, one final exchange during the House floor debate is

particularly illuminating.  During consideration of the resolution (in the form of a special order

of the House) that automatically enacted the criminal and civil contempt resolutions,

---

[23] Oversight Hearing on the Continuing Investigation Into the U.S. Attorneys Controversy and Related Matters
(Part 1): Hearing Before the House Comm. On the Judiciary, 110th Cong. at 8 (2007), available at
http://judiciary.house.gov/media/pdfs/printers/110th/35603.pdf.
[24] Id. at 9.

Subcommittee Ranking Member Cannon specifically asked what evidence or discrepancies in witness testimony the Committee had to justify the dramatic step of a contempt and executive privilege showdown with the White House in the courts.  154 Cong. Rec. H 948, 954 (2008).  Mr. Cannon set before the House his view that there was no evidence and there were no testimonial discrepancies supporting this step.  In a moment of candor, the Committee Chairman agreed.  Id.  He did not refute Mr. Cannon's view of the evidence.  On the contrary, he admitted that "we don't have any evidence. We aren't accusing them of anything, sir.  We're merely seeking the documents that could be relevant to the determination of whether the Department of Justice has been politicized."  Id.

## ARGUMENT

I.    Standard Of Review

Federal courts are courts of limited jurisdiction, and have authority only to hear cases entrusted to them by grants of power in the Constitution or acts of Congress.  See, e.g., Srour v. Barnes, 670 F. Supp. 18, 20 (D.D.C. 1987) (citing City of Kenosha v. Bruno, 412 U.S. 507, 511 (1973)).  When a complaint falls outside such a grant of power, Rule 12(b)(1) of the Federal Rules of Civil Procedure ("F.R.C.P") provides that it may be dismissed for lack of subject-matter jurisdiction.  Moreover, "[a] court may appropriately dispose of a case under [F.R.C.P.] 12(b)(1) for lack of justiciability[.]"  Am. Historical Ass'n v. Nat'l Archives & Records Admin., 516 F. Supp. 2d 90, 101 (D.D.C. 2007).  In considering whether to dismiss a complaint for lack of subject-matter jurisdiction, the Court generally should accept as true the factual allegations in the complaint; the Court, may, however, look beyond the pleadings to inquire into facts pertaining to its jurisdiction.  See Land v. Dollar, 330 U.S. 731, 735 n.4 (1947).  The plaintiff bears the burden of establishing jurisdiction.  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

Under F.R.C.P. 56, summary judgment is appropriate when the pleadings and the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  F.R.C.P. 56(c); Briggs v. Wash. Metro. Area Transit Auth., 481 F.3d 839, 843 (D.C. Cir. 2007).  In ruling on a motion for summary judgment, such as the Plaintiff's partial motion for summary judgment, "the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true."  Citizens for Responsibility & Ethics v. Dep't of Justice, 535 F. Supp. 2d 157 (D.D.C. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

II.     The Court Should Dismiss The Complaint For Lack Of Ripeness.

Given the gravity of the constitutional and institutional questions on which the parties ask it to rule, the Court should look carefully for dispositive grounds that would avoid the need to answer those questions.  Cf. Liverpool, New York & Philadelphia S. S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39 (1885) ("[We are bound] never to anticipate a question of constitutional law in advance of the necessity of deciding it."); United States v. House of Representatives, 556 F. Supp. 150, 152 (D.D.C. 1983) ("Courts have a duty to avoid unnecessarily deciding constitutional issues.").  Foremost among those grounds is ripeness.

The Plaintiff has failed to exhaust numerous non-judicial means of obtaining relevant and material information, including voluntary information from Ms. Miers and Mr. Bolten.  Any and all of that information could shape a determination of whether there is a "demonstrated, specific need" to force additional information from Ms. Miers and Mr. Bolten by judicial order.  Indeed, it could prove beyond further dispute that no such need exists.  As a result, even in the light most

- 20 -

favorable to the Plaintiff, it would, at best, be speculation for the Court to determine now that there is or ever will be a demonstrated, specific need to set aside the White House's assertions of executive privilege and order Ms. Miers and Mr. Bolten to comply with the subpoenas served upon them. Moreover, unless and until the Plaintiff can prove such a demonstrated, specific need for Ms. Miers and Mr. Bolten's information, there will be no need for the Court to reach the question of whether Executive officials such as Ms. Miers and Mr. Bolten are absolutely immune from compelled congressional testimony. For both of these reasons, the Plaintiff's suit is unripe and should be dismissed.

      A.     <u>Standards for Determining Ripeness</u>

The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." <u>Nat'l Park Hospitality Ass'n v. Dep't of Interior</u>, 538 U.S. 803, 808 (2003). Ripeness, like other justiciability doctrines, serves "[t]he central perception . . . that courts should not render decisions absent a genuine need to resolve a real dispute." 13A C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> § 3532.1 (2008).

The Supreme Court has distilled the Article III ripeness inquiry into a three factor test: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." <u>Ohio Forestry Ass'n, Inc. v. Sierra Club</u>, 523 U.S. 726, 733 (1998). Prudential ripeness considerations also require this court "to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." <u>Nat'l Park Hospitality Ass'n</u>, 538 U.S. at 808.

B. **Because Non-Judicial Means Have Not Been Exhausted by the Plaintiff, It Is at Best Speculative for the Court To Assess Whether There Is a "Demonstrated, <u>Specific Need</u>" for Evidence from Ms. Miers and Mr. Bolten.**

As the Plaintiff alleges, to overcome the President's assertion of executive privilege, the Plaintiff must establish that it has a "demonstrated, specific need" for the information subpoenaed. Complaint ¶ 96; <u>United States v. Nixon</u>, 418 U.S. 706, 708 (1974); <u>In re Sealed Case</u>, 121 F.3d at 753–55; <u>Senate Select Committee on Presidential Campaign Activities v. Nixon</u>, 498 F.2d 725, 731 (D.C. Cir. 1974) (<u>Senate Select Comm. II</u>) (holding that the information must be "demonstrably critical to the responsible fulfillment of the Committee's functions" to overcome executive privilege). It is not enough that the Plaintiff desires information from the White House. Nor is it enough that one day in the future the Plaintiff may have a demonstrated, specific need for that information. The law requires that the Plaintiff <u>must now have</u> a "demonstrated, specific need" to overcome the President's claim to executive privilege. <u>See</u> <u>In re Sealed Case</u>, 121 F.3d at 760 (denying the grand jury's need for the privileged material "at this stage"); <u>Senate Select Comm. II</u>, 498 F.2d at 732 (denying the Committee's need for the privileged material in light of the Committee's "<u>present sense</u> need for the materials subpoenaed") (emphasis added).

As the D.C. Circuit has observed, in applying this standard, "[e]fforts should first be made to determine whether sufficient evidence can be obtained elsewhere, and the subpoena's proponent should be prepared to detail these efforts and explain why evidence covered by the presidential privilege is still needed." <u>In re Sealed Case</u>, 121 F.3d at 755. "To overcome the presidential privilege, it is necessary to demonstrate with specificity why it is likely that the subpoenaed materials contain important evidence and why this evidence, or equivalent evidence, is not practically available from another source." <u>Id.</u>; <u>accord</u> <u>Nixon v. Sirica</u>, 487 F.2d 700, 717 (D.C. Cir. 1973) (holding that the President's claim of privilege was overcome only "in face of

the <u>uniquely powerful showing</u> made by the Special Prosecutor . . . that the subpoenaed tapes contain evidence <u>peculiarly necessary</u> to the carrying out of [the grand jury's] vital function – evidence <u>for which no effective substitute is available</u>") (emphasis added).

      For reasons discussed above and in the Minority Views section of H. Rep. 110–423 (Pl.'s Ex. 1), Amici believe that the Plaintiff has not shown a "demonstrated, specific need" for information from Ms. Miers and Mr. Bolten.  As previously described, the record contains unambiguous testimony from the key Department witnesses, Mr. Sampson, former Attorney General Gonzales and Monica Goodling, that the White House did not seek U.S. Attorney dismissals for partisan ends in cases or investigations.  <u>See</u> Pl.'s Ex. 1 at 113–14.  The record also demonstrates that the dismissed U.S. Attorneys were not replaced by traditional political appointees, but by career First Assistant U.S. Attorneys or other career Department officials.  <u>Id.</u> at 113 n.65.  Replacement of the dismissed U.S. Attorneys with career officials refutes the speculation that the Administration dismissed U.S. Attorneys to achieve partisan influence.

      Further, the record now contains the unanimous finding of the Senate Ethics Committee that there is "no substantial evidence" of wrongdoing in Sen. Domenici's contact with Mr. Iglesias.  Amici Ex. 2 at 1.  The committee's finding directly refutes what is perhaps the most controversial speculation that any U.S. Attorney was dismissed to achieve improper partisan ends or retaliate against a U.S. Attorney for partisan purposes.

      The more important question at this stage, however, is whether the Complaint should be dismissed as unripe, because the Plaintiff's failure to exhaust so many alternative means of obtaining relevant and material information renders speculative any determination by the Court that there is a demonstrated, specific need for the testimony and documents subpoenaed from Ms. Miers and Mr. Bolten.

Amici submit that the answer to this question is in the affirmative; the matter is indeed

unripe at this time.  It may be that the Plaintiff could attempt to meet its burden after exhausting

the alternative means of gathering information.  At present, however, the Plaintiff has no more

than a desire for information that cannot substitute for the required demonstrated, specific need.

It is at best speculation to determine whether Ms. Miers and Mr. Bolten's information is likely to

contain "important evidence," much less evidence that is unavailable in at least an "equivalent"

form from other sources.  In re Sealed Case, 121 F.3d at 755.

       1.    Failure to exhaust means of gathering information from other witnesses

As discussed above, the Plaintiff has failed to pursue interviews of numerous other

witnesses who may have evidence that could tend either to prove or disprove any need for

evidence from Ms. Miers and Mr. Bolten.  In the case of Mr. Iglesias, for example, the Plaintiff

has neglected to interview Mr. Iglesias himself (a step that proved helpful in the Senate Ethics

Committee's investigation, see Amici Ex. 2 at 2, and which OIG and OPR reportedly have

completed); the New Mexico citizens who allegedly sought Mr. Iglesias' dismissal; the

Department officials to whom those citizens were referred by Mr. Friedrich; Monica Goodling,

who also allegedly had contact with the New Mexico citizens; former Attorney General

Gonzales; and several less senior White House officials, some of whose Senate testimony

indicated that they could and would answer at least some congressional questions.  Moreover, the

Plaintiff never completed its interview with Michael Elston, and thus never was able to call

former Deputy Attorney General Paul McNulty for a follow-up interview based on any

additional information that may have come to light.  Since Mr. McNulty was specifically

involved in the Iglesias matter, this was likely an important, but untaken, step before elevating

this matter to a constitutional confrontation between Congress and the President.  And, as also

described above, the Plaintiff has similarly failed to follow investigative leads with regard to the

dismissal of Mr. McKay, the only other U.S. Attorney on whom the Complaint focuses with any specificity.

2.    <u>Failure to exhaust negotiating options with the White House</u>

Perhaps even more important, the Plaintiff has failed to exhaust all steps it could have taken to obtain a voluntary opportunity to interview Ms. Miers herself and to obtain documents from her and Mr. Bolten.  Had the Plaintiff accepted the White House's offer of that opportunity, it could have had the information sought without involving the courts.

The Plaintiff contends that the initial White House offer was unacceptable, and that attempts to negotiate never yielded an acceptable compromise.  Complaint ¶¶ 33–40.  But these contentions are unpersuasive when another congressional committee has accepted a similar opportunity and has been able to conclude its investigation successfully with bipartisan cooperation.

As discussed above, the Plaintiff does not allege that it offered to accept all of the White House's conditions, except the request that the Committee renounce further process with the White House once informal discovery had concluded.  <u>Id.</u>  Perhaps such a counter-offer would have – and still could – resolve the purported impasse.  Such a path would have been similar to the one successfully negotiated by the Committee on Oversight and Government Reform in the Patrick Tillman investigation.  <u>See</u> <u>generally</u> Amici Ex. 1.  In that matter, Chairman Waxman and Ranking Member Tom Davis overcame White House resistance to discovery through negotiation.  With regard to senior White House officials with possible information about the Tillman investigation, OGR agreed to interviews without a transcript and with the presence of counsel from the White House, but without prejudice to OGR's right to seek a transcribed interview with these senior officials or their testimony under oath at a hearing in the future.  <u>Id.</u> at 1–2.

- 25 -

After OGR staff conducted the informal round of interviews, the matter was resolved, and a second round was never called. Accordingly, the courts never had to be involved. Were the Committee to make a similar counter-offer with regard to Ms. Miers in this investigation, perhaps this matter might also be concluded.

Moreover, with regard to the documents covered by the Bolten subpoena, the White House offered to provide the Plaintiff with correspondence between the White House and the Department and between the White House and third parties such as members of Congress and their staffs. Complaint ¶ 34. Acceptance of this part of the offer might have resolved the Bolten subpoena question as well.

The implication for the instant suit, in short, is clear. If the Plaintiff had chosen to exercise all of the available options in this matter, it might already have acquired all of the facts it might want from Ms. Miers and Mr. Bolten and avoided this suit. Since the Plaintiff still has the power to pursue these other options, the matter should be deemed unripe for judicial resolution. Cf. In re Sealed Case, 121 F.3d at 756 ("[T]o overcome the presidential privilege it is necessary to demonstrate with specificity why it is likely that the subpoenaed materials contain important evidence and why this evidence, or equivalent evidence, is not practically available from another source.").

3. The possibility of awaiting the results of investigations by the Inspector General and the Office of Professional Responsibility and the Senate Ethics Committee

Another step the Plaintiff could have taken was to await the joint OIG/OPR report before resorting to contempt proceedings against Ms. Miers and Mr. Bolten. As noted above, the OIG/OPR report is expected to be based on interviews with a far greater group of witnesses. One might expect that such a broader base of information might provide a fuller factual setting in which the Committee and the Court might evaluate whether there is a critical need for the

information sought in this matter.  Indeed, because the Office of Inspector General was created

by congressional statute as an independent investigative body within the Department, Congress

has specifically provided it with the authority and the obligation to determine whether

wrongdoing or mismanagement occurred at the Department in a given instance and to report to

Congress on the matter, so that Congress can determine what legislative steps, if any, are needed

in response.  5 U.S.C. app. § 2.

Likewise, the Plaintiff could have awaited the results of the Senate Ethics Committee's

investigation.  That committee's recent conclusion of its investigation might have shown the

wisdom of such a patient approach.  The committee found "no substantial evidence" of

wrongdoing in Sen. Domenici's contact with Mr. Iglesias.  It did so, moreover, after:

> depos[ing], obtain[ing] sworn affidavits from or interview[ing] numerous
> witnesses, including [Sen. Domenici], Mr. Iglesias, members of [Sen.
> Domenici's] staff, current and former executive branch officials and attorneys,
> and other private individuals.  The Committee reviewed extensive documents and
> records, obtained through subpoena, by voluntary production, or available in the
> public record.  The Committee also considered several submissions made by [Sen.
> Domenici] through, or made on [his] behalf by, [his] counsel.

Amici Ex. 2 at 2.  In short, after thoroughly investigating one of the most controversial issues in

the matter regarding the Iglesias dismissal, the Senate committee found no substantial evidence

of wrongdoing.

It remains within the Committee's power to await the results of the OIG/OPR

investigation before proceeding further in this matter.  From the Amici's perspective, the Senate

Ethics Committee's investigation demonstrates that, until the results of this other investigation

are reported, the Court should find the Committee's executive privilege suit unripe.[25]  See Ohio

Forestry Ass'n, 523 U.S. at 733 (holding that the ripeness inquiry requires consideration of

"whether the courts would benefit from further factual development of the issues presented").

---

[25] The results of the Office of Special Counsel's investigation thus far furnish a similar lesson.  See supra note 20, at
16.  Indeed, OSC's staff investigators have recommended precisely this approach to the Special Counsel.  Id.

If a dismissal requires the Plaintiff to await the results of the OIG/OPR investigation, the Plaintiff will no doubt complain that its time to respond legislatively will be pressed.  See Pl.'s Memo. Outlining Proposed Briefing Schedule at 1–2 (March 19, 2008).  But concerns about the potential shortness of time are concerns created by the actions of the Plaintiff and the House majority, and the Plaintiff should not be able to use those actions to force the Court's intervention over the requirements of ripeness.  The Plaintiff allowed more than three months to pass after its contempt vote before it even transmitted its report to the floor of the House.  The House majority then waited nearly seven months in total before allowing the matter to be considered on the House floor.  In the intervening time, the relevant Department officials have all resigned.  There plainly is no need for a constitutional confrontation with the White House over the information sought from Ms. Miers and Mr. Bolten before OIG and OPR issue their report, and the Court would likely benefit from the more robust factual setting that the report will likely provide.  Accordingly, for this additional reason, the Plaintiff's suit should be dismissed as unripe.

> 4.    The Committee Chairman's Concessions During Floor Debate Show That The Matter is Unripe.

Finally, in addition to the above grounds, concessions made by the Committee Chairman during floor debate make clear that the Plaintiff's complaint is unripe.  The Committee Chairman has agreed that there is no evidence and there are no testimonial discrepancies supporting this suit.  In his own words, "we don't have any evidence.  We aren't accusing them of anything . . . . We're merely seeking the documents that could be relevant to the determination of whether the Department of Justice has been politicized."  154 Cong. Rec. at H 954.  What more is needed to see the speculative nature of the Plaintiff's interest and the lack of clarity as to whether there is a demonstrated, specific need for the evidence sought?  The Chairman has plainly revealed this

suit to be a fishing expedition – and a fishing expedition is virtually the definition of an unripe

case.

> C.    Unless and Until the Plaintiff Can Present a "Demonstrated, Specific Need," the
>        Plaintiff's Challenge to the Executive's Absolute Immunity Theory Should Not
>        Be Considered Ripe.

The above arguments apply to each count of the Plaintiff's complaint.  They thus support

the dismissal of the Complaint in its entirety.  Amici also submit, however, that there is an

additional basis for denying as unripe the specific challenge to executive privilege underlying the

Plaintiff's partial motion for summary judgment.  That is the challenge to the assertion that the

President's senior-most officials, including Ms. Miers and Mr. Bolten, are absolutely immune

from compelled congressional testimony.  Pl.'s Memo in Support at 26–36.

As discussed above, in executive privilege cases, the party seeking information generally

may overcome the assertion of privilege if that party demonstrates a critical need for the

information.  When absolute immunity is the question at issue, however, even a demonstrated

critical need will not be sufficient to overcome the privilege, if the assertion of absolute

immunity is valid.  As a prudential matter, therefore, because the absolute immunity theory can

be pivotal only in cases in which there is a demonstrated, specific need for disputed information,

any challenge to the theory in the absence of a demonstrated, specific need should be considered

unripe.  House of Representatives, 556 F. Supp. at 152 ("Since th[is] controversy . . . clearly

raises difficult constitutional questions in the context of an intragovernmental dispute, the Court

should not address these issues until circumstances indicate that judicial intervention is

necessary.").

For the reasons already addressed, this is plainly such a case.  The Committee

Chairman's concessions during House debate and an abundant number of other factors make that

apparent.  Moreover, the Committee's partial summary judgment brief is clear that it is Ms.

Miers' and Mr. Bolten's information and not their mere appearance that is the Committee's final goal. Thus, while it is true that a decision by this Court that rejects the absolute immunity theory may facilitate an appearance, such a decision will not guarantee the provision of information that is subject to executive privilege. The Court accordingly should determine as a prudential matter that the Committee's challenge to the assertion of the absolute immunity theory is unripe.

D.    The Potential for Other Jurisdictional Issues To Sway the Balance of Power Between the Branches Places a Premium on Assuring Ripeness before Consideration of Any Other Question.

The importance of assuring ripeness is heightened, moreover, by the nature of other jurisdictional issues that may bear on this case. Amici fully expect the parties to this litigation to brief questions pertaining to each of the bases for jurisdiction alleged in paragraphs 17 and 18 of the Complaint, and perhaps others. These issues could include, for example: whether jurisdiction exists under 28 U.S.C. § 1331, if the Committee has no separate statutory authorization to pursue civil enforcement of its subpoenas; whether jurisdiction fails under 28 U.S.C. § 1354, because the Plaintiff's suit "has not been expressly authorized . . . by Act of Congress"; whether the Plaintiff lacks standing to sue because it lacks a statute authorizing civil contempt actions; whether the Plaintiff lacks standing to sue because no legislative vote of the House has been nullified; and whether the Plaintiff has alleged a waiver of sovereign immunity sufficient to allow suit against Mr. Bolten, who is sued in his official capacity.[26]

Amici expect the parties to address issues such as these, and their mention of them should not be taken as a sign that they are inclined to embrace any particular party's position on them. Amici highlight these issues here, however, because of the temptations they raise to create new,

---

[26] Indeed, the Committee sues Mr. Bolten not just in his official capacity, see Complaint at 1, but while claiming itself that it is suing as the "United States." See Pl.'s Memo in Support of Partial Summary Judgment at 16. This raises, at a minimum, the additional question of whether the United States can be seen as authorized to sue itself and its own officers. Moreover, it is not just jurisdictional issues that tempt the creation of new law. A preponderance of the merits theories pursued by the Committee may also call for the judiciary to blaze new trails – and upset the current balance – in defining the relationship between the political branches. These theories present, just for example, the questions mentioned at the very outset of this brief and noted infra at 34–35.

judge-made law that could sway the balance of power between the political branches. This risk places all the more emphasis on the Court requiring, before anything else, that this case be ripe. To dispose of the case on ripeness grounds, the Court need not make new law, but simply find that it "would benefit from further factual development of the issues presented," Ohio Forestry Ass'n, 523 U.S. at 733, or, alternatively, that the issues are not yet fit for judicial decision, and that the parties would not suffer hardship if the Court withheld consideration. Nat'l Park Hospitality Ass'n, 538 U.S. at 808. The Court need look no further than the Senate Ethics Committee's decision to see the wisdom that may come from further factual development.

III.   The Court Should Refrain From Exercising Jurisdiction To Grant Relief.

Even if the matter were ripe, moreover, there would be no sufficient basis for the Court to grant the declaratory and injunctive relief the Plaintiff requests.

A.   The Court's Authority To Grant Relief under the Declaratory Judgment Act Is Discretionary.

"[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." Wilton v. Seven Falls Co., 515 U.S. 277, 283 (1995). "Qualifying litigants are not entitled to seek relief under the Act; rather, the district court is to determine in its discretion whether the litigant's claim is appropriate for a declaratory judgment." Mittleman v. United States Dep't of the Treasury, 919 F. Supp. 461, 470 (D.D.C. 1995).

Put simply, then, "[t]he fact that a court can enter a declaratory judgment does not mean that it should." Hewitt v. Helms, 482 U.S. 755, 762 (1987). Factors bearing on whether to grant declaratory relief include:

> whether [declaratory relief] would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of "procedural fencing"; the state of the record; the degree of

adverseness between the parties; and the public importance of the question to be decided.

Jackson v. Culinary Sch. of Washington, Ltd., 27 F.3d 573, 580 (D.C. Cir. 1994) (alteration in original) (quoting Hanes Corp. v. Millard, 531 F.2d 585, 591 n.4 (D.C. Cir. 1976)).  The Court's discretion "is to be 'exercised in the public interest' and in such a way as 'to strike a proper balance between the needs of the plaintiff and the consequences of giving the desired relief.'"  Hanes Corp., 531 F.2d at 591–92 (quoting Eccles v. Peoples Bank, 333 U.S. 426, 431 (1948)).

> B.   The Court Should Refrain from Exercising any Authority To Grant Relief, Because the Plaintiff Has Not Sufficiently Exhausted Non-Judicial Means of Obtaining the Information Sought.

Under these standards, even if the Court has jurisdiction to hear the Plaintiff's case, it should not grant the declaratory relief the Plaintiff requests.[27]

> 1.   The Plaintiff's Speculative Quest Does Not Merit the Requested Relief.

First, even if the Plaintiff's failure to pursue other investigative steps do not render the matter unripe, they do support the conclusion that, at this time, the Committee has no need for the disputed information sufficient to support declaratory relief.  As the Court ruled in Mittleman, even a qualified applicant is not as of right entitled to a declaratory judgment.  And the Plaintiff, far from being a qualified applicant with a demonstrated, specific need, is in the posture of simply wanting the information.  The Committee Chairman made that clear on the House floor.  154 Cong. Rec. at H 954.  Because the Plaintiff has not sufficiently exhausted non-judicial Means of obtaining the information sought, there is no adequate basis for a declaratory judgment.  See Jackson, 27 F.3d at 580 (noting factors to be considered in granting declaratory relief).

---

[27] Of course, if the Court declines to grant the requested declaratory relief, it should also decline the requested injunctive relief; the latter depends on a prior grant of declaratory relief.

2.      The Potential Harms of Granting the Requested Relief far Outweigh the
        <u>Potential Benefits.</u>

The potential harms in this case to Congress' oversight prerogatives, moreover, make still
clearer that the Court should not grant the requested relief.

First and foremost, the Plaintiff's complaint and its partial summary judgment motion
tempt a ruling from this Court that Executive officials on the order of Ms. Miers and Mr. Bolten
<u>are</u> absolutely immune from compelled congressional testimony.  The nation has persisted for
more than two hundred years without such a ruling.  And past executives, while holding to the
assertion of immunity from compelled testimony, have nevertheless been willing to offer those
same officials voluntarily without waiving that assertion.  <u>See</u> Pl.'s Ex. 1 at 143–44.  That was
the case in the Clinton Administration.  <u>See id.</u> at 144.  It has also been the case in the Bush
Administration, as the White House's offer of voluntary interviews in this matter attests, and as
the experience of the Committee on Oversight and Government Reform in its Tillman
investigation shows.

Surely, the possibility that a court, in a case of true congressional need, might rule that
such officials cannot resist compelled congressional testimony has factored into the Executive's
past agreements to provide voluntary testimony.  The Congress and the Executive have labored
long and well in that state of equipoise and this case presents no need to disturb it.  Amici
submit, moreover, that if the Court were to disturb it, Congress's institutional interests could
suffer, as could the public's interest in productive congressional oversight and in the balance of
power between the political branches.

Second, this is far from the only adverse result the Plaintiff risks.  In just its opening brief
in support of its motion for partial summary judgment, the Plaintiff places in issue, at a
minimum, the following:

- 33 -

- "the scope of Congress' constitutional power to subpoena witnesses";

- "Congress's ability to compel [witnesses'] appearance";

- Congress's ability to compel "the production of documents";

- "whether the Constitution authorizes the President to grant immunity from congressional process to private citizens;"

- whether jurisdiction lies under 28 U.S.C. § 1331 for a suit such as this;

- whether jurisdiction lies under 28 U.S.C. § 1345 for a suit such as this;

- whether, in a case like the instant one, a plaintiff congressional committee qualifies as the "United States" for the purposes of 28 U.S.C. § 1345, contrary to the Court's prior decision in Senate Select Committee on Presidential Campaign Activities v. Nixon, 366 F. Supp 51, 56 (D.D.C. 1973) (Senate Select Committee I);

- whether 2 U.S.C. § 130f separately authorizes the General Counsel of the House of Representatives to sue as the "United States";

- whether the fact that a suit presents the question of the enforceability of a congressional subpoena to an Executive Branch official renders such a suit justiciable;

- whether the Congress "has the clearly available alternative of civil enforcement proceedings" whenever an Executive branch official asserts executive privilege;

- whether the fact that "the President himself," in cases not involving his official duties, "is subject to judicial process from a grand jury and in a civil suit" means that "his former aide cannot elude her [alleged] responsibility to comply with a congressional subpoena";

- whether a distinction should be drawn between senior and junior presidential aides;

- whether the absolute immunity theory of executive privilege can apply, if otherwise valid, to a former top advisor to the President;

- whether the President has authority to direct his former top advisor to withhold from Congress information concerning her official White House duties, and thus not comply with a congressional subpoena;

- 34 -

- whether the President has authority to direct his former top advisor not to appear before a congressional committee in response to a congressional subpoena concerning her performance of her official duties;

- whether the President, if he "wishes to prevent congressional or judicial testimony," must always "seek a judicial ruling to enjoin compliance with the subpoena";

- whether a former counsel to the President is under a "heightened obligation" to comply with a congressional subpoena, regardless of the President's position concerning whether the former counsel should comply;

- whether a former counsel to the President can point to any other source of authority permitting her not to comply with a congressional subpoena concerning her performance of her official duties;

- whether the President can never assert immunity from congressional subpoena process for himself or some of his aides, even though Congress may in many cases have political means of compelling the testimony it desires; and

- whether the President may be required, in asserting executive privilege in the course of congressional proceedings, to provide the Congress with a privilege log.[28]

This list does not include whatever new issues Defendants may raise, of course. It also does not include issues raised by the Plaintiff's alleged legislative purposes, such as whether the Congress has any authority to legislate constraints on the President's power to nominate or dismiss U.S. Attorneys and similar political appointees who serve at his pleasure. See Complaint ¶ 27 (discussing possible legislation).

Finally, there can be no serious question that the Congress's interest (and in turn the public's interest) in protecting against potentially damaging long-term ramifications of rulings adverse to the institution of the Congress on the issues placed in jeopardy by this case far outweigh the Plaintiff's desire for the information subpoenaed. The institutional interests Amici seek to protect are all the more pronounced when one considers that the House majority was

---

[28] See Pl.'s Memo in Support of Partial Summary Judgment at 15-17, 21-22, 26-30, 35-36.

willing to let it lay dormant for nearly seven months before even brining the matter to a vote on the floor of the House.

      3.      <u>The Requested Relief Might Well Fail to Settle the Controversy.</u>

In addition, it is unclear whether the requested relief will "finally settle the controversy between the parties[.]" <u>Jackson</u>, 27 F.3d at 580. To the contrary, with so many other investigative steps uncompleted, it is possible that this controversy will remain unsettled regardless of how the Court rules. For example, even if the Court rules in favor of absolute immunity, the Plaintiff will still have many other avenues through which to investigate the dismissals, avenues that are also available to the Plaintiff at present. Presumably the Plaintiff would then pursue them – unless, of course, this suit is merely a partisan endeavor, in which case the Court should be all the more careful in determining whether to grant the requested relief.[29]

If, on the other hand, the Court rejects the absolute immunity theory, and the Plaintiff is able to elicit whatever relevant information Ms. Miers and Mr. Bolten have, it is not clear whether that will finally resolve the controversy. The Executive presumably will continue to fight for the other theories on which it has asserted executive privilege, and the Plaintiff may still have many other investigative leads to pursue. Indeed, the Plaintiff's motion seeks only partial

---

[29] Numerous aspects of this matter suggest the undue hand of partisanship on the part of the congressional majority. For example, the initial rush toward an executive privilege showdown with the White House, followed by the long period of dormancy in the face of a number of other leads, suggests a process aimed primarily at partisan confrontation. The same can be said of the Committee's disregard of exculpatory evidence and the unprecedented manner in which H. Res. 980 was brought to the floor for a vote. <u>See also supra</u> notes 11 & 12 and accompanying text, at 9. Indeed, the Court need only examine the Committee's failure to accept the White House's offer of voluntary interviews and document production at the outset, and the Committee's failure to pursue numerous other witnesses before rushing to subpoenas against the White House, to observe a greater Committee interest in creating a political showdown with the Bush Administration than with investigating the facts of this matter.

   Amici do not raise these points to carry a partisan skirmish into the courts. Rather, they raise them so that the Court may be aware of the potential for this case to enmesh it in a partisan controversy. They also raise them because of the extraordinary nature of the case. In this litigation, the Committee goes out of its way to ask the Court to make new law that would alter the balance of power between the political branches. A decision by the courts may expose the Judicial Branch to a host of future litigation, as the political branches fight to fill in the gaps in whatever new landscape the courts may open. Concern for the dignity of the Court, the institutional prerogatives of the House, the balance of power between the branches, and the public interest all counsel that, in this matter, the better part of discretion would be for the Court to consider with caution whether it should issue the requested relief in a matter that is infused with partisanship rather than a genuine need for the information sought.

summary judgment on the absolute immunity theory, the privilege log question, and non-privileged documents. As such, it guarantees that a ruling at this point will not finally settle the matter.

Amici will grant that, if information from Ms. Miers and Mr. Bolten instructs that there was no improper White House involvement, and if the Plaintiff then stands down, the matter may be over. Amici submit, however, that such a result would nonetheless have a negative impact on the institutional prerogatives of the House. In the end, Congress would have obtained information showing that the litigation was avoidable, while provoking an unnecessary shift in the balance of power between the political branches. The Court should not rush to allow that possibility, particularly when there ample evidence showing that the Plaintiff has failed to demonstrate a need for the information sought.

Finally, the Plaintiff's hesitancy to date to credit direct testimony supporting the White House's lack of involvement, including the testimony of central witnesses that bear a strong indicia of credibility and the Committee Chairman concedes contain no discrepancies, suggests that the Plaintiff will continue with this matter, even if information from Ms. Miers and Mr. Bolten, reasonably considered, should preclude any conclusion of improper White House involvement in the U.S. Attorney dismissals. For this reason it is unlikely that the requested relief will settle this matter.

Indeed, this feature of the case particularly counsels judicial caution. From the outset of the investigation, the Department has been remarkably cooperative, offering a string of the senior-most Department officials to testify in interviews, along with many thousands of pages of documents.[30] The witnesses and documents offered a wealth of information substantiating the

---

[30] The Department's forthcoming approach has been consistent with advice given to it by the White House. Specifically, as discussed in the Minority Views, the record evidence is that, at a White House meeting with the Department the night before the March 6, 2007 hearing, Mr. Rove joined in advice to the Department that it simply

Department's grounds for the dismissals and discrediting the suggestion that the White House had been improperly involved. All of the witnesses, moreover, gave interviews under pain of criminal sanction pursuant to 18 U.S.C. § 1001, and all testified against an evolving and eventually voluminous testimonial and documentary record. Finally, all testified under the Department's agreement that no witness would be allowed to see another witness's interview transcript as he or she prepared for his or her interview.[31] These were strong safeguards of the credibility of the information offered.

Yet after receiving all of this, the Plaintiff could not identify during floor debate any discrepancies in witness testimony undercutting the extensive evidence from the Department demonstrating the performance-based reasons for the U.S. Attorney dismissals. Included by necessity in this testimony was the specific testimony by Mr. Sampson, former Attorney General Gonzales, and Ms. Goodling to an absence of improper partisan activity by the White House, see supra at 12–13. Nonetheless, the Plaintiff now alleges in the Complaint – notwithstanding the Committee Chairman's unequivocal statement during debate – that there is no credible evidence supporting the Department's account and no explanation of the White House's role. To quote:

> Because of the <u>absence of any credible explanation</u> for the forced resignations, and because of the <u>unexplained involvement of Ms. Miers and other White House personnel</u> in the decisions to seek these resignations, the Committee determined that it could not complete its Investigation, render conclusions or propose corrective legislation or other action without access to testimony from, and documents in the possession of, key White House personnel, including Ms. Miers and Mr. Bolten.

---

explain at the hearing what it did and why. See Pl.'s Ex. 1 at 107 n.32. The Committee, rather than recognize this as a sign of Administration candor, strains to label Mr. Rove's advice as evidence of a cover-up.

[31] See Letter from Richard A. Hertling, Acting Assistant Attorney General to the Honorable John Conyers, Jr. and the Honorable Patrick Leahy at 2 (Mar. 29, 2007). Former Attorney General Gonzales stressed that he had hewed strictly to this commitment in preparing for his own congressional testimony. See Statement of Alberto R. Gonzales, Attorney General, before the Committee on the Judiciary, United States Senate, Concerning Oversight of the Department of Justice at 3 (April 17, 2007).

Complaint ¶ 5 (emphasis added).  In Amici's view, what is not credible is the Plaintiff's
insistence that there is neither credible evidence nor an explanation.  That insistence should give
the Court substantial pause over whether the requested relief will settle this matter.

> 4.    The Remaining Considerations Also Suggest that the Relief Requested
> <u>Should Not Be Granted.</u>

As for the other prongs of the tests for declaratory relief, they too point to the conclusion
that the requested relief should not be granted.  The Committee will not be inconvenienced by
waiting, for now, for an opportunity to interview Ms. Miers and receive documents from Ms.
Miers and Mr. Bolten, particularly when other investigatory remedies are available to the
Committee, including the option of obtaining voluntary interviews with White House officials.
Additionally, the OIG/OPR investigation offers an alternative proceeding that may resolve the
Plaintiff's questions.  The equity of the Plaintiff, based on its conduct, is low.  A declaratory
judgment would be very much a part of procedural fencing.  The record is far from sufficiently
developed.  And, of course, what is more important to the public in this case is that the Court not
issue a ruling unnecessarily upsetting the balance of power between its sister branches.  In short,
there is no basis for the Court to exercise its discretion to issue the requested declaratory
judgment.

> C.    The Nature of the Legal Theory in Dispute Calls for the Court to Refrain from
> <u>Granting the Requested Relief on the Basis of the Instant Record.</u>

Finally, the Court should refrain from granting the requested relief because of the precise
nature of the key legal issue underpinning the Plaintiff's partial summary judgment motion;
namely, the question of whether the Executive's senior-most advisors are absolutely immune
from compelled congressional testimony.

As discussed above, Amici submit that the absence of a demonstrated, specific need for
the subpoenaed information renders the Plaintiff's challenge to the absolute immunity theory

unripe.  But even if the Plaintiff's challenge were ripe, there would be more than sufficient

reason to decline to grant the Plaintiff relief.  The Plaintiff is on no more than a fishing

expedition, and the need for the information sought is minimal to non-existent.  The absolute

immunity theory, meanwhile, is a theory that has been asserted for decades by presidents of both

parties.  See Pl.'s Ex. 1 at 103, 142–44.  It touches upon exceptionally delicate constitutional

issues concerning the Congress' prerogatives and the Executive's need to obtain candid and

confidential advice from the counselors upon whom he most depends.  It can be pivotal to the

resolution of a case, moreover, only if the party challenging executive privilege already has

established a demonstrated, specific need for the information sought.  As a prudential matter, the

Court should refrain from making new law on this theory unless and until it is confronted with

such a showing.

     The Plaintiff can make no such showing here, as the Committee chairman's concessions

during House debate and other enumerated factors make clear.  Moreover, this matter bears the

hallmarks of partisan gamesmanship rather than a thorough investigation.  To issue a decision

under these circumstances on the absolute immunity theory would be imprudent.

## CONCLUSION

     To conclude, the Plaintiff could long ago have resolved this matter in a number of ways.

It could have accepted the unequivocal and uncontroverted testimony of Kyle Sampson, Alberto

Gonzales and Monica Goodling about White House involvement.  It could have accepted the

White House's offer of voluntary interviews and document production.  It could have

interviewed the New Mexico citizens and others involved in the Iglesias matter.  It could have

waited for the report of the Inspector General and the Office of Professional Responsibility

before seeking further process against the White House.

The Plaintiff having failed to take any of those alternative steps, the Court should dismiss this case as unripe, or decline prudentially to grant the requested relief.

Respectfully submitted,

/s/  Richard A. Hertling
RICHARD A. HERTLING
  (D.C. Bar No. 416599)
  Counsel of Record
  Republican Deputy Chief of Staff
DANIEL M. FLORES
  (D.C. Bar No. 418586; reactivation pending)
  Republican Chief Counsel, Subcommittee on
  Commercial and Administrative Law
ZACHARY N. SOMERS
  Republican Counsel
Committee on the Judiciary
United States House of Representatives
Washington, D.C. 20515
(202) 225-6906
Email: richard.hertling@mail.house.gov

Of Counsel:

JO-MARIE ST. MARTIN
  (D.C. Bar No. 417264)
  General Counsel to the Republican Leader
MELANIE LOONEY
  Counsel to the Republican Whip
SEAN P. MCLAUGHLIN
  Republican Chief Counsel,
    Committee on the Judiciary
United States House of Representatives
Washington, DC 20515
(202) 225-6906

Dated: May 9, 2008                                    Counsel for Amici Curiae

# EXHIBIT 1

HENRY A. WAXMAN, CALIFORNIA,
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
    DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY   (202) 225–5051
FACSIMILE  (202) 225–4784
MINORITY   (202) 225–5074
TTY        (202) 225–6852

http://oversight.house.gov

TOM DAVIS, VIRGINIA,
RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
———

August 2, 2007

Mr. Fred F. Fielding
Counsel to the President
The White House
Washington, DC 20500

Dear Mr. Fielding:

We are writing to follow up on our July 31, 2007, meeting with you regarding the
Committee's investigation into what the White House knew about Corporal Patrick Tillman's
death by friendly fire. We believe the accommodations that both sides discussed during the
meeting can provide a path forward that, we hope, will avert a conflict between the branches.

There are three areas of dispute. The first is the Committee's request for transcribed
interviews with three former Assistants to the President: Dan Bartlett, former Assistant to the
President for Communications; Scott K. McClellan, former Assistant to the President and Press
Secretary; and Michael Gerson, former Assistant to the President for Speechwriting. At the
meeting, you asked that we consider interviewing these officials without a transcript and with the
presence of counsel from the White House, but without prejudice to the Committee's right to
seek a transcribed interview with these officials or their testimony under oath at a hearing or
deposition.

We believe this is a constructive offer and we are willing to proceed on this basis. In
dealing with an earlier impasse over documents, we proposed a staff review of the documents to
allow the Committee to assess which documents were needed for the investigation and to narrow
the areas of dispute. As both sides have acknowledged, this worked well. The staff review
revealed that many of the documents about which you had concerns were not needed for the
Committee's investigation, and you appropriately agreed to provide the Committee with the
narrowed list of documents that were determined to be needed for the investigation.

The approach you have proposed for informal interviews with Mr. Bartlett, Mr.
McClellan, and Mr. Gerson holds similar promise. These interviews will allow us to assess
whether these individuals have information that is relevant to the Committee's investigation. If
they do not have relevant information, an unnecessary dispute between the branches will be
avoided. If they do have relevant information, we will ask them to return to the Committee for a

Mr. Fred F. Fielding
August 2, 2007
Page 2

transcribed proceeding so that the Committee has an official record of their statements. We hope that at that point you would refrain from asserting any claims of privilege, though we recognize that you are reserving your rights.

The second area of dispute involves the Committee's request for transcribed interviews two other former White House officials: John Currin, former Director of Fact-Checking; and Taylor Gross, former Spokesperson. These officials are not Assistants to the President and have a more junior status. In fact, they are likely to have had less direct contact with the President than other White House officials who have already provided sworn testimony or transcribed interviews to the Committee, such as Sara Taylor, the former Deputy Assistant to the President and Director of the Office of Political Affairs; Ruben Barrales, the former Deputy Assistant to the President; and Alan Swendiman, Special Assistant to the President and Director of the Office of Administration. For this reason, we ask that they appear for a transcribed interview as we have requested. If they are unwilling to appear for this interview voluntarily, the Committee will subpoena their attendance at a hearing or deposition.

The final area of dispute involves the Committee's requests for drafts of the President's speech at the White House Correspondent's Dinner on May 1, 2004. In deference to your concerns, we will not pursue at this time access to drafts of the speech that the President himself reviewed. But we do ask that you make the other drafts available for a staff review by August 10 to determine whether their production is needed for the investigation. We hope you will find this to be an acceptable accommodation and avoid the need for the Committee to subpoena these documents.

We appreciate the productive discussions we have had with you and reiterate our desire to resolve disputes by mutual accommodation. We hope that the accommodations we are offering will make that possible in this instance.

Sincerely,

Henry A. Waxman
Chairman

Tom Davis
Ranking Minority Member

# EXHIBIT 2

BARBARA BOXER, CALIFORNIA, CHAIRMAN
JOHN CORNYN, TEXAS, VICE CHAIRMAN

MARK PRYOR, ARKANSAS          PAT ROBERTS, KANSAS
KEN SALAZAR, COLORADO         JOHNNY ISAKSON, GEORGIA

ROBERT L. WALKER, CHIEF COUNSEL AND STAFF DIRECTOR
ANNETTE GILLIS, DEPUTY STAFF DIRECTOR

TELEPHONE: (202) 224-2981
FACSIMILE: (202) 224-7416
TDD: (202) 228-3752

# United States Senate

SELECT COMMITTEE ON ETHICS
HART SENATE OFFICE BUILDING, ROOM 220
SECOND AND CONSTITUTION AVENUE, NE
WASHINGTON, DC 20510-6425

April 24, 2008

The Honorable Pete V. Domenici
United States Senate
Washington, DC 20510

## Public Letter of Qualified Admonition

Dear Senator Domenici:

In response to a complaint of improper conduct reflecting upon the United States Senate, the Select Committee on Ethics of the United States Senate issues this Public Letter of Qualified Admonition to you pursuant to Section 2(d)(3) of Senate Resolution 338, 88th Congress, 2nd Session (1964), as amended by Senate Resolution 222, 106th Cong., 1st Session (1999) and its Supplementary Procedural Rules, Rule 3(g)(2).

The Committee's action in this matter addresses your conduct in calling David C. Iglesias, then the United States Attorney for the District of New Mexico, in October 2006 to inquire about the timing of indictments in a pending New Mexico federal grand jury investigation into allegations of public corruption relating to the construction of the Bernalillo County courthouse.

The Committee finds no substantial evidence to determine that you attempted to improperly influence an ongoing investigation. The Committee does find that you should have known that a federal prosecutor receiving such a telephone call, coupled with an approaching election which may have turned on or been influenced by the prosecutor's actions in the corruption matter, created an appearance of impropriety that reflected unfavorably on the Senate.

In making this determination, the Committee relied on general guidance under Rule 43 to avoid communications with a federal agency on a matter in which it is "engaged in an on-going enforcement, investigative or other quasi-judicial proceeding" (*Senate Ethics Manual*, 2003 ed., page 179). The Committee also considered the well-known duty of prosecutors to ensure the fair and impartial administration of justice and the publicity at the time of your call about the

handling of public corruption matters as an issue in the close election contest in the First Congressional District of New Mexico.

On March 7, 2007, the Committee began its review of this matter. In the course of the preliminary inquiry the Committee deposed, obtained sworn affidavits from or interviewed numerous witnesses, including you, Mr. Iglesias, members of your Senate staff, current and former executive branch officials and attorneys, and other private individuals. The Committee reviewed extensive documents and records, obtained through subpoena, by voluntary production, or available in the public record. The Committee also considered several submissions made by you through, or made on your behalf by, your counsel.

In its inquiry into all the circumstances surrounding your October 2006 telephone call to Mr. Iglesias, the Committee considered a number of questions, concerns and factual issues which we do not discuss in this letter because, as previously stated, the evidentiary record did not provide sufficient support for any determination by the Committee beyond that expressed above. We do emphasize, however, that the Committee confined its inquiry to your October 2006 call to Mr. Iglesias, its context and consequences and related actions by you or your office. It was never a purpose of the Committee in this matter to inquire more broadly into actions that may have been taken by others with regard to other United States Attorneys in the fall of 2006.

The Committee specifically notes and took into consideration your March 2007 public statement wherein you stated that:

> I called Mr. Iglesias late last year. My call had been preceded by months of extensive media reports about acknowledged investigations into courthouse construction, including public comments from the FBI that it had completed its work months earlier, and a growing number of inquiries from constituents. I asked Mr. Iglesias if he could tell me what was going on in that investigation and give me an idea of what timeframe we were looking at. It was a very brief conversation, which concluded when I was told that the courthouse investigation would be continuing for a lengthy period.

> In retrospect, I regret making the call and I apologize. However, at no time in that conversation or any other conversation with Mr. Iglesias did I ever tell him what course of action I thought he should take on any legal matter. I have never pressured him nor threatened him in any way.

2

The Committee appreciates your candor.

With this Public Letter of Qualified Admonition, this matter is closed.

Sincerely,

Barbara Boxer
Chairman

John Cornyn
Vice Chairman

Mark Pryor, Member

Pat Roberts, Member

Sherrod Brown, Member

Johnny Isakson, Member

3

# EXHIBIT 3



**U.S. OFFICE OF SPECIAL COUNSEL**

*Memorandum*

**TO:**        Scott Bloch
                Special Counsel

**THRU:**      Jim Byrne
                Deputy Special Counsel

**FROM:**     The Task Force Advisors
                Lenny Dribinsky
                Ana Galindo-Marrone
                William Reukauf
              The Task Force Members
                Greg McClelland
                Matthew Spurlock
                Katie Nash
                Amber Vail

**DATE:**      January 18, 2008

**SUBJECT:**   Summary of Task Force Activities and Recommendations

---

The Office of Special Counsel's Special Task Force (TF) was created in May 2007 to pursue certain complex and high profile investigations, such as the firing of the U.S. Attorneys and the political presentations given by the White House Office of Political Affairs. Since its inception, the cases reviewed by the TF have grown substantially. Below is a summary of the TF's actions and recommendations.

## I. OFFICE OF POLITICAL AFFAIRS PRESENTATIONS:

During OSC's investigation into the Hatch Act complaint filed against General Services Administrator, Lurita Doan, (OSC File No. HA-07-1180) it was discovered that approximately twenty-five agencies had received briefings by the White House's Office of Political Affairs (OPA) similar to the presentation given to the General Services Administration. As a result, OSC opened a file to investigate what took place during these briefings and whether government resources had been used for the purpose of promoting or opposing a political party and/or partisan candidates.

Summary of Task Force Activities
January 18, 2008
Page 3

officials leading up to the election and request all grant awards for
election and non-election years. ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████ TF suggests that we interview
agency officials and then determine whether we need to request the grant
awards. Recommendation is denied by the Special Counsel.

- November 26, 2007: TF provides Deputy Special Counsel with draft 5.4
requests that the Special Counsel directed the TF to create. In preparing
the drafts, the TF suggests that the Special Counsel may want the emails
that were released to Congress by the RNC, not the White House.
- December 13, 2007: TF again recommends that OSC open up a separate
file for each agency with respect to the political briefings investigation.
The TF explains that each agency should be closed and informed of the
case closure once the investigation is complete. Recommendation is
denied.
- December 14, 2007: TF submits draft RNC letter and subpoena
requesting copies of documents the RNC has previously released to
Congress relating to the US Attorney Firings.
- January 16, 2008: Special Counsel returns the draft RNC letter and
subpoena to the TF. He directs that the RNC subpoena request emails on
ten new topics, i.e., all emails concerning grants, asset deployment.
- January 18, 2008: TF submits revised RNC letter and subpoena, which
incorporates the Special Counsel's most recent directive.

*Current Status:*
　　The Task Force is currently in the process of interviewing political appointees
from twenty-two different agencies who attended the political briefings and the asset
deployment meetings to ascertain what took place during these meetings. During the
interviews, the TF is inquiring into whether any agency resources have been used to
promote or oppose a political party or candidate for public office. This probe includes
inquiring into whether the agency directed resources, such as grant awards, to those
states or districts where elections were closely contested.

███████████████
　　We recommend that we only request grant award documents if evidence is
discovered during the interviews or from documents produced that indicates or raises a
question as to whether grant awards were somehow manipulated to promote or oppose
certain candidates or parties.

**II.   INVESTIGATION INTO THE US ATTORNEY FIRINGS**

Summary of Task Force Activities
January 18, 2008
Page 4

OSC received a complaint from David Iglesias alleging that his discharge may have violated the Hatch Act and may have been in violation of USERRA. As a result of the complaint filed by Iglesias, the TF was ordered to investigate the firings of all nine U.S. Attorneys (David Iglesias, Daniel Bogden, Paul Charlton, Bud Cummins, Carol Lam, John McKay, Margaret Chiara, Kevin Ryan and Todd Graves). Specifically, the TF is investigating whether individuals currently and formerly employed or holding office in the OPA and the Department of Justice (DOJ) violated the Hatch Act by engaging in activity related to the resignation of the nine US Attorneys listed above. In order to establish a Hatch Act violation, the TF would have to prove that an individual employed or holding office in an Executive Branch Agency used his/her official authority or influence for the purpose of affecting the results of an election.

- May 4, 2007: Special Counsel and Deputy Special Counsel meet with individuals at the Department of Justice, including officials from the Office of Legal Counsel to discuss OSC's investigation of the Iglesias complaint.
- May 8, 2007: The Special Counsel sends DOJ a letter stating OSC would not suspend its investigation relating to Iglesias.
- May 17, 2007: TF interviews Iglesias concerning his knowledge regarding his discharge. Specifically, the TF is seeking any evidence that any individual in the Executive Branch interfered or attempted to interfere with Iglesias or his office's processing of cases for the purpose of interfering with the 2006 elections.[1] Iglesias stated that no one in the Executive Branch of government attempted to interfere with or affect his office's handling of the voter fraud or public corruption cases.
- May 22, 2007: TF sends DOJ and the White House a preservation of documents request asking that documents concerning the dismissal of the US Attorneys be preserved.
- May 29, 2007: DOJ sends Special Counsel a letter again asking OSC to suspend its investigation until DOJ concludes its criminal investigation. DOJ also continues to question OSC's jurisdictional basis to investigate the dismissal of the US attorneys.
- June/July 2007: TF reviews over ten thousand documents that were released to the public concerning the firing of the U.S. Attorneys. The

---

[1] In October 2006 (prior to the 2006 midterm election) Senator Pete Domenici called Iglesias to ask about the progress of an investigation. Iglesias said he felt this inquiry was trying to "pressure" him to speed up indictments in a federal corruption investigation that involved at least one former Democratic state senator. When Iglesias said an indictment wouldn't be handed down until at least December, "the line went dead." Also in October, Representative Heather Wilson called about the indictments in a federal corruption investigation that involved at least one former Democratic state Senator. Iglesias, however, testified that no one in the Executive Branch questioned or tried to influence his handling of these cases.

Summary of Task Force Activities
January 18, 2008
Page 5

TF does not find any evidence of a Hatch Act violation in these documents and expresses concern about the lack of any evidence that there was a Hatch Act violation. Specifically, TF finds no evidence that anyone in the Executive Branch of government attempted to influence any of the fired U.S. Attorneys to take (or not take) some action to affect the result of the mid term elections.

- June/July 2007: TF watches Congressional hearings on the US Attorney firings.
- August 13, 2007: TF sends a 5.4 request for information to the Department of Justice requesting all information concerning the dismissal of the US Attorneys.
- September 13, 2007: DOJ's response to OSC's 5.4 is due.
- September 18, 2007: TF presents three possible courses of action to pursue in this matter: 1. issue subpoena to DOJ; 2. Immediately interview the rest of the US Attorneys; 3. allow TF to contact DOJ to discuss the 5.4 and OLC's concerns. The TF recommended the third course of action.
- October 3, 2007: TF again requests permission to reach out to DOJ to try and facilitate cooperation among our agencies. TF circulates draft subpoena for DOJ in the event the Special Counsel decides to pursue this option.
- October 9, 2007: TF is told that the Special Counsel is still considering whether to move forward with the subpoena or to try and negotiate with DOJ.
- October 17, 2007: TF is informed that the Special Counsel is entertaining the idea of allowing the TF to reach out and negotiate with DOJ.
- November 1, 2007: TF presents negotiation strategy based on the SMEAC model to advisors.
- November 9, 2007: A member of the TF contacted Paul Colborn, Special Counsel in DOJ's OLC, in an attempt to schedule meeting with OIG, OLC and OPR to discuss status of 5.4 request and negotiate cooperation from DOJ.
- November 10, 2007: TF Leader calls Colborn regarding this request.
- November 19, 2007: Letter sent to Mr. Colborn explaining in detail OSC's jurisdiction and requesting a meeting with DOJ in an attempt to come to an agreement as to how both agencies would be able to proceed with their parallel investigations.
- January 16, 2008: DOJ sends response to November 19, 2007, letter. DOJ again expresses concern that OSC's investigation could interfere with DOJ's criminal investigation into the same matters. DOJ states it is not in a position to respond to OSC's 5.4 request. They are willing to share appropriate portions of their report when their investigation is

Summary of Task Force Activities
January 18, 2008
Page 6

       complete.

*Current Status:*
       TF is awaiting further guidance as to how it should proceed.

**Recommendation:**

       Considering the TF has not found any evidence that anyone in the Executive Branch of government attempted to influence any of the nine US Attorneys to take some action to affect the result of an election, the TF recommends that OSC agree to stand down its investigation of the US Attorney Firings until the DOJ concludes its criminal investigation in exchange for DOJ's cooperation with other matters pending before the TF. After reviewing DOJ's final report concerning the firing of the U.S. Attorneys, the TF could re-evaluate whether there is any evidence of a Hatch Act violation with respect the dismissals of nine U.S. Attorneys.

### III. POLITICAL AFFILIATION HIRING PRACTICES AND PERSONNEL DECISIONS AT DOJ

       While investigating the above allegations concerning the US Attorney Firings, the TF watched all congressional hearings on the matter. Sworn testimony given before Congress by Monica Goodling and Bradley Schlozman indicates that certain officials at DOJ took into consideration political affiliation when determining whether to hire or promote certain individuals. In addition, Joe Rich, the former chief of the Voting Section of the Civil Rights Division, gave sworn testimony that he was ordered to change the performance standards of attorneys under his supervisor based on a person's political affiliations.

- August 20, 2007: TF submits memorandum recommending that this case be opened immediately and that the TF investigate whether individuals at DOJ committed any PPPs when they took political affiliation into consideration when hiring and making other personnel decisions. TF also presents draft of 5.4 request to be sent to DOJ concerning these allegations.
- August 29, 2007: TF is told that the Special Counsel has directed the TF not to open or investigate allegations concerning DOJ political hiring practices.
- August – September 2007: TF continues to request permission to investigate these allegations arguing the sworn testimony before Congress appears to establish a prima facie case of numerous PPPs.
- October 17, 2007: TF is told that Iglesias has heard that DOJ will issue a report before Thanksgiving on three different issues, including the allegedly politically motivated hiring practices in the Civil Rights Division at DOJ.